UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVED
SEP 2 4 2009
U.S.D.C. S.D. N.Y.
CASHIERS

---

BRUCE S. SHERMAN,

                    Plaintiff,

        v.

BEAR STEARNS COMPANIES INC., JAMES CAYNE,
WARREN SPECTOR and DELOITTE & TOUCHE LLP

                    Defendants.

---

COMPLAINT

**Index No.:**

Bruce S. Sherman ("Sherman" or "Plaintiff") alleges the following upon personal

knowledge as to himself and his own acts and upon information and belief as to all other matters:

## I.    PRELIMINARY STATEMENT

1.    In the spring of 2008, Bear Stearns Companies Inc. ("Bear") collapsed in one of

the most spectacular failures in U.S. business history.  At the time of the events in question,

Sherman purchased and owned shares of Bear stock.

2.    Sherman was at all relevant times Chief Executive Officer and Chief Investment

Officer of Private Capital Management, L.P. ("PCM").  Sherman had investment control over the

largest, longest-held block of Bear stock, approximately 5.9% of Bear's outstanding shares.

3.    This action arises out of a valuation fraud committed on Plaintiff by Defendants,

Bear, James Cayne ("Cayne"), Warren Spector ("Spector") and Deloitte & Touche LLP

("Deloitte") (collectively "Defendants").  Defendants fraudulently overstated the value of Bear's

mortgages, mortgage- and asset-backed securities and other derivative financial instruments

("Bear's assets"), the adequacy of its liquidity and capital reserves, and the quality of Bear's risk

management with the intent of inducing Plaintiff to retain his shares of Bear stock and to

purchase additional shares of Bear stock, which Plaintiff did.

 4. Defendants' material misrepresentations and omissions included, but were not

limited to, the following:

 a. Defendants Cayne and Spector repeatedly and directly assured Sherman that Bear's internal valuations of its assets were accurate when, in fact, they knew that Bear's valuations were materially inflated;

 b. Defendants Cayne and Spector directly assured Sherman that Bear's "book value" was accurate when, in fact, they knew this was false and misleading because the value of Bear's assets was materially inflated;

 c. Defendants Cayne and Spector intentionally and repeatedly materially overstated to Sherman the adequacy of Bear's capital reserves and its liquidity;

 d. In or about July 2007, Defendants Cayne and Spector told Sherman that the substantial overvaluation of mortgages, mortgage- and asset-backed securities and other derivative financial instruments owned by two failed Bear-managed hedge funds did not reflect a broader overvaluation of Bear's assets by Bear, which Cayne and Spector knew to be false and misleading;

 e. Defendants Bear, Cayne and Spector repeatedly materially misrepresented the value of Bear's assets as well as their valuation procedures in Bear's public financial statements;

 f. Defendants Cayne and Spector repeatedly assured Sherman that Bear's risk management strategies protected his investment in Bear from the growing housing crisis and that the risk management failures of two Bear-managed hedge funds did not reflect inadequacies in Bear's own risk management practices, which Cayne and Spector knew to be false; and

 g. Defendant Deloitte repeatedly falsely certified that Bear's false and misleading financial statements "present[ ] fairly, in all material respects, the information set forth therein."

5.      In fact, as the SEC found and revealed to the public, including Sherman, only after Bear's collapse:

- Bear used outdated, ten-year-old models to assign values to its mortgage-backed securities which it failed to review even after the SEC warned Bear about them;

- Bear failed to review, evaluate, or update its Value at Risk models, which were key to Bear's risk management; and

- Bear publicly reported values for its assets that were materially higher than those assigned by Bear's own risk managers and higher than Bear itself used for those same assets in transactions with counterparties.

6.      Defendants intended that Sherman rely on their misrepresentations and omissions, thereby causing Plaintiff to hold shares of Bear stock he would otherwise have sold months before Bear ultimately collapsed.

7.      Defendants sought to induce Sherman to retain his Bear stock and to purchase additional shares of Bear stock because, among other reasons, Defendants knew that the market and the financial press would view Sherman's sale of his Bear stock as a loss of confidence in Bear by a well known and long-standing investor.  This, in turn, would have undermined confidence in Bear's management at a critical time when Bear's liquidity and Bear's valuation of its assets were open to question following the implosion of two Bear-sponsored hedge funds in the summer of 2007.

8.      Defendants knew that Sherman would not purchase or retain shares of Bear stock over which he held investment control, including his own shares, if Defendants accurately and fairly described Bear's true financial condition and the quality of Bear's risk management.  For example, Defendants knew that if Sherman concluded that Bear's tangible book value was materially overstated due to Bear's overvaluation of its assets, he would sell all or a substantial

3

number of the shares of Bear stock over which he had investment control, including his own shares.

9.      Defendants successfully accomplished their dishonest purpose of fraudulently inducing Sherman to hold his shares of Bear stock and to purchase additional Bear shares until Bear's collapse in March of 2008.

10.     By virtue of the misrepresentations and omissions alleged in this Complaint, Defendants deceived the investing public regarding Bear's financial condition and the quality of Bear's risk management, thereby artificially inflating the price of Bear stock and causing Sherman to purchase Bear stock at inflated prices.

11.     The disclosure of the true value of Bear's assets and the insufficiency of Bear's liquidity and capital reserves resulted in Bear's ultimate collapse and the decline of Bear's stock price, thereby injuring Sherman.  On or about March 14, 2008, when Bear acknowledged that it lacked the liquidity to continue operating, and had admitted that its assets were worth nearly $2 billion less than Bear had previously represented, Bear's share price dropped nearly 95%. Between its Friday close and its Monday open on March 17, 2008, Bear shares fell to as low as $2.84 per share following the announcement by JPMorgan Chase & Co. ("JPMorgan") that it had reached an agreement to purchase Bear for two dollars per share.  Sherman sold PCM's clients' and then his personally held Bear shares on or about March 19, 2008 for less than six dollars per share. JPMorgan ultimately acquired Bear for ten dollars per share.

12.     Defendants' material misrepresentations and omissions caused Sherman substantial losses.  Plaintiff was injured by Defendants' misrepresentations and omissions, which fraudulently overstated the value of Bear's assets and concealed Bear's deterioration and

vulnerability to changing market circumstances. As and when these facts were disclosed, the value of Bear's stock fell dramatically, thereby injuring Plaintiff.

13.    By virtue of the material misrepresentations and omissions made to Sherman, Defendants are liable to Sherman under, *inter alia*, Sections 10(b), 18(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j, 78r and 78t, including Rule 10b-5 promulgated under § 10(b) by the Securities and Exchange Commission ("SEC") (17 C.F.R. 240.10b-5), and under, *inter alia,* the common law of the State of New York.

## II.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. §§ 1331, 1332 and 1367(a). The claims asserted herein arise under §§ 10(b), 18(a) and 20(a) of the Exchange Act, SEC Rule 10b-5 and the common law of the State of New York. There is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.    Venue is proper in this district under § 27 of the Exchange Act and 28 U.S.C. § 1391. Bear has offices in this district and many of the acts and transactions giving rise to the violations of law complained of occurred here.

16.    In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, telephone communications systems and facilities of the national securities markets.

## III.    PARTIES

17.    Plaintiff Bruce S. Sherman was at all relevant times the Chief Executive Officer and Chief Investment Officer of PCM. Sherman owned shares of Bear stock at least as early as

the beginning of 2007. On or about March 19, 2008, following his sales for clients, Sherman fully exited his Bear position through market sales of his holdings of Bear common stock. At all relevant times, Sherman acted in an individual capacity with respect to his personal shares. All of Sherman's personal shares were purchased and sold in accordance with PCM's employee trading policies, which apply to all PCM employees. He is a resident of the State of Florida.

18.     Defendant Bear Stearns Companies Inc., the successor to Bear Stearns & Company and Subsidiaries, was, from October 29, 1985 to June 2, 2008, a Delaware corporation with its principal place of business in the State of New York. On June 2, 2008, JPMorgan completed its acquisition of Bear, making Bear a wholly owned subsidiary of JPMorgan. Bear remains a Delaware corporation with its principal place of business in the State of New York.

19.     Defendant James Cayne was the Chief Executive Officer of Bear from 1993 until January 2008 and Chairman of the Board from 2001 until Bear's collapse in March 2008. He is a resident of the State of New York.

20.     Defendant Warren Spector was Co-President and Co-Chief Operating Officer of Bear from 2001 until August 2007. Spector resigned these positions in August 2007, but remained Senior Managing Director of Bear until December 28, 2007. He is a resident of the State of New York.

21.     Defendants Cayne and Spector (the "Individual Defendants"), because of their positions with Bear, possessed the power and authority to control the contents of Bear's SEC filings, reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. They were provided with copies of Bear's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

6

Because of their positions with Bear, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and the positive representations being made were then materially false and misleading. In the alternative, the Individual Defendants were reckless in causing Bear to make the misleading statements regarding Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, alleged in this Complaint.

22.     Deloitte & Touche LLP is a Delaware limited liability partnership and was, at all relevant times, the independent outside auditor for Bear and provided audit, audit-related, tax and other services to Bear. While the independent outside auditor for Bear, Deloitte issued unqualified opinions on Bear's financial statements for fiscal years 2006 and 2007. Deloitte consented to and caused the incorporation by reference of its unqualified opinions on Bear's financial statements for fiscal years 2006 and 2007.

## IV.    FACTUAL BACKGROUND

23.     At all relevant times, Sherman was Chief Executive Officer and Chief Investment Officer of PCM, a registered investment adviser that he founded in 1986.

24.     Sherman was, at all relevant times, the PCM portfolio manager with primary responsibility for the investment analysis and monitoring of, and purchase and sales decisions relating to Bear.

25.     Pursuant to PCM's employee trading restrictions, Sherman's purchases and sales of his personal Bear shares in general trailed the purchases or sales PCM made at Sherman's direction for PCM clients.

26.     Sherman's trades were based on a long-term investment approach that focused on identifying companies whose securities were trading at a significant discount to the company's intrinsic value.

27.     The company's tangible book value (*i.e.,* liquidation value) was an important factor in Sherman's analysis of the intrinsic value of a commercial bank, thrift (savings and loan) or investment bank such as Bear.

28.     Accordingly, a comparison of a financial company's tangible book value to the company's share price is an indication of the potential risk inherent in an investment in the company. All other things being equal, Sherman would view an investment in a financial company that trades at a low multiple of its tangible book value as having less risk than an investment in a competing company that trades at a higher multiple.

A.     **Plaintiff's Investment in Bear**

29.     Sherman was familiar with Bear since he first invested in it for PCM clients in 1993.

30.     From the late 1990s through the spring of 2007, Sherman was arguably Bear's most visible institutional investor. For example, from 2004 – 2007, PCM is listed in Bear's annual proxy statements as the company's largest beneficial owner of stock. In fact, between 2004 and 2006, PCM was the *only* outside beneficial owner of stock listed as having investment control over more than 5% of the company's outstanding shares.

31.     Sherman first invested personally in Bear in 2000 and at the beginning of 2007 owned approximately 30,000 shares.

32.     Sherman was widely associated with Bear, having on a number of occasions been singled out in the press as a significant Bear investor. In publications such as *Fortune* and *The*

8

*Wall Street Journal*, Sherman was variously described as the company's "largest shareholder," "an activist investor" and "a respected value investor."

33.     On several occasions, Bear executives requested that Sherman field calls from reporters who were researching stories on Bear.

34.     Because Sherman was a major, long-time investor in Bear, Sherman regularly communicated directly with Defendants through face-to-face meetings and telephone conversations.

35.     Bear's tangible book value was central to Sherman's view that the company's shares were significantly undervalued. Bear's tangible book value took on increasing importance in Sherman's evaluation of Bear when Bear experienced flat or declining revenues or increased uncertainty regarding its future revenue stream beginning in 2006.

36.     Unlike a private equity investor or company conducting due diligence for a potential acquisition, which is provided access to a company's internal books and its confidential correspondence with regulators, outside investors such as Sherman were not permitted by Bear to review Bear's proprietary valuation models or the valuations ("marks") Bear assigned to the financial assets on its balance sheet or non-public regulatory inquiries or examinations.

37.     Accordingly, as Defendants knew, in monitoring Bear's book value and conducting his ongoing diligence and investment analysis of the company, Sherman necessarily relied on Bear's publicly filed financial statements and on discussions with members of Bear's senior management, including Defendants Cayne and Spector as well as Bear CFO and later COO Sam Molinaro ("Molinaro"), regarding, among other things, Bear's liquidity and capital reserves, accounting policies and valuation procedures.

38.    Mortgages, mortgage- and asset-backed securities and other derivative financial instruments retained by Bear were a major component of Bear's book value.

39.    In its 2004 10-K, Bear reported that it held $27.679 billion in mortgages, mortgage- and asset-backed securities and $12.711 billion in other derivative financial instruments.

40.    In its 2005 10-K, Bear reported that it held $40.297 billion in mortgages, mortgage- and asset-backed securities and $12.957 billion in other derivative financial instruments.

41.    In its 2006 10-K, Bear reported that it held $43.226 billion in mortgages, mortgage- and asset-backed securities and $11.617 billion in other derivative financial instruments.

42.    In its 2007 10-K, Bear reported that it held $46.141 billion in mortgages, mortgage- and asset-backed securities and $19.725 billion in other derivative financial instruments.

43.    Accordingly, if these assets were materially overvalued by Bear, it would materially impact Bear's tangible book value and would materially impact Sherman's view as to whether Bear was misvalued by the market.

44.    To the extent Bear overstated the current market value of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments, as in fact happened, Bear's stock would in fact be trading at a lesser discount to the company's true intrinsic value. In this event, an investment in Bear stock would carry greater risk than the company's financial statements would indicate.

45.     Thus, the accuracy of Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments (*i.e.*, the "marks" Bear took) was very important to Sherman, especially as Bear's revenues declined beginning in the second half of 2006.

46.     By August 2006, it was clear that a significant downturn in the housing market was occurring. The median price of new homes dropped almost 3% in the first seven months of 2006; home inventories were near record highs; and sales were down more than 10%. The Dow Jones U.S. Home Construction Index was down over 40% as of mid-August 2006. The value of luxury home builder Toll Brothers' stock fell 50% between August 2005 and August 2006. Several home builders revised their forecasts sharply downward during the summer of 2006. For example, D.R. Horton cut its yearly earnings forecast by one-third in July 2006.

47.     Further, default rates on subprime mortgages were rising in or about the second half of 2006.

48.     Sherman became increasingly concerned about the effects on the share value of Bear stock of the downturn in the housing market and rising defaults on subprime mortgages.

49.     Sherman was focused on the effects on Bear of the downturn in the housing market and the rising defaults on subprime mortgages because of Bear's significant exposure to the U.S. residential mortgage market, including subprime mortgages.

**B.     Bear's Significant Exposure to the U.S. Residential Mortgage Market**

50.     Since at least as early as 1995, Bear was a major participant in the U.S. residential mortgage market. Bear was a leading originator and servicer of mortgages, including subprime mortgages. Bear was the largest U.S. underwriter of mortgage-backed securities in 2006 and the second largest in 2007, when it underwrote $83 billion in such securities. Bear further

11

established hedge funds that traded heavily in mortgage-backed securities, including those backed by subprime mortgages.

51.    Bear also securitized mortgages into mortgage-backed securities, including collateralized debt obligations and collateralized mortgage obligations, which it then sold to investors or warehoused for later sale.

52.    During 2007, Defendants acknowledged that Bear held as much as $57.5 billion in mortgages, mortgage- and asset-backed securities and other derivative financial instruments. Under Generally Accepted Accounting Principles ("GAAP"), the rules the SEC requires for financial reporting by publicly traded companies, such assets must be assigned a current market value – they must be "marked to market."

53.    The "mark-to-market" accounting under GAAP, which Bear was required to follow for reporting its balance sheet, was central to Sherman's inquiry, analysis and understanding of Bear's tangible book value.

54.    Defendants used internal valuation models to generate value estimates for its mortgages, mortgage- and asset-backed securities and other derivative financial instruments and then reported those estimates to the investing public in Bear's SEC filings.

**C.    Defendants' Material Misrepresentations and Omissions**

55.    Defendants claimed unique expertise in the mortgage-backed securities market. Bear's 2006 Annual Report, for example, states that Thomson Financial ranked Bear "No. 1" for "US Mortgage-Backed Securities, US Mortgage-Backed Securities-Residential, US Whole Loans, and US Adjustable Rate Mortgages." That annual report goes on to state: "Our vertically integrated mortgage franchise allows us access to every step of the mortgage process, including

origination, securitization, distribution and servicing." Defendants Spector and Cayne made similar representations highlighting their expertise directly to Sherman.

### 1. Misrepresentations and Omissions Regarding the Value of Bear's Assets at the Credit Suisse Financial Services Forum

56.     On or about February 9, 2007, Sherman attended the Credit Suisse Financial Services Forum in Naples, Florida. There, Sherman attended a presentation by Defendant Spector, Co-President and Co-Chief Operating Officer of Bear. The presentation was designed to review significant developments in the company's operations and markets and to reassure investors that Bear's exposure to subprime mortgages posed no danger to Bear shareholders.

57.     After Spector's presentation, Sherman and Spector spoke privately for nearly an hour. Sherman questioned Spector, *inter alia*, about Bear's subprime exposure, about how much of Bear's profitability was based on subprime mortgages, and about the valuation of Bear's portfolio of mortgages, mortgage- and asset-backed securities and other derivative financial instruments.

58.     Spector told Sherman that, as a result of its unique expertise in the mortgage market, Bear was in no danger from subprime mortgages. Spector reassured Sherman that Defendants understood the subprime mortgage market better than other financial institutions because of Bear's leading role as an originator and servicer of such mortgages.

59.     Spector further represented that as a result of its expertise, Bear had anticipated the deterioration in the subprime mortgage market and was conservatively managing its exposure to that market.

60.     Spector also assured Sherman of the accuracy of Bear's publicly disclosed balance sheet, including the values Bear had reported for its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments. Further, Spector told Sherman

that Bear's investment in mortgage-backed securities posed no risk to Bear's business and prospects because of Bear's superior understanding of the mortgage-backed securities market.

61.    In fact, Spector's representations on behalf of Bear were materially false and misleading when made.

62.    Spector knew, or was reckless in not knowing, that the SEC had warned Bear at least as early as 2005 that "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked." *See* December 2, 2005 memo from SEC to Jeffrey M. Farber, Bear's then Senior Managing Director and the Company's Controller and Principal Accounting Officer who reported directly to Bear Chief Financial Officer Sam Molinaro (cited in "SEC's Oversight of Bear Stearns and Related Entities:  The Consolidated Supervised Entity Program," U.S. Securities and Exchange Commission Office of Inspector General, September 25, 2008, ("2008 SEC Report", attached as Exhibit A) at 20.)  Spector also knew, or was reckless in not knowing, that Bear had not completed a review of its mortgage derivative valuation models since the 2005 SEC warning. 2008 SEC Report, Ex. A, at 23.  Further, Spector knew, or was reckless in not knowing, that Bear's models did not even incorporate measures to take into account declines in housing prices until "towards the end of 2007." *Id.* at 27.  Thus, Spector also knew, or was reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was based on seriously outdated and inaccurate models and that Bear had materially overstated the value of those assets.  The problems identified in the SEC's 2005 warning letter and the 2008 SEC Report were not available to the public, including Sherman, prior to Bear's collapse.

63.    Despite the fact that the SEC had warned Bear at least as early as 2005 that "[i]t was critically imperative for Bear Stearns' risk managers to review mortgage models because its primary business dealt with buying and selling mortgage-backed securities," Bear did not ever complete a review of its models valuing mortgage- and other asset-back securities, as Spector knew. 2008 SEC Report, Ex. A, at 20-23.

64.    As the SEC found: "the reviews of mortgage models that should have taken place before the subprime crisis erupted in February 2007 appears to have never occurred, in the sense that it was still a work in progress when Bear Stearns collapsed in March 2008." 2008 SEC Report, Ex. A, at 23.

65.    Spector also knew, but concealed from Sherman, that the hedges on Bear's mortgage-backed securities and other assets were inadequate and that Bear's own risk managers thought that these hedges were inadequate. 2008 SEC Report, Ex. A, 21-22.

66.    Because the SEC's 2005 warning letter to Bear was not made public, and because Bear maintained the strict confidentiality of its valuation models, Sherman did not have information available to him that would have alerted him to the falsity of Spector's statements.

67.    If Spector had revealed the truth about Bear's valuation of its mortgages, mortgage- and asset-backed securities and other derivative financial instruments, Sherman would have been able to accurately re-evaluate his view that Bear was materially undervalued by the market in light of the fact that a material portion of the financial assets reflected in Bear's financial statements were not being reflected at current market value, but were in fact overvalued.

68.    If Spector had revealed the truth about Bear's valuation of its mortgage-backed securities, Sherman would have sold all or a substantial number of the shares of Bear stock over which he exercised investment control, including his own shares.

69.    On February 9, 2007, when Sherman met with defendant Spector at the Credit Suisse forum, Bear stock closed at $159.73.

### 2.    Misrepresentations and Omissions Regarding Bear's Risk Management and the Value of Bear's Assets in Bear's 2006 10-K

70.    On February 13, 2007, Defendants released Bear's 2006 10-K for the fiscal year ending November 30, 2006.

71.    Bear stated that "review of pricing models" was part of Bear's effort "in ensuring the integrity and clarity of the daily profit and loss statements" because "a clear understanding of how its positions generate profit or loss on a daily basis is crucial to managing risk."  For example, Bear's 2006 10-K represented that in reviewing the models it used to value its mortgages, mortgage- and asset-backed securities and other derivative financial instruments, Bear had "compared its model-based valuations with counterparties in conjunction with collateral exchange agreements."

72.    This representation regarding Bear's comparison of its model-based valuations with its counterparties' was materially false and misleading when made.  Defendants knew, or were reckless in not knowing, that Bear did not use such comparisons to verify or correct its model-based valuations.  When Bear's comparison of its model-based valuations with counterparties showed that Bear's assets were worth less than what Bear represented, Bear continued to use the higher, model-based values in its representations to the public.

73.    Bear's 2006 10-K further represented that Bear's risk management procedures "begin with the Company marking its financial instruments owned to fair value on a daily

basis…" and purported to disclose the "fair value" of Bear's holdings and obligations regarding mortgages, mortgage- and asset-backed securities and other derivative financial instruments.

74.      These representations were materially false and misleading when made. Defendants knew, or were reckless in not knowing, among other things, that the SEC had confidentially warned Bear in 2005 that Bear was using "outdated models more than ten years old to value mortgage derivatives" and that these models had not been reviewed since the SEC warning. Further, Defendants knew, or were reckless in not knowing, that Bear's valuation models did not even incorporate measures to take declines in housing prices into account until "towards the end of 2007." 2008 SEC Report, Ex. A, at 27. Thus, Defendants knew, or were reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was not accurate and instead materially overvalued those assets.

75.      Further, in discussing Bear's "Value at Risk" ("VaR") models, a key element of Bear's risk management, Bear represented that it "regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."

76.      This representation was materially false and misleading when made. As the SEC found and as defendant Cayne knew, "Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models." Since Bear used outdated and inaccurate models to value its assets, Bear's "daily VaR amounts could have been based on obsolete data." 2008 SEC Report, Ex. A, at 20.

77.      Sherman read these materially false and misleading representations in Bear's 2006 10-K, consistent with his practice of reading all of Bear's Form 10-K and 10-Q filings, and relied on these materially false and misleading representations in his analysis of Bear and in

deciding whether he should retain his shares of Bear stock, purchase additional shares of Bear

stock, or sell his shares of Bear stock. In fact, Sherman retained his shares of Bear stock and

purchased thousands of additional shares in reliance these misrepresentations and omissions.

3.    **Misrepresentations and Omissions Regarding Bear's Book Value, the Adequacy of Bear's Liquidity and Capital Reserves, the Value of Bear's Assets, Bear's Financial Condition and Bear's Risk Management Following the Collapse of Bear's Hedge Funds**

78.    Bear created at least two highly leveraged hedge funds that invested heavily in

subprime mortgage-backed securities: The High-Grade Structured Credit Strategies Fund (the

"Structured Credit Fund") in or about 2004 and the High-Grade Structured Credit Strategies

Enhanced Leverage Fund (the "Enhanced Leverage Fund") in or about 2006 (together, the "Bear

Hedge Funds" or "the Funds").

79.    The Funds overvalued their mortgages, mortgage- and asset-backed securities and

other derivative financial instruments. As a result, in or about the spring and summer of 2007,

the Bear Hedge Funds began to report heavy losses.

80.    By April 2007, the Bear Hedge Funds' managers could no longer conceal the

Hedge Funds' liquidity problems and turned to Bear for urgently needed financing. Bear

analyzed the Funds' problems and entered into a bridge "repo loan" of approximately $290

million with the Enhanced Leverage Fund to help it temporarily address its expanding liquidity

problems.

81.    On or about May 15, 2007, Bear announced that the Enhanced Leverage Fund had

lost 6.5% in April 2007. Just three weeks later, Bear restated these losses to 19% in April and

23% for the year.

82.    Sherman was concerned by what he had learned from reports about the Bear

Hedge Funds' problems. On or about July 3, 2007, Sherman had a phone conversation with

Defendants Cayne and Spector about these developments and the extent of the danger they posed to Bear.

83.     Among other concerns, Sherman was concerned that if the Bear Hedge Funds' overvalued mortgages, mortgage- and asset-backed securities and other derivative financial instruments had been purchased from Bear, Bear's own portfolio of mortgages, mortgage- and asset-backed securities and other derivative financial instruments was also overvalued. Sherman therefore asked Cayne and Spector whether the Bear Hedge Funds' mortgages, mortgage- and asset-backed securities and other derivative financial instruments were overvalued and if the Funds had purchased them from Bear.

84.     In response, defendants Cayne and Spector initially denied that Bear had sold mortgages, mortgage- and asset-backed securities or other derivative financial instruments to the Bear Hedge Funds. Soon after, however, Cayne and Spector conceded to Sherman that Bear had in fact sold such assets to the Funds, but only during the first two months of their existence on a limited basis. Cayne also assured Sherman that Bear's and the Bear Hedge Funds' mortgages, mortgage- and asset-backed securities and other derivative financial instruments were properly valued.

85.     Cayne's and Spector's statements were false and misleading when made. In fact, Bear sold mortgage-backed securities which were materially overvalued both by Bear and by the Bear Hedge Funds to each of the Funds over the course of at least a year.

86.     Cayne and Spector knew, but concealed from Sherman, that Bear materially over-valued its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments.

19

87.    Cayne and Spector knew, but concealed from Sherman, that Bear assigned values to and reported values for its assets on the basis of seriously outdated and inaccurate models. Bear Stearns' head of model validation resigned in or around March 2007, "precisely when the subprime crisis was beginning to hit and the first large write-downs were being taken. At exactly this point in time, Bear Stearns had a tremendous need to rethink its mortgage models and lacked key senior risk modelers to engage in this process. As a result, mortgage modeling by risk managers floundered for many months." SEC Report, Ex. A, at 22-23. As a result, the models Bear was using to value its mortgage-backed securities had still not been reviewed by Bear's risk managers even though, as the SEC recognized, that review "should have taken place before the subprime crisis erupted in February 2007." SEC Report, Ex. A, at 23.

88.    During the July 3, 2007 phone conversation, defendants Cayne and Spector also represented to Sherman that Bear did not need to raise additional capital. Cayne rhetorically asked Sherman, "Why would I sell stock at this price?" The price per share of Bear stock, Cayne represented, was far too low given the book value of the company. Bear stock closed that day at $143.89 per share – nearly 30 times the price it would fall to after Bear's collapse less than ten months later.

89.    In fact, as Cayne and Spector knew, Defendants overstated Bear's capital reserves. For example, "Since Bear Stearns bore all downside risks, sound risk management (consistent with Basel II) requires that the impact on Bear Stearns' capital associated with the[] repos [Bear entered into with the Funds] should have been at least as great as the impact Bear Stearns would incur if it held the assets in its own trading book at the end of June 2007." 2008 SEC Report, Ex. A, at 31. In fact, however, "the capital charge incurred by Bear Stearns at the end of June 2007 was far less than the capital charge consistent with sound risk management."

*Id.* This improper accounting "allowed Bear Stearns to delay taking a huge hit to its capital." *Id.* at 31-32.

90.     Despite Cayne and Spector's repeated misrepresentations to Sherman that Bear did not need to raise additional capital, Bear secretly pursued at least six deals to raise billions of dollars in additional capital starting in the summer of 2007, including potential deals with the leveraged-buyout firm Kohlberg Kravis Roberts & Co., financier J. Christopher Flowers, and Allianz SE's Pacific Investment Management Co.

91.     During this same conversation, defendants Cayne and Spector assured Sherman that Bears' risk management procedures were excellent, and that the failure of the Bear Hedge Funds did not reflect on Bears' own risk management practices.   Rather, Cayne and Spector falsely told Sherman, the Bear Hedge Funds collapsed because they had failed to employ the same risk management practices that Bear used.

92.     In fact, as Defendants knew, these statements were materially false and misleading when made, as set forth above (at, for example, ¶ 87) and below (at, for example, ¶¶ 104-05).

93.     In reliance on Defendants' misrepresentations and omissions during the July 3, 2007 phone conversation and earlier, similar misrepresentations and omissions, Sherman purchased approximately 60,000 shares of Bear stock in the weeks following the July 3, 2007 phone conversation.

94.     If Defendants Cayne and Spector had revealed the truth about Bear's capital reserves and the extent to which the overvaluation of the Bear Hedge Funds' assets reflected an overvaluation of the mortgages, mortgage- and asset-backed securities and other derivative financial instruments that Bear retained on its own books, and the deficiencies in Bear's

21

valuation of these assets, Sherman could and would have determined that the actual current

market value of Bear's assets meant that Bear stock was trading at a higher multiple of tangible

book value than was reflected by Bear's public financial statements. Sherman would have relied

on the results of this evaluation in deciding whether he should retain his shares of Bear stock,

purchase additional shares of Bear stock, or sell his shares of Bear stock. Cayne's and Spector's

material misrepresentations and omissions on behalf of Bear denied Sherman a fair opportunity

to investigate and evaluate Bear's true condition.

95.    In reliance on Spector's and Cayne's statements that Bear stock was trading at or

below Bear's tangible book value (and their assurances regarding Bear's tangible book value and

Bear's valuations of its retained financial assets that confirmed those statements), Sherman

retained his shares of Bear stock and purchased thousands of additional shares of Bear stock.

96.    If Cayne or Spector had revealed the truth about Bear's book value, capital

reserves, and the value of Bear's retained financial assets, Sherman would have sold all or a

substantial number of the shares of Bear stock over which he exercised investment control,

including his own shares.

97.    On July 10, 2007, Bear filed its Form 10-Q for the second quarter of 2007.

98.    Bear's 2Q 2007 10-Q contained a certification from defendant Cayne in which

Cayne certifies, *inter alia*:

> 1.  I have reviewed this quarterly report on Form 10-Q of The Bear Stearns
> Companies Inc.;
>
> 2.  Based on my knowledge, this report does not contain any untrue statement of
> a material fact or omit to state a material fact necessary to make the statements
> made, in light of the circumstances under which such statements were made, not
> misleading with respect to the period covered by this report;
>
> 3.  Based on my knowledge, the financial statements, and other financial
> information included in this report, fairly present in all material respects the

22

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

99.    In this filing, Bear again misrepresented Bear's use of Value at Risk models, stating that it "regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."

100.    This representation was materially false and misleading when made. As the SEC found in examination results not made public until after Bear's collapse and as Defendants knew, "Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models .... Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked. As a result, Bear Stearns' daily VaR amounts could have been based on obsolete data." 2008 SEC Report, Ex. A, at 20.

101.    In an August 2007 meeting between Sherman and Vincent Tese ("Tese"), an independent director of Bear, Tese assured Sherman that Bear's own internal risk-management practices were very good and far superior to those employed at the Bear Hedge Funds, and that the Funds collapsed because of their failure to employ these same practices.

102.    Tese's representations to Sherman thus repeated Cayne's and Spector's reassurances to Sherman regarding risk management made during the July 3, 2007 phone call.

103.    In fact, however, as Tese and defendants Cayne and Spector knew, the risk management system at Bear was fundamentally deficient.

104.    As the SEC has found and as Tese and defendants Cayne and Spector knew, the "risk management of mortgages at Bear Stearns had numerous shortcomings, including lack of expertise by risk managers in mortgage-backed securities at various times; lack of timely formal review of mortgage models; persistent understaffing; a proximity of risk managers to traders

23

suggesting a lack of independence; turnover of key personnel during times of crisis; and an inability or unwillingness to update models to reflect changing circumstances." 2008 SEC Report, Ex. A, at 23.

105.    The SEC also found that "this disarray in risk management [at Bear] tended to give trading desks more power over risk managers." As a result, the risk managers had difficulty communicating with senior managers and difficulty "telling the traders to take on less risk than they would otherwise choose to do (*i.e.,* information that the traders would presumably not want to hear)." 2008 SEC Report, Ex. A, at 23. As a result, Bear's traders took on risky mortgage-backed securities beyond the level recommended by Bear's risk managers.

106.    On August 5, 2007, Bear Stearns announced that, "effective immediately, Alan D. Schwartz has been named the company's sole president, and Samuel L. Molinaro, Jr. will become chief operating officer in addition to his current duties as chief financial officer. Jeffrey Mayer, co-head of the Fixed Income Division, has been named to the Bear Stearns Executive Committee. Warren J. Spector has resigned his positions of president and co-chief operating officer, member of the Executive Committee and member of the Board of Directors of Bear Stearns."

107.    Defendant Spector had been Bear's leading expert in valuing and trading mortgages, mortgage- and asset-backed securities and other derivative financial instruments.

108.    In the wake of the Bear Hedge Funds' collapse and the forced resignation of Co-President Spector, Bear sought to reassure the investing public. In August 2007, Bear issued talking points to broker-dealers designed to allay investors' concerns. These talking points provided, *inter alia*:

> • "Bear Stearns' operating performance, financial condition, balance sheet and capital base remain strong.

- The Firm's liquidity position, capital adequacy and funding capacity remains extremely solid notwithstanding the current difficult market conditions.

- The Firm continues to have ample liquidity to support our full range of business activities."

109.    These talking points substantially repeated representations made by Defendant

Cayne to Sherman during their July 3, 2007 phone call and by Bear's independent director Tese

to Sherman during their August 2007 meeting.

110.    Bear also issued a press release entitled "Bear Stearns Responds to S&P Action,"

stating in part (emphasis added):

> The Bear Stearns Companies Inc. said today that it is disappointed with S&P's decision to change its outlook on Bear Stearns. Most of the themes highlighted in its report are common to the industry and are not likely to have a disproportional impact on Bear Stearns. S&P's specific concerns over issues relating to certain hedge funds managed by BSAM are unwarranted as these were isolated incidences and are by no means an indication of broader issues at Bear Stearns.
>
> S&P's action highlights the concerns in the marketplace over the recent instability in the fixed income environment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Contrary to rumors in the marketplace, our franchise is profitable and healthy and our balance sheet is strong and liquid. Bear Stearns has thrived throughout both tumultuous and fortuitous markets for the past 84 years. We are experiencing another market cycle and we are confident in Bear Stearns' ability to succeed in this environment as it has in so many others.
>
> With respect to operating performance and financial condition, the company has been solidly profitable in the first two months of the quarter, while **the balance sheet, capital base and liquidity profile have never been stronger.** Bear Stearns' risk exposures to high profile sectors are moderate and well-controlled. The risk management infrastructure and processes remain conservative and consistent with past practices. This structure and strong risk management culture has allowed the firm to operate for all of its history as a public company without ever having an unprofitable quarter.

111.    These representations in Bear's talking points and press release were materially false and misleading when made. In fact, Bear was reporting materially inflated values in its financial statements for its mortgages, mortgage- and asset-backed securities and other derivative financial instruments and Bear's liquidity and capital reserves were inadequate in light of market conditions.

4.    **Misrepresentations and Omissions Regarding Bear's Book Value, the Adequacy of Bear's Liquidity and Capital Reserves, the Value of Bear's Assets and Bear's Financial Condition at Bear's "Investor Day."**

112.    On or about October 4, 2007, Bear hosted an "Investor Day" conference intended to review Bear's recent operating results with investors and apprise them of significant developments in the company's operations and markets and to reassure investors regarding the fixed-income segment of Bear, which handled Bear's business in mortgage-backed securities.

113.    During Bear's presentations, defendant Cayne, along with Schwartz and Molinaro reassured investors on behalf of Bear regarding the risk to Bear from its subprime exposure and the adequacy of Bear's capital, its financial condition and the value of its retained financial assets.

114.    For example, in his presentation, Molinaro touted Bear's "[r]educed risk," "enhanced liquidity" and "[m]aterially increased cash liquidity pool" and claimed Bear's "Liquidity Profile Remains Strong."

115.    These claims were materially false and misleading when made. As Schwartz, Molinaro and defendant Cayne knew, Bear's liquidity and capital reserves were insufficient given market conditions, placing Bear at risk.

116.    Molinaro also told investors that "[a]ll assets are marked to market" with "[a]sset values verified by risk/controllers."

117.    In fact, these claims were materially false and misleading when made. Bear had reported materially higher values for its mortgages, mortgage- and asset-backed securities and other derivative financial instruments than they were assigned by its risk managers or would realize in open market sales.

118.    Sherman attended this presentation and afterwards met with Cayne, Schwartz and Molinaro.

119.    Prompted by his concerns over Bear's potential exposure to the problems in the housing market, Sherman questioned Cayne, Schwartz and Molinaro about the effect of the housing market on Bear's business.

120.    Cayne and Molinaro assured Sherman that Bear's valuations of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments were accurate, that Bear's book value was properly stated, and that Bear had adequate capital reserves.

121.    Cayne and Molinaro knew that these representations were materially false and misleading and made them in order induce Sherman, among Bear's most significant institutional investors, to retain his shares of Bear stock.

122.    Cayne told Sherman that, unlike other firms, Bear was protected from the mortgage crisis by its unique expertise as a result of being a leading mortgage originator and servicer.

123.    If Cayne, Schwartz and Molinaro had reported fairly and accurately the facts about Bear's valuation of its assets and the sufficiency of its capital reserves, Sherman would have investigated and formed a more accurate understanding of Bear's book value. Sherman would have relied on the results of this investigation in deciding whether he should retain his shares of Bear stock, purchase additional shares of Bear stock, or sell his shares of Bear stock.

Cayne's, Schwartz's and Molinaro's material misrepresentations and omissions denied Sherman the opportunity to investigate Bear's problems.

124.    If Cayne, Schwartz and Molinaro had reported fairly and accurately the facts about Bear's valuation of its assets and the sufficiency of its capital reserves, Sherman would have sold all or a substantial number of shares of Bear stock over which he exercised investment control, including his own shares.

125.    On October 4, 2007, when Cayne, Schwartz and Molinaro made these material misrepresentations and omissions on behalf of Bear, Bear stock closed at $127.61 per share.

126.    In reliance on the misrepresentations and omissions made during Bear's Investor Day conference and Sherman's meeting with Cayne, Schwartz and Molinaro as well as earlier, similar misrepresentations and omissions, Sherman retained his shares of Bear stock and in the days following the Investor Day conference Sherman purchased approximately 10,000 shares of Bear stock.

127.    On October 10, 2007, Bear filed its Form 10-Q for the third quarter of 2007.

128.    This public filing contained a certification from defendant Cayne in which Cayne certifies, *inter alia*:

> 1. I have reviewed this quarterly report on Form 10-Q of The Bear Stearns Companies Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

129.    In its third-quarter 2007 10-Q, Bear again misrepresented Bear's use of Value at Risk models, stating that it "regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."

130.    This representation was materially false and misleading when made.  As the SEC found in examination results not made public until after Bear's collapse and as Defendants knew, "Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models ....  Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked.  As a result, Bear Stearns' daily VaR amounts could have been based on obsolete data."  2008 SEC Report, Ex. A, at 20.

131.    In its 3Q 2007 10-Q, Bear materially overvalued its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments when it reported that the current market value of its mortgages, mortgage- and asset-backed securities as $55.936 billion and the current market value of its other derivative financial instruments as $14.688 billion.

132.    Sherman read these materially false and misleading representations in Bear's third quarter 2007 10-Q, consistent with his practice of reading all of Bear's Form 10-K and 10-Q filings, and relied on these materially false and misleading representations in his analysis of Bear and in deciding whether he should retain his shares of Bear stock, purchase additional shares of Bear stock, or sell his shares of Bear stock.  Sherman in fact retained his shares of Bear stock in reliance on Bear's misrepresentations and omissions.

5.   **Misrepresentations and Omissions Regarding Bear's Risk Management and the Value of Bear's Assets in Bear's 2007 10-K**

133.   On January 29, 2008, Bear filed its Form 10-K, certified by Schwartz and Molinaro, for fiscal year 2007.

134.   In this filing, Bear again misrepresented its use of Value at Risk models, stating that it "regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."

135.   This representation was materially false and misleading when made. As the SEC found and disclosed to the public after Bear's collapse and as Defendants knew at the time, "Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models .... Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked. As a result, Bear Stearns' daily VaR amounts could have been based on obsolete data." 2008 SEC Report, Ex. A, at 20.

136.   Bear reported higher values for its assets in its SEC filings than it agreed those same assets were worth in agreements with counterparties.

137.   Bear touted in its 2007 10-K that in order to gain "a clear understanding of how its positions generate profit or loss" and thus to appropriately manage risk, Bear "compare[d] its model-based valuations with counterparties in conjunction with collateral exchange agreements."

138.   This representation regarding Bear's comparison of its model-based valuations with its counterparties' was materially false and misleading when made. Bear did not use such comparisons to verify or correct its model-based valuations. When Bear's comparison of its model-based valuations with counterparties showed that Bear's assets were worth less than Bear

represented, Bear continued to use the higher model-based values in its representations to the public.

139.    Bear used its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments as collateral for secured financing, principally in the form of repurchase (or "repo") agreements.

140.    A "mark dispute" can arise when parties to a repo agreement disagree about the value of the collateral. If a lender believes that the posted collateral has lost value, it can demand additional collateral or a return of part or all of the money loaned.

141.    As the SEC found and disclosed to the public after Bear's collapse and as Schwartz and Molinaro knew or were reckless in not knowing at the time, mark disputes between Bear and its counterparties became more common beginning in the summer of 2007.  2008 SEC Report, Ex. A, at 27-28.

142.    In July of 2007, Bear told the SEC that there were two large dealers with whom it had mark disputes in excess of $100 million each. This information was not disclosed to Sherman despite his direct inquiries to Cayne and Spector about Bear's risk control and marks during the summer of 2007.

143.    Because Bear's assets were overvalued, Bear was often forced to accept its counterparties' lower valuation of the posted collateral and settle these mark disputes by paying money to its counterparties.

144.    Bear nevertheless concealed this drop in the value of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments from the investing public. Rather than record the collateral assets at the lower value which Bear acknowledged in its settlements with counterparties, "Bear Stearns tended to use [its own]

31

traders' more generous marks for profit and loss" as reported in Bear's SEC filings. 2008 SEC Report, Ex. A, at 27-28.

145.    In its 2007 10-K, Bear materially overvalued its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments when it reported that the current market value of its mortgages, mortgage- and asset-backed securities as $46.141 billion and the current market value of its other derivative financial instruments as $19.725 billion.

146.    Sherman read these materially false and misleading representations in Bear's 2007 10-K, consistent with his practice of reading all of Bear's Form 10-K and 10-Q filings, and relied on these materially false and misleading representations in his analysis of Bear and in deciding whether he should retain his shares of Bear stock, purchase additional shares of Bear stock, or sell his shares of Bear stock. In fact, Sherman retained his shares of Bear stock and purchased approximately 70,000 additional shares in reliance these misrepresentations and omissions.

### 6.    Deloitte's Materially False and Misleading Assurances of the Accuracy of Bear's Financial Statements

147.    In connection with the Company Form 10-K for fiscal year 2007, Deloitte stated:

> We have audited the consolidated financial statements of The Bear Stearns Companies Inc. and subsidiaries (the "Company") as of November 30, 2007 and 2006, and for each of the three years in the period ended November 30, 2007, and the Company's internal control over financial reporting as of November 30, 2007, and have issued our reports thereon dated January 28, 2008 (such report on the consolidated financial statements expresses an unqualified opinion and includes an explanatory paragraph relating to the adoption of Statement of Financial Accounting Standards ("SFAS") No. 155, "Accounting for Certain Hybrid Instruments, an amendment of FASB Statements No. 133 and 140" and SFAS No. 157, "Fair Value Measurements"); such consolidated financial statements and reports are included in your 2007 Annual Report to Stockholders and are incorporated herein by reference. Our audits also included the financial statement schedule (Schedule I) of The Bear Stearns Companies Inc. (Parent Company Only), listed in Item 15. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on

our audits. **In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.**

(emphasis added).

148.    Deloitte caused this same unqualified opinion to be incorporated in Bear's 2006 10-K and in each of Bear's 2007 Form 10-Q filings.

149.    Deloitte's representation that "such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein" in its certified opinion in Bear's 2006 and 2007 Form 10-K filings and incorporated in each of Bear's 2007 Form 10-Q filings was materially false and misleading when made. As set forth above, Bear materially overvalued its assets and overstated its liquidity and capital reserves.

150.    Deloitte knew, or should have known, that potential investors were relying on Deloitte's opinion and Bear's public financial statements.

151.    Indeed, Sherman read these materially false and misleading representations by Deloitte in Bear's 2006 and 2007 Form 10-K filings, as well as in each of Bear's 2007 Form 10-Q filings, consistent with his practice of reading all of Bear's Form 10-K and 10-Q filings, and relied on these materially false and misleading representations in his analysis of Bear and in deciding whether he should retain his shares of Bear stock, purchase additional shares of Bear stock, or sell his shares of Bear stock. In fact, Sherman retained his shares of Bear stock and purchased approximately 70,000 additional shares in reliance on these misrepresentations and omissions.

152.    Despite Defendants' knowledge that Bear needed and was desperately seeking a capital infusion, Molinaro gave a presentation on behalf of Bear to Sherman and other investors

at the Credit Suisse Financial Services Forum on or about February 8, 2008, in which he continued to misrepresent Bear's financial condition. In this presentation, Molinaro claimed that Bear's "Capital position is strong," that Bear has a "Strong and Growing Capital Base," an "Enhanced liquidity profile," and "improved" balance sheet liquidity. According to Molinaro's presentation, the "fundamental strength" of Bear "remains intact."

153.    On February 8, 2008, when Molinaro made these material misrepresentations and omissions on behalf of Bear, Bear stock closed at $80.67 per share. Bear collapsed five weeks later.

**D.    The Collapse of Bear**

154.    On March 10, 2008, Bear issued a press release claiming that there was "absolutely no truth to the rumors of liquidity problems" at Bear and quoting Bear CEO Schwartz as stating that Bear's "balance sheet, liquidity, and capital remain strong."

155.    These statements were materially false and misleading when made, as was made clear, for example, on or about March 13, 2008, when Bear's Treasurer, Robert Upton, informed Molinaro and Schwartz that Bear had nearly exhausted its cash reserves.

156.    That weekend, JPMorgan executives studied Bear's books, especially Bear's mortgage book, and found Bear's exposure to risk-weighted assets – those most likely to go bad – to be close to $220 billion, about $100 billion more than Defendants had represented. As a result, JPMorgan offered just $2 per share for Bear, which Bear's Board of Directors had little choice but to accept.

157.    Such a low price for Bear was inconsistent with Defendants' repeated reassurances to Sherman about Bear's risk management and financial condition, including the

34

value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, and the value of Bear's assets.

**E.      Plaintiff's Damages**

158.    On or about March 19, 2008, following his sales of shares for PCM clients, Sherman sold all of his shares of Bear stock for less than six dollars per share, thereby suffering substantial losses.

## ADDITIONAL SCIENTER ALLEGATIONS

159.    As alleged herein, each of the Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in Bear's name were materially false and misleading when made, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities law and common law of the State of New York.

160.    Defendants Cayne and Spector each had the opportunity to commit and participate in the wrongful conduct complained of herein.  Each was a senior executive officer and/or director of Bear and thus controlled the information disseminated to the investing public in Bear's press releases, SEC filings and communications with analysts and investors, including the information communicated directly to Sherman.  As a result, each could falsify the information that reached the public about Bear's business and performance.

**James E. Cayne**

161.    As Chairman of the Board and Chief Executive Officer of Bear, Defendant Cayne

participated in the issuance of, signed and certified Bear's materially false and misleading SEC

filings, as required by Sarbanes-Oxley, issued through the relevant period.

162.    Specifically, in connection with Bear's 2006 10-K and Bear's 10-Q for each

quarter of 2007, Cayne certified that he had put in place disclosure controls and procedures to

ensure the accuracy of Bear's filings, and that he had:

> Designed such disclosure controls and procedures, or caused such disclosure
> controls and procedures to be designed under our supervision, to ensure that
> material information relating to the registrant, including its consolidated
> subsidiaries, is made known to us by others with in those entities, particularly
> during the period in which this report is being prepared[.]

163.    Also in connection with Bear's Form 10-K for 2006 and 2007 and the Form 10-Q

for all quarters of 2007 and the first quarter of 2008, Cayne certified that he had:

> Designed such internal control over financial reporting, or caused such internal
> control over financial reporting to be designed under our supervision, to provide
> reasonable assurance regarding the reliability of financial reporting and the
> preparation of financial statements for external purposes in accordance with
> generally accepted accounting principles[.]

164.    These disclosure controls, together with his position as Bear's CEO, meant that

throughout the relevant period Cayne was aware that the Bear had been warned by the SEC that

Bear's mortgage valuation models failed to reflect key indicators in the housing market.

165.    Cayne knew, or was reckless in not knowing, the SEC had warned Bear at least as

early as December 2005 that "Bear Stearns used outdated models that were more than ten years

old to value mortgage derivatives and had limited documentation on how the models worked."

2008 SEC Report, Ex. A, at 20.

166.    Cayne knew, or was reckless in not knowing, that Bear's valuation models were not reviewed since the SEC's warning in 2005. 2008 SEC Report, Ex. A, at 23. Further, Cayne knew, or was reckless in not knowing, that Bear's valuation models did not even incorporate measures to take into account declines in housing prices until "towards the end of 2007." *Id.* at 27.

167.    Accordingly, Cayne knew, or was reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was based on outdated and inaccurate models and that Bear had materially overvalued those assets.

168.    Since Cayne knew that the adequacy of Bear's liquidity and capital reserves depended on the value of Bear's assets, Cayne had access to information showing and he knew, or was reckless in not knowing, that Defendants' statements regarding Bear's liquidity and capital reserves were materially inaccurate.

169.    Cayne also knew of Bear's stated reliance on GAAP accounting but ignored or recklessly disregarded GAAP accounting requirements. For example, Cayne was aware of the FAS 157 requirement to accurately mark values to their market prices, and was further aware that Bear was not in compliance because it had used flawed and outdated and inaccurate models which rendered Bear's financial statements false and misleading. Likewise, Cayne was aware that, given Bear's material overstatement of the value of its assets and Bear's tremendous leverage, Bear's capital cushion was inadequate in the event that creditors made margin calls caused by declining asset values.

170.    Defendant Cayne was motivated during the relevant period to misrepresent the public material facts about Bear's risk management and true financial condition, including the

value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, in order to keep the stock price artificially high while he sold his own shares at a profit.

171. Notwithstanding Defendant Cayne's duty not to sell Bear common stock under these circumstances, or to disclose his non-public, inside information prior to selling his stock, Defendant Cayne sold Bear stock during the relevant period at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

172. During the relevant period, Cayne sold more than 219,000 shares of Bear stock at prices artificially inflated by Defendants' misrepresentations and omissions described herein, resulting in proceeds to Cayne of over $23 million.

173. Alternatively, Cayne made his materially false and misleading statements and omissions through negligence.

**Warren Spector**

174. As Co-President and Co-Chief Operating Officer of Bear, Defendant Spector participated in the issuance of Bear's materially false and misleading SEC filings issued through the relevant period and signed Bear's 2006 10-K.

175. During his tenure as Co-President and Co-Chief Operating Officer, all divisions of Bear except investment banking reported to Spector, including Bear's mortgage business and the Bear Hedge Funds. Spector was Bear's leading expert in valuing and trading mortgages, mortgage- and asset-backed securities and other derivative financial instruments.

176. Spector knew, or was reckless in not knowing, that the SEC had warned Bear at least as early as December 2005 that "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked." 2008 SEC Report, Ex. A, at 20.

38

177.    Spector knew, or was reckless in not knowing, that Bear's valuation models were not reviewed since the SEC's warning in 2005. 2008 SEC Report, Ex. A, at 23. Further, Spector knew, or was reckless in not knowing, that Bear's valuation models did not even incorporate measures to take into account declines in housing prices until "towards the end of 2007." *Id.* at 27.

178.    Accordingly, Spector knew, or was reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was based on outdated and inaccurate models and that Bear had materially overvalued those assets.

179.    Since Spector knew that the adequacy of Bear's liquidity and capital reserves depended on the value of Bear's assets, Spector had access to information showing and he knew, or was reckless in not knowing, that Defendants' statements regarding Bear's liquidity and capital reserves were materially inaccurate.

180.    Spector also knew of Bear's stated reliance on GAAP accounting but ignored or recklessly disregarded GAAP accounting requirements. For example, Spector was aware of the FAS 157 requirement to accurately mark values to their market prices, and was further aware that Bear was not in compliance because it had used flawed, outdated and inaccurate models which rendered Bear's financial statements false and misleading. Likewise, Spector was aware that, given Bear's material overstatement of the value of its assets and Bear's tremendous leverage, Bear's capital cushion was inadequate in the event that creditors made margin calls caused by declining asset values.

181.    Defendant Spector was motivated during the relevant period to misrepresent the public material facts about Bear's risk management and true financial condition, including the

value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves in order to keep the stock price artificially high while he sold his own shares at a profit.

182.     Notwithstanding Defendant Spector's duty not to sell Bear common stock under these circumstances, or to disclose his non-public, inside information prior to selling his stock, Defendant Spector sold Bear stock during the relevant period at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

183.     During the relevant period, Spector sold more than 116,000 shares of Bear stock at prices artificially inflated by Defendants' misrepresentations and omissions described herein, resulting in proceeds to Spector of over $19 million.

184.     Alternatively, Spector made his materially false and misleading statements and omissions through negligence.

**Bear Stearns Companies Inc.**

185.     The cumulative knowledge of all of Bear's agents, including Defendants Cayne and Spector, is imputed to Bear.

186.     The facts alleged in this Complaint create a strong inference that one or more of Bear's officers acted knowingly or recklessly in violating the federal securities laws and the common law of the State of New York.

187.     For example, at least as early as 2005 in a memo to Jeffrey M. Farber, then a Senior Managing Director and Bear's Controller and Principal Accounting Officer, the SEC had criticized Bear for using "outdated models that were more than ten years old to value mortgage derivatives and [for having] limited documentation on how the models worked." 2008 SEC Report, Ex. A, at 20. Defendant Cayne was "intimately engaged" in Bear's risk management process and Defendant Spector was Bear's leading expert in valuing and trading mortgages,

mortgage- and asset-backed securities and other derivative financial instruments. Both were apprised of the SEC's criticism of Bear's mortgage valuation models. Despite this, Bear knowingly or recklessly continued to use such models and issued materially false or misleading public statements regarding the value of its assets and its liquidity and capital reserves, as set forth herein.

188.    Further, neither Bear nor its agents corrected or updated the materially false and misleading representations they had disseminated to the market, despite Bear's and its agents' knowledge of Bear's risk management and true financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves.

189.    Alternatively, Bear made its materially false and misleading statements through negligence.

**Deloitte & Touche LLP**

190.    The Sarbanes-Oxley Act established the Public Company Accounting Oversight Board (the "PCAOB"), which is responsible for the development of auditing practice standards. The PCAOB adopted Generally Accepted Auditing Standards ("GAAS"), which are required to be followed by registered public accounting firms.

191.    Deloitte was required to perform an audit of Bear in accordance with PCAOB Auditing Standards. Among other things, Deloitte was charged with evaluating Bear's fair value measurements. Deloitte knowingly or recklessly disregarded several red flags with respect to valuation, including the fact that Bear continued to use valuation models that the SEC had repeatedly criticized as inaccurate and outmoded, and that ignored home price depreciation.

192.    Alternatively, Deloitte was negligent in performing their audit of Bear.

193.   For purposes of both its 2006 and 2007 audits, GAAS required Deloitte to evaluate Bear's assumptions used in determining fair value.

194.   GAAS required Deloitte to, among other things:

a.   test Bear's processes for preparing fair value measurements and the reasonableness, relevance and timeliness of the information, assumptions, inputs and models;

b.   evaluate whether the fair value measurements were consistent with market information, were determined using an appropriate model, and included relevant information that was reasonably available at the time;

c.   identify assumptions that had high sensitivities on valuation including whether any sensitive assumptions had been excluded from the valuation process;

d.   test whether reliance on historical financial information relied on in Bear's valuation models was justified;

e.   test the pricing models to compute the reported fair value Bear's retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments; and

f.   assess whether Bear Stearns' assumptions were reasonable and reflected market-based information.

195.   In October 2007, the Center for Audit Quality published an audit alert entitled "Measurements of Fair Value in Illiquid (Or Less Liquid) Markets," which noted:

The level of defaults has, in many cases, exceeded the model-based projections originally used to structure and assign ratings to securities backed by subprime mortgage loans…and holders of existing loans and mortgage-backed securities have experienced sharp declines in their value.

196.   Thus, by the time Deloitte undertook its 2007 audit of Bear, Deloitte was well aware that it needed to pay particularly close attention to Bear's valuation models for financial instruments.

197.   Specifically, Deloitte was confronted with significant red flags relating to Bear's valuation of Bear's retained mortgages, mortgage- and asset-backed securities and other

42

derivative financial instruments. As set forth above, Bear Stearns had been warned by the SEC

at least as early as 2005 that Bear's valuation models were materially deficient. According to the

2008 SEC Report, Bear failed to review its outdated and inaccurate models or, until the end of

2007, to reflect home price depreciation in its mortgage valuation models.

198.    In light of the warnings by the Center for Audit Quality, warnings by the SEC and

Deloitte's audit of Bear's assumptions used in determining fair value of Bear's mortgages,

mortgage- and asset-backed securities and other derivative financial instrument, Deloitte knew,

or was reckless or negligent in not knowing, that its statement, among others, that Bear's "basic

consolidated financial statements taken as a whole, presents fairly, in all material respects, the

information set forth therein" was materially false and misleading.

199.    Alternatively, Deloitte subsequently learned, or was reckless or negligent in not

learning, that its statements in Bear's 2007 10-K and other filings were materially false or

misleading when made without taking reasonable steps to correct or withdraw its opinion.

200.    In conducting its audit, Deloitte either deliberately, recklessly, or negligently

disregarded the fact that the SEC had already warned Bear of these problems.

## LOSS CAUSATION

201.    The material misrepresentations and omissions by Defendants detailed above (at,

for example, ¶¶ 58-60, 65, 71, 73, 75, 84, 86-88, 91, 99, 101, 108-10, 114, 116, 120, 122, 129,

131, 134, 136, 144-45, 147-48, 152) fraudulently concealed Bear's deterioration and Bear's

vulnerability to changing market circumstances as a result of its poor financial condition and risk

management. Defendants' material misrepresentations and omissions fraudulently overstated the

value of Bear's assets and Bear's liquidity and capital reserves, among other things, thereby

creating and maintaining artificially inflated prices for Bear common stock.

202.    Defendants' misrepresentations and omissions that were not immediately followed by an upward movement in the prices of Bear common stock served to maintain the price of Bear common stock at artificially inflated levels by maintaining and supporting the false, positive perception of Bear's risk management and financial condition, including the value of Bear's assets and Bear's liquidity and capital reserves.

203.    Defendants had a duty to promptly disseminate accurate and truthful information about Bear's risk management and financial condition, including the value of Bear's assets and its liquidity and capital reserves, and to promptly correct or update any information they had previously disseminated that was materially false or misleading. As a result of Defendants' failures to do so, the price of Bear common stock was artificially inflated, directly causing Plaintiff to suffer damages when the price of Bear common stock fell significantly due to partial disclosures on dates including June 22, 2007, July 18, 2007, September 20, 2007, November 14, 2007, December 20, 2007, March 14, 2008, and March 16, 2008, as set forth below.

204.    Defendants' materially false and misleading statements and omissions in their press releases, SEC filings and other statements concealed Bear's poor risk management and true financial condition, that, as and when it was disclosed, negatively affected the value of Bear stock. Defendants' materially false and misleading statements and omissions were the proximate cause of losses suffered by Plaintiff.

### *June 22, 2007 Partial Corrective Disclosure*

205.    On June 22, 2007, Bear issued a press release attached to a Form 8-K filed June 26, 2007, in which Bear announced a plan to provide a loan of $3.2 billion to Bear's Structured Credit Fund, explaining that Bear's Hedge Funds "have had difficulty in creating necessary

liquidity and working capital to continue to operate the Funds" as a result of the declining value of their mortgage-related assets.

206.    Bear's June 22, 2007 disclosure of its substantial loan to the Structured Credit Fund indicated that Bear's own assets, like those of the Bear Hedge Funds, might also be declining in value and worth less than Bear had reported with the result that Bear would have similar "difficulty in creating necessary liquidity and working capital to continue to operate," especially since Bear was devoting significant capital to propping up the Structured Credit Fund. This was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

207.    As a consequence of Bear's June 22, 2007 partial corrective disclosure, Bear stock dropped more than 4.5%, falling from its June 21, 2007 close at $145.81 to close at $139.10 on June 25, 2007.

208.    This loss, which was caused by the June 22, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*July 18, 2007 Partial Corrective Disclosure*

209.    On July 18, 2007, Bear disclosed in a letter to investors that Bear's Enhanced Leverage Fund had lost all of its value, while there was "very little value" left in the Structured Credit Fund.

210.    Bear's July 18, 2007 disclosure of the collapse in value of the Bear Hedge Funds indicated that Bear's own holdings of mortgages, mortgage- and asset-backed securities and other derivative financial instruments might also be of declining value and worth less than Bear

had reported. This was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

211.    As a consequence of Bear's July 18, 2007 partial corrective disclosure, Bear stock dropped more than 22.5%, falling from its July 17, 2007 close at $139.91 to close at $108.35 on August 3, 2007.

212.    This loss, which was caused by the July 18, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

### September 20, 2007 Partial Corrective Disclosure

213.    On September 20, 2007, Bear Stearns issued a press release and filed a Form 8-K announcing financial results for the quarter ended August 31, 2007 in which Bear reported a 61% drop in net income and a 38% drop in net revenues.

214.    Bear's September 20, 2007 disclosure of its precipitous drop in net income and revenues indicated that Bear's assets were declining in value and generating less liquidity and capital than anticipated. This was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

215.    As a consequence of Bear's September 21, 2007 partial corrective disclosure, Bear stock dropped approximately 2.3%, falling from its September 19, 2007 close at $115.64 to close at $112.99 on September 24, 2007.

216.    This loss, which was caused by the September 20, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*November 14, 2007 Partial Corrective Disclosure*

217.    On November 14, 2007, Molinaro made a presentation at the Merrill Lynch Banking and Financial Services Investor Conference in which he announced that Bear expected to take a $1.2 billion write-down on its mortgage and collateralized debt obligation portfolios. This news was also included in a Form 8-K Bear filed November 15, 2007.

218.    Bear's November 14, 2007 disclosure of its $1.2 billion write-down, which revealed that Bear's assets were declining in value and worth less than Bear had reported and that Bear's capital and liquidity reserves were diminished, was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

219.    As a consequence of Bear's November 14, 2007 partial corrective disclosure, Bear stock dropped more than 11.7%, falling from its November 14, 2007 close at $103.45 to close at $91.28 a week later on November 21, 2007.

220.    This loss, which was caused by the November 14, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

*December 20, 2007 Partial Corrective Disclosure*

221.    On December 20, 2007, Bear issued a press release announcing the financial results for the quarter and fiscal year ended November 30, 2007. In that press release, which

Bear attached to its Form 8-K filed December 21, 2007, Bear announced that it was increasing its write-downs by almost 60%, from $1.2 billion announced on November 14, 2007 to $1.9 billion and announced its first quarterly loss in Bear's 84-year history.

222.    Bear's December 20, 2007 disclosure of the sharp jump in its write-downs, which revealed that Bear's assets were declining in value and worth less than Bear had reported and that Bear's capital and liquidity reserves were diminished, was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

223.    As a consequence of Bear's December 20, 2007 partial corrective disclosure, Bear stock dropped more than 22%, falling from its December 20, 2007 close at $91.42 to close at $71.21 on January 8, 2008.

224.    This loss, which was caused by the December 20, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

***March 14, 2008 Partial Corrective Disclosure***

225.    On March 14, 2008, Bear announced that its liquidity position had significantly deteriorated, requiring Bear to seek financing through a secured loan facility from JPMorgan.

226.    Bear's March 14, 2008 disclosure of its desperate liquidity position was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including its capital and liquidity reserves.

227.    As a consequence of Bear's March 14, 2008 partial corrective disclosure, Bear stock dropped 47.7%, falling from its March 13, 2008 close at $57.35 to close at $29.99 on March 14, 2008 on heavy trading of approximately 187 million shares.

228.    This loss, which was caused by the March 14, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

### *March 16, 2008 Partial Corrective Disclosure*

229.    On March 16, 2008, Bear announced that it would be acquired by JPMorgan for $2 per share.

230.    Bear's March 16, 2008 disclosure that JPMorgan would pay only $2 per share, which revealed Bear's dire financial condition and that Bear's assets were worth far less than Bear had reported, was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

231.    As a consequence of Bear's March 16, 2008 partial corrective disclosure, Bear stock dropped 84%, falling from its March 14, 2008 close at $29.99 to close at $4.78 on March 17, 2008 on heavy volume of over 166 million shares.

232.    This loss, which was caused by the March 16, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiff would have sustained as a result of ordinary market forces.

### PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET

233.    As a result of the actions alleged above, the market price of Bear's common stock was artificially inflated.

      a.     At all relevant times, the market for Bear's common stock was an efficient market for the following reasons, among others: Bear securities met the requirements for listing and were listed and actively traded on the New York Stock Exchange, a highly efficient market;

      b.     as a regulated issuer, Bear filed periodic public reports with the SEC;

      c.     Bear regularly communicated with public investors through established market communication mechanisms, including regular dissemination of press releases on major newswire services and other wide-ranging public disclosures, such as communications with the financial press;

      d.     the market reacted to the public information disseminated by Bear;

      e.     securities analysts employed by brokerage firms followed Bear and wrote publicly available reports about the company that were distributed to the sales force and to customers of their respective brokerage firms. Each of these reports was publicly available and entered the public market place;

      f.     the material representations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Bear securities; and

      g.     without knowledge of the misrepresented or omitted material facts, Sherman purchased Bear securities between the time Defendants made the material misrepresentations and omissions and the time the fraudulent scheme was being disclosed, during which time the price of Bear securities was inflated by Defendants' misrepresentations and omissions.

234.    As a result, the market for Bear securities efficiently digested current information regarding the company from all publicly available sources and reflected such information in the price of the company's securities. In ignorance of the false and misleading representations and

omissions by Defendants described above, Sherman relied, to his damage, on the integrity of the market as to the value of Bear's securities and acquired them at an artificially inflated price. At the time of the acquisition of Bear stock by Sherman, the true fair market value of the securities was substantially less than the purported fair market value due to Bear's material misrepresentations and omissions.

## NO SAFE HARBOR

235.    Defendants cannot escape liability for their misrepresentations and omissions by resort to statutory safe harbor provided for forward-looking statements. The statements alleged to be false or misleading in this Complaint relate to facts and conditions existing at the time the statements were made. Moreover, to the extent Defendants may now seek to characterize any of these statements as "forward looking", they were not identified as "forward-looking" statements when they were made. Nor were the statements accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for those statements because at the time each one was made, the particular speaker had actual knowledge that the particular statement was false, and/or the statement was authorized and/or approved by an executive officer of Bear who knew that the statement was false when made.

## V.    CLAIMS FOR RELIEF

### Count I

#### (Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5—Manipulative and Deceptive Devices)

236.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

237.    Defendants disseminated or approved the untrue statements described above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

238.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff Sherman in connection with his purchases of Bear stock.

239.    Plaintiff has suffered damages in that, in reliance upon the integrity of the market, he paid artificially inflated prices for Bear stock, prices which subsequently declined when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, thereby damaging Plaintiff.  Plaintiff would not have purchased Bear stock at the prices he paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

240.    The underlying problems at Bear concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Bear's stock price that caused Plaintiff harm as and when the truth about Bear's problems was finally disclosed to the market.

## Count II

### (Section 18 of the Securities Exchange Act of 1934—Misleading Statements)

241.    Plaintiff repeats and realleges each and every preceding allegation as if fully set forth herein. For purposes of this Count only, Plaintiff asserts only negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

242.    Defendants made or caused to be made untrue statements described above in documents filed pursuant to the Securities Exchange Act of 1934 or regulations promulgated thereunder.

243.    For example, Defendants made or caused to be made untrue statements in Bear's 2006 and 2007 Form 10-K filings as set forth in, for example, ¶¶ 71, 73, 75, 134, 137, 145, 147-48, above, including Deloitte's causing the incorporation by reference of its unqualified opinions on Bear's financial statements for fiscal years 2006 and 2007 as set forth in, for example, ¶¶ 147-48, above.

244.    Plaintiff has suffered damages in that, in reliance upon the Defendants' materially false and misleading statements in documents filed pursuant to the Securities Exchange Act of 1934 or regulations promulgated thereunder as set forth above, Plaintiff purchased Bear common stock at prices which had been artificially inflated as a result of those false and misleading statements, prices which subsequently declined when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, thereby damaging Plaintiff. Plaintiff would not have purchased Bear common stock at the prices it paid, or at all, if he had

been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

245.    The underlying problems at Bear concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Bear's stock price that caused Plaintiff harm as and when the truth about Bear's problems was disclosed to the market.

246.    Sherman exercised due diligence in reading all of Bear's Form 10-K and 10-Q filings and repeatedly meeting with and questioning Bear's senior management on matters regarding Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves

247.    Despite Sherman's diligence, and because the underlying wrongs were self-concealing, he could not and did not discover his cause of action prior to publication of the 2008 SEC Report on September 25, 2008.

### COUNT III

#### (Section 20 of the Securities Exchange Act of 1934—Control Persons)

248.    Plaintiff repeats and realleges each and every preceding allegation as if fully set forth herein.

249.    The Individual Defendants acted as controlling persons of Bear within the meaning of § 20(a) of the Exchange Act. By reason of their positions with Bear, and their ownership of Bear stock, the Individual Defendants had the power and authority to cause Bear to engage in the wrongful conduct complained of herein. Bear controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

250.     As set forth above, Bear and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act.

251.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases and sales of Bear common stock in that, as a result of Defendants' false and misleading statements, Plaintiff paid artificially inflated prices for Countrywide common stock, prices which subsequently declined as and when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, thereby damaging Plaintiff.

## Count IV

### (Common Law Fraud)

252.     Plaintiff repeats and realleges each and every preceding allegation as if fully set forth herein.

253.     The representations by Defendants alleged herein regarding the adequacy of Bear's liquidity and capital reserves, Bear's risk management, Bear's financial condition and the value of Bear's assets were false, as revealed by Bear's collapse as a result of these factors.

254.     Defendants' false and misleading representations include:

    a.     Spector's representations directly to Sherman, on or about February 9, 2007, that Bear's publicly disclosed balance sheet, including the values Bear had reported for its mortgages, mortgage- and asset-backed securities and other derivative financial instruments, were accurate;

    b.     Bear's 2006 10-K's representations that that public filing disclosed the "fair value" of Bear's holdings and obligations regarding mortgages, mortgage- and asset-backed securities and other derivative financial instruments; that Bear marked "its financial instruments owned to fair value on a daily basis"; that Bear compared its model-based valuations

with counterparties in conjunction with collateral exchange agreements"; and that Bear "regularly evaluate[d] and enhance[d]" its Value at Risk models "in an effort to more accurately measure risk of loss";

c.   Cayne and Spector's representations directly to Sherman, on or about July 3, 2007, that Bear had not sold mortgages, mortgage- and asset-backed securities and other derivative financial instruments to the failed Bear Hedge Funds (or, later, had sold such assets to the Bear Hedge Funds for only two months), that Bear had adequate liquidity and capital reserves, and that Bear stock was trading at or below Bear's tangible book value;

d.   Bear's second-quarter 2007 10-Q's representation that Bear "regularly evaluate[d] and enhance[d]" its Value at Risk models "in an effort to more accurately measure risk of loss";

e.   Bear's representation in talking-points issued in or about August 2007, that "[t]he Firm's liquidity position, capital adequacy and funding capacity remains extremely solid notwithstanding the current difficult market conditions";

f.   Bear's representation in a press release issued in or about August 2007, that "the balance sheet, capital base and liquidity profile have never been stronger";

g.   Molinaro's representations during Bear's "Investor Day" on or about October 4, 2007, that Bear's "Liquidity Profile Remains Strong" and that "[a]ll assets are market to market" with "[a]sset values verified by risk/controllers";

h.   Cayne and Molinaro's representations directly to Sherman during Bear's Investor Day on or about October 4, 2007 that Bear's valuations of its mortgages, mortgage- and asset-backed securities and other derivative financial instruments were accurate, that Bear's book value was properly stated, and that Bear's capital reserves were adequate;

i.   Bear's third-quarter 2007 10-Q's representations that Bear "regularly evaluate[d] and enhance[d]" its Value at Risk models "in an effort to more accurately measure risk of loss and that the current market value of Bear's retained mortgages, mortgage- and asset-backed securities was $55.936 billion and that the current market value of its other retained derivative financial instruments was $14.688 billion;

j.   Bear's 2007 10-K's representation that Bear "compare[d] its model-based valuations with counterparties in conjunction with collateral exchange agreements" and that Bear "regularly evaluate[d] and enhance[d]" its

Value at Risk models "in an effort to more accurately measure risk of loss";

k.   Bear's 2007 10-K's representations that the current market value of Bear's retained mortgages, mortgage- and asset-backed securities was $46.141 billion and that the current market value of its other retained derivative financial instruments was $19.725 billion;

l.   Monlinaro's representations on or about February 8, 2008 that Bear's "[c]apital position is strong", that Bear has a "Strong and Growing Capital Base," an "[e]nhanced liquidity profile," and "improved" balance sheet liquidity;

m.   Bear's representation in a press release on or about March 10, 2008 that "there was absolutely no truth to the rumors of liquidity problems" at Bear and quoting Bear CEO Schwartz as stating that Bear's "balance sheet, liquidity, and capital remain strong"; and

n.   Deloitte's certification that Bear's false and misleading financial statements "present[] fairly, in all material respects, the information set forth therein."

255.   Defendants knew their misrepresentations and omissions as to Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, were false.

256.   Alternatively, in light, *inter alia*, of Bear's precarious capital position, portfolio of improperly valued mortgages, mortgage- and asset-backed securities and other derivative financial instruments, deteriorating reputation, the failure of its hedge funds, its commitment to those failed funds and its significant exposure to markets actually, and widely perceived to be, deteriorating, Defendants had no reasonable foundation for their representations regarding Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, and recklessly made the representations identified in this Complaint.

257.    All of Defendants' misrepresentations and omissions concerned facts that were peculiarly within the knowledge of Defendants and which were not readily available to Plaintiff. As Defendants' knew, as a result of Defendants' misrepresentations and omissions, Plaintiff was acting under mistaken beliefs about these material facts.  Defendants breached their duty by failing to disclose the truth to Plaintiff.

258.    Defendants sometimes deceived Plaintiff through partial or ambiguous statements that information available to Defendants rendered materially misleading.  Defendants breached their duty by failing to disclose that information to Plaintiff.

259.    Defendants intended and reasonably expected that their misrepresentations and omissions would cause Plaintiff to purchase additional shares of Bear stock or retain his shares of Bear stock, desist from further inquiry and remain passive.  As a result of the misrepresentations and omissions alleged in this Complaint, Plaintiff lost the opportunity to investigate Bear's problems and to evaluate the steps Defendants were taking to address them.

260.    As a result of these misrepresentations and omissions, Defendants deceived Plaintiff regarding Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, and thereby intentionally transformed Plaintiff's indecision about whether to sell or keep their shares of Bear stock into a damaging decision to retain them or purchase additional shares of Bear stock.

261.    Plaintiff decided to purchase shares of Bear stock and to retain his shares of Bear stock in justifiable reliance on Defendants' fraudulent misrepresentations and omissions.

262.    Defendants' misrepresentations and omissions alleged herein deceived Plaintiff and denied Plaintiff the opportunity to investigate Bear's problems and the steps, if any, Defendants were taking to address them.

263.    If Defendants had not made the misrepresentations and omissions alleged in this Complaint, Plaintiff would not have purchased additional shares of Bear stock.

264.    If Defendants had not made the misrepresentations and omissions alleged in this Complaint, Plaintiff would have sold all or a substantial number of his shares of Bear stock.

265.    The underlying weaknesses concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Bear's stock price that caused Plaintiff harm as and when the truth about Bear's problems was disclosed to the market.

266.    By virtue of the material misrepresentations and omissions alleged herein, Defendants are liable to Plaintiff for damages for actual and/or constructive fraud under the common law of the State of New York in an amount to be determined at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(a)    awarding Plaintiff damages for all injuries suffered as a result of Defendants' wrongdoing;

(b)    awarding Plaintiff prejudgment interest at the maximum rate allowable by law;

(c)    awarding Plaintiff such other and further relief as they may show themselves justly entitled.

### Demand for Jury Trial

Plaintiff hereby demands a trial by jury.

Dated:  September 24, 2009

Respectfully submitted,

BOIES SCHILLER & FLEXNER LLP

By: _____

Philip Korologos
575 Lexington Avenue
7th Floor
New York, NY 10022
Phone: (212) 446-2300
Fax: (212) 446-2350

Richard B. Drubel
Matthew J. Henken
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
Phone:  (603) 643-9090
Fax:  (603) 643-9010

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Direct: (312) 641-9760
Fax: (312) 641-9751

Stephen M. Tillery
Douglas R. Sprong
KOREIN TILLERY LLC
505 North 7th Street,
Suite 3600
St. Louis, MO 63101
Phone:  (314) 241-4844
Fax:  (314) 241-3525

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                          :

BRUCE S. SHERMAN,            :

                              :

                  Plaintiff,     :

                              :

             v.               :       09-cv-8161

                              :

BEAR STEARNS COMPANIES INC.,  :

JAMES CAYNE, WARREN SPECTOR,  :

and DELOITTE & TOUCHE LLP,    :

                              :

                Defendants.  :

                              :

-------------------------------------------------------X

 

**COMPLAINT**

EXHIBIT A



# U.S. Securities and Exchange Commission

# Office of Inspector General

## Office of Audits

# SEC's Oversight of Bear Stearns and Related Entities:

# The Consolidated Supervised Entity Program



September 25, 2008
Report No. 446-A

The SEC believes this report contains non-public and confidential Information



**OFFICE OF
INSPECTOR GENERAL**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

September 25, 2008

**To:**     Chairman Christopher Cox
Erik Sirri, Director, Division of Trading and Markets
Lori Richards, Director, Office of Compliance Inspections and
      Examinations
John White, Director, Division of Corporation Finance
Jonathan Sokobin, Director, Office of Risk Assessment

**From:**   H. David Kotz, Inspector General

**Subject:**  Audit of *SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program*, Report No. 446-A

This memorandum transmits the Securities and Exchange Commission, Office of Inspector General's (OIG) final report detailing the results of our audit on the SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program. This audit was conducted pursuant to a Congressional request from Ranking Member Charles E. Grassley of the United States Senate Committee on Finance.

The final report consists of 26 recommendations that are addressed primarily to the Division of Trading and Markets (TM). Recommendations 18 and 25 are also addressed to the Office of Compliance Inspections and Examinations (OCIE) and Recommendation 19 is also addressed to the Office of Risk Assessment (ORA). Recommendations 20 and 21 are addressed to the Division of Corporation Finance (CF), Recommendation 17 is addressed to CF and TM, and Recommendation 22 is addressed to Chairman Cox.

In response to the draft report, responsible management officials agreed with 21 out of 26 recommendations. TM concurred with 20 of 23 recommendations addressed to them and disagreed with Recommendations 13, 15, and 16. OCIE concurred with both recommendations addressed to them. CF concurred with Recommendation 17, but disagreed with Recommendations 20 and 21.

Your written responses to the draft report, dated August 18, 2008, are included in their entirety in Appendices VI and VII. In addition, OIG's response to Chairman Cox's and Management's comments are included in Appendix VIII.

Should you have any questions regarding this report, please do not hesitate to contact me. During this audit we appreciate the courtesy and cooperation that you and your staff extended to our auditors.

Attachment

cc:    Peter Uhlmann, Chief of Staff, Chairman's Office
Diego Ruiz, Executive Director, Office of the Executive Director
Brian Cartwright, General Counsel, Office of General Counsel
Andrew Donohue, Director, Division of Investment Management
John Nester, Director Office of Public Affairs
William Schulz, Office of Legislative and Intergovernmental Affairs
Bob Colby, Deputy Director, TM
Daniel Gallagher, Deputy Director, TM
Shelley Parratt, Deputy Director, CF
Michael Macchiaroli, Associate Director, TM
Mary Ann Gadziala, Associate Director, OCIE
Matthew Eichner, Assistant Director, TM
John Walsh, Chief Counsel, OCIE
Thomas K. McGowan, Assistant Director, TM
Herb Brooks, Assistant Director, TM
William Lenox, Ethics Counsel, Office of General Counsel
Denise Landers, Legal Counsel, TM
Juanita Bishop Hamlett, Branch Chief, OCIE
Darlene L. Pryor, Management Analyst, Office of the Executive Director
Other staff who participated in the audit

Rick Hillman, Managing Director of Financial Markets and Community Investment, GAO

# The CSE Program (Including Reviews Performed on Bear Stearns)

## Executive Summary

**Background.** During the week of March 10, 2008, rumors spread about liquidity problems at The Bear Stearns Companies, Inc. (Bear Stearns).[1] As the rumors spread, Bear Stearns was unable to obtain secured financing from counterparties. This caused severe liquidity problems. As a result, on Friday March 14, 2008, JP Morgan Chase & Co. (JP Morgan) provided Bear Stearns with emergency funding from the Federal Reserve Bank of New York (FRBNY).[2] According to Congressional testimony,[3] after the markets closed on March 14, 2008, it became apparent that the FRBNY's funding could not stop Bear Stearns' downward spiral. As a result, Bear Stearns concluded that it would need to file for bankruptcy protection on March 17, 2008, unless another firm purchased it. On Sunday March 16, 2008, (before the Asian markets opened), Bear Stearns' sale to JP Morgan was announced with financing support from the FRBNY. In May 2008, the sale was completed.

Because Bear Stearns had collapsed, at the time of our fieldwork, there were six holding companies in the Securities and Exchange Commission's (Commission) Consolidated Supervised Entity (CSE) program. In addition to Bear Stearns, these six holding companies include or included Goldman Sachs Group, Inc. (Goldman Sachs), Morgan Stanley, Merrill Lynch & Co. (Merrill Lynch), Lehman Brothers Holdings Inc. (Lehman Brothers), Citigroup Inc. and JP Morgan. On September 15, 2008, Lehman Brothers announced that it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch.[4] Both firms had experienced serious financial difficulties. Finally, on September 21, 2008, the Board of Governors of the Federal Reserve System (Federal Reserve) approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies with the Federal Reserve as their new principal regulator. As a result, the future of the CSE program is uncertain.

---

[1] See Acronyms used in Appendix I.

[2] The funding was from the Federal Reserve Bank of New York (FRBNY) through JP Morgan Chase & Co. (JP Morgan) to The Bear Stearns Companies, Inc. (Bear Stearns) because JP Morgan, unlike Bear Stearns, could borrow money from the FRBNY.

[3] Timothy Geithner (President and Chief Executive Officer, FRBNY) and Alan Schwartz (President and Chief Executive Officer of Bear Stearns) before U.S. Senate Committee on Banking, Housing and Urban Affairs on Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators dated April 3, 2008.

[4] The audit fieldwork was completed prior to these events on September 15, 2008.

Of the seven original CSE firms, the Commission exercised direct oversight over only five firms (Bear Stearns, Goldman Sachs, Morgan Stanley, Merrill Lynch, and Lehman Brothers), which did not have a principal regulator. The Commission does not directly oversee Citigroup Inc. and JP Morgan because these firms have a principal regulator, the Federal Reserve.

The CSE program is a voluntary program that was created in 2004 by the Commission pursuant to rule amendments under the Securities Exchange Act of 1934.[5] This program allows the Commission to supervise these broker-dealer holding companies on a consolidated basis. In this capacity, Commission supervision extends beyond the registered broker-dealer to the unregulated affiliates of the broker-dealer to the holding company itself. The CSE program was designed to allow the Commission to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place United States regulated broker-dealers and other regulated entities at risk.

A broker-dealer becomes a CSE by applying to the Commission for an exemption from computing capital using the Commission's standard net capital rule, and the broker-dealer's ultimate holding company consenting to group-wide Commission supervision (if it does not already have a principal regulator). By obtaining an exemption from the standard net capital rule, the CSE firms' broker-dealers are permitted to compute net capital using an alternative method. The Commission designed the CSE program to be broadly consistent with the Federal Reserve's oversight of bank holding companies.

Bear Stearns' main activities were investment banking, securities and derivatives sales and trading, clearance, brokerage and asset management. Bear Stearns was highly leveraged with a large exposure (*i.e.,* concentration of assets) in mortgage-backed securities. Bear Stearns had less capital and was less diversified than several of the other CSE firms.

The Commission stated that Bear Stearns' unprecedented collapse was due to a liquidity crisis caused by a lack of confidence. Chairman Christopher Cox described Bear Stearns as a well-capitalized and apparently fully liquid major investment bank that experienced a crisis of confidence, denying it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.[6]

---

[5] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34,428). Securities and Exchange Commission (Commission). 21 June 2004.
<http://www.sec.gov/rules/final/34-49830.htm>.

[6] Source: Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators Before United States (U.S.) Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

**Congressional Request.** On April 2, 2008, the Office of Inspector General (OIG) received a letter from Ranking Member Charles E. Grassley of the United States Senate Committee on Finance, requesting that the OIG analyze the Commission's oversight of CSE firms and broker-dealers subject to the Commission's Risk Assessment Program.[7] This letter noted that the Commission's Division of Trading and Markets (TM) was responsible for regulating the largest broker-dealers, and their associated holding companies. The letter requested a review of TM's oversight of the five CSE firms it directly oversees, with a special emphasis on Bear Stearns. The letter requested that the OIG analyze how the CSE program is run, the adequacy of the Commission's monitoring of Bear Steams, and make recommendations to improve the Commission's CSE program.

The United States Senate Committee on Finance letter also requested that the OIG provide an update of findings made in its previous audit report on the Commission's Broker-Dealer Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report no. 354, issued on August 13, 2002).[8]

**Audit Objectives.** In response to the April 2, 2008 Congressional Request, the OIG conducted two separate audits with regard to the Commission's oversight of Bear Steams and related entities. This audit's objectives were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Steams and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

The OIG performed a second audit on the Commission's Broker-Dealer Risk Assessment Program to follow up on the current status of recommendations made in the OIG's prior audit report of the Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report no. 354, issued on August 13, 2002) and to examine the Broker-Dealer Risk Assessment program to determine whether improvements are needed. The Commission's Risk-Assessment program tracks the filing status of 146 broker-dealers that are part of a holding company structure and have at least $20 million in capital. The Risk Assessment Program report found that TM is not fulfilling its obligations in accordance with the underlying purpose of the Broker-Dealer Risk Assessment program in several respects. TM has failed to update and finalize the rules governing the program, TM has not enforced the filing requirement incumbent on broker-dealers, resulting in the failure of nearly one-third of the required firms to file 17(h) documents, TM has not yet determined whether the two remaining Bear Steams' broker-dealers are obligated to file Form 17-H, and TM only

---

[7] A copy of this request letter is attached to this report in full in Appendix II.

[8] The U.S. Senate Committee on Finance letter also requested that the Office of Inspector General (OIG) conduct an investigation into the facts and circumstances surrounding the Commission's decision not to pursue an Enforcement Action against Bear Stearns. This issue will be addressed in an OIG investigative report to be issued on September 30, 2008.

conducts an in-depth review of the filings for six of the 146 filing firms that TM determined are most significant, based on their free credit balances and customer accounts. Audit report number 446-B examining the Commission's Risk Assessment program contains 10 recommendations and was issued on September 25, 2008.

**Retention of an Expert.** Given the complexity of the subject matter, the OIG retained an expert, Albert S. (Pete) Kyle to provide assistance with this audit. Professor Kyle joined the University of Maryland faculty as the Charles E. Smith Chair Professor of Finance at the Robert H. Smith School of Business in August 2006. He earned a Bachelor of Science degree in Mathematics from Davidson College in 1974, studied Philosophy and Economics at Oxford University as a Rhodes Scholar and completed his Ph.D. in Economics at the University of Chicago in 1981. He was a professor at Princeton University's Woodrow Wilson School from 1981-1987, at the University of California's Haas Business School in Berkeley from 1987-1992, and at Duke University from 1992-2006.

Professor Kyle is a renowned expert on many aspects of capital markets, with a particular focus on market microstructure. He has conducted significant research on such topics as informed speculative trading, market manipulation, price volatility, and the information content of market prices, market liquidity, and contagion. His paper "Continuous Auctions and Insider Trading" (Econometrica, 2005) is one of the mostly highly cited papers in theoretical asset pricing.

Professor Kyle was elected a Fellow of the Econometric Society in 2002. He was also a board member of the American Finance Association from 2004-2006. He served as a staff member of the Presidential Task Force on Market Mechanisms (Brady Commission), after the stock market crash of 1987. During his career, he has worked as a consultant on finance topics for several government agencies, in addition to the Commission, including the Department of Justice, the Internal Revenue Service, the Federal Reserve and the Commodity Futures Trading Commission.

Professor Kyle's Curriculum Vitae appears in Appendix III of this report.

In this audit, Professor Kyle analyzed TM's oversight of the CSE firms, with a particular focus on Bear Stearns. Professor Kyle reviewed TM's internal memoranda on the CSE firms, which documented TM's assessment of the CSE firms' operations and reviewed data in the CSE firms' monthly and quarterly CSE program filings.

From this information, Professor Kyle analyzed the firms' financial data, holdings, risk management strategies, tolerance for risk and assessed the adequacy of the firms' filings. In particular, Professor Kyle analyzed Bear Stearns' capital, liquidity, and leverage ratios, access to secured and unsecured financing, and its

compliance with industry and worldwide standards such as the Basel Standards.[9] Professor Kyle analyzed how TM supervised or oversaw Bear Stearns' mortgage-backed securities portfolio, its use of models to measure risk, the adequacy of its models, its model review process, the relationship between its traders and risk management department, and its risk-management scenarios. Professor Kyle also examined how TM supervised Bear Stearns' internal operations, including its funding of two prominent hedge funds that collapsed in the summer of 2007.

**Audit Conclusions and Results.** The CSE program's mission (goal) provides in pertinent part as follows:

> The regime is intended to allow the Commission to monitor for, and act quickly in response to, financial or operational weakness in a CSE holding company or its unregulated affiliates that might place regulated entities, including US and foreign-registered banks and broker-dealers, *or the broader financial system at risk.*[10] [Emphasis added]

Thus, it is undisputable that the CSE program failed to carry out its mission in its oversight of Bear Stearns because under the Commission and the CSE program's watch, Bear Stearns suffered significant financial weaknesses and the FRBNY needed to intervene during the week of March 10, 2008, to prevent significant harm to the broader financial system.[11]

This audit was not intended to be a complete assessment of the multitude of events that led to Bear Stearns' collapse, and accordingly, does not purport to demonstrate any specific or direct connection between the failure of the CSE Program's oversight of Bear Stearns and Bear Stearns' collapse. However, we have identified serious deficiencies in the CSE program that warrant improvements. Overall, we found that there are significant questions about the adequacy of a number of CSE program requirements, as Bear Stearns was

---

[9] "The Basel Committee on Banking Supervision (Basel Committee) seeks to improve the quality of banking supervision worldwide, in part by developing broad supervisory standards. The Basel Committee consists of central bank and regulatory officials from 13 member countries: Belgium, Canada, France, Germany, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, United Kingdom, and United States. The Basel Committee's supervisory standards are also often adopted by nonmember countries." Source: Government Accountability Office. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, February 15, 2007.

[10] Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria. Commission. 16 Mar 2007.
<http://www.sec.gov/divisions/marketreg/cseoverview.htm>.

[11] The Commission established criteria (the link is provided below) for measuring the success of the Consolidated Supervised Entity (CSE) program. While the CSE program may have been successful in achieving its established criteria, none of the criteria standards directly related to the failure of a CSE firm and its effect on the broader financial system (as stated in the CSE program's goal statement). Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria. Commission. 16 Mar 2007.

compliant with several of these requirements, but nonetheless collapsed. In addition, the audit found that TM became aware of numerous potential red flags prior to Bear Steams' collapse, regarding its concentration of mortgage securities, high leverage, shortcomings of risk management in mortgage-backed securities and lack of compliance with the spirit of certain Basel II standards, but did not take actions to limit these risk factors.

In addition, the audit found that procedures and processes were not strictly adhered to, as for example, the Commission issued an order approving Bear Steams to become a CSE prior to the completion of the inspection process. Further, the Division of Corporation Finance (CF) did not conduct Bear Steams' most recent 10-K filing review in a timely manner.

The audit also identified numerous specific concerns with the Commission's oversight of the CSE program, some of which are summarized as follows:[12]

(a) Bear Steams was compliant with the CSE program's capital and liquidity requirements;[13] however, its collapse raises questions about the adequacy of these requirements;

(b) Although TM was aware, prior to Bear Steams becoming a CSE firm, that Bear Steams' concentration of mortgage securities was increasing for several years and was beyond its internal limits, and that a portion of Bear Steams' mortgage securities (e.g., adjustable rate mortgages) represented a significant concentration of market risk, TM did not make any efforts to limit Bear Steams' mortgage securities concentration;

(c) Prior to the adoption of the rule amendments which created the CSE program, the broker-dealers affiliated with the CSE firms were required to either maintain:

- A debt to-net capital ratio of less than 15 to 1(after their first year of operation); or

- Have net capital not less than the greater of $250,000 or two percent of aggregate debit items computed in accordance with the *Formula for Determination of Reserve Requirements for Broker-Dealers.*

However, the CSE program did not require a leverage ratio limit for the CSE firms. Furthermore, despite TM being aware that Bear Steams' leverage was high, TM made no efforts to require Bear

---

[12] We have no specific evidence indicating whether any of these issues directly contributed to Bear Steams' collapse since our audit scope did not include a determination of the cause of Bear Steams' collapse (see Appendix IV).

[13] As discussed in the Scope and Methodology section (see Appendix IV), we did not independently verify (*i.e.,* recalculate and determine the accuracy) Bear Steams' capital or liquidity amounts.

Steams to reduce its leverage, despite some authoritative sources describing a linkage between leverage and liquidity risk;

(d) · TM became aware that risk management of mortgages at Bear Steams had numerous shortcomings, including lack of expertise by risk managers in mortgage-backed securities at various times; lack of timely formal review of mortgage models; persistent understaffing; a proximity of risk managers to traders suggesting a lack of independence; turnover of key personnel during times of crisis; and the inability or unwillingness to update models to reflect changing circumstances. Notwithstanding this knowledge, TM missed opportunities to push Bear Steams aggressively to address these identified concerns;

(e) There was no documentation of discussions between TM and Bear Steams of scenarios involving a meltdown of mortgage market liquidity, accompanied by a fundamental deterioration of the mortgages themselves. TM appeared to identify the types of risks associated with these mortgages that evolved into the subprime mortgage crisis yet did not require Bear Steams to reduce its exposure to subprime loans;

(f) Bear Steams was not compliant with the spirit of certain Basel II standards and we did not find sufficient evidence that TM required Bear Steams to comply with these standards;

(g) TM took no actions to assess Bear Steams' Board of Directors' and senior officials' (*e.g.*, the Chief Executive Officer) tolerance for risk although we found that this is a prudent and necessary oversight procedure;

(h) TM authorized (without an appropriate delegation of authority) the CSE firms' internal audit staff to perform critical audit work involving the risk management systems instead of the firms' external auditors as required by the rule that created the CSE program;

(i) In June 2007, two of Bear Steams' managed hedge funds collapsed. Subsequent to this collapse, significant questions were raised about some of Bear Steams' senior managements' lack of involvement in handling the crisis. However, TM did not reassess the communication strategy component of Bear Steams' Contingency Funding Plan (CFP) after the collapse of the hedge funds, and very significant questions were once again raised about some of Bear Stearns' managements' handling of the crisis during the week of March 10, 2008;

(j) The Commission issued four of the five Orders approving firms to use the alternative capital method, and thus become CSEs (including Bear Steams) before the inspection process was completed; and

(k)     CF did not conduct Bear Stearns' most recent 10-K filing review in a timely manner. The effect of this untimely review was that CF deprived investors of material information that they could have used to make well-informed investment decisions (*i.e.*, whether to buy/sell Bear Stearns' securities). In addition, the information (*e.g.*, Bear Stearns' exposure to subprime mortgages) could have been potentially beneficial to dispel the rumors that led to Bear Stearns' collapse.

**Recommendations.** We identified 26 recommendations (see Appendix V) that should significantly improve the Commission's oversight of CSE firms. Chairman Cox's and Management's comments are attached in Appendix VI and VII, respectively. Our recommendations include:

(a)     A reassessment of guidelines and rules regarding the CSE firms' capital and liquidity levels;

(b)     Taking appropriate measures to ensure that TM adequately incorporates a firm's concentration of securities into the CSE program's assessment of a firm's risk management systems and more aggressively prompts CSE firms to take appropriate actions to mitigate such risks;

(c)     A reassessment of the CSE program's policy regarding leverage ratio limits;

(d)     Ensuring that: (1) the CSE firms have specific criteria for reviewing and approving models used for pricing and risk management, (2) the review and approval process conducted by the CSE firms is performed in an independent manner by the CSEs' risk management staff, (3) each CSE firm's model review and approval process takes place in a thorough and timely manner, and (4) limits are imposed on risk taking by firms in areas where TM determines that risk management is not adequate;

(e)     Being more skeptical of CSE firms' risk models and working with regulated firms to help them develop additional stress scenarios that have not already been contemplated as part of the prudential regulation process;

(f)     Greater involvement on the part of TM in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal;

(g)     Taking steps to ensure that mark disputes do not provide an occasion for CSE firms to inflate the combined capital of two firms by using inconsistent marks;

(h)     Encouraging the CSE firms to present Value at Risk and other risk management data in a useful manner, which is consistent with how

the CSE firms use the information internally and allows risk factors to be applied consistently to individual desks;

(i)   Ensuring (in accordance with Basel II) that the Consolidated Supervised Entities take appropriate capital deductions for illiquid assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral;

(j)   Greater discussion of risk tolerance with the CSE firms' Boards of Directors and senior management to better understand whether the actions of CSE firms' staff are consistent with the desires of the Boards of Directors and senior management;

(k)   Requiring compliance with the existing rule that requires external auditors to review the CSE firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act for this deviation from the current rule's requirement;

(l)   Ensuring that reviews of a firm's CFP includes an assessment of a CSE firm's internal and external communication strategies;

(m)   Developing a formal automated process to track material issues identified by the monitoring staff to ensure they are adequately resolved;

(n)   Ensuring that they complete all phases of a firm's inspection process before recommending that the Commission allow any additional CSE firms the authority to use the alternative capital method;

(o)   Improving collaboration efforts among TM, CF, the Office of Compliance Inspections and Examination (OCIE), and the Office of Risk Assessment (ORA);

(p)   The development by CF of internal guidelines for reviewing filings timely and tracking and monitoring compliance with its internal guidelines; and

(q)   The creation of a Task Force led by ORA with staff from TM, the Division of Investment Management, and OCIE to perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis.

The final report consists of 26 recommendations that are addressed primarily to the Division of Trading and Markets (TM). Recommendations 18 and 25 are also addressed to the Office of Compliance Inspections and Examinations (OCIE) and Recommendation 19 is also addressed to the Office of Risk Assessment (ORA). Recommendations 20 and 21 are addressed to the Division of

Corporation Finance (CF), Recommendation 17 is addressed to CF and TM, and Recommendation 22 is addressed to Chairman Cox.

In response to the draft report, responsible management officials agreed with 21 out of 26 recommendations. TM concurred with 20 of 23 recommendations addressed to them and disagreed with Recommendations 13, 15, and 16. OCIE concurred with both recommendations addressed to them. CF concurred with Recommendation 17, but disagreed with Recommendations 20 and 21.

# TABLE OF CONTENTS

Executive Summary.................................................................................iv

Table of Contents.................................................................................xiv

Background and Objectives.................................................................... 1

Findings and Recommendations........................................................... 10

 Finding 1: Bear Stearns Was Compliant With The CSE
 Program's Capital Ratio And Liquidity Requirements, But The
 Collapse Of Bear Stearns Raises Questions About The
 Adequacy Of These Requirements.................................................. 10
  Capital.................................................................................... 10
   Adequacy of Capital Levels................................................ 10
   Increased Access to Secured Financing............................. 11
   Recommendation 1 ............................................................ 13

  Liquidity .................................................................................. 14
  Recommendation 2 ................................................................. 17

 Finding 2: TM Did Not Adequately Address Several Significant
 Risks That Impact The Overall Effectiveness Of The CSE
 Program............................................................................................ 17
  Concentration of Assets ........................................................ 17
  Recommendation 3 ................................................................. 18

  Leverage.................................................................................. 19
  Recommendation 4 ................................................................. 20

 Bear Stearns Model Review Process and Risk
 Management Staffing Were Inadequate In The Area Of
 Mortgage Backed Securities .................................................. 20
  Recommendation 5 ................................................................. 24

  Risk Scenarios ....................................................................... 24
  Recommendation 6 ................................................................. 27
  Recommendation 7 ................................................................. 27

  Non-compliance With Basel II................................................. 27
   Mark Disputes .................................................................. 27
   Recommendation 8 ........................................................... 29

   Inconsistent VaR Numbers................................................ 29
   Recommendation 9 ........................................................... 29

Bear Stearns' Capital Requirements for Illiquid
Assets and Stressed Repos Require Careful
Oversight ............................................................................ 29
Recommendation 10 ...................................................... 33

Tolerance for Risk .................................................................. 33
Recommendation 11 ...................................................... 33

Finding 3:  TM, Without Explicit Authority, Allowed The CSE
Firms' Internal Auditors To Perform Critical Work ............................ 34
Recommendation 12 ...................................................... 35

Finding 4:  TM Did Not Review The Communication Strategy
Component Of Bear Stearns' Contingency Funding Plan After
The Collapse Of Two Of Its Managed Hedge Funds ........................... 35
Recommendation 13 ...................................................... 36

Finding 5:  TM's Monitoring Staff Do Not Adequately Track
Material Issues ....................................................................... 37
Develop a Formal Automated Tracking Process ..................... 37
Recommendation 14 ...................................................... 38

Follow-up on Prior OCIE Findings ..................................... 38
Recommendation 15 ...................................................... 40

Finding 6:  The Commission's Orders Allowing Firms (Including
Bear Stearns) To Use The Alternative Capital Method Were
Generally Approved Before The Inspection Process Was
Completed ............................................................................. 40
Recommendation 16 ...................................................... 41

Finding 7:  Collaboration Between TM and Other Commission
Divisions/Offices Should Be Significantly Improved .......................... 41
Collaboration with CF ..................................................... 41
Recommendation 17 ...................................................... 42

Collaboration with OCIE .................................................. 42
Recommendation 18 ...................................................... 43

Collaboration with ORA .................................................. 43
Recommendation 19 ...................................................... 43

Finding 8:  CF's Filing Review Of Bear Stearns' 2006 10-K
Was Not Timely ...................................................................... 44
Review of Bear Stearns' 10-K Filing .................................. 44

Recommendation 20 ........................................................ 45
Bear Stearns' Response to CF's Comment Letter ................. 45
Recommendation 21 ........................................................ 46

Finding 9:  Certain Firms May Pose A Systemic Risk
Because They Are Not Supervised On A Consolidated Basis ......... 46
Recommendation 22 ........................................................ 47

Finding 10:  TM Should Address Organizational Issues
Involving The Future Of The CSE Program ....................... 48
Changes to the CSE Program .................................... 48
Recommendation 23 ........................................................ 49

Program Staffing ...................................................... 49
Recommendation 24 ........................................................ 50

Ethics Manual .......................................................... 50
Recommendation 25 ........................................................ 50

Coordination with Other Regulators ............................. 50
Recommendation 26 ........................................................ 51

Appendices
Appendix I:  Acronyms ................................................. 52
Appendix II:  Congressional Audit Request ....................... 54
Appendix III:  Curriculum Vitae (OIG expert: Albert "Pete" Kyle) ........ 56
Appendix IV:  Scope and Methodology ............................... 70
Appendix V:  List of Recommendations ............................. 76
Appendix VI:  Chairman Cox's Comments .......................... 81
Appendix VII:  Management Comments ............................... 83
Appendix VIII:  OIG Response to Chairman Cox & Management
Comments .......................................................... 115
Appendix IX:  Gross Leverage Ratios .............................. 119
Appendix X:  Criteria ................................................... 120

# Background and Objectives

## Background

**General Background Information.** The Division of Trading and Markets (TM)[14] is responsible for regulating broker-dealers, which includes administering the Consolidated Supervised Entity (CSE) and Broker-Dealer Risk Assessment programs. The Office of Compliance Inspections and Examinations (OCIE) has responsibility within the Securities and Exchange Commission (Commission) for conducting the inspections[15] of broker-dealers, including broker-dealers that are affiliated with CSE firms[16] (*i.e.*, investment banks).[17] The following TM offices are directly involved in these programs:

- Office of Financial Responsibility: This office is responsible for administering the financial responsibility regulations (*e.g.*, net capital rule[18]

---

[14] See Acronyms used in Appendix I.

[15] The Division of Trading and Markets (TM) uses the term "inspections", however, the Office of Compliance Inspections and Examinations (OCIE) uses the term "examinations". For purposes of this audit report, we use the term "inspections" to refer to both. In addition, for purposes of this audit report, OCIE also includes the inspection staff in the Commission's regional offices.

[16] During our audit fieldwork, there were four Consolidated Supervised Entity (CSE) firms whose principal regulator (as discussed below) was the Commission: Goldman Sachs Group. Inc., Lehman Brothers Holdings Inc. (Lehman Brothers), Merrill Lynch & Co., Inc., and Morgan Stanley. On September 15, 2008, Lehman Brothers announced that it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch & Co., Inc. On September 21, 2008, the Federal Reserve approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies. The Bear Stearns Companies, Inc. (Bear Stearns) was also a CSE firm (approved in November 2005) until its collapse. In addition, JP Morgan Chase & Co. (JP Morgan) and Citigroup Inc. have been approved to use the alternative method for their broker-dealer capital requirements, but the Board of Governors of the Federal Reserve System (Federal Reserve) is their principal regulator (*i.e.*, is responsible for the consolidated entity) but the Commission is responsible for the oversight of their broker-dealers. As a result, the Securities and Exchange Commission (Commission) defers oversight (of the consolidated entity) of JP Morgan and Citigroup to the Federal Reserve to avoid duplicative or inconsistent regulation.

[17] In 2007, in response to a Government Accountability Office (GAO) report Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration, Report 07-154, March 15, 2007 (as discussed in the Prior Audit Coverage section of the Scope and Methodology - see Appendix III): the Chairman (in consultation with the other Commissioners) transferred the responsibility for conducting inspections of the consolidated entity from OCIE to TM. OCIE retained (within the Commission) responsibility for conducting inspections on the CSE's broker-dealers. The Self Regulatory Organizations (SRO) have the primary inspection responsibility for the registered broker-dealers. OCIE has oversight responsibility of these broker-dealers and conducts periodic inspections. The Financial Industry Regulatory Authority (FINRA) is the primary regulator of approximately 5,000 broker-dealers registered in the United States (U.S.).

[18] "The net capital rule focuses on liquidity and is designed to protect securities customers, counterparties, and creditors by requiring that broker-dealers have sufficient liquid resources on hand at all times to satisfy claims promptly". Source: GAO Report Risk-Based Capital Regulatory and Industry Approaches to Capital and Risk, Report No. GGD-98-153, July 20, 1998.

and customer protection[19]). These regulations are intended to protect customers and financial institutions. This office also oversees the Securities Investor Protection Corporation and has approximately nine staff.[20]

- Office of Prudential Supervision and Risk Analysis: The staff (referred to as "monitors") in this office work in teams of three to review each CSE firm. They perform their work mainly through periodic meetings and informal discussions with CSE staff. The staff also review CSE required financial filings. The staff have backgrounds in economics, accounting, and finance and expertise in credit, market, or liquidity risk. Approximately 13 individuals comprise the staff.

- Office of CSE Inspections: This office is responsible for conducting the inspections on the CSE firms. They have seven staff who are located in both Washington D.C. and New York.

**CSE Program.** In 2004, the Commission adopted rule amendments under the Securities and Exchange Act of 1934,[21] which created the voluntary CSE program. This program allows the Commission to supervise certain broker-dealer holding companies on a consolidated basis. In this capacity, Commission supervision extends beyond the registered broker-dealer to the unregulated affiliates of the broker-dealer and the holding company itself. The CSE program was designed to allow the Commission to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place United States (U.S.) regulated broker-dealers and other regulated entities at risk.

A broker-dealer becomes a CSE by applying to the Commission for an exemption from the Commission's standard net capital rule,[22] and the broker-dealer's ultimate holding company consenting to group-wide Commission supervision, if it does not already have a principal regulator. By obtaining an exemption from the standard net capital rule, the CSE firms' broker-dealers are permitted to compute net capital using an alternative method.[23]

---

[19] The customer protection rule "is designed to ensure that customer property (securities and funds) in the custody of broker-dealers is adequately safeguarded."
Source: GAO Report Risk-Based Capital Regulatory and Industry Approaches to Capital and Risk, Report No. GGD-98-153, July 20, 1998.

[20] The Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa et. seq., as amended, was enacted to protect customers from losses resulting from a broker-dealers' failure, thereby promoting investor confidence in the securities markets. The Securities Investor Protection Corporation was created by the Act to pay investor claims. (See 15 U.S.C. § 78ccc).

[21] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34,428). Commission. 21 June 2004.
<http://www.sec.gov/rules/final/34-49830.htm>.

[22] See 17 C.F.R. § 24015c3-1.

[23] The alternative capital method is based on mathematical models and scenario testing, while broker-dealers operating under the standard net capital rule must meet certain ratios and maintain minimum net capital levels based on the type of securities activities they conduct. (See 17 C.F.R. 240.15c3-1(a)(7)).

The Commission designed the CSE program to be broadly consistent with the Board of Governors of the Federal Reserve System's (Federal Reserve) oversight of bank holding companies. However, the CSE program "reflects the reliance of securities firms on mark-to-market accounting as a critical risk and governance control. Second, the design of the CSE regime reflects the critical importance of maintaining adequate liquidity in all market environments for holding companies that do not have access to an external liquidity provider."[24]

The CSE application process includes TM reviewing a firm's application[25] (for an exemption from the net capital rule) and makes a recommendation to the Commission. Approval of the firm's application is contingent on the firm agreeing to group-wide Commission supervision of the consolidated entity (including unregulated affiliates), if the firm does not already have a principal regulator. In addition, CSE firms must agree to:

- "Maintain and document an internal risk management control system for the affiliate group;"[26]

- "Calculate a group-wide capital adequacy measure consistent with the international standards adopted by the Basel Committee on Banking Supervision [27] ('Basel Standards')."[28] The CSEs are required to maintain an overall Basel capital ratio[29] of not less than the Federal Reserve's 10 percent "well-capitalized" standard for bank holding companies. The CSE must notify the Commission (*e.g.,* file an Early Warning Notice) if the 10 percent capital ratio is or is likely to be violated,[30] or if tentative net capital of the broker-dealer falls below $5 billion;[31]

---

[24] Source: *Examining Regulation and Supervision of Industrial Loan Companies* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (October 4, 2007) (statement of Erik Sirri, Director of TM, Commission).

[25] The application process includes inspections whose purpose is to verify the information the firms provides during the application process and to "assess the adequacy of the implementation of the firm's internal risk management policies and procedures."
Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[26] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[27] "The Basel Committee on Banking Supervision (Basel Committee) seeks to improve the quality of banking supervision worldwide, in part by developing broad supervisory standards. The Basel Committee consists of central bank and regulatory officials from 13 member countries: Belgium, Canada, France, Germany, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, United Kingdom, and United States. The Basel Committee's supervisory standards are also often adopted by nonmember countries." Source: GAO. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, February 15, 2007.

[28] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>. [footnote added]

[29] The Basel capital ratio is capital divided by risk weighted assets.

[30] We are aware of one instance where this occurred. In our opinion, TM acted reasonably.

[31] Sources for the information include:
- *Risk Management and Its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission); and

- Maintain "sufficient stand-alone liquidity and sufficient financial resources to meet its expected cash outflows in a stressed liquidity environment where access to unsecured funding is not available for a period of at least one year. Another premise of this liquidity planning is that any assets held in a regulated entity are unavailable for use outside of the entity to deal with weakness elsewhere in the holding company structure, based on the assumption that during the stress event, including a tightening of market liquidity, regulators in the U.S. and relevant foreign jurisdictions would not permit a withdrawal of capital;"[32]

- "Consent to Commission examination [inspection] of the books and records of the ultimate holding company [*i.e.*, the consolidated entity] and its affiliates, where those affiliates do not have principal regulators;"[33]

- "Regularly report on the financial and operational condition of the holding company, and make available to the Commission information about the ultimate holding company or any of its material affiliates that is necessary to evaluate financial and operations risks within the ultimate holding company and its material affiliates;"[34] and

- "Make available [examination] inspection reports of principal regulators for those affiliates that are not subject to Commission [examination] inspection."[35]

The firms agreed to consolidated supervision because of the preferential capital treatment under the alternative method and international requirements. The European Union's (EU) Conglomerates Directive required that affiliates of U.S. registered broker-dealers demonstrate that they were subject to consolidated supervision by a U.S. regulator or face significant restrictions on their European operations.[36]

---

- Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34-428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.

[32] Source: *Risk Management and Its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission).

[33] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[34] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[35] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[36] According to the CSE final rule, "EU [European Union] 'consolidated supervision' consists of a series of quantitative and qualitative rules, imposed at the level of the ultimate holding company, regarding firms' internal controls, capital adequacy, intra-group transactions, and risk concentration. Without a demonstration of 'equivalent' supervision, U.S. securities firms have expressed concerns that an affiliate institution located in the EU either may be subject to additional capital charges or be required to form a sub-holding company in the EU." See 'Directive 2002/87/EC of the European Parliament and of the Council of 16 December 2002." Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htmP42_10820>.

**Mortgage Loans.** Beginning around late 2004, lenders offered mortgages to individuals who did not meet the normal qualifications (*e.g.*, income or credit history). Many of these loans had teaser rates and/or were interest only. These more risky loans are referred to as "subprime mortgages." The theory behind approving these risky loans was that the homeowner would be able to refinance the loan in a few years because of the increased growth in home values and the individual's improved credit rating. Banks converted these loans into securities and sold the securities to other firms (known as the securitization process).

Once home values began to decrease, mortgage loan defaults started to increase, causing the market value of the mortgage securities to decrease. In the ensuing months, the financial services industry wrote-down billions of dollars in the value of all types of mortgage securities.[37]

**Bear Stearns' Collapse.**[38] The Bear Stearns Companies, Inc. (Bear Stearns) was a holding company that had two registered broker-dealers. Its main activities were investment banking, securities and derivatives sales and trading, clearance, brokerage and asset management.[39] Bear Stearns was highly leveraged[40] with a large exposure (*i.e.*, concentration of assets) in mortgage-backed securities.[41] Bear Stearns also had less capital and was less diversified than several of the CSE firms.

In June 2007, two of Bear Stearns' managed hedge funds collapsed because of subprime mortgage losses.[42] Nearly a year later, during the week of March 10, 2008, rumors spread about liquidity problems at Bear Stearns. Due to Bear Stearns' lenders not rolling over secured financing, Bear Stearns faced severe liquidity problems on March 14, 2008.[43] As a result, on March 14, 2008, JP Morgan Chase & Co. (JP Morgan) provided Bear Stearns with emergency

---

[37] In accordance with Generally Accepted Accounting Principles, the securities must be valued at fair market value (*i.e.*, mark to market accounting).

[38] Sources for this information include:

- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Timothy Geithner, President and Chief Executive Officer, Federal Reserve Bank of New York (FRBNY);

- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Jamie Dimon (Chairman and Chief Executive Officer, JP Morgan); and

- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* . Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Alan Schwartz (President and Chief Executive Officer, Bear Stearns).

[39] Source: 2006 Bear Stearns' Annual Report (page 32).

[40] There are many definitions of leverage. A simple definition of leverage is assets divided by capital. Bear Stearns' gross leverage ratio was about 33-1. See Appendix IX.

[41] Depending on the definition used to classify a mortgage as "subprime", Bear Stearns' exposure to subprime mortgages varied. However, it clearly had a large exposure to mortgage securities overall.

[42] Bear Stearns' direct exposure to these hedge funds was minimal.

[43] A pledge of collateral supports secured financing.

funding.[44]  According to Congressional testimony,[45] after the markets closed on March 14, 2008, it became apparent that FRBNY's funding could not stop Bear Steams' downward spiral.  As a result, Bear Stearns concluded that it would need to file for bankruptcy protection on March 17, 2008, unless another firm purchased it.[46]  On March 16, 2008, Bear Stearns' sale to JP Morgan was announced with financing support from the FRBNY.  In May 2008, the sale was completed.

In testimony given before the Senate Committee on Banking, Housing, and Urban Affairs on April 3, 2008, Chairman Christopher Cox stated that Bear Steams' collapse was due to a liquidity crisis caused by a lack of confidence.[47] Chairman Cox described Bear Stearns' collapse as a "run on the bank"[48] which occurred exceptionally fast and in an already distressed market environment (i.e., the credit crisis).  Specifically, Chairman Cox testified as follows:

> What happened to Bear Stearns during the week of March 10th was likewise unprecedented.  For the first time, a major investment bank that was well-capitalized and apparently fully liquid experienced a crisis of confidence that denied it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.  Counterparties would not provide securities lending services and clearing services. Prime brokerage clients moved their cash balances elsewhere.  These decisions by counterparties, clients, and lenders to no longer transact with Bear Steams in turn influenced other counterparties, clients, and lenders to also reduce their exposure to Bear Stearns.[49]

---

[44] The funding was from FRBNY through JP Morgan to Bear Steams because JP Morgan could borrow money from FRBNY.

[45] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statements of Timothy Geithner, President and Chief Executive Officer, FRBNY) and Alan Schwartz, President and Chief Executive Officer, Bear Steams).

[46] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[47] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[48] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before US.. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[49] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

According to a Commission press release,[50] TM monitored Bear Stearns' capital and liquidity daily since Bear Stearns' hedge funds collapsed. According to data (provided to TM by Bear Stearns), there was adequate capital at the holding company level and at Bear Stearns' two registered broker-dealers prior to and during the week of March 10, 2008. In addition, the Commission stated that Bear Stearns was compliant with the $5 billion liquidity requirement.[51] Furthermore, according to data we reviewed, Bear Stearns had significantly increased its liquidity levels since May 2007.[52]

The Commission stated that neither the CSE program nor any regulatory model (*i.e.,* the Basel Standards)[53] used by commercial or investment banks considered the possibility that secured financing, even when backed by high-quality collateral could become completely unavailable. Instead, the CSE program only considered that a deterioration of secured financing could occur (*e.g.,* that financing terms could become less favorable) and that unsecured funding could be unavailable for at least one year.

**The Commission's Response to Bear Stearns' Collapse.** In the aftermath of Bear Stearns' collapse, the Commission has:

- Supported the work of the Basel Committee on Banking Supervision regarding their planned updated guidance (*i.e.,* strengthening the standards applicable to liquidity risks) on liquidity management;[54]

- Supported legislation to make the CSE program mandatory.[55] At a recent Congressional hearing before the Committee on Financial Services, House of Representatives, July 24, 2008, Chairman Christopher Cox stated:

---

[50] Source: Statement of SEC Division of Trading and Markets Regarding The Bear Stearns Companies. Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-44.htm>. The Chairman also made similar statements in his letter to the Basel Committee regarding liquidity management; and testimony (*Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission)).

[51] As discussed in the Scope and Methodology section (see Appendix IV), we did not independently verify (*i.e.,* recalculate and determine the accuracy) Bear Stearns' capital or liquidity amounts.

[52] According to the Commission, Bear Stearns had a high of $21 billion (in liquidity) in early March 2008, (*i.e.,* before the week of March 10), compared to $7.6 billion in May 2007 according to TM data. Source: Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity Management. Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-48.htm>.

[53] The CSE firms operate under the Basel II standards.

[54] Source: Chairman Cox Letter to Basel Committee In Support of New Guidance on Liquidity Management. Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-48.htm>.

[55] Sources of this information include:
  - *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission); and
  - *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

The mandatory consolidated supervision regime for investment banks should provide the SEC [Commission] with several specific authorities. Broadly, with respect to the holding company, these include authority to: set capital and liquidity standards; set recordkeeping and reporting standards; set risk management and internal control standards; apply progressively more significant restrictions on operations if capital or liquidity adequacy falls, including requiring divestiture of lines of business; conduct examinations and generally enforce the rules; and share information with other regulators. Any future legislation should also establish a process for handling extraordinary problems, whether institution-specific or connected with broader market events, to provide needed predictability and certainty.[56]

- Requested dedicated Congressional funding for the CSE program and increased CSE staffing from about 25 to 40 people;[57]

- Consulted with the CSE firms on their liquidity situation (*e.g.,* funding plans). Specifically, the Commission worked with the firms to:

  o increase their liquidity levels;[58]

  o lengthen the terms of their secured and unsecured financing;[59]

  o review their risk practices and models;[60]

  o discuss their long-term funding plans, including plans for raising new capital by accessing the equity and long-term debt markets;[61]

  o increase their public disclosures of their capital and liquidity;[62]

---

[56] Source: *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

[57] Source: *Risk Management and Its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Chairman, Commission).

[58] Source: *Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators*, Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[59] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[60] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[61] Source: *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

- Invited FRBNY examiners to review the CSE firms' funding and how the firms are managing their funding;[63] and

- In July 2008, the Commission and the Federal Reserve agreed on a Memorandum of Understanding (MOU) involving coordination and information sharing.[64]

# Objectives

As a result of the collapse of Bear Stearns in March 2008, we received a Congressional request to perform this audit of the Commission's CSE Program, in addition to an audit of the Commission's Broker-Dealer Risk Assessment Program (see Appendix II).

The objectives of this audit were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

The objectives of the audit on the Commission's Broker-Dealer Risk Assessment Program were to follow up on recommendations made in the Office of Inspector General's (OIG) prior audit report of the Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report No. 354, issued on August 13, 2002) and to examine the Broker-Dealer Risk Assessment process to determine whether improvements are needed. Audit report number 446-B discusses the Risk Assessment Program in detail and addresses these objectives.

---

[62] Source: Speech by SEC [Commission] Chairman: Address to the Security Traders 12th Annual Washington Conference. Commission. 7 May 2008. <http://www.sec.gov/news/speech/2008/spch050708cc.htm>.

[63] Source: *Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing, and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[64] SEC [Commission], FRB Sign Agreement to Enhance Collaboration, Coordination and Information Sharing. Commission. 7 July 2008. <http://www.sec.gov/news/press/2008/2008-134.htm>.

# Findings and Recommendations

## Finding 1: Bear Stearns Was Compliant With The CSE Program's Capital Ratio And Liquidity Requirements, But The Collapse Of Bear Stearns Raises Questions About The Adequacy Of These Requirements [65]

Bear Stearns was compliant with the capital and liquidity requirements; however, its collapse raises serious questions about the adequacy of these requirements.

### Capital [66]

<u>Adequacy of Capital Levels</u>

In 2004, the Commission adopted rule amendments under the Securities and Exchange Act of 1934, which created the CSE program and allowed broker-dealers to apply for an exemption from the net capital rule and instead use the alternative capital method.[67] The Commission designed the CSE program to be broadly consistent with the Federal Reserve's oversight of bank holding companies. However, the CSE program "reflects the reliance of securities firms on mark-to-market accounting [[68]] as a critical risk and governance control. Second, the design of the CSE regime reflects the critical importance of maintaining adequate liquidity in all market environments for holding companies that do not have access to an external liquidity provider."[69]

If approved, a firm must comply with capital requirements at both the holding company and the broker-dealer levels. The CSEs at the holding company level are required to maintain an overall Basel capital ratio of not less than the Federal

---

[65] The capital ratio requirement is stipulated by Basel II, which TM incorporated into the CSE program. TM developed the CSE program's liquidity requirements.

[66] Capital is the difference between a firm's assets and liabilities.
Source: <u>Answers to Frequently Asked Investor Questions Regarding The Bear Stearns Companies, Inc.</u> Commission. 8 March 2008. <http://www.sec.gov/news/press/2008/2008-46.htm>.

[67] The alternative capital method is based on mathematical models and scenario testing while broker-dealers operating under the standard net capital rule must meet certain ratios and maintain minimum net capital levels based on the type of securities activities they conduct.

[68] Mark-to-market accounting refers to a requirement that the securities must be valued at fair market value in accordance with Generally Accepted Accounting Principles.

[69] Source: *Examining Regulation and Supervision of Industrial Loan Companies* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (October 4, 2007) (statement of Erik Sirri, Director of TM, Commission).

Reserve's 10 percent "well-capitalized" standard for bank holding companies.[70]
In addition, a broker-dealer calculating its capital using the alternative method
must maintain tentative net capital[71] of at least $1 billion and net capital of at
least $500 million. If the tentative net capital of a broker-dealer using alternative
method falls below $5 billion, it must notify the Commission.[72]

According to Bear Stearns' data, it exceeded the required capital amounts at the
holding company and broker-dealer level the entire time it was in the CSE
program, including during the week of March 10, 2008.[73] Although Bear Stearns
was compliant with the capital requirements, there are serious questions about
whether the capital requirement amounts were adequate.[74] For instance, some
individuals have speculated that Bear Stearns would not have collapsed if it had
more capital than was required by the CSE program. In fact, a former Director of
TM has stated:[75]

> The losses incurred by Bear Stearns and other large broker-dealers
> were not caused by 'rumors' or a 'crisis of confidence,' but rather by
> inadequate net capital and the lack of constraints on the incurring
> of debt.

### Increased Access to Secured Financing

Notwithstanding the fact that Bear Stearns was compliant with the CSE
program's capital requirements, there are serious questions about whether Bear
Stearns had enough capital to sustain its business model. As the subprime crisis
unfolded, Bear Stearns' cost of unsecured financing tended to increase. For
example, by March 2008, a ten-year bond which had recently been issued at a
spread of 362 basis points over Treasury rates was trading at 460 basis points
over Treasury rates. The high spread indicates that market participants believed
that Bear Stearns' creditworthiness was deteriorating in a manner consistent with
downgrades by ratings agencies. According to the expert retained by the OIG in
connection with this audit,[76] the high cost of financing tended to undermine the

---

[70] Source: SEC [Commission] Holding Company Supervision with Respect to Capital Standards and
Liquidity Planning. Commission. 7 Mar 2007. <http://www.sec.gov/divisions/marketreg/hcfiquidity.htm>.
[71] Tentative capital is net capital before deductions for market and credit risk.
[72] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of
Consolidated Supervised Entities (69 Fed Reg. 34.428). Commission. 21 June 2004.
<http://www.sec.gov/rules/final/34-49830.htm>.
[73] Source: Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity Management.
Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-48.htm>.
[74] It is worth noting that prior to the current mortgage crisis, a main concern surrounding the securities
industry was a real/perceived lack of competitiveness with overseas markets. One specific area of
concern was that U.S. firms were potentially at a competitive disadvantage because U.S. regulators were
requiring excessive capital compared to foreign banks. Source: Sustaining New York's and the US'
Global Financial Services Leadership (Recommendation 6, page 24) by McKinsey & Company.
[75] Source: Pickard Lee. "SEC's [Commission] Old Capital Approach Was Tried-and-True." American Banker
August 8, 2008.
[76] Professor Albert S. (Pete) Kyle was retained by the Office of Inspector General (OIG) to provide
assistance with this audit. See Appendix III for Professor Kyle's Curriculum Vitae and the Methodology
section of Appendix IV.

viability of Bear Stearns' business model, which relied heavily on leverage. Therefore, to preserve the viability of its business model, Bear Stearns had a strong incentive to lower its financing costs. One way to lower borrowing costs is to raise new equity capital, thus providing a larger equity cushion to protect unsecured lenders. To the extent that secured financing was cheaper than unsecured financing, another way for Bear Stearns to lower its borrowing costs was to shift its funding model from unsecured to secured financing.

From April 2006 to March 2008, Bear Stearns' Basel capital ratio decreased from 21.4 percent to 11.5 percent.[77]  TM memoranda suggest that in March 2008, TM inquired about whether Bear Stearns was contemplating capital infusions, but the memorandum does not suggest that TM exerted influence over Bear Stearns to raise additional capital.[78]  The OIG expert was unable to find TM memoranda indicating that TM had formally required or informally pressured Bear Stearns to raise additional equity capital prior to March 2008. In this sense, TM acted as though it did not believe it had a mandate to compel Bear Stearns to raise additional capital as long as its Basel capital ratio was greater than 10%. In fact, Bear Stearns did not raise additional capital during this time in 2007 or 2008.

According to TM's documentation of its meetings with Bear Stearns, in November 2006, Bear Stearns initiated a plan to increase its availability of secured funding at the holding company level.[79]  One component of this plan involved a tri-party repurchase agreement[80] with secured lenders, giving Bear Stearns access to $1 to $1.5 billion from each lender.[81]  Bear Stearns' secured borrowings were initially for terms of 30 days, with the goal of extending the terms to six months to one year.[82]  By May 2007, Bear Stearns' short-term borrowing was 60 percent secured and by September 2007, it was 74 percent secured.[83]  Finally, by March 2008, Bear Stearns' short-term borrowing was 83 percent secured.[84]  Nevertheless, Bear Stearns was still unable to obtain adequate secured funding to save the firm in March 2008.

---

[77] Source: Bear Stearns monthly Commission filings.

[78] "We (Eric Sirri I believe) inquired about any discussions they were having at the moment in terms of capital infusions. Allan [sic] [Schwartz, the President and Chief Executive Officer of Bear Stearns] said there were no 'terribly current discussions'. They had hired Lazard to advise them but that was on "slow burn" and that with the time it would take to get that done it wouldn't help (rumors would cause more damage in the meantime)."
Source: TM internal memorandum (file name: "Bear Stearns March Notes – SMS.doc").

[79] Source: TM's internal quarterly meeting memoranda with Bear Stearns for the 4th quarter 2006, 1st quarter 2007, 2nd quarter 2007, and 3rd quarter 2007.

[80] In a tri-party repo arrangement, a third party (in this case JP Morgan) acts as a custodian for loans between Bear Stearns and other lenders. The custodian holds Bear Stearns assets as collateral for the loans from the other lenders. Bear Stearns used this tri-party repurchase agreement (repo) facility to finance assets which were otherwise difficult to fund.

[81] Source: TM's internal quarterly meeting memorandum with Bear Stearns for the 4th quarter of 2006.

[82] Source: TM's internal quarterly meeting memorandum with Bear Stearns for the 4th quarter of 2006.

[83] Source: TM's internal quarterly meeting memoranda with Bear Stearns for the 2nd quarter 2007 and 3rd quarter 2007.

[84] Source: TM internal memorandum (file name: BS Monthly Liquidity Call_03-06-08.doc).

Bear Stearns' increasing reliance on secured funding indicates that, although it appeared to be compliant with CSE program's capital requirement, the market did not perceive it to be sufficiently capitalized to justify extensive unsecured lending. In this sense, Bear Stearns was not adequately capitalized.

These facts illustrate that although Bear Stearns was compliant with the CSE program's ten percent Basel capital requirement, it was not sufficiently capitalized to attract the funding it needed to support its business model. Although the Commission has maintained that liquidity (not capital) problems caused Bear Stearns' collapse, this audit found that it is entirely possible that Bear Stearns' capital levels could have contributed to its collapse by making lenders unwilling to provide Bear Stearns the funding it needed.

The fact that Bear Stearns collapsed while it was compliant with the CSE program's capital requirements raises serious questions about the adequacy of the CSE program's capital ratio requirements.

The CSE capital requirements are broadly consistent with the Basel II framework. The Basel II framework is based on three pillars: (1) minimum capital requirements, (2) supervisory review, and (3) market discipline in the form of increased public disclosure.[85] CSE firms calculate their capital ratios in a manner consistent with a models-based approach of pillar 1. Under pillar 2, supervisors are required to ensure that banks comply with the minimum capital requirements of pillar 1; address risks not fully captured by pillar 1, including liquidity risk and credit concentration risk; and encourage good risk management practices. Under pillar 2, supervisors should expect banks to operate above the minimum regulatory capital ratios, and should intervene at an early stage to prevent banks from falling below minimum levels required to support the risk characteristics of a particular bank, including requiring banks to raise additional capital immediately.[86] Pillar 3 establishes disclosure requirements that aim to inform market participants about banks' capital adequacy in a consistent framework that enhances comparability.[87] The Basel II framework does not dictate a maximum capital ratio, but instead gives the supervisor the ability to set a high enough capital ratio to be consistent with the characteristics of the banks it regulates.

**Recommendation 1:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System and the Basel Committee should: (1) reassess the guidelines and rules regarding the Consolidated Supervised Entity (CSE)

---

[85] Source: GAO. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, page 20. February 15, 2007.

[86] Source: Basel Committee on Banking Supervision. International Convergence on Capital Measurement and Capital Standards, June 2006, paragraphs 9 and 756-760. < http://www.bis.org/publ/bcbs128.pdf>.

[87] Source: GAO. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, page 91. February 15, 2007.

firms' capital levels; and (2) identify instances (*e.g.,* a firm's credit rating is downgraded, or its unsecured debt trades at high spreads over Treasuries) when firms should be required to raise additional capital, even if the firm otherwise appears to be well capitalized according to CSE program requirements.

## Liquidity [88]

The Commission designed the CSE program to ensure that, in a stressed environment, a firm could withstand the loss of its unsecured financing for up to one year,[89] under the assumption that secured funding for liquid assets would be available. In addition, the liquidity analysis assumes that any assets held in a regulated entity are unavailable for use outside of the entity to deal with liquidity issues elsewhere in the consolidated entity.[90] The CSE program's guidelines on liquidity implement supervisory principles concerning liquidity in a manner that attempts to be consistent with pillar 2 of Basel II.[91]

According to agreements between the Commission and the United Kingdom's Financial Services Authority entered into in April 2006, each CSE is required to maintain a liquidity portfolio of cash or highly liquid debt and equity securities of $10 billion, with the exception of Bear Stearns, which was required to maintain a liquidity portfolio of $5 billion. The liquidity requirement for Bear Stearns was lower because it was the smallest CSE. Bear Stearns was continuously compliant with this requirement.

Bear Stearns initiated a plan in November 2006 to increase its liquidity levels and in fact (according to TM data), it significantly increased its liquidity levels from

---

[88] According to the Commission, "[i]t is important to realize capital is not synonymous with liquidity. A firm can be highly capitalized, that is, can have more assets than liabilities, but can have liquidity problems if the assets cannot quickly be sold for cash or alternative sources of liquidity, including credit, obtained to meet other demands. While the ability of a securities firm to withstand market, credit, and other types of stress events is linked to the amount of capital the firm possesses, the firm also needs sufficient liquid assets, such as cash and U.S. Treasury securities, to meet its financial obligations as they arise.

Accordingly, large securities firms must maintain a minimum level of liquidity in the holding company. This liquidity is intended to address pressing needs for funds across the firm. This liquidity consists of cash and highly liquid securities for the parent company to use without restriction."
Source: Answers to Frequently Asked Investor Questions Regarding The Bear Stearns Companies, Inc. Commission. 18 March 2008. <http://www.sec.gov/news/press/2008/2008-46.htm>.

[89] Source: Risk Management and its Implications for Systemic Risk Before the U.S. Senate Subcommittee on Securities, Insurance, and Investment Committee on Banking, Housing, and Urban Affairs, 110th Cong. (June 19, 2008) (statement by Erik Sirri, Director of TM, Commission).

[90] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[91] Sources for this information include:
- Basel Committee on Banking Supervision. International Convergence on Capital Measurement and Capital Standards, June 2006, paragraphs 738 and 741.
  < http://www.bis.org/publ/bcbs128.pdf>: and
- Basel Committee on Banking Supervision. Sound Practices for Managing Liquidity in Banking Organizations, February 2000. <http://www.bis.org/publ/bcbs69.pdf?noframes=1>.

May 2007 until it suddenly collapsed during one week in March 2008.[92] According to the Commission, Bear Stearns collapsed because it experienced a liquidity crisis when it lost its secured financing. The collapse of Bear Stearns thus indicates that the CSE program's liquidity guidelines (implementing the spirit of pillar 2 of Basel II) are inadequate in two respects. First, the time horizon over which a liquidity crisis unfolds is likely to be significantly less than the one-year period. Second, secured lending facilities are not automatically available in times of stress.

Bear Stearns' liquidity planning indicates that Bear Stearns was well aware of these impractical aspects of the CSE program's approach to liquidity more than a year before it failed. At a quarterly meeting with TM in April 2006, Bear Stearns told TM that it had developed a 60-day cash inflow and outflow analysis that it could use to track cash flows on a daily basis.[93] Bear Stearns told TM that the 60-day stress test "provides a detailed cash inflows and outflows analysis during the most critical part of a liquidity crisis."[94] The 60-day analysis, however, did not assume that secured funding was always available. Instead, the analysis assumed the availability of existing credit lines.[95] A 60-day period corresponds more closely than a one-year period to the timeframe over which a liquidity crisis unfolds. A 60-day period also corresponds to a time period over which a firm can raise new equity capital in an orderly manner. In this sense, Bear Stearns realized that the one-year period was not realistic and also recognized that secured funding might not be available in times of stress.

In November 2006, Bear Stearns also undertook efforts to line up *committed* secured lending facilities. The fact that Bear Stearns made a special effort to line up committed secured lending facilities indicates that Bear Stearns did not think that such facilities would automatically be available in a stressed environment. Bear Stearns told TM that the secured funding initiative was improving the firm's performance in the 60-day stress scenarios, because the 60-day stress scenarios did not assume that secured funding would always be available as contemplated by the CSE program's one-year liquidity stress test. Bear Stearns planned to extend its 60-day stress model to one year and to modify its analysis to include unused credit lines only to the extent that they were committed.[96] As part of its secured funding initiative, Bear Stearns planned to use uncommitted lines of credit on an ongoing basis, thus increasing its access

---

[92] According to the Commission, Bear Stearns had a high liquidity level of $21 billion in early March 2008 (*i.e.*, before the week of March 10) compared to $7.6 billion in May 2007 (according to TM data). Bear Stearns' required liquidity was $5 billion.

[93] Source: TM's internal quarterly meeting memorandum with Bear Stearns for the 1st quarter of 2006.

[94] Source: TM's internal quarterly meeting memorandum with Bear Stearns for the 2nd quarter of 2006.

[95] Source: The Bear Stearns Companies Inc. Financial Review – Quarter ended February 28, 2007 Meeting held April 18, 2007 and Conference call held on April 24, 2007.

[96] Source: TM's internal quarterly meeting memoranda with Bear Stearns for the 2nd quarter of 2007 and 3rd quarter of 2007.

to credit in a stressed environment where uncommitted lines might not be available.[97]

Internal TM memoranda indicate that TM believed that the secured funding initiative helped Bear Stearns weather the credit difficulties it faced during the summer of 2007, when two hedge funds sponsored by Bear Stearns' Asset Management (BSAM) failed.[98]

According to internal TM memoranda, Bear Stearns had a goal of arranging committed secured evergreen facilities with terms of six to twelve months. An evergreen facility allows a borrower to lock in funding for a predetermined minimum period of time. For example, in a six-month evergreen facility, the lender must give notice to terminate the facility six months before being entitled to start getting its money back. If Bear Stearns had such facilities, which were terminated, such terminations would have created potential financial stress for Bear Stearns with a known, contractually predetermined time lag. Therefore, it would have been important for TM to know about such terminations, in order for TM to anticipate the potential financial stress. OIG has asked TM for information concerning whether TM knew about terminations of any evergreen facilities providing secured collateralized lending to Bear Stearns, but OIG has been unable to determine what additional information TM had about any such facilities, including terminations.

To summarize, as early as November 2006, Bear Stearns was implementing a more realistic approach to liquidity planning than contemplated by the CSE programs' liquidity stress test. While this more realistic approach may have helped Bear Stearns in the summer of 2007, it was not sufficient to save the firm in March 2008. Bear Stearns' initiative to line up secured funding indicates that the crisis which occurred in March 2008 was not totally unanticipated by Bear Stearns, in that Bear Stearns had been taking specific steps to avoid such a crisis for more than a year before it occurred.

According to the expert retained by OIG in conjunction with this audit, the need for Basel II firms to undertake specific efforts to line up committed secured funding in advance of a stressed environment depends on the extent to which the Basel II firms can rely on secured lending facilities from the central bank

---

[97] Source: TM's internal quarterly meeting memorandum with Bear Stearns for the 3rd quarter of 2007.
[98] "By early summer 2007, the firm had made substantial progress on its [secured funding] initiatives, reducing commercial paper substantially and increasing the pool of liquidity available to the parent company. This progress proved to be very important. In August of 2007 the collapse of two Bear [Bear Stearns] managed hedge funds prompted S&P to change its outlook on Bear Stearns' debt to 'Negative'. This rating agency action and a poorly received investor call that followed led to some creditor anxiety around the Bear Stearns' name. Because of this idiosyncratic news, along with the general stress that began in the funding markets in August, OPSRA began monitoring Bear Stearns' liquidity on a daily basis. Obviously the funding enhancements that began in the earlier part of the year helped the firm in managing throughout these challenging times."
Source: TM internal memorandum with Bear Stearns for the 3rd quarter 2007 (file name: BS_risk iden_qtr3_2007_v2.doc).

during a liquidity crisis. On the one hand, if it is assumed that secured lending facilities will always be available from the central bank, lining up committed secured lending facilities is not necessary. In this case, a liquidity stress test, which assumes that secured lending facilities will automatically be available is appropriate. On the other hand, if it is assumed that collateralized central bank lending facilities might not be available during a time of market stress, Basel II firms have incentives to line up committed secured lending facilities, in advance, from other sources. In the context of CSE firms which are not banks, the policies of the Federal Reserve towards making collateralized loans to non-banks becomes an important element of their liquidity planning process.

Subsequent to the collapse of Bear Stearns, the Basel Committee released a draft set of updated guidelines concerning supervision of liquidity.[99]

**Recommendation 2:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess pillar 2 of the Basel II framework and the Consolidated Supervised Entity (CSE) program guidelines regarding liquidity and make appropriate changes to the CSE program's liquidity requirements. Changes should describe assumptions CSE firms should be required to make about availability of secured lending in times of stress (including secured lending from the Federal Reserve) and should spell out circumstances in which CSE firms should be required to increase their liquidity beyond levels currently contemplated by CSE program liquidity requirements.

# Finding 2:  TM Did Not Adequately Address Several Significant Risks That Impact The Overall Effectiveness Of The CSE Program

TM did not adequately address several significant risks, which affected the overall effectiveness of the CSE program. Notes from TM's meeting with Bear Stearns' management indicate that TM often discussed risks, which turned out to be relevant, but the discussions did not prompt TM to exert sufficient influence over Bear Stearns to make changes as a result of the risks identified.

## Concentration of Assets

Bear Stearns had a high concentration of mortgage securities. Prior to Bear Stearns becoming a CSE, TM was aware that its concentration of mortgage securities had been steadily increasing. For instance, TM stated:

---

[99] Source: Basel Committee on Banking Supervision. Principles for Sound Liquidity Risk Management and Supervision. June 2008 – Draft for Consultation. <http://www.bis.org/publ/bcbs138.pdf?noframes=1>.

> ... [Bear Stearns] continues to push for increased balance sheet
> and risk taking authority despite six limit increases since 2001.
> These increases have brought the total permitted balance sheet
> usage from less than $2 billion to over $6 billion.[100]

TM staff even found that the amount of mortgage securities was occasionally
well beyond Bear Stearns' internal limits. For instance, TM stated:

> We [TM staff] will continue to discuss with risk management the
> size of the Adjustable Rate Mortgage ("ARM") business as it
> continues to operate *in excess of allocated limits*, reaching new
> highs with respect to the net market value of its positions.[101]
> [Emphasis Added]

Furthermore, according to TM's own documentation, a portion of Bear Stearns'
mortgage securities (e.g., adjustable rate mortgages) represented a significant
concentration of market risk, as was evidenced by Bear Stearns' collapse.
Paragraph 777 of Basel II framework states:

> In the course of their activities, supervisors should assess the
> extent of a bank's credit risk concentrations, how they are
> managed, and the extent to which the bank considers them in its
> internal assessment of capital adequacy under Pillar 2. Such
> assessments should include reviews of the results of a bank's
> stress tests. Supervisors should take appropriate actions where the
> risks arising from a bank's credit risk concentrations are not
> adequately addressed by the bank.[102]

Yet, notwithstanding these "red flags" that TM knew about, and warnings in the
Basel standards, TM did not make any efforts to limit Bear Stearns' mortgage
securities concentration.

## Recommendation 3:
The Division of Trading and Markets should ensure that it adequately
incorporates a firm's concentration of securities into the Consolidated Supervised
Entity (CSE) program's assessment of a firm's risk management systems (e.g.,
internal controls, models, etc.) and more aggressively prompts CSE firms to take
appropriate actions to mitigate such risks.

---

[100] Source: an internal TM memorandum dated November 15, 2004.
[101] Source: an internal TM memorandum dated March 2005. TM stated that it verified that Bear Stearns'
senior management had granted temporary authority to exceed these limits.
[102] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement
and Capital Standards, June 2006, paragraph 777. < http://www.bis.org/publ/bcbs128.pdf>.

## Leverage

Prior to the adoption of the rule amendments which created the CSE program, the broker-dealers affiliated with the CSE firms were required to either maintain:

- A debt to net capital ratio of less than 15 to 1(after their first year of operation); or

- Have net capital not less than the greater of $250,000 or two percent of aggregate debit items computed in accordance with the *Formula for Determination of Reserve Requirements for Broker-Dealers.*

However, the CSE program did not require a leverage ratio limit for the CSE firms. As a result, Bear Stearns was highly leveraged, with a gross leverage ratio of approximately 33 to 1 prior to its collapse.[103]   Leverage can affect liquidity risk. For instance:

- The Counterparty Risk Management Policy Group (in June 1999)[104] stated:

    The link between leverage and funding liquidity risk is relatively straightforward: leverage amplifies funding liquidity risk...

- The President's Working Group (PWG) on Financial Markets[105] Report (in April 1999) on Long-Term Capital Management (LTCM) stated:[106]

    In addition, the liquidity risk of a hedge fund interacts with and is magnified by leverage, most clearly in distressed market circumstances.[107]

Although TM has maintained that leverage is not directly related to liquidity, it is clear that if a firm experiences a lack of confidence, its liquidity can be adversely affected and that leverage can influence confidence levels. Thus, it is entirely

---

[103] There are many definitions of leverage. Other firms also had high gross leverage amounts (*i.e.,* assets divided by stockholders' equity). See Appendix VI.

[104] "In January 1999, a group of 12 major, internationally active commercial and investment banks announced the formation of a Counterparty Risk Management Policy Group (CRMPG). The objective of the Policy Group, whose formation was endorsed by Chairman Greenspan [then Federal Reserve Chairman], Chairman Levitt [then Commission Chairman] and Secretary Rubin [then Secretary of the U.S. Department of Treasury], has been to promote enhanced strong practices in counterparty credit and market risk management." *Improving Counterparty Risk Management Policies,* Counterparty Risk Management Policy Group 2 (June 1999).

[105] In 1988, Executive Order 12631 established the President's Working Group (PWG). The PWG's purpose is "...enhancing the integrity, efficiency, orderliness, and competitiveness of our nations financial markets and maintaining investor confidence..." The PWG members are: the Chairmen of the Commission, the Commodities Futures Trading Commission, and the Federal Reserve; and the Secretary of the U.S. Department of Treasury.

[106] Long-Term Capital Management (LTCM) was a very large U.S. hedge fund that collapsed in 1998. However, apparently some counterparties treated LTCM as an investment bank and not a hedge fund.

[107] Although, Bear Stearns was not a hedge fund, we believe that the concept of leverage's relationship to liquidity still applies, especially since apparently some counterparties treated LTCM as an investment bank and not a hedge fund.

possible that Bear Stearns' high leverage contributed to a lack of confidence in the firm (including unsubstantiated rumors) which had an impact on its collapse. In fact, TM believed in early 2006 that Bear Stearns was still managing its balance sheet at quarter end, a practice which suggests that Bear Stearns was aware that its leverage ratios affected market perceptions.[108] Although banking regulators have established a leverage ratio limit, the CSE program has not established a leverage ratio limit.[109] The adoption of leverage limits must be reassessed in light of the circumstances surrounding the Bear Stearns' collapse, especially since some individuals believe that this policy failure directly contributed to the current financial crisis.

**Recommendation 4:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess the Consolidated Supervised Entity (CSE) program's policy regarding leverage ratio limits and make a determination as to whether, and under what circumstances, to impose leverage ratio limits on the CSEs.

## Bear Stearns' Model Review Process and Risk Management Staffing Were Inadequate in the Area of Mortgage Backed Securities

Prior to Bear Stearns' approval as a CSE in November 2005, OCIE found that Bear Stearns did not periodically evaluate its VaR models,[110] nor did it timely update inputs to its VaR models. Further, OCIE found that Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked.[111] As a result, Bear Stearns' daily VaR amounts could have been based on obsolete data. It was critically imperative for Bear Stearns' risk managers to review mortgage models because its primary business dealt with buying and selling mortgage-backed securities.

During the initial CSE application, TM staff raised concerns about model review scope regarding mortgages and other cash products. TM stated:

---

[108] "(From a liquidity and funding perspective-it appears that both BS [Bear Stearns] and LB [Lehman Brothers] are still actively managing their balance sheets at quarter end, whereas this practice seems to have been mitigated substantially at MS [Morgan Stanley] and GS [Goldman Sachs Group, Inc.] based on the quarterly discussions with MS and GS Treasury departments)."
Source: TM credit meeting memorandum with Bear Stearns dated December 2005.

[109] However, there are some fundamental differences between commercial and investment banks. For instance, unlike investment banks, commercial banks rely on customer deposits.

[110] "Value at Risk (VaR) is the maximum loss not exceeded with a given probability defined as the confidence level, over a given period of time." Source: Wikipedia- The Free Encyclopedia. <http://en.wikipedia.org/wiki/Value_at_risk>.

[111] OCIE internal memorandum to Jeffrey M. Farber (Bear Stearns, Senior Managing Director), December 2 2005, page 8. Also see Finding 5.

We believe it would be highly desirable for Independent Model Review to carry out detailed reviews of models in the mortgage area.[112]

At a meeting with TM on September 20, 2006, Bear Stearns' risk managers provided TM with a presentation concerning how its risk managers reviewed Bear Stearns' models to price and hedge various financial instruments. As a result of this presentation, TM concluded that Bear Stearns' model review process lacked coverage of mortgage-backed and other asset-backed securities, in part because the models were not used for pricing and in part because the sensitivities to various risks implied by the models did not reflect risk sensitivities consistent with price fluctuations in the market.[113] According to the OIG expert, this information is consistent with the interpretation that pricing at Bear Stearns was based more on looking at trading levels in the market than on looking at models. This information is also consistent with the interpretation that traders used their own models (perhaps empirically based) for hedging purposes and not the ones that the risk managers were reviewing. When markets are liquid and trading is active, market prices can be used to value assets accurately. In times of market stress, trading dries up and reliable price information is difficult to obtain. Models therefore become relatively more important than market price in times of market stress than in times when markets are liquid and trading actively. Such stressed circumstances force firms to rely more on models and less on markets for pricing and hedging purposes.

TM later learned that spikes in VaR resulted from disagreements between traders and risk managers concerning appropriate hedge ratios.[114] Traders often combine long and short positions together, using the short positions to hedge out some of the risks associated with long positions. For example, a trader might short a government bond to hedge the interest rate risk associated with a mortgage-backed security. To construct an appropriate hedge ratio, traders use information such as the sensitivity of the value of the assets to interest rate changes or interest rate spreads. At Bear Stearns, traders and risk managers sometimes disagreed concerning what these sensitivities were, and processes for handling these disagreements were built into the risk management process at Bear Stearns. A VaR model is intrinsically based on more information than a sensitivity of value to interest rate spread. A VaR model also incorporates an assumption about the ratio of spread changes in one asset to spread changes in another. A VaR model can therefore tell the trader an appropriate hedge ratio to use to reduce risks associated with fluctuations in spreads. At Bear Stearns, traders used hedge ratios that were consistent with the traders' own models even though the risk managers' VaR models indicated that different hedge ratios

---

[112] Bear Stearns & Co. Inc. Consolidated Supervised Entity Market Risk Review, October 2005, page 44.
[113] Source: TM's internal Model Review Update memorandum dated September 20, 2006.
[114] Source: TM's internal credit meeting memorandum with Bear Stearns dated December 2006 and follow up notes memorandum dated February 9, 2007 and February 21, 2007.

would have been more appropriate.[115]  Since VaR measures of risk reported to TM are based on the risk managers' models and not the traders' models, the reported VaR numbers suggested a risk that was different than the risks the traders thought they were bearing. The fact that VaR spiked as a result of these disagreements also raises the question of whether VaR risk measures were taken seriously enough by Bear Steams' traders.

The OIG expert believes that interest rate and spread sensitivities were actively used as part of the discussion between risk managers and traders at Bear Steams, but the OIG expert did not see evidence in TM memoranda that the additional modeling assumptions incorporated into VaR models added much to these discussions.

TM believed that Model Review at Bear Steams was more of a support function and was less formalized than at other CSE firms.[116]  Model validation personnel, modelers, and traders all sat together at the same desk.[117]  According to the OIG expert, sitting together at the same desk has the potential advantage of facilitating communication among risk managers and traders but has the potential disadvantage of reducing the independence of the risk management function from the trader function, in both fact and appearance.

In 2006, the expertise of Bear Steams' risk managers was focused on pricing exotic derivatives and validating derivatives models.  At the same time, Bear Steams' business was becoming increasingly concentrated in mortgage securities, an area in which its model review still needed much work.  The OIG expert concluded that, at this time, the risk managers at Bear Steams did not have the skill sets that best matched Bear Steams' business model.

For instance, TM's discussions with risk managers in 2005 and 2006 indicated that Bear Steams' pricing models for mortgages focused heavily on prepayment risks but TM's internal memoranda rarely mentioned how the models dealt with default risks.[118]  Given the risk managers' lack of expertise in mortgages, it would have been difficult for risk managers at Bear Steams to advocate a bigger focus on default risk in its mortgage models.

There was also turnover of Bear Steams' risk management personnel at critical times.  Bear Stearns' head of model validation resigned around March 2007, precisely when the subprime crisis was beginning to hit and the first large write-downs were being taken.[119]  At exactly this point in time, Bear Steams had a tremendous need to rethink its mortgage models and lacked key senior risk

---

[115] Source: TM's internal credit meeting memorandum with Bear Steams dated December 2006 and follow up notes memorandum dated February 9, 2007 and February 21, 2007.

[116] Source: TM's internal Model Review Update memorandum dated September 20, 2006.

[117] Source: TM's internal Model Review Update memorandum dated September 20, 2006.

[118] Source: TM's internal credit meeting memoranda with Bear Steams dated February 2006 and September 2004.

[119] Source: TM's internal credit meeting memorandum with Bear Steams dated February 2007.

modelers to engage in this process. As a result, mortgage modeling by risk managers floundered for many months.[120] According to the OIG expert, this disarray in risk management tended to give trading desks more power over risk managers. In fact, there are indications (in internal TM memoranda from later monthly meetings between TM and Bear Stearns) that the risk manager who left had difficulty communicating with senior managers in a productive manner.[121] In the opinion of the OIG expert, difficulties in communication are a potential red flag indicating that a risk manager could be telling the traders to take on less risk than they would otherwise choose to do (*i.e.*, information that the traders would presumably not want to hear). This risk manager's eventual replacement was described as having some trading experience and therefore a potentially better skill set for communicating with trading desks.[122]

When a new senior risk manager (with expertise in mortgages) arrived in summer of 2007, TM was aware that there was a great need for risk management to work on mortgage models.[123] Instead, TM learned that the risk management process was operating in crisis mode, dealing with numerous issues related to price verification, markdowns, and disputes over collateral valuations with counterparties.[124] TM was aware that the model review function was typically understaffed at Bear Stearns for much of 2007.[125] As a result, the OIG expert concluded that the reviews of mortgage models that should have taken place before the subprime crisis erupted in February 2007 appears to have never occurred, in the sense that it was still a work in progress when Bear Stearns collapsed in March 2008.

To summarize, TM was aware that risk management of mortgages at Bear Stearns had numerous shortcomings, including lack of expertise by risk managers in mortgage-backed securities at various times; lack of timely formal review of mortgage models; persistent understaffing; a proximity of risk managers to traders suggesting lack of independence; turnover of key personnel during times of crisis; and an inability or unwillingness to update models quickly enough to keep up with changing circumstances. In 2006, TM missed an opportunity to push Bear Stearns aggressively to add expertise in mortgage modeling to the risk management staff, to review mortgage models in a timely manner, to add incorporate default rates into mortgage modeling, and to make sure that mortgage risk management could function efficiently in a stressed environment.

---

[120] Source: TM's internal credit meeting memorandum with Bear Stearns dated April 2007, and Model Review Update memorandum involving Bear Stearns dated December 19, 2007.

[121] Source: TM's internal credit meeting memorandum with Bear Stearns dated March 2007.

[122] Source: TM's internal credit meeting memorandum with Bear Stearns dated March 2007.

[123] Source: TM's internal credit meeting memorandum with Bear Stearns dated July 2007.

[124] Source: TM's internal credit meeting memorandum with Bear Stearns dated July 2007.

[125] Source: TM's internal Model Review Update memorandum involving Bear Stearns dated December 19, 2007.

**Recommendation 5:**
The Division of Trading and Markets (TM) should ensure that: (1) the Consolidated Supervised Entity (CSE) firms have specific criteria for reviewing and approving models used for pricing and risk management, (2) the review and approval process conducted by the CSE firms is performed in an independent manner by the CSEs' risk management staff, (3) each CSE firms' model review and approval process takes place in a thorough and timely manner, and (4) impose limits on risk taking by firms in areas where TM determines that risk management is not adequate.

## Risk Scenarios

When Bear Stearns applied to be a CSE, TM reviewed the independent risk management function at Bear Stearns in 2005.[126] In addition to VaR, Bear Stearns used stress scenarios to capture risks associated with history-based and hypothetical scenarios.  TM reviewed a sample of a "Bear Stearns Scenario Summary Report."  The report contains nine history-based scenarios which had been implemented (including the 1987 stock market crash and the 1998 LTCM crisis), eight hypothetical scenarios which had been implemented (including shocks to interest rates and interest rate spreads), and six additional proposed hypothetical scenarios, which appear not to have been implemented when Bear Stearns became a CSE.[127]  Most of these proposed scenarios related to the market for residential mortgages.  For example, the proposed scenarios contemplated shocking the credit spreads for both high grade and high yield mortgage-backed securities separately.

Bear Stearns' VaR models did not capture risks associated with credit spread widening of non-agency mortgages that are prime or near-prime (Alt-A).[128]  Thus, the residential mortgage stress tests were potentially beneficial in that they quantified potential risks not otherwise captured.  The OIG expert did not find documentary evidence indicating that these scenarios were actually implemented or subsequently discussed with TM until 2007.  Furthermore, the OIG expert believes that meaningful implementation of high grade and high yield mortgage credit spread scenarios requires both a measure of sensitivity of mortgage values to yield spreads as well as a model of how fundamental mortgage credit risk factors make yield spreads fluctuate.  These fundamental factors include housing price appreciation, consumer credit scores, patterns of delinquency rates, and potentially other data.  These fundamental factors do not seem to have been incorporated into Bear Stearns' models at the time Bear Stearns became a CSE.

---

[126] Source: TM internal memorandum Bear Stearns & Co. Inc. Consolidated Supervised Entity Market Risk Review, October 2005, Appendix D:  Scenario Analysis Summary Report.

[127] The scenario names are "MBS Underp. (Prepay Risk)," "HG MBS/ABS Underp. (Credit Risk)," "HY MBS/ABS Underp. (Credit Risk)," "Volatility Spike," "FNMA Problems," and "FHLMC Problems."

[128] Source: TM internal memorandum Bear Stearns & Co. Inc. Consolidated Supervised Entity Market Risk Review, October 2005, Appendix D:  Scenario Analysis Summary Report.

The presence of the proposed mortgage scenarios in the materials TM reviewed in 2005 indicates that both TM and Bear Stearns knew that incorporating these features into Bear Stearns' risk management was important for effective risk management. The absence of their implementation suggests that Bear Stearns did not have in place in 2005 the risk management technology needed to implement the scenarios in a meaningful manner.

According to internal TM memoranda, TM discussed several different risk scenarios with Bear Stearns' management. The most commonly-discussed stress scenarios mentioned in TM memoranda include the 1987 stock market crash, the 1998 collapse of LTCM and the 9/11 terrorist attacks, because these crisis scenarios resulted in the greatest potential losses. The OIG expert concluded based on a review of internal TM memoranda, that Bear Stearns' risk managers analyzed these risks carefully. Additionally, TM collected a great deal of information on other aspects of risk management, including the organizational structure of the risk management process, model verification, and price verification.

The OIG expert however, also concluded that the internal TM memoranda provide no discussion of the most serious forward-looking risk scenario that Bear Stearns might face, which was a complete meltdown of mortgage market liquidity accompanied by fundamental deterioration in the mortgages themselves, resulting from falling housing prices.

In April 2006 through June 2006, Bear Stearns briefed TM multiple times on problems faced by a United Kingdom mortgage originator subsidiary.[129] As a result of extremely poor performance of collateral, due to weak underwriting standards, Bear Stearns took losses associated with security originations by this subsidiary. In fact, an internal memorandum to TM's Division Director quoted the text of two newspaper articles chronicling this subsidiary's inability to meet its interest payments.[130] At the time of the news articles, Bear Stearns told TM that it was holding $1.5 billion in unsecuritized whole loans and commitments from this subsidiary, and TM believed that Bear Stearns would be unable to sell this commitment due to the negative publicity surrounding this subsidiary.[131] In focusing on Bear Stearns' problems with this subsidiary, the OIG expert believes that in 2006, TM identified precisely the types of risks that evolved into the subprime crisis in the U.S. less than one year later. Yet, TM did not exert influence over Bear Stearns to use this experience to add a meltdown of the subprime market to its risk scenarios. Moreover, TM did not use this event to exert influence on Bear Stearns to reduce its exposure to subprime loans, as previously discussed on page 17.

---

[129] Source: TM's internal credit meeting memoranda with Bear Stearns dated April 2006, May 2006, and June 2006.
[130] Source: TM's internal credit meeting memorandum with Bear Stearns dated June 2006.
[131] Source: TM's internal credit meeting memorandum with Bear Stearns dated June 2006.

In terms of large drops in market prices and large asset write-downs on mortgage-backed securities, the subprime crisis began to affect the U.S. around December 2006. The drop in prices tended to hit residuals from mortgage securitizations first. When mortgages or other assets are securitized, the tranches, which have the highest certainty of payment, typically receive "AAA" ratings. The tranches with lowest credit quality are called "residuals," and these tranches bear credit losses before the higher rated tranches bear credit losses. In February 2007, Bear Stearns told TM that it had written $300 million of residuals down by $58 million in January 2007, after writing the residuals down by $25 million in December 2006.[132] Additional write-downs the following month brought total losses on second lien inventory to $168 million and total losses on residential mortgage backed securities and structured products to $240 million.[133] The write-downs during this quarter were mostly on residuals backed by second lien loans,[134] Alt-A loans,[135] and subprime mortgages.[136] TM described the residual write-downs as a meltdown that was worse than what Bear Stearns could have predicted over a year before Bear Stearns collapsed.[137]

Prior to these write-downs, in the fall of 2006, TM had focused on the risks associated with residuals and asked for detailed breakdowns of residuals by age and asset type. Bear Stearns' management told TM that it was moving away from holding residuals in its portfolio, was attempting to sell aging residuals, and was aware that its residuals on second lien mortgage securitizations were very risky.[138] In the months prior to Bear Stearns' taking these losses, Bear Stearns briefed TM on the rising delinquencies on subprime mortgages.[139]

The OIG expert believes that the greater risk was that the mortgage market would deteriorate further, with losses spreading from sub-prime loans to Alt-A loans and even to higher rated agency securities.[140] In fact, this scenario did unfold. TM discussed with Bear Stearns the market's heavy reliance on ratings agencies and the risks associated with ratings downgrades.[141] However, TM did not appear to have sufficiently encouraged Bear Stearns to incorporate into its risk management forward-looking risk scenarios based on risks identified and discussed during the regular monthly meetings between TM and Bear Stearns. Such scenarios could have included the consequences of much higher delinquencies on subprime and Alt-A mortgages, the consequences of rating

---

[132] Source: TM's internal credit meeting memorandum with Bear Stearns dated January 2007.

[133] Source: TM's internal credit meeting memorandum with Bear Stearns dated February 2007.

[134] Second lien loans are home equity loans.

[135] An Alt-A mortgage is considered riskier than a "prime" mortgage, but not as risky as "subprime" mortgage.

[136] Source: TM's internal credit meeting memorandum with Bear Stearns dated January 2007.

[137] Source: TM's internal credit meeting memorandum with Bear Stearns dated January 2007.

[138] Source: TM's internal credit meeting memoranda with Bear Stearns dated August 2006 and September 2006.

[139] Source: TM's internal credit meeting memorandum with Bear Stearns dated November 2006.

[140] Source: TM's internal credit meeting memoranda with Bear Stearns dated January 2007 and February 2007.

[141] Source: TM's internal credit meeting memorandum with Bear Stearns dated December 2006.

downgrades on mortgage-backed securities, contagion and loss of liquidity from losses on mortgage-backed securities. By July 2007, deterioration of mortgages had spread to highly rated securities such as AAA paper backed by Alt-A mortgages, and Bear Stearns reported $570 million in losses for the month.[142]

Towards the end of 2007, Bear Stearns incorporated measures to reflect house price appreciation or depreciation into its mortgage models. It also developed a housing led recession scenario which it could incorporate into risk management and use for hedging purposes. By this time, Bear Stearns had large inventories of mortgage related assets, which had lost both their value and their liquidity. Since it was difficult for Bear Stearns to reduce its inventory by selling assets, this scenario helped Bear Stearns focus its attention on ways to hedge its mortgage risk by using more liquid instruments.

It is not the purpose of this discussion to claim that Bear Stearns' use of scenario analysis was better or worse than other CSE firms. TM asserts that Bear Stearns' use of scenario analysis was consistent with industry practices and the entire banking sector failed to anticipate the magnitude and scope of the housing decline that is still ongoing.

**Recommendation 6:**
The Division of Trading and Markets should be more skeptical of Consolidated Supervised Entity firms risk models and work with regulated firms to help them develop additional stress scenarios that may or may not have not have been contemplated as part of the prudential regulation process.

**Recommendation 7:**
The Division of Trading and Markets (TM) should be involved in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal, including plans for every stress scenario that the Consolidated Supervised Entity (CSE) firms use in risk management, as well as plans for scenarios that TM believes might happen but are not incorporated into CSE firms' risk management.

## Non-compliance with Basel II

### *Mark Disputes*
The subprime mortgage crisis began to affect the U.S. economy around December 2006. As the subprime crisis continued into the summer of 2007, TM learned that mark disputes were becoming more common.[143] A mark dispute can occur when two parties to a derivatives transaction, such as a swap, disagree over the value of the derivative. A mark dispute can also occur in a repurchase agreement (repo) transaction, when the borrower and the lender disagree over the value of the collateral. Mark disputes can lead the two parties

---

[142] Source: TM's internal credit meeting memorandum with Bear Stearns dated July 2007.
[143] Source: TM's internal credit meeting memorandum with Bear Stearns dated July 2007.

to a swap or financing transaction to each make margin calls on the other. During July 2007, Bear Stearns told TM that there were two large dealers with whom mark disputes were in excess of $100 million each.[144]  Bear Stearns had thousands of trades with each of these two dealers.   TM says that mark disputes are an unavoidable issue faced by all dealers (particularly when markets for underliers become less liquid), and the total disputed numbers at Bear Stearns are much smaller than at other institutions.

By March 2008, Bear Stearns' mark disputes involved even larger amounts.  For example, on March 12, 2008, TM was told that Bear Stearns paid out $1.1 billion in disputes to numerous counterparties in order to squelch rumors that Bear Stearns could not meet its margin calls.[145]

There are indications in the TM memoranda that Bear Stearns tended to use the traders' more generous marks for profit and loss purposes, even when Bear Stearns conceded to the counterparty for collateral valuation purposes.[146]  This practice allows two traders at different firms to record a gain at the expense of the other, despite the fact that the zero-sum nature of trading requires the net gain to be zero.  One particularly large mark dispute, discussed in multiple meetings, involved Bear Stearns and another CSE.  It is inconsistent with the spirit of Basel II for two firms to use a mark dispute as an occasion to increase their combined capital, as would occur when both parties to a trade book profit at the expense of the other simply because they each mark positions favorably for themselves.  While TM memoranda indicate that TM had several discussions with Bear Stearns' risk managers about this particular mark dispute, the OIG expert found no evidence from reviewing internal TM memoranda that TM encouraged the CSE firms to adopt mutually consistent marking practices that avoid the use of collateral disputes to create apparent capital in a manner inconsistent with Basel II.  Since mark disputes tend to occur on illiquid positions that are hard to value, conservative valuation adjustments consistent with Basel II[147] should theoretically result in a situation where the long side of a trade is carried at a lower value than the short side; i.e., when netted across two firms with offsetting long and short positions, appropriately conservative valuations should appear to reduce capital, not increase it.

---

[144] Source: TM's internal credit meeting memorandum with Bear Stearns dated July 2007.

[145] Source: TM internal memorandum from March 2008 (filename: Bear Stearns March Notes - SMS.doc).

[146] Source: TM's credit meeting memorandum with Bear Stearns dated March 2007, states: "We also asked how helpful the counterparty collateral process was for informing the price verification process. Kan said the collateral process does not tend to lead to changes in marks for P/L purposes – suggesting it was not helpful – but Mike Alix [Chief Risk Officer, Bear Stearns] said it could be helpful not sure if the mortgage guys actually gave a straight answer)."

[147] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 700. < http://www.bis.org/publ/bcbs128.pdf >.

**Recommendation 8:**
The Division of Trading and Markets should take steps to ensure that mark disputes do not provide an occasion for Consolidated Supervised Entity firms to inflate the combined capital of two firms by using inconsistent marks.

*Inconsistent VaR Numbers*
According to an internal TM memorandum, there were occasions when Bear Stearns' risk managers had difficulty explaining changes in VaR numbers from one month to the next.[148] For example, when markdowns on assets occurred, Bear Stearns' risk managers had difficulty explaining whether the markdowns were a delayed response to market moves resulting in changes in VaR risk factors or updates based on asset specific information (such as delinquency rates on individual assets).

In some cases, Bear Stearns' risk managers had difficulty explaining how firmwide VaR numbers were related to desk-specific VaR numbers. The OIG expert believes that this occurred because each of Bear Stearns' trading desks evaluated profits and risks individually, as opposed to relying on one overall firm-wide approach. On some occasions, Bear Stearns' several trading desks had opposite positions in various instruments (*e.g.*, some desks were long sub-prime while other desks were short sub-prime), and Bear Stearns used VaR numbers more for regulatory reporting than for internal risk management. This inconsistency between use of VaR for internal and regulatory reporting purposes does not comport with the spirit of Basel II and makes it harder for TM to understand what is going on inside the firm. TM encouraged Bear Stearns to do a better job of presenting risks in a manner that made it easier to understand the relationship between firm-wide desk-level risks. Bear Stearns' risk management was working on improved reporting, perhaps influenced by TM's encouragement.

**Recommendation 9:**
The Division of Trading and Markets should encourage the Consolidated Supervised Entity (CSE) firms to present VaR and other risk management data in a useful manner, which is consistent with how the CSE firms use the information internally and which allows risk factors to be applied consistently to individual desks.

*Bear Stearns' Capital Requirements for Illiquid Assets and Stressed Repos Require Careful Oversight.*

As the subprime crisis worsened in June 2007, the market began to freeze up and formerly liquid assets lost much of their liquidity. Bear Stearns told TM that it found it difficult to find ways to establish objective market values for assets as they became more thinly traded and therefore, less liquid. TM stated that, in some instances, TM required a full deduction for certain illiquid assets, such as mortgage residuals. Since the decline in liquidity of many mortgage-related

---

[148] Source: TM's internal credit meeting memorandum with Bear Stearns dated May 2007.

assets was so unprecedented, and the decline in liquidity increased the difficulties associated with valuing such illiquid assets, it would have been prudent for TM to consider expanding the list of assets that require a full deduction from capital. The OIG expert was unable to find documentary evidence that TM considered expanding the list of assets that required a 100% capital deduction.

When the Basel Standard is operating correctly, firms take markdowns on the value of trading book assets as the value of the assets decline. When market illiquidity increases and assets become more difficult to value, these markdowns should include valuation adjustments which not only take account of declining market values but also add an element of conservatism based on widening bid-ask spreads and the high costs that would be been incurred by a firm to liquidate its assets in a stressed environment.[149] These markdowns result in a decline in Tier 1 capital.

At times of market stress, when banks often need to take large markdowns, raising additional Tier 1 capital is often very expensive, due to factors such as a bank's falling stock price and negative signaling concerns, which could cause a bank's stock price to fall even further. In such circumstances, banks have a perverse incentive (associated with what is called "moral hazard") to postpone taking markdowns that would require the banks to raise additional capital. As an alternative to taking markdowns while continuing to hold assets whose value is questionable, banks have an incentive to consider selling such assets into the market. When selling an asset, Tier 1 capital is reduced by the amount of losses on the sale, but capital requirements are also reduced by removing the asset from the bank's portfolio. A bank looking to improve its Basel capital ratios by selling assets therefore has a perverse incentive not to sell assets that have modest capital requirements relative to the markdowns the banks should have taken but has not yet taken. This perverse incentive tends to amplify the tendency for markets to freeze up and become illiquid by reducing trading volume that would otherwise occur as banks sell losing positions into the market. On the one hand, these perverse incentives are mitigated to the extent that capital requirements on such assets are high and valuations are appropriately conservative. For assets that face a 100% capital haircut, for example, the bank gains no improvement in its capital ratios by avoiding taking a markdown, and the bank increases its capital by the proceeds of any asset sales. On the other hand, these perverse incentives are worsened to the extent that supervisors allow banks to avoid marking assets down quickly enough, to avoid taking appropriate valuation adjustments in a timely manner, or to understate assets' risks.

As the subprime crisis worsened, numerous Bear Stearns' repo counterparties, such as hedge funds with positions in mortgage related assets, suffered losses

---

[149] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 700. < http://www.bis.org/publ/bcbs128.pdf>.

and demands for redemptions. Some of these hedge funds became financially distressed. This led to discussions between TM and Bear Stearns concerning what deductions from capital were appropriate for a financially stressed hedge fund repo counterparty.[150] Consistency with the spirit of Basel II requires that the capital for a stressed repo counterparty (with no assets other than the collateral it has posted) be at least as great as the capital requirement Bear Stearns would face if it purchased the collateral for the amount owed on the repo transaction. The OIG expert believes that internal TM memoranda suggest that Bear Stearns may have been taking a smaller capital charge than Basel II requires. In addition, internal TM memoranda do not indicate that TM pressured Bear Stearns to take more aggressive capital charges on stressed repos.

Lastly, BSAM's "High Grade" hedge fund became a very large, stressed repo counterparty to Bear Stearns during the summer of 2007.[151] As of June 2007, Bear Stearns loaned $1.6 billion to BSAM's "high grade" fund. The loan was collateralized with assets estimated to be worth $1.7 to $2 billion. By the end of June 2007, asset sales had reduced the amount loaned to the fund down to $1.345 billion, but the value of the remaining collateral had deteriorated to a level very close to the value of the loan.[152] The BSAM "High Grade" hedge fund evidently had no assets other than the collateral Bear Stearns already held. Although the BSAM investors may have benefited to some extent from increases in the value of the collateral, Bear Stearns bore all risks associated with the downside. Since Bear Stearns bore all downside risks, sound risk management (consistent with Basel II) requires that the impact on Bear Stearns' capital associated with these repos should have been at least as great as the impact Bear Stearns would incur if it held the assets in its own trading book at the end of June 2007.

According to the OIG expert, a stressed repo is conceptually similar to a portfolio with a call option written against it, where the portfolio is the repo collateral and the call option is the upside gains to the stressed counterparty. Such a stressed repo is worth less than the portfolio itself, since the call option might have some value. In addition, the value of this stressed repo should have reflected the possibility that Bear Stearns might not benefit fully from potential upside gains in the value of the collateral. Furthermore, to the extent that the $1.345 billion in collateral was illiquid and would take time to liquidate, Bear Stearns should have valued the collateral conservatively, reflecting appropriate valuation adjustments.

TM memoranda summarizing discussions with Bear Stearns' risk managers suggest that the capital charge incurred by Bear Stearns at the end of June 2007 was far less than the capital charge consistent with sound risk management. TM memoranda indicate that by the end of July 2007, "Bear Stearns effectively took

---

[150] Source: TM's internal credit meeting memorandum with Bear Stearns dated June 2007.
[151] Source: TM's internal credit meeting memoranda with Bear Stearns dated May 2007, June 2007, and July 2007.
[152] Source: TM's internal credit meeting memorandum with Bear Stearns dated June 2007.

the collateral onto its own balance sheet while putting in place agreements that allow fund investors to enjoy some of the upside should (contrary to expectations) the value of the collateral rise."[153]  This arrangement is similar to a portfolio with a call option written against it.

The OIG expert did not find any evidence suggesting that TM exerted influence on Bear Stearns to take significantly larger capital charges in conjunction with the BSAM financing than would have been appropriate if the repo were not stressed.  For instance, according to TM internal documentation on July 5, 2007:

> [The] Enhanced [fund] is in the process of liquidating its remaining positions in an orderly manner while Bear Stearns has stepped in to assume the secured funding obligations of other creditors to the High Grade fund. Currently, none of the CSE firms have more than de minimis exposure, net of collateral, to either fund. However, they are reviewing their policies regarding setting "haircuts" on less liquid positions that are financed on a secured basis.[154]

TM staff could have used much tougher language to describe (to senior TM management) the very risky situation in which Bear Stearns had put itself and exerted influence over Bear Stearns accordingly.  For example, TM staff could have stated that Bear Stearns' financing of the High Grade fund appeared to have allowed Bear Stearns to delay taking a huge hit to its capital, as required by Basel II.

Bear Stearns' financing of the BSAM funds is conceptually similar to implicit support.  According to Basel II, "Implicit support arises when a bank provides support to a securitization in excess of its predetermined contractual obligation."[155]  Although the BSAM funds are not themselves, literal securitizations, the funds invested in securitizations, and Bear Stearns' financing of the BSAM funds is a form of support in excess of Bear Stearns' contractual obligations to the funds.  The repo structure created the potential for Bear Stearns to overstate the amount of risk borne by BSAM and understate its own exposure; as a result, Bear Stearns' capital calculation would understate its true risk.[156]  Basel II also requires that "When a bank has been found to provide implicit support to a securitization, it will be required to hold capital against all of the underlying exposures associated with the structure as if they had not been securitized."[157]  In the opinion of the OIG expert, it would have been appropriate

---

[153] Source: TM's internal monthly staff memorandum to TM Division Director dated August 3, 2007.
[154] Source: TM's internal monthly staff memorandum to TM Division Director dated July 5, 2007.
[155] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 551. < http://www.bis.org/publ/bcbs128.pdf>.
[156] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 791. < http://www.bis.org/publ/bcbs128.pdf>.
[157] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 792. <http://www.bis.org/publ/bcbs128.pdf>.

for TM to have treated the BSAM financing in a manner parallel to the way in which Basel II mandates that implicit support be treated.

In fact, Bear Stearns eventually acquired much of the remaining portfolio and wrote its value down by $500 million in the fall of 2007.[158]

### Recommendation 10:
The Division of Trading and Markets should ensure that the Consolidated Supervised Entity take appropriate valuation deductions for illiquid, hard-to-value assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral.

## Tolerance for Risk

TM's oversight of the CSE firms did not include assessing the risk tolerance (*e.g.*, concentration of assets) of the CSEs' Boards of Directors and other senior management (*e.g.*, CEO). In fact, TM staff never contacted these individuals about any matters relating to risk tolerance at any of the CSE firms, including Bear Stearns prior to its collapse.

We conclude based on our research that discussing risk management practices and risk tolerance with the CSEs' Boards of Directors is a prudent oversight procedure.[159] This type of assessment would assist TM staff to evaluate governance issues in the CSE firms. For example, in the case of Bear Stearns, an assessment could have been useful when there was evidence that the staff kept increasing the firm's exposure to mortgage securities. TM staff could also assess whether firms are inappropriately increasing leverage to help meet a revenue level that is tied to compensation that is provided to the CSEs' senior officers.[160]

### Recommendation 11:
The Division of Trading and Markets (TM), in consultation with the Chairman's Office, should discuss risk tolerance with the Board of Directors and senior management of each Consolidated Supervised Entity (CSE) firm to better understand whether the actions of CSE firm staff are consistent with the desires of the Board of Directors and senior management. This information would

---

[158] Source: TM's internal credit meeting memorandum with Bear Stearns dated October 2007.
[159] Sources for this information include:
  - *Risk Management and its Implications for Systemic Risk* Before the U.S. Senate Subcommittee on Securities, Insurance, and Investment Committee on Banking, Housing, and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri Director of TM, Commission);
  - The Comptroller of the Currency. Liquidity and Funds Management Manual, February 2001, page 27; and
  - The Counterparty Risk Management Policy Group. Containing Systemic Risk: The Road to Reform. August 6, 2008, page 18.
[160] TM stated that the Chairman and the TM Director have recently begun having discussions with these senior CSE personnel about undertaking this type of assessment.

enable TM to better assess the effectiveness of the firms' risk management systems.

# Finding 3: TM, Without Explicit Authority, Allowed The CSE Firms' Internal Auditors To Perform Critical Work

TM, without explicit authority, allowed the firms' internal auditors to perform critical work involving the risk management control systems. As a result, there are significant questions as to whether the work that TM relied upon in fulfilling its oversight role was as thorough or meaningful as the Commission intended in approving the rule amendments.

The CSE firms are required by the rule amendments which created the CSE program (see 17 CFR §240.15c3-1g(b)(1)(iii)(B)) to have their external auditors report[161] on the firms' risk management control systems. This review is critical because TM designed the CSE program to focus on a firm's risk management systems (e.g., internal controls, models) and their financial condition (e.g., compliance with capital and liquidity requirements), which was to be the focus of the external auditors' work. However, after the Commission approved the rule, TM decided that the firms' internal auditors could perform this critical work, instead of the external auditors.

We reviewed the delegations of authority from the Commission to TM and found no explicit authority for TM to approve this change. In addition to the apparent lack of TM's legal authority, there are serious questions about the wisdom of this decision. The rule's requirement that external auditors perform the risk management work helps to ensure the independence and quality of this critical audit work. The external auditors' work is more strictly regulated as the Public Company Accounting Oversight Board (PCAOB) regulates external auditors.[162]

---

[161] The report is referred to in the rule as the "Accountant's Report on Internal Risk Management Control System."

[162] The Sarbanes-Oxley Act of 2002 (SOX), Public Law No. 107-204, was enacted in July 2002 in response to numerous financial statement accounting scandals involving public companies (e.g., Enron and WorldCom) and their auditors (e.g., Arthur Andersen). Among other reforms, SOX established the Public Company Accounting Oversight Board (PCAOB) as a nonprofit corporation. The PCAOB's statutory mission is "to oversee the audits of public companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports for companies the securities of which are sold to, and held by and for, public investors." (Section 101(a) of SOX, 15 U.S.C §7211(a)). SOX requires that accounting firms be registered with the PCAOB, if they "prepare or issue, or participate in the preparation or issuance of, any audit report with respect to any issuer" as defined in Section 3 of the Securities Exchange Act of 1934.

TM's own internal memorandum dated November 2006 noted significant deficiencies in Bear Stearns internal auditors' work, as follows:

> The audits for Market Risk Management, Credit Risk Management, and Funding/Liquidity Risk Management are completed and the reports are in draft form.  At this point it can be noted the [sic] there appears to be significant deficiencies in the coverage for the review of liquidity and funding risk management which will be a focal point of our discussions of scope expansion in the 2007 CSE audits.[163] [Emphasis added]

As a result of TM's decision to allow CSE firm's internal auditors to perform the work, there are significant questions as to whether this work that TM relied upon was as thorough or meaningful as the Commission intended in approving the rule.

**Recommendation 12:**
The Division of Trading and Markets should require compliance with the existing rule that requires external auditors to review the Consolidated Supervised Entity firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act[164] for this deviation from the current rule's requirement.

# Finding 4:  TM Did Not Review The Communications Strategy Component Of Bear Stearns' Contingency Funding Plan After The Collapse Of Two Of Its Managed Hedge Funds

> TM did not review the communications strategy component of Bear Stearns' Contingency Funding Plan (CFP) after two of its managed hedge funds collapsed in June 2007.  Questions regarding Bear Stearns' effectiveness in communicating with its investors and the public were raised after the collapse of its hedge funds and again after the firm collapsed in March 2008.

---

[163] Given the scope of our audit, we have no evidence linking these "significant deficiencies" with the cause of Bear Stearns' collapse.

[164] The Administrative Procedures Act (5 U.S.C. §500 et. seq.,) sets forth the basic procedural requirements for agency rulemaking.  It generally requires (1) publication of a notice of proposed rulemaking in the Federal Register, (2) opportunity for public participation in rulemaking by submission of written comments, and (3) publication of a final rule and accompanying statement of basis and purpose not less than 30 days before the rule's effective date.

TM reviewed Bear Stearns' CFP during its application process. The review included an assessment of its internal and external communications strategies. According to TM:

> The goal of the contingency funding plan is to manage liquidity risk and communicate effectively with creditors, investors, and customers during a funding crisis.[165]

In June 2007, two of Bear Stearns' managed hedge funds collapsed. After the collapse, questions were raised about the lack of involvement by some of Bear Stearns senior management in handling the crisis. For instance, according to media reports, at an August conference call with investors, the conduct of a senior Bear Stearns official (*i.e.*, their lack of involvement in the telephone call) did not apparently help to restore confidence in the firm (which was the purpose of the meeting).

TM did not reassess the communication strategy component of Bear Stearns' CFP after the collapse of its hedge funds. Although there was contact between TM and Bear Stearns (about many issues) after the June 2007 collapse of its hedge funds, at no point did TM discuss Bear Stearns' communication strategy. This proved particularly problematic as questions were once again raised about some of Bear Stearns' management[166] regarding its handling of the crisis during the week of March 10, 2008.

Conversely, some individuals praised Lehman Brothers Holdings Inc. (Lehman Brothers) management for its handling of a crisis it previously experienced (*e.g.*, Lehman Brothers provided talking points to its traders to use with its trading partners). In fact, some of these individuals credited Lehman Brothers' management with helping to save the firm during/around the week of March 10, 2008, when Bear Stearns collapsed.[167]

It is undisputed that a firm's communication strategy can affect confidence levels in the firm. Bear Stearns' collapse illustrated the importance of confidence for an investment bank's survival.

**Recommendation 13:**
The Division of Trading and Markets should ensure that reviews of a firm's Contingency Funding Plan include an assessment of a Consolidated Supervised Entity firm's internal and external communication strategies.

---

[165] Source: TM's internal Liquidity and Funding Risk Review manual (draft) dated March 3, 2004.

[166] We did not asses the performance of Bear Stearns' management during the collapse of the hedge funds or Bear Stearns.

[167] While Bear Stearns collapsed in March 2008, concerns about Lehman Brothers' survival began to circulate and on September 15, 2008, Lehman Brothers announced that it would file for bankruptcy.

# Finding 5: TM's Monitoring Staff Do Not Adequately Track Material Issues

TM's monitoring staff identify numerous issues involving internal risk management systems (*e.g.*, the adequacy of CSE staffing levels in various departments, the functioning of the internal audit office, and the adequacy of documented policies and procedures) which require action by the CSEs and a resolution. However, TM does not adequately track the issues.

## Develop a Formal Automated Tracking Process

TM's monitoring staff does not have a formal process (*e.g.*, automated) to track material issues to ensure that they are adequately resolved. The monitoring staff mainly identify issues through meetings with CSE firm staff. Currently, TM staff document some issues (*e.g.*, the adequacy of the CSE staff levels in various departments, the functioning of the internal audit office and the adequacy of documented policies and procedures) in e-mails and organizes them by firm while other issues are documented in monthly memoranda to senior management (*e.g.*, the Division Director).[168]

However, these current methods are not reliable and do not provide an audit trail. Our review of TM's documentation supports this assertion because we assessed twenty issues[169] that TM and OCIE identified with the CSE firms and we asked TM to explain how the issues were resolved. In some instances, the staff needed to perform detailed research in order to determine how the issues were eventually resolved. For example, OCIE staff found that Bear Stearns' Legal & Compliance group did not have any formal documentation that identified and assessed all of the applicable rules, laws, regulations, requirements and risks pertaining to the entire organization. TM could not readily tell us how and whether this issue was resolved. The follow-up of issues that OCIE identified is further discussed on page 38.

In a somewhat similar recent situation, the Government Accountability Office (GAO) criticized OCIE for its informal method of tracking recommendations regarding its Self Regulatory Organization (SRO) inspections. GAO stated:

> OCIE's informal methods for tracking inspection recommendations contrast with the expectations set by federal internal control standards for ensuring that management has relevant, reliable, and

---

[168] These monthly memoranda describe current significant issues that for instance, the staff identified during their meetings with CSE staff. However, the memoranda do not generally discuss the resolution of prior issues, as this is not the purpose of the memoranda. The memoranda are stored on a shared computer network.

[169] As discussed in the Scope and Methodology Section (see Appendix III).

timely information regarding key agency activities. These standards state that key information on agency operations should be recorded and communicated to management and others within the entity and within a time frame that enables management to carry out its internal control and other responsibilities. [170]

Given all the facts discussed above, TM cannot provide reasonable assurance (consistent with internal control standards) that issues are adequately resolved. Furthermore, we believe that the risk of an issue being overlooked (*i.e.,* not adequately resolved by a firm) increases if, the CSE program receives additional staff (as requested by Chairman Cox) because presumably more issues will be identified and require resolution.

**Recommendation 14:**
The Division of Trading and Markets should develop a formal automated process to track material issues identified by the monitoring staff to ensure that they are adequately resolved. At a minimum, the tracking system should provide the following information:

- The source of the issue;

- When the issue was identified;

- Who identified the issue;

- The current status of the issue (*e.g.,* new developments);

- When the issue was resolved; and

- How the issue was resolved.

## Follow-Up on Prior OCIE Findings

Prior to July 2007, OCIE was responsible for conducting inspections of the CSE firms at the holding company level, while TM was responsible for monitoring the CSE firms at the holding company level. In July 2007, Chairman Cox transferred the inspections authority from OCIE to TM, thus consolidating the oversight of the CSEs at the holding company level within TM.[171]  OCIE continues to perform inspections of the CSEs' broker-dealers.

---

[170] Source: GAO. Securities and Exchange Commission: Opportunities Exist to Improve Oversight of Self-Regulatory Organizations, Report 08-33, November 15, 2007.
[171] The transfer was in response to a GAO audit report (Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration. Report 07-

While OCIE was responsible for conducting inspections at the holding company level, it identified numerous issues during its inspections performed as part of the CSE firms' application processes. TM stated that after Chairman Cox transferred the inspection authority from OCIE to TM, it decided not to follow-up on issues that OCIE identified because they did not view the OCIE issues as material and they assumed that these issues were OCIE's responsibility. OCIE stated that they did not follow-up (i.e., conduct a new inspection) on the issues because it was no longer their responsibility once Chairman Cox transferred the inspections authority to TM.[172] Although TM stated that it had communicated with Bear Stearns about resolving this issue, TM did not make any efforts to verify Bear Stearns' assertions that it had addressed this issue. Further, OCIE provided TM with a list of eight issues related to Bear Stearns, that OCIE believed were particularly significant.[173] Two of these issues are discussed below.

As discussed in the Scope and Methodology section in Appendix IV, we performed testing on TM's tracking of material issues. Our testing found instances where TM's monitoring staff failed to ensure that issues identified by OCIE were adequately resolved.

We found that OCIE had identified significant issues that could have affected Bear Stearns' approval to become a CSE. One issue involved concerns that Bear Stearns was not sufficiently retaining its internal audit workpapers. Although TM stated that they had spoken to Bear Stearns about resolving this issue, no follow-up work was conducted. This issue raised by OCIE was clearly significant in nature as in fact, according to an internal memorandum, TM and OCIE both agreed that they must reach an agreement with Bear Stearns on this issue prior to its approval as a CSE. In addition, OCIE identified a second significant issue during the application inspection, regarding the adequacy of

---

154, March 15, 2007) recommendation. In response to the report Chairman Cox told GAO: "To implement this recommendation, I have carefully considered the question of which organizational structure will best achieve the goal of the CSE program. I have concluded that the success of the CSE program will be best ensured if the supervision of the CSE firms is fully integrated with, rather than merely coordinated with, the detailed onsite testing that is done of the documented controls at CSE firms. As a result, I have decided to transfer responsibility for on-site testing of the CSE holding company controls to the Division of Market Regulation [now called TM]. This will better align the testing and supervision components of the CSE program, will strengthen its prudential character, and will most efficiently utilize the Commission's resources. With the new structure, ongoing supervision activities will be more directly informed by the results of focused testing of controls, and field inspections will be more precisely targeted using information from ongoing supervisory work. In addition, the Commission's expertise related to the prudential supervision of securities firms will be concentrated in the Division of Market Regulation, which will foster improved communication and coordination among the staff responsible for administering various components of the CSE program." The Chairman made his decision after carefully evaluating proposals from TM and OCIE, and after consulting with the four other Commissioners, who unanimously supported the decision to consolidate CSE oversight under TM.

[172] After the Orders allowing the firms to use the alternative capital method were issued (from December 2004 to November 2005), OCIE retained the inspection authority up until July 2007.

[173] These issues were identified in a memorandum from OCIE to TM dated November 4, 2005.

Bear Stearns' VaR models, as discussed on page 20. The OIG expert found similar problems with Bear Stearns' VaR models, which raised serious questions about TM's oversight of Bear Stearns.

As a result, it is possible that other issues identified by OCIE were significant and were not adequately followed up on by TM.

**Recommendation 15:**
The Division of Trading and Markets should: (1) reassess all the prior Office of Compliance Inspections and Examinations (OCIE) issues to ensure that no significant issues are unresolved (given the belief that OCIE followed up); and (2) follow up on all significant issues.

# Finding 6: The Commission's Orders Allowing Firms (Including Bear Stearns) To Use The Alternative Capital Method Were Generally Approved Before The Inspection Process Was Completed

> The Commission approved firms to use the alternative capital method before OCIE completed its inspection process.

OCIE's and TM's inspections of firms are a significant part of the application process, and are supposed to be completed prior to a firm's approval as a CSE.[174] The purpose of an inspection is to verify the information provided by the firm and to "assess the adequacy of the implementation of the firm's internal risk management policies and procedures."[175] However, four of five Commission Orders approving the firms (those without principal regulators) to use the alternative capital method were issued by the Commission before the inspection process was completed, thereby rendering the application process less meaningful.[176] TM acknowledged that they were aware that OCIE did not complete the inspection process prior to the Commission's approval. Yet, TM recommended to the Commission that the firms be approved to use the alternative capital method without first completely verifying the information it was

---

[174] As a result of the organizational change at the Commission, OCIE would no longer be involved in the application inspection.

[175] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[176] Other than the inspection performed during Bear Stearns' application process, neither TM nor OCIE performed any additional inspections of Bear Stearns involving firm-wide issues (e.g., risk management) prior to its collapse. However, this does not include any inspections (e.g., financial and operational) that FINRA performed of Bear Stearns' broker-dealers.

supposed to be relying upon and without ensuring that the firms had adequately implemented internal risk management policies and procedures.

Specifically, we found that:

- In two instances, the Commission approved the Order before OCIE sent the firms a formal letter (*i.e.,* the deficiency letter) describing the issues that were identified during the inspection. Bear Stearns was one of these two firms. In fact, as previously discussed in Finding 5, during Bear Stearns' inspection, OCIE identified a significant issue involving Bear Stearns not retaining internal audit workpapers. In fact, according to an internal memorandum, TM and OCIE both agreed that they must reach an agreement with Bear Stearns on this issue prior to the approval of its CSE application. While TM believes that Bear Stearns implemented corrective action, TM never verified Bear Stearns' assertions that it had resolved this issue, as TM did not follow up on many of the OCIE issues.

- In two instances, the Commission approved the Order before the firms responded to the deficiency letter.

TM indicated that they discussed the issues orally with the firms and were comfortable with their responses and, as a result, recommended that the Commission issue the Orders. OCIE stated that it was not involved in this decision process at all.

**Recommendation 16:**
The Division of Trading and Markets should ensure that they complete all phases of a firm's inspection process before recommending that the Securities and Exchange Commission allow any additional Consolidated Supervised Entity firms the authority to use the alternative capital method.

# Finding 7: Collaboration Between TM And Other Commission Divisions/Offices Should Be Significantly Improved

TM should improve its collaboration with the Division of Corporation Finance (CF), OCIE, and the Office of Risk Assessment (ORA) in order to achieve efficiencies and the overall effectiveness of Commission operations.

## Collaboration with CF

The CF staff who review company filings (*e.g.,* Form 10-K) are assigned to Industry Groups within CF. CF assigns firms to a particular group based on their

Standardized Industrial Classification code.[177] Periodically, CF management reassigns firms to adjust the staff's workload. During the past two years, CF twice transferred the CSE firms to different Industry Groups.

CF staff stated that they received a briefing from TM regarding how the CSE program operates. However, according to CF, TM did not provide any specifics regarding the information that the CSE program obtains from the CSE firms.

We believe that the information that TM obtains could substantially improve CF's filing review process. For instance, CF could evaluate whether the information in the filing (e.g., mark to market accounting, VaR models, funding sources) is consistent with TM's information. Furthermore, as a result of Bear Stearns' collapse, CSE firms are now required to disclose additional information regarding capital and liquidity. Also, Basel's Pillar 3 standard (when implemented) will require additional disclosures regarding capital, risk exposures, and risk assessment. TM stated that the CSE firms would incorporate all of these new disclosures mainly into their CF filings. These additional disclosures will, therefore, increase the need for collaboration between TM and CF.

Our audit found that CF could not opine on the potential usefulness of TM's information on the filing review process since they are not aware of the information that TM receives on the CSE firms. The effectiveness of CF's filing review is potentially diminished because CF is not incorporating TM's information on the CSEs into its review process.

**Recommendation 17:**
The Divisions of Corporation Finance (CF) and Trading and Markets (TM) should take concrete steps to improve their collaboration efforts and should determine whether TM's information on the Consolidated Supervised Entity (CSE) firms could be used by CF in its review of the CSE firms.

## Collaboration with OCIE

GAO found that TM and OCIE should improve communication (e.g., information sharing) between their offices.[178] Although TM and OCIE informed GAO during its audit in 2007, that they were working on an agreement to improve communication, they never finalized the agreement.

In July 2007, Chairman Cox transferred the responsibility for inspecting the consolidated entities from OCIE to TM. However, despite this organizational

---

[177] "The Standard Industrial Classification was created by the United States government as a means of classifying industries by the use of a 4-digit coding system to collect economic data on businesses." (Source: http://www.business.com/directory/management/strategic_planning/business_information/industry_resea ch/classification_systems/standard_industrial_classification_sic/.
[178] Source: GAO. Financial Market Regulation, Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration, Report No. 07-154. March 15, 2007.

change, TM and OCIE could still improve their collaboration involving the broker-dealers of the CSE firms. OCIE stated that TM does not provide it access to information that TM obtains from meetings with CSE staff, filings submitted by the CSE firms, and other sources of information. OCIE stated that all of this information could improve their risk-based broker-dealer inspections. A senior staff official at a CSE firm stated there is no coordination between TM and OCIE and this creates a challenge. OCIE stated that it believes that it would still be useful to finalize the agreement to improve collaboration and TM has not identified any substantive reasons to oppose finalizing the agreement.

### Recommendation 18:

The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (e.g., discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program. They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

## Collaboration with ORA

The missions of ORA and the CSE programs' have certain similarities. ORA's mission includes identifying emerging issues and market risks[179] while the CSE's program mission states that its purpose is to:

> ... allow the Commission to monitor for, and act quickly in response to, financial or operational weakness in a CSE holding company or its unregulated affiliates that might place regulated entities, including US and foreign-registered banks and broker-dealers, *or the broader financial system at risk.*[180] [Emphasis added]

We believe that a formal understanding between ORA and TM would increase the likelihood that ORA achieves its mission while potentially minimizing duplicative efforts in identifying and analyzing risks.

### Recommendation 19:

The Division of Trading and Markets and the Office of Risk Assessment should develop an agreement outlining their roles and responsibilities, as well as methods for information sharing such as communicating project results. These two offices should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

---

[179] Source: Jonathan Sokobin Named Director of SEC's Office of Risk Assessment. Commission. 28 February 2008. <http://www.sec.gov/news/press/2008/2008-24.htm>.

[180] Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria. Commission. 16 Mar 2007. <http://www.sec.gov/divisions/marketreg/cseoverview.htm>.

# Finding 8:  CF's Filing Review Of Bear Stearns' 2006 10-K Was Not Timely

CF is responsible for reviewing filings of all public reporting companies, such as Bear Stearns.  However, CF's review of Bear Stearns' 2006 10-K was not timely.

## Review of Bear Stearns' 10-K Filing

There are significant issues regarding CF's review of Bear Stearns' 2006 10-K filing dated November 30, 2006.  The filing review emphasized Bear Stearns' disclosures involving its exposure to subprime mortgage securities.[181]

Bear Stearns submitted its 2006 10-K filing to the Commission on February 13, 2007.  The CF staff accountant completed the initial review of Bear Stearns' 2006 10-K filing on April 30, 2007, approximately 2½ months after Bear Stearns submitted the filing.  Another CF staff accountant completed a second level review on September 27, 2007, nearly five months after the initial review.  CF could not provide a specific reason as to why the second reviewer did not perform the review in a timely manner.

CF sent a comment letter[182] to Bear Stearns on September 27, 2007, which, among other things, requested additional information on Bear Stearns' exposure to subprime mortgage securities.  Thus, it took CF nearly 7½ months, after Bear Stearns' initial filing, to send a letter to Bear Stearns requesting additional information.

CF's policy is to send a comment letter to a firm prior to the firm's next fiscal year-end.  In the case of Bear Stearns, its next fiscal year-end was November 30, 2007 and the Commission received its 2007 10-K on February 13, 2007.  According to CF's policy, CF needed to provide Bear Stearns with a comment letter before November 30, 2007.[183]  In this way, the firm would have an opportunity to incorporate appropriate changes into its next year's 10-K filing.  However, other than this policy, CF does not have any internal guidelines regarding timeframes within which to review filings and issue comment letters.[184]

---

[181] CF staff performed a targeted review that focused on subprime mortgage exposure and revenue recognition.
[182] The staff provide firms with a written memorandum (i.e., a "comment letter") describing the staff's filing review comments.
[183] In this instance, CF met its policy of issuing a comment letter prior to Bear Stearns' fiscal year end.
[184] The Sarbanes Oxley Act of 2002 also requires CF to review each public reporting company at least one time every three years.

We believe that a five-month timeframe to complete a second review coupled with a total time of 7½ months to send a comment letter to Bear Stearns was simply unacceptable in this particular instance, because this filing review focused on the material issue of subprime mortgage securities (which was adversely affecting the securities industry worldwide).

Bear Stearns' response letter (coupled with CF's comment letter) contained material information that investors could have used to make well-informed investment decisions.[185] For example, Bear Stearns' response letter described its criteria for classifying loans as sub-prime, information about its risk management philosophy, how it defines non-performing loans and a quantification of its investments in securities backed by subprime mortgages. The OIG expert believes that all of these criteria would have been helpful to investors.[186]

We did not perform audit work to determine CF's timeliness in reviewing 10-K filings in general. Despite the lack of information about other filings, based upon CF's review of Bear Stearns' 10-K filing, we believe that the filing review process lacks the appropriate internal controls (*i.e.*, timeframes for conducting second level reviews) to ensure timely reviews.

**Recommendation 20:**
The Division of Corporation Finance should: (1) develop internal guidelines for reviewing filings in a timely manner, and (2) track and monitor compliance with these internal guidelines.

## Bear Stearns' Response to CF's Comment Letter

Pursuant to CF policy, firms are supposed to reply within 10 business days to CF comment letters. Thus, Bear Stearns' reply was due on October 12, 2007. Prior to this due date, Bear Stearns asked CF (in writing) and received an extension until early November 2007 to file its response. However, Bear Stearns did not respond by this new due date. Bear Stearns then orally asked for and received additional extensions. Bear Stearns finally submitted its comments to CF on January 31, 2008, nearly 3½ months after the initial due date.[187]

As a result of Bear Stearns' delays, the CF staff accountant did not complete the initial review of Bear Stearns' response until March 4, 2008 and the second

---

[185] This information was especially material given that Bear Stearns' stock price went from a one-year closing price high of $158 (April 25, 2007) to a closing price high of $77 the week before March 10, 2008. The final price was $10, the sale price that JP Morgan paid.

[186] CF does not consider its public comment letters and firms' response letters as a means of disseminating (*i.e.*, disclosure) information about public companies. Rather, CF believes that changes to a firm's filings, as a result of CF's comment letters, should be the primary disclosure method. In fact, CF does not post its public comment letters and a firm's response letters to the public site of EDGAR until an issue has been fully resolved.

[187] Two other CSE firms did not respond in a timely manner to comments on their 2006 10-K filings. These filing reviews also emphasized subprime mortgages.

reviewer did not complete her review until April 2, 2008, by which time Bear Stearns had already collapsed.

It is our understanding that Bear Stearns' delay in responding to the comment letter was not a unique situation and CF routinely grants extensions to firms to address CF's comment letters. Further, CF informed us that it only requests a firm to contact CF within 10 days of receiving a comment letter and does not require a substantive response to the issues within the 10-day timeframe. Thus, while CF imposes a timeframe for a firm to contact CF, CF does not have a policy prescribing when firms are expected to respond to the issues raised in CF's comment letters.

While there are several consequences that may be imposed on a firm for not responding timely (*e.g.,* the firm may be required to make additional disclosures in future filings regarding the outstanding staff comments or the staff may refer the matter to the Commission's Division of Enforcement for investigation), in the case of Bear Stearns, none of these consequences occurred. Furthermore, by granting repeated extensions, the filing review was rendered less meaningful since the staff completed the filing review after Bear Stearns collapsed. As a result, we believe that investors could have used this material information to make well-informed investment decisions. In addition, the information (*e.g.,* Bear Stearns' exposure to subprime mortgage securities) could have potentially been beneficial to dispel the rumors that led to Bear Stearns' collapse.

**Recommendation 21:**
The Division of Corporation Finance (CF) should (1) establish a policy outlining when firms are expected to substantively respond to issues raised in CF's comment letters, and (2) track and monitor compliance with this policy.

# Finding 9:  Certain Firms May Pose A Systemic Risk Because They Are Not Supervised On A Consolidated Basis

> Certain firms may pose a systemic risk because neither the Commission nor any other regulator currently supervises them on a consolidated basis.

Several large firms, other than the CSEs, have many customer accounts, hold large amounts of customer funds, and have unregulated affiliates. The broker-dealer affiliates of these firms are subject to the Risk Assessment program, but neither the Commission nor any other regulator supervises these firms on a consolidated basis.[188] In most cases, these firms would be ineligible to apply for

---

[188] Some of the firms are also subject to the Investment Advisers Act of 1940 and the Investment Company

group-wide supervision under the CSE program. In some cases, these firms could voluntarily elect to be supervised under the Commission's CSE program or under the statutory supervision regime created by Gramm-Leach-Bliley Act,[189] but these firms are not required to elect this supervision.

Several firms both inside and outside the CSE program collapsed or otherwise experienced serious financial difficulties between March and September 2008.[190] As a result, we believe that if one of these other (non-CSE) firms failed or experienced another significant problem, the broader financial system could be adversely affected, thus impacting the Commission's mission of maintaining fair, orderly, and efficient markets. We did not perform an in-depth assessment of the risks that these firms present or the costs/benefits of supervising these firms on a consolidated basis because of resource constraints. However, we believe that in light of the impact of Bear Stearns collapse, it would behoove the Commission to perform such an analysis.

**Recommendation 22:**
Chairman Cox should create a Task Force led by the Office of Risk Assessment (ORA) with staff from the Divisions of Trading and Markets, and Investment Management, and the Office of Compliance Inspections and Examinations. The Task Force should perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis. If the Task Force ultimately believes that the Securities and Exchange Commission (Commission) should supervise these firms on a consolidated basis, it should make a recommendation to the Commission that involves seeking the necessary statutory authority to oversee these firms on a consolidated basis.

---

Act of 1940. As a result, OCIE is responsible for inspecting these firms and the Division of Investment Management is responsible for the regulations.

[189] "The Gramm-Leach-Bliley Act of 1999 ("Act") will significantly impact the financial services industry. By repealing provisions of the Glass-Steagall Act, the Act facilitates affiliations between banks, securities firms, and insurance companies."
Source: Banking Information: Overview of the Gramm-Leach-Bliley Act. Federal Reserve Bank of San Francisco. < http://www.frbsf.org/publications/banking/gramm/grammpg1.html>.

[190] Between March and September 2008, Bear Stearns, Lehman Brothers, Merrill Lynch, mortgage originators Fannie Mae and Freddie Mac and the American International Group, Inc., all experienced major financial difficulties and collapsed, filed for bankruptcy, or were purchased or taken over by another entity.

# Finding 10: TM Should Address Organizational Issues Involving The Future Of The CSE Program

We identified several organizational issues involving the future of the CSE Program, which could significantly improve the CSE program.

## Changes to the CSE Program

Due to the collapse of Bear Stearns in March 2008, the bankruptcy filing by Lehman Brothers, the purchase of Merrill Lynch by Bank of America, the planned change in status to bank holding companies for Goldman Sachs and Morgan Stanley, [191] and the changing economic environment, the future of the CSE program is uncertain.

Since the collapse of Bear Stearns, several aspects of the CSE program's oversight activities have changed and other changes are being contemplated, as follows:

- The CSE program staff now closely scrutinize the secured funding activities of each CSE firm, with a view to lengthening the average term of secured and unsecured funding arrangements;

- The CSE program staff now obtain more funding and liquidity information for all CSEs;

- TM is in the process of establishing additional scenarios that entail a substantial loss of secured funding. The scenario analyses help TM to determine whether firms could survive in a stressed environment;

- TM is discussing with CSE senior management their long-term funding plans, including plans for raising new capital by accessing the equity and long-term debt markets.

- The Commission plans to request legislative authority to regulate the CSEs at the holding company level as well as the authority to require compliance. Currently, participation in the CSE program is voluntary. TM claims that the voluntary nature of the program does not capture all systemically important broker-dealer holding companies, as companies may not opt for such supervision. Additionally, the ability of a holding company to opt out of supervision creates tension when the Commission wishes to impose more rigorous requirements or mandate CSEs to address specific concerns, according to TM;

---

[191] On September 21, 2008, the Federal Reserve approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies.

- Chairman Cox has discussed the CSEs programs' need to have systems in place to systematically unwind or liquidate a failing institution at the holding company level. Currently, regulators are only permitted to intervene in the liquidation of a holding company's subsidiaries, such as broker-dealers and banks.

  According to TM, intervention at the holding company level would allow the Commission to operate a failing institution for a limited period of time and would protect the institution's customers and counterparties. Such holding companies typically have substantial activities outside its U.S. bank or broker-dealer. TM believes that the Commission's lack of authority to intervene at the holding company level could lead to massive liquidations of collateral by counterparties to unregulated or non-U.S. regulated affiliates, which in turn, could cause market dislocations and put severe stress on other systemically important financial institutions; and

- The Commission has contemplated ways to improve the efficient and orderly operation of the tri-party repo market. Financial institutions rely on the repo market to finance proprietary and customer positions. If a repo clearing entity is unable to conduct business in an orderly manner, or if a major firm does not have ready access to the repo market, it could have systemic effects on a large number of financial institutions. Bear Stearns was not able to access the repo market on normal business terms, which, according to some accounts, led to its demise.

Changes to the program will require Chairman Cox, Congress, and TM to re-evaluate the needs and priorities of the CSE program.

### Recommendation 23:

The Division of Trading and Markets, in consultation with the Chairman's office, should determine what additional changes need to be made to the Consolidated Supervised Entity (CSE) program in light of the collapse of Bear Stearns and changing economic environment.

## Program Staffing

The CSE program consists of a small number of staff, several of whom have worked in the CSE program since its inception in 2004. The Office of CSE Inspections currently has only two staff in Washington, DC and five staff in the New York regional office. It also does not currently have an Assistant Director (*i.e.*, an office head).

In July 2007, TM assumed the responsibility for conducting inspections of the CSE firms. However, as of mid-September 2008, TM staff had not completed any inspections in the 14 months that the office has been operational. Three inspections are in varying stages of completion. These inspections act to "assess the adequacy of the implementation of the firm's internal risk

management policies and procedures".[192]  No milestones are in place to ensure that inspections are completed in a timely manner.

Furthermore, staff at the CSE firms informed the OIG that the inspections information would be useful to them, especially because it would provide the CSEs with information regarding best practices and where the firms stand in relation to each other.  It is imperative to receive this information timely to ensure that the information does not become outdated.

**Recommendation 24:**
The Division of Trading and Markets (TM) should fill critical existing positions, and consider what any additional staff it believes will be needed to carry out the CSE program's function going forward.  TM should also establish milestones for completing each phase of an inspection and implement a procedure to ensure that the milestones are met.

## Ethics Manual

In 1997, OCIE developed an ethics manual for its Inspection staff because it wanted to formalize standards of behavior and ensure that inspections are conducted in a fair and impartial manner.  This manual has been revised and expanded several times since 1997.  We believe that a similar manual would be beneficial for TM's monitoring and inspection staff given their close working relationship with the CSE staff.

**Recommendation 25:**
The Division of Trading and Markets, in consultation with the Office of Compliance Inspections and Examinations and the Commission's Ethics office, should develop an ethics manual.

## Coordination with Other Regulators

The CSE program staff are increasingly working with the Federal Reserve and other Federal regulators in its administration of the CSE program.  Increased coordination with the Federal Reserve is particularly important because the Federal Reserve, unlike the Commission, is in a position to provide emergency funding to distressed firms.  Improved communication and information sharing among Federal regulators should also reduce overlaps and alleviate the firms' need to produce duplicative information for each entity.  The memorandum of understanding that the Commission and the Federal Reserve entered into in July 2008 is a positive step.

Additionally, we believe that the CSE program staff will need to further recognize the interconnectedness between securities firms and banks.  A general

---

[192] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008.  <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

SEC's Oversight of Bear Stearns and Related Entities: The CSE Program          September 25, 2008
Report No. 446-A

perception, as communicated by a staff member at a CSE firm, is that if a broker-dealer fails, the Commission seems to worry only about customer assets, and if a bank fails, the Federal Reserve seems to worry only about depositors' accounts. Neither regulator appears to focus on systemic risk, nor how the interconnectivity among securities firms and banks affects the overall landscape.

**Recommendation 26:**
The Division of Trading and Markets should continue to seek out ways to increase its communication, coordination, and information sharing with the Federal Reserve and other Federal Regulators