UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE BEAR STEARNS COMPANIES, INC. SECURITIES, DERIVATIVE, AND ERISA LITIGATION<br><br>This Document Relates To:<br>Securities Action, No. 08 Civ. 2793 (RWS) | Master File No.:<br>08 MDL 1963 (RWS)<br><br>ECF Case |
| BRUCE S. SHERMAN,<br><br>Plaintiff,<br><br>v.<br><br>BEAR STEARNS COMPANIES INC., JAMES CAYNE, WARREN SPECTOR AND DELOITTE & TOUCHE LLP,<br><br>Defendants. | Index No.:<br>09 Civ. 8161 (RWS) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE EVIDENCE CONCERNING THE SEC'S OFFICE OF INSPECTOR GENERAL, OFFICE OF AUDITS' REPORT, "SEC OVERSIGHT OF BEAR STEARNS AND RELATED ENTITIES"**

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Brad S. Karp
John F. Baughman
Jessica S. Carey
Jonathan H. Hurwitz
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns Companies Inc.*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
David S. Frankel
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
*Attorneys for Defendant James E. Cayne*

WACHTELL, LIPTON, ROSEN & KATZ
David B. Anders
51 West 52nd Street
New York, New York 10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................................iii

PRELIMINARY STATEMENT ...........................................................................................................1

THE FACTS ....................................................................................................................................2

I.     Senator Grassley's Request ................................................................................2

II.    The Office of Inspector General's Response........................................................3

      A.     The Flawed OIG Investigation Report ....................................................3

      B.     The Office of Audits........................................................................4

      C.     The Flawed OIG Audit Report ................................................................5

      D.     Internal SEC Criticism of the OIG Audit Report ...................................7

      E.     Plaintiff's Use of the OIG Audit Report................................................8

            1.     The Complaint's Misleading Allegations....................................8

            2.     Plaintiff's Failure to Substantiate His Allegations .......................9

ARGUMENT...................................................................................................................................10

I.     The OIG Audit Report Is Not Trustworthy and Therefore Is Not Admissible As a Public Record under Rule 803(8) .......................................................................10

      A.     The OIG Audit Report Was Not Intended to Analyze Bear Stearns's Near Collapse or to Be Offered as Substantive Evidence at a Trial...............11

      B.     The OIG Audit Report Is Anonymous ..................................................12

      C.     The OIG and OOA Do Not Have Appropriate Skill or Expertise..........13

      D.     The SEC's Own Significant Internal Criticisms of the OIG's Work Product Demonstrate That the Audit Report Is Not Trustworthy .........14

      E.     The OOA Did Not Hold a Hearing........................................................15

      F.     There Is No Way to Critically Assess Statements in the OIG Audit Report.........16

II.    The OIG Audit Report Also Should Be Excluded under Rule 403 ...................17

III.   There Are No Other Grounds for Admitting the OIG Audit Report ..................19

Doc#: US1:10180826v1

**Page**

CONCLUSION .................................................................................................................................20

.

Doc#: US1:10180826v1

TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*Beech Aircraft Corp.* v. *Rainey*,
    488 U.S. 153 (1988) ............................................................................................................... 13

*Bright* v. *Firestone Tire & Rubber Co.*,
    756 F.2d 19 (6th Cir. 1984) ............................................................................................ 17, 18

*City of New York* v. *Pullman Inc.*,
    662 F.2d 910 (2d Cir. 1981) ................................................................................ 12, 15, 17, 18

*Coughlin* v. *Tailhook Ass'n*,
    1994 WL 780904 (D. Nev. 1994) .......................................................................................... 12

*Denny* v. *Hutchinson Sales Corp.*,
    649 F.2d 816 (10th Cir. 1981) .............................................................................................. 16

*Franklin* v. *Skelly Oil Co.*,
    141 F.2d 568 (10th Cir. 1944) ........................................................................................ 15, 16

*United States* v. *Jacques Dessange, Inc.*,
    2000 WL 294845 (S.D.N.Y. 2000) .............................................................................. 12, 17, 18

*John McShain, Inc.* v. *Cessna Aircraft Co.*,
    563 F.2d 632 (3d Cir. 1977) ................................................................................................. 17

*Pearce* v. *E.F. Hutton Grp. Inc.*,
    653 F. Supp. 810 (D.D.C. 1987)...................................................................................... 12, 17

*United States* v. *Strother*,
    49 F.3d 869 (2d Cir. 1995) ................................................................................................... 20

*United Air Lines, Inc.* v. *Austin Travel Corp.*,
    867 F.2d 737 (2d Cir. 1989) ................................................................................................. 15

## RULES

Fed. R. Evid. 403 ......................................................................................................*passim*

Fed. R. Evid. 803 ......................................................................................................*passim*

Fed. R. Evid. 807 .............................................................................................................. 20

Doc#: US1:10180826v1

Defendants respectfully submit this memorandum of law in support of their motion regarding the September 25, 2008 report by the Securities and Exchange Commission, Office of Inspector General, Office of Audits, titled "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program."  The report should not be received in evidence and all other use of the document at trial should be precluded.

**PRELIMINARY STATEMENT**

The Complaint alleges claims against Bear Stearns and some of its former executives.  All of plaintiff's causes of action concern events at Bear Stearns, in particular the firm's near collapse in the spring of 2008.

To support its allegations, the Complaint attaches an "OIG Audit Report" prepared by the SEC's Office of Inspector General.  That OIG Audit Report, however, was not about anything concerning Bear Stearns's trading, internal controls, risk management or public statements.  It was not really about Bear Stearns at all.  Rather, it was an inward-facing report by the Inspector General's "Office of Audits" that focused on internal conduct at the SEC.  The OIG Audit Report itself specifically disclaimed any broader focus, noting that issues relating to how or why Bear Stearns nearly collapsed were beyond its "scope."

Defendants now move to exclude the OIG Audit Report, as well as any reference to it, or reliance on it at trial.  Although the document is a "public record," it is not sufficiently trustworthy to be admitted, used, or referenced at trial.

Notably, the anonymous report was prepared for a different purpose than it would be offered for at trial.  This alone is reason to exclude it, but the Court should also rely on the SEC's own statements.  The SEC itself has called the OIG Audit Report "fundamentally flawed" and described it as having "findings that are materially in error."

That is not the type of document that should be received in evidence. The Court should hold the OIG Audit Report inadmissible under Rule 803(8)(B) and Rule 403.

**THE FACTS**

In 2008, as the financial crisis unfolded, questions were raised about how the Securities and Exchange Commission ("SEC") was regulating certain market participants. The report at issue concerns an internal SEC audit of its own conduct.

## I.     Senator Grassley's Request

On April 2, 2008, Senator Charles E. Grassley, then the Ranking Member of the Senate Committee on Finance, wrote to the Inspector General of the SEC, H. David Kotz. Sen. Grassley was concerned about the SEC's decision in 2007 not to pursue an enforcement action against Bear Stearns "for improperly valuing mortgage-related investments." (Ex. 1 at 54.)[1] He noted that the Senate had previously determined that the SEC had conducted a "failed investigation" of an unrelated firm called Pequot Capital Management, due in part to providing improper "deference" to witnesses. Thus, Sen. Grassley requested an investigation into the SEC's conduct with respect to Bear Stearns. He wrote:

> In light of my earlier investigation I need to know whether the same problems identified in the Pequot investigation were repeated in the Bear Stearns case. Accordingly, I request that you conduct a thorough investigation into the facts and circumstances surrounding the decision to not pursue an enforcement action against Bear Stearns. Please provide a final report on whether there was any improper action or misconduct relating to SEC investigation of Bear Stearns and its decision to close the investigation.

(*Id.*)

In addition to calling for an investigation, Sen. Grassley requested an "audit" of SEC activities relating to Bear Stearns. (*Id.* at 55.) He asked, with respect to various SEC offices,

---

[1]   "Ex. __" refers to exhibits attached to the accompanying declaration of Meredith Borner, dated August 17, 2015.

for "a description and assessment of their missions, how the programs are run, their policies and procedures, the adequacy of any reviews conducted regarding Bear Stearns, and recommendations for improvements in the process." (*Id.*)

## II.     The Office of Inspector General's Response

Sen. Grassley's letter was addressed to the head of the SEC's Office of Inspector General ("OIG"). According to its website:

> The Office of Inspector General (OIG) is an independent office within the U.S. Securities and Exchange Commission (SEC or Commission) that conducts, supervises, and coordinates audits and investigations of the programs and operations of the SEC. The mission of the OIG is to prevent and detect fraud, waste, and abuse and to promote integrity, economy, efficiency, and effectiveness in the Commission's programs and operations.

(Ex. 2.)  To respond to Sen. Grassley's letter, the OIG prepared two documents (1) the "OIG Investigation Report" and (2) the "OIG Audit Report" (or the "Audit").

### A.     The Flawed OIG Investigation Report

The OIG Investigation Report was issued September 30, 2008. (Ex. 3.)  It focused on Sen. Grassley's question about whether "improper action or misconduct" had taken place at the SEC. (*Id.* at 1.)  The report concluded it had.  Specifically, the report found that an SEC Regional Director had "failed to administer his statutory obligations and responsibilities." (*Id.* at 38.)  Thus, the OIG Investigation Report referred the matter for "disciplinary and/or performance-based action." (*Id.*)

Less than six weeks later, however, pursuant to internal SEC procedures, the findings of the OIG Investigation Report were overturned.  On November 7, 2008, an SEC "Initiating Official" issued a report repudiating the OIG's work. (Ex. 4.)  The Initiating Official,

Doc#: US1:10180826v1

the SEC's Chief Administrative Law Judge Brenda P. Murray,[2] was unflinching in her criticism of the OIG Investigation Report.  She found that the report "does not support" its conclusions; that it had "no basis" for some of its findings; and that at least one of its claims was "refuted by testimony." (*Id.* at 2, 4, 7.)  Thus, Judge Murray concluded, there was "no basis for following" the recommendation of the OIG Investigation Report.  (*Id.* at 9.)

### B.   The Office of Audits

Inspector General Kotz assigned the task of responding to Sen. Grassley's request for an audit to the OIG's Office of Audits ("OOA").  According to the SEC's website:

> The Office of Audits conducts, coordinates, and supervises independent audits and evaluations of the U.S. Securities and Exchange Commission's (Commission) internal programs and operations at its headquarters and 11 regional offices.

(Ex. 6.)  The website further describes the office's function as follows:

> The primary purpose of an audit or evaluation is to review the agency's past operations and performance to determine compliance with applicable laws, rules, and regulations.  At the completion of an audit or evaluation, the OIG issues an independent report in which it identifies any deficiencies and makes recommendations to correct those deficiencies or increase efficiencies in an SEC program. Typically, auditors and evaluators assess whether:
>
> *     resources are safeguarded and appropriately managed;
> *     governing laws, regulations, and policies are complied with;
> *     funds are expended properly;
> *     desired program results are achieved; and
> *     information provided by the Commission to the public and others is reliable.

---

[2]   *See* Ex. 5 (Sarah N. Lynch, *SEC judge in Cohen case no stranger to high-profile cases*, REUTERS, July 24, 2013 ("Brenda P. Murray is the longest-serving administrative law judge at the SEC, where she has served as chief judge since 1994 . . . .").)

Doc#: US1:10180826v1

(*Id.*)  Neither the Office of Audits specifically, nor the OIG more generally, publicly claims any authority to investigate any entity other than the SEC.  This is reflected by the titles of other recent audit reports, which include:

- Audit of the Representation of Minorities and Women in the SEC's Workforce, Report No. 528 (Nov. 20, 2014);

- Controls over the SEC's Inventory of Laptop Computers, Report No. 524 (Sept. 22, 2014);

- SEC's Records Management Practices, Report No. 505 (Sept. 30, 2012);

- Review of Alternative Work Arrangements, Overtime Compensation, and COOP-Related Activities at the SEC, Report No. 491 (Sept. 28, 2011); and

- Audit of SEC's Employee Recognition Program and Recruitment, Relocation, and Retention Incentives, Report No. 492 (Aug 2, 2011).[3]

The SEC website lists many other OIG reports on similar topics.

### C.    The Flawed OIG Audit Report

The OIG delivered the audit Sen. Grassley had requested on September 25, 2008. (Ex. 1.)  The OIG Audit Report is noteworthy in several respects.

First, the report is anonymous.  It does not identify an author (or authors) and it says nothing about his, her, or their qualifications.

Second, the report focused on an SEC program called the "Consolidated Supervised Entity" ("CSE") program, which included six financial firms.  (*Id.* at iv.)  Thus, the OIG Audit Report described its audit objectives like this:

> This audit's objectives were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns

---

[3]    These reports are all listed on the SEC's website: *Issued Reports*, SEC OIG, OOA, http://www.sec.gov/about/offices/oig/inspector_general_audits_reports.shtml (last visited Aug. 10, 2015).

and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

(*Id.* at vi.)  As the report explains, the audit scope did not include a determination of the cause of Bear Stearns's near collapse.  (*Id.* at ix n.12.)  Indeed, the document emphasizes that:

> This audit was not intended to be a complete assessment of the multitude of events that led to Bear Stearns' collapse, and accordingly, does not purport to demonstrate any specific or direct connection between the failure of the CSE Program's oversight of Bear Stearns and Bear Stearns' collapse.

(*Id.* at viii.)  Accordingly, OOA made no effort to investigate events at Bear Stearns, as opposed to conduct at the SEC.  It did not request any documents from Bear Stearns, interview any Bear Stearns personnel, or otherwise request any information from Bear Stearns.  (*See id.* at 72, 83.)  Indeed, the OOA candidly notes that it did not visit any CSE firm (such as Bear Stearns) and did not "perform an independent assessment of the firm's risk management systems . . . or their financial condition."  (*Id.* at 71.)

What the OOA did do was evaluate the conduct of the SEC.  As to that, the OIG Audit Report concluded:  "[I]t is undisputable that the CSE program failed to carry out its mission in its oversight of Bear Stearns . . . ."  (*Id.* at viii.)  Thus, the OIG Audit Report made 26 recommendations aimed at improving the Commission's oversight of CSE firms.  (*Id.* at 76-80.)

Third, even with respect to the work the OOA did do, its underlying methodology is opaque.  The Audit Report provides only a two-paragraph overview:

> **Methodology.**   Our methodology included reviewing required filings, inspection reports, and documentation surrounding periodic meetings between TM and CSE staff.  We also reviewed other types of supporting documentation such as TM's policies and procedures, prior GAO audit reports, newspaper articles, etc.  We also conducted interviews with staff from the Commission, CSE firms, GAO, and the FRBNY.

> Lastly, we hired a contractor (*i.e.*, an expert) to provide us with technical expertise. The expert reviewed the adequacy of TM's review of models, scenario analysis, etc.; as well as, the associated internal risk management controls. We have incorporated the expert's opinions, findings, and recommendations into this audit report. The expert focused his review on the Commission's oversight of Bear Stearns.

(*Id.* at 72 (footnote omitted).) However, the Audit does not explain, for example, what specific "filings, inspection reports, and documentation" were reviewed, or who authored any of those materials. Worse, to the extent the Audit provides citations, in footnotes, the referenced materials are frequently other internal SEC documents which are not available to the parties here.[4] Nor is there any word of who OOA staff may have interviewed. Likewise, as to the "contractor" hired to provide "technical expertise," there is no record of what he did, what materials he reviewed, or who he may have spoken to.

### D. Internal SEC Criticism of the OIG Audit Report

The OIG Audit Report's findings were directed primarily towards the activities of the SEC's Division of Trading and Markets ("T&M"). That Division took great exception to the Audit and provided a rebuttal "commentary" that the OOA included as Appendix VII of the OIG Audit Report. T&M's core position was that the Audit was "fundamentally flawed in its process, premises, analysis, and key findings." (*Id.* at 83.) It backed up that position with several pages of specific criticisms, including the following:

- OIG "failed to interview [T&M's] senior management."

- OIG "did not interview Bear Stearns managers . . . ."

- "OIG's expert spent only three hours with Division staff before preparing his portions of the OIG Report."

---

[4]   At least 51 of the 200 footnotes in the OIG Audit Report explicitly cite an "internal" Commission document. (Ex. 1 at n.78-79, 81-84, 93-94, 96-98, 100-101, 113-126, 128-133, 136-145, 148, 150-154, 158, 165.)

- Large portions of the OIG Report rely on informal notes that "do not represent all the facts."

- The Report "cites staff notes out of context."

- The Report's "assessments contain numerous factual and analytical errors, and weakly supported conclusions."

- The process used to draft the report "produced findings that are materially in error."

- Statements in the Report "are premature at best."

(*Id.* at 83-85.)  Following these and other pointed observations, T&M summed up with this:  "For our part, we believe that the key conclusions of the OIG Report are inaccurate and without empirical foundation."  (*Id.* at 85.)

### E.   Plaintiff's Use of the OIG Audit Report

Plaintiff attached the OIG Audit Report to the Complaint as Exhibit A, referring to it—somewhat misleadingly—as the "2008 SEC Report" and its findings as having been made by the "SEC."  (Compl. ¶¶ 62, 64.)   Notwithstanding that the OIG Audit Report was about the conduct of the SEC, the Complaint cites it as the basis for allegations about Bear Stearns.  (*See, e.g.*, *id.* ¶¶ 63, 64, 100, 104-05.)

#### 1.   The Complaint's Misleading Allegations

Plaintiff cited the OIG Audit Report in a way that is misleading, confusing and incomplete.

First, Plaintiff mischaracterized the nature of the OIG Audit Report by claiming that it contained "examination results."  (*Id.* ¶ 130.)  This is untrue, as neither the OOA nor the OIG

has authority to conduct an "examination."  Those are conducted by a separate office within the SEC, the Office of Compliance Inspections and Examinations.[5]

Second, the Complaint describes numerous purported "findings" of the SEC that, upon inspection, turn out to be mere opinions or conclusions of the OOA's technical expert.  For example, the Complaint alleges:

> *As the SEC found:*  "the reviews of mortgage models that should have taken place before the subprime crisis erupted in February 2007 appears to have never occurred, in the sense that it was still a work in progress when Bear Stearns collapsed in March 2008."  2008 SEC Report, Ex. A, at 23.

(Compl. ¶ 64 (emphasis added).)  But here is what the OIG Audit Report actually says:

> As a result, *the OIG expert concluded that* the reviews of mortgage models that should have taken place before the subprime crisis erupted in February 2007 appears to have never occurred, in the sense that it was still a work in progress when Bear Stearns collapsed in March 2008.

(Ex. 1 at 23 (emphasis added).)  There are similar mischaracterizations throughout the Complaint. (*E.g.*, Compl. ¶¶ 62, 63, 87, 105, 166, 177.)

Third, plaintiff inaccurately suggests that the SEC made findings about defendants' state of mind.  For example, at numerous places the Complaint cites the OIG Audit Report as a basis for alleging that various defendants "knew" certain things.  (*E.g.*, *id.* ¶¶ 141, 165-66, 176-77.)  The actual report, however, says nothing about what any person at Bear Stearns "knew" about any subject at any time.  That was never an objective of the Audit.

### 2.      Plaintiff's Failure to Substantiate His Allegations

For almost the entire history of this litigation, plaintiff did nothing to substantiate his allegations concerning the OIG Audit Report.  Plaintiff never sought to identify its authors.

---

[5]   *See Office of Compliance Inspections and Examinations*, SEC, http://www.sec.gov/ocie (last visited Aug. 10, 2015).

Plaintiff did not seek any discovery from the Office of Audits, the Office of Inspector General, or any other division of the SEC to authenticate or verify any aspect of the Audit or its findings.

Indeed, plaintiff did nothing at all until the last day of fact discovery, when he served a subpoena for documents on the "contractor" the OIG had retained to consult on unspecified portions of the Audit.  Plaintiff did not seek testimony from this consultant, a professor at the University of Maryland named Albert Kyle.

At the same time that it issued the subpoena to Professor Kyle, plaintiff wrote to the Court seeking to extend the fact discovery deadline to accommodate a response to the subpoena, as well as two other belated discovery requests.  (08 Civ. 2793, Dkt. No. 339.)  On February 9, 2015, the Court denied plaintiff's request for an extension.  (08 Civ. 2793, Dkt. No. 354.)  In ruling against the plaintiff, the Court noted:

> [Plaintiffs] do not explain why they did not serve the subpoena upon him at that time, rather than waiting until the day ending fact discovery.  They also do not explain why they began attempting to contact Prof. Kyle in 2014 when his only connection to this case, serving as an expert for the SEC, took place in 2008.

(*Id.* at 3-4.)  All discovery—including expert discovery—closed on June 22, 2015.

ARGUMENT

The OIG Audit Report should not be received in evidence and all reference to it, reliance upon it, or other use should be precluded at trial.

## I.    The OIG Audit Report Is Not Trustworthy and Therefore Is Not Admissible As a Public Record under Rule 803(8)

The OIG Audit Report is a "public record."  Therefore, it is admissible unless defendants can "show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(B).  The test is whether "sufficient negative factors are

10

present." Fed. R. Evid. 803 advisory committee's note (Note to Paragraph (8)).  Defendants meet

their burden here, as there are many problems with the OIG Audit Report that make it unreliable.

### A.      The OIG Audit Report Was Not Intended to Analyze Bear Stearns's Near Collapse or to Be Offered as Substantive Evidence at a Trial

Central questions in this case include why did Bear Stearns nearly fail, and who at

the firm knew what when.  The Complaint quotes the OIG Audit Report repeatedly in an effort to

present plaintiff's answers to those questions.   The problem—and a fundamental reason the

document should be excluded—is that the OIG Audit Report never was intended to serve as

evidence on these questions.

The Audit is up front about its limitations.  As its title reflects, it is an audit of the

SEC's "oversight" of Bear Stearns and related entitles.  Its "objectives were to evaluate the

Commission's CSE program," and to determine whether improvements were needed.  (Ex. 1 at vi.)

It was not an audit of Bear Stearns and the report specifically disclaims any effort to determine

what happened at Bear Stearns.  Indeed, it recognizes that a "multitude of events" led to the fall of

the firm.  (*Id.* at viii.)  Thus, OOA acknowledges that it has "no specific evidence" as to what

issues "directly contributed to Bear Stearns' collapse."  (*Id.* at ix n.12.)

The same limitation applies to sub-issues raised in the Complaint.  For example,

plaintiff makes numerous allegations about Bear Stearns's internal controls and risk management

practices.  (*E.g.*, Compl. ¶¶ 104-05.)  The OIG Audit Report, however, states specifically that it did

not analyze these matters.  OOA "did not visit [Bear Stearns] and perform an independent

assessment of the firm's risk management systems (*e.g.*, internal controls, models, etc.)."  (Ex. 1 at

71.)  Likewise, OOA "did not review management controls because they did not pertain to the

audit's objectives."  (*Id.* at 72.)

11

Similarly, the work contributed by the OOA's technical consultant was for a limited purpose irrelevant to this lawsuit. As the Audit states, Professor Kyle examined "the adequacy" of the SEC's work and "focused his review on the Commission's oversight of Bear Stearns." (*Id.*) It was never part of his assignment to evaluate anything at Bear Stearns itself.

The Second Circuit has held that the situation presented here—when a report "was prepared for very different purposes that [*sic*] those for which it was offered at trial"—presents a strong reason for excluding a proffered public document. *City of New York* v. *Pullman Inc.*, 662 F.2d 910, 915 (2d Cir. 1981);[6] *see also United States* v. *Jacques Dessange, Inc.*, 2000 WL 294845, at *3 (S.D.N.Y. 2000) (excluding opinion of immigration judge in subsequent case because the prior decision "expressly declined to address the issue at the heart of this case").

## B.    The OIG Audit Report Is Anonymous

One factor courts should consider when evaluating whether to admit a public record into evidence is the "skill or expertise" of the author(s). Here, that is impossible because the OIG Audit Report is anonymous. As other courts have recognized, this is a factor that weighs against admissibility.

For example, in one case, the court excluded a report prepared by the Department of Defense Inspector General in part because "[t]hose who conducted the investigation and prepared the report are not identified and there is no basis on which this court can meaningfully assess their skill or experience." *Coughlin* v. *Tailhook Ass'n*, 1994 WL 780904, at *1 (D. Nev. Sept. 2, 1994); *see also Pearce* v. *E.F. Hutton Grp. Inc.*, 653 F. Supp. 810, 816 (D.D.C. 1987) (excluding report prepared by "an anonymous group of individuals"). The same is true here and the OIG Audit Report should be similarly excluded.

---

[6]    The quoted sentence from *Pullman* is in a section of the opinion discussing Rule 403, but the Court excluded the report at issue under both Rule 803(8) and Rule 403.

### C.    The OIG and OOA Do Not Have Appropriate Skill or Expertise

A key factor to analyze under Rule 803(8) is the "skill or expertise" of the author of the document at issue. *Beech Aircraft Corp.* v. *Rainey*, 488 U.S. 153, 167 n.11 (1988) (citing Fed. R. Evid. 803 advisory committee's note (Note to Paragraph (8)). In this case, there is no evidence that the OIG in general, or the OOA in particular, have relevant skill or expertise. Their jurisdiction is limited to internal SEC matters and they typically audit such things as the SEC's use of laptop computers, records management practices, and overtime compensation. Their focus is on identifying "deficiencies" in the commission's programs and recommending improvements. And that is what they did in this case, providing 26 recommendations to improve SEC procedures. Each is forward-looking and phrased in terms of things an SEC division "should" do; none has anything to do with any historical findings about Bear Stearns. (*See* Ex. 1 at 76-80 ("List of Recommendations").)

In the course of evaluating the work of the SEC's Trading & Markets Division, however, the OOA did make some statements concerning Bear Stearns and its business practices. (*See, e.g.*, *id.* at 13 ("Bear Stearns was not adequately capitalized"); *id.* at 22 (There are questions of "whether VaR measures were taken seriously enough by Bear Stearns' traders"); *id.* at 23 (There was "disarray" in Bear Stearns's MBS risk management); *id.* at 45 (Bear Stearns's 10-K response letter contained material information that was not disclosed).) These are the sorts of statements that plaintiff will no doubt seek to offer at trial, and precisely the sorts of statements that should be exclude as untrustworthy, because there is no basis to believe that the anonymous authors of the OIG Audit Report have the necessary skill or expertise to make these pronouncements reliably.

Put more formally, there is no foundation for the proposition that the OOA is competent to make statements about Bear Stearns's business practices. OIG's statutory authority

13

to evaluate the internal performance of the SEC does not give rise to a concomitant authority to analyze the adequacy of Bear Stearns's capital, risk management, or liquidity. The best evidence of this is the division of responsibility within the SEC itself: Trading & Markets, not OIG, was tasked with regulating broker dealers like Bear Stearns. (*See id.* at 1.)

### D.   The SEC's Own Significant Internal Criticisms of the OIG's Work Product Demonstrate That the Audit Report Is Not Trustworthy

The Court should not hesitate to conclude—at least as it relates to Bear Stearns— that the OIG's work product is not trustworthy, because significant constituencies within the SEC itself have found as much. In response to Sen. Grassley's letter, the OIG prepared two reports. Each was subject to stinging criticism from within the SEC.

As to the OIG Investigative Report, the Chief Administrative Law Judge of the Commission concluded that the entire document was flawed. She rejected its recommendation and criticized the OIG for offering conclusions without "support," with "no basis" and backed by "no persuasive evidence." (Ex. 4 at 2, 4, 6.)

This Court is entitled to credit Judge Murray's conclusions regarding the OIG Investigative Report and apply them to the OIG Audit Report. The documents concern the same general subject matter. Both were prepared at the same time, in response to the same Senate inquiry and under the supervision of the same SEC Inspector General.

Separately, the Court should credit the significant criticisms set forth by the SEC's Division of Trading & Markets. That Division was the subject of the OIG Audit Report and was so opposed to its findings that it submitted an extensive "commentary." Its conclusion that the OIG Audit Report "is fundamentally flawed in its process, premises, analysis, and key findings" (Ex. 1 at 83) is ample basis for this Court to hold that the "circumstances indicate a lack of trustworthiness" within the meaning of Rule 803(8)(B). This is particularly so where T&M's

14

criticisms are not limited to process issues.   As the Division noted, OOA's flawed process "produced findings that are materially in error."  (Ex. 1 at 84.)

Dissension within a government agency is a recognized reason for a court to find that a report should be excluded from evidence.  For example, in *Pullman*, the Second Circuit found it "significant" that the administrator of an agency "did not accept" a particular recommendation in a staff report and affirmed the District Court's exclusion of the document on that basis.  662 F.2d at 915.  The criticisms marshalled against the OIG Audit Report by the Division of Trading & Markets are more fundamental than the disagreement in *Pullman*.  If anything, this is a stronger case for exclusion.[7]

### E.      The OOA Did Not Hold a Hearing

Public reports drafted on the basis of a hearing are considered more reliable than those that are not.  Thus, the drafters of Rule 803(8) identified "whether a hearing was held" as a one factor to weigh in determining admissibility.  Fed. R. Evid. 803 advisory committee's note (Note to Paragraph (8)).  The reason is the proven fact-finding ability of the adversarial process.

In *Franklin* v. *Skelly Oil Co.*, the court explained that the public records exception "has been considered a justifiable abridgement of the privilege of cross-examination on the grounds that the inquisition or inquiry was in the nature of a judicial proceeding wherein the right of cross-examination was amply safeguarded and protected."  141 F.2d 568, 572 (10th Cir. 1944).[8]

---

[7]  In *United Air Lines, Inc.* v. *Austin Travel Corp.*, 867 F.2d 737, 743 (2d Cir. 1989), the Second Circuit held that the trial court was within its discretion to exclude as untrustworthy various government reports on the computerized reservation system ("CRS") market in an antitrust suit between a travel agency and an airline.  The court cited as support for its decision to exclude the reports the fact that a U.S. House of Representatives report had eleven dissenters; that a General Accounting Office review had "failed to interview officials of key CRS users and did not verify some pertinent data"; and that a U.S. Department of Justice report was insufficiently final.  *Id.* at 742 n.3.

[8]  The Advisory Committee Notes to Rule 803 cite *Franklin* for the recommendation that courts consider whether a hearing was held.

The court excluded the document in question "because the matter and things contained therein express merely the opinion of one whose official office and duty does not rise to the dignity of an adjudicator of causes and effects." *Id.* Citing *Franklin*, a later opinion determined that a report "made pursuant to an ex parte investigation" also did not satisfy the requirements of FRE 803(8). *Denny* v. *Hutchinson Sales Corp.*, 649 F.2d 816, 821 (10th Cir. 1981).

The *Franklin* reasoning is directly applicable. The OIG Audit Report itself states that it was not making any finding (let alone an adjudication) as to the cause of Bear Stearns's near collapse. It was unequivocally an "ex parte investigation" and not "in the nature of a judicial proceeding" in which Bear Stearns's right of cross-examination was "amply safeguarded and protected." Indeed, because the OIG Audit Report was anonymous, Bear Stearns has no way of cross-examining the author(s). All of these facts further undermine the trustworthiness of the OIG Audit Report and militate in favor of exclusion.

### F.  There Is No Way to Critically Assess Statements in the OIG Audit Report

All of the factors discussed above, along with basic limitations of the OIG Audit Report make it essentially unchallengeable. Given that there is no record of the analysis done, the documents considered, the witness interviewed, what the witness said, or how the OOA's technical consultant did whatever he did, the final Audit Report is little more than a set of naked conclusions. It would be extremely difficult at trial for defendants to challenge what it says and for the Court or the jury to critically evaluate its various assertions. All of this makes the OIG Audit Report untrustworthy within the meaning of Rule 803(8).

It is also a key reason why the document should also be excluded under Rule 403. We turn to that issue next.

Doc#: US1:10180826v1

**II.     The OIG Audit Report Also Should Be Excluded under Rule 403**

Even where a government report technically meets the requirements of Rule 803(8), the report may be excluded if its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403; *see, e.g.*, *Bright* v. *Firestone Tire & Rubber Co.*, 756 F.2d 19, 23 (6th Cir. 1984) (excluding Congressional reports under Rule 403); *John McShain, Inc.* v. *Cessna Aircraft Co.*, 563 F.2d 632, 636 (3d Cir. 1977) (similarly excluding NTSB report).   Several of the considerations underlying Rule 403 further support exclusion of the OIG Audit Report in this matter.

First, a risk of unfair prejudice arises when government reports are offered, because they appear "official."   As the Sixth Circuit held in *Firestone*, "There was a substantial danger of unfair prejudice because the jury may have been influenced by the official character of the report, to afford it greater weight than it is worth."   756 F.2d at 23; *see also Pearce* v. *E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 816 (D.D.C. 1987) (excluding report "because of the undue weight that a jury is likely to attach to the official reports").   The case for exclusion on this basis is stronger still where, as here, the probative value of the report is already diminished by methodological deficiencies.   In *Pullman*, for example, the Second Circuit excluded "a so-called government report which in fact was incomplete and based largely on hearsay" because "the report would have been presented to the jury in 'an aura of special reliability and trustworthiness' which would not have been commensurate with its actual reliability."   662 F.2d at 915 (quoting *United States* v. *Fosher*, 590 F.2d 381, 383 (1st Cir. 1979)); *see also Jacques Dessange*, 2000 WL 294849, at *5 (citing *Pullman* to exclude document).

Second, exclusion under Rule 403 is appropriate if "admission of the report would [be] likely to protract an already prolonged trial with an inquiry into collateral issues regarding the

17

accuracy of the report and the methods used in its compilation." *Pullman*, 662 F.2d at 915 (citing *John McShain*, 563 F.2d at 636). As set forth above, there are good grounds to question the accuracy of statements in the OIG Audit Report. If the document were admitted at trial, defendants would have to present to the jury the evidence and arguments developed here, in order to ensure that the jury adequately recognized the untrustworthiness of the report. That is precisely the sort of minitrial Rule 403 is intended to prevent. "It is entirely appropriate to exclude a report when the effort a party must undertake to expose the weaknesses in the report may confuse the jury and result in an undue waste of time." *Jacques Dessange*, 2000 WL 294845, at *5; *see also Firestone*, 756 F.2d at 23 (excluding report where it "would be extremely difficult and time-consuming to evaluate the report's trustworthiness by examining all the data on which it was based").

Third, permitting plaintiff to use the OIG Audit Report is likely to result in juror confusion. The misleading manner in which Complaint cites the report illustrates the mischief that could result if the report is introduced at trial.

Plaintiff presents the Report as if it were authored by the SEC. *See, e.g.*, Compl. ¶¶ 64, 76 ("As the SEC found . . . ."); *id.* ¶ 87 ("as the SEC recognized"); *id.* ¶¶ 135, 141 ("As the SEC found and disclosed to the public . . . ."). In fact, the report was prepared by the OOA. The SEC "oversees the key participants in the securities world, including securities exchanges, securities brokers and dealers, investment advisors, and mutual funds."[9] By contrast, the OOA investigates the SEC on matters such as whether "resources are safeguarded and appropriately managed," "funds are expended properly," and "information provided by the Commission to the

---

[9] *The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation*, SEC, http://www.sec.gov/about/whatwedo.shtml (last visited Aug. 10, 2015).

public and others is reliable."[10]   Given the disparate mandates and expertise of the two entities, juror confusion as to the actual role of each in the preparation of the report is likely.

In a similar vein, in his Complaint, plaintiff misleadingly claims that "the SEC found in examination results" that Bear Stearns used outdated risk models and inputs.  *See* Compl. ¶ 100.  But, as made clear above, the OOA did not conduct an "examination" of Bear Stearns.  To suggest that the SEC completed an examination in which it drew conclusions about risk management at Bear Stearns—when, in fact, the OOA completed an audit of the SEC and its oversight of broker-dealers—is unquestionably deceptive, with great potential to confuse a jury.

In addition, plaintiff cites the OIG Audit Report multiple times in support of the proposition that individual employees of Bear Stearns had, or should have had, knowledge of particular practices of Bear Stearns that plaintiff alleges were problematic.  *See id.* ¶¶ 62, 176-77 (Spector); ¶ 141 (Schwartz and Molinaro); ¶¶ 165-66 (Cayne).  Yet the report does not even suggest anything about the mental state of these individuals.

As these circumstances illustrate, permitting use of the OIG Audit Report would be unfairly prejudicial, confusing and a waste of time and resources.  It should be excluded.

## III.     There Are No Other Grounds for Admitting the OIG Audit Report

As discussed above, the OIG Audit Report should be excluded because it is not trustworthy and because permitting its use would be unfairly prejudicial to defendants.  The analysis presented focused on Rules 803(8) and 403 but it is applicable to other rules plaintiff might cite in support of admissibility.

Rule 803(6):  The Court should not admit the document as a business record under Rule 803(6), for two reasons.  First, the trustworthiness analysis in Rule 803(6)(E) is identical to

---

[10]     *Overview*, OIG, OOA,  http://www.sec.gov/about/offices/oig/inspector_general_audits.shtml (last visited Aug. 10, 2015).

that required—and discussed above—or Rule 803(8)(B). Second, the OIG Audit Report does not qualify as a business record because it was not made at or near the time of the events described. *See United States* v. *Strother*, 49 F.3d 869, 876 (2d Cir. 1995) (affirming exclusion of memorandum that "was made six months after the relevant events and contained narrative statements based on multiple hearsay").

Rule 807: Plaintiff also cannot rely on the residual exception in Rule 807. For the reasons stated, the OIG Audit Report lacks the required "circumstantial guarantees of trustworthiness." Fed. R. Evid. 807(a)(1).

## CONCLUSION

The Court should preclude at trial all use of or reference to the OIG Audit Report.

Dated: August 17, 2015
      New York, New York

Respectfully Submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

    Brad S. Karp (bkarp@paulweiss.com)
    John F. Baughman (jbaughman@paulweiss.com)
    Jessica S. Carey (jcarey@paulweiss.com)
    Jonathan H. Hurwitz (jhurwitz@paulweiss.com)

1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns Companies Inc.*

David S. Frankel (dfrankel@kramerlevin.com)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
(212 715-9100)
*Attorneys for Defendant James E. Cayne*

20

David B. Anders (DBAnders@wlrk.com)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*

21