# Acronyms

| | |
|---|---|
| BDRA | Broker-Dealer Risk Assessment |
| Bear Stearns | The Bear Stearns Companies, Inc. |
| BSAM | Bear Stearns Asset Management |
| CF | Division of Corporation Finance |
| CFP | Contingency Funding Plan |
| Commission | Securities and Exchange Commission |
| CSE | Consolidated Supervised Entity |
| EU | European Union |
| FINRA | Financial Industry Regulatory Authority |
| Federal Reserve | Board of Governors of the Federal Reserve System |
| FRBNY | Federal Reserve Bank of New York |
| GAO | Government Accountability Office |
| JP Morgan | JP Morgan Chase & Co |
| Lehman Brothers | Lehman Brothers Holdings Inc. |
| LTCM | Long-Term Capital Management |
| Merrill Lynch | Merrill Lynch & Co |
| MOU | Memorandum of Understanding |
| OCIE | Office of Compliance Inspections and Examinations |
| OIG | Office of Inspector General |

**APPENDIX I CONTINUED..**

| | |
|---|---|
| ORA | Office of Risk Assessment |
| OTS | Office of Thrift Supervision |
| PCAOB | Public Company Accounting Oversight Board |
| PWG | President's Working Group |
| Repo | Repurchase Agreements |
| SOX | Sarbanes-Oxley Act of 2002 |
| SRO | Self Regulatory Organizations |
| TM | Division of Trading and Markets |
| U.S. | United States |
| VaR | Value at Risk |

**APPENDIX II**

# <u>Congressional Audit Request</u>

**United States Senate**

COMMITTEE ON FINANCE

WASHINGTON, DC 20510-6200

April 2, 2008

**Via Electronic Transmission**

The Honorable David Kotz
Inspector General
US Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-2736

Dear Inspector General Kotz:

According to regulatory filings and a December 2007 *Wall Street Journal* article, the SEC Enforcement Division declined to bring a case against Bear Stearns for improperly valuing mortgage-related investments. Given the later collapse and federally backed bail-out of Bear Stearns, Congress needs to understand more about this case and why the SEC ultimately sought no enforcement action.

Moreover, I am particularly interested in this case in light of the SEC's failed investigation of Pequot Capital Management. As you know, in the final report of the Senate's inquiry into that matter, we found that senior SEC officials showed extraordinary deference to a particular witness because of his "prominence" as the head of Morgan Stanley.

**Request for Investigation**

In light of my earlier investigation I need to know whether the same problems identified in the Pequot investigation were repeated in the Bear Stearns case. Accordingly, I request that you conduct a thorough investigation into the facts and circumstances surrounding the decision to not pursue an enforcement action against Bear Stearns. Please provide a final report on whether there was any improper action or misconduct relating to SEC investigation of Bear Stearns and its decision to close the investigation. The report should also describe and assess:

    1.  the nature, extent, and propriety of communications between Bear Stearns executives or their representatives and senior SEC officials;

    2.  the decision-making process which led to the SEC's failure to bring an enforcement action following the drafting of a Wells notice;

    3.  the reasons for declining to proceed with an enforcement action; and

**APPENDIX II CONTINUED..**

4.  the degree to which more aggressive action by the Enforcement Division may have led to an earlier and more complete understanding of the issues that contributed to the collapse of Bear Stearns.

**Request for Audit**

In addition to this investigative request, I would also like your office to follow-up on previous audit work relevant to issues surrounding Bear Stearns. The Division of Trading and Markets (Division) is responsible for regulating the largest broker-dealers and the associated holding companies. Offices within the Division are staffed with accountants and economists who are responsible for reviewing the market and credit-risk exposures of the broker dealers. Their review includes assessing broker-dealers' quarterly financial filings, ensuring broker-dealers are meeting net-capital requirements and that other financial ratios, such as liquidity ratios, are adequate. There is a special emphasis in reviewing the five very large broker-dealers, including Bear Stearns, known as the Consolidated Supervised Entity (CSE) Program. The Division staff exercises additional oversight of these firms and examines their risk models.

I understand that the OIG conducted a prior audit of these responsibilities in 2002. Please provide an update of the previous findings, determine whether earlier recommendations were implemented, and analyze the current function of these offices. The review should include a description and assessment of their missions, how the programs are run, their policies and procedures, the adequacy of any reviews conducted regarding Bear Stearns, and recommendations for improvements in the process.

If you have any questions about these requests, please contact Jason Foster or Emilia DiSanto at (202) 225-4515.

Sincerely,

Charles E. Grassley
Ranking Member

---

APPENDIX III

# Curriculum Vitae (Albert "Pete" Kyle)

CURRICULUM VITAE
Albert S. "Pete" Kyle

Date: February 25, 2007
Current Position: Charles E. Smith Professor of Finance, Robert H. Smith School of Business
Business Address: University of Maryland, 4453 Van Munching Hall, College Park, MD 20742
Business Phone: 301-405-9684 (UMD voice), 301-314-5828 (UMD fax)
E-Mail: akyle@rhsmith.umd.edu

## EDUCATION

- University of Chicago, 1977-1979, 1980-1981. Ph.D., Economics, 1981.
  Dissertation: "An Equilibrium Model of Speculation and Hedging."
  Advisors: José Scheinkman (chair), Robert E. Lucas, Lester Telser.
- Nuffield College, Oxford University, 1976-1977. Field: Economics. Advisor: James Mirrlees.
  Met all requirements for B.Phil. degree (now called M.Phil.) except two-year residency requirement.
- Merton College, Oxford University, 1974-1976. B.A. Math and Philosophy, 2nd class honors, 1976.
- Davidson College, 1970-1974. B.S. Mathematics, summa cum laude.

## CAREER

- Charles E. Smith Professor of Finance (with tenure), Robert H. Smith School of Business, University of Maryland, August 2006 to Present
- Professor of Finance and Economics (with tenure), Duke University, Fuqua School of Business and Department of Economics, January 2002-2006 (appointment predominantly in Fuqua School of Business)
- American Standard Visiting Professor, Said Business School, Oxford University (St. Edmund Hall), June 2004, June 2005, June 2006.
- Visiting Scholar, Princeton University, Department of Economics, Fall 2004 (while on sabbatical leave from Duke University).
- Consultant, Morgan-Stanley and Company, December 1996 – December 1998, full time while on unpaid leave from Duke University, Proprietary trading research.
- Associate Professor of Finance (with tenure), Duke University, Fuqua School of Business, July 1992-July 2002 (on unpaid leave for calendar years 1997,1998).
- Associate Professor of Finance (with tenure), University of California at Berkeley, Haas School of Business, July 1990-June 1992.
- Visiting Scholar, Duke University, Fuqua School of Business, September 1991-June 1992 (on sabbatical leave from UC Berkeley Fall 1991).
- Assistant Prof. of Finance, Univ. of California at Berkeley, Haas School of Business, July 1987-June 1990.
- Assistant Prof. of Economics and Public Affairs, Woodrow Wilson School, Princeton University, 1981-87.
- Visiting Fellow, Yale School of Organization and Management, Spring 1984 (on sabbatical leave from Princeton University).
- Visiting Research Fellow, Centre of Policy Studies, Monash University, Australia, Fall 1983 (on sabbatical leave from Princeton University).
- Pit Trading and Risk Management, Goodman-Manster and Company, Chicago, 1979-1980.
- Staff Economist, Chicago Board of Trade, part-time, 1978-1979.

1

56

## APPENDIX III CONTINUED..

### PUBLICATIONS IN REFERRED JOURNALS
(In co-authored articles, all authors have equal seniority and approximately equal contribution.)

* Avinash K. Dixit and Albert S. Kyle, "The Use of Protection and Subsidies for Entry Promotion and Deterrence," American Economic Review, Vol. 75, No. 1, 1985, pp. 139-152.
* Albert S. Kyle, "Continuous Auctions and Insider Trading," Econometrica 53, 1985, 1335-1355.
* Albert S. Kyle, "Improving the Performance of the Stock Market," California Management Review, 30:4, Summer 1988, 90-114.
* Peter R. Hartley and Albert S. Kyle, "Equilibrium Investment in an Industry with Moderate Investment Economies of Scale," The Economic Journal, 99:396, June 1989, 392-407.
* Peter R. Hartley and Albert S. Kyle, "Real Rates and Home Goods: A Two Period Model," The Economic Record, 64:186, September 1988, 168-177.
* Albert S. Kyle, "Informed Speculation with Imperfect Competition," Review of Economic Studies 56:3, No. 187, July 1989, 317-356.
* Albert S. Kyle and Jean Luc Vila, "Noise Trading and Takeovers," Rand Journal of Economics, Vol. 22, No. 1, Spring 1991, pp. 54-71.
* John Y. Campbell and Albert S. Kyle, "Smart Money, Noise Trading, and Stock Price Behavior," Review of Economic Studies 1993, 60 pp. 1-34.
* Albert S. Kyle and Albert Wang, "Speculation Duopoly with Agreement to Disagree: Can Overconfidence Survive the Market Test?" Journal of Finance, volume LII, number 5, December 1997, pp. 2073-2090.
* Albert S. Kyle and Wei Xiong, "Contagion as a Wealth Effect," Journal of Finance, volume LVI, No. 4, August 2001, pp. 1401-1440.
* Albert S. Kyle, Hui Oo-yang, and Wei Xiong, "Prospect Theory and Liquidation Decisions," Journal of Economic Theory, Elsevier, vol. 127 (1), July 2006, pp. 273-288.

### CHAPTERS IN BOOKS

* Albert S. Kyle, "Imperfect Competition, Market Dynamics, and Regulatory Issues," in Financial Markets and Incomplete Information: Frontiers of Modern Financial Theory, Vol. 2, edited by Sudipto Bhattacharya and George M. Constantinides, Rowman and Littlefield, 1989, 153-161.
* Albert S. Kyle, "A Theory of Futures Market Manipulations," The Industrial Organization of Futures Markets, edited by Ronald W. Anderson, Lexington, Mass., Lexington Books, 1984, pp. 141-173, also reprinted in Paul Weller (editor), The Theory of Futures Markets, Blackwell, 1992 pp. 272-303.

### PUBLICATIONS IN UNREFERRED CONFERENCE VOLUMES

* Albert S. Kyle, "Trading Halts and Price Limits," The Review of Futures Markets, 7:3, 1988, 426-434.
* Albert S. Kyle, "Market Structure, Information, Futures Markets, and Price Formation," in International Agricultural Trade: Advanced Readings in Price Formation, Market Structure, and Price Instability, edited by Gary G. Storey, Andrew Schmitz, and Alexander H. Sarris, Boulder, Westview, 1984, pp. 45-64.
* Albert S. Kyle, "Discussion of 'The Pricing of Oil and Gas: Some Further Results'," (by Merton Miller and Charles Upton), The Journal of Finance, Papers and Proceedings, Vol. 40, No. 3, July 1985, 1018-1020.
* Peter R. Hartley and Albert S. Kyle, "The Economics of Medical Insurance," in Medical Care and Medical Ethics, edited by C.L. Buchanan and E.W. Prior, Winchester, Mass., Allen & Unwin Inc., 1985, pp. 77-104.

2

# APPENDIX III CONTINUED..

## MISCELLANEOUS PUBLISHED ARTICLES

* Albert S. Kyle and Terry A. Marsh, "Computers and the Crash: Is Technology the Problem or the Solution?" Institutional Investor Financial Technology Forum 2, June 1988, pp. 6-7.

## UNPUBLISHED PAPERS

* Albert S. Kyle, "A Rational Expectations Model of Equilibrium in Speculative Markets with Imperfect Liquidity and Costly Information," Thesis seminar and job-market paper, 1980.
* Albert S. Kyle, "The Efficient Markets Hypothesis and the Supply of Speculative Services," manuscript, 1982.
* Albert S. Kyle, "An Equilibrium Model of Speculation and Hedging," University of Chicago Ph.D. Dissertation (Economics), 1981.
* Peter R. Hartley and Albert S. Kyle, "Equilibrium in a Model with Lumpy Investment," manuscript (now subsumed in "Equilibrium Investment in an Industry with Moderate Investment Economies," 1983.
* Avinash K. Dixit and Albert S. Kyle, "On the Use of Trade Restrictions for Entry Promotion and Deterrence," Economics Discussion Paper No. 56, Woodrow Wilson School, Princeton University, 1983.
* Albert S. Kyle, "Equilibrium in a Speculative Market with Strategic Informed Trading," (revised as "Informed Speculation with Imperfect Competition). 1983.
* Albert S. Kyle, "Informational Efficiency and Liquidity in a Continuous Auction Futures Market," Centre for the Study of Futures Markets, Columbia Business School, Working Paper Series #CSFM-75, 1984.
* Albert S. Kyle, "An Explicit Model of Smart Money and Noise Trading," manuscript (now subsumed in "Smart Money, Noise Trading, and Stock Price Behavior), 1985.
* Albert S. Kyle, "An Intuitive Introduction to Agency Theory with Applications to Money Management," Q-Group Talk, manuscript, April 1989.
* Albert S. Kyle and Ailsa Roell, Comments on Recent Developments and Proposals Concerning Dealing Practices in the UK Equity Market," manuscript, 1989.
* Albert S. Kyle and Terry A. Marsh, "On the Economics of Securities of Clearing and Settlement," manuscript, 1993.
* Albert S. Kyle, "On Incentives to Acquire Private Information with Continuous Trading," manuscript, 1985.
* Albert S. Kyle, "Dealer Competition Against an Organized Exchange," manuscript, June 1987.
* Albert S. Kyle, "Market Failures and the Regulation of Financial Markets," manuscript, 1992.
* Gerard Gennotte and Albert S. Kyle, "Intertemporal Insider Trading with a Smooth Order Flow," manuscript, 1993.
* Albert S. Kyle and Tao Lin, "Continuous Speculation with Overconfident Competitors," manuscript, 2002.
* Albert S. Kyle and Tao Lin, "An Analysis of Excessive Trading Volume with Different Beliefs," manuscript, 2002.
* Albert S. Kyle and Rujing Meng, "Strategic Acquisitions and Investment in a Duopoly Patent Race under Uncertainty," manuscript, 2003.
* Ming Gao and Albert S. Kyle, "An Intertemporal Asset Pricing Model with Strategic Informed Trading and Risk-Averse Market Makers," manuscript, 2004.
* Albert S. Kyle, "A Two-Factor Model of Value and Growth with Adjustment Costs," manuscript, 2004.
* Alex Boulatov and Albert S. Kyle, "Uniqueness of Equilibrium in the Single-Period Kyle-85 Model," manuscript, 2005.

3

**APPENDIX III CONTINUED..**

## RESEARCH CONTRACTS AND GRANTS

- Research Consultant, Bell Laboratories, 1982.
- Research Associate, Center for the Study of Futures Markets, Columbia Business School, two months of summer support, 1983.
- Principal Investigator, NSF Grant (Information Science): "Organized Exchanges, Dealer Markets, and Anonymous Trading." Princeton University, Two summers of summer support, 1985, 1986.
- Academic Visitor, Federal Reserve Bank, Washington, D.C., June 6-10, 1992.
- Academic Visitor, Federal Reserve Bank, Atlanta, GA, 5 days, 2008.

## FELLOWSHIPS, PRIZES AND ACADEMIC AWARDS

- Phi Beta Kappa, Davidson College, 1974.
- Honorary Postmastership, Merton College, 1976-1977.
- George Webb Medley Prize in Economics, Merton College, Oxford University, 1976.
- Rhodes Scholarship (Texas), Davidson College, 1974-1977.
- Schwabacher Fellowship, Haas School of Business, 1988-1989.
- Batterymarch Fellowship, 1990-1991.
- NSF Graduate Fellowship, University of Chicago, 1977-1979, 1980-1981.
- Keynote Speaker, Western Finance Association, Park City, Utah, June 25, 2002, "Market Microstructure."
- Keynote Speaker, Twelfth Annual Conference on The Theories and Practices of Securities Markets, National Sun Yat-sen University, Kaohsiung, Taiwan, "Insider Trading and Corporate Governance," December 17,2004.
- Assurant Lecture, Assurant/Georgia Tech International Finance Conference, "Market Microstructure and Rational Expectations: A Primer," April 8, 2005.
- Fellow, Econometric Society, 2002-present.
- Clarendon Lectures in Finance, Oxford University, June 2006.

## PH.D. DISSERTATION ADVISING
(Initial academic placements are tenure track assistant professors or equivalent, unless otherwise indicated.)

**Princeton University:**

Steve Kealhofer (Chair, 1983), Columbia University Business School; KMV.
George Mailath (Second Reader, 1984), University of Pennsylvania, Department of Economics.
Loretta Mester (1985), Federal Reserve Board, Philadelphia.
Menachem Stemberg (Second Reader, 1985), Commodities Corporation.
Mark Dudey (Second Reader, 1986), Rice University.
Leroy Nakamura (Second Reader, 1985), Federal Reserve Board, Philadelphia.
Ian Gale (Chair, 1989), University of Wisconsin, Federal Reserve Board, Cleveland.
Julie Nelson (Second Reader, 1986), New York University Business School.
Matt Spiegel (Second Reader, 1987), Columbia University, UC Berkeley, Yale University.
Jean Luc Vila (Second Reader, 1987), New York University, MIT.
Blaise Allaz (Second Reader, 1987), University of Lausanne.

**University of California, Berkeley:**

Theodore Sternberg (Chair,1989), Vanderbilt University.
Helena Mollins (Chair,1990), University of Oregon.
Rich Lindsey (Chair,1991), Yale University; Bear Stearns Securities.
Peter Algert (Chair,1991), University of California, Davis; Barclays Global Investor Services.

4

## APPENDIX III CONTINUED.

Jim Angel (Chair,1991), Georgetown University.
Lewis Lu (Chair,1992), University of Hong Kong.
Takeshi Yamada, (Chair,1993), Hong Kong Univ. of Science and Technology; National Univ. of Singapore.

<u>Duke University:</u>

John Graham (Chair, Finance, 1994), University of Utah; Duke University.
Susan Monaco (Chair, Finance, 1995), University of Indiana.
Lu Feng (Chair, Finance, 1995), Saloman Brothers; Stark Investments.
Jinjian Zhai (Chair, Economics, 1996), Federal Home Loan Bank, Iowa.
Jennifer Babcock (Accounting, 1997), Sloan School of Business, MIT.
Mary Beth Fisher (Mathematics, 1998), EBT Bank.
Brian Balyeat, (Chair, Finance, 1998), Texas A&M.
Wei Xiong (Chair, Finance, 2001), Bendheim Finance Center, Princeton University.
Jon Wongswan (Tang) (Economics, 2002), Federal Reserve Board, Chicago.
Ben Zhang (Economics, 2002), Moodies KMV; Fitch.
Lin Peng (Chair, Finance, 2002), City University of NY, Baruch College.
Emma Rasiel (Chair, Finance, 2003), Duke University (Lecturer)
Ge Zhang (Finance, 2003), University of New Orleans.
Julia Litvinova (Economics, 2003), The Brattle Group.
Ilia Tsetlin (Decision Sciences, 2003), INSEAD Singapore.
Tao Lin (Chair, Finance, 2003), University of Hong Kong.
Krishna Narisimhan (Finance, 2004), Wharton Business School (visitor).
Ruping Meng (Chair, Finance, 2004), University of Hong Kong.
Mohan Gopalan (Finance, 2004), Barclays Global Investors, London.
Lakshman Easwaran (Finance, 2004), Lehmann Brothers.
Haofei Chen (Economics, expected 2005), Goldman Sachs, Hong Kong.
Sandra Lizarazo (Economics, 2005), ITAM, Mexico City.
Oksana Loginova (Economics, 2005), University of Missouri, Columbia.
Will Xu (Chair, Economics, 2005), Hong Kong University.
Ming Guo (Chair, Economics, 2005), Citadel Investment Group.
Florin Dorobantu (Economics, expected 2006).
Bin Wei (Co-chair, Finance, expected 2007).
Fei Ding (Chair, Finance, expected 2007).
Bruce Carlin (Co-chair, Finance, expected 2007).

<u>North Carolina State University:</u>

Lu Na (Decision Sciences, 2004), Medical College of Wisconsin, BioStatistics Consulting Center staff.

<u>University of North Carolina, Chapel Hill:</u>

Albert Wang (Chair, Finance, 1994), Columbia University; Rice University.

<u>TEACHING (Estimated Enrollments)</u>

<u>University of Maryland:</u>

BUFN 758V: Special Topics in Finance: Venture Capital and Private Equity
    Fall 2006: 35 students.

BMGT 808I: Doctoral Seminar: Market Microstructure and Industry Equilibrium
    Fall 2006: 10 students (including auditors)

5

## APPENDIX III CONTINUED..

<u>Duke University</u>: (One daytime MBA course meets for 2 hours 15 minutes twice a week for six weeks, plus exam. Ph.D. courses are one a semester system.)

Finance I – First-year Finance Theory course for Ph.D. students
    Fall 2002: 30 students.
    Fall 2001: 30 students.
    Fall 2000: 20 students.
    Fall 1999: 20 students.
    Fall 1996: 15 students.
    Fall 1995: 15 students.
    Fall 1994: 15 students.
    Fall 1993: 10 students.
    Fall 1992: 10 students.

Finance III – Second-year Finance Elective for Ph.D. students (Market Microstructure and Derivatives)
    Spring 1998: 15 students.

Venture Capital and Private Equity:
    Summer 2004: Week-end MBA, one section, 50 students.
    Fall 2003: Global Executive MBA One-Day Mini-course, 55 students.
    Fall 2003: Day-time MBA, two sections, with Rebecca Zarutskie, 100 students.
    Fall 2003: Cross-Continent Executive MBA, 50 students, taught as Advanced Corporate Finance.
    Summer 2004: Week-end MBA, one section, 50 students.
    Fall 2002: Global Executive MBA One-Day Mini-course, 50 students.
    Fall 2002: Day-time MBA, two sections, with Stephen Wallenstein, 110 students.
    Fall 2002: Cross-Continent Executive MBA, 50 students, taught as "Advanced Corporate Finance."
    Fall 2001: Global Executive MBA One-Day Mini-course, 50 students.
    Fall 2001: Day-time MBA, two sections, with Stephen Wallenstein, 110 students.
    Fall 2001: Cross-Continent Executive MBA, 25 students, taught as "Advanced Corporate Finance."
    Fall 2000: Day-time MBA, two sections, with Stephen Wallenstein, 110 students.

Advanced Corporate Finance:
    Fall 2000: Day-time MBA, two sections, 70 students.
    Fall 1995: Daytime MBA, two sections, 90 students.
    Fall 1994: Daytime MBA, two sections, 90 students.
    Fall 1993: Daytime MBA, two sections, 90 students.

Corporate Finance:
    Summer 2005: Week-end MBA, one section, 55 students.
    Fall 2005: Daytime MBA, four sections, 210 students.
    Fall 1996: Daytime MBA, two sections, 100 students.
    Fall 1995: Daytime MBA, two sections, 100 students.
    Fall 1994: Daytime MBA, two sections, 100 students.
    Fall 1993: Daytime MBA, one section, 60 students.
    Fall 1992: Daytime MBA, one section, 60 students.

<u>University of California, Berkeley</u> (MBA and Ph.D. courses on semester system)

Finance I – First-year Finance Theory course for Ph.D. students
    Fall 1989: 15 students.
    Fall 1988: 15 students.
    Fall 1987: 15 students.

6

### APPENDIX III CONTINUED..

Financial Theory: Gateway Investments elective for MBA students:
  Spring 1988: Daytime MBA, two sections, 80 students.
  Spring 1989: Daytime MBA, three sections, 180 students.

Corporate Finance: Elective for MBA students:
  Fall 1990: Daytime MBA, two sections, 80 students.
  Fall 1990: Evening MBA, one section, 40 students.
  Fall 1989: Evening MBA, one section, 40 ments.

Futures and Options: Advance Undergraduate Elective
  Spring 1989: With David Modest, 20 students.

Princeton University (Courses on semester system):

Finance I – First-year Finance Theory course for Ph.D. students
  Fall 1981: With Raymond Hill, 20 students.
  Fall 1982: 15 students.
  Fall 1984: 15 students.
  Fall 1985: With Sanford Grossman, 15 students.
  Fall 1986: 15 students.

Financial Markets – Finance Elective for Woodrow Wilson Masters of Public Affairs students.
  Fall 1981: 25 students.
  Fall 1982: 25 students.
  Fall 1984: 25 students.
  Fall 1985: 25 students.
  Fall 1986: 25 students.

Topics in Micro-economics – Elective for Woodrow Wilson Masters of Public Affairs students.
  Fall 1981: 25 students.
  Fall 1982: 25 students.
  Fall 1985: 25 students.

UNIVERSITY SERVICE

University of Maryland:

  Business School Ph.D. Oversight Committee, 2006-2007.
  Finance Area Ph.D. Committee, 2006-2007.
  Finance Area Recruitment Committee, 2006-2007.
  Finance Area Strategy Council, 2006-2007.
  Business School Financial Lab Committee, 2006-2007.
  Mentor to Assistant Professor Georgios Skoulakis

Duke University

  Member, Dean's Advisory Committee, 2002-2003.
  Membory, Duke Global Capital Markets Advisory Committee, 2000-2004.
  Finance Area Coordinator, Fall 1995.
  Finance Ph.D. Program Administrator, 2000-2003. Helped with Ph.D. admissions other years.
  Health Sector Management Curriculum Review Committee, 2003.
  TeraData Center Research Review Committee, 2002-2004.

7

# APPENDIX III CONTINUED..

Faculty Technology Committee, 2000.
Organized Duke NYSE Conference on Market Microstructure, 1995.
External Ad Hoc Committee Chairman: 1996.
Internal Ad Hoc Committee Chairman: 1992, 1993, 1995.
Internal Ad Hoc Committee Member: 2003, 2004.
Curriculum Committee, 1995-1996.
Elected Academic Council Representative, 1994-1995.
Rhodes Scholarship Advisory Committee, 2001-2004.
Junior and Senior Faculty Recruiting, 1992-2005, including interviewing at ASSA meetings most years.
Carnegie Case Competition Advisor, 1999-2002.

University of California, Berkeley:

Ph.D. Program Administrator, 1988-1991.
Faculty Recruiting, 1987-1991, including interviewing at ASSA meetings.
Elected Academic Council Representative, 1988-1989.
Active Participant in Berkeley Program in Finance, 1987-1991.
Active Participant in Financial Investment Technology (Executive Education) Program, 1989-1991.

Princeton University:

Rhodes Scholarship Advisory Committee, 1984-87.
Finance Faculty Recruiting, 1983-87, including interviewing at ASSA meetings several years.
Woodrow Wilson Qualifying Exam Committee, 1984-87.
Woodrow Wilson Ph.D. Committee, 1985-87.
Economics Department Ph.D. Admissions, 1984-85.

PROFESSIONAL SERVICE

* NBER Research Associate, 1983-1985.
* Institute for the Study of Securities Markets, Member, Board of Directors, 1988-1992.
* Ecole Nationale des Ponts et Chaussees, Visiting Lecturer, two-week finance course, 1991, 1992, 1993.
* CEPR Summer Institute, Gerzansee, Switzerland, Participant, July 11-23, 1993.
* Frankfurt University, Guest Lecturer, Ph.D. lectures on market microstructure, Aug 13-15, 1999.
* Rhodes Scholarship Selection Committee, Illinois (1979, 1980), Florida (1998, 1999, 2000, 2001, 2002).
* American Finance Association, Board of Directors, Member, 2004-present.
* NASDAQ, Economic Advisory Board, Member, 2005-present.

REFEREEING AND REVIEWING

* I typically referee 6-10 papers per year.
* I occasionally serve on program committees for conferences.
* Referee Reports and External Reviews, 2004: Journal of Financial Economics (3), Journal of Finance (7), Review of Financial Studies, American Economic Review, Econometrica, Journal of Political Economy, Journal of Economic Theory, Economic Journal, NSF, several reviews for tenure or promotion.
* Utah Winter Finance Conference Program Committee, 2004, 2005, 2006.

8

## APPENDIX III CONTINUED..

### SELECTED CONSULTING

- Goodman-Manaster and Company, 1981. Futures trading, risk management.
- Pepper, Hamilton, and Scheetz, 1984-1986, expert witness. Railroad deregulation. Reports with Robert Willig.
- Consultants in Industry Economics, Inc. 1983-1986, 1988, expert witness. Anti-trust.
- New York Stock Exchange, 1987, 1990, consultant. Market surveillance, insider trading.
- Commodity Futures Trading Commission, 1986-1989, expert witness. Hunt silver market manipulation. Report.
- Staff Member, Presidential Task Force on Market Mechanisms (Brady Commission), 1987-1988. Stock market crash of 1987, stock index futures, index arbitrage, portfolio insurance.
- Options Clearing Corporation, 1989. Clearing and settlement.
- Berkeley Financial Technologies, 1989-1991. Lectures on futures and options.
- Expert witness for Robert Griffin, 1991. Angelo et al vs. CFTC (Treasury Bond Futures tick size). Report and testimony.
- Law and Economics Consulting Group, 1991, manipulation.
- BARRA, 1991, measuring market liquidity.
- The Long Term Credit Bank of Japan, 1991-1996 interest rates and derivatives pricing.
- National Economic Research Associates, 1996, expert witness, securities fraud, damages.
- Salomon Brothers (Wachtell, Lipton, Rosen and Katz), 1991-1992, expert witness. Cocoa futures trading, damages. Deposition.
- Internal Revenue Service, 1996. Expert witness. Treasury Bond Futures trading.
- Justice Department, 1996. Expert witness. NASD market maker competition and tick size.
- Chase Securities, 2000, Foreign Exchange Order Flow
- Expert Witness, Alleged Price Manipulation of NYMEX Electricity Futures Involving Cash-Settled OTC Derivatives, 2003-2004. Report.
- Expert Witness, Barrick Gold Corporation, 2004-2005, price manipulation, damages.

### CURRENT RESEARCH INTERESTS

- Industry Dynamics and Valuation of Firms:  An Integration of Corporate Finance and Industrial Organization
- Cash Settlement, Market Manipulation, and the Modigliani-Miller Theorem
- Trading Volume and Overconfidence
- Applications of Numerical Techniques in Finance.
- Settlement Negotiations with Endogenous Discovery
- Financial Contagion.
- Moral Hazard in Continuous Time.
- Trading with Transaction Costs.
- Algorithms for Pricing Interest rates and Derivative Assets.
- Continuous Trading with Many Informed Traders and Risk Aversion.
- Optimal Insider Trading with Smooth Noise Order Flow.
- Applications of complex analysis to finance.

9

# APPENDIX III CONTINUED..

CONFERENCE PRESENTATIONS

- USDA Universities International Trade Consortium Meeting, December 1981. "Market Structure, Information, Futures Markets, and Price Formation."
- Center for the Study of Futures Markets, 1982. "A Theory of Futures Market Manipulations."
- NBER-KGSM Conference on Time and Information in Economics, February 1982. "The Efficient Markets Hypothesis and the Supply of Speculative Services."
- Centre of Policy Studies Conference on Distributional Issues in Health Care, 1983. "The Economics of Medical Insurance" (with Peter Hartley).
- Australian Meetings of the Econometrics Society, August 1983. "Equilibrium in a Speculative Market with Strategic Informed Trading."
- Allied Social Science Associations National Convention, December 1984. Session Chairman. Discussant in two sessions.
- Berkeley Program in Finance Seminar, Trading Costs and Trading Strategies, April, 1984. "Trading in Markets Where Buyers May Have Better Information."
- NBER – NYC Conference on Applications of Game Theory to Finance, December 1985. "Informed Speculation with Imperfect Competition."
- ASSA Convention, December 1985.  "On Incentives to Acquire Private Information with Continuous Trading."
- Conference on Market Making, June 1987,  London School of Economics, "Dealer Markets and Organized Exchanges."
- ASSA Convention, Discussant (three different sessions).
- ASSA Convention, December 1987.  "Dealer Markets and Organized Exchanges."
- Discover Cal, Berkeley, February 12, 1988. Discussion of stock market crash.
- Financial Investment Technology Program, Berkeley, February 1988. Lectures on futures markets.
- Institutional Investor Pension Roundatable, Los Angeles, February 25, 1988. Panel discussion on the stock market crash.
- NBER Conference, Cambridge, MA March 10-11, 1988.  Panel discussion on the stock market crash.
- Berkeley Program in Finance Seminar: Stock and Futures Markets: Lessons and Prospects, March 28-30, 1989, Santa Barbara, CA. "What Happened During the Week of the Crash" (with Terry Marsh).
- Wells Fargo Investment Advisors Seminar, San Francisco, April 11, 1988. Discussion of the stock market crash.
- CRSP Seminar, Drake Hotel, Chicago, May 1988. Panel discussion. Causes and Consequences of the Stock Market Crash.
- Institute for Fiduciary Education, Carmel Valley. Ranch, CA. May 1988. Panel discussion on the 1987 stock market crash.
- Western Economic Assoc., Meetings, July 1, 1988.
- Berkeley Program in Finance Seminar. On Trading and Fund Management: The Role of Technology. September 23-27, 1988, Silverado, CA. Co-organizer (with Terry Marsh).
- Cal Business Alumni, Meridian Hotel, San Francisco, October 20, 1988, discussion on "The Stock Market Crash: A Year and a Day Later."
- Advanced Financial Technology Seminar of Futures Markets, December 6-10, 1989, Tokyo, lectures with David Modest.
- Chicago Board of Trade Conference on Futures Market Regulation, November 19, 1988, Mayflower Hotel, Washington, D.C., "Trading Halts and Price Limits."
- ASSA Convention, December 1988. Discussant.
- ASSA Convention, December 1988, "Estimating Intraday Price Volatility during the Crash, presented part of "Improving the Performance of the Stock Market."
- Institute for Quantitative Research in Finance (Q-Group), Spring Seminar, Orlando, Florida, April 18, 1989,

10

---

## APPENDIX III CONTINUED..

- "An Intuitive Introduction to Agency Theory with Applications to Money Management."
- New York Stock Exchange Academic Seminar, May 5, 1989.  Roundtable discussion.
- STEP-CEPR Seminar, Bocconi University, Milan Italy, May 26, 1989. "Smart Money, Noise Trading, and Stock Price Behavior."
- University of Bonn Summer Workshop, Bonn W. Germany, June 28-July 8, 1989, invited guest.
- French Finance Association Conference (AFFI), June 28, 1989, "Smart Money, Noise Trading and Stock Price Behavior."
- New York Stock Exchange/London School of Economics Conference on Market Microstructure, London, England, November 15, 1989. Discussant.
- Washington University, Regional Finance Conference, November 1990, lecture on trading with asymmetric information.
- University of Iowa, Market Microstructure Conference, November 1990. "Dealer Markets and Organized Exchanges."
- Chicago Board of Trade Conference, Vanderbilt University,  December 8, 1990. Discussant.
- ASSA Convention, Washington, D.C., December 30, 1990. Session chair.
- Berkeley Program in Finance, April 5-7, 1992. Discussant.
- Atlanta, Federal Reserve Bank, February 28, 1992. Discussant.
- New York Stock Exchange Conference, Los Angeles, California, March, 1992. Discussant.
- Commodity Futures Trading Commission, March 30-31, 1992.
- Konstanz, Germany, April 3-4, 1992. "Intertemporal Insider Trading..."
- Jerusalem, March 11, 1992. "Intertemporal Insider Trading..."
- Western Finance Association, June 22-24, 1992. Discussant.
- Stockholm, Sweden, August 21-22, 1992. "Market Failures and the Regulation of Financial Markets."
- Allied Social Sciences Association, January 5-7, 1993. Discussant.
- Berkeley Program in Finance, Lake Tahoe, California, March 14-16, 1993.  Conference Summarizer.
- Allied Social Sciences Association, Boston, January 3-5, 1994.  Discussant.
- Western Finance Association, Santa Fe, June 22-25, 1994.  Discussant.
- National Bureau of Economic Research Conference, Key Largo, Florida, July 11-12, 1994.  Discussant.
- Federal Reserve Bank of Atlanta Conference, Miami, March 3-4, 1995. Discussant.
- Q-Group Conference, November 22-23, 1995.  "Active Mismanagement."
- Allied Social Sciences Association, San Francisco, 1996.  Session Chair.
- Berkeley Program in Finance, Santa Barbara, September 29-October 1, 1996.  Essay in Honor of Fischer Black.
- Western Finance Association Meetings, Los Angeles, June 19, 1999; discussant.
- Duke University Global Capital Markets Center, Conference on Bond Market Microstructure, Washington DC, October 19, 1999, presenter.
- SIRCA  Mini-Conference on Insider Trading, Sydney, Australia, November 5, 1999, keynote speaker, "Insider Trading."
- Duke Univerisy Global Capital Markets Center, Conference on Hedge Funds, Durham, NC, November 19, 1999, moderator.
- NBER Asset Pricing Conference, Boston, May 5, 2000, discussant.
- Western Finance Association, Sun Valley, Idaho, June 21-24, 2000, discussant.
- Review of Economic Studies Conference, Frankfurt, Germany, June 30, 2000, "Contagion as a Wealth Effect."
- Federal Reserve Bank of Atlanta Conference, Atlanta, September 15, 2000, "Contagion as a Wealth Effect."
- Federal Reserve Bank of Atlanta Conference on E-Finance, October 14, 2000, discussant.
- Berkeley Program in Finance, Squaw Valley, CA, March 17, 2001, program discussant.
- ASSA Meetings, New Orleans, LA, January 6, 2001, "Contagion as a Wealth Effect."

11

## APPENDIX III CONTINUED..

- Q-Group, Tampa, FL, April 4, 2001, "Contagion as a Wealth Effect."
- Western Finance Assn., Tucson, AZ, June 22-23, 2001, session chair (Market Microstructure), discussant.
- New York Stock Exchange Conference, Institutional Trading, Palm Beach, FL, Dec. 6, 2001, session chair.
- Utah Winter Finance Conference, Salt Lake City, Utah, February 26-28, discussant.
- RFS Conference, Northwestern University, April 26-28, 2002, discussant.
- Federal Reserve Bank of Atlanta Conference on Venture Capital, Sea Island, GA, May 2-4, 2002, discussant.
- Conference in Honor of David Whitcomb, Rutgers University, October 11, 2002, discussant.
- SEC Roundtable Discussion on Market Transparency, November 12, 2002, participant.
- NYSE Roundtable Discussion on Market Quality Statistics, December 6, 2002, participant.
- ASSA Convention, Contagion, January 4, 2003, session chair.
- Utah Winter Finance Conference, February 6, 2003, discussant.
- FRB Atlanta Conference on Business Method Patents, Sea Island, GA, April 3, 2003, discussant.
- NBER Market Microstructure Meeting, Chicago, April 12, 2003, discussant.
- ASSA, San Diego, January 5, 2004, discussant.
- Utah Winter Finance Conference, February 5, 2004, discussant.
- Duke/NYSE Conference on International Cross-Listings, Sarasota, FL, March 11-13, Duke GCMC representative.
- New York Stock Exchange Conference, Market Microstructure, Palm Beach, FL, December 12, 2003, panel on market microstructure.
- FRB Atlanta Conference on Market Transparency, Sea Island, GA, April 15, 2004, discussant.
- 2004 HKUST Finance Symposium, Hong Kong, "A Two-Factor Model of Value and Growth with Adjustment Costs," December 13, 2004.
- Keynote Speaker, Twelfth Annual Conference on The Theories and Practices of Securities Markets, National Sun Yat-sen University, Kaohsiung, Taiwan, "Insider Trading and Corporate Governance," December 17,2004.
- ASSA, Philadelphia, January 8, 2005, discussant.
- Utah Winter Finance Conference, February 10, 2005, discussant.
- Assurant/Georgia Tech International Finance Conference, Assurant Lecture, "Market Microstructure and Rational Expectations: A Primer," April 8, 2005.
- Oxford Finance Summer Symposium, "A Two-Factor Model of Value and Growth with Adjustment Costs," June 15, 2005.
- Conference on Information and Behavioral Biases in Financial Markets, Fundación Ramón Areces, Madrid, "An Intertemporal Asset Pricing Model with Strategic Informed Trading and Risk-Averse Market Makers," July 8, 2005.
- Oxford Summer Finance Symposium, "A Two-Factor Model of Value and Growth," June 16, 2005.
- Conference on Information and Behavioral Biases in Financial Markets, Madrid, Spain, "An Intertemporal Asset Pricing Model with Strategic Informed Trading and Risk-Averse Market Makers," July 7, 2005.
- Alpha Strategies Conference on Quantitative Money Management, commentator, April 10-12,2006.
- Clarendon Lectures in Finance "Stock Price Dynamics and Industry Equilibrium," June 13-14, 2006.
- LSE Conference on New Directions in Asset Pricing and Risk Management, "Dynamic Strategic Informed Trading with Risk-Averse Market Makers," June 16, 2006.
- Western Finance Association, session chair, discussant, June 21-22, 2005.
- European Summer Symposium in Financial Markets, Gerzensee, Switzerland, focus session chair, July 24-28, 2005.

12

# APPENDIX III CONTINUED..

### INVITED UNIVERSITY RESEARCH SEMINARS

- School of Organization and Management, Yale University, March 1982.
- New York University, April 1983.
- Australian National University, October 1983.
- University of New England, Armidale, NSW, Australia, October 1983.
- Australian Graduate School of Management, University of New South Wales, October 1983.
- Centre of Policy Studies, Monash University, Melbourne, August 1983 and November 1983.
- School of Organization and Management, Yale University, March 1984.
- Columbia University Business School, April 1984.
- University of Rochester, April 1984.
- NBER Trade Group, April 1984.
- NBER Financial Markets Group, November 1984.
- Harvard Business School, May 1985.
- University of Chicago Business School, May 1985.
- Kellogg Graduate School of Management, Northwestern University, May 1985.
- Sloan School, MIT, October 1985.
- Graduate School of Business, Stanford University, March 1986.
- Graduate School of Management, Rutgers University, April 1986.
- Columbia University Business School, September 1986.
- GSIA, Carnegie-Mellon University, September, 1986.
- University of Chicago Business School, October 1986.
- Kellogg Graduate School of Management, Northwestern University, October 1986.
- School of Business, Washington University, St. Louis, February, 1987.
- Graduate School of Management, Rutgers University, February 1987.
- Graduate School of Business, Stanford University, January 1987.
- School of Business, University of California, Berkeley, January 1987.
- School of Management, Rice University, February 1987.
- Business School, University of Michigan, February 1987.
- Business School and Economics, University of Wisconsin, February 1987.
- Economics Department, University of Pittsburgh, February 1987.
- Wharton Business School, University of Pennsylvania, February 1987.
- Economics Department, Brown University, February 1987.
- School of Organization and Management, Yale University, April 1987.
- Economics Department, Virginia Polytechnic Institute, June 1987.
- UCLA Business School, May 20, 1988 "Smart Money, Noise Trading, and Stock Price Behavior."
- University of California, Santa Cruz, Economics Department, October 25, 1988, "Dealer Markets and Organized Exchanges."
- Anderson School of Management, University of New Mexico, November 18, 1988 "Dealer Markets and Organized Exchanges."
- Bocconi University, Milan Italy, "Asymmetric Information and Market Microstructure," May 25, 1989.
- Commodity Futures Trading Commission, November 1989.
- University of British Columbia, Finance Seminar, December 1989, "Noise Trading and Takeovers."
- Vanderbilt University, Finance Seminar November 1989, "Noise Trading and Takeovers."
- University of Utah, Finance Seminar, December 1989. "Intertemporal Insider Trading..."
- University of Indiana, Finance Seminar, September 1990. "Intertemporal Insider Trading..."
- Ecole Nationale des Ponts et Chaussees, Paris Finance Seminar, January 1991. "Intertemporal Insider Trading..."

13

---

# APPENDIX III CONTINUED..

- University of North Carolina, February 18, 1992. "Intertemporal Insider Trading With Smooth Order Flow."
- Northwestern University, Kellogg Graduate School of Management, June 3-4, 1992. "Intertemporal Insider Trading With Smooth Order Flow."
- New York University, September 22, 1993. "Speculation Duopoly..."
- UCLA, November 5, 1993. "Speculation Duopoly..."
- Vanderbilt University, April 14, 1995. "Speculation Duopoly..."
- University of Michigan, December 6, 1996. " Speculation Duopoly with Agreement to Disagree."
- Rice University, October 1, 1999, "Contagion as a Wealth Effect of Financial Intermediaries."
- Sydney University, Sydney, Australia, November 2, 1999, "Contagion as a Wealth Effect of Financial Intermediaries."
- Carnegie Mellon University, GSIA, February 23, 2001, "Contagion as a Wealth Effect."
- Stanford University, Graduate School of Business, March 14, 2001, "Contagion as a Wealth Effect."
- University of California, Berkeley, Haas School of Business, March 15, 2001, "Contagion as a Wealth Effect."
- University of Indiana, April 27, 2001, "Contagion as a Wealth Effect."
- London School of Economics, May 9, 2001, "Contagion as a Wealth Effect."
- University of Texas, Austin, October 26, 2001, "Continuous Speculation with Overconfident Traders."
- Norwegian School Of Management, Oslo, June 5, 2002, "Continuous Trading with Heterogeneous ...."
- Humboldt University, Berlin, June 7, 2002, "Continuous Trading with Heterogeneous Beliefs ...."
- Oxford Summer Finance Institute, June 11, 2002, "Continuous Trading with Heterogeneous Beliefs and No Noise Trading."
- Oxford Summer Finance Institute, June 12, 2002, "Corporate Finance and Industrial Organization."
- New York University, "Strategic Acquisitions ... ", November 5, 2003.
- University of Virginia, "Prospect Theory ... ", February 14, 2003.
- INSEAD, Paris, "Strategic Acquisition ... ", April 2, 2004.
- HEC, Paris, "Strategic Acquisitions ... ", April 1, 2004.
- University of Amsterdam, "Strategic Acquisitions ... ", March 30, 2004.
- University of Tilburg, "Strategic Acquisitions ... ", March 29, 2004.
- University of Pompeu Fabri, Barcelona, "Strategic Acquisitions ...", March 24, 2004.
- Princeton University, "Strategic Acquisitions ...," March 3, 2004.
- University of Maryland, "Strategic Acquisitions ..." April 28, 2004.
- Federal Reserve Board, Washington, DC, "Strategic Acquisitions ..." August, 17, 2004.
- Baruch College, CUNY, "Strategic Acquisitions and Investments in a Duopoly Patent Race Under Uncertainty" November 17, 2004.
- INSEAD Singapore, "Value and Growth ...," December 7, 2004.
- National University of Singapore, "A Two-Factor Model of Value and Growth with Adjustment Costs," December 9, 2004.
- University of Maryland, "A Two-Factor Model of Value and Growth with Adjustment Costs," May 9, 2005.
- Imperial College, London, "A Two-Factor Model of Value and Growth ...," May 11, 2006.
- Warwick University, "Strategic Trading with Risk Averse Market Makers," May 31, 2006.

14

# Scope and Methodology

We conducted this performance audit in accordance with Generally Accepted Government Auditing Standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**Scope.** We performed our audit from April 2008 to August 2008. Our audit scope included a review of the CSE and Broker-Dealer Risk Assessment program, as requested. Although our audit scope focused on TM's oversight of the CSE firms, we also considered the role of other Commission divisions and offices (for a Commission wide perspective) in the oversight of the CSE firms.

Our scope emphasized the CSE firms (especially Bear Stearns) that do not have a principal regulator because the Commission has much greater oversight responsibility for these firms. Our period of review was from October 2002 until August 2008. However, it varied depending on the nature of the issue. The scope of our review considered when:

- Bear Stearns collapsed;

- The subprime mortgage crisis started to become apparent (based on our audit work, we used December 2006);

- Two of Bear Stearns' managed hedge funds collapsed; and

- The CSE program began and the Commission issued the Order for the particular firm.

Lastly, our scope either did not include or was limited in the following areas:

- We completed our audit fieldwork prior to September 15, 2008 when Lehman Brothers announced it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch & Co. As a result, our fieldwork did not emphasize these firms, unlike Bear Stearns;

- We did not evaluate the effect(s), if any, that mark to market (*i.e.,* "fair value") accounting had on the valuation of mortgage securities and the ensuing write-downs which subsequently caused the firms to raise capital;

- We did not evaluate the role of rating agencies in the securitization process of mortgage loans;

**APPENDIX IV CONTINUED..**

- We did not visit the CSE firms and perform an independent assessment of the firm's risk management systems (*e.g.*, internal controls, models, etc.), or their financial condition (*e.g.*, compliance with capital and liquidity requirements). As a result, we may not have identified certain findings and recommendations (*i.e.*, improvements);

- We did not determine (*i.e.*, recalculate and determine the accuracy) of the capital and liquidity data provided by the CSE firms to TM. OCIE and TM performed some inspection testing on the financial data during the application inspection. Also, the Financial Industry Regulatory Authority (FINRA) routinely performs inspection testing on the registered broker-dealers capital calculation;

- We did not determine the cause of Bear Stearns' collapse. For instance, some individuals have speculated that short sellers may have caused Bear Stearns' collapse by intentionally spreading false rumors. This issue is beyond the scope of this audit;

- The CSE program consists of four interrelated activities: an application process, inspections, the review of required filings, and periodic meetings with CSE staff.[193]  We performed limited testing on some of these processes, as discussed below:[194]

    o  TM relies mainly on meetings with the CSE staff to administer the CSE program. As a result, we viewed compliance testing in this area to have limited value; instead we (our expert, primarily) focused on the substance of these meetings. Thus, we excluded the meeting process from our compliance testing; and

    o  In July 2007, in response to a GAO audit report (as discussed in the <u>Prior Audit Coverage</u> of this Appendix); Chairman Cox transferred the responsibility for conducting inspections of the consolidated entity from OCIE to TM. OCIE retained within the Commission, the responsibility for conducting inspections on the CSE's broker-dealers. TM had not completed any of these inspections as of mid-September 2008. As a result, we only performed limited compliance testing on TM's inspection process. Instead, we emphasized the design of the TM inspection program;

- The Congressional request also asked the OIG to investigate the closing of a Commission enforcement investigation involving Bear Stearns. This issue is beyond the scope of this audit, but is the subject of a separate investigative report; and

- The role of federal regulators (*e.g.*, the U.S. Department of Treasury) in the sale of Bear Stearns to JP Morgan is beyond the scope of this audit.

---

[193] Source: SEC [Commission] <u>Holding Company Supervision Program Description</u>. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[194] The purpose of our testing was to determine whether the CSE program is compliant with its policies and procedures and the CSE rule.

**APPENDIX IV CONTINUED..**

**Methodology.** Our methodology included reviewing required filings, inspection reports, and documentation surrounding periodic meetings between TM and CSE staff. We also reviewed other types of supporting documentation such as TM's policies and procedures, prior GAO audit reports, newspaper articles, etc. We also conducted interviews with staff from the Commission, CSE firms, GAO, and the FRBNY.

Lastly, we hired a contractor (*i.e.*, an expert) to provide us with technical expertise.[195] The expert reviewed the adequacy of TM's review of models, scenario analysis, etc; as well as, the associated internal risk management controls. We have incorporated the expert's opinions, findings, and recommendations into this audit report. The expert focused his review on the Commission's oversight of Bear Stearns.

**Internal/Management Controls.** We did not review management controls because they did not pertain to the audit's objectives. However, we identified several improvements in the CSE program's internal controls (*e.g.*, tracking of issues).

**Use of Computer-Processed Data.** We relied on data from the Commission's Broker-Dealer Risk Assessment (BDRA) computer system. Firms use the BDRA system to electronically transmit filings (and BDRA stores the filing) to TM. The BDRA system does not process any of the data contained in the filings. As a result, we considered the relevant risks to be:

- TM's failure to receive a filing sent by a firm; and

- Whether information in the BDRA system could be compromised (information security risks).

We did not identify any instances where TM failed to receive a filing that a CSE firm transmitted through the system. However, TM told us about situations where firm filings made under the Broker-Dealer Risk Assessment program did not completely transmit to TM through the BDRA system. Given how we used the BDRA data in this audit, if a similar situation occurred with the CSE filings, we would have been aware because the firms transmit the filings at known intervals (*e.g.*, month end).

We considered the risk surrounding information security. The Commission's Office of Information Technology recently certified and accredited the BDRA system, as required by the Federal Information Security Management Act of 2002. Therefore, we believe that we can rely upon the information in the BDRA system as it pertains to information security.

---

[195] See Appendix III for our expert's (Albert "Pete" Kyle) Curriculum Vitae.

**APPENDIX IV CONTINUED..**

We identified a few issues with the BDRA system, but they do not affect the reliability of the data. We discuss the issues in our related audit report (No. 446-B).

**Judgmental Sample.** We judgmentally selected twenty issues that TM or OCIE staff identified for our testing on TM's tracking of material issues (see Report Finding No. 5). Our sample included issues from all the CSE firms including those with principal regulators, although our audit work emphasized Bear Stearns. We generally selected specific issues such as an internal control weakness, as opposed to more generic issues (*e.g.*, exposure to subprime). We selected samples from:

- The TM action memo recommending that the Commission

- OCIE inspection reports; and[196]

- The monitoring staff's monthly memoranda (which discuss significant issues) to senior TM management.

Although we believe that our sampling methodology is reasonable and representative, our results should not be projected onto the universe of issues.

**Use of Technical Assistance.** We received technical assistance from an expert, as discussed in the Methodology section of this Appendix. His expertise is described in his Curriculum Vitae in Appendix III.

**Prior Audit Coverage.** GAO Report <u>Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration</u>, GAO Report 07-154, dated March 15, 2007 on strengthening performance measurement and collaboration for the agencies (*i.e.*, the Federal Reserve, Commission, and the Office of Thrift Supervision (OTS)) involved in consolidated supervision. They made several recommendations involving the Commission:

GAO Recommendation:     To better assess the Commission's achievements, the Chairman of the Commission should direct his staff to develop program objectives and performance measures that are specific to the CSE program.

The Commission has developed program objectives and performance measures. These documents are available on the Commission's website.[197]

---

[196] We did not use TM's inspection reports because they had not completed any inspections (as of when we performed our testing) since the Chairman transferred (from OCIE to TM) the inspection authority for the consolidated entity. Lastly, TM has implemented an automated method to track the inspection issues (*i.e.*, findings).

[197] Source: SEC [Commission] <u>Holding Company Supervision Program Description</u>. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

**APPENDIX IV CONTINUED..**

GAO Recommendation:   To ensure they are promoting consistency with primary bank and functional supervisors and are avoiding duplicating the efforts of these supervisors, the Chairman of the Federal Reserve, the Director of the OTS, and the Chairman of the Commission should also direct their staffs to identify additional ways to more effectively collaborate with primary bank and functional supervisors.  Some of the ways they might consider accomplishing this include:

- Ensuring common understanding of how the respective roles and responsibilities of primary bank and functional supervisors and of consolidated supervisors are being applied and defined in decisions regarding the examination and supervision of institutions; and

- Developing appropriate mechanisms to monitor, evaluate, and report jointly on results.

In response to Bear Stearns' collapse, the Commission and the Federal Reserve have agreed on a MOU involving coordination and information sharing.

GAO Recommendation:   To take advantage of the opportunities to promote better accountability and limit the potential for duplication and regulatory gaps, the Chairman of the Federal Reserve, the Director of OTS, and the Chairman of the Commission should foster more systematic collaboration among their agencies to promote supervisory consistency, particularly for firms that provide similar services.  In particular, the Chairman of the Commission and the Director of the OTS should jointly clarify accountability for the supervision of the CSEs that are also thrift holding companies and work to reduce the potential for duplication.

The Chairman and the Director of OTS are still discussing the jurisdictional issues raised by the recommendation. This issue was recently discussed at a Congressional hearing.[198]

GAO Recommendation:   The Chairman of the Commission should direct the staff to develop and publicly release explicit written

---

[198] Source: *Risk Management and its Implications for Systemic Risk* Before the U.S. Senate Subcommittee on Securities, Insurance, and Investment on Banking, Housing, and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission).

## APPENDIX IV CONTINUED..

guidance for supervision of CSEs.  This guidance should clarify the responsibilities and activities of the OCIE and TM's responsibilities for administering the CSE program.

The Chairman transferred the inspection authority of the consolidated entity from OCIE to TM.[199]  However, as discussed in the audit report, TM and OCIE can still improve collaboration.  Lastly, the Commission developed and publicly released written guidance describing the CSE program (*e.g.,* TM's roles and responsibilities).

---

[199] The transfer was in response to a GAO audit report (Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration. Report 07-154, March 15, 2007) recommendation.  In response to the report Chairman Cox told GAO: "To implement this recommendation, I have carefully considered the question of which organizational structure will best achieve the goal of the CSE program.  I have concluded that the success of the CSE program will be best ensured if the supervision of the CSE firms is fully integrated with, rather than merely coordinated with, the detailed onsite testing that is done of the documented controls at CSE firms.  As a result, I have decided to transfer responsibility for on-site testing of the CSE holding company controls to the Division of Market Regulation [now called TM].  This will better align the testing and supervision components of the CSE program, will strengthen its prudential character, and will most efficiently utilize the Commission's resources.  With the new structure, ongoing supervision activities will be more directly informed by the results of focused testing of controls, and field inspections will be more precisely targeted using information from ongoing supervisory work.  In addition, the Commission's expertise related to the prudential supervision of securities firms will be concentrated in the Division of Market Regulation, which will foster improved communication and coordination among the staff responsible for administering various components of the CSE program." The Chairman made his decision after carefully evaluating proposals from TM and OCIE, and after consulting with the four other Commissioners, who unanimously supported the decision to consolidate CSE oversight under TM.

# List of Recommendations

**Recommendation 1:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System and the Basel Committee should: (1) reassess the guidelines and rules regarding the Consolidated Supervised Entity (CSE) firms' capital levels; and (2) identify instances (*e.g.,* a firm's credit rating is downgraded, or its unsecured debt trades at high spreads over Treasuries) when firms should be required to raise additional capital, even if the firm otherwise appears to be well capitalized according to CSE program requirements.

**Recommendation 2:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess pillar 2 of the Basel II framework and the Consolidated Supervised Entity (CSE) program guidelines regarding liquidity and make appropriate changes to the CSE program's liquidity requirements. Changes should describe assumptions CSE firms should be required to make about availability of secured lending in times of stress (including secured lending from the Federal Reserve) and should spell out circumstances in which CSE firms should be required to increase their liquidity beyond levels currently contemplated by CSE program liquidity requirements.

**Recommendation 3:**
The Division of Trading and Markets should ensure that it adequately incorporates a firm's concentration of securities into the Consolidated Supervised Entity (CSE) program's assessment of a firm's risk management systems (*e.g.,* internal controls, models, etc.) and more aggressively prompts CSE firms to take appropriate actions to mitigate such risks.

**Recommendation 4:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess the Consolidated Supervised Entity (CSE) program's policy regarding leverage ratio limits and make a determination as to whether, and under what circumstances, to impose leverage ratio limits on the CSEs.

**APPENDIX V CONTINUED..**

**Recommendation 5:**
The Division of Trading and Markets (TM) should ensure that: (1) the Consolidated Supervised Entity (CSE) firms have specific criteria for reviewing and approving models used for pricing and risk management, (2) the review and approval process conducted by the CSE firms is performed in an independent manner by the CSEs' risk management staff, (3) each CSE firms' model review and approval process takes place in a thorough and timely manner, and (4) impose limits on risk taking by firms in areas where TM determines that risk management is not adequate.

**Recommendation 6:**
The Division of Trading and Markets should be more skeptical of Consolidated Supervised Entity firms risk models and work with regulated firms to help them develop additional stress scenarios that may or may not have not have been contemplated as part of the prudential regulation process.

**Recommendation 7:**
The Division of Trading and Markets (TM) should be involved in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal, including plans for every stress scenario that the Consolidated Supervised Entity (CSE) firms use in risk management, as well as plans for scenarios that TM believes might happen but are not incorporated into CSE firms' risk management.

**Recommendation 8:**
The Division of Trading and Markets should take steps to ensure that mark disputes do not provide an occasion for Consolidated Supervised Entity firms to inflate the combined capital of two firms by using inconsistent marks.

**Recommendation 9:**
The Division of Trading and Markets should encourage the Consolidated Supervised Entity (CSE) firms to present VaR and other risk management data in a useful manner, which is consistent with how the CSE firms use the information internally and which allows risk factors to be applied consistently to individual desks.

**Recommendation 10:**
The Division of Trading and Markets should ensure that the Consolidated Supervised Entity take appropriate valuation deductions for illiquid, hard-to-value assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral.

APPENDIX V CONTINUED..

**Recommendation 11:**
The Division of Trading and Markets (TM), in consultation with the Chairman's Office, should discuss risk tolerance with the Board of Directors and senior management of each Consolidated Supervised Entity (CSE) firm to better understand whether the actions of CSE firm staff are consistent with the desires of the Board of Directors and senior management. This information would enable TM to better assess the effectiveness of the firms' risk management systems.

**Recommendation 12:**
The Division of Trading and Markets should require compliance with the existing rule that requires external auditors to review the Consolidated Supervised Entity firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act[200] for this deviation from the current rule's requirement.

**Recommendation 13:**
The Division of Trading and Markets should ensure that reviews of a firm's Contingency Funding Plan include an assessment of a Consolidated Supervised Entity firm's internal and external communication strategies.

**Recommendation 14:**
The Division of Trading and Markets should develop a formal automated process to track material issues identified by the monitoring staff to ensure that they are adequately resolved. At a minimum, the tracking system should provide the following information:

- The source of the issue;

- When the issue was identified;

- Who identified the issue;

- The current status of the issue (*e.g.*, new developments);

- When the issue was resolved; and

- How the issue was resolved.

---

[200] The Administrative Procedures Act (5 U.S.C. §500 *et. seq.*,) sets forth the basic procedural requirements for agency rulemaking. It generally requires (1) publication of a notice of proposed rulemaking in the *Federal Register*; (2) opportunity for public participation in rulemaking by submission of written comments, and (3) publication of a final rule and accompanying statement of basis and purpose not less than 30 days before the rule's effective date.

**APPENDIX V CONTINUED..**

**Recommendation 15:**
The Division of Trading and Markets should: (1) reassess all the prior Office of Compliance Inspections and Examinations (OCIE) issues to ensure that no significant issues are unresolved (given the belief that OCIE followed up); and (2) follow up on all significant issues.

**Recommendation 16:**
The Division of Trading and Markets should ensure that they complete all phases of a firm's inspection process before recommending that the Securities and Exchange Commission allow any additional Consolidated Supervised Entity firms the authority to use the alternative capital method.

**Recommendation 17:**
The Divisions of Corporation Finance (CF) and Trading and Markets (TM) should take concrete steps to improve their collaboration efforts and should determine whether TM's information on the Consolidated Supervised Entity (CSE) firms could be used by CF in its review of the CSE firms.

**Recommendation 18:**
The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (*e.g.*, discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program. They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

**Recommendation 19:**
The Division of Trading and Markets and the Office of Risk Assessment should develop an agreement outlining their roles and responsibilities, as well as methods for information sharing such as communicating project results. These two offices should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

**Recommendation 20:**
The Division of Corporation Finance should: (1) develop internal guidelines for reviewing filings in a timely manner, and (2) track and monitor compliance with these internal guidelines.

**Recommendation 21:**
The Division of Corporation Finance (CF) should (1) establish a policy outlining when firms are expected to substantively respond to issues raised in CF's comment letters, and (2) track and monitor compliance with this policy.

**APPENDIX V CONTINUED..**

**Recommendation 22:**
Chairman Cox should create a Task Force led by the Office of Risk Assessment (ORA) with staff from the Divisions of Trading and Markets, and Investment Management, and the Office of Compliance Inspections and Examinations. The Task Force should perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis. If the Task Force ultimately believes that the Securities and Exchange Commission (Commission) should supervise these firms on a consolidated basis, it should make a recommendation to the Commission that involves seeking the necessary statutory authority to oversee these firms on a consolidated basis.

**Recommendation 23:**
The Division of Trading and Markets, in consultation with the Chairman's office, should determine what additional changes need to be made to the Consolidated Supervised Entity (CSE) program in light of the collapse of Bear Stearns and changing economic environment.

**Recommendation 24:**
The Division of Trading and Markets (TM) should fill critical existing positions, and consider what any additional staff it believes will be needed to carry out the CSE program's function going forward. TM should also establish milestones for completing each phase of an inspection and implement a procedure to ensure that the milestones are met.

**Recommendation 25:**
The Division of Trading and Markets, in consultation with the Office of Compliance Inspections and Examinations and the Commission's Ethics office, should develop an ethics manual.

**Recommendation 26:**
The Division of Trading and Markets should continue to seek out ways to increase its communication, coordination, and information sharing with the Federal Reserve and other Federal Regulators.

**APPENDIX VI**

# Chairman Cox's Comments

September 25, 2008

MEMORANDUM

TO:       H. David Kotz
          Inspector General

FROM:     Christopher Cox
          Chairman

SUBJECT:  Draft Report on *SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entities Program*

Thank you for the opportunity to review the Draft Report on *SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entities Program*. I welcome your report and recommendations on the CSE program.

There is much value that the agency can take from an independent and arms-length review of its programs, and your report provides an invaluable and fresh perspective for the agency to carefully review and consider. The staff of the Division of Trading and Markets and the Division of Corporation Finance, who as you know have been working around the clock for months in the current market turmoil, have provided detailed comments on specific aspects of the analysis in the report. As head of the agency, I would like to address your major findings and recommendations.

Your report makes 26 specific recommendations to improve the CSE program, all of which are well-considered and worthy of support. Some of these recommendations had already been undertaken and many will have potential applicability beyond the CSE program.

Your report also underscores the fundamental flaw with the CSE program that I have reported to the Congress on several occasions in recent months: voluntary regulation does not work. When Congress passed the Gramm-Leach-Bliley Act, it failed to give the SEC or any agency the authority to regulate certain large investment bank holding companies. Because of the lack of explicit statutory authority for the Commission to regulate the large investment bank holding companies, the Commission in 2004 created a voluntary program, the Consolidated Supervised Entities program, in an effort to fill this regulatory gap.

**APPENDIX VI CONTINUED..**

The inherent weakness of the CSE program from the beginning was that investment banks could opt in or out of supervision voluntarily. The program had no explicit statutory authority to require these investment bank holding companies to report their capital, maintain liquidity, or submit to leverage requirements. The fact that investment bank holding companies could withdraw from this voluntary supervision at their discretion diminished the perceived mandate of the CSE program, and weakened its effectiveness in a number of ways.

Lacking a statutory mandate to regulate these investment bank holding companies, the CSE program was patterned after the regulation of commercial bank holding companies. It used the capital and liquidity measurement approaches from the commercial banking world — with unfortunate results.

Thus, as your report confirms, at the time of its near-failure Bear Stearns had a capital cushion well above what was required to meet supervisory standards calculated under the internationally-accepted Basel framework and the Federal Reserve's "well capitalized" standard for bank holding companies.

Your report also highlights the consequences of a critical issue that existed throughout the financial services sector. Prior to the spring of 2008, the bank risk models in use throughout the U.S., including those relied upon by the CSE firms, did not include scenarios premised on a total mortgage meltdown on a scale so devastating that it would cause the failure of Fannie Mae and Freddie Mac. Throughout this year, national and international banking regulators have worked to strengthen and improve the capital and liquidity standards that are used throughout the banking system. The SEC has been a leader in this process through institutions like the Basel Committee on Banking Supervision, the Senior Supervisors Group, the Financial Stability Forum, and the International Organization of Securities Commissions. Those efforts are ongoing and vital.

I am pleased that the SEC has already undertaken several of the actions listed in your recommendations, and look forward to working with you to implement others. Thank you for your role in helping to ensure that the SEC is faithfully executing its mission to protect investors, facilitate capital formation, and maintain fair and orderly markets.

**APPENDIX VII**

# Management's Comments

## DIVISION OF TRADING AND MARKETS MANAGEMENT COMMENTARY

The Division of Trading and Markets ("Division") appreciates the opportunity to comment on the Office of Inspector General ("OIG") Report "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program" ("OIG Report"). This comment process is of critical importance to the Division because previous modes of feedback to OIG have proven ineffective in correcting what the Division believes are factual errors and unsupported conclusions. This OIG Report therefore becomes the mechanism by which the Division can attempt to set the record straight.

We believe the OIG Report is fundamentally flawed in its process, premises, analysis, and key findings. The Division understands the importance of an active and independent OIG, and supports full and fair investigations of matters by the OIG. However, with respect to this OIG Report, the Division's calls to correct mistakes, misunderstandings, and misrepresentations have had limited effect on the final document. It is our view that the resulting OIG Report starts from incorrect assumptions and reaches inaccurate, unrealistic, and impracticable conclusions.

Few would argue that the demise of Bear Stearns was a significant event for the U.S. financial markets. This demise deserves a careful analysis to assess its causes and to prescribe future actions. This OIG Report does not provide such an analysis; rather, it attempts to explain Bear's collapse in nutshell fashion. The Division believes that the OIG Report is flawed in several respects.

As a threshold matter, the Division believes it was not provided with a fair and meaningful process to address the issues raised in the OIG Report. In particular:

- OIG failed to interview the Division's senior management. Senior managers were in a position to address many of the concerns raised in the OIG Report and provide information that OIG could not obtain from staff workpapers.
- OIG did not interview Bear Stearns managers regarding critical aspects of the OIG Report. Firm management constitutes a primary source of information that could serve to meaningfully support or refute a number of the OIG Report's statements about the Division's CSE supervision of the firm. Such a cross-check and verification should be incorporated in such a OIG Report.
- OIG's expert spent only three hours with Division staff before preparing his portions of the OIG Report. The issues associated with supervision of a complex firm such as Bear Stearns cannot be evaluated without developing a context for the information. Without the benefit of conversations with Division staff, such context is missing and the OIG's conclusions are destined to lack proper foundations.

**APPENDIX VII CONTINUED..**

- Large portions of OIG's Report – and in particular the portion prepared by the OIG expert – rely extensively, if not exclusively, on information contained in informal Divison staff memoranda that recorded notes, not final conclusions, and do not represent all the facts or work performed by Division staff. These notes were not a final work product and were not even circulated to the Division's senior management.
- The OIG Report cites staff notes out of context, giving the impression that the Division, at some point, shared such views but failed to act prudently. The OIG Report should have distinguished between its own findings and opinions, and those of Division staff.
- The OIG Report's assessments contain numerous factual and analytical errors, and weakly supported conclusions, perhaps reflective of the process used and the tight time, informational, and resource constraints under which it was prepared. Each error is, in and of itself, understandable. Untangling capital from liquidity, market risk from funding risk, risk weighted assets from less liquid assets, is difficult even for many practitioners and regulators involved in day-to-day consideration of the issues. Unfortunately, the cumulative effect of the errors led to less informed and more assertive conclusions than would have been the case had the process had the luxury of more time and greater resources.

This process has produced findings that are materially in error, including the following:

- As the Division has expressly informed OIG in informal comments, CSE holding companies are not subject to a <u>capital</u> requirement – they are required to <u>report</u> a capital ratio calculated under the Basel II Standard.
- As the Division has expressly informed OIG in informal comments, paragraph 777 of the Basel II Standard, quoted in the OIG Report, describes requirements related to <u>credit</u> risk. Yet the text of the OIG Report cites this paragraph to make an argument that the Standard was applied imprudently with respect to <u>market</u> risk concentrations.
- As the Division has expressly informed OIG in informal comments, the OIG Report improperly criticizes CSE oversight, noting "that pricing at Bear Stearns was based more on looking at trading levels in the market than on looking at models." Marking positions based upon recent trading activity is a higher valuation standard in the accounting literature and should be used above marks produced by models.

This OIG Report considers an isolated set of data about Bear Stearns, yet it makes sweeping statements and comes to broad findings about the CSE program in general. In doing so, it does not consider the events in our markets following the collapse of Bear Stearns. Since that time, we have seen the failure of IndyMac bank, the bankruptcy of Lehman Brothers, the purchase of Merrill Lynch by Bank of America, the Federal government's explicit actions to guarantee Fannie Mae, Freddie Mac, the injection of Federal money into the insurance company AIG, the attempt by the U.S. Treasury to create a $700B purchase facility for distressed

**APPENDIX VII CONTINUED..**

assets from the financial sector, and the conversion of Morgan Stanley and Goldman Sachs to bank holding companies.

[REDACTED PARAGRAPH]

This chain of events raises very significant questions about the supervision of all types of financial institutions, not just investment banks. For our part, the Division has engaged with domestic and international regulators in a concerted effort to answer what are very fundamental questions about how large and complex financial institutions should be supervised, capitalized, and kept liquid. With respect to Bear Stearns, the staff applied the relevant international standards for holding company capital adequacy in a conservative manner, and added a holding company liquidity requirement: and yet they could not withstand a "run-on-the-bank." Where the globally accepted standards required an eight foot high levee, Division staff raised a ten foot levee, which was of course little use in the face of a fifteen foot storm surge. The relevant question now is not whether the levees were high enough, because they clearly were breached. Rather, the central issue is whether levee systems, no matter how high, afford sufficient protection from the financial environment, or are additional measures needed to complement the levees?

In particular, there is widespread recognition that the international standards for holding company capital adequacy, relied upon by both commercial and investment banks, require revision. Also, new standards for liquidity need to be calibrated and applied to large institutions. There are many venues in which relevant discussions are progressing and where guidance will soon be issued. The Commission staff has been active in all of these, including the Senior Supervisors Group, the Basel Committee, the Financial Stability Forum, and the International Organization of Securities Commissions. Rather than wait for this collaborative work to be complete, however, the Division responded quickly to the collapse of Bear Stearns by requiring the remaining CSE firms to increase their liquidity pools, which already were significantly in excess of any applicable international standard.

Given continuing market events, we feel it is not possible to responsibly make the type of statements that were made in this OIG Report about the demise of Bear Stearns, and the role of the CSE program. We expect that after these data are analyzed with proper care and reflection, responsible lessons can be drawn. But the events subsequent to the failure of Bear Stearns strongly suggest that the statements made in this OIG report are premature at best. For our part, we believe that the key conclusions of the OIG Report are inaccurate and without empirical foundation.

**APPENDIX VII CONTINUED..**

OIG Report 446-A: SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program

Please indicated your concurrence or non-concurrence with each recommendation that applies to your Division or Office.

**Recommendation 1:**

The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System and the Basel Committee should: (1) reassess the guidelines and rules regarding the Consolidated Supervised Entity (CSE) firms' capital levels; and (2) identify instances (e.g., a firm's credit rating is downgraded, or its unsecured debt trades at high spreads over Treasuries) when firms should be required to raise additional capital, even if the firm otherwise appears to be well capitalized according to CSE program requirements.

**Management Response (Concur or Non-concur):**

The Division of Trading and Markets concurs with this recommendation, even though we believe it is based on a fundamentally flawed understanding of the Bear Stearns crisis. Nonetheless, we have already undertaken efforts that respond to the recommendation,

Actions:  Since Bear Stearns' failure, we have:

- Worked with the Basel Committee on Banking Supervision to amend capital adequacy standards for internationally active sophisticated institutions to deal explicitly with liquidity risk;
- Supported the work of the Basel Accord Implementation Group on "incremental default risk capital," which aims to supplement Value at Risk-based capital to ensure that "tail risk exposures" in the trading book are adequately capitalized.
- Developed and entered into a formal Memorandum of Understanding with the Federal Reserve to improve sharing of information and provide a mechanism for cooperation in supervision of CSEs.
- Jointly with the Federal Reserve, discussed with the senior management at each CSE firm its long-term funding plans, including plans for raising new capital by accessing the equity and long-term debt markets.
- Required public disclosure of capital adequacy measures computed under the Basel Standard.

Flawed Assumptions and Findings: TM believes that the OIG Report's findings are fundamentally flawed in the following ways:

- The OIG Report's exclusive focus on capital is misplaced.  As explained in Commission public statements and testimony, Bear Stearns's failure was due to a run on liquidity, not capital.  The primary reason that Bear failed was concerns by

**APPENDIX VII CONTINUED..**

secured lenders that it would suffer greater losses in the future. These concerns caused secured lenders to stop providing financing, even on a fully-secured basis, despite the firm's compliance with applicable net capital requirements.

- The OIG Report misconstrues the nature of the Basel Standard. The CSE rules incorporate by reference the Basel Standard, the capital adequacy regime applicable to internationally active financial institutions, including commercial banks, on a global basis. The Basel II Standard is a capital ratio, not a capital requirement. However, the CSE program requires reporting of the capital ratio and incorporates the 10% Basel capital ratio threshold as constituting a "well capitalized" institution consistent with the threshold used by banking supervisors. Falling below 10% triggers certain obligations on the firm, but because there is no capital requirement is not necessarily a "violation."

- At the time of its failure, the Bear Stearns holding company actually exceeded the Basel II "well-capitalized" standard, and Bear's primary broker-dealer maintained tentative net capital above $5 billion.

- The OIG Report questions whether Bear's "capital requirement amounts were adequate," but the real issue is whether the international Basel standard that all international banking institutions rely on is sufficient.

- The OIG Report's assumption regarding leverage based on the Pickard article are inaccurate.

  - The statement of Mr. Pickard, used in the OIG Report, is inapplicable to the relevant capital and liquidity requirements at Bear's holding company. The quotation appears to confuse holding company Basel II capital standards and broker-dealer net capital requirements.

  - Mr. Pickard's statement does not accurately reflect the letter and operation of the SEC's current net capital rule and has numerous analytical errors as a result. For instance, the CSE broker-dealers were not subject to an explicit 12x leverage standard before the CSE amendments, as implied by Mr. Pickard. The article says that broker-dealers were formerly subject to a leverage ratio limit of 12x net capital in computing minimum net capital, and this limit was removed by the net capital requirements applicable to broker-dealer subsidiaries of CSEs. (This limit is in the "aggregate indebtedness" method for calculating net capital.) However, CSE broker-dealers were not subject to this leverage limit even before the CSE net capital standard was created. These broker-dealers used an alternative capital standard that has been in the rule since 1975. Under this requirement, broker-dealers that carry customer accounts maintain minimum net capital equal to no less than two percent of "aggregate debit items", not the aggregate indebtedness standard referred to by Mr. Pickard. This alternative method to compute the minimum net capital requirement is applied by all the CSE broker-dealers and most

2

**APPENDIX VII CONTINUED..**

other large broker-dealers. Under the "aggregate debit items" method for
calculating net capital, a broker-dealer's ability to increase leverage is limited
through the application of haircuts to proprietary positions rather than through
the application of a leverage standard from the aggregate indebtedness
standard.

- The OIG Report's conclusion regarding the intersection of capital and secured
  funding is misguided.

  - In analyzing Bear Stearns's efforts to increase its relative reliance on secured
    rather than unsecured funding, the OIG Report states that this shift called into
    question "whether Bear had enough capital to sustain its business model."
    This statement focuses on capital – not liquidity – as the primary issue
    causing Bear's collapse, and TM believes it is fundamentally incorrect in
    concluding that such activity points to inadequate capital at Bear.

  - Further, the OIG Report states that even though Bear had increased its
    reliance on secured funding, it was "unable to obtain" enough to save the firm
    in March. TM submits that Bear never would have been able to obtain enough
    funding because the firm was experiencing a run-on-the-bank by
    counterparties that provide secured funding.

  - A firm's decision as to the form of funding is based on many factors such as
    term, diversification, collateral, stability of lender, maintaining relationships
    and cost. It was widely believed that secured funding was more stable and
    reliable than unsecured funding. Also, the cost of unsecured funding
    increased substantially for all financial institutions during and after the
    Summer of 2007. In these circumstances, it is understandable that many
    financial companies, including Bear, sought cheaper, more stable sources of
    financing through secured funding. Also important was the collapse of the
    securitization business. The high cost of funding was an effect of the collapse
    of securitization rather than its cause.

  - The OIG Report incorrectly states, based on a review of informal staff notes
    and internal memoranda, that TM did not believe it had a mandate to compel
    Bear Stearns to raise additional capital if the firm's Basel II capital ratio was
    greater than 10%.

  - As TM explained in informal comments, the CSE rules expressly and broadly
    state that the Commission can impose additional conditions on either the
    broker-dealer or the holding company if the Commission finds it necessary
    and appropriate in the public interest or for the protection of investors. See
    Exchange Act Rule 15c3-1e(g)(7). There are also specific conditions that
    would trigger Commission action. Exchange Act Rule 15c3-1e(a)(1)-(6).

5.

---

**APPENDIX VII CONTINUED..**

* TM has always believed and represented from the beginning of the CSE program that it had broad authority related to financial responsibility to mandate that a broker-dealer and or its ultimate holding company raise capital or achieve the same and by reducing the balance sheet, as well as direct the firm in the sale of assets or customer accounts as the facts and circumstances may warrant.

Background on the CSE Rules

TM believes that it is useful for the reader to understand certain fundamental features of the CSE rules. The CSE rules incorporate by reference the Basel Standard, the capital adequacy regime applicable to internationally active financial institutions, including commercial banks, on a global basis. The Commission has sought to apply this standard in a conservative manner, in particular with regard to charges for the positions held with trading intent, which are a significant share of those held overall by securities firms. Specifically, firms have been required to augment value-at-risk charges (VaR), computed using internally-developed statistical models, with fixed percentage haircuts. These additional haircuts are, in fact, a multiple of the value-at-risk charges, and so, are more conservative.

Because the Commission recognized that the primary risks to securities firms are those associated with funding, the CSE program imposed a liquidity requirement in addition to the Basel Standard. It is important to note that this requirement, which mandated firms hold significant pools of liquid assets, is not part of the Basel Standard.

In the wake of crises at Bear Stearns, Northern Rock, Countrywide, and a number of other institutions, the Basel Committee on Banking Supervision, which developed and promulgated the Basel Standard, has initiated a number of projects intended to modify the Basel Standard to reflect the lessons of recent events. TM staff has actively engaged in this effort at the behest of Chairman Cox. TM staff co-chair one Basel committee dealing with these issues, and participate in another, which are working to strengthen in a number of areas the capital standards applicable to internationally active institutions. The Basel Committee has expanded its work to include consideration of guidance, and perhaps explicit standards, regarding liquidity risk management for financial institutions. Here again, TM staff has been actively involved. So while the Commission staff believed that capital and liquidity standards applicable to CSEs were conservative relative to international norms prior to the collapse of Bear Stearns, they join other regulators in recognizing that further strengthening and expanding these standards to include liquidity is necessary in the wake of recent events.

Recommendation 2:
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess pillar 2 of the Basel II framework and the Consolidated Supervised Entity (CSE) program guidelines regarding liquidity and make appropriate changes to the CSE program's liquidity requirements. Changes should

## APPENDIX VII CONTINUED..

describe assumptions CSE firms should be required to make about availability of secured lending in times of stress (including secured lending from the Federal Reserve) and should spell out circumstances in which CSE firms should be required to increase their liquidity beyond levels currently contemplated by CSE program liquidity requirements.

**Management Response (Concur or Non-concur):**

We concur with the recommendation, and have either already undertaken or already completed work that responds to the recommendation.

Since Bear's collapse we have:

* Worked with the Basel Committee on Banking Supervision to implement the Chairman's call for amended capital adequacy standards for internationally active sophisticated institutions to deal explicitly with liquidity risk.

* Jointly with the Federal Reserve, established new stress scenarios as a basis for sizing liquidity pool requirements based on the response to shorter, more extreme events entailing a substantial loss of secured funding, more severe liquidity outflows from prime brokerage activities and liquidity drains due to operations frictions such as in derivatives settlements and timing considerations related to margin postings.

* Jointly with the Federal Reserve, strengthened the liquidity requirements for CSE firms relative to their unsecured funding needs, and closely scrutinized the secured funding activities of each CSE firm, with a view to lengthening the average duration and broadening the diversity of all funding arrangements.

Like Recommendation 1, Recommendation 2 is fundamentally flawed, as it based on the same analysis. In addition, as we informed the OIG in our informal comments, the analysis is inaccurate in the following ways:

* The OIG Report's statement that the CSE program liquidity guidelines were inadequate because the time horizon for a liquidity crisis to unfold is likely to be less than the one-year period, and secured lending facilities are not automatically available in times of stress, presupposes that the loss of all secured funding was reasonably predictable. It also ignores the difficulty of providing adequate liquidity for this event.

* The firm stated clearly that its liquidity pool requirements, like those of other international and domestic regulators contemplating similar issues, did not anticipate a complete unwillingness of lenders to provide financing on quality assets (such as Treasuries or agency securities). This would include the availability of committed secured lending facilities.

---

9

APPENDIX VII CONTINUED..

- From the standpoint of unsecured funding, applying a one year liquidity requirement to replace unsecured funding was itself a logical approach. The concept underlying the one-year liquidity requirement for unsecured funding was that, should a firm experience a severe event such that unsecured lenders decide on day one to cease lending, the firm would have a liquidity pool sized to allow it to replace the unsecured funding as it matured over a one-year period.

- The 60-day cash flow analysis is a different metric that provides the firm another perspective. It is a short-term cash flow analysis focused on a more acute event.

- Also, given that US and international credit markets have been in crisis for over a year, the one-year unsecured funding liquidity pool requirement remains relevant.

- The OIG Report suggests that TM staff should have recognized that terminations of Bear's committed secured evergreen facilities were a predictor of a "run-on-the-bank." However, during 2007 availability of longer-term secured funding including evergreen facilities was declining for most investment banks, so that by March, an increasing amount of secured funding was provided on a short-term basis. This was phenomenon visible at many firms and was well understood at the time by TM staff.

- The OIG Report's statement that OIG staff could not determine whether TM staff received information on secured lending facilities, including evergreen is unsupportable. As we explained in informal comments to OIG, since at least August 2007 TM staff periodically received information on the availability of secured evergreen facilities in Fixed Income Inventory Analysis reports compiled by Bear Stearns. Also, TM staff explained that in weekly and daily discussions with Bear's fixed income funding desk and with the Treasury managers, Bear informed TM staff of significant losses of such evergreen facilities.

**Recommendation 3:**
The Division of Trading and Markets should ensure that it adequately incorporates a firm's concentration of securities into the Consolidated Supervised Entity (CSE) program's assessment of a firm's risk management systems (e.g., internal controls, models, etc.) and more aggressively prompt CSE firms to take appropriate actions to mitigate such risks.

**Management Response (Concur or Non-concur):**

We concur with the recommendation, and either already had in place processes, or have since undertaken efforts that respond to the recommendation.

- The CSE program incorporates an assessment of a firm's concentration of securities into the firm's risk management processes and systems.

8.

**APPENDIX VII CONTINUED..**

- TM staff have in the past instructed CSEs to reduce outsized, or concentrated exposures related to lending to specific sovereigns, particular instruments or risk factors.

However, the recommendation misapprehends the role of the Commission in overseeing CSEs.

- The OIG Report's conclusion at base is an indictment not of the CSE program's assessment of risk management systems, but of Bear's fundamental business strategy.

- At the time of Bear's CSE approval and thereafter, it was apparent to the Commission and CSE staff, as well as to Bear's equity and debt investors and the market, that Bear Stearns business strategy was focused on US-based fixed income generally and mortgages in particular.

- It is worth noting that a number of other institutions supervised under a variety of regulatory regimes, including Indy Mac, Countrywide and Northern Rock, likewise collapsed because of a business model that relied heavily on mortgage origination or securitization. Moreover, as announced by the US Treasury Department on September 7, 2008, the US Government has placed Fannie Mae and Freddie Mac in conservatorship as a result of the losses they suffered on their mortgage-based holdings.

- The Commission's responsibility was not to dictate business strategies to Bear Stearns. Rather, it was to review whether the exposures taken on by Bear Stearns were properly controlled and measured. The focus of Commission staff on Bear's governance processes was intended to insure that these exposures were reported to senior management in a manner that accurately reflected material risks.

- To discharge this responsibility, Commission staff monitored the risk profile of the firm in the aggregate and at the desk level using a variety of metrics, and discussed with the firm's independent risk management instances where limits were exceeded. These exposures were reported both to Bear's senior business Heads as well as to the Executive Committee regularly.

**Recommendation 4:**
The Division of Trading and Markets, in consultation with the Board of Governors of the Federal Reserve System, should reassess the Consolidated Supervised Entity (CSE) program's policy regarding leverage ratio limits and make a determination as to whether, and under what circumstances, to impose leverage ratio limits on the CSEs.

7

**APPENDIX VII CONTINUED..**

**Management Response (Concur or Non-concur):**

Given the current public discussions about the utility of leverage ratios for securities firms, we concur with the recommendation and believe it is important to address this issue with fellow regulators. The Recommendation, however, minimizes the problems with imposing limits through leverage ratios.

- Financial institutions are, by their very nature, highly leveraged businesses.

- The Commission has not sought to impose explicit leverage limits on CSE holding companies for several reasons. First, analysts can easily assess leverage from public financial information. Second, a leverage ratio is a crude measure, and implicitly assumes that every dollar of balance sheet involves the same risk, whether due to a treasury bond or an emerging market equity. Further, leverage tests do not at all capture the potential exposures of derivative products that remain off balance sheet. Finally, a leverage limit creates an incentive for firms to move exposures off balance sheet, through instruments ranging from over-the-counter derivatives to the SIV structures that proved highly problematic for other financial institutions (not investment banks) in the last year.

- While a leverage limit may be effective for an institution that does not deal in derivative products, highly complex institutions can easily evade any leverage limit imposed, often with the unintended consequence of increasing the firm's exposure to complex instruments.

**Recommendation 5:**
The Division of Trading and Markets (TM) should ensure that: (1) the Consolidated Supervised Entity (CSE) firms have specific criteria for reviewing and approving models used for pricing and risk management, (2) the review and approval process conducted by the CSE firms is performed in an independent manner by the CSEs' risk management staff, (3) each CSE firms' model review and approval process takes place in a thorough and timely manner, and (4) impose limits on risk taking by firms in areas where TM determines that risk management is not adequate.

**Management Response (Concur or Non-concur):**

TM concurs with the goals of recommendation 5, and the CSE program does ensure that these standards are satisfied.

- However, the OIG Report does not recognize the progress achieved through the review process. While the OIG Report correctly notes that the staff raised concerns with Bear Stearns regarding its coverage and staffing of its Model Review Function, the OIG Report does not reflect the resulting subsequent progress. In fact, the firm did respond to staff concerns, and created and implemented action plans to address them.

---

8.

**APPENDIX VII CONTINUED..**

- For example, in September 2006 Bear hired two dedicated model control staff persons for MBS and cash products and three completed model reviews were presented at this time. The MBS and Cash inventory models were reviewed between September 2006 and December 2007.

- With respect to the risk metrics that the firm used in managing its market risk to mortgage products, the OIG Report contains key omissions, and incorrect conclusions.

- The firm in fact made significant progress in improving its VaR infrastructure subsequent to approval in response to Commission staff concerns. For example, the firm followed through on recommendations to enhance control over the VaR system. Inputs to VaR models were regularly updated following application approval.

- Since the beginning of the SEC oversight of Bear as a CSE, Bear regularly improved and expanded its data sources. In some instances where data sources were limited, the instruments were immaterial. For example, mortgage derivatives, which were distinct from CDS and ABS CDO positions, were an immaterial exposure with only de minimis impact on Bear's profit and loss.

- The OIG report assumptions and conclusion regarding Bear's model review staffing are inaccurate. Specifically, while certain model reviewers left Bear in 2006 and the head of model validation resigned in early 2007, TM staff discussed staffing and the model validation process with the head of Bear's Model Review Committee. The model control function for mortgages was shifted to the product line risk managers while a new Head of Model Validation was hired in Sept 2007. Model control work on mortgages was unaffected during the interim period.

**Recommendation 6:**
The Division of Trading and Markets should be more skeptical of Consolidated Supervised Entity firms risk models and work with regulated firms to help them develop additional stress scenarios that may or may not have not have been contemplated as part of the prudential regulation process.

**Management Response (Concur or Non-concur):**

TM concurs that skepticism is warranted when reviewing firm risk models, but we believe that Recommendation 6 is based on incomplete information.

- Bear Stearns' use of scenario analysis was consistent with industry practices: virtually the entire banking sector failed to anticipate the magnitude and scope of the housing decline that is still ongoing.

- TM staff did in fact discuss repeatedly with Bear risk officers the firm's Alt-A and option ARMS positions in addition to subprime.

---

9

**APPENDIX VII CONTINUED..**

- Therefore, the OIG report conclusions, which are based on the OIG expert's review of internal TM memoranda that did not mention forward-looking risk scenarios, such as a complete meltdown of mortgage market liquidity, are based on incomplete information.

**Recommendation 7:**
The Division of Trading and Markets (TM) should be involved in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal, including plans for every stress scenario that the Consolidated Supervised Entity (CSE) firms use in risk management, as well as plans for scenarios that TM believes might happen but are not incorporated into CSE firms' risk management.

**Management Response (Concur or Non-concur):**

We concur with the recommendation, but believe that it reflects what TM and Bear had already accomplished.

- Contrary to the OIG Report statements, Bear did incorporate into its risk scenarios those risks discussed in meetings with TM staff, such as a housing-led recession scenario.

**Recommendation 8:**
The Division of Trading and Markets should take steps to ensure that mark disputes do not provide an occasion for Consolidated Supervised Entity firms to inflate the combined capital of two firms by using inconsistent marks.

**Management Response (Concur or Non-concur):**

We concur with the recommendation as written, but we believe it reflects a misunderstanding of the marking process and the oversight capabilities of supervisors.

TM did inquire into the mark disputes referenced in the OIG Report.

- TM acknowledges certain, persistent mark disputes indicate illiquid assets and valuation issues that TM should inquire into. However, mediating most or all of any individual firm's disagreements over marks across all its counterparties is not feasible. Additionally, many of the disputed margin calls related to products such as customized structured credit derivatives where price transparency is an issue and variations in marks is conceivable.

- The OIG report does not provide the proper context when discussing certain $100 million mark disputes Bear had with counterparties. Bear had more than 25,000 trades with JPM and, given the nature of the counterparty, a highly-rated financial institution, the capital impact under Basel II would be de minimis.

---

10

**APPENDIX VII CONTINUED..**

- Therefore, TM believes that the OIG report assumption that firms are collaborating to create capital was not properly substantiated.

- The OIG report confounds marking versus price verification processes at investment banks, and does not consider all the information provided to OIG by TM regarding price verification processes.

Background on Industry Practice:

First, we should point out that margin disputes are unavoidable particularly when markets become less liquid or illiquid. This is an issue that all dealers are facing today and the total disputed numbers at Bear Stearns were much smaller than at other institutions.

With respect to the OIG report assertion about using traders' marks for profit and loss, it is universal industry practice (and endorsed by various descriptions of best practices such as the Group of 30) for traders to mark firm inventory for purposes of books and records. It is then that an independent control group has the role of validating or substantiating those marks via an independent price verification process.

Recommendation 9:
The Division of Trading and Markets should encourage the Consolidated Supervised Entity (CSE) firms to present VaR and other risk management data in a useful manner, which is consistent with how the CSE firms use the information internally and which allows risk factors to be applied consistently to individual desks.

Management Response (Concur or Non-concur):

TM concurs with the recommendation, but we believe the findings are inaccurate.

- Contrary to the OIG Report assertion, Bear did not use inconsistent VaR numbers:

- The OIG expert supports this conclusion by noting that Bear's trading desks evaluated profits and risks individually and so assumes VaR was not implemented firmwide.

- As TM already explained in informal comments, Bear's trading desks and businesses need a variety of metrics to measure and manage its risk. VAR, however, was implemented firm-wide.

11

**APPENDIX VII CONTINUED..**

**Recommendation 10:**
The Division of Trading and Markets should ensure that the Consolidated Supervised Entity take appropriate valuation deductions for illiquid, hard-to-value assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral.

**Management Response (Concur or Non-concur):**

TM concurs with the recommendation and either already had in place processes, or have since undertaken efforts that respond to the recommendation.  However, we believe the findings underlying Recommendation 10 are unsupported.

The report asserts TM should have considered expanding the list of assets that require a full deduction from capital.  However, the Report did not present evidence that TM did not follow Basel II or did not apply sufficiently conservative capital treatment in light of the relative illiquidity of assets.  The analysis to support this assertion is incomplete or without basis.

As explained in informal comments to the OIG, TM applied Basel II correctly and did employ conservative capital treatment where appropriate.

- Specifically, with respect to illiquid assets, Basel II does not require full deduction of most illiquid assets, many of which attract capital charges of 8%. TM did require full deduction for certain illiquid assets, such as mortgage residuals.

- For assets held in the trading book, Bear took significant mark-downs in mortgage-related assets which resulted in a reduction of Tier 1 capital, as it should.

- With respect to the report's description of Bear's loan to the BSAM High Grade hedge fund, as TM explained in informal comments, the loan was overcollateralized, and Basel II did not require Bear to reduce its capital by the full amount of the loan.

- Specifically, TM explained to the OIG that Bear provided the replacement secured funding to BSAM funds at current marks, that is net of write-downs, and with haircuts.  Bear took capital charges for the resulting secured exposures that far exceeded Basel II requirements, and effectively treated the positions as if these had been held on Bear Stearns' balance sheet.

- When the BSAM funds failed to make margin calls in July, the assets were indeed taken onto Bear Stearns' books.

12

**APPENDIX VII CONTINUED..**

**Recommendation 11:**
The Division of Trading and Markets (TM), in consultation with the Chairman's Office, should discuss risk tolerance with the Board of Directors and senior management of each Consolidated Supervised Entity (CSE) firm to better understand whether the actions of CSE firm staff are consistent with the desires of the Board of Directors and senior management. This information would enable TM to better assess the effectiveness of the firms' risk management systems.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation and we have already had in place processes, or have since undertaken efforts, that respond to the recommendation.

* TM acknowledges that SEC senior officials should engage the CSE boards of directors periodically to review risk management issues and assess risk tolerance or discuss particular issues.

**Recommendation 12:**
The Division of Trading and Markets should require compliance with the existing rule that requires external auditors to review the Consolidated Supervised Entity firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedure Act[4] for this deviation from the current rule's requirement.

**Management Response (Concur or Non-concur):**

TM understands the recommendation and will present to the Commission whether to require compliance with the existing rule or to propose rule amendments that would permit the internal auditor to perform this review.

However, we believe that the finding is incorrect. We raised the following issues with respect to this finding and recommendation:

* TM has specific authority to issue exemptions from the net capital rule of which 15c3-1g is an appendix. See 17 CFR 200.30-3(a)(7)(ii). The functions of the Director of Trading and Markets include responding to no-action requests from CSEs. See 17 CFR 200.19a.

* TM strongly disagrees with the statement that there are serious questions about the wisdom of its decision. The Rule permits the external audit to be based on

---

[4] The Administrative Procedure Act (5 U.S.C. § 500 et. seq.) sets forth the basic procedural requirements for agency rulemaking. It generally requires (i) publication of a notice of proposed rulemaking in the Federal Register, (ii) opportunity for public participation in rulemaking by submission of written comment, and (iii) publication of a final rule and accompanying statement of basis and purpose not less than 30 days before the rule's effective date.

13

**APPENDIX VII CONTINUED..**

"agreed upon procedures" between the firm and its external auditor.  After much negotiation between the Division of Trading and Markets, the CSEs and the external auditors, the external auditors would not agree to perform more than a "check the box" review of the risk management control systems for fear of liability.  Thus, it was apparent that the "agreed upon procedures" would be of minimal benefit.

- In contrast, TM believed that a substantive review of procedures by internal audit, which included a determination of whether the procedures used by the firm were sufficient for the purposes intended, would be a more effective check on the firms' risk management process.  As a result, the internal audits undertaken by the firm were greater in scope and substance than would have been performed by the external auditors under their agreed upon procedures.  The internal audit department's review of internal risk management controls also would be conducted throughout the year rather than as a once a year audit process.  The independence, staffing levels, and audit scopes of the internal audit departments were reviewed by OCIE and the Division of Trading and Markets as part of the application process.

- The report's statement that "the external auditor's work is more strictly regulated as the PCAOB regulates external auditors" is misleading due to the lack of substantive auditing standards for reviewing a firm's risk management control systems.  It also is not clear that the PCAOB has in place a process for reviewing such auditing work.

**Recommendation 13:**
The Division of Trading and Markets should ensure that reviews of a firm's Contingency Funding Plan include an assessment of a Consolidated Supervised Entity firm's internal and external communication strategies.

**Management Response (Concur or Non-concur):**

The Division of Trading and Markets does not concur with this recommendation.

- As TM informed OIG in earlier comments, there is no requirement in the CSE rules that CSEs have an internal or external communication policy.  Likewise, there are no SEC rules requiring non-CSE broker-dealers to maintain such communication policies, and we are unaware of any such requirement for any other SEC-regulated entities.  Although TM noted that Bear Stearns had a communications strategy within its Contingency Funding Plan, there was no TM "assessment" of that strategy, as stated by OIG.

- What OIG has failed to appreciate is that the CSEs are part of public holding companies that have securities registered with the SEC and listed and trading on U.S. securities exchanges.  As public companies, the CSEs are subject to myriad

14

## APPENDIX VII CONTINUED..

SEC disclosure requirements, including Regulation S-X and Regulation FD. Corporate disclosures such as those covered in Bear Stearns's CFP communication strategy are subject to these disclosure requirements, and the SEC's Divisions of Corporation Finance and Enforcement actively enforce compliance with these requirements. Accordingly, it would be inappropriate for TM to opine on, or otherwise influence, the corporate communications of these public companies.

**Recommendation 14:**
The Division of Trading and Markets should develop a formal automated process to track material issues identified by the monitoring staff to ensure that they are adequately resolved. At a minimum, the tracking system should provide the following information:

* The source of the issue;
* When the issue was identified;
* Who identified the issue;
* The current status of the issue (e.g., new developments);
* When the issue was resolved; and
* How the issue was resolved.

**Management Response (Concur or Non-concur):**

TM concurs with the recommendation, and will undertake efforts that fully respond..

However, the analysis underlying the recommendation does not show evidence that the CSE program failed to adequately resolve issues, or that material issues were not monitored.

* Rather, the OIG report reaches its conclusion that the program does not adequately track issues from its criticism of the recordkeeping of those issues. While we recognize that an automated audit trail is desirable, its absence is not proof that issues are not adequately tracked, merely that recording of those issues could be improved.

**Recommendation 15:**
The Division of Trading and Markets should: (1) reassess all the prior Office of Compliance Inspections and Examinations (OCIE) issues to ensure that no significant issues are unresolved (given the belief that OCIE followed up); and (2) follow-up on all significant issues.

18

**APPENDIX VII CONTINUED..**

Management Response (Concur or Non-concur):

We understand the recommendation, but believe that these issues are either moot or long since addressed.

- Moreover, as we explained in our informal comments, the recommendation is predicated on an incorrect understanding of the division of responsibilities, past and present, between the Division of Trading and Markets and OCIE. The report criticizes TM staff that "assumed" issues were the responsibility of OCIE, whereas in fact for eighteen months subsequent to the Bear Stearns application examination, the issues were in fact OCIE's responsibilities.

- In addition, as we informed OIG in our informal comments, TM monitored the material issues to ensure that they were resolved. TM and OCIE agreed that one issue mentioned in the report, the issue regarding workpaper retention at Bear Stearns, was material. The firm was required to respond in writing to TM before a recommendation was made that the Commission act upon the application, and firm in fact agreed to retain workpapers. Subsequent oversight by TM personnel relied on access to these workpapers and so verified that corrective action had in fact occurred. With regard to the second issue mentioned in the report, as we explained in our informal comments, there is no basis for the statement about materiality of the VaR model issue. The OIG expert did not directly review the models, related documents, and the firm's books and records. Without a thorough review and reasonable basis for the statement, its materiality finding is conclusory. Appendix III indicates clearly that neither OIG nor the expert conducted an independent analysis of Bear's risk management system.

**Recommendation 16:**

The Division of Trading and Markets should ensure that they complete all phases of a firm's inspection process before recommending that the Securities and Exchange Commission allow any additional Consolidated Supervised Entity firms the authority to use the alternative capital method.

Management Response (Concur or Non-concur):

The Division of Trading and Markets does not concur with this recommendation.

- As the Division staff explained in informal comments, the Commission was clearly informed of the examination findings and their status when they approved the CSE applications.

16

**APPENDIX VII CONTINUED..**

- In addition, the OIG report's characterization of the application process as "less meaningful" is inaccurate. The Commission was well within its authority to approve such applications, given they were notified of OCIE's findings, of TM's assessment of the materiality of the issues with respect to the application, and of TM's direct follow up with Bear Stearns (or other CSE) regarding the identified issues and resolution.

- The OIG report fails to appreciate that CSE examinations were an ongoing process. As part of its normal business operations, a CSE constantly reviewed its risk management systems to assure that these systems adequately dealt with marketplace changes. Consequently, the staff continually monitored a firm's risk management systems to identify changes a CSE made to its risk management systems and to determine whether those changes appropriately addressed the perceived issues and that they were adequately implemented. For instance, if marketplace changes caused an increase in a CSE's backtesting exceptions, the CSE could amend its models to capture additional data points in an effort to decrease such exceptions. In such cases the staff would review and approve those changes to the CSE's models.

- With respect to Bear in particular, the European Commission's Conglomerates Directive set a fixed deadline by which the firm needed to be supervised on a consolidated basis. Given this timeline and the level of materiality of the issues involved, TM did not believe it necessary to wait for the formal transmittal of a written deficiency letter or the receipt of a written response before recommending the Commission approve the order.

- Finally, the OIG report's statement that TM failed to follow up on issues raised by OCIE during its inspection of Bear is incorrect. As explained to OIG staff in TM's informal comments, TM indeed resolved material issues identified by OCIE and the report has not cited any factual basis for finding otherwise.

**Recommendation 17:**
The Divisions of Corporation Finance (CF) and Trading and Markets (TM) should take concrete steps to improve their collaboration efforts and should determine whether TM's information on the Consolidated Supervised Entity (CSE) firms could be used by CF in its review of the CSE firms.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation, and will work with CF to assess the degree to which additional information and information would be useful.

- However, as the staff explained in its informal comments, TM staff met repeatedly with CF staff during 2007 and 2008 to discuss the issues cited in the

17

**APPENDIX VII CONTINUED..**

report around public disclosure of capital information.  No acknowledgement of those efforts is made in the formal draft report.

**Recommendation 18:**
The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (e.g., discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program.  They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation, and will work with OCIE and the Chairman's office to determine how collaboration should be further formalized.

- As we informed OIT in our informal comments, however, and what is not described in the OIG report, is that TM and OCIE issued joint guidance to all staff regarding the division of responsibilities and the sharing of information with respect to the CSE firms on March 19, 2007, shortly after the Commission transferred inspections responsibility from OCIE to TM.  TM has complied with all provisions of that guidance.

**Recommendation 19:**
The Division of Trading and Markets and the Office of Risk Assessment should develop an agreement outlining their roles and responsibilities, as well as methods for information sharing such as communicating project results.  These two offices should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation, and will work with ORA and the Chairman's office to determine how collaboration should be further formalized.

- We note, however, that TM's relationship with ORA is strong, as evidenced by collaboration on a number of issues ranging from credit rating agencies to analysis of Bear Stearns' failure.

- Formalizing an agreement between two offices within the Commission would be relatively unusual, in contrast to concluding a formal MOU with an external agency such as the Federal Reserve.

---

18

**APPENDIX VII CONTINUED..**

**Recommendation 20:**
The Division of Corporation Finance should: (1) develop internal guidelines for reviewing filings in a timely manner, and (2) track and monitor compliance with these internal guidelines.

**Management Response (Concur or Non-concur):**

Please see CF letter submitted separately.

**Recommendation 21:**
The Division of Corporation Finance (CF) should (1) establish a policy outlining when firms are expected to substantively respond to issues raised in CF's comment letters, and (2) track and monitor compliance with this policy.

**Management Response (Concur or Non-concur):**

Please see CF letter submitted separately

**Recommendation 22:**

Chairman Cox should create a task force led by the Office of Risk Assessment (ORA) with staff from the Divisions of Trading and Markets, and Investment Management, and the Office of Compliance Inspections and Examinations. The Task Force should perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis. If the Task Force ultimately believes that the Securities and Exchange Commission (Commission) should supervise these firms on a consolidated basis, it should make a recommendation to the Commission that involves seeking the necessary statutory authority to oversee these firms on a consolidated basis.

**Management Response (Concur or Non-concur):**
TM concurs with this recommendation.

- We note, however, that this issue was previously considered when implementing the rules for Supervised Investment Bank Holding Companies (SIBHCs).

- In Exchange Act Release 49831, the Commission found that its supervision of an investment bank holding company as a SIBHC would be necessary and appropriate only when the IBHC is affiliated with a broker-dealer that has a "substantial presence" in the securities business. The requirement that a firm have a "substantial presence" was to identify broker-dealers and their holding companies whose failure could have a materially adverse impact on other securities market participants, thus reducing systemic risk.

- Under the SIBHC rules, among other things, evidence that an investment bank holding company owns or controls a broker-dealer that maintains $100 million in

19

**APPENDIX VII CONTINUED..**

tentative net capital would be sufficient to demonstrate a substantial presence in the securities business. One firm has applied to be supervised as a SIBHC.

**Recommendation 23:**
The Division of Trading and Markets, in consultation with the Chairman's office, should determine what additional changes need to be made to the Consolidated Supervised Entity (CSE) program in light of the collapse of Bear Stearns and changing economic environment.

**Management Response (Concur or Non-concur):**
We understand the recommendation, and are now actively working with the Chairman's Office to consider what changes are appropriate in light of recent developments. In addition, the Chairman has made a number of requests for legislative changes that could require further modifications of the CSE program.

**Recommendation 24:**
The Division of Trading and Markets (TM) should fill critical existing positions, and consider what any additional staff it believes will be needed to carry out the CSE program's function going forward. TM should also establish milestones for completing each phase of an inspection and implement a procedure to ensure that the milestones are met.

**Management Response (Concur or Non-concur):**

TM concurs with this recommendation, and we have already undertaken efforts that fully respond to it.

- We have posted a position for an Assistant Director (CSE Inspections) in New York, as well as staff jobs for the CSE inspections units in both New York and Washington.

- It is worth noting, however, that this recommendation arises in part from a misperception of the CSE inspections program.

- As we informed the OIG in our informal comments, three inspections have been conducted and two inspection reports have progressed to the final stages of review in the 13 months since responsibility was transferred from OCIE and in the 9 months since TM's inspections unit became operational.

- In addition, OIG staff was provided with a term sheet document, shared with the Commission in Fall 2007, which set out the specific milestones used to assess progress in each inspections project. While the TM staff would certainly prefer that all three inspections were fully complete at this point, the unprecedented

---

20

**APPENDIX VII CONTINUED..**

financial market conditions that have prevailed through much of this year have affected the pace of this work, and much else.

**Recommendation 25:**
The Division of Trading and Markets, in consultation with the Office of Compliance Inspections and Examinations and the Commission's Ethics office, should develop an ethics manual.

**Management Response (Concur or Non-concur):**

TM concur with this recommendation, and we have already undertaken efforts that fully respond to this recommendation.

- As we informed the OIG in our informal comments, the finding is based upon flawed understanding of the current situation. In particular, on March 1, 2005, the Division Director of TM directed the Division staff to follow OCIE's Ethics Guidelines with two minor variations.

- For simplicity's sake, TM management recently concluded that staff should follow the OCIE guidelines. An email has been sent to the staff providing that clarification.

**Recommendation 26:**
The Division of Trading and Markets should continue to seek out ways to increase its communication, coordination, and information sharing with the Federal Reserve and other Federal Regulators.

**Management Response (Concur or Non-concur):**

TM concurs with the recommendation, and we have already undertaken efforts that fully respond to the recommendation. Since inception, TM has collaborated with a large number of other regulators in the context of the CSE program, including the Federal Reserve Board, the New York Federal Reserve Bank, the FDIC, the State of Utah, and others. Efforts continue to expand the range of both bilateral and multilateral activities.

---

21

# MEMORANDUM

| | |
|---|---|
| **TO:** | David Kotz<br>Jill Lennox<br>Office of Inspector General |
| **FROM:** | Lori Richards, Director<br>Office of Compliance Inspections and Examinations |
| **SUBJECT:** | OIG Draft Report 446 -A: *"SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program"* |
| **DATE:** | September 24, 2008 |

The Office of Inspector General provided a draft of its report, OIG Report 446 -A *"SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program"* and has requested that we provide a written response indicating whether or not we concur with each recommendation that refers to the Office of Compliance Inspections and Examinations.  This memo outlines our response.

There are three recommendations in the Report that are directed to the Office of Compliance Inspections and Examinations (OCIE) (Recommendations 18, 22, and 25), and one recommendation that references the Office (Recommendation 15). Our response to each is discussed below.

> **Recommendation 18:**
> The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (*e.g.*, discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program. They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

OCIE concurs with Recommendation 18.  We believe that a collaboration agreement that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity (CSE) program would improve the effectiveness of the oversight by both offices.  While the two offices issued a memorandum on March 19, 2007 to all staff involved in CSE oversight that described the allocation of responsibilities and the reallocation of CSE examination oversight from OCIE to TM, a more detailed agreement could enhance the information sharing and corroboration between the two offices.

> **Recommendation 22:**

> Chairman Cox should create a task force led by the Office of Risk Assessment (ORA) with staff from the Divisions of Trading and Markets, and Investment Management, and the Office of Compliance Inspections and Examinations. The Task Force should perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis. If the Task Force ultimately believes that the Securities and Exchange Commission (Commission) should supervise these firms on a consolidated basis, it should make a recommendation to the Commission that involves seeking the necessary statutory authority to oversee these firms on a consolidated basis.

OCIE concurs with Recommendation 22. A joint TM, OCIE and IM task force led by the Office of Risk Assessment to determine the costs and benefits of supervising firms with significant customer assets and unregulated affiliates could be very valuable in producing evidence supporting the need for consolidated oversight. At the current time, the SEC is generally limited in its oversight authority of financial firms to registered broker-dealers, investment advisers, and transfer agents; the Consolidated Supervised Entity oversight is a voluntary program. In the current environment, where firms are highly diversified and deal in very complex products and businesses, with much of this activity in unregulated material affiliates, consideration of additional statutory authority would be valuable.

> **Recommendation 25:**
> The Division of Trading and Markets, in consultation with the Office of Compliance Inspections and Examinations and the Commission's Ethics office, should develop an ethics manual.

OCIE concurs with Recommendation 25. OCIE has implemented strong written ethics procedures for the OCIE examination force, with requirements and prohibitions that are more stringent than the SEC procedures that apply to all SEC staff. Examiners are entrusted with special responsibilities that require the utmost integrity, avoidance of even a remote appearance of a conflict of interest, and the highest level of professional conduct. Because SEC exam staff are evaluating compliance with the law and effectiveness of risk management controls, their credibility, judgment, and independence must be above reproach. For this reason, OCIE believes that the stringent ethics procedures that apply to OCIE examination staff should apply consistently to all SEC staff that perform examinations, and would work with TM to develop an ethics manual for the CSE program.

While Recommendation 15 does not require any action by OCIE, it does reference the Office and therefore we add the comment below.

> **Recommendation 15:**
> The Division of Trading and Markets should: (1) reassess all the prior Office of Compliance Inspections and Examinations (OCIE) issues to

ensure that no significant issues are unresolved (given the belief that OCIE followed up); and (2) follow up on all significant issues.

We note that the OCIE examination process generally involves requesting and receiving documents, reviewing and evaluating those documents and conducting an onsite review, determining if any deficiencies or weaknesses exist, conducting an exit interview with the firm, producing an examination report and detailing deficiencies in a deficiency letter sent to the firm examined. The OCIE staff request that the firm provide a detailed written response to the deficiency letter that describes any corrective action. OCIE evaluates the response and determines whether the firm has responded appropriately. For significant findings that do not appear to be appropriately resolved, OCIE works with the firm on resolution. All responses to findings that required action by the firm are then followed up in the next examination. The most recent CSE examination of Bear Stearns that was conducted by OCIE resulted in an examination report issued by OCIE in December 2005, and Bear Stearns provided its response in January 2006. The results were provided to TM. TM subsequently assumed responsibility for the overall CSE examination program in March 2007, and OCIE ceased CSE examination activities as of that date (OCIE examiners continue to be solely responsible for examinations of broker-dealer firms that are part of CSEs).

***

As an additional matter, on page 37 of the report you indicate that in 2007 the Government Accountability Office commented on our method of tracking recommendations regarding Self-Regulatory Organization ("SRO") inspections. Please note that following receipt of that comment, OCIE developed a formal tracking system for recommendations in SRO inspections, and deployed the system for use in SRO inspections in early 2008.

Finally, you requested that OCIE indicate whether there is non-public OCIE information in the report. Any non-general examination-related information would be considered non-public. Examples of this are found on pages 20, 37, and 39 of the report.

**APPENDIX VII CONTINUED..**



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
CORPORATION FINANCE

September 24, 2008

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Dear Mr. Kotz:

Thank you for the opportunity to respond to the recommendations relating to the Division of Corporation Finance in your August 18, 2008 draft report *SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program* (Audit Report No. 446-A).

In 2007, Corporation Finance selected Bear Stearns' 2006 Form 10-K for review. On September 27, 2007, two months prior to its internal guideline for issuance of a comment letter to a company selected for review, Corporation Finance issued its comment letter to Bear Stearns. That letter included a focus on subprime mortgage matters. Soon after receiving this letter, and well before Bear Stearns' collapse in March 2008, Bear Stearns began adding improvements to its disclosures about subprime mortgage securities in its publicly available filings. Those additional disclosures appear in:

* Its Form 10-Q filed on October 10, 2007 (details on net inventory markdowns related to losses in residential mortgages and leveraged finance areas);

* Its Form 8-K filed on November 15, 2007 (updated information on collateralized debt obligations and subprime related exposures);

* Its Form 8-K filed on December 21, 2007 (fourth quarter financial results, including a detailed exhibit of CDO and subprime mortgage asset exposures); and

* Its Form 10-K filed on January 29, 2008 (schedule of subprime exposure).

**APPENDIX VII CONTINUED..**

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 2

**Division of Corporation Finance concerns about Audit Report findings on Bear
Stearns filing review**

In Finding 8 of your audit report, you recommend what could be sweeping
changes to Corporation Finance's full disclosure program based upon conclusions you
draw from a *single* Corporation Finance review – the review of Bear Stearns' 2006 Form
10-K. You include conclusions regarding that review in Finding 8 with which I cannot
agree, the two most significant of which are:

1. That Corporation Finance's "untimely review deprived investors of material
   information that they could have used to make well-informed investment
   decisions," and

2. That Corporation Finance's review of Bear Stearns was "untimely."

*The Division of Corporation Finance review of Bear Stearns resulted in
improved and timely disclosure for investors*

As to the first of these conclusions, you indicate that "Bear Stearns' response
letter (coupled with CF's comment letter) contained material information that investors
could have used to make well-informed investment decisions." You also conclude that
"the information (e.g., Bear Stearns' exposure to subprime mortgage securities) could
have potentially been beneficial to dispel rumors that led to Bear Stearns' collapse."
While you go on to identify information in that letter and state that Albert S. Kyle, the
OIG expert, believes that this information would have been "helpful" to investors, you do
not note the significant redactions of information. I do not understand the basis for your
or Professor Kyle's conclusions.

First, as I indicate above, Bear Stearns began making additional public disclosures
concerning its subprime exposures in its public filings soon after it received our
September 27, 2007 comment letter. In addition, the information that was in Bear
Stearns' response to our comment letter, which we later posted on our website, was
heavily redacted under the confidentiality provisions of Rule 83. I note that in well over
100 places in the letter, Bear Stearns redacted significant information.[1] I have difficulty
agreeing with Professor Kyle that this heavily redacted letter, which would not have

---

[1] Redacted information included: various metrics utilized to determine FICO scores and designation of
loans as subprime; loan to value ratios; subprime production in 2005 and 2006; trend data for loan-to-value
ratios and full-document loans during 2007; percentage of loans with full documentation; size of data
sample upon which risk models are based; table of margin requirements by collateral type; fair value of
subprime loans at various dates; fair value and balance of non-performing subprime loans; fair value of
retained interests in subprime securitizations; reduction of subprime exposure from hedging; fair value of
securitization trusts; amount of subprime loans serviced; amounts securitized through SPEs; amounts
provided to finance subprime collateral to counterparties; fair value of other subprime related instruments;
revenues derived from subprime activity for all periods presented; litigation reserves.

APPENDIX VII CONTINUED..

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 3

become available, under our posting policy until at least 45 days after we completed our review and after Bear Stearns had made additional subprime disclosures (which included actual numeric data and dollar amounts), would have been "helpful" to investors or would have provided material information that Bear Stearns had not already provided in the public reports it filed with us. The redacted letter, however, is publicly available and I urge investors and other readers of this report to review the Bear Stearns response letter, and reach their own conclusions about the importance of the additional information appearing in the redacted letter, particularly in light of public disclosures in the Forms 8-K, 10-Q and 10-K I reference above.[2]

*The Division of Corporation Finance review was timely*

As to the second conclusion with which I cannot agree, you conclude that "CF's filing review of Bear Stearns' 2006 10-K was not timely." This is not correct and the implication of your conclusion is that we should review Forms 10-K immediately upon filing and that a failure to do so means that we are "untimely." As background, we have a selective review program, guided by Section 408 of the Sarbanes-Oxley Act of 2002, through which we review all public companies on a regular and systematic basis, at least once in a rolling three-year period. Following this statutory direction, we select for review between 35% and 40% of public companies each year – which results in approximately 4,000 to 4,500 company reviews. We do not have a requirement to review each company each year and there are many companies that we do not select for review in any given year. Although most Forms 10-K are filed in February and March, we conduct our reviews of those companies we select for review throughout the year.

As you correctly point out, our long standing internal guideline is that we should issue our initial comments to a company we select for review before the end of the company's fiscal year. By following this guideline, we give the companies we select for review time to reflect our comments, if appropriate, in the disclosure in their next Form 10-K. As you state in your report, we met this internal guideline in our review of Bear Stearns' 2006 Form 10-K, filed on February 13, 2007, by providing comments on September 27, 2007 – over two months *prior* to the end of Bear Stearns' fiscal year on November 30, 2007. Thus, I cannot agree with your statement that the amount of time we spent to review Bear Stearns' filing is "simply unacceptable."[3]

---

[2] http://www.sec.gov/Archives/edgar/data/777001/000041412108000089/filename1.txt

[3] In fact, in 2006, the Inspector General (Audit 401) recommended that Corporation Finance consider ways to manage workload peaks resulting from the bunching of Form 10-K filings in February and March. This recommendation reflected the Inspector General's acknowledgement of the difficulties we face in meeting our Sarbanes-Oxley mandated and internal review guidelines. The implication of this Inspector General recommendation in 2006 was actually that we should consider lengthening the timeframe for our filing reviews, not condensing it closer to the February and March filing peak.

APPENDIX VII CONTINUED..

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 4

As an aside, I should point out that our comment letters to the other four CSE firms, all of which we selected for review in 2007, were sent out well before their fiscal year ends in November and December. We issued comments to Lehman Brothers Holdings Inc. on August 1, 2007; to Morgan Stanley on August 30, 2007; to Goldman Sachs Group, Inc. on September 20, 2007; to Merrill Lynch & Co., Inc. on September 25, 2007; and to Bear Stearns Companies, Inc. on September 27, 2007.

*Current and periodic reports are the appropriate disclosure mechanism*

Separate from any discussion of these two conclusions, I thought it would be useful to provide some background on our review process and its role in prompting good public company disclosure. Our comment letters and company responses are not the mechanism for disclosure of material information to investors envisioned by our full disclosure program. The goal of disclosure of material information to investors, which is paramount in our efforts, is achieved in our program by seeking improvements to a company's public disclosures in its periodic and current reports. Those reports are readily available to all investors. These changes in disclosure are subject to the full liability provisions of the federal securities laws applicable to information appearing in these reports and, when they are included in a periodic report, the safeguards provided by the Sarbanes-Oxley Act of 2002 apply, including senior officer certifications and the disclosure controls and procedures process.

The public posting of comment letters and responses is only a recent development in our full disclosure program and is intended to increase the transparency of our review process and to make this correspondence available to all interested persons at no cost. We believe that companies like to look at the comment letters we send to their competitors to see what comments they might expect, as well as to glean competitive information. To address company concerns about public dissemination of competitively harmful information in their comment response letters, we permit companies to redact such information pursuant to a Rule 83 confidential treatment request. Companies frequently take advantage of this provision, as Bear Stearns did in its response letter in the review of its 2006 10-K.

We intentionally wait until at least 45 days after we complete a filing review before we post correspondence. Our separation of the exchange of views reflected in this correspondence from the disclosure public companies provide in their filings is intentional – we seek to promote a free give-and-take in the review process and to avoid having conclusions drawn from our questions before a company has an opportunity to respond. Frequently, a company's explanation or analysis of an issue will satisfactorily resolve an issue without any changes to previously filed or future disclosure. When a company improves its disclosure, it makes those improvements in its widely available periodic and current disclosure documents, which is where investors expect to find material disclosures. To my knowledge, investors do not use review correspondence, which may be heavily redacted, and which we do not post until 45 days after we

APPENDIX VII CONTINUED..

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 5

complete our review, as a source of disclosure. To revamp our program to make this back-and-forth correspondence with a company a disclosure vehicle to investors would require significant, and I believe unwarranted, changes to our program, which would significantly undermine its effectiveness for investors.

*The Division of Corporation Finance seeks timely responses to its comments*

You also discuss Corporation Finance's general practice of requesting, but not requiring, that companies respond to comments within ten business days. While it is true that we rarely insist that a company respond in that timeframe, it is important to note that in many cases, companies do respond during that time period. You recommend that we establish a policy outlining when we expect companies to substantively respond to issues we raise in our comment letters and monitor compliance with this policy.

Our disclosure review program is built on the common goal we share with companies — to enhance disclosure and improve compliance with the disclosure requirements of the federal securities laws. Although the limited consequences of not responding to our comments can be quite significant — for example, a company is required to disclose material staff comments that have been outstanding for six months in its Form 10-K and/or Corporation Finance may refer a non-compliant company or one with faulty disclosure to the Division of Enforcement for further investigation — they are rarely the outcome of a staff filing review. While you recommend that we change our policy in this area, our experience is that most companies do respond to us, in some form, within the ten business days in which we seek a response. Our experience is also that, similar to the Bear Stearns review described above, a company may respond to staff comments in its public disclosure documents. Although we believe that extending the ten business day request-for-response time period will be counterproductive to our ongoing efforts to enhance public disclosure, we will consider your recommendation and how it would impact our program.

**Division of Corporation Finance's role with respect to the CSE program**

The Commission's CSE program is the focus of your report. You explain in the Executive Summary that your objectives in this audit "were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns, and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program." You also summarize the work of Albert S. Kyle, the expert you obtained to assist you with your audit, and indicate that Professor Kyle's focus was on "the Division of Trading and Markets' oversight of the CSE firms, with a particular focus on Bear Stearns."

The Division of Corporation Finance is not directly involved with the CSE program and, as I understand your report, neither the Division of Corporation Finance, nor its full disclosure program generally, was the focus of your audit or of Professor

**APPENDIX VII CONTINUED..**

H. David Kotz
Inspector General
U.S. Securities and Exchange Commission
Page 6

Kyle's work.  However, in connection with your audit of the CSE program, you did
review Corporation Finance's review of Bear Stearns' 2006 Form 10-K, filed in February
2007, and, based on that *single* review, you have recommended what could be *sweeping*
changes to Corporation Finance's full disclosure program.  In our full disclosure
program, we review the filings of more than 4,000 companies each year.  I believe it is
inappropriate for you to have reached conclusions, and to have made recommendations,
about our program based upon your examination of our review of just *one* company's
filings.

I believe, based on the scope of your audit work, that your comments and
recommendations to Corporation Finance would have more appropriately focused on our
full disclosure program as it relates to the CSE program.  To the extent your
recommendations do focus on Corporation Finance's interaction with the CSE program, I
agree fully that we should examine the interaction between our reviews of the CSE firms
and Trading and Markets' administration of the CSE program.  For example, we will
consider whether we should review CSE firms promptly after they make their annual
Exchange Act filings and issue comments, if any, within a specific time period.  We will
discuss our thoughts on this with Trading and Markets.  In addition, in Finding 7, you
recommend that we should take concrete steps to improve our collaboration efforts with
Trading and Markets and that we should determine whether the information Trading and
Markets receives from the CSE firms would be helpful in our reviews of the filings these
companies make.  As you note, we were not able to respond to your questions during the
audit about the potential usefulness of this information since we did not know what it
was.  Furthermore, as we previously conveyed to you, we are concerned about basing our
comments to a company, which we will make public, on non-public information that a
company provides to another Division or Office for different purposes.  That being said,
we will take steps to work closely with Trading and Markets to pursue this.

I appreciate your giving me the opportunity to present my views on your report
and I very much appreciate your commitment to present this letter as an attachment to it.
Doing so will allow readers to draw their own conclusions, and is consistent with the
transparent full disclosure review process I and the staff of the Division of Corporation
Finance are proud to administer.

Sincerely,

John W. White
Director

# Office of Inspector General Response to Chairman Cox and Management Comments

The Office of Inspector General (OIG) has received responses to its audit report entitled "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program" from Chairman Christopher Cox, the Division of Trading and Markets (TM), the Office of Compliance Inspections and Examinations (OCIE), the Division of Corporation Finance (CF), and the Office of Risk Assessment (ORA).

In total, the Commission's responsible management officials have concurred with 21 out of the 26 recommendations contained in the report.

Response to the Chairman's Comments

We are particularly pleased that the Chairman has commented that he believes that the 26 specific recommendations are well-considered and worthy of support. We also appreciate his comment that the report provides an invaluable and fresh perspective for the agency to carefully review and consider.

Response to the Comments of the Division of Trading and Markets (TM)

The OIG is pleased that TM concurred with 20 out of the 23 recommendations addressed to them in the OIG audit report. The OIG, however, is, quite disappointed in many of the assertions made in TM's "Management's Commentary."

The OIG made supreme efforts throughout the entire audit process to engage and consult with TM on every aspect of the audit report. Over the five months of fieldwork, OIG auditors had weekly and sometimes daily conversations with TM management, including senior officials, on all issues relating to the audit work. In many cases, TM management did not provide full responses to questions posed and issues raised by the OIG.

It is important to point out that specifically because the OIG recognized that this audit involved numerous issues of a technical and complex nature, the OIG retained a renowned and highly-regarded expert on many aspects of the capital markets, and market microstructure in particular, to assist the OIG's efforts. The expert worked closely with the OIG's auditors, providing technical expertise and guidance. The expert also spent countless hours reviewing detailed notes and memoranda that TM staff had prepared during the time periods pertinent to the audit and conversed in detail with TM management and staff.

**APPENDIX VIII CONTINUED..**

Even after having numerous conversations with TM staff throughout the audit field work, immediately prior to finalizing the draft report, the OIG convened a meeting with the Director of TM and several senior management officials to discuss the findings and recommendations in the report.  TM officials stated that they were unable to provide any substantive responses without viewing the report in writing in its entirety.

Shortly after this meeting, the OIG also provided TM officials with an initial working draft of the report, complete with findings and recommendations, for their comment.  TM management provided in response a red-lined version of the report and an additional memorandum containing substantive comments.  OIG staff painstakingly reviewed both TM's redlined version of the report and its memorandum.  Thereafter, the OIG incorporated many of TM's suggestions, including making major revisions to one finding, and removing another finding altogether.  The OIG then provided TM with a second draft for comment and invited another round of substantive responses.  The OIG also posed two separate sets of questions to TM officials regarding some of the assertions they had made in response to the working draft of the report.  TM failed to provide any response to these two sets of questions.

Instead of responding to the OIG's questions or providing additional substantive suggestions regarding the OIG report, TM decided to issue its "Management's Commentary," which claims the report is flawed and inaccurate, and asserts that TM was not provided with a fair and meaningful opportunity to address the issues raised in the report.  It is worth noting that notwithstanding the rhetoric contained in "Management's Commentary," TM concurred with nearly all of the report's recommendations.  Moreover, while the commentary asserts that the report in fundamentally flawed in all aspects, it provides only a few examples of actual statements being inaccurate, all of whom are relatively minor, even if true, and have no impact on overall findings and conclusions of the report.

We sincerely hope that the tone adopted in TM's "Management's Commentary" is not indicative of TM's unwillingness to take the OIG report and its findings seriously and responsibly as these matters are of utmost importance to the Commission and the country, particularly as lawmakers consider the administration's proposed unprecedented bailout of the nations' financial markets.

<u>Response to the Comments of the Office of Compliance Inspections and Examinations (OCIE)</u>

The OIG is pleased that OCIE has concurred with all 3 recommendations addressed to it, and commented favorably on an additional recommendation.

Specifically, OCIE concurred that the development of a collaboration agreement that maintains a clear delineation of responsibilities between TM and OCIE

would improve the effectiveness of the oversight by both offices and that a joint TM, OCIE and Division of Investment Management task force led by the ORA to determine the costs and benefits of supervising firms with significant customer assets and unregulated affiliates could be very valuable in producing evidence supporting the need for consolidated oversight. OCIE also concurred with the recommendation that TM develop an ethics manual, agreeing that stringent ethics procedures should apply consistently to all SEC staff that perform examinations, and indicated that it would work with TM to develop an ethics manual for the CSE program.

<u>Response to the Comments of the Division of Corporation Finance (CF)</u>

The OIG is disappointed that CF concurred with only 1 of the 3 recommendations addressed to it. The OIG also disagrees with several of the comments contained in the management response submitted by CF.

First, CF indicates that the OIG recommends what could be "sweeping changes" to its program. The OIG's finding concluded that CF has not established guidelines for the timeliness of second level filing reviews. We recommended that CF establish such guidelines and thereafter monitor compliance with the established guidelines. We do not view these improvements to be "sweeping changes" but rather reasonable and necessary management practices.

Second, CF points out that its current view of timeliness, as it pertains to the entire filing review process, is dictated by the requirements of Section 408 of the Sarbanes-Oxley Act (SOX) of 2002, as well its internal guideline of issuing comments before a company's next fiscal year-end. While these factors may guide the timeliness of filing reviews (and the issuance of comment letters) as a general rule, CF ignores the need to address high-risk filings in an expeditious manner. As evidenced by developments in recent years, a company's stock price can have a dramatic downward swing in a very short period of time. Under the particular circumstances involving Bear Stearns, we simply disagree that CF's review of its 2006 10-K was "timely."

Third, CF questions what value to investors an earlier release of its comment letter on Bear Steam's 2006 10-K and the company's response would have had because those documents were heavily redacted when publicly disclosed. During our audit, we considered whether the information would still have been useful, even though it was redacted, and we concluded it would have been quite useful. Further, the OIG expert opined on the redacted version and found the information to be beneficial.

Fourth, CF notes that under Section 408 of SOX, it is not required to review every company each year, and there are many companies that are not reviewed at all in a given year. While this may be true, CF is overlooking a critical aspect of Section 408, which contemplates that CF will consider the risks associated

APPENDIX VIII CONTINUED..

with filings when scheduling its filing reviews.  Bear Stearns' 2006 10-K filing was high-risk, in our opinion, given the company's high exposure to subprime mortgages and, accordingly, should have been reviewed in a more timely manner.

Fifth and finally, CF maintains that investors do not use review correspondence, which may be heavily redacted, as a source of information on which to base investment decisions.  In addition, CF explains the practice of publicly disclosing the comment letters and the associated responses as a relatively new development intended to increase the transparency of the review process and to make correspondence available to all interested person at no cost.  However, according to SEC Insight (now known as Disclosure Insight), an independent and private investment research firm, CF's comment letters and responses can be quite beneficial to investors.  In fact, it was stated by SEC Insight as follows:

> The comment letter proposal [to make the comment letters public] provides one important means for _investors_ to level the playing field with registrants [companies] by enhancing their ability to do what investors do best in transparent markets; that is, assess and discount risks. [Emphasis added].

**APPENDIX IX**

# Gross Leverage Ratios

Figure 1. CSE Firms- Gross Leverage Ratios



Source: This data was provided by TM. They obtained the information from public filings (i.e., 10-K) and Bloomberg. We verified each firm's year-end gross leverage ratio amount, but did not verify its quarterly ratios.

APPENDIX X

## Criteria

**Basel II Standards.**

**Final Rule: Alternative Capital Requirements for Broker-Dealers That Are Part Of Consolidated Supervised Entities" (Release No. 34-49830).**[201] In 2004, the Commission adopted rule amendments under the Securities and Exchange Act of 1934 (which created the CSE program) that allowed firms (the broker-dealers) to apply for an exemption from the net capital rule and instead use the alternative capital method.

**TM's Policies and Procedures describing its administration of the CSE program.**

**Publicly Disclosed Information about the CSE Program.**[202] The Commission has posted the following documents on its website about the CSE program:

- Program Overview & Assessment Criteria;
- Program Description; and
- SEC Holding Company Supervision With Respect To Capital Standards And Liquidity Planning.

---

[201] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.
[202] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

# Audit Request and Ideas

The Office of Inspector General welcomes your input.  If you would like to request an audit in the future or have an audit idea, please contact us at:

U.S. Securities and Exchange Commission
Office of Inspector General
Attn: Assistant Inspector General, Audits (Audit Request/Idea)
100 F. Street N.E.
Washington D.C. 20549-2736

Tel. #:  202-551-6061
Fax #:  202-772-9265
Email: oig@sec.gov

