# Exhibit 3

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.



# REPORT OF INVESTIGATION

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## OFFICE OF INSPECTOR GENERAL

### Case No. OIG-483

### Failure to Vigorously Enforce Action Against W. Holding and Bear Stearns at the Miami Regional Office

### September 30, 2008

**The SEC believes that this report contains nonpublic and confidential information**



**OFFICE OF
INSPECTOR GENERAL**

### UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

# MEMORANDUM

September 30, 2008

**To:**     Honorable Christopher Cox
            Chairman

**From:**   H. David Kotz
            Inspector General

**Re:**     Report of Investigation:  Case No. OIG-483
            Investigation Concerning Failure to Vigorously Enforce Action Against
            W. Holding Company, Inc. and Bear Stearns & Co., Inc. at the Miami
            Regional Office

Attached is our report of investigation into claims concerning a failure by the Miami Regional Office to vigorously enforce an action against W. Holding Company, Inc. and Bear Stearns & Co., Inc.

This report is being referred to management for disciplinary or performance-based action. In order to ensure that we have information necessary to comply with our reporting responsibilities, please advise us within 45 days what action is taken in response to his report.

Please understand that this report is confidential in nature and should be treated in a secure manner. We request that, when you are finished with the report, you either shred it or return it to us.

If we can be of further assistance to you, please do not hesitate to contact me.

Attachment

cc:    Peter Uhlmann, Chief of Staff
       Diego Ruiz, Executive Director

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

# REPORT OF INVESTIGATION

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION OFFICE OF INSPECTOR GENERAL

### Case No. OIG-483

### Failure to Vigorously Enforce Action Against W. Holding and Bear Stearns at the Miami Regional Office

#### Introduction and Background

On April 2, 2008, the Office of Inspector General ("OIG") opened an investigation at the request of United States Senator Charles Grassley, Ranking Member of the Senate Finance Committee (the "Committee"), into the reasons why a U.S. Securities and Exchange Commission ("SEC" or the "Commission") investigation of, among others, Bear Stearns and Co., Inc. ("Bear Stearns") was closed without any action taken by the SEC Division of Enforcement ("Enforcement").[1]

Ranking Member Grassley requested that the OIG provide "a final report on whether there was any improper action or misconduct relating to SEC investigation of Bear Stearns and its decision to close the investigation." *Id.* The report was to also describe and assess the following:

1.    the nature, extent, and propriety of communications between Bear Stearns executives or their representatives and senior SEC officials;

2.    the decision-making process which led to the SEC's failure to bring an enforcement action following the drafting of a Wells notice;

3.    the reasons for declining to proceed with an enforcement action; and

4.    the degree to which more aggressive action by the Enforcement Division may have led to an earlier and more complete

---

[1] Exhibit 1. (Letter dated April 2, 2008 from Senator Charles E Grassley to The Honorable David Kotz, Inspector General).

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

understanding of the issues that contributed to the collapse of Bear Stearns.

Below, we report on our investigation into this matter, with particular focus on the handling of the investigation by Commission staff and management, Commission staff's relationships with counsel for the proposed defendants and the results of settlement negotiations with counsel for the proposed defendants, and Enforcement's decision to close the investigation and to not pursue an enforcement action against Bear Stearns.

## Summary of Results of Investigation

Beginning in March 1999, W. Holding Company, Inc. ("W. Holding") began purchasing Collateralized Bond Obligations ("CBOs") and Collateralized Loan Obligations ("CLOs") from Bear Stearns through Ernest Almanza ("Almanza"), a registered representative in Bear Stearns' Latin American group. For eleven months in 2002, Almanza violated Bear Stearns' internal policies and procedures by calculating his own prices as the CBOs and CLOs in W. Holding's portfolio began to decline in value. When W. Holding discovered the improper valuation, and that the CDOs had been impaired, its Chief Financial Officer, Freddy Maldonado ("Maldonado"), took several steps to reduce the impact of the impairment charge, each of which was not in accordance with Generally Accepted Accounting Principles ("GAAP"). Moreover, using flawed information, Maldonado concluded that a smaller than appropriate impairment charge was necessary, and W. Holding issued a 2003 first quarter earnings release that was grossly inadequate, giving the impression that the securities were not impaired. Even after the SEC Division of Corporation Finance ("Corporation Finance") questioned W. Holding about its practices, Maldonado continued to use inaccurate prices, resulting in an overstatement of 67 percent on W. Holding's pre-tax net income. W. Holding then filed a Form 10-K and amended Form 10-K that failed to disclose relevant information concerning the impairment of its CDO portfolio. Thereafter, W. Holding filed misleading press releases and a registration statement that incorporated the false information. By using the materially false and misleading price information in press releases and filings, W. Holding was able paint a favorable picture of its earnings streams for its shareholders and keep its stock price from dropping.

In May 2003, Corporation Finance referred the matter involving W. Holding to the Division of Enforcement. Corporation Finance had determined that, at a minimum, W. Holding had used an inaccurate method of fair value to reflect its inventory, contrary to accounting principles.

Due to a backlog in Enforcement's Office of Chief Accountant, the referral stalled for seven months. In January 2004, the Assistant Chief Accountant in Enforcement authored a Referral Disposition Memorandum, recommending further investigation to determine whether information contained in W. Holding's press release about its earnings and financial condition for the first quarter of 2003 was false and misleading.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

In February 2004, the referral was sent to Miami Regional Office ("MIRO") Associate Regional Director Glenn Gordon for his review and disposition. MIRO opened a Matter Under Inquiry ("MUI") into W. Holding on February 27, 2004. Between March 11, 2004 and July 28, 2004, the investigative team assigned to W. Holding worked at an intense pace, sending document requests that culled 53,000 documents, and between October 6, 2004 and February 14, 2005, fourteen witnesses gave voluntary testimony in the matter.

On February 15, 2005, MIRO staff requested and was granted a formal order of investigation by the Commission. In requesting the formal order, MIRO staff represented to the Commission that it had "nearly completed" its investigation "in connection with the impairment of" certain of W. Holding's assets, "and the role that Bear Stearns and Co., Inc. may have played in those violations."

Once the formal order was obtained, between February 22, 2005 and June 6, 2005, MIRO took the testimony of 13 additional witnesses in the case. Sometime around June 15, 2005, the investigative team met with MIRO Regional Trial Counsel Robert Levenson ("Levenson"), who, by all accounts, told the investigative team he believed it was a "strong case." His feeling was echoed by MIRO senior staff, who all expressed to the investigative team that it was a high priority case for the office, particularly because it had been referred by headquarters and because there were allegations of fraud involving Bear Stearns.

On June 15, 2005, MIRO staff issued Wells notices to Bear Stearns and Alamanza, as well as Bear Stearns' Senior Managing Directors Marjorie Hogan ("Hogan") and Rudolfo Betancourt ("Betancourt"), against whom there was evidence that they provided false price information to Maldonado with the knowledge that W. Holding was going to provide such information to its auditor as support for the incorrect $2.7 million impairment charge. MIRO never issued Wells notices to Maldonado and W. Holding because the staff believed both would be willing to discuss settlement.

In the fall of 2005, MIRO staff met with counsel for Bear Stearns and began discussing settlement. During that same period of time, MIRO staff entered into settlement negotiations with counsel for W. Holding and Maldonado. An Action Memorandum was then drafted by MIRO staff, which named as proposed defendants, W. Holding, Maldonado, Bear Stearns, Hogan, Betancourt and Almanza. Shortly thereafter, in October or November 2005, MIRO reached a settlement in principle with Maldonado's attorneys, whereby Maldonado would agree to a non-scienter based fraud charge, a $100,000 penalty and a possible officer and director bar. At the same time, W. Holding also agreed to settle in principle for an injunction with no civil monetary penalty.

In January 2006, Chedley Dumornay ("Dumornay") took over the MIRO Assistant Regional Director Position. Despite his immediate interest in the W. Holding case, Dumornay took at least nine months to become familiar with the matter. MIRO staff became frustrated with the inaction and repeatedly inquired about its status.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

In September or October of 2006, Dumornay finally completed his very belated review of the September 2005 Action Memorandum, and in November 2006, at least fourteen months after the initial meetings with Bear Stearns' counsel, MIRO re-contacted Bear Stearns' counsel and advised them that MIRO was finally prepared to proceed against them.

After restarting the case, in the early months of 2007, Bear Stearns' counsel convinced MIRO to drop all charges against Hogan and Bettancourt, and to reduce the charges against Bear Stearns from a fraud charge to a charge of failure to supervise. MIRO revised its Action Memorandum to reflect the reduction in charges.

MIRO renewed settlement discussions with counsel for W. Holding and Maldonado, who had heard nothing from MIRO for 15 or 16 months. Although W. Holding and Maldonado had previously agreed to a $100,000 penalty, MIRO staff offered to reduce the proposed penalty to $75,000, and reached agreement with both W. Holding and Maldonado.

MIRO also engaged in successful settlement discussions with counsel for Bear Stearns, who agreed to the reduced "failure to supervise" charge and a monetary penalty of $500,000.

MIRO was also making progress obtaining a settlement arrangement with the final proposed defendant, Almanza, when MIRO Regional Director David Nelson ("Nelson") abruptly decided to close the case entirely.

Nelson then contacted counsel for Bear Stearns, Michael Trager ("Trager"), who was a former SEC Enforcement lawyer, and with whom Nelson had an ongoing personal relationship, and said "Christmas is coming early this year" and Bear Stearns "can keep their money." Almanza's lawyer, Paul Leder ("Leder"), also a former SEC lawyer who had worked with Nelson and Trager in Enforcement in the mid-to-late 1980s, was also informed that no case would be brought against his client. The decision also meant that W. Holding and Maldonado were not required to pay a penalty or agree to any charges.

MIRO staff was stunned at the decision to close the case, and the reasons provided to them were incongruous. MIRO staff reported that they were told the case was being dropped for "litigation risk," even though settlements had been negotiated with essentially all the parties in the case. When Nelson was asked for an explanation, he replied that the case was too old, and there was pressure from Enforcement in DC not to bring old cases. MIRO staff believed the case was dropped because MIRO management never truly understood the complexities of the case.

Concurrent with the MIRO investigation, the U.S. Attorney's Office in the Southern District of New York was investigating another Bear Stearns' employee's questionable pricing of CDOs. Although the U.S. Attorney's Office informed MIRO

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

about its investigation, and asked to be apprised of the status of MIRO's W. Holding/ Bear Stearns investigation, MIRO never submitted an access request for information, and failed to even notify the Assistant U.S. Attorney ("AUSA") about the W. Holding/Bear Stearns case. The AUSA believed that it was significant that Bear Stearns' traders out of New York and Florida were being investigated for the same conduct, and had MIRO sought information about his investigation in New York, MIRO would have uncovered potential systematic problems at Bear Stearns in determining the market price and assessing the value of additional CDOs issued and held by Bear Stearns.

In light of the foregoing, the OIG investigation finds a failure on the part of MIRO management to administer its statutory obligations and responsibilities to vigorously enforce compliance with applicable securities laws.

The W. Holding/Bear Stearns investigation was plagued by numerous unconscionable delays that adversely affected MIRO staff's ability to conduct the investigation. Proposed defendants were dropped inexplicably, and the action memorandum was re-written at the behest of defense counsel. Notwithstanding all the delays and blunders in the case, MIRO staff was able to negotiate significant settlements with essentially all the proposed defendants when MIRO Regional Director Nelson abruptly decided to drop the case entirely. A significant opportunity to coordinate with the U.S. Attorney's Office and uncover evidence of a systematic problem at Bear Stearns was also lost through neglect.

The fact that two of the defense counsels in the W. Holding matter were former Enforcement attorneys created the appearance, to some, that they may have obtained favorable treatment from MIRO staff. The evidence established that Trager, Leder and Nelson had a friendship going back over 20 years, which may have been one of the reasons that Nelson felt comfortable enough to call Trager and tell him that "Christmas is coming early" when relating the Commission's decision to close the case despite Bear Stearns' $500,000 settlement offer. While the OIG investigation did not find evidence of a direct connection between the relationship between Nelson and Trager and the decision to close the investigation, even the appearance of a conflict is disturbing and could potentially damage the reputation of the Commission.

Accordingly, this matter is being referred to the Executive Director, Chief of Staff and Chairman for disciplinary and/or performance-based actions.

### Scope Of Investigation

The OIG took the sworn, on-the-record testimony of the following current and former SEC employees:

(1)   Susan G. Markel ("Markel"), Chief Accountant in the Division of Enforcement, on June 27, 2008;

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

(2)   Ernesto Palacios ("Palacios"), Staff Attorney in the Miami Regional Office, ("MIRO") on July 14, 2008;

(3)   Jon Jordan ("Jordan"), MIRO Branch Chief, on July 15, 2008;[2]

(4)   Kathleen Strandell ("Strandell"), MIRO Staff Accountant, on July 15, 2008;

(5)   Chedly C. Dumornay ("Dumornay"), MIRO Assistant Regional Director, on July 16, 2008;

(6)   Karaz S. Zaki ("Zaki"), MIRO Staff Accountant, on July 16, 2008;[3]

(7)   Glenn S. Gordon ("Gordon"), MIRO Associate Regional Director, on July 17, 2008;

(8)   Ivan P. Harris ("Harris"), a former MIRO Assistant Director, on July 18, 2008;

(9)   Robert K. Levenson ("Levenson"), MIRO Regional Trial Counsel, on July 24, 2008;

(10)  Margarete Bronhard-D'Aniello ("Bronhard"), a former MIRO Staff Attorney, on August 5, 2008;[4]

(11)  Alexander Southwell ("Southwell"), former Assistant United States Attorney for the Southern District of New York, on August 5, 2008.

(12)  John Heine ("Heine"), SEC Office of Public Affairs Deputy Director, on August 21, 2008;

(13)  David P. Nelson ("Nelson"), MIRO Regional Director, on September 3, 2008;

(14)  Joan McKown ("McKown"), Chief Counsel in the Enforcement Office of Chief Counsel, on September 5, 2008; and

---

[2] The OIG conducted a follow-up telephone interview of Jordan on September 25, 2008.

[3] The OIG conducted a follow-up telephone interview of Zaki on September 24, 2008.

[4] Bronhard left the Commission in August 2006; the OIG reviewed Bronhard's e-mails for the time period of February through April 2004.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

(15)     Walter Ricciardi ("Ricciardi"), former Enforcement Deputy Director, on September 10, 2008.

The OIG also took the sworn, on-the-record testimony by telephone of:

(1)     Andres Rivero ("Rivero"), Partner, Rivero Palmer & Mestre, LLP, on July, 29, 2008;

(2)     Michael D. Trager ("Trager"), Partner, Arnold & Porter, LLP, on August 6, 2008 (and former SEC Enforcement Attorney); and

(3)     George H. Mernick ("Mernick"), Partner, Hogan & Hartson, on August 7, 2008.

Additionally, the OIG obtained and reviewed e-mails[5] for the following current and former SEC employees for the period February through April 2004 and April through December 2007: (1) Nelson; (2) Gordon; (3) Dumornay; (4) Jordan; (5) Bronhard; (6) Palacios; (7) Zaki; and (8) Strandell. In addition, the OIG obtained and reviewed Harris's e-mails for the period February through August 2005,[6] when he left the agency.

The OIG also obtained and reviewed e-mails for the period of April through December 2007 for Enforcement Director Linda C. Thomsen ("Thomsen"), Ricciardi, and McKown.

Additionally, on April 8, 2008, the OIG requested, obtained and reviewed information and documents from MIRO concerning Commission investigation FL-030058-A, *In the Matter of W. Holding Company, Inc.*, including:

a.   A chronology of the events leading up to the decision not to file an enforcement action against Bear Stearns;

b.   Copies of all Wells notices, including drafts, and Wells submissions;

c.   Notes from, or any other documents related to any Wells meetings, any oral Wells notices or any Wells submissions;

d.   The closing memo and all drafts thereof;

---

[5] The OIG reviewed e-mails for the time period February through April 2004, because the MIRO investigation was opened during this period. Additionally, the OIG requested the time period April through December 2007, because meetings were scheduled to take place in April or May between senior SEC staff in Washington, D.C. and counsel for one of the subjects of the investigation, as well as other information relevant to the OIG investigation.

[6] E-mails for the months of February, April and July 2005 were not available from the Commission's Office of Information Technology.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

e.  The formal order memorandum and all drafts thereof;

f.  Any drafts of a final action memorandum recommending the filing of a civil injunctive action or administrative proceeding against Bear Stearns or other parties related to the investigation;

g.  Electronic versions of all witness testimony, or if unavailable, hard copy transcripts of such testimony; and

h.  Any written staff recusals relating to the investigation.

## Applicable Rules, Regulations and Relevant Case Law

### Commission Canons of Ethics

**17 CFR § 200.50 Policy.** "It is characteristic of the administrative process that the Members of the Commission and their place in public opinion are affected by the advice and conduct of the staff, particularly the professional and executive employees. It shall be the policy of the Commission to require that employees bear in mind the principles specified in the Canons."

**17 CFR § 200.53 Preamble (a).** "Members of the Securities and Exchange Commission are entrusted by various enactments of the Congress with powers and duties of great social and economic significance to the American people. It is their task to regulate varied aspects of the American economy, within the limits prescribed by Congress, to insure that our private enterprise system serves the welfare of all citizens. Their success in this endeavor is a bulwark against possible abuses and injustice which, if left unchecked, might jeopardize the strength of our economic institutions."

**17 CFR § 200.55 Statutory obligations.** "In administering the law, members of this Commission should vigorously enforce compliance with the law by all persons affected thereby...."

**17 CFR § 200.59 Relationship with persons subject to regulation.** "In all matters before him, a member should administer the law without regard to any personality involved, and with regard only to the issues."

**17 CFR § 200.61 Impressions of influence.** "A member should not, by his conduct, permit the impression to prevail that any person can improperly influence him, or that any person unduly enjoys his favor or that he is affected in any way by the rank, position, prestige, or affluence of any person."

**17 CFR § 200.64 Judicial review.** "Members should recognize that their obligation to preserve the sanctity of the laws administered by them requires that they *pursue and*

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

*prosecute, vigorously and diligently* but at the same time fairly and impartially and with dignity, all matters which they or others take to the courts for judicial review." (Emphasis added).

**17 CFR § 200.68 Promptness.** "Each member should promptly perform the duties with which he is charged by the statutes. The Commission should evaluate continuously its practices and procedures to assure that it promptly disposes of all matters affecting the rights of those regulated."

**17 CFR § 200.72 Supervision of internal organization.** "Members and particularly the Chairman of the Commission should scrutinize continuously its internal organization in order to assure that such organization handles all matters before it *efficiently and expeditiously*, while recognizing that changing times bring changing emphasis in the administration of the laws." (Emphasis added).

### Commission Conduct Regulation

**17 CFR § 200.735-2 Policy**

(a) The Securities and Exchange Commission has been entrusted by Congress with the protection of the public interest in a highly significant area of our national economy. In view of the effect which Commission action frequently has on the general public, it is important that members, employees and special Government employees maintain unusually high standards of honesty, integrity, impartiality and conduct. They must be constantly aware of the need to avoid situations which might result either in actual or apparent misconduct or conflicts of interest and to conduct themselves in their official relationships in a manner which commands the respect and confidence of their fellow citizens.

(b) For these reasons, members, employees and special Government employees should at all times abide by the standards of conduct set forth in this subpart, the canons of ethics for members of the Securities and Exchange Commission (subpart C of this part 200) and, in the case of a professional person, the ethical standards applicable to the profession of such person."

### Relevant Case Law

The Court of Appeals for the District of Columbia has held that the SEC has an obligation to investigate possible violations in order to effectively enforce securities laws. In *Securities and Exchange Commission v. Dresser Industries, Inc.*, 628 F.2d 1368, 1370 (D.C. Cir.) *cert. denied*, 449 U.S. 993 (1980), the appellant challenged a decision of the District Court requiring it to comply with a subpoena issued by the SEC in connection with an investigation into the appellant's use of corporate funds and the adequacy of his disclosures under the securities laws. The court noted that "[i]f the SEC suspects that a company has violated the securities laws, it must be able to respond quickly." *Id.* at

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

1377. Further, the court added that "…the SEC must often act quickly, lest the false or incomplete statements of corporations mislead investors and infect the markets." *Id.* at 1380. *See also SEC v. Fishbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) ("effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable.").[7]

## Results of Investigation

I.  History of Fraudulent and Improper Behavior by W. Holding, Bear Stearns, and Related Individuals

In March 1999, W. Holding[8] began purchasing Collateralized Bond Obligations ("CBOs")[9] and Collateralized Loan Obligations ("CLOs")[10] from Bear Stearns after being introduced to the products by Ernest Almanza, a registered representative in Bear Stearns' Latin America Group. Exhibits 2 and 3.[11] The market for CBOs and CLOs was booming when W. Holding first began purchasing them, and by the end of 2002, W. Holding's CBO and CLO portfolio amounted to approximately $64 million, all of which had been purchased from Bear Stearns. Exhibit 3. However, after the September 11,

---

[7] The obligation and necessity for swift enforcement action has been referred to in the Commission's own Strategic Plan, which reads, "With regards to the SEC's enforcement authority, the Commission seeks to detect violations quickly, publicize misconduct where appropriate to alert investors to possible wrongdoing, and take prompt action to halt the misconduct and its effects." *See* United States Securities and Exchange Commission 2004-2009 Strategic Plan at 30. *See also* U.S. Securities and Exchange Commission 2007 Performance and Accountability Report at 6, "When violations occur, the SEC aims to take prompt action to halt the misconduct, sanction wrongdoers effectively, and, where possible, return funds to harmed investors." The SEC uses the percentage of first enforcement actions filed within two years of opening an investigation as a performance measure, and identifies a case as "successfully resolved" if it results in a favorable judgment for the SEC, a settlement, or the issuance of a default judgment. *Id.* at 27. *See also* U.S. Securities and Exchange Commission FY 2009 Congressional Justification at 12, "[Enforcement] staff continually strives to balance the need for complete, effective, and fair investigations with the need for timely filing of enforcement actions..."

[8] W. Holding Company, Inc. is a Puerto Rico-based bank holding company that operates through a wholly-owned subsidiary, Westernbank Puerto Rico ("Westernbank"). Exhibit 22.

[9] Collateralized Bond Obligations (CBOs) are investment-grade bonds backed by a collection of junk bonds with different levels of risk, called tiers, that are determined by the quality of junk bond involved. CBOs backed by highly risky junk bonds receive higher interest rates than other CBOs. Source: Bloomberg.com Financial Glossary.

[10] A Collateralized Loan Obligation (CLO) is a security backed by a pool of commercial or personal loans, structured so that there are several classes of bondholders with varying maturities, called tranches. A tranche is one of several related securities offered at the same time. Tranches from the same offering usually have different risk, reward, and/or maturity characteristics. Source: Bloomberg.com Financial Glossary.

[11] Almanza was a registered representative with Bear Stearns from 1988 until he resigned in January 2003. Exhibit 3. He is currently employed as a high school teacher. *Id.*

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

2001 terrorist attacks and corporate accounting scandals involving issuers such as WorldCom and Enron – whose debt backed some of W. Holding's Corporate Debt Obligations ("CDOs") – the market for these products began declining.[12] *Id.* By the end of 2002, many CDOs, including some in W. Holding's portfolio, had become distressed. *Id.* The CDOs at issue in the case included: the Mountain Capital CLO ("Mountaincap"), tranches A-4, B-2 and the income note; the Prudential Structured Finance Corporate Bond Obligation ("Prudential"), tranches B-1L, B-2L and the income note; and Aeltus CBO V, LTD tranche A-3. *Id.*

Bear Stearns' customers (such as W. Holding) "usually requested CDO prices from its registered representatives, who in turn, obtained the prices from [Bear Stearns'] Pricing Department or directly from its trading desk." *Id.* Thus, at the end of each month, W. Holding would typically send Almanza a pricing sheet that contained the names of the CDOs and a blank column for the price of the relevant securities. *Id.* Almanza would complete the form by inputting the prices and returning the completed pricing sheet to W. Holding. *Id.*

Almanza should have obtained the information for W. Holding's pricing sheets from Bear Stearns' pricing department, as Bear Stearns' internal policies and procedures prohibited sales representatives (such as Almanza) from computing their own prices. *Id.* For eleven months in 2002, Almanza violated Bear Stearns' internal policies and procedures by calculating his own prices as the CDOs in W. Holding's portfolio began to decline in value because some of the underlying securities became significantly impaired. *Id.* Throughout 2002, W. Holding never knew the extent to which the value of its CDO portfolio had declined because Almanza had provided it with inflated month-end price quotes.[13] *Id.*

By the time W. Holding requested its CDO pricing information for January 2003, Almanza had left Bear Stearns. *Id.* When W. Holding received the information calculated by Bear Stearns' pricing department, it discovered that the prices were

---

[12] A Collateralized Debt Obligation (CDO) includes CBOs, CLOs and Collateralized Mortgage Obligations (CMOs). A Collateralized Mortgage Obligation (CMO) is a security backed by a pool of pass-through rates, structured so that there are several classes of bondholders with varying maturities, called tranches. The principal payments from the underlying pool of pass-through securities are used to retire the bonds on a priority basis as specified in the prospectus. Source: Bloomberg.com Financial Glossary.

[13] According to Exhibit 3, Almanza testified that he decided to calculate his own prices for W. Holding's CDOs because the Bear Stearns Trading Desk was frequently late in preparing the prices for W. Holding, which generally needed the pricing information within a week of month's end. Exhibit 3 at 4. He further testified that he was qualified to price W. Holding's CDOs because of his prior experience performing research and analysis work for Bear Stearns' fixed income department. *Id.* Almanza stated that the disparity that existed between his prices and those of the Bear Stearns pricing department were because he must have inadvertently inputted incorrect prices on the pricing sheet because he was distracted and not focused on the job. *Id.* According to MIRO, W. Holding was one of Bear Stearns' largest clients. Exhibit 3 at 5.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

significantly lower than those quoted by Almanza during the previous months.[14]  *Id.*  This caused W. Holding's Chief Financial Officer, Freddy Maldonado, to question the earlier quotes.  *Id.*  No one at Bear Stearns questioned Almanza about the prices he provided to W. Holding in 2002 or how he arrived at them, nor did anyone at Bear Stearns inform W. Holding that it had received incorrect prices for the CDOs for 2002.[15]  *Id.*

Maldonado requested that Bear Stearns perform an analysis of the performance of W. Holding's CDOs.  *Id.*  In response, Bear Stearns prepared two sensitivity and cash flow reports.[16]  *Id.*  The first report, which was dated March 10, 2003, did not take into account why the CDO prices were dropping (*i.e.,* that the investment grade market was being impacted negatively by defaulting loans held by companies such as WorldCom).  *Id.*  As a result, the standard default assumptions used in the March 10, 2003 report for the Prudential securities (which suffered the largest decline in price) were no longer valid given the substantial increase in their default rates.  *Id.*  The report incorrectly reflected higher prices for the Prudential securities.  *Id.*

Consequently, on March 18, 2003, Bear Stearns provided Maldonado with a second sensitivity and cash flow report for the Prudential securities that addressed different scenarios in which no principal would be returned because of the deterioration of the underlying collateral.  *Id.*  This report clearly showed that it would be necessary for W. Holding to take an impairment charge on its CDO portfolio.  *Id.*  Maldonado dismissed the March 18, 2003 report because it made no sense to him.  *Id.*  Instead, he relied on the March 10, 2003 report, maintaining that he believed it accurately reflected the value of the CDOs.  *Id.*  Maldonado acknowledged that by the end of March 2003, he knew the CDOs were impaired and that W. Holding would have to take some type of charge against the earnings for the first quarter of 2003.  *Id.*

---

[14] While Almanza was on vacation for a month, another Bear Stearns registered representative, Rodolfo J. Betancourt ("Betancourt"), also provided W. Holding with month-end CDO price quotes that were substantially higher than the quotes he had obtained from Bear Stearns pricing department.  Exhibit 5 at 2, 5-6.

[15] W. Holdings CDOs were not collateralized by subprime or mortgage-related instruments.  According to MIRO staff accountant Karaz Zaki ("Zaki"), looking at the underlying collateral, there were no direct bond or loan payments coming from individual mortgage holders.  Exhibit 6 at 19-21.  Nor did Zaki believe there were subprime bonds even available at the time the bonds in question were generated, which was in 1999 and 2000.  Exhibit 6 at 21.  Former MIRO Staff Attorney Margarete Bronhard ("Bronhard") also testified that as part of the W. Holding investigation, the staff did not investigate Bear Stearns' valuation of mortgage-related securities.  Exhibit 7 at 102.  MIRO Branch Chief Jon Jordan testified that he didn't "recall these things having anything to do with corporate mortgage obligations, CMOs."  Exhibit 35 at 97. Former MIRO Assistant Director Ivan Harris testified that he did not recall the W. Holding investigation having anything to do with the valuation of mortgage-related or sub-prime investments.  Exhibit 16 at 13.

[16] A sensitivity report consists of yield tables that are run with different scenarios to show how a security will perform under varying assumptions.  A cash flow report projects how much cash would be received from an investment over time under specific scenarios.  These reports also determine how much principal will return for each investment and how much each tranche in the investment will receive as the collateral deteriorates.  Exhibit 3 at 5.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

When it became apparent to Maldonado that the CDOs were impaired, he took several steps to reduce the impact of the impairment charge, each of which was not in accordance with Generally Accepted Accounting Principles ("GAAP"). *Id.* First, he reduced the original cost basis assigned to the Prudential and Mountaincap CDOs. *Id.* Since an impairment charge taken on an asset is typically equal to the difference between the original cost basis of a security and the new cost basis, Maldonado sought to minimize the charge by reducing the original cost basis assigned to these two securities. *Id.* He did so by improperly offsetting excess interest payments that W. Holding received in 2002 on the income notes for these securities against their principal.[17] *Id.* This transaction had the effect of lowering the original cost of the Prudential and Mountaincap securities by approximately $1.7 million and $1.8 million, respectively. *Id.* Consequently, Maldonado improperly reduced the amount of the ensuing impairment charge by about $3.5 million. *Id.*

After he reduced the cost basis for the two securities, Maldonado then calculated the impairment charge. *Id.* However, he used management's estimates of fair value instead of available quoted market prices (as required by GAAP) to calculate the amount of the charge.[18] *Id.* In particular, notwithstanding the fact that he received correct price quotes for the CDOs from Bear Stearns for the first three months of 2003, he improperly calculated the write-down using an average of the much higher CDO prices for the last three months of 2002. *Id.* He also relied on the information included in the flawed March 10, 2003 Bear Stearns sensitivity and cash flow report to calculate the amount of the write-down. *Id.* In addition, for some of the securities, he incorrectly determined that they were not permanently impaired. *Id.* Thus, using flawed information, Maldonado concluded that an impairment charge totaling only $2.7 million was all that was necessary. *Id.* In fact, however, a write-down of $21.250 million was needed by that time to bring the CDOs to fair value. *Id.*

On April 22, 2003, W. Holding issued its first quarter earnings release, which took into account the grossly inadequate and miscalculated $2.7 million impairment charge. *Id.* The earnings release gave the impression that the securities were not significantly impaired, and did not cause any decrease in W. Holding's stock price. Exhibit 5. At the time it issued its first quarter 2003 earnings release, the Commission's Division of Corporation Finance was in the process of reviewing W. Holding's Form S-3 registration statement for a $300 million offering filed in March 2003. Exhibit 3. During its review, Corporation Finance discovered that W. Holding used management's estimates of fair value rather than quoted market prices in calculating the $2.7 million impairment charge, and it began questioning W. Holding about it. *Id.* In response to

---

[17] W. Holding had been receiving these excess interest payments since 2001 and correctly recorded the excess payments as income in that year. Exhibit 3 at 6.

[18] *See* Statement of Financial Accounting Standards No. 115 ("FASB 115"), *Accounting for Certain Investments in Debt and Equity securities.*

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Corporation Finance's comments about how W. Holding arrived at the impairment charge, Maldonado agreed to recalculate the charge using the quoted market prices. *Id.* However, rather than using market prices (the quotes as of March 31, 2003), Maldonado used what he described as "best efforts" prices. *Id.* Relying on his "best efforts" prices, Maldonado came up with an additional write-down of $13 million that W. Holding needed to book for the impaired CDOs, thus bringing the total write-down to $15.7 million. *Id.* Had Maldonado used the proper quoted market prices, the true amount of the write-down necessary would have been $21.250 million. *Id.* The impact on W. Holding's pre-tax net income for the quarter resulted in an overstatement of 67 percent. *Id.*

On March 31, 2003 and May 13, 2003, W. Holding filed a Form 10-K and an amended Form 10-K, respectively, for the year ending December 31, 2002, that failed to disclose subsequent event information concerning the impairment of its CDO portfolio. *Id.* Despite the fact that W. Holding was aware of the significant deterioration of the value of its CDOs before filing its Form 10-K, it failed to disclose that fact. *Id.* GAAP requires that events or transactions that have a material effect which occur subsequent to the balance sheet date but prior to the issuance of the financial statements require adjustment or disclosure in the company's financial statements.[19] W. Holding was aware of the significant deterioration of the value of its CDOs prior to the filing of the Form 10-K. *Id.* Additionally, the false month-end prices that Almanza provided to W. Holding had the impact of materially overstating its pre-tax net income, as reported in the Form 10-K and amended Form 10-K, by more than 15 percent. *Id.*

In a May 15, 2003 press release issued by W. Holding, it announced an additional $13 million write-down for the first quarter of 2003 relating to its impaired CDO portfolio. *Id.* The press release stated that "management, using quotations provided by broker-dealers, determined that an additional $13 million other-than-temporary impairment charge from the amount of $2.7 million previously reported, for a total charge in the quarter ended March 31, 2003 of $15.7 million, was warranted to adjust to fair value all of the investments in CBO's and CLO's." Exhibit 2. Management used what they identified as a verbal quote to support a portion of the $13 million additional impairment. *Id.* However, if quoted market prices were used, an additional loss of $3.25 million would have been realized.[20] *Id.*

W. Holding filed Form 8-Ks on April 22, 2003 and May 15, 2003, attaching the above-mentioned respective press releases. Exhibit 3. The press releases falsely represented that the CDOs had been adjusted to fair value and contained false and misleading earnings and other financial information which failed to properly recognize in earnings the full extent of the non-temporary decline in the fair value of the CDOs. *Id.* Additionally, on May 15, 2003, W. Holding filed a Form 10-Q for the first quarter ending

---

[19] *See* Statement of Financial Accounting Standards No. 5 ("FASB 5"), *Accounting for Contingencies.*

[20] As a result of this negative information, the share price of W. Holding's stock plummeted over 21 percent. Exhibits 2 and 3.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

March 31, 2003, which included a discussion regarding the additional $13 million impairment charge. *Id.* As was the case with the press releases, this Form 10-Q falsely represented that W. Holding's CDOs had been adjusted to fair value and contained financial information which failed to fully account for the impaired CDOs. *Id*

On May 21, 2003, W. Holding filed a Form S-3 registration statement that incorporated by reference the false and misleading amended Form 10-K for the year ending December 31, 2002 and Form 10-Q for the first quarter ending March 31, 2003. *Id.* Maldonado signed and certified the annual and quarterly reports described above. *Id.* On June 6, 2003, W. Holding sold the impaired CDOs back to Bear Stearns at quoted market prices and recorded on its books the additional loss resulting from the sale of the securities at market prices. *Id.*

Finally, in April 2003, the national office of W. Holding's independent auditors – Deloitte & Touche, LLP ("Deloitte") – became involved in assisting W. Holding with preparing its responses to a Corporation Finance comment letter in connection with its Form S-3 review. Exhibit 5. During that time, Maldonado asked Bear Stearns for an outstanding cash flow report that related to the inaccurate March 10, 2003 report. *Id.* In an e-mail dated April 30, 2003 from Betancourt to Bear Stearns Senior Managing Director Marjorie Hogan, Betancourt advised Hogan that Maldonado requested the cash flow for one of the scenarios in the March 10, 2003 report, and that Maldonado intended to use it to convince W. Holding's auditors how much of a write-down the company should take in light of the impairment. *Id.* Thus, it appeared that Betancourt and Hogan provided false price information to Maldonado with the knowledge that W. Holding was going to provide such information to its auditors (Deloitte) as support for the incorrect $2.7 million impairment charge.[21] *Id.*; Exhibit 6 at 46-51.

By using the materially false and misleading price information in the above-referenced press releases and in its SEC filings, W. Holding and Maldonado were able to "smooth" earnings (*i.e.*, to report a steady stream of earnings and/or growth in earnings) and thus paint a favorable picture for the shareholders. This is evidenced by the impact of the May 15, 2005 press release announcing the additional $13 million impairment charge on W. Holding's share value – a precipitous drop of more than 21 percent. W. Holding should have, but never did, restate its financial statements in the Form 10-K it filed for fiscal year ending December 31, 2002, as well as for the first two quarters of fiscal year 2003 (*i.e.*, the March 2003 and June 2003 Forms 10-Q). Exhibit 6 at 27-28, 58-60; Exhibit 7 at 13-15, 49, 53-58.

---

[21] MIRO Staff Accountant Karaz Zaki testified that when it appeared to Deloitte that it might have been deceived by Maldonado, it went to W. Holding's Audit Committee and requested that the company conduct an independent internal investigation. Zaki further testified that the investigation was conducted by a local Puerto Rican CPA firm called Adsuar, Munoz, which found no wrongdoing. Thus, Deloitte did not terminate its engagement with W Holding. Exhibit 6 at 46-51.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

II.  Referral of the W. Holding Company, Inc. Matter to Enforcement

On May 19, 2003, Corporation Finance referred the matter concerning W. Holding to the Division of Enforcement. Exhibit 3.[22]

Sometime between May 19, 2003 and October 14, 2003, Susan Markel – who was named Enforcement's Chief Accountant on June 19, 2003 – assigned the W. Holding referral to Assistant Chief Accountant Stanley Handwerger ("Handwerger"). Exhibit 8 at 12-13, 15. The referral indicated that Corporation Finance had determined that W. Holding used an internally-derived estimate of fair value to reflect its inventory of CBOs and CLOs, contrary to GAAP. Exhibit 9. GAAP requires that such financial instruments be valued at fair value and that quoted market prices in active markets were the best evidence of fair value. Exhibits 9 and 10; Exhibit 8 at 8-12. According to Corporation Finance, quoted market prices were readily available for W. Holding CBOs and CLOs. Exhibit 9.

Corporation Finance had limited the referral in scope to a single issue – the improper calculation of an impairment charge by W. Holding for the first quarter ending March 31, 2003. Exhibits 9 and 10. Nevertheless, the W. Holding referral remained at headquarters in Enforcement for nearly nine months before the matter was finally forwarded to MIRO for investigation.

Markel testified that these referrals to Enforcement were "distributed across the accountants in [her] group." Exhibit 8 at 31. The review of the referrals is considered part of the accountants' workloads. *Id.* at 29. There were approximately 30-35 accountants working in Enforcement's Washington headquarters at the time Handwerger was assigned the W. Holding referral. *Id.* at 31-36. At the time of Handwerger's W. Holding review, according to Markel, there was a "bit of a backlog" in the Office of the Chief Accountant with respect to its review of referrals. *Id.* at 32-34.[23]

On January 15, 2004, Handwerger sent a Referral Disposition Memorandum to Markel and Enforcement Associate Director Paul Berger, recommending further investigation to determine whether information contained in W. Holding's April 21, 2003

---

[22] W. Holding was the third largest public bank holding company headquartered in Puerto Rico as measured by its total assets, stockholder's equity and net income exceeding $11 million as of December 31, 2003. Exhibit 11.

[23] Markel also testified that since 2003, they "don't have as much of a backlog to work through." *Id.* This, she explained, was the result of new policies, procedures and supervisory review to expedite the "workup" necessary for making the determination of whether a referral should be forwarded to a regional office. Exhibit 8 at 33-35. When asked how many referrals her office currently receives each year, Markel's response was, "Several hundred, I think." *Id.* at 35. However, she could not state what percent of those referrals were actually forwarded to regional SEC offices for investigation. *Id* According to Markel, Enforcement has a database in use since 2003 that tracks those types of numbers *Id*

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

press release about its earnings and financial condition for the first quarter of 2003 was false and misleading.  Exhibit 12.  Handwerger further recommended exploring the motives for issuing such a release, and whether insider trading was involved.  *Id.*  Markel understood Handwerger's concern to be about the truthfulness of statements in the press release in relation to W. Holding's timing of the write-downs of the CBOs and CLOs. Exhibit 8 at 11-12, 17-18.

On January 16, 2004, Markel officially concurred with Handwerger's recommendation and the W. Holding matter was assigned to MIRO for further investigation.  Exhibit 12; Exhibit 8 at 25-26.

On February 5, 2004, Enforcement forwarded the May 19, 2003 Corporation Finance referral of W. Holding, under then-Deputy Director Linda Thomsen's name, to MIRO Associate Regional Director Glenn Gordon for his review and disposition. Exhibits 13 and 34; Exhibit 15 at 8, 35-37.[24]

After the referral was sent to MIRO, Markel's role going forward was merely "as a liaison or resource for them."  Exhibit 8 at 41.  She testified that she recalled a single November 2004 meeting with MIRO staff in Miami in which they discussed the W. Holding referral in general terms.  *Id.* at 43.  She had no recollection of any specific issues that were discussed at that time; nor did she recall having any further involvement in the W. Holding matter after the November 2004 meeting.  *Id.* at 43-49.  MIRO never sought technical assistance on any complex accounting issues related to W. Holding from Enforcement's Office of Chief Accountant; neither did that office follow up with MIRO's accounting staff.  *Id.* at 40-41, 43-44.

III.     The Matter Under Inquiry

On February 27, 2004, MIRO opened a Matter Under Inquiry ("MUI") into W. Holding.  Exhibit 13.  Harris, Jordan, Bronhard and Zaki were assigned to the investigation.[25]  Exhibit 35 at 9-10; Exhibit 6 at 9-10.  Between March 11, 2004 and July 28, 2004, the investigative team sent document requests to W. Holding, Deloitte, Bear Stearns, various analysts, and the New York Stock Exchange.  Exhibit 13.  Pursuant to those requests and over the course of the investigation, the entities produced approximately 53,000 documents.  *Id.*

---

[24] The actual decision to forward Corporation Finance's referral of W. Holding to MIRO was jointly made by Markel, then-Associate Director of Enforcement Paul Berger, and then-Deputy Assistant Director of Enforcement Timothy N. England.  Exhibit 8 at 38-39.  The memorandum forwarding the W. Holding referral to MIRO went out under Thomsen's name, although she took no part in the decision-making process.  *Id.*

[25] Initially, Gary Klein was assigned as branch chief on the W. Holding matter.  Klein never became involved in the investigation because he left the Commission for private practice shortly thereafter.  After Klein's departure, Assistant Regional Director Ivan P. Harris took over temporarily as branch chief on the W. Holding investigation until it was ultimately re-assigned to Jon Jordan.  Exhibit 35 at 8-9; Exhibit 6 at 9; Exhibit 16 at 10.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

The staff assigned to the matter (Harris, Bronhard, Zaki, and Jordan) also initially moved expeditiously to take sworn testimony, albeit on a voluntary basis, in light of the fact that there was no formal order of investigation. From the period of October 6, 2004 until February 14, 2005, the testimony of the following fourteen witnesses was taken (Exhibit 17):

1.  October 6, 2004:  Stanley C. Brach – Senior Managing Director Portfolio Strategies, Bear Stearns;

2.  October 7, 2004:  Marjorie Hogan – Senior Managing Director Mortgage Trading Department, Bear Stearns;

3.  October 8, 2004:  Adam L. Siegel – Analyst and Trader, Bear Stearns;

4.  October 26, 2004:  Luis Angueira – Investment Accounting Supervisor, W. Holding;

5.  October 26, 2006:  Hiram Mesonero – Assistant Vice President for Investments, Westernbank;

6.  October 27, 2004:  Erik Santiago – Financial Analyst, W. Holding;

7.  October 27, 2004:  Eva Toro – Manager of Comptrollership, Westernbank;

8.  October 28, 2004:  Vixson Baez – Financial Analyst, Westernbank;

9.  November 16, 2004 and December 17, 2004:  Rodolfo Betancourt – Vice President Financial Services Group, Bear Stearns;

10.  January 26, 2005:  Oswaldo Coll – Manager, Deloitte;

11.  January 28, 2005:  Jose Sierra – Senior Assistant Auditor, Deloitte;

12.  February 2, 2005:  Gilberto Del Valle – Partner, Deloitte;

13.  February 4, 2005:  Jose Jaime Rodriguez – Senior Manager and Director, Deloitte; and

14.  February 14, 2005: Ernesto J. Almanza, Jr. – Associate Director, Bear Stearns .

Former MIRO Staff Attorney Margarete Bronhard testified that she took the testimony of the Deloitte audit partner, manager and staff between January 26, 2005 and February 4, 2005.  Exhibit 7 at 41.  She believed that the auditors had provided W.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Holding "a rubber stamp of approval, that [the auditors] were not diligent, or if they had suspicions or ideas as to what was going on, that they look[ed] the other way." *Id.* at 41-42. Bronhard also felt that Deloitte lacked professional skepticism, and she and Zaki did not receive a comfort level that the Deloitte auditors performed their own due diligence. *Id.* at 42-43. Bronhard testified that she believed the investigative team was "pushing" to institute a disciplinary proceeding against Deloitte auditors pursuant to 17 CFR § 201.102(e) and that she recalled the charges being in an earlier version of the Action Memorandum.[26] *Id.* at 43. However, Bronhard testified, somebody "kiboshed [sic] it." *Id.*

> Bronhard went on to describe the intense pace of the initial investigation:
>
> We traveled, we were away for weeks on end taking testimony back to back. I mean, and typically you take a testimony and you have a little bit of a break, and then you take a few more people, it was just like, boom, boom, boom, boom, we're getting these people out this week, and so there was late nights, weekends, preparation to try and, you know, make sure that every "t" was crossed, every "i" was dotted, that we weren't going to miss anything, because we knew we only had, you know, these opportunities that we were going to Puerto Rico to take testimony from W. Holding and Maldonado, and that crew there, and then we'd go to New York, and so it was just a lot of pressure to get the case done because it was referred to us from – I'm not sure who referred it to Glenn [Gordon], but we wanted to do a good job on it.

*Id.* at 67-68.

IV.    Formal Order of Investigation

In the first week of February 2005, the MIRO staff made a request for formal order authority in connection with the W. Holding case. The staff represented to the Commission that it had been investigating potential violations of the federal securities laws by W. Holding "in connection with the impairment of certain of its assets, and the role that Bear Stearns and Co., Inc. may have played in those violations." Exhibit 11. The staff further represented that it had been investigating the matter without a formal order since February 2004 and had taken the testimony of numerous witnesses and obtained documents on a voluntary basis during that time. *Id.* It declared the investigation of the W. Holding matter "nearly completed," and maintained that the formal order was necessary because the staff was "unable to obtain the voluntary testimony of a former Bear Stearns employee who was at the center of the possible fraud" in the case. *Id.*

---

[26] 17 CFR § 201.102(e) provides for suspension and/or disbarment of those practicing before the Commission for failure to possess the requisite qualifications, engaging in unethical or improper conduct, willful violation of the Federal securities laws, or improper professional conduct as described therein.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

On February 15, 2005, the Commission granted the staff's request for a formal order of investigation in the W. Holding case (FL-3058). *Id.*; Exhibit 11.  The MIRO staff subsequently subpoenaed additional documents and took the testimony of additional witnesses.  Exhibit 17.  The following witnesses testified under oath and pursuant to subpoena between February 22, 2005 and June 6, 2005 (Exhibits 13 and 17):

1. February 22, 2005:  Ricardo Henandez-Rivera – Vice President Controller, Westernbank;

2. February 23, 2005:  Frank C. Stipes – Chief Executive Officer, Westernbank;

3. February 24, 25, and March 10, 2005:  Freddy Maldonado-Perez – Vice President for Finance and Investments, Westernbank;

4. March 7, 2005:  Marjorie Hogan – Senior Managing Director Mortgage Trading Department, Bear Stearns;

5. May 17, 2005:  Yat Wong – Vice President Pricing Group, Bear Stearns;

6. May 17, 2005:  Unmesh Bhide – Managing Director, Bear Stearns;

7. May 18, 2005:  James Egan – Co-Head of U.S. and Global Sales, Bear Stearns;

8. May 18, 2005:  Daniel J. Hoffman – Senior Managing Director Mortgage Sales Desk, Bear Stearns;

9. May 19, 2005:  Eric Banks – Managing Director Trading and Research, Bear Stearns;

10. May 19, 2005:  Gyan P. Sinha – Senior Managing Director, Bear Stearns; and

11. June 6, 2005:  Stanley C. Brach – Senior Managing Director Portfolio Strategies, Bear Stearns.

V.  Evidentiary Review, Issuance of Wells Notices, and Drafting of the Action Memorandum

Prior to issuing Wells letters in the case, Harris, Jordan, Bronhard, and Zaki met with MIRO's Regional Trial Counsel, Robert K. Levenson, to review the evidence gathered to date.  Exhibit 18 at 14-15; Exhibit 7 at 77; Exhibit 35 at 37-38.  Levenson,

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

who headed up MIRO's trial unit, was assigned to the W. Holding/Bear Stearns case.[27] Exhibit 18 at 7; Exhibit 15 at 13; Exhibit 35 at 35-36.

At the meeting with Levenson, the investigative team showed him their draft preliminary statement of facts for an Action Memorandum and related witness testimony transcripts. Exhibit 18 at 15-16, 39-40. Bronhard recalled Levenson remarking to the investigative team that he believed they had "a strong case [against Bear Stearns], but that probably Bear Stearns was going to fight like hell because they had the resources and they probably wouldn't want this type of publicity." Exhibit 7 at 77. Harris also testified that Levenson said he believed "it was a strong case." Exhibit 16 at 35.

Bronhard also recalled Nelson, Gordon, Harris and Jordan telling her that the W. Holding/Bear Stearns case was a high priority case. Exhibit 7 at 68-69. She believed it was a high priority case because it had been referred to MIRO for investigation by Washington and it became evident there were allegations of fraud involving Bear Stearns. Id. at 69-70. Bronhard's recollection was buttressed by Jordan, who stated that at the time, both he and Harris believed they "had a strong case." Exhibit 35 at 53. In fact, in his testimony before the OIG, Jordan remarked, "And to this day I still believe it was a great case." Id.

Levenson, however, contradicted the recollections of Bronhard, Harris and Jordan, stating that he believed the W. Holding/Bear Stearns case presented "some difficult and challenging issues." Exhibit 18 at 13-14. However, he said he was "intrigued" by them and had therefore decided to personally handle the case. Id.

On June 15, 2005, MIRO staff issued Wells notices[28] to Bear Stearns, Betancourt, Hogan, and Almanza, all of whom provided responses.[29] Exhibits 19 and 20. Levenson

---

[27] At all times relevant to the instant investigation, Levenson reported directly to MIRO Associate Regional Director for Enforcement, Glenn S. Gordon. Exhibit 15 at 7-8.

[28] The "Wells submission" process represents a critical phase in SEC investigations. Pursuant to the Securities Act Release No. 5310, Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations (September 27, 1972), at the conclusion of an Enforcement investigation where staff has decided to seek authority from the Commission to bring a public administrative proceeding or civil injunctive action against an individual or entity, Enforcement staff may advise prospective defendants of the proposed charges against them and provide them the opportunity to file a written statement "setting forth their interests and position" in accordance with Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 C.F.R. § 202.5(c). Prospective defendants use these responding statements--known by the SEC and the securities bar as "Wells submissions" -- as an opportunity to set forth the reasons why the staff should not pursue such action before the Commission brings formal charges.

[29] Bear Stearns, Betancourt, and Hogan were represented by Robert N. Weiner and Michael Trager of the Washington, D.C., offices of Arnold & Porter LLP. Almanza was represented by Paul A. Leder of the Washington, D.C., offices of Richard Spears, Kibbe, & Orbe, LLP. Exhibits 19 and 29; Exhibit 21 at 28, 78; Exhibit 16 at 26-27; Exhibit 7 at 61-63.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

reviewed the proposed defendant's Wells submissions and also attended two Wells meetings – one with W. Holding's lawyers and the other with Bear Stearns' counsel.[30] Exhibit 18 at 16, 21-22. MIRO never issued Wells notices to Maldonado and W. Holding, because the staff believed both would be willing to discuss settlement. Exhibit 35 at 35-36.

In the fall of 2005, the staff entered into settlement negotiations with counsel for W. Holding and Maldonado and a settlement in principle was reached with both of them. Exhibit 35 at 36, 45, 54-55; Exhibit 6 at 65-66.

After receiving and reviewing Bear Stearns' Wells submission, Levenson considered the possible ramifications of litigation with the other proposed defendants. Exhibit 18 at 16- 17. According to Levenson, Bear Stearns hired an expert witness from "Ohio State" who opined that there were problems valuing the CDOs. *Id.* Levenson believed that the expert's opinion would make the "underlying premise difficult to prove." *Id.* Levenson further asserted that when he discussed the W. Holding/Bear Stearns investigation with Harris, Jordan, Bronhard and Zaki, they all acknowledged there were difficulties assessing the value of the CDOs. *Id.* at 15-16.

Bronhard and Zaki completed a draft of the Action Memorandum. Exhibit 7 at 64. The Action Memorandum then went to Jordan, who "worked intensively" on it before giving it to Harris, who "ended up rewriting" it. Exhibit 35 at 37. According to Jordan, it was unusual for someone like Harris – who was an Assistant Regional Director – to become so involved in the actual drafting of the Action Memorandum. *Id.* Harris explained to Jordan that he felt "this was the most important case" in his section and thus edited the Action Memorandum himself because he "wanted to make sure that everyone who read [it] understood it." Exhibit 22. Eventually, Harris and Jordan finalized the draft Action Memorandum, and Harris left the Commission on August 2005. Exhibit 35 at 37; Exhibit 16 at 6-7.

The resulting September 25, 2005 version of the Action Memorandum – which Jordan referred to as his and Harris'version – named as proposed defendants W. Holding, Maldonado, Bear Stearns, Betancourt, Hogan and Almanza.[31] Exhibit 4; Exhibit 35 at 58. According to Jordan, Levenson reviewed the September 2005 Action Memorandum and they all "felt it was ready to go." Exhibit 35 at 58. That Action Memorandum recommended, among other things, that the Commission: (a) accept the settlement offers of W. Holding and Maldonado, in which both consented to the entry of a cease and desist order, and Maldonado also consented to the entry of a judgment requiring him to pay a

---

[30] The MIRO staff never issued Wells notices to Freddy Maldonado or W. Holding. The reason given in testimony to the OIG was that both potential defendants were actively engaged in settlement discussions with MIRO staff and it appeared a settlement was imminent. Exhibit 35 at 35-36; Exhibit 6 at 66.

[31] This was the most up-to-date version of the Action Memorandum for which Harris was responsible before his departure from the Commission. After Dumornay replaced Harris as Assistant Regional Director in January 2006, Dumornay "revamped the entire memo." Exhibit 35 at 55-56.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

civil monetary penalty; (b) authorize the staff to file civil injunctive actions against Bear Stearns, Betancourt, Hogan and Almanza for violations of, among other things, the antifraud fraud provisions of the federal securities laws and to seek accountings, disgorgement with prejudgment interest, and civil money penalties against them; and (c) authorize, but delay, the institution of public administrative proceedings against Betancourt, Hogan and Almanza pursuant to Section 15(b) of the Securities Exchange Act of 1934. Exhibit 4. The Action Memorandum, however, never made it to the Commission for consideration.

VI.     Initial Settlement Discussions

After Bear Stearns filed its Wells submission on August 8, 2005, its attorneys had a meeting with MIRO staff in Miami in September 2005. Exhibit 23 at 11. At the meeting, Bear Stearns' attorney, former SEC Enforcement attorney, Michael Trager, informed MIRO staff that Bear Stearns believed the matter had been overcharged, "and if it stayed like that, Bear Stearns would litigate." *Id.* On the issue of settlement, Trager stated that the door "was cracked slightly open about the ability to maybe reach a palpable resolution." *Id.*

Shortly thereafter, in October or November 2005, MIRO staff finalized a settlement in principle with Maldonado's attorneys, whereby Maldonado would agree to a non-scienter based fraud charge, a $100,000 penalty and a possible officer and director bar. Exhibit 35 at 45-46. At the same time, W. Holding also agreed to settle in principle for an injunction with no civil monetary penalty. *Id.* at 46.

VII.    W. Holding/Bear Stearns Case Stagnates

Inexplicably, after the meeting with Trager and settlement in principle with counsel for W. Holding and Maldonado, "momentum" to bring the W. Holding/Bear Stearns Action Memorandum to the Commission table "stopped." Exhibit 7 at 63-64. In fact, MIRO neglected to contact or pursue any further settlement negotiations with attorneys for Bear Stearns. Exhibit 23 at 11, 13-14.

As early as late 2005, Bronhard realized no activity had been taken on the draft Action Memorandum, she became frustrated and repeatedly inquired about its status. Exhibit 7 at 64; Exhibit 6 at 77. She believed that "something must be going on" and that she and Zaki were being kept in the dark because they "weren't in the so-called political inner loop." Exhibit 7 at 64. Bronhard testified that she began sending Jordan e-mails every few days asking, "What's going on with the 'W' Holding memo?" *Id.* She would wait a few days and when he did not respond she would again write him asking, "What's going on with the memos?" *Id.* Bronhard was concerned that if she did not persist with her efforts to find out about the status of the case, someone could later accuse her of "dropp[ing] the ball." *Id.* at 65.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Consequently, Jordan appeared at Bronhard's office and told her, "Don't send me that e-mail again." *Id.* Nevertheless, Bronhard responded to Jordan, "I'm going to send this e-mail because it's making me nervous myself, I'm like, I don't want to look bad after the fact that we've worked our tails off, [and] it's sitting on someone's desk." *Id.* at 66. Bronhard eventually left the Commission in September 2006. Exhibit 6 at 71.

Meanwhile, Harris' position as Assistant Regional Director, which had been vacant since August 19, 2005, was filled in January 2006 by Chedley C. Dumornay. Exhibit 24 at 6, 8. Upon taking the position, Dumornay inherited the W. Holding case, and asked to see the latest version of the draft Action Memorandum. *Id.* at 31.

However, Dumornay admitted that after Harris left, "things kind of just sat" and that he, Dumornay, "sort of back-burnered" the W. Holding case. *Id.* at 32, 34. In fact, Dumornay confessed that from January 2006 until August or September 2006, he delayed to "really start[] spending a lot of time on [W. Holding]…" *Id.* at 34-35, 39.

For a period of several months, from January 2006 to "late summer, early fall of 2006," Dumornay edited, revised and rewrote "the whole" Action Memorandum. Exhibit 35 at 56-58. Jordan testified that when Dumornay took over the supervision of the case, he did not involve Jordan in the revision process. *Id.* at 56. Instead, Dumornay had Jordan work on a number of other cases, while he had Zaki and Bronhard provide him with information for the rewrite. *Id.* at 56-58.

In September or October 2006, Dumornay completed his very belated review of the draft Action Memorandum, which he gave back to Gordon for review since "it was long time since [Gordon] had looked at the case." Exhibit 24 at 32, 36.

In testimony, Nelson indicated "surprise" at the fact that it took Dumornay as long as it did [nine months] to get brought up to speed on the case, and testified that such a delay would make him "concerned." Exhibit 21 at 90 – 91. Nelson asserted that a nine month delay of this nature "would not be ideal… [because] the investigation is suffering. I wouldn't be thrilled if somebody who was putting a whole lot of effort into getting up to speed would take that long." *Id.* at 92.

XIII.    Belated Efforts Made to Restart the W. Holding/Bear Stearns Case

In November 2006, at least fourteen months after the Miami meeting between Bear Stearns' counsel and the staff – Jordan called Bear Stearns' counsel, Trager, and advised "that the staff was prepared to proceed against Bear Stearns along the lines outlined in the Wells notice. The Wells notice going back to June 2005." Exhibit 23 at 14-15.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

By that point, Ernesto Palacios was assigned to replace Bronhard as the staff attorney assigned to the W. Holding/Bear Stearns case.[32] Exhibit 25 at 10-12. Palacios stated that normally, when a proposed defendant has been issued a Wells notice by the staff and there are no attendant mitigating circumstances, it is unusual for such a long period of time to go by – in this case one and one-half years (June 15, 2005 to December 2006) – without an action being filed by the Commission against the defendants. *Id.* at 12-13. Palacios also testified that because the matter had "fallen through the cracks," and so much time had elapsed since the original Bear Stearns' Wells notice, MIRO staff intended to "re-Wells" Bear Stearns. *Id.* at 16-17. It was Palacios' belief that the matter "fell through the cracks" because of the turnover in MIRO personnel (*i.e.*, Harris and Bronhard had both left the Commission), and that "there was a resurrection [of the case] once people were assigned to the matter again." *Id.* at 17.

George H. Mernick III, a partner at the law firm of Hogan & Hartson, who represented W. Holding and Maldonado, stated that in his experience, it is not unusual not to hear from the SEC on a case for 15 – 16 months, "[a]nd in fact, there are cases that I handled with the SEC years ago where, to this day, I never heard that the matter was terminated...." Exhibit 26 at 16.

IX.    Relationship between MIRO Regional Director Nelson and Counsel for Bear
       Stearns and Almanza

Underlying these events was the fact that Michael Trager, Counsel for Bear Stearns, Paul Leder, counsel for Almanza and MIRO Regional Director Nelson worked together in the SEC's Division of Enforcement Washington, D.C., headquarters in the mid-to-late 1980s. Exhibit 21 at 103; Exhibit 23 at 23. Back then, Nelson and Trager would get together when they were "footloose and fancy free." Exhibit 21 at 103. Nelson testified that now he only sees Trager "once every two or three years." *Id.* Nelson testified that he is friendly with Trager, that he sees him professionally, and that "he's a good lawyer." *Id.*

In describing his relationship with Nelson when they were both on the SEC staff, Trager stated, "we were friends and we definitely went out together." Exhibit 23 at 23. As to whether he and Nelson were still friends, Trager testified: "once somebody's my friend, and unless they've done something terrible to me, they are always my friend." *Id.* at 24. Since Trager left the Commission staff, he only recalled seeing Nelson at bar association-type events. *Id.*

---

[32] There was no staff attorney assigned to the case in the three-to-four month interim period between Bronhard's departure and Palacios' start on the case.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

IX.    Renewed Settlement Negotiations and a Potential Meeting in Washington

Shortly after Jordan notified counsel for the proposed defendants that the SEC was still prepared to proceed with the case, Trager requested another meeting at MIRO. Exhibit 23 at 14-15.

In December 2006, Trager returned to Miami for another meeting with the staff to discuss the case. *Id.* at 14-15. At the December 7, 2006 meeting with Palacios, Nelson, Jordan and Zaki, Trager reiterated the same points he made back in September 2005 as to why he believed the case was "overcharged." Exhibit 23 at 16-17. Trager believed the staff indicated a willingness to settle if the parties could agree on the right terms. *Id.* Trager responded that if Bear Stearns were "going to settle, it couldn't be for any conduct during 2003. It has to be limited to 2002 ...." *Id.* A monetary amount was not agreed upon at this meeting, but Trager felt the matter should be resolved administratively with a modest penalty. *Id.*

The staff's next communication with Trager took place in January 2007. Exhibit 23 at 18. According to Jordan, Trager "continued taking an aggressive stance," and in an unusual strategy, Trager attempted to "push" the staff to drop the charges against Almanza to something less than fraud, notwithstanding the fact that Trager did not even represent Almanza. Exhibit 35 at 68. Almanza was in fact represented by former SEC Enforcement attorney Paul Leder. *Id.* at 60.

In January 2007, based on discussions Dumornay had with Gordon and Nelson, Dumornay proposed to Trager that Bear Stearns pay a $5 million penalty to resolve the case. Exhibit 35 at 75-76; Exhibit 24 at 44-45. Trager counter-offered with a $250,000 penalty, which the staff considered "insulting." Exhibit 35 at 76. Gordon declined the offer. *Id.* Trager subsequently raised Bear Stearns' offer to $500,000. *Id.* at 77. This was a figure that, although still low, was something the staff felt they could work with in continuing negotiations and was "getting closer." *Id.*

During the ensuing settlement negotiations, Trager succeeded in persuading the staff to drop Hogan and Betancourt as potential defendants and to drop the fraud charge against Bear Stearns. Exhibit 24 at 49-50. Thus, MIRO staff agreed to proceed against Bear Stearns with only a "failure to supervise case." *Id.* at 50. When Zaki was asked in testimony why Hogan and Betancourt were dropped as defendants, she responded, "I do not know. I wish I did." Exhibit 6 at 77.

The MIRO staff then revised the Action Memorandum to reflect the agreement made with Trager. The April 25, 2007 version of the Action Memorandum shows that the staff dropped Betancourt and Hogan as proposed defendants, and removed the fraud charge against Bear Stearns.[33] Exhibit 3. By dropping Betancourt and Hogan, the staff

---

[33] The fraud charge against Bear Stearns would have been brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

was no longer pursuing the fraudulent conduct engaged in during 2003. Exhibit 35 at 67–68. Removing Hogan and Betancourt as defendants also foreclosed the possibility of charging them for their role in providing Maldonado with the fraudulent pricing information he turned over to W. Holding's independent auditor, Deloitte. Exhibit 3.

Palacios expressed concern about MIRO's decision to remove Hogan and Betancourt from the Action Memorandum. Exhibit 25 at 32. Palacios pointed out that:

> [t]here seemed to be e-mail correspondence [between Hogan and Betancourt, which showed] that Ms. Hogan became aware that this practice was going on at some point. And that's why we included her, or at least we I mean the investigative team had included her in the Wells ….. I think the intention was to file an action against her as well because at some point she became aware that this practice was going on.

*Id.* at 32-33.

MIRO also renewed settlement discussions with George H. Mernick III, counsel for W. Holding and Maldonado. Mernick stated that he heard nothing from MIRO until some 15 or 16 months after initial settlement discussions. Exhibit 26 at 13. Mernick recalled Jordan calling him in February 2007 to suggest reducing the proposed civil monetary penalty from $100,000 to $75,000. *Id.* Mernick stated that Jordan gave no reason for the delay. *Id.* at 14.

Andres Rivero, an attorney who represented Maldonado in his individual capacity, recollected negotiations with MIRO staff in the summer of 2005, but then discussions "dropped off" until "a number of months later; … the call [from MIRO] was, hey, … this is back on the radar screen and we need to resolve this or we're going to move forward." Exhibit 27 at 15– 16.

During this time period, MIRO was also having settlement discussions with Paul Leder, Almanza's counsel. In an April 10, 2007 e-mail, Gordon relayed Leder's request for a meeting with Washington to discuss the matter. Exhibit 28; Exhibit 35 at 69-70. Gordon attempted to find a mutually convenient time for him, Dumornay, Jordan, Palacios and Leder to meet with Washington. Exhibit 35 at 71-72.

In an April 11, 2007 e-mail to Palacios, Zaki, and Dumornay, Jordan wrote that he had a conversation with Leder, who said that he "would be interested in hearing any potential settlement options" from the staff's end. Exhibit 29. Jordan further wrote that although Leder felt that the fraud and aiding and abetting books and records violations were harsh, he did not "want to foreclose his client from considering settlement possibilities with the SEC…." *Id.* Jordan believed that if they would have pushed Almanza with the threat of a fraud charge, he would have eventually settled because Almanza had already retired from the industry. Exhibit 35 at 78.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Initially, settlement discussions progressed well with Leder and staff believed a meeting in Washington would not be necessary. *Id.* at 72. However, MIRO was unable to finalize an agreement with Leder, and he renewed his earlier request for a meeting with Washington. *Id.* at 73. Once again, staff began attempting to pin down a date for a meeting in Washington with Enforcement Chief Counsel Joan McKown and Walter Ricciardi, then-Deputy Director of Enforcement. Exhibit 24 at 52-53. A meeting was scheduled for August 2007. *Id.* at 57-58.

At that point, negotiations with Trager, on behalf of Bear Stearns, had progressed to a point that there was agreement on a failure to supervise charge against Bear Stearns, and the only remaining issue to be worked out with Bear Stearns was the amount of the civil monetary penalty. Exhibit 35 at 74.

The settlement negotiations with Trager continued, at which time the staff and Trager reached a settlement in principle whereby the Bear Stearns would pay a civil monetary penalty of $500,000, with a failure to supervise charge in an administrative proceeding. Exhibit 23 at 16-20.

Thus the staff had settlements in principle with W. Holding and Maldonado as well as with Bear Stearns. Exhibit 24 at 62. Nelson testified:

> Generally, I think we finally reached a point I thought or we were close to reaching a point with Bear Stearns where we'd figured out some civil money penalty paid. And it was sort of coming down to fine tuning as to whether they would have some direct violations or that we could evolve as a supervisory case....It was pretty evident to me that we could have settled it.

Exhibit 21 at 86.

Nelson confirmed that the dollar amount of the settlement in principle with Bear Stearns was in the six figures, and that a settlement with Almanza was likely as well. In that regard, he stated, "I'm confident we could have gotten him to sign up for something" because Almanza had already retired from the business. *Id.* at 87.

## X.    Nelson Decides to Drop the W. Holding/Bear Stearns Case Entirely

In an e-mail dated August 14, 2007, Nelson wrote that the week of August 27, 2007 looked good for the meeting with Leder in Washington, D.C. Exhibit 30. However, before the meeting actually occurred, Nelson decided to close down the entire case. Sometime after August 22, 2007, Gordon so advised Dumornay. Exhibit 24 at 60, 70, 87.

Nelson called Trager to inform him that his client (Bear Stearns) would not be charged, and told him:

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> Just saying you're going to be happy with this. It's a surprise and you're going to be happy with the surprise but, you know, you probably wouldn't have expected this result.

Exhibit 21 at 112.

Trager testified that Nelson said to him in the phone call, that he could tell Bear Stearns "that Christmas is coming early" this year and "Bear Stearns can keep their money." Exhibit 23 at 33-34.

Nelson described why he thought Trager would be surprised when he got the call about dropping the case:

> Because he was offering to settle for half a million dollars and it's a little bit unusual as I said earlier for us to make a decision like this.  Because as I said, the easy decision is take what you got and send it out. But we actually put some extra thought at the time, thought into it and said this looks like an old case that isn't going to get a lot for us.

Exhibit 21 at 112.

Nelson further stated that MIRO has closed other cases that have been on the verge of settlement, although he admitted this does not happen very often.  *Id.* at 113.

Mernick, counsel for W. Holding and Maldonado, stated that when Jordan called him in November 2007 to inform him that the case was closed, Jordan "said that the staff had determined to terminate the investigation with no charges against Mr. Maldonado or the company or anyone else." Exhibit 21 at 17.

Rivero, Maldonado's personal counsel, stated that MIRO had been "totally silent" for a period of over a year until he received a call from Jordan in November 2007, during which Jordan told him that Maldonado would not be civilly charged and that the matter would be closed as to Maldonado. Exhibit 27 at 21.

XI.   Washington Approved Decision to Close the W. Holding/Bear Stearns Case

Enforcement Chief Counsel Joan McKown reviews and makes the final determination on all case closing recommendations when no enforcement action is taken. Exhibit 31 at 18.  According to McKown, she reviews the case closing recommendations "to make sure that it seems like the right decision is being made."  *Id.* at 20-21.  McKown testified that when she reviewed the W. Holding case closing recommendation, she had no question that it appeared appropriate and was the correct decision.  *Id.* at 21.

McKown testified that she considered the W. Holding case to be a "light case" because it was a "short period of time that the conduct occurred," and that the age of the case was a "problem."  *Id.* at 28, 40-41.  McKown stated that it was a "resource issue" for the Enforcement Division in deciding what cases to bring, and that in this case, "we

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

thought that they may have violated the law, so I mean this is not a case where the staff thought no violations had taken place, and I don't think anyone is suggesting that. But balanced against everything else, it was appropriate to close." *Id.* at 41.

When asked why the case was closed when MIRO had already negotiated with the defendants, McKown said "we have that happen," and "even if a case is settled, you still have to have everyone's support that it's an appropriate case to bring." *Id.* at 22.

XII.    The U.S. Attorney's Office's Concurrent Parallel Criminal Investigation

In May 2005, while MIRO was conducting witness examinations in the W. Holding case, a matter involving another Bear Stearns employee's questionable pricing of CDOs was brought to the attention of the United States Attorney for the Southern District of New York. At that time, Alexander Southwell was working as an Assistant U.S. Attorney in the Securities Fraud Unit. Exhibit 32 at 5. His duties and responsibilities included investigating and prosecuting violations of federal securities laws. *Id.*[34]

Southwell testified that in May 2005, he was contacted by an acquaintance named Robert Mintz ("Mintz"), an attorney from the law firm of McCarter & English. Mintz represented Hudson United Bank, which wanted to bring a complaint to the attention of the U.S. Attorney's office. *Id.* at 7. A meeting was arranged, during which Mintz provided Southwell with a copy of a letter that they had also sent to the New York State Attorney General's Office, containing allegations about the pricing of two CDOs that Bear Stearns had sold to Hudson United Bank. *Id.* at 8.

Hudson United Bank alleged that Bear Stearns had sold the securities to it in 2002, and had been providing monthly marks at the market price throughout 2003 and 2004. *Id.* at 10-11. However, in late 2004, when Hudson United Bank told Bear Stearns that it was interested in selling, Bear Stearns got a new price, that was much lower, 70 percent or so, leading the bank to be concerned that it had been defrauded. *Id.*

Shortly after the meeting with Mintz and Hudson United Bank, Southwell opened an investigation into the matter with the concurrence of his supervisors. *Id.* at 6-8. Southwell could not recall whether he learned about the existence of the related SEC investigation from Hudson United Bank, or from representatives of Bear Stearns. *Id.* at 8-9. However, upon learning of the SEC investigation in September 2005, Southwell contacted Bronhard at MIRO. *Id.* at 13-15.

Bronhard told Southwell that MIRO was looking at "similar allegations with a different alleged victim, but the same alleged perpetrator." Southwell Tr. at 17. During his testimony, Southwell clarified that the Bear Stearns employee that Hudson United

---

[34] Southwell is currently a defense attorney at Gibson, Dunn & Crutcher, LLP, where he has worked for about a year. Exhibit 32 at 5.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Bank complained about was not Almanza. *Id.* at 17-18.[35]  However, Southwell found it significant that "the fact of having two investigations into the same general type of conduct spoke to at least potential systematic problems at Bear Stearns, as a company." *Id.* at 19.

Southwell testified that he "informed the person at the SEC about [his] investigation, and about this nexus, and asked to be apprised of the status of their investigation." *Id.* at 21.  Southwell subsequently made an access request for information, which the Commission granted on October 11, 2005. *Id.* at 14-15.

However, MIRO never submitted an access request to the U.S. Attorney's Office which, if granted, would have resulted in MIRO obtaining information about Hudson United Bank. Exhibit 33.  If MIRO had requested and obtained a copy the Hudson United Bank complaint from U.S. Attorney's Office, MIRO would have uncovered potential systematic problems at Bear Stearns in determining the market price and assessing the value of additional CDOs issued and held by Bear Stearns.  Instead, MIRO only focused its investigation on the Mountaincap CLO income note and Prudential CBO income note. *Id.*

When over a year passed without the SEC contacting him about his concurrent investigation, Southwell attempted to contact Bronhard for a status on the Commission investigation on February 8, 2007. *Id.* at 22-23.   However, Bronhard had left the Commission, and Southwell spoke with Branch Chief JonJordan. *Id.* at 23-24.

During the call, Jordan revealed to Southwell that the Commission had not closed its investigation; that the SEC had Wells'd both W. Holding and Bear Stearns, and that MIRO was "in hard core settlement talks, hoping to be done by September [2007]." *Id.* at 25-26.  Jordan insisted to Southwell that MIRO believed Almanza to be a "rogue trader" who had acted on his own, confirming the defense provided by Bear Stearns. *Id.*

Southwell questioned Jordan about the "rogue trader" theory, since Southwell was concerned about the conduct in question being a larger problem at Bear Stearns:

> "I think I asked whether there was anything that they had learned that suggested this was a systematic problem at Bear Stearns, and [Jordan's] response was, which paralleled the response from Bear Stearns, was that it was just a solo actor."

*Id.* at 25.

Southwell placed importance on the fact that Bear Stearns' traders out of New York and Florida were being investigated for the same type of conduct:

---

[35]   Southwell stated because of Federal Rule of Criminal Procedure 6E, he was unable to provide more details pertaining to the investigation he conducted as a U.S. Attorney.  Exhibit 32 at 8.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> "There were certainly allegations of issues with respect to pricing, and that there was more than on trader involved in the pricing of those."

*Id.* at 32.

He added:

> "I mean, there were also news articles about these issues going on. They [sic] were general problems with pricing of CBO's at the time. So there was more out there than just the rogue trader story, and certainly more that would suggest that there might be systematic problems."

*Id.* at 32-33.

Southwell went on to say that finding out the results of the Commission investigation would be "useful to understand what they learned, and how it developed, because that would be relevant, the question of whether there was some systematic issue." *Id.* at 34.

Enforcement failed to follow up with the U.S. Attorneys' Office, despite the fact that an information access request had been made to MIRO and Southwell indicated to at least two MIRO staff that he was interested in the status of the case. Southwell indicated that if he had been told that the SEC was not only looking at the conduct of Almanza, but also of Betancourt, Hogan and Maldonado, "I certainly think that would be something that a U.S. Attorney's Office would be interested in knowing about, and possibly investigating." *Id.* at 36-38. Southwell went on to say that he was not sure if the SEC had rules about sharing such information, "[b]ut as a matter of professional courtesy, when you're conducting an investigation that has some parallels, it's typical to share information, and as I shared information with them about our investigation the best that I could, would have expected them to share information with us .... I think it certainly would have been important to know." *Id.* at 42-43.

Southwell indicated that the U.S. Attorney's Office might have pursued its investigation further had MIRO provided him with information about its investigation of the matter. He stated to MIRO staff on at least two occasions that he thought there might be a systematic problem with pricing at Bear Stearns, and stated that the U.S. Attorney's Office was "relying on [the] information that was provided" by the Commission, however, he was never informed by MIRO that they closed the investigation. *Id.* at 45, 58.[36]

---

[36] During his testimony, Southwell expressed surprise upon learning that the Commission had a settlement in principle with Maldonado, W. Holding and Bear Stearns, and that the Commission subsequently dropped the case. Exhibit 32 at 54.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

MIRO senior management, however, inexplicably claimed that they were not aware of a related investigation by the Southern District of New York, even though as the head of the office, Nelson signed off on the information access request.

MIRO Associate Regional Director Glenn Gordon also denied knowledge of the parallel criminal investigation by the U.S. Attorney's Office for the Southern District of New York, stating, "I am not aware of any such parallel investigation." Exhibit 15 at 89. Harris, too, denied any recollection of a criminal investigation or criminal interest on the part of the U.S. Attorney's Office. Exhibit 16 at 41.

Palacios, the staff attorney who took over the W. Holding investigation after Bronhard left the SEC, said he never discussed the interest of the U.S. Attorney's Office with any MIRO staff; nor did he discover that the access request had been made. Palacios denied knowledge of the criminal interest in the case or any contact with the U.S. Attorney's Office. Exhibit 25 at 74. In fact, he testified he was unaware that the access request had been granted. *Id.* at 89. Palacios stated that he did not "remember there being criminal interest at least at the time that I was involved in the investigation." *Id.*

Chedly Dumornay, Assistant Regional Director of MIRO, also denied knowledge of the parallel investigation by the U.S. Attorney's Office, and stated that common practice would have been to share information in such an instance:

> ... I don't remember any [criminal investigation]. If there were I mean we would have been working with that. We usually do. I mean I would never, if there were, was criminal interest I would never not contact the U.S. Attorneys assigned to the case to, to talk about coordinating and, you know, working together. I mean that's, that's, I mean to my, to my knowledge there, there wasn't. If, if there was I was never told about it.

Exhibit 24 at 119-120.

Despite disavowing knowledge of the U.S. Attorney's Office interest in the case, David Nelson, the Regional Director of MIRO, stated that he "probably signed off" on the formal access requests from the U.S. Attorney's Office. Exhibit 21 at 74.

XIII.   The Reasons Given by MIRO for Closing the W. Holding Investigation

The staff uniformly expressed surprise that the case had been closed, and no plausible reasons for its closing were provided by MIRO management.

Jordan stated that he did not know who made the decision to close the case. Exhibit 35 at 79-80. He said Dumornay called him into his office and told him that the case was being closed. *Id.* at 79. Jordan was "shocked" that the case was being closed, especially when there were settlement offers on the table. *Id.* at 79-80. According to Jordan, nobody had spoken with Jordan about the decision to close the case before it was

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

made. *Id.* Jordan stated that he "wanted to scream and yell and … go and argue and say, why the heck did you guys do this?" *Id.* However, Jordan didn't do so because "that would do nothing for [him] in this place but make [his] life miserable," and it "definitely would not help [his] career." *Id.* at 80.

Zaki testified that she was in her office when Dumornay came in and told her that a decision had been made and that Nelson and Gordon told him that the W. Holding case was being closed. Exhibit 6 at 78-79. According to Zaki, Dumornay mentioned something about the statute of limitations and the case being old, and Zaki "blanked out." *Id.* at 79. She was very upset. *Id* Palacios similarly testified that either Jordan or Gordon came into his office and said they were closing the case. Exhibit 25 at 58. Palacios said "we were surprised when it was closed." *Id.* at 67. Bronhard described her reaction as "perplexed," concerned" and "upset." Exhibit 7 at 93.

According to the staff, the primary justification provided for closing the case was "litigation risk." Palacios indicated MIRO management informed him that "there was some litigation risk associated with this case." Exhibit 25 at 77. He added, "I figured it was closed because we just didn't want to litigate it because we thought that there was a possibility that we could lose, and that was basically it." *Id.* Bronhard testified that it was a possibility that the case was closed because MIRO was afraid to litigate. Exhibit 7 at 99.

Dumornay said he went to each of the three staff members and "told them that Glenn [Gordon] just thought the case is just too risky …. I mean too much litigation risk …. And, they want us to close it." Exhibit 24 at 96. Dumornay explained to Jordan, Palacios and Zaki that "the decision was made above us." *Id.* at 97.

Dumornay elaborated that he believed Gordon and Nelson "always had concerns" and were "never comfortable" with the case. *Id.* at 88, 101-102. He testified that in different meetings, Nelson kept pushing the view that "it's just a rogue trader." *Id.* at 88. Dumornay recalled Nelson repeatedly questioning the decision to go forward with litigating the matter, and being concerned that Bear Stearns "could get an expert" to show that Almanza's prices were right, and therefore possibly lose the case. *Id.* at 89.

Dumornay concluded, "I think [Gordon and Nelson] just felt that there was too much risk there and that's why they decided to close it. I don't think it was for any other reason." *Id.* at 102.

Robert Levenson, MIRO Regional Trial Counsel, testified, however, that a case would not typically be closed due to litigation risk alone, stating, "the decision as to whether to settle are made for a lot of different reasons besides litigation risk or value." Exhibit 18 at 25. Levenson further stated that MIRO could have litigated against Almanza separately and taken on any perceived litigation risk:

"If someone had come to me and said this is what we are going to do, we

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

are going to file an unsettled action against Almanza only, I would have said okay…[i]t wouldn't have been without risk but I don't think I would have had a problem doing that if somebody had asked me that."

*Id.* at 24.

Levenson could not say that it made any sense to close the case with three settlement offers in principle on the table, and could not recall ever having another situation where there were three offers to settle on the table without at least presenting the settlement offers to the Commission. *Id.* at 26, 36.

The OIG asked Levenson if litigating against Almanza alone would have been less work than having to litigate against Bear Stearns:

"It certainly would have been less work. No question about that because there was one defendant and one lawyer versus probably, you know, … probably doesn't have the same kind of resources as the company."

*Id.* at 51.

Levenson further stated that it was "not irrational speculation" to suppose that someone with Almanza's limited resources would likely have wanted to settle at some point rather than bring this case to litigation. *Id.* at 53. He added that there is litigation risk in every case, stating, "Any case has a litigation risk because there is no guaranty [sic] you are going to win." *Id.* at 12.

Although the staff was informed that the reason for closure was "litigation risk," when asked by the OIG why the case was closed, Associate Director Gordon and Regional Director Nelson provided other explanations.

Gordon stated that they believed that they had a "basis for the case," but claimed that the decision to close the W. Holding case was predicated upon the "bigger question" of "whether to pursue a case against Bear Stearns or anyone there." Exhibit 15 at 78. Gordon described the consensus about Almanza was "that he did not follow Bear Stearns' policies, that he did create his own calculations and that he provided them to W. Holding and should not have done that. And that we felt was misconduct."[37] *Id.*

Gordon further stated that once the decision was made not to bring a case against Almanza, the case against Bear Stearns and other potential subjects was no longer viable. Gordon explained that the "real focus" should have been on "Almanza's conduct." However, once the decision was made not to bring the case against Almanza, "then

---

[37] MIRO Regional Director Nelson testified that he believed W. Holding to be a "pretty significant case." Exhibit 21 at 39.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

although we have a legal basis to still bring a failure to supervise case against the firm, it would be odd." Exhibit 15 at 79.[38]

In addition, when asked to provide the reasons why the W. Holding case was closed, Nelson, who made the ultimate decision to close the investigation, also did not mention "litigation risk." Nelson stated that at the time they were deciding on the fate of the W. Holding case, there was "pressure" coming out of Washington, D.C. regarding the age of cases and that this was a factor in the decision to close it. Nelson described "a little bit of call to arms around [E]nforcement to say, hey, think twice before, you know, you bring a case, think about what you're accomplishing here." Exhibit 21 at 107.

Nelson stated that "some of the Commissioners were not particularly receptive to old cases. They were asking questions about why they were relevant and what do you accomplish by doing this. And in that framework, I thought actually it was worth sitting down and making some of the tough choices. It's not easy to walk away from a case that you've spent a lot of time on." *Id*. at 105-106.

Nelson indicated that if the case had been brought before the Commission, he expected that MIRO would have received flak "about the age of the case and what took so long …. What happened, you know, why are we, we notice that you got the case here, then a year passed, and then a[nother] year. What were you doing, why did it take so long to finish the case?" *Id.* at 107.

Nelson actually said he believed the staff supported the decision to close the case because it was so old, stating, "I think the consensus was, at least what I was hearing from sort of the branch chief -- there's some sort of relief, too. It's a really old case. Nobody's really got the appetite for it. And if you guys think it makes sense to shut her down, we'll go on to the next." *Id.* at 108.[39]

Nelson called John Heine, the Deputy Director in the Office of Public Affairs, after the press called MIRO regarding its closing of the Bear Stearns investigation. Exhibit 34 at 6. Nelson sought counsel from Heine because Bear Stearns had publicly disclosed that they had been contacted by SEC staff, and that enforcement action was

---

[38] Gordon also testified "there were too many risks" to recommend a case against Hogan after the case against Almanza was dropped. Exhibit 15 at 79-80.

[39] A similar circumstance of investors not being able to receive timely information due to Commission inaction was detailed in the SEC OIG Audit Report titled, Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program Report No.446-A, dated September 25, 2008. The OIG audit revealed that the Division of Corporation Finance (Corporation Finance) failed to review a Bear Stearns 10-K filing in a timely manner, resulting in a seven-and-a-half month delay in Corporation Finance sending its comment letter to Bear Stearns. The Corporation Finance comment letter, coupled with Bear Stearns' response letter, contained material information which would have aided investors in making better-informed investment decisions. The dilatory review by Corporation Finance deprived the marketplace of the opportunity and information required for informed decision-making immediately precedent to the collapse of Bear Stearns.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

contemplated, and then when the Commission ultimately took no action, the press became interested in why it was closed with no action. *Id.* at 8-9.

Heine testified that Nelson told him the case was closed primarily because "the violations were to some degree dated." *Id.* at 11.  Nelson also related to Heine his concern as to "whether the Division would be successful in [its] recommendation to the Commission to take some kind of action." *Id.*

Other possible explanations for closing the investigation were similarly disturbing.  Bronhard, the initial staff attorney assigned to the W. Holding investigation, testified that she felt the W. Holding case was closed with no action because Jordan did not have an "understanding" of the case:

> [It p]robably just sat on somebody's desk, and nobody did anything.  And when I left I went to Karaz, and I was concerned.  I said, "Oh, they're going to give the case to Ernie", and I wasn't sure how well, or how deep of an understanding Jon Jordan had of the specific securities, and how they worked, and how they were valued, so I -- and I remember when I was leaving I said, "Karaz, I'm concerned, I really want this case to be brought", and I even said to pardon me for being a little bit jealous, I said, "Ernie's going to get all the glory", but I just think it sat there, that would be my opinion.  I don't know why, I mean, because if you look at this, we were pretty much settled with Maldonado and the bank, and then even if -- maybe they didn't want to litigate Bear Stearns.  Maybe Bear Stearns was going to fight.

Exhibit 7 at 98.

Zaki also testified that she felt that neither Gordon nor Nelson truly understood the nature of the W. Holding case when they made the decision to close it.  Because of their fundamental misunderstanding of the case (and the bad press that they thought could result), it was closed:

> [At] the time that it was determined to be closed was right when the subprime market was blowing up and right after that.  And I think that their understanding, them being Dave and/or Glenn, of this case, that they may have thought that it had something to do with subprime, when it didn't.  And I think they didn't want to bring it because it could have been bad press for them or us at the SEC.

Exhibit 6 at 112.

Zaki testified that when she was advised by Dumornay of the decision to close the investigation, he said "something about statute of limitations, the case was closed, old, I blanked out.  Because I thought there are more older cases that I'm working on still that we are about to bring actions on." *Id.* at 78-79.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Zaki stated that she could not comprehend why such a strong case was dropped and closed, stating·

> "I just can't imagine why the case was closed. Terrible, but something went wrong with somebody. I don't know who it was. I don't know if somebody, I hate to say it, was covering their ass about something or had undue influence."
> *Id* at 111-112.

### Conclusion and Recommendation

The OIG investigation found that Regional Director David Nelson failed to administer his statutory obligations and responsibilities to vigorously enforce compliance with securities laws in connection with the W. Holding/Bear Stearns investigation.

This matter is being referred to the Executive Director, Chief of Staff and Chairman for disciplinary and/or performance-based action for David Nelson.

Submitted·   Brian Bressman
             Samuel W. Morris

Concur.      Noelle Frangipane

Approved·    H. David Kotz

Date:   September 30, 2008