# Exhibit 4

**PRIVATE**

**November 7, 2008**

From:      **Brenda P. Murray**
           **Initiating Official**
           **U.S. Securities and Exchange Commission**

To:        **Diego T. Ruiz**
           **Executive Director**
           **U.S. Securities and Exchange Commission**

**Report of Initiating Official on Administrative Process for Disciplinary and Performance-Based Action Recommended by U.S. Securities and Exchange Commission Inspector General in Case No. OIG-483: Investigation Concerning Failure to Vigorously Enforce Action Against W Holding Company, Inc. and Bear Stearns & Co., Inc. at the Miami Regional Office**

The Securities and Exchange Commission's (Commission) Inspector General (IG) delivered to Commission Chairman Christopher Cox a Report of Investigation: Case No. OIG-483 (OIG-483) on September 30, 2008, that resulted from an inquiry to the IG by United States Senator Charles Grassley (Senator Grassley) on April 2, 2008. Senator Grassley wanted to know why the Commission closed an investigation of Bear Stearns & Co., Inc. (Bear Stearns), among others, without any action by the Commission's Division of Enforcement (Enforcement).[1] (IG Memorandum Sept. 30, 2008.) Senator Grassley directed that the report describe and assess:

> whether there was any improper action or misconduct relating to the investigation of Bear Stearns and the decision to close the investigation;
>
> the nature, extent, and propriety of communications between Bear Stearns's executives or their representatives and senior Commission officials;
>
> the decision-making process which led to the Commission's failure to bring an enforcement action following the drafting of a Wells notice;
>
> the reasons for declining to proceed with an enforcement action; and
>
> the degree to which more aggressive action by the Division may have led to an earlier and more complete understanding of the issues that contributed to the collapse of Bear Stearns.

---

[1] I will cite to OIG-483 as "OIG-483 at __." OGI-483 is a thirty-eight page document with thirty-five exhibits.

On October 21, 2008, the Commission's Executive Director appointed me as Initiating Official with respect to OIG-483's conclusion that Commission Regional Director David Nelson (Nelson) failed to administer his statutory obligations and responsibilities to vigorously enforce compliance with securities laws in connection with the W Holding Company, Inc. (W Holding), and Bear Stearns investigation, and the IG's recommendation that Nelson be subject to disciplinary and/or performance-based action.[2]  (OIG-483 at 38.)  The Executive Director instructed me to complete the task by November 7, 2008.

I advised Nelson that I would accept written statements preferably by October 29, 2008, but at any time before I finished the task. At Nelson's request, I asked the IG for a copy of the sworn, on-the-record testimony of Walter Ricciardi (Ricciardi), former Enforcement Deputy Director, taken on September 10, 2008, that is referred to in OIG-483 at 7. The IG refused to furnish the requested material.  Memorandum on Requests for Office of Inspector General Files in Connection with Reports of Investigations in Case Nos. OIG-431 and OIG-483 CONFIDENTIAL (Oct. 28, 2008).

Nelson filed a written response on October 29, 2008, that consists of a written presentation and seven exhibits: (1) Affidavit of Nelson; (2) Case Closing Report, W Holding; (3) Enforcement's Memorandum to the Commission (Oct. 10, 2008); (4) Resume of Nelson; (5) Cases Filed: Nelson as Regional Director; (6) Copy of news article, *Did Authorities Miss a Chance to Ease Crunch* (Dec. 10, 2007); (7) e-mails December 6-7, 2007.  (Response of Nelson to OIG-483 (Nelson Response).)

I have applied a preponderance of the evidence standard, that is whether a reasonable person, considering the contents of OIG-483, would conclude that Nelson breached the applicable laws, rules, and ethical standards so that the action the IG recommends is appropriate. (Merit System Protection Board Basic Procedures, Chapter 2.)

## IG's Report of Investigation and Conclusions

### Contents of IG Report

The IG's Report of Investigation does not support his conclusions. First, his statement of facts relies heavily on an Action Memorandum dated April 25, 2007, to the Commission. (OIG-483 at 10-15, Exhibit 3.)  An Action Memorandum could be viewed as a biased document because it

---

[2] Nelson is a graduate of Princeton University in 1979 and Georgetown University Law School in 1983.  He is a member of the bar of the District of Columbia. Nelson has been an attorney with the Commission since 1984.  While at the Commission, Nelson served as a Special Assistant United States Attorney. Nelson has received the John Marshall Award, the Chairman's Award for Excellence, and the Capital Markets Award. Nelson worked on some high profile Commission prosecutions. Nelson was appointed Regional Director of the Miami Regional Office (Miami) in 2000. Nelson is a Senior Official, one of the highest ranking Commission employees. Nelson has not been the subject of any disciplinary or adverse personnel actions. (OIG-483 at 5-6; Response of David Nelson; Office of Human Resources.)

requests prosecutorial action and thus presents only the side of the issue that supports that position. Second, this particular Action Memorandum has some questionable factual assertions that the IG repeats. For example, the IG states that W Holding understated income in its Form 10-K and amended Form 10-K for 2002 on the theory, presumably, that the assets were permanently impaired. The IG concludes W Holding should have, but never did, restate its financials in its Form 10-K for the fiscal year ended December 31, 2002, and its Forms 10-Q for the first two quarters of 2003. In fact, the Commission's Division of Corporation Finance (Corporation Finance) accepted W Holding's position that there were no permanent impairments in its Collateralized Debt Obligations (CDOs) portfolio as of the end of fiscal 2002. (EDGAR, letters between W Holding and Corporation Finance on April 11, May 9, and May 12, 2003.) The evidence strongly suggests that this is the reason why Corporation Finance did not require that W Holding restate its financials in its Form 10-K for 2002.[3] The fact that Corporation Finance did not require a restatement from W Holding of the financials in its Form 10-K for 2002 would provide W Holding a strong defense if the Commission decided to prosecute W Holding for not doing so.

In addition, by referencing the Form 10-K filing, the IG makes it appear that the questionable conduct occurred over a longer period of time than it did. Witness testimony and the original referral to Miami viewed the questionable conduct as occurring over a single quarter. (OIG-483 at 16, Exhibit 31 at 28; Case Closing Recommendation, W Holding Company, Inc.) This time difference is significant because Enforcement, which has to prioritize among the six hundred cases a year it has resources to bring, does not bring many cases where the alleged wrongdoing occurred over one quarter. (OIG-483 Exhibit 31 at 40.)

**Litigation Risks**

The IG reports that, by all accounts, the Miami Regional Trial Counsel, Robert K. Levenson (Levenson), remarked on June 15, 2005, that he believed they had "a strong case [against Bear Stearns], but that probably Bear Stearns was going to fight like hell because they had the resources and they probably wouldn't want this type of publicity." (OIG-483 at 3, 21.)

Levenson, however, has no recollection of ever saying this, and his present recollection is that the case was a close call, difficult to litigate, and it fell on the weak side of the cases he has litigated at the Commission. (OIG-483 Exhibit 18 at 20, 33.) In response to a question of what Levenson said about the case in terms of a litigation perspective, Margarete E. Bronhard-D'Aniello (Bronhard), staff attorney, stated:

> I don't recall [Levenson] having any occurrence about the strength of the case. If anything, I recall that he said that we had a strong case, but that probably Bear Sterns was going to fight like hell because they had the resources and they probably wouldn't want this type of publicity. (OIG-483 Exhibit 7 at 77.)

---

[3] It is technically incorrect to say that Corporation Finance requires companies to restate their financial restatements, but that is what, in fact, happens.

3

Unlike most referrals from Corporation Finance, this one came to Enforcement in the form of a four sentence e-mail. (OIG-483 Exhibit 9 at 8-10, Exhibit 10.) The basic issue involved was the recognition of other than temporary losses on W Holding's Collateralized Bond Obligation (CBO) and Collateralized Loan Obligation (CLO) interests. (OIG-483 Exhibit 10.) According to Enforcement's Chief Accountant's recommendation in January 2004:

> [W Holding] used an internally derived estimate of fair value to reflect its inventory of CBOs and CLOs when it should have used quoted market prices that were available. FAS 115, paragraph 137 as amended by FAS 133, paragraph 540, states that financial instruments, such as CBOs, should be valued at fair value and that quoted market prices in active markets are the best evidence of fair value.

(OIG-483 Exhibit 12.)

Enforcement's Chief Accountant uses the terms "value" and "valuation" nine times in her testimony. (OIG-483 Exhibit 8.) According to Enforcement's Chief Counsel, Joan McKown (McKown), valuation cases are notoriously difficult to successfully litigate. They often become battles between experts. The Commission has not had a great deal of success in bringing them. (OIG-483 Exhibit 31 at 37-38.)

The facts, as they began to unravel, were complicated as Miami's Associate Regional Director for Enforcement, Glenn Gordon (Gordon), noted when he outlined them to the IG's investigators. (OIG-483 Exhibit 15 at 48-50.) Gordon also tried to explain that the investigators' view of the facts might not necessarily be provable.[4] (OIG-483 Exhibit 15 at 53, 55.) Gordon had some big concerns about litigating certain aspects of the case. (OIG-483 Exhibit 15 at 63-65.) Miami called headquarters to confer on some troubling aspects, for example, how the lack of a purchase or sale would impact any possible fraud charge against Ernest Almanza (Almanza), a registered representative with Bear Stearns from 1988 until January 2003, and Bear Stearns. (OIG-483 at 2, 10 n.11, Exhibit 15 at 70-72, 87.)

The IG gives no weight to the doctrine of discretion defined as "[a] public official's power or right to act in certain circumstances according to personal judgment and conscience." BLACK'S LAW DICTIONARY, 479 (7th ed. 1999). In the case of prosecutions, this includes the power to chose between a number of options that include bringing or not bringing a formal action.

**Impact of Possible Settlements**

There is no basis for the IG's apparent conclusion that Nelson did something wrong by dropping the case after Miami staff reached settlements in principle with certain of the proposed defendants.[5] Gordon recalls that, given other matters that Miami was working on and given the

---

[4] It appears Gordon mistakenly believed that W Holding restated its financials. (OIG-483 Exhibit 15 at 53-55.)

[5] According to Gordon, "You said a settlement in principle and I've adopted that term with regard to W. Holding and Freddy Maldonado. The only thing I want to be clear is we had an

4

resources it had, the W Holding and Bear Sterns case was not worth bringing.[6] (OIG-483 Exhibit 15 at 79.)

The IG holds Nelson singularly responsible for closing the W Holding investigation. In fact, Enforcement's Case Closing Documentation for W Holding, a significant document which, for some unknown reason, is not an exhibit to OIG-483, states:

> This closing recommendation was prepared by Karaz S. Zaki, Staff Accountant, and Ernesto Palacios, Senior Counsel, and reviewed and approved by Jon B. Jordan, Branch Chief, Chedly C. Dumornay, Assistant Regional Director, and Glenn Gordon, Associate Regional Director.[7]

Ernesto Palacios, Jordan, and Chedly C. Dumornay (Dumornay), signed the document in December 2007, and Nelson signed it as Regional Director in January 2008. McKown and Ricciardi each agreed with the decision to end the investigation without litigation. (OIG-483 Exhibit 31 at 12, 20-21; Enforcement Memorandum to the Commission Re: Report of Investigation: Case No. OIG-483 (W Holding Company, Inc./Bear Stearns & Co.) (Oct. 10, 2008).)

The IG gives no reasons for discounting McKown's views based on fifteen years of experience and as the last person in Enforcement to review closings. McKown considered this a light case and that age would have been a huge factor in deciding to close it. (OIG-483 Exhibit 31 at 28.) Her experience is that closings occur after settlements have been negotiated:

> Well, we have that happen. It's hard when the staff has settled a case to decide that we don't think it's appropriate to bring, but there's a lot of reasons why a case might be closed at that particular point in time. . . .
>
> However, you still have to – the Commission scrutinizes even settled cases to make sure that we're not doing something in settlement that we couldn't be doing in litigation, and the general counsel's office reviews the cases. This case would have been reviewed by trading and markets, then called market reg.

---

agreement on what the charges would be, what the form would be, and with regard to Maldonado that there would be an additional civil penalty. We, to the best of my recollection, had not exchanged any proposed orders." (OIG-483 Exhibit 15 at 86.) Almanza said he would absolutely litigate a scienter-based fraud charge. (OIG-483 Exhibit 15 at 70.)

[6] The fact that Miami ultimately decided there were too many risks to bring a case against Marjorie Hogan (Hogan) was a strong factor in deciding not to bring a case against Bear Stearns. (OIG-483 at 79-80.)

[7] The IG cites testimony from two people who disagreed with the decision: Jon Jordan (Jordan), the Branch Chief on the investigation, signed the closing memorandum, and Bronhard, the Staff Attorney, stopped working on the investigation and at the Commission full time in September 2006.

5

> So even if it is settled, you still have to have everyone's support that it's an appropriate case to bring. So I get closings where we have settled with at least some of the parties.
>
> I couldn't put a number on it, but I definitely receive closings where they had a settlement with at least some of the parties and we decided not to do it, or it was sent up, it was part of the review process.
>
> I stand by our closing report.

(OIG-483 Exhibit 31 at 18-19, 21-22, 25, 34.)

In addition, Gordon believes that Ricciardi also approved closing the investigation. (OIG-483 Exhibit 15 at 81.) Gordon, not Nelson, was the "point man" on the investigation. (OIG-483 Exhibit 15 at 39.) Gordon makes the point that one consideration was whether it would have been fair or the right thing to do to recommend an action against W Holding if they were not going to recommend an action against Bear Stearns or the people involved at Bear Stearns. (OIG-483 Exhibit 15 at 78.)

**Allegation of Improper Conduct**

Nelson, Michael Trager (Trager), who was one of two lawyers representing Bear Stearns, Rodolfo J. Betancourt (Betancourt) and Hogan, Bear Stearns employees, and Paul Leder, counsel for Almanza, worked with each other in Enforcement in the mid-to-late 1980s.[8] According to the IG, the fact that two of the defense counsel in the W Holding/Bear Stearns investigation were former Enforcement attorneys created the appearance, to some, that they may have obtained favorable treatment from the Miami staff. (OIG-483 at 5.) In fact, the evidence is that several of the staffers did not have much recollection of these lawyers, who they represented, or at what firms they worked. (OIG-483 Exhibit 7 at 70-71, Exhibit 15 at 72-73, Exhibit 16 at 23-26.) The record does not show any improper or unethical conduct by Nelson. The OIG's investigation did not find evidence of a direct connection between Nelson's relationship with Bear Stearns's counsel and the decision to close the investigation. (OIG-483 at 5.)

**Failure to Uncover Widespread Wrongdoing by Bear Stearns**

There is no persuasive evidence to support the IG's conclusion that, through neglect, Miami lost a significant opportunity to coordinate with the United States Attorney for the Southern District of New York (SDNY) and uncover "potential systematic problems at Bear Stearns." (OIG-483 at 5.) The IG notes that the SDNY had asked Miami to apprise him of Miami's W Holding/Bear Stearns investigation because the SDNY was investigating another employee at Bear Stearns for

---

[8] Trager is a Partner at Arnold & Porter, LLP (Arnold & Porter). (OIG-483 at 7.) Robert N. Weiner was another Arnold & Porter attorney. (OIG-483 at Exhibit 21 at 28.)

6

questionable pricing of CDOs. (OIG-483 at 4.) The IG faults Miami for not coordinating its efforts with the SDNY. (OIG-483 at 5, 30-33.) The IG states:

> The [SDNY] believed that it was significant that Bear Stearns' traders out of New York and Florida were being investigated for the same conduct, and had [Miami] sought information about his investigation in New York, [Miami] would have uncovered potential systematic problems at Bear Stearns in determining the market price and assessing the value of additional CDOs issued and held by Bear Stearns. (OIG-483 at 5.)

The IG's claim is refuted by testimony of at least three members of the Miami investigative team – Karaz Saleh Zaki, staff accountant, Bronhard, and Ivan Harris (Harris), Assistant Regional Director – who testified that the W Holding investigation did not involve Bear Stearns' subprime or mortgage-related financial instruments. (OIG-483 at 12 n.15.) Gordon was aware of the investigation in New York, but believed it did not involve the investigation in Miami. (OIG-483 Exhibit 15 at 89.)

It is unrealistic to represent, on these facts, that Enforcement should have coordinated with the SDNY and that , if it did, it would have uncovered evidence of systematic problems at Bear Stearns. There is no evidence that the investigation ever considered, or had reason to consider, in 2004-07, that what it was investigating involved anything more than the false reporting by a single public issuer (W Holding) of the value of deteriorating assets (CDOs) and the actions of a "rogue" trader at Bear Stearns. (OIG-483 at 31, Exhibit 9.)

**Processing Delays**

The IG alleges that the W Holding/Bear Stearns investigation was plagued by numerous unconscionable delays. (OIG-483 at 5.) The e-mail referral from Corporation Finance to Enforcement's Office of Chief Accountant occurred on May 15, 2003. (OIG-483 at Exhibit 10.) Following review, Enforcement's Chief Accountant and Associate Director referred it to Miami in late January-early February 2004. (OIG-483 13-19, Exhibit 12.) The Chief Accountant explained that referrals are done by the staff in addition to its normal accounting responsibilities. (OIG-483 at 29.) In 2003, the Office of the Chief Accountant in Enforcement had between thirty and thirty-five staff accountants at headquarters. It annually receives several hundred referrals from a variety of sources. By 2008, implementing new procedures and technology, it has eliminated the backlog that existed in 2003. (OIG-483 at 16 n.23, Exhibit 8 at 32-37.)

In Miami, Harris left in the summer of 2005, and was not replaced as Assistant Regional Director by Dumornay until January 2006. (OIG-483 at 3.) Nelson was not able to replace Harris for an extended period:

> That concerned me almost more than any one particular case because I had one third of my enforcement office without an assistant director for almost a year. That concerned me. I wasn't focused so much on any one specific case and certainly this one at that time was not the same focus of concern as it is sitting around this table. I mean, I had a whole third of my enforcement division to

7

> worry about and I had an inventory of several hundred cases and a third of those to worry about.[9]

OIG-483 Exhibit 21 at 94.

Gordon also remembers that Miami was without an Assistant Regional Director for a long period of time. (OIG-483 Exhibit 15 at 44.) When Dumornay became Assistant Regional Director, he became responsible for at least twenty-five open investigations that were all new to him. (OIG-483 Exhibit 21 at 2-3, Exhibit 35 at 55.) Dumornay did not complete his review, and Miami did not re-contact Bear Stearns until November 2006. (OIG-483 at 4.)

Processing of the investigation was not exemplary, but the evidence does not show malfeasance or negligence. Rather it shows that delays occurred in the W Holding/Bear Stearns investigation because of workload and personnel changes.

**Dropping Possible Defendants**

The evidence does not support the IG's charges that proposed defendants were dropped inexplicably and that the action memorandum was re-written at the behest of defense counsel. (OIG-483 at 5.) Gordon and Dumornay testified that, as a result of the Wells submissions, Miami decided to drop the case against Betancourt and Hogan. (OIG-483 Exhibit 15 at 69, Exhibit 24 at 19-20.) There is no evidence refuting Nelson's testimony that Betancourt and Hogan were dropped as possible defendants between preparation of the July 5, 2005, and April 25, 2007, memoranda because of staff discussions as to whether the evidence supported prosecutions. (OIG-483 Exhibit 21 at 57-61.)

**Legal Basis for Taking Disciplinary Action**

The IG cites the Commission's Canons of Ethics: 17 C.F.R. §§ 200.50, .53, .55, .59, .61, .64, .68, and .72; the Commission's Conduct Regulation, 5 C.F.R. § 200.735-2; SEC v. Dresser Indust., Inc., 628 F.2d 1368, 1370 (D.C. Cir.) cert. denied, 449 U.S. 993 (1980); and SEC v. Fishbach Corp., 133 F.3d 170, 175 (2d Cir.1997). He also finds the obligation and necessity for swift enforcement action, referred to in the following: United States Securities and Exchange Commission 2004-2009 Strategic Plan at 30; U.S. Securities and Exchange Commission 2007 Performance and Accountability Report at 6; and U.S. Securities and Exchange Commission FY 2009 Congressional Justification at 12. (OIG-483 at 10 n.7.)

---

[9] According to Nelson, Miami brought thirty-seven cases in fiscal year (FY) 2000, thirty-two in FY 2001, sixty-one in FY 2002, fifty-six in FY 2003, fifty-five in FY 2004, thirty-eight in FY 2005, thirty-four cases approved in FY 2006, thirty-two cases approved in FY 2007, and forty-nine authorized cases in FY 2008. (Nelson Response Exhibit 5.) Another source shows that Miami filed forty-six cases in FY 2004, thirty in FY 2005, and thirty-five in FY 2006. The differences could be explained by the use of different terms: brought, approved, authorized, and filed.

None of the materials the IG cites provides a legal basis for his recommendation that the Commission should take disciplinary or performance-based action against Nelson for the conduct described in OIG-483. The Code of Federal Regulations does not define "neglect of duty." The Commission's Conduct Regulation, 5 C.F.R. § 200.735-2, is based on 5 U.S.C. § 2302, but the term is not defined in the U.S.C.

**Conclusion**

For all the reasons stated, the record does not show that Nelson failed to vigorously enforce compliance with the securities laws in connection with the W Holding/Bear Stearns investigation. There is no basis for following the IG's recommendation as to disciplinary or performance-based action.