UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

IN RE THE BEAR STEARNS COMPANIES,   :
INC. SECURITIES, DERIVATIVE, AND ERISA   :   Master File No.:
LITIGATION   :   08 M.D.L. 1963 (RWS)
   :
This Document Relates To:   :   ECF Case
     Securities Action, No. 08 Civ. 2793 (RWS)   :
   :
   :
   :
   :

------------------------------------------------------------------- x

BRUCE S. SHERMAN,   :
   :   Index No.:
               Plaintiff,   :   09 Civ. 8161 (RWS)
   :
   v.   :
   :
BEAR STEARNS COMPANIES INC.,   :
 JAMES CAYNE, and WARREN SPECTOR,   :   **FILED UNDER SEAL**
   :
             Defendants.   :
   :
   :
   :

------------------------------------------------------------------- x

## PLAINTIFF BRUCE S. SHERMAN'S MEMORANDUM OF LAW IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS' MOTION TO <u>EXCLUDE THE REPORT AND TESTIMONY OF JOHN D. FINNERTY</u>

# <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ............................................................................ 1

**I.    LEAKAGE ANALYSIS HAS BEEN ACCEPTED AND DEFENDANTS'
        CRITICISMS OF DR. FINNERTY'S PERFORMANCE OF THE LEAKAGE
        ANALYSIS ARE BASELESS AND DO NOT JUSTIFY EXCLUSION OF HIS
        REPORT OR TESTIMONY** ........................................................................ 5

     A.    Leakage Analysis Has Been Accepted by Both the Courts And the Relevant
            Scientific Community ............................................................................ 5

     B.    Defendants' Criticisms of Dr. Finnerty's Leakage Analysis Are Baseless And, in
            Any Event, Are Criticisms That Should Be Addressed to the Fact Finder............. 9

          1.    Dr. Finnerty sufficiently identifies the leakage of the relevant truth into the
                    market, while Defendants' criticisms reflect a misunderstanding of
                    leakage. .................................................................................. 9

          2     Dr. Finnerty's treatment of Bear-specific, non-fraud-related news on
                    "mixed news days" is proper and, in any event, does not significantly
                    affect his inflation calculation................................................... 11

          3.    Dr. Finnerty's treatment days where there was only non-fraud-related
                    public news is proper and, in any event, does not significantly affect his
                    inflation calculation................................................................ 12

**II.   DR. FINNERTY'S CALCULATION OF STOCK-PRICE INFLATION PRIOR TO
        THE LEAKAGE PERIOD IS BASED ON THE ACCEPTED AND RELIABLE
        CONSTANT DOLLAR METHOD** .......................................................... 16

**III.  DR. FINNERTY'S OPINIONS REGARDING BEAR'S RISK MANAGEMENT,
        ASSET VALUATION, AND LIQUIDITY ARE BASED ON EXTENSIVE
        REVIEW AND ANALYSIS OF THE RECORD EVIDENCE** ................................. 19

**CONCLUSION** .......................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Am. Home Assur. Co. v. Merck & Co.,*
    462 F. Supp. 2d 435 (S.D.N.Y. 2006)....................................................................22, 23

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002)...................................................................................15

*Arista Records LLC v. Usenet.com, Inc.,*
    608 F. Supp. 2d 409 (S.D.N.Y. 2009).....................................................................22

*Astra Aktiebolag v. ANDRX Pharm., Inc.,*
    222 F. Supp. 2d 423 (S.D.N.Y. 2002).....................................................................23

*B.F. Goodrich v. Betkoski,*
    99 F.3d 505 (2d Cir. 1996).....................................................................................23

*Borawick v. Shay,*
    68 F.3d 597 (2d Cir. 1995)......................................................................................4

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996).................................................................................18, 19

*Buchwald v. Renco Grp.,*
    No. 13 CIV 7948, 2015 WL 5000623 (S.D.N.Y. Aug. 19, 2015) .............................14, 15

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,*
    769 F. Supp. 2d 269 (S.D.N.Y. 2011).......................................................................4

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993)...........................................................................4, 5, 8, 9, 20

*Derienzo v. Trek Bicycle Corp.,*
    376 F. Supp. 2d 537 (S.D.N.Y. 2005).....................................................................25

*Discover Fin. Servs. v. Visa U.S.A., Inc.,*
    582 F. Supp. 2d 501 (S.D.N.Y. 2008)......................................................15, 20, 21, 24

*Dura Pharm. v. Broudo,*
    544 U.S. 336 (2005)....................................................................................2, 5, 6, 8, 17

*E.E.O.C. v. Bloomberg L.P.,*
    No. 07 CIV 8383, 2010 WL 3466370 (S.D.N.Y Aug. 31, 2010) .............................24, 25

*Faulker v. Arista Records LLC*,
    46 F. Supp. 3d 365 (S.D.N.Y. 2014)..................................................................24

*F.D.I.C. v. Suna Assoc., Inc.*,
    80 F.3d 681 (2d Cir. 1996)..........................................................................8, 9

*Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.*,
    No. 03 CIV 969, 2006 WL 1319543 (S.D.N.Y. 2006) ......................................9

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)....................................................................................21

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ...............................................................2, 6, 7

*Gussack Realty Co. v. Xerox Corp.*,
    224 F.3d 85 (2d Cir. 2000)............................................................................23

*Houlihan v. Marriott Int'l, Inc.*,
    2003 WL 22271206 (S.D.N.Y. Sept. 30, 2003)..............................................4

*In re Blech Sec. Litig.*,
    No. 94 CIV 7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ......................4

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).........................................................................2, 5

*In re Fosamax Prods. Liab. Litig.*,
    688 F. Supp. 2d 259 (S.D.N.Y. 2010)........................................................4, 21

*In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*,
    593 F. Supp. 2d 549 (S.D.N.Y. 2008)............................................................9

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ...................................................................14

*In re Pfizer Inc. Sec. Litig.*,
    No. 04 CIV 9866, 2014 WL 3291230 (S.D.N.Y. 2014)....................................9

*In re Vivendi Universal, S.A. Sec. Litig.*,
    605 F. Supp. 2d 586 (S.D.N.Y. 2009)............................................................6

*In re Williams Sec. Litig.*,
    558 F.3d 1130 (10th Cir. 2009) ....................................................................8

*Lentell v. Merrill Lynch & Co. Inc.*,
    396 F.3d 161 (2d Cir. 2005)..............................................................................5, 6

*Levine v. AtriCure, Inc.*,
    508 F. Supp. 2d 268 (S.D.N.Y. 2007)...................................................................6

*Linde v. Arab Bank, PLC*,
    922 F. Supp. 2d 316 (E.D.N.Y. 2013) ...............................................................23

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007).................................................................22

*Park W. Radiology v. Carecore Nat'l LLC*,
    675 F. Supp. 2d 314 (S.D.N.Y. 2009)...........................................................21, 22

*POM Wonderful LLC v. Organic Juice USA, Inc.*,
    769 F. Supp. 2d 188 (S.D.N.Y. 2011).................................................................25

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
    2000 WL 310352 (S.D.N.Y. Mar. 24, 2000),
    *aff'd*, No. 94 CIV. 5587, 2000 WL 420548 (S.D.N.Y. Apr. 18, 2000) .............7

*Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc.*,
    208 F. Supp. 2d 423 (S.D.N.Y. 2002).................................................................25

*Schleicer v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ................................................................................6

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003)....................................................................................4

*United States v. Hatfield*,
    2014 WL 7271616 (E.D.N.Y. 2014)......................................................................6

*United States v. Mulder*,
    273 F.3d 91 (2d Cir. 2001)..................................................................................23

*United States v. Rosario*,
    No. 09-CR-415-2, 2014 WL 6076364 (S.D.N.Y. Nov. 14, 2014)......................9

*WeddingChannel.Com, Inc. v. The Knot, Inc.*,
    2005 WL 165286 (S.D.N.Y. Jan. 26, 2005) .......................................................4

*Zaremba v. Gen Motors Corp.*,
    360 F.3d 355 (2d Cir. 2004)..................................................................................9

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp*., LLC,
    571 F.3d 206 (2d Cir. 2009)..............................................................................4, 18

**<u>Rules and Statutes</u>**

Fed. R. Evid. 702 ...........................................................................................4, 15

**<u>Secondary Sources</u>**

David Tabak, "Inflation and Damages in a Post-Dura World," National Economic
Research Associates, Inc. (NERA), September 15, 2007 ...........................................17

## PRELIMINARY STATEMENT

Dr. John D. Finnerty has been Professor of Finance at Fordham University's Gabelli School of Business since 1987.   He has published fifteen books and more than a hundred articles and professional papers.  Dr. Finnerty has submitted an expert report and testimony in this case on behalf of Plaintiff Bruce S. Sherman ("Plaintiff" or "Sherman") in order to determine if and by how much Sherman was damaged by Defendants' fraud.  Dr. Finnerty spent approximately 400 hours in this case reviewing and analyzing thousands of documents and hours of deposition testimony as well as performing his own event study and other analyses in order to reach the conclusions he presented in his report and testimony.  In addition to his own expertise and judgment, Dr. Finnerty used widely accepted statistical techniques which have been developed and tested through an extensive academic literature to which Dr. Finnerty has contributed.  In applying these techniques, Dr. Finnerty has been invariably conservative in Defendants' favor.

Defendants disagree with Dr. Finnerty's conclusions, but rather than present contrary evidence or arguments a jury, Defendants ask this Court to exclude Dr. Finnerty's report and testimony.  Defendants criticize: (i) Dr. Finnerty's leakage analysis, which shows that Bear's fraud caused Sherman's losses as the truth about Bear leaked into the market; (ii) Dr. Finnerty's treatment of Bear-specific, non-fraud-related news; (iii) Dr. Finnerty's calculation of inflation during the relevant period, which he bases on the amount of inflation that came out of the stock once the relevant truth was revealed; and (iv) Dr. Finnerty's conclusions about Bear's financial condition, risk management, asset valuation and liquidity, which were conclusions that Dr. Finnerty was required to draw in reaching his ultimate conclusions about loss causation.  Defendants' criticisms regarding each of these points are meritless and, to the extent that they had any merit, they would raise issues to be decided by the fact finder in deciding how much weight to give Dr. Finnerty's evidence.  They do not justify exclusion of his report or testimony.

1

***First***, courts and the relevant scientific community accept leakage analysis.  Both the Supreme Court and the Second Circuit have recognized in that loss in a securities fraud action may be caused by the truth leaking into the market.  *See, e.g., Dura Pharm. v. Broudo,* 544 U.S. 336 (2005); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 n.5 (2d Cir. 2009). Most recently, the Seventh Circuit has confirmed that—under conditions that Dr. Finnerty's analysis amply satisfies—loss causation analysis based on leakage goes to a jury.  *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015).  Furthermore, an extensive academic literature, which has developed over the last twenty five years, confirms the validity of leakage analysis, which is widely recognized and regularly used in event studies in financial economics and management. *See* Section I.A, *infra*.

***Second***, Defendants' criticisms of Dr. Finnerty over how to properly handle Bear-specific, non-fraud-related information would not justify exclusion even if these criticisms had merit (which they do not).  Dr. Finnerty properly treated Bear-specific, non-fraud-related information. Even if he had not, and even if Dr. Finnerty were to adopt precisely Defendants' preferred treatment of such information, his inflation calculation would be altered by no more than a few percentage points.  *See* Section I.B, *infra*.

***Third***, Dr. Finnerty's approach for calculating inflation during the relevant period uses the "constant dollar method," according to which the inflation in a stock's price prior to the disclosure of the relevant truth is estimated to be equal to the amount of inflation removed from the stock's price by the disclosure of the relevant truth.  This method, accepted in countless securities fraud actions, has come to be thought to be the *only* method of calculating inflation consistent with the Supreme Court's decision in *Dura Pharmaceuticals*.  Even were Defendants

correct that this method is not appropriate in this case, that is an argument properly addressed to a jury, not used to exclude Dr. Finnerty's report and testimony.  *See* Section II, *infra*.

**Fourth**, Dr. Finnerty's opinions regarding loss causation and damages require that he form opinions about the truth of Bear's financial condition, what the market knew about this truth at various times, and the effect the disclosure of the truth about Bear had on the market.  Dr. Finnerty has spent hundreds of hours analyzing thousands of documents from Bear insiders and outside analysts, in addition to performing his own statistical analyses (including an event study). On the basis of this examination, together with his experience, expertise, and judgment, Dr. Finnerty has formed opinions regarding the valuation of Bear's mortgage-related assets, risk-management practices, and the adequacy of Bear Stearns' liquidity.  Defendants claim—without support or explanation—that Dr. Finnerty relied on a "mere handful" of documents, that he "mischaracterized" those documents, that those documents do not support his conclusions and, inconsistently, that his opinions are mere "summaries" of those documents.  Defendants' assertions about the accuracy of Dr. Finnerty's opinions are meritless and, in any event, certainly do not justify *excluding* Dr. Finnerty's report or testimony.  *See* Section III, *infra*.[1]

## ARGUMENT

"The decision to admit expert testimony is left to the broad discretion of the trial judge." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp*., LLC, 571 F.3d 206, 213 (2d Cir. 2009). However, because "[t]he Rules of Evidence provide a liberal standard for the admissibility of expert testimony," *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003), "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee's

---

[1] In in response to certain arguments made in Defendants' Memorandum of Law in Support of Their Motion to Exclude the Report and Testimony of John D. Finnerty ("Motion to Exclude Finnerty"), Dr. Finnerty has prepared the Declaration of John D. Finnerty, Ph.D., in Support of Opposition to Defendants' Motion to Exclude Dr. Finnerty's Report and Testimony ("Finnerty Decl."), filed contemporaneously herewith.

note.  Therefore, the testimony of a qualified expert is *presumed* admissible. *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,* 769 F. Supp. 2d 269, 282 (S.D.N.Y. 2011) ("*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence" (quoting *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995))); *In re Fosamax Prods. Liab. Litig.*, 688 F. Supp. 2d 259, 267-68 (S.D.N.Y. 2010) ("Only serious flaws in reasoning will warrant exclusion.").

In securities actions, there is rarely "an accepted methodology," unlike in the "world of physical science" where "[s]ome types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others." *In re Blech Sec. Litig.*, 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003) (quoting Fed. R. Evid. 702, Advisory Comm. Notes).  "Although a court *may* look to the *Daubert* criteria when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *WeddingChannel.Com, Inc. v. The Knot, Inc.*, No. 03 CIV.7369, 2005 WL 165286, at *5-6 (S.D.N.Y. Jan. 26, 2005) (Sweet, J.) (quoting *Houlihan v. Marriott Int'l, Inc.*, No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003)).

Expert testimony is admissible so long as it "rests on a reliable foundation and is relevant." *Daubert*, 509 U.S. at 597 (1993).  The inquiry into reliability focuses "solely on [the expert's] principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.  Ultimately, courts should admit expert testimony where there are sufficient indicia of reliability because "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof," rather than excluding the expert, are "the appropriate means of attacking" such testimony.  *Daubert,* 509 U.S. at 596.

I.    **LEAKAGE ANALYSIS HAS BEEN ACCEPTED AND DEFENDANTS'
       CRITICISMS OF DR. FINNERTY'S PERFORMANCE OF THE LEAKAGE
       ANALYSIS ARE BASELESS AND DO NOT JUSTIFY EXCLUSION OF HIS
       REPORT OR TESTIMONY**

      A.    **Leakage Analysis Has Been Accepted by Both the Courts And the Relevant
             Scientific Community**

Defendants argue that leakage analysis "is not endorsed by the courts, generally accepted

in the relevant scientific community, or peer reviewed."  Motion to Exclude Finnerty at 9-11.

That is incorrect.

      *First*, **leakage analysis has been endorsed by the courts.**  In *Dura Pharms. v. Broudo,*

544 U.S. 336 (2005)*,* the Supreme Court recognized that the truth about a company can "leak

out" to the market and cause loss by lowering a company's stock price.  *See Dura,* 544 U.S. at

342-45 ("But if, say, the purchaser sells the shares quickly, before *the relevant truth begins to*

*leak out*, the misrepresentation will not have led to any loss.") (emphasis added).  The Second

Circuit also recognizes that loss causation analysis may be based on information's leaking to the

market.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d at 40 n.5 ("We do not take

issue with the plausibility of Plaintiffs' 'leakage' theory.  Indeed, in *Lentell*, we explicitly

acknowledged that loss causation can be established by a 'corrective disclosure to the market'

that 'reveal[s] ... the falsity of prior recommendations.' And nowhere does either *Dura* or our

precedent suggest that such disclosures must come from the Company itself." (quoting *Lentell v.*

*Merrill Lynch & Co. Inc.,* 396 F.3d 161, 175 n.4 (2d Cir. 2005)).[2]  The Seventh Circuit has

---

[2] *And see United States v. Hatfield,* 2014 WL 7271616, at *8 (E.D.N.Y. 2014) ("The flexibility
of the corrective disclosure inquiry reflects the reality that the market does not always learn of a
fraudulent scheme in one complete mea culpa; instead, the truth 'leak[s] out' gradually."
(quoting *Dura*, 544 U.S. at 342)); *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586,
596 (S.D.N.Y. 2009) ("For a fact-finder to conclude that the fraud caused a decline in the share
price, there must at least be evidence that the truth had begun to leak out into the market and that
the shares traded at lower prices as a consequence of this leak."); *Levine v. AtriCure, Inc.*, 508 F.
Supp. 2d 268, 273 (S.D.N.Y. 2007) (loss causation analysis must "recognize the possibility that

recognized the same. *See Schleicer v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010) ("[T]ruth can come out, and affect the market price, in advance of a formal announcement.").

The Seventh Circuit recently confirmed—under conditions that Dr. Finnerty's analysis amply satisfies—that a leakage analysis may be presented to a jury.  In *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015), plaintiffs brought a securities class action against a consumer lender and its executives for misrepresenting their lending practices, delinquency rates, and earnings from credit card agreements.  *Id.* at 413.  In support of their loss causation argument, the plaintiffs submitted expert testimony that advanced a "leakage" analysis, according to which the "truth came to light over a period of about a year." *Id.*  Under this analysis, the loss represented by the sum of the daily differences between the predicted return (using a regression analysis) and the actual returns on the stock during the period December 20, 2007 through March 13, 2008 (the "Leakage Period") was caused by the fraud.  *Id.* at 416.  The jury adopted the leakage analysis and, following trial, a judgment was entered for plaintiffs in the amount of $2.46 billion.  *Id.* at 414.  On appeal, the Seventh Circuit rejected the defendants' argument that the leakage model was legally insufficient.  *Id.* at 422-23.

While Defendants cite *Household* as supporting their claim that leakage analyses are not accepted by courts, *Household* in fact stands for the proposition that a leakage analysis can go to a jury so long as the analysis addresses the effect of firm-specific, non-fraud-related information:

> If the plaintiffs' expert testifies that no firm-specific, nonfraud related information contributed to the decline in stock price during the relevant time period and explains in nonconclusory terms the basis for this opinion, then it's reasonable to expect the defendants to shoulder the burden of identifying some significant, firm-specific, nonfraud related information that could have affected the stock price. If they can't, then the leakage model can go to the jury; if they can, then the burden shifts back to the plaintiffs to account for that specific information or provide a

declines in stock price prior to broad public disclosure may be reflective of leaking of relevant information into the marketplace").

6

loss-causation model that doesn't suffer from the same problem, like the specific-disclosure model.[7] One possible way to address the issue is to simply exclude from the model's calculation any days identified by the defendants on which significant, firm-specific, nonfraud related information was released.

*Id.*

Here, as in *Household*, Dr. Finnerty has submitted his own event study.  *See id.* at 414; *and see RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 CIV. 5587, 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24), *aff'd*, No. 94 CIV. 5587, 2000 WL 420548 (S.D.N.Y. Apr. 18, 2000) (expert testimony is reliable where an event study is conducted).   Dr. Finnerty has also, as in *Household*, submitted an analysis according to which the loss represented by the sum of the daily differences between the predicted return (using his event study) and the actual returns on the stock during the Leakage Period is caused by leakage of the fraud.  However, unlike *Household*, where the court ultimately ordered a new trial on loss causation because neither party had developed any substantial evidence or testimony regarding how company-specific, non-fraud-related information was handled by the expert, Dr. Finnerty's report and testimony specifically and extensively address his handling of Bear-specific, non-fraud-related information.  *See* Section I.B, *infra*.  By contrast, Defendants and their experts in this case have failed to shoulder their burden, per *Household*, to identify any significant, firm-specific, non-fraud-related information that could have affected Bear's stock price.

The other case that Defendants rely on, *In re Williams Sec. Litig.*, 558 F.3d 1130 (10th Cir. 2009), is similarly unhelpful to their claim.  The Tenth Circuit begins its opinion in that case by noting that leakage analysis is consistent with the Supreme Court's approach in *Dura*. *Id.* at 1137 (noting that *Dura* "acknowledged that the relevant truth can 'leak out,' which argues "against a strict rule requiring revelation by a single disclosure" (quoting *Dura*, 544 U.S. at 342)).  Though the *In re Williams* court ultimately affirmed the district court's decision to

exclude the expert, it did so only after determining that the plaintiffs in that case had failed to identify any mechanism by which the truth may have leaked into the market. *Id*. at 1138.

That is simply not the case here. Dr. Finnerty's report presents extensive evidence of how market participants were alerted to the weakness that Bear concealed, including, for example: (a) Bear's increasingly desperate efforts seeking funding, (b) Bear's increasing disputes with counterparties regarding the value of its assets, (c) Bear's cutting off long-term customers from financing Bear had historically provided, (d) Bear's inability to roll over its bank loans and repurchase financing, and (e) Bear's failed attempts to raise outside capital. Indeed, Dr. Finnerty sets out evidence that Bear *itself* knew that its activities risked alerting the market to its internal problems. *See, e.g.*, Finnerty Rpt. ¶¶170, 174(g)-(j), 176(c)-(d), 180(b).

**Second, leakage analysis has been accepted in the relevant scientific community.** An extensive professional and academic literature addresses and accepts leakage as a fact as well as a basis for establishing loss causation and damages in securities actions. *See* Finnerty Decl. ¶¶8-9, 12. A scientific technique need not be "generally accepted" to be admissible under *Daubert*. *Daubert*, 509 U.S. at 588 ("Nothing in the text of this Rule establishes 'general acceptance' as an absolute prerequisite to admissibility."); *see also FDIC v. Suna Assoc., Inc*., 80 F.3d 681, 686-87 (2d Cir. 1996) ("[G]eneral acceptance is not a necessary precondition to the admissibility of scientific evidence."); *United States v. Rosario*, No. 09-CR-415-2, 2014 WL 6076364, at *1 (S.D.N.Y. Nov. 14, 2014) (noting that "the Supreme Court has rejected a 'rigid' standard that would require general acceptance of an expert's opinion"). Nonetheless, the extensive peer review of leakage analysis—spanning over the last twenty-five years—reflects that it has been "submit[tted] to the scrutiny of the scientific community," which "is a component of 'good

science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593.[3]

**B.      Defendants' Criticisms of Dr. Finnerty's Leakage Analysis Are Baseless And, in Any Event, Are Criticisms That Should Be Addressed to the Fact Finder**

Defendants level a number of criticisms at Dr. Finnerty's leakage analysis.  Each is baseless. In any event, they are criticisms that concern the weight that should be given to Dr. Finnerty's evidence and addressed to the jury, not used to exclude his report and testimony.

**1.      Dr. Finnerty sufficiently identifies the leakage of the relevant truth into the market, while Defendants' criticisms reflect a misunderstanding of leakage.**

Defendants criticize Finnerty for not identifying "public" information during the Leakage Period that revealed the fraud.[4]  Motion to Exclude Finnerty at 11.  Not only is this inaccurate, but it also misunderstands the very idea of leakage.  First, Dr. Finnerty identified a great deal of

---

[3]  The cases Defendants rely on are not to the contrary.  Rather, the Defendants' cases involve experts that made gross lapses bearing no resemblance to Dr. Finnerty's work in this case. Motion to Exclude Finnerty at 10-11.  *See Zaremba v. Gen Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (excluding expert opinion claiming an alternative design for a car was safer when the expert never tested nor even offered a drawing of this design); *In re Pfizer Inc. Sec. Litig.*, 2014 WL 3291230, at *2 (S.D.N.Y. 2014) (finding that the third supplemental report offered by an expert "is not deserving of an 'expert opinion' label" where the expert offered completely different inflation methodologies "in the alternative" in order "to permit the Court to select which of two putatively valid inflation determination methodologies to present to the jury"); *In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 561 (S.D.N.Y. 2008) (excluding testimony where the expert "could not name another  scientist who has ever employed, much less approved of, such a method (i.e., dividing the results of one study by five because another study on an unrelated chemical showed that the subjects' threshold decreased by 'almost a factor of five' with repeated testing)"); *Gary Price Studios*, *Inc. v. Randolph Rose Collection, Inc.*, 2006 WL 1319543, at *8 (S.D.N.Y. 2006) (excluding the testimony of an expert who applied an otherwise-valid method to an entirely new area of study in which expert was not qualified to opine).

[4]  Contrary to Defendants' claim that Dr. Finnerty's leakage analysis requires that the "same facts" leaked in to the market as Bear disclosed between March 14 and March 17, 2008, Motion to Exclude Finnerty at 3, leakage requires only that some of the relevant truth about Bear leaked into the market.  The leaked facts need not be the same as the later-disclosed facts.

public information that partially reveals the alleged fraud.  *See* Finnerty Rpt., Ex. 30; Pl. Summ. J. Opp. Br. § III.D.  Second, and more fundamentally, leakage is not restricted to market-wide, public information.  Leakage also occurs when information is disclosed to a restricted audience among market participants.  *See* Finnerty Decl. ¶¶ 8-10.  Dr. Finnerty also identifies a great deal of evidence that the truth about Bear was leaking into the market through Bear's own interactions with other market participants.  *See* Pl. 56.1 ¶ 168.[5] Notably, this includes evidence that Bear insiders themselves recognized that their activities were likely to alert other market participants about the troubles at Bear that they were concealing.  *See* Pl. 56.1 ¶¶ 158, 172.

Defendants next argue that Dr. Finnerty's report "contains no evidence of Bear Stearns's counterparties becoming aware of the alleged fraud."  Motion to Exclude Finnerty at 11.  That is incorrect.  Dr. Finnerty has set forth substantial evidence of disclosure events that informed market participants of the weaknesses that Defendants were fraudulently concealing. Carey Decl. Ex. 2, Finnerty Rpt, Section VII.B, Att. 30; Pl. Summ. J. Opp. Br. § III.D.[6]

Defendants claim that Dr. Finnerty's "opinions on loss causation rely entirely on his leakage model."  Motion to Exclude Finnerty at 12.  Dr. Finnerty, of course, recognizes that additional loss was caused by Defendants' fraud when Bear collapsed <u>after</u> the Leakage Period. Carey Decl. Ex. 2, Finnerty Rpt, Att. 34; Finnerty Decl., Att. C)

---

[5]  All citations to "Pl. 56.1" are to Sherman's responses and objections and statements of additional material fact to be tried contained in his accompanying Local Rule 56.1 statement.

[6] All citations to "Carey Decl." refer to the August 17, 2015 Declaration of Jessica S. Carey and accompanying exhibits (Dkt. No. 99).

2.      **Dr. Finnerty's treatment of Bear-specific, non-fraud-related news on "mixed news days" is proper and, in any event, does not significantly affect his inflation calculation.**

Defendants argue that Dr. Finnerty inappropriately attributes entirely to fraud the abnormal returns occurring on days where there is a mix of both fraud- and non-fraud-related public news ("mixed-news days"). Motion to Exclude Finnerty at 12-13. Careful examination of those days, however, confirms Dr. Finnerty's approach. *See* Finnerty Decl. Section. V.A. There were ten mixed-news days during the Leakage Period. As an initial matter, on six of those days the non-fraud-related news items were not economically significant or were previously disclosed. *See* Finnerty Decl. ¶¶18-20. Thus, it was proper for Dr. Finnerty to attribute the abnormal returns on these days to Bear's fraud.

Of the four remaining mixed-news days, two (January 9, 2008 and February 15, 2008) had positive abnormal returns. *See id.* ¶21. Thus, Dr. Finnerty <u>decreased</u> the calculated amount of damages by <u>crediting</u> Bear with the abnormally positive return on those days. For example, on February 15, 2008, the non-fraud-related speculation regarding a potential takeover of Bear may have been a bigger driver of the abnormal positive return on the stock than the fraud-related news (and leakage) that was also published that day. To be conservative, Dr. Finnerty's report credits that abnormal positive return to the effect of the fraud. *Id.* (Dr. Finnerty's approach "reduces the damages amount").

On the two remaining mixed-news days were December 21, 2007 and March 14, 2008. Dr. Finnerty concluded that the abnormal returns on these days were driven by fraud-related news and thus he attributed the negative abnormal return on those days to the fraud.

On both these days, there was economically significant news could be classified as partly non-fraud-related news and partly fraud-related. *See id.* ¶¶ 25, 28. Because these news items

could be classified either as fraud-related or as non-fraud related, Dr. Finnerty classified them as non-fraud-related on Attachment 30 to the Finnerty Report in order to be conservative in Defendants' favor.  If Dr. Finnerty could classify a news item either way, he did not want his classification by itself to result in the attribution of a daily abnormal return to fraud unless the fraud-related news was the driver of the abnormal return for the day.  Dr. Finnerty, after a careful analysis of these days' news items, found that fraud-related news drove the negative abnormal returns on December 14, 2007 and March 14, 2008.  Accordingly, he properly treated the abnormal returns on these days as the result of the fraud.  *See id.* ¶¶ 22-30.

For example, on March 14, 2008, the economically significant news items classified as non-fraud related would have had a net <u>positive</u> effect on Bear's stock, so the negative abnormal return on the day was in fact driven by the fraud-related news.  Indeed, Dr. Finnerty was conservative in Defendants' favor when he treated the whole abnormal return on March 14, 2008 as attributable to the fraud rather than seeking to separate the negative effect of the fraud from the positive effect of the news he classified as non-fraud related.

Even if Defendants' criticisms of Dr. Finnerty's analysis were well grounded, they would not materially affect Dr. Finnerty's inflation calculation.  In fact, were Dr. Finnerty to revise his inflation calculation to exclude mixed-news days with statistically significant abnormal returns, inflation per share during the pre-Leakage Period would decrease by only $4.08 (from $78.73 to $74.65), a drop of approximately 5.18%.  *See id.* ¶¶ 26-31.

> **3.**     **Dr. Finnerty's treatment days where there was only non-fraud-related public news is proper and, in any event, does not significantly affect his inflation calculation.**

Defendants further criticize Dr. Finnerty for attributing the abnormal return of the stock price to leakage on days where (a) the only public news was non-fraud-related and (b) the

movement of Bear's stock price movement was not statistically significant.  *See* Motion to Exclude Finnerty at 12-13.  That criticism is baseless.  First, as discussed above, leakage is not limited to public announcements.  The leakage of information into and through the market continues (and continues to have an effect) even where there is non-fraud-related news revealed to the public on a particular day.  In any event, because there is no statistically significant price movement of the stock on these days, and because any residual movements are indistinguishable from pure "noise"—just as likely to be positive as negative—Dr. Finnerty's treatment of these days neither over- nor under-estimates actual inflation or damages.  *See* Finnerty Decl. ¶16.  In fact, were Dr. Finnerty to exclude such days, his inflation calculation would decrease by only $0.06 (from $78.73 to $79.57), or approximately 0.07%.  *Id.* ¶35.

Defendants next criticize Dr. Finnerty for attributing some change in the stock price to leakage on days when (a) the only public news is non-fraud-related, and (b) there <u>is</u> statistically significant stock price movement.  *See* Motion to Exclude Finnerty at 13.  This criticism is mistaken for several reasons.  First, as noted above, leakage continues on those days with non-fraud-related news, so it is not surprising that some of the price change during those days would be due to leakage.  Second, Dr. Finnerty's treatment of these days is an <u>improvement</u> over earlier approaches.  *See* Finnerty Decl. ¶14 n.21.  Briefly, earlier approaches to leakage analysis attributed the full abnormal return to leakage on days where the only public news is non-fraud-related.  This fails to adjust for any company-specific non-fraud-related news and thus may overstate damages.  Finnerty Decl. ¶14 & n.21.  On such days, in contrast, Dr. Finnerty adjusts the but-for price of the stock by the same percentage as the actual stock price moved on that

day.[7]  *See* Carey Decl. Ex. 2, Finnerty Rpt, Att. 31; Finnerty Decl., Att. B.  This eliminates the

bias in favor of exaggerated damages while also avoiding the absurd results generated by Dr.

Ferrell's attempt on such days to match the changes between the actual and but-for price in dollar

terms (as opposed to percentage terms).  For example, as shown in Exhibit 6 to the April 16,

2015 Report of Dr. Alan Ferrell, the attempt to match the changes between the actual and but-for

price in dollar terms results in inexplicably large swings in the but-for price of Bear stock (e.g., a

day-to-day drop of approximately 33 percent in the but-for price of Bear stock from March 7 to

March 10, 2008).[8] *See* Henken Decl. Ex.11, Ferrell Tr. 162:2-169:22.[9]

Furthermore, Dr. Finnerty's modified procedure ultimately produces a <u>conservative</u>

analysis of loss causation by lessening the bias inherent to the Cornell and Morgan methodology,

which could overstate the effect of leakage.  Even if this modification were made solely for the

purpose of litigation, which it was not, it would not render the methodology unreliable.  *See In re*

*NYSE Specialists Sec. Litig*., 260 F.R.D. 55, 68 (S.D.N.Y. 2009) (the fact that an expert report

relies on an algorithm that has been modified specifically for litigation does not render it

inadmissible); *Buchwald v. Renco Grp*., 2015 WL 5000623, at *9 (S.D.N.Y. Aug. 19, 2015)

("'[S]light modification[s]' of reliable methods do not, on their own, require exclusion. Rather,

to require exclusion of expert testimony under Rule 702, the flaws in the expert's conclusion

---

[7]  Of course, since the same percentage change is applied to different amounts (the actual price being inflated above the but-for price of the stock), the difference between the actual and but-for prices will change on those days as well.  (Thus, a 10% decline in the actual price of a stock of $10 applied equally a but-for price of $5 will reduce the difference between the actual and but-for prices by $0.50.)

[8]  Dr. Ferrell attribute these swings to Dr. Finnerty's methodology, but Dr. Finnerty calculates only an approximately four percent drop in the but-for price of Bear stock over the same period. *See* Ferrell Tr. at 181:18-25; Carey Decl. Ex. 2, Finnerty Rpt, Att. 31; Finnerty Decl., Att. B.

[9]  All citations to "Henken Decl." refer to the concurrently filed October 13, 2015 Declaration of Matthew Henken and accompanying exhibits.

must be sufficiently large that he or she 'lacks good grounds for his or her conclusions.'"

(quoting *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2001))).

 Defendants criticize the starting date of the Leakage Period, yet acknowledge in the very same paragraph that the December 20, 2007 start date coincides with the announcement of Bear's first quarterly loss as a public company as well as its write-down of $1.9 billion in mortgage-related assets.  Motion to Exclude Finnerty at 13-14.  That was clearly a day on which market participants would begin to exhibit heightened sensitivity to information leaking out about Bear's financial condition and liquidity.  Dr. Finnerty's selection of December 20, 2007 as the starting date for the Leakage Period was, again, a conservative choice in Defendants' favor. Dr. Finnerty found significant evidence for leakage even before December 20, 2007.  *See* Pl. 56.1 ¶ 172.   so an earlier-starting Leakage Period would likely have attributed more of Bear's stock drop to the effect of Defendants' fraud.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 212. In any event, the proper date range for the Leakage Period is an issue for the jury.  *Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 506 (S.D.N.Y. 2008).

 Defendants argue that the statistical significance of the aggregate abnormal return over the entire Leakage Period is entirely a function of the last few days of that period.  Defendants argue that since Bear performed the same as its peer firms during all but the last few days of the Leakage Period, no leakage occurred between December 20, 2007 and March 10, 2008 (the "truncated Leakage Period").  *See* Motion to Exclude Finnerty at 14-15.  Defendants' convenient truncation of the Leakage Period is improper and distorts their analysis.  Finnerty Decl. ¶ 38, 42.

 Defendants are correct that if one considers only the truncated Leakage Period, Bear's <u>aggregate</u> return is similar to that of its peer firms.  But closer examination reveals that Bear significantly underperformed its peer firms during the truncated Leakage Period except for three

days in late January—January 22-25, 2008—during which Bear's stock price increased by approximately 20 percent.  While this late January bump masks the effect of leakage on the performance of Bear's stock, the events which give rise to it are at least irrelevant to and indeed appear to support the existence of leakage.  Finnerty Decl. ¶ 40.  Without this late-January bump, leakage caused Bear to underperform its peer firms even in the truncated Leakage Period by 14.56%.  *Id.* ¶ 41.  In any event, Defendants arguments should be addressed to a jury and do not justify exclusion of Dr. Finnerty's report or testimony.

## II.   DR. FINNERTY'S CALCULATION OF STOCK-PRICE INFLATION PRIOR TO THE LEAKAGE PERIOD IS BASED ON THE ACCEPTED AND RELIABLE CONSTANT DOLLAR METHOD

Defendants criticize Dr. Finnerty for estimating the inflation in Bear's stock price at the beginning of the relevant period as the amount of inflation that came out of the stock as a result of the disclosure of the stock through the Leakage Period until Bear's collapse.  *See* Motion to Exclude Finnerty at 15-18.  This conclusion, Defendants' expert recognizes, is simply the result of Dr. Finnerty's applying the "constant dollar method" to calculate inflation prior to disclosure of the fraud.   Ferrell Tr. at 126:11-127:11.  Defendants' criticisms of Dr. Finnerty's use of the constant dollar method are unavailing.  The constant dollar method is universally accepted as the gold standard for damage valuations in securities cases.  Further, it is arguably the only method consistent with the Supreme Court's holding in *Dura.*

Under the constant dollar method, the inflation in a stock's price at a given time prior to the disclosure of the fraud at issue is identified as the dollar value by which the stock price dropped as a result of disclosure of the fraud (through leakage or market-wide, public statements).  Applying this method, the maximum per-share loss of investors who sold shares after Bear's collapse is $78.73 (the inflation that came out of the stock through leakage and

market-wide disclosure during the period December 20, 2007-March 17, 2008), regardless of whether the investor purchased Bear stock for $170/share in January 2007 or $95/share in November 2007.  This is consistent with the Supreme Court's ruling in *Dura* that the only recoverable losses in a securities fraud action are those which occur after (and as a result of) the disclosure of the "relevant truth."  Indeed, it has been argued this it is the <u>only</u> method consistent with *Dura*. *See,* David Tabak, "Inflation and Damages in a Post-Dura World," National Economic Research Associates, Inc. (NERA), September 15, 2007 (noting that a "response to *Dura* has been to consider the constant dollar method as the sole permissible approach to modeling inflation"); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1269 (N.D. Okla. 2007), *aff'd*, 558 F. 3d 1130 (10th Cir. 2009) (rejecting an alternative to the constant dollar method—the "constant percentage method"—as contrary to *Dura* because it "would give the equity investor the 'partial downside insurance policy' which *Dura* counsels that the securities law should not provide" (quoting *Dura*, 544 U.S. at 348)); Finnerty Decl. ¶44.  Critically, alternative methods of calculating damages appear to require that the investor who purchased Bear stock for $170/share in January 2007 suffered greater damages than the investor who purchased Bear stock for $95/share in November 2007, even though those losses occurred <u>prior</u> to the disclosure of the relevant truth.  *See*, *e.g.*, Tabak, *Inflation and Damages in a Post-*Dura *World*, *9, 22.  Defendants' own expert, Dr. Ferrell, was unaware of a single case in which the constant dollar method has been rejected by a court. *See* Henken Decl. Ex. 11, Ferrell Tr. 121:17-23. Dr. Finnerty's use of this universally accepted method cannot justify exclusion of his report or testimony.  Defendants' contention that one cannot estimate inflation prior to the revelation of the fraud by using the amount of inflation that came out of the stock after the

disclosure of the fraud would, if accepted, represent a sea change in inflation calculation, against all accepted estimations of inflation utilized in prior securities fraud cases consistent with *Dura*.

Moreover, comparative analysis reveals that the constant dollar method is the <u>conservative</u> method for calculating inflation in this case.  *See* Finnerty Decl. ¶40.  Under the constant percentage method, the maximum inflation would have been calculated as approximately $150, as compared to $79.60.  Finnerty Decl. ¶ 45 & n.47; *see* Henken Decl. Ex. 11, Ferrell Tr. 121:10-16 (admitting that inflation would have been higher under constant percentage method).

Defendants claim that Dr. Finnerty's inflation calculation is based on an assumption that an earlier disclosure of the fraud would have resulted in a run on Bear.  That is incorrect.  As Dr. Ferrell recognized, Dr. Finnerty's inflation estimate for early 2007 does not require or imply a run on the bank at that time.  Rather, it requires only that the disclosure of the fraud would remove the same dollar amount (which, because of the higher stock price in early 2007, would have represented a much smaller percentage) from Bear's stock price as was removed from the stock after the revelation of fraud in March 2008.  *See* Henken Decl. Ex. 11, Ferrell Tr. at 134:20-135:10. Dr. Finnerty does not assume that the removal of $78.73 from Bear's stock (the amount by which he calculates the stock was inflated prior to the Leakage Period) requires a run on the bank and. Defendants offer no reason to suppose that he must do so for revelation of the fraud to reduce Bear's stock price from (for example) $171.51 (Bear's closing stock price on January 12, 2007) to $92.78 (the stock price after removing the inflation calculated by Dr. Finnerty).

Finally, even if Dr. Finnerty's inflation calculation *had* assumed that the disclosure of the alleged fraud in early 2007 would have caused a run on Bear (which it did not), it would not be

sufficient to justify excluding his report and testimony.  *See Zerega Ave. Realty Corp.*, 571 F.3d

at 213 (affirming the district court's ruling that expert testimony was admissible because

"contentions that assumptions [made by the expert] are unfounded go to the weight, not the

admissibility, of the testimony"); *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.

1996) (expert testimony's assumptions sufficient to justify exclusion only if they "are so

unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges

comparison, other contentions that the assumptions are unfounded go to the weight, not to the

admissibility of the testimony") (citations and internal quotations omitted).

## III.    DR. FINNERTY'S OPINIONS REGARDING BEAR'S RISK MANAGEMENT, ASSET VALUATION, AND LIQUIDITY ARE BASED ON EXTENSIVE REVIEW AND ANALYSIS OF THE RECORD EVIDENCE

Defendants argue that even if Dr. Finnerty's opinions on loss causation, damages, and the

efficiency of the market for Bear's stock are admitted, his opinions on Bear's financial condition,

including its liquidity, asset valuations, and risk management, should be excluded.  Dr.

Finnerty's opinions regarding loss causation and damages require that he form opinions about

the truth of Bear's financial condition, what the market knew about this truth at various times,

and the effect on the market of the disclosure of Bear's true financial condition.  In particular,

Dr. Finnerty's review of publicly available sources and documents produced in this case,

together with his experience, expertise, and judgment, led him to form opinions regarding the

Bear's assets valuations, risk-management, and the adequacy of Bear Stearns' liquidity.

Defendants' argument that Dr. Finnerty's opinions on these so-called "additional topics" should

be excluded because they are not derived from any reliable principles or methods and will not

assist the trier of fact is plainly incorrect.  Motion to Exclude Finnerty at 18.

Defendants also claim that Dr. Finnerty "mischaracterizes or takes out of context" the evidence that he cites.  Motion to Exclude Finnerty at 19.  Defendants, however, point to only a single example of such a document (which they identify as "just one example" without offering any additional citations) arguing that Dr. Finnerty's report "blatantly misprepresent[ed]" the document in question.  *Id*. at 25.  That single, so-called misrepresentation is nothing of the sort.  Specifically, Defendants' refer to ¶165 of Dr. Finnerty's report, where Dr. Finnerty provides samples of evidence that "at least some members of Bear Stearns' management were aware of the overvaluation of Bear Stearns' assets and were concerned about the implications of the overvaluation."  Finnerty Rpt. ¶165.  Among the evidence presented in that paragraph is a November 8, 2007 e-mail between Bear insiders reporting that "our Risk management refuses to recognize the difference between real market prices we see and the Totem [a reporting service] data" and risk management even ignores Bear's own trading prices; "the implication is that the desk is being dishonest and systematically mis-marking the book."  Defendants' chide Dr. Finnerty for allegedly cherry-picking quotes.  Ironically, Defendants' selectively quote the very next words in the e-mail, "This is just not the case [that the desk is being dishonest and systematically mis-marking the book]," but fail to quote the remainder of that *same* sentence: "and Risk does not do a good job in my opinion at recognizing this and explaining it to management." (Carey Decl. Ex. 2, Finnerty Rpt, Ex. 25).  Dr. Finnerty's quotes this e-mail as an example to supporting the conclusion that there were Bear insiders concerned about problems with Bear's valuations.  The fact that the sender of the e-mail disagrees that there is "dishonest and systematic mismarking" of Bear's book does not alter the fact that Bear insiders were concerned, especially since the sender notes that his view on the truth about Bear's valuations had not been properly "explaine[ed]" to management.

20

Defendants simply disagree with Dr. Finnerty, which is a dispute for the trier of fact to resolve, not a basis for excluding an expert's report or testimony. *See Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). "To the extent Defendants disagree with the conclusions [plaintiff's expert] reaches, their experts can testify about their contrary interpretations, and Defendants can challenge [the expert's] conclusions on cross-examination." *Discover Fin. Servs.*, 582 F. Supp. 2d at 506 (denying *Daubert* motion); *see Park W. Radiology v. Carecore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009).

Defendants criticize Dr. Finnerty's opinions on mortgage valuation, risk management, liquidity, and capital because of the "analytical gap" between his opinions and the evidence. Motion to Exclude Finnerty at 23. An "analytical gap" that requires excluding an expert's opinion arises where the evidence cited by the expert is inadequate to support the expert's conclusion beyond his or her *ipse dixit*. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *In re Fosamax*, 688 F. Supp. 2d at 267-68 (noting that, in establishing an analytical gap, "[o]nly serious flaws in reasoning will warrant exclusion," because "[a]s long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process") (citation and internal quotations omitted). Specifically, Defendants argue that Dr. Finnerty should have considered additional evidence or evaluated the evidence that he considered differently, but fail to provide any evidence they claim to be contradictory to his conclusions. Rather, Defendants simply characterize Dr. Finnerty's evidence as nothing more than a "handful of documents." Motion to Exclude Finnerty at 19. That characterization is clearly incorrect. Dr. Finnerty testified regarding the broad scope of his evidentiary review and made clear that he was providing merely examples of the evidence he found in support of his

21

conclusions.  To wit, by the time of his deposition, he had already spent approximately 300-400 hours analyzing this case.  *See* Henken Decl. Ex. 5, Finnerty Tr. at 30:25-31:5.  Dr. Finnerty attached a nearly 150-page list of more than 2,750 documents that he specifically relied on to his report, *see* Finnerty Rpt. Att. B, which is itself just a subset of an even larger collection of documents that he reviewed.  *See id.* at 34:18-42:22.

Inconsistently with their claim that Dr. Finnerty does not support his conclusions with adequate evidence, Defendants also claim that Dr. Finnerty's opinions should be excluded because they merely "summarize" the record evidence.  Motion to Exclude Finnerty at 23.  Dr. Finnerty's evaluation of the evidence is not a mere summary, but reflects his assessment of the credibility and import of the massive volume of evidence that he reviewed in reaching his conclusions, as evidenced by Defendants' own disagreements with Dr. Finnerty's weighting of certain evidence.  *See, e.g.,* Motion to Exclude Finnerty at 22 (claiming that Dr. Finnerty failed to give sufficient weight to the certain evidence).  Any questions that Defendants have about the weight or sufficiency of the evidence Dr. Finnerty relied on or his conclusions therefrom "can be asked on cross examination."  *Park W. Radiology*, 675 F. Supp. 2d at 326.

The cases Defendants rely on to support their claim that Dr. Finnerty's opinions are mere "summaries" of the evidence are readily distinguished.  In *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409 (S.D.N.Y. 2009), the expert's declaration was "replete with opinions and conclusions which appear to be nothing more than information supplied to" the expert by the defendant. *Id*. at 428.  In fact, the expert in that case "simply repeat[ed] the hearsay of the client who retained him, without any independent investigation or analysis."  *Id.* at 429.  Relatedly, in *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007), the expert admitted that he did not participate, in any way, in conducting the regression analysis that he presented;

further, he was unqualified to conduct or interpret any statistical analyses.  *See id.* at 664.  The case at bar is much closer to the third decision cited by Defendants, *Am. Home Assur. Co. v. Merck & Co.,* 462 F. Supp. 2d 435 (S.D.N.Y. 2006), where the court *admitted* an expert's report because the expert had "reviewed all the underlying materials that informed [an earlier expert report] and reached similar conclusions. … [and] then add[ed] additional observations." *Id.* at 448.  Similarly, Dr. Finnerty reached his own conclusions after reviewing thousands of produced documents and testimony provided by Bear personnel, Bear's outside consultants, the SEC, and the Officer of the Inspector General (the "OIG") (and its outside expert), as well as public statements by Bear and third-party analysts.

Defendants criticize Dr. Finnerty for not performing his own analysis of Bear's valuations (*see* Motion to Exclude Finnerty at 19-20), risk management (*see id.* at 20), or liquidity (*see id.* at 21), but Dr. Finnerty properly relied on analyses including those performed by those inside Bear and consultants hired by Bear, such as Mercer Oliver Wyman, as well as outside work completed by the SEC and in connection with the SEC Office of Inspector General's 2008 audit report (the "OIG Report").  There is no requirement that an expert do more. *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect."); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 322 (E.D.N.Y. 2013) (admitting expert testimony and noting that "it is significant that an expert may rely on data collected by others," including "approved documents").  Expert analysis is often based on reported information rather than on firsthand knowledge, which is no bar to its admissibility.  *See*, *e.g.*, *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001); *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 524-25 (2d Cir. 1996) (determining that an expert affidavit "was laid on a proper foundation" where the expert reviewed studies and reports concerning subject matter of

his opinions); *see also Astra Aktiebolag v. ANDRX Pharma., Inc.*, 222 F. Supp. 2d 423, 494 (S.D.N.Y. 2002) ("[A]n expert may rely on data he or she did not personally collect." (quoting *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000)). Moreover, since Bear ceased to operate independently in March 2008, any analysis would perforce be done through examination of the contemporary, documentary evidence.

Defendants criticize Dr. Finnerty for "ignoring" allegedly contradictory evidence. Motion to Exclude Finnerty at 22.   For example, Defendants criticize Dr. Finnerty for "ignoring" the SEC's Division of Trading and Markets' ("T&M's") criticisms of the OIG Audit Report, but Dr. Finnerty has testified he *did* review these criticisms. *See* Henken Decl. Ex.5, Finnerty Tr. at 44:21-45:12.   While Defendants endorse T&M's own view of the OIG Report, the OIG concluded that the T&M's criticisms, "even if true, [] have no impact on the overall findings and conclusions of the [OIG] report." Carey Decl., Ex. 30, OIG Rep. at 116-17. Furthermore, T&M ultimately adopted twenty of the Audit Report's twenty three recommendations.  *See* Carey Decl. Ex. 34, Ltr. from H. David Kotz to Chairman Christopher Cox (dated Sept. 25, 2008).  The fact that Dr. Finnerty did not treat T&M's criticisms the way Defendants would prefer does not mean that he "ignored" them.

Defendants simply disagree with Dr. Finnerty's evaluation of what they claim to be contradictory evidence.  That alone does not justify exclusion of his report or testimony.  *See Discover Fin. Servs.*, 582 F. Supp. 2d at 506 ("To the extent Defendants disagree with the conclusions [plaintiffs' expert] reaches, their experts can testify about their contrary interpretations, and Defendants can challenge [the expert's] conclusions on cross-examination."). Defendants point to *Faulker v. Arista Records LLC*, 46 F. Supp. 3d 365 (S.D.N.Y. 2014), for support, but in that case the expert's opinions "were set prior to his review of the documents"

24

and the expert's failure to review certain records and disregard of such records after his belated

review, "indicate that his methodology was aimed at achieving one result." *Id.* at 381.

Defendants also cite *E.E.O.C. v. Bloomberg L.P.*, 2010 WL 3466370 (S.D.N.Y Aug. 31, 2010),

but in that case the expert had reviewed only a "truncated version" of an e-mail exchange,

conceded "that had he reviewed the email in its entirety, it would have made him 'reconsider' his

conclusion and 'back off … from [this conclusion] in the report,'" and failed to review

deposition testimony which refuted the expert's characterization of the policy at issue in the case.

*Id.* at *16.  Here, by contrast, Dr. Finnerty has made a thorough review of the record evidence.

Defendants' arguments, at most, go to the weight that Dr. Finnerty's testimony should be

accorded—not to its admissibility. *See POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F.

Supp. 2d 188, 200 (S.D.N.Y. 2011) (admitting an expert report because any "methodological

flaws alleged in [the expert's] report go to the weight to be given to the surveys, not their

admissibility"); *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 557 (S.D.N.Y. 2005)

(stating that an expert's lack of experience in applying a particular methodology goes to the

"weight of [the expert] testimony, not its admissibility"); *Royal Ins. Co. of Am. v. Joseph Daniel*

*Constr., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) ("Once the thresholds of reliability and

relevance are met . . . any purported weakness in an expert's methodology or conclusion goes to

the degree of credibility to be accorded to the evidence, not to the question of its admissibility.").

## CONCLUSION

For the reasons stated above, Plaintiff Bruce S. Sherman respectfully requests that the

Court deny Defendants' motion to exclude the report and testimony of John D. Finnerty.

Dated:   October 13, 2015

BOIES, SCHILLER & FLEXNER LLP

Philip C. Korologos
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Phone: (212) 446-2300
Fax:    (212) 446-2350

Richard B. Drubel
Matthew J. Henken
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
Phone: (603) 643-9090
Fax:    (603) 643-9010

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Phone: (312) 641-9750
Fax:    (312) 641-9751

Stephen M. Tillery
Douglas R. Sprong
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Phone: (314) 241-2844
Fax:    (314) 241-3525

*Attorneys for Plaintiff*