**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE THE BEAR STEARNS COMPANIES, INC. SECURITIES, DERIVATIVE, AND ERISA LITIGATION<br><br><br>This Document Relates To:<br>    Securities Action, No. 08 Civ. 2793 (RWS) | Master File No.:<br>08 MDL 1963 (RWS)<br><br>ECF Case |
| BRUCE S. SHERMAN,<br><br>                      Plaintiff,<br><br>           v.<br><br>BEAR STEARNS COMPANIES INC., JAMES CAYNE, WARREN SPECTOR AND DELOITTE & TOUCHE LLP,<br><br>                      Defendants. | Index No.:<br>09 Civ. 8161 (RWS) |

**PLAINTIFF BRUCE S. SHERMAN'S RESPONSES AND OBJECTIONS**
**TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT, AND**
**STATEMENT OF ADDITIONAL MATERIAL FACTS TO BE TRIED**

Plaintiff Bruce S. Sherman, by and through his undersigned counsel, respectfully submits

these responses and objections to Defendants' Local Rule 56.1 Statement, and additional

statements of material facts as to which he contends there exists a genuine issue to be tried.

I.    **RESPONSES AND OBJECTIONS TO DEFENDANTS' STATEMENTS**

For the Court's convenience, Defendants' statements are repeated verbatim, followed by

Plaintiff's responses.

**Background – Defendants**

1.    **Defendants' Statement:**

Prior to its acquisition by JPMorgan Chase & Co. ("JPMorgan") on June 2, 2008 (Compl.
¶ 18), Bear Stearns was a leading publicly traded investment banking, securities and derivatives
trading, clearance and brokerage firm.  (Carey Decl. Ex. 1, 2006 10-K at 32, 122.)  Its principal
business lines included capital markets, which was "comprised of the institutional equities, fixed
income and investment banking areas," global clearing services, and wealth management, which
was "comprised of the Private Client Services... and asset management areas."  (*Id.* at 4.)

    **Plaintiff's Response:**

Admitted.

2.    **Defendants' Statement:**

The individual defendants were directors and/or officers of Bear Stearns before the
JPMorgan merger.  They are James E. Cayne, Bear Stearns's former CEO and Chairman of the
Board (Compl. ¶ 19) and Warren J. Spector, former co-President and co-COO until August 2007
and former Senior Managing Director until December 2007 (Compl. ¶ 20).

    **Plaintiff's Response:**

Admitted.

**Plaintiff Bruce Sherman and his Stock Purchases**

3.    **Defendants' Statement:**

Plaintiff Bruce Sherman was at all relevant times CEO and CIO of Private Capital
Management L.P. ("PCM").  (Compl. ¶ 2.)

    **Plaintiff's Response:**

Admitted.  Overall, PCM had investment control over the largest block of Bear common
stock, almost six percent of Bear's outstanding shares.

4.    **Defendants' Statement:**

Plaintiff claims to have made the following purchases during the relevant period, as defined by plaintiff's expert, from December 14, 2006 through March 14, 2008 ("Relevant Period") (Carey Decl. Ex. 2, Finnerty Rpt ¶ 10):

    a.  15,000 shares of Bear Stearns common stock on June 25, 2007 at a price of $140.76 per share.  (Carey Decl. Ex. 2, Finnerty Rpt, Att. 37, Panel A.)

    b.  45,000 shares of Bear Stearns common stock on August 3, 2007 at a price of $110.14 per share.  (*Id.*)

    c.  10,000 shares of Bear Stearns common stock on August 10, 2007 at a price of $108.60 per share.  (*Id.*)

    d.  5,000 shares of Bear Stearns common stock on August 14, 2007 at a price of $106.12 per share.  (*Id.*)

    e.  7,000 shares of Bear Stearns common stock on August 15, 2007 at a price of $103.15 per share.  (*Id.*)

    f.  10,000 shares of Bear Stearns common stock on October 8, 2007 at a price of $126.74 per share.  (*Id.*)

    g.  10,000 shares of Bear Stearns common stock on December 18, 2007 at a price of $91.54 per share.  (*Id.*)

    h.  12,000 shares of Bear Stearns common stock on January 9, 2008 at a price of $72.13 per share.  (*Id.*)

    i.  13,000 shares of Bear Stearns common stock on January 10, 2008 at a price of $75.95 per share.  (*Id.*)

    j.  50,000 shares of Bear Stearns common stock on March 11, 2008 at a price of $61.37 per share.  (*Id.*)

    k.  20,000 shares of Bear Stearns common stock on March 13, 2008 at a price of $53.77 per share.  (*Id.*)

**Plaintiff's Response:**

Plaintiff admits that he made the purchases at the prices and on the dates listed in paragraph 4(a)-(k).

5.    **Defendants' Statement:**

Plaintiff claims to have sold 229,150 shares of Bear Stearns common stock on March 19, 2008 at a price of $5.23 per share.  (*Id.*)

**Plaintiff's Response:**

Plaintiff admits that he sold 229,150 shares of Bear common stock on March 19, 2008 at a price of $5.23 per share.

6.   **Defendants' Statement:**

Among the shares at issue in this case are 7,000 shares of Bear Stearns common stock purchased on August 15, 2007 (*Id.*, Panel C) in an account owned by the Bruce and Cynthia Sherman Charitable Foundation Inc. (the "Foundation"), not by plaintiff. (*See* Carey Decl. Ex. 3.) Plaintiff is seeking $922,371 in damages related to these shares. (Carey Decl. Ex. 2, Finnerty Rpt, Att. 37, Panel C.)

**Plaintiff's Response:**

Plaintiff admits that the 7,000 shares of Bear common stock purchased on August 15, 2007 were held in an account owned by the Foundation. Plaintiff is seeking $922,371 in damages related to these shares on behalf of the Foundation. *See* Pl.'s Summ. J. Opp. Br. § VI;

███████████████████████████████████████████████████████

7.   **Defendants' Statement:**

███████████████████████████████████████████████████████

**Plaintiff's Response:**

Admitted.

8.   **Defendants' Statement:**

The Foundation is not a plaintiff in this case. (*See generally* Compl.)

**Plaintiff's Response:**

Denied. Although the Foundation is not a named plaintiff in this case.

███████████████████████████████████████████████████████

---

[1] All citations to "Henken Decl." refer to the concurrently filed October 13, 2015 Declaration of Matthew Henken and accompanying exhibits.

9. **Defendants' Statement:**

The Foundation did not opt out of the settlement of the related securities class action, *In re The Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.*, 08 Civ. 2793 (S.D.N.Y.) (RWS) (the "Securities Class Action"). (08 Civ. 2793, Dkt. No. 249, Ex. A.)

**Plaintiff's Response:**

Plaintiff denies that the Foundation did not opt out of the settlement of the Securities Class Action. The shares Plaintiff purchased for the benefit of the Foundation on August 15, 2007 were included in Plaintiff's opt-out letter and thus excluded from the Securities Class Action by this Court's order. Henken Decl. Ex. 2, Letter from Richard B. Drubel to Bear Stearns Securities Litigation Settlements Exclusions, Attach. 1; Securities Class Action, No. 08 Civ. 2793, Dkt. No. 249, Ex. A.

10. **Defendants' Statement:**

Plaintiff is also seeking $5,734,636 in damages for 50,000 shares of Bear Stearns common stock purchased on March 11, 2008 and 20,000 shares of common stock purchased on March 13, 2008. (*See* Carey Decl. Ex. 2, Finnerty Rpt, Att. 37, Panel C.)

**Plaintiff's Response:**

Admitted.

11. **Defendants' Statement:**

These shares were purchased with funds held in an escrow account in connection with the sale of PCM to Legg Mason, Inc. (the "Escrow Account"). (*See* Carey Decl. Ex. 5 at SH00002; Carey Decl. Ex. 4, Sherman Tr. at 85:19-86:15.)

**Plaintiff's Response:**

Admitted.

12. **Defendants' Statement:**

In 2001, Plaintiff and his partners sold PCM to Legg Mason, Inc. ("Legg Mason") (Carey Decl. Ex. 4, Sherman Tr. at 43:12-44:7), a publicly-traded financial services firm based in Baltimore, MD (Carey Decl. Ex. 6, Legg Mason 2010 10-K at 1).

**Plaintiff's Response:**

Admitted.

13. **Defendants' Statement:**

This purchase was structured as an upfront payment of $682 million in cash, with two contingent payments based on PCM's performance in the subsequent years, which would be

made after three years, in 2004 (the "Year 3 Earnout"), and after five years, in 2006 (the "Year 5 Earnout"), if PCM reached certain earnings targets. (*See* Carey Decl. Ex. 7, 5/30/01 Legg Mason 8-K at 17 (Ex. 99.2, "Transaction Overview").) The Year 3 Earnout was capped at $400 million, and the aggregate transaction value was capped at $1.382 billion (meaning that since the purchase price was $682 million, the combined Year 3 and Year 5 Earnouts could not exceed $700 million). (*Id.*)

### Plaintiff's Response:

Admitted.

### 14.   Defendants' Statement:

The first $300 million of the Year 5 Earnout was to be placed in escrow, and would only be released out of escrow in installments in subsequent years if PCM continued to meet additional earnings targets in 2007, 2008, and 2009. (Carey Decl. Ex. 8, Legg Mason Purchase Agreement § 2.15(a), (b), and (c).) Otherwise, the escrowed funds remained subject to claw back by Legg Mason. (*Id.*)

### Plaintiff's Response:

Admitted.

### 15.   Defendants' Statement:

In 2004, Legg Mason paid the full amount of the Year 3 Earnout, $400 million, directly to plaintiff and his partners. (Carey Decl. Ex. 9, Legg Mason 2007 10-K at 49.)

### Plaintiff's Response:

Admitted.

### 16.   Defendants' Statement:

In 2006, Legg Mason paid the maximum possible Year 5 Earnout, $300 million, into one or more escrow accounts for plaintiff and his partners, with the moneys remaining subject to claw back based on PCM's continued performance. (*Id.*)

### Plaintiff's Response:

Admitted.

### 17.   Defendants' Statement:

**Plaintiff's Response:**

███████████████████████████████████████████████████████

18.   **Defendants' Statement:**

On March 11, 2008, $3,068,550.00 from the escrow account was invested in 50,000 shares of Bear Stearns common stock.  (Carey Decl. Ex. 5 at SH00002.)  On March 13, 2008, $1,075,380.60 from the escrow account was invested in 20,000 shares of Bear Stearns common stock.  (*Id.*)

**Plaintiff's Response:**

Admitted.

19.   **Defendants' Statement:**

On March 19, 2008, plaintiff sold those 70,000 shares of Bear Stearns common stock.  (*Id.* at SH00003.)  The proceeds of the sale were returned to the Escrow Account.  (*Id.*)

**Plaintiff's Response:**

Admitted.

20.   **Defendants' Statement:**

███████████████████████████████████████████████████████

**Plaintiff's Response:**

Admitted.

21.   **Defendants' Statement:**

In the fall of 2008, plaintiff and his partners made an "early return" to Legg Mason of $68.4 million from the escrowed funds.  (Carey Decl. Ex. 10, Legg Mason 4Q08 10-Q at 16.)

**Plaintiff's Response:**

Admitted.

22.   **Defendants' Statement:**

███████████████████████████████████████████████████████

**Plaintiff's Response:**

█████████████████████████████████████████████████████████

23. **Defendants' Statement:**

Legg Mason is not a plaintiff in this case (*see* Compl.) and did not opt out of the Securities Class Action.  (*In re The Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation*, 08 M.D.L. 1963, Dkt. No. 338, Ex. A.)

**Plaintiff's Response:**

Admitted.

## Bear Stearns's Disclosures Related to Its Involvement in the Mortgage Market

24. **Defendants' Statement:**

Bear Stearns was extensively involved in originating, distributing, and trading mortgage-backed securities ("MBS") and other mortgage derivatives (*see* Compl. ¶¶ 50-51; *see also* Carey Decl. Ex. 11, 2007 10-K at 3).

**Plaintiff's Response:**

Admitted.

25. **Defendants' Statement:**

Through its subsidiaries, Bear Stearns originated residential mortgage loans, packaged them into residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"), and sold them to investors.  (*See* Compl. ¶¶ 50-51; *see also* Carey Decl. Ex. 11, 2007 10-K at 7.)

**Plaintiff's Response:**

Admitted.

26. **Defendants' Statement:**

The scope of Bear Stearns's involvement in the mortgage market and its reliance on revenues from mortgage securitizations and trading was disclosed to investors.

   a. Bear Stearns characterized itself as a "market leader in mortgage-backed securitization and other structured financing arrangements."  (Carey Decl. Ex. 12, 3Q06 10-Q at 16.)

b.  Bear Stearns disclosed that it was "a leading underwriter of and market-maker in, residential and commercial mortgages" and specifically disclosed that its mortgage loan portfolios were "of varying quality."  (Carey Decl. Ex. 1, 2006 10-K at 8.)

**Plaintiff's Response:**

Plaintiff denies that Defendants disclosed the scope of Bear's involvement in the mortgage market and its reliance on revenues from mortgage securitizations and trading.  While, the statements quoted above assert that Bear was a leader in certain mortgage-related transactions, they say nothing about the scope of, or revenues from, those transactions.  *See* Carey Decl. Ex. 12, 3Q06 10-Q at 16;[2] Henken Decl. Ex. 3, 2006 10-K at 8.  Moreover, notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's actual subprime exposure, such as its indirect exposure to subprime assets, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks).

27.  **Defendants' Statement:**

Bear Stearns disclosed that its fixed income division, which housed its mortgage-related activities, accounted for a large portion of its revenues. (Carey Decl. Ex. 1, 2006 10-K at 4, 40). Analysts reported that mortgage-related activities made up the largest part of this revenue.  (*See, e.g.*, Carey Decl. Ex. 16, Richard X. Bove, Punk Ziegel & Co., *Bear Stearns Upgrade Report*, at 1 (Nov. 21, 2006); *see also* Carey Decl. Ex. 17, Joe Dickerson and Camilla Petersen, Atlantic Equities, *Bear Stearns: Expect* Q2 *07 Below Street on Fixed Income*, at 1 (May 30, 2007) ("Expect fixed income trading (~40% of total) down 10% QoQ and YoY[], as Bear likely experienced prolonged weakness in its mortgage business (which we estimate to be 30-40% of fixed income revenues) over the quarter.")

a.  Bear Stearns reported that approximately 41% of its net revenues for the third quarter of 2006 were attributable to fixed income.  (Carey Decl. Ex. 12, 3Q06 10-Q at 28.)

b.  In its 2006 10-K, the Company disclosed that fixed income net revenues for fiscal year 2006 were $4.19 billion, approximately 45% of its total net revenues.  (Carey Decl. Ex. 1, 2006 10-K at 33.)

c.  On April 10, 2007, the Company disclosed that fixed income net revenues for the first quarter of 2007 were $1.15 billion, approximately 46% of its total net revenues. (Carey Decl. Ex. 13, 1Q07 10-Q at 30.)

d.  On July 10, 2007, the Company disclosed that fixed income net revenues for the second quarter of 2007 were $962.3 million, approximately 38% of its total net revenues.  (Carey Decl. Ex. 14, 2Q07 10-Q at 3l.)

---

[2] All citations to "Carey Decl." refer to the August 17, 2015 Declaration of Jessica S. Carey and accompanying exhibits (Dkt. No. 99).

e.  On October 10, 2007, the Company disclosed that fixed income net revenues for the third quarter of 2007 were a loss of $179.1 million, down from a net positive of $789.3 million from the prior year quarter.  (Carey Decl. Ex. 15, 3Q07 10-Q at 38.)

f.  On January 29, 2008, the Company disclosed that fixed income net revenues for FY 2007 were a loss of $685 million, down from a net positive of $4.19 billion from the prior year quarter.  (Carey Decl. Ex. 11, 2007 10-K at 41.)

**Plaintiff's Response:**

Denied.  According to Bear's 2006 10-K, the fixed-income area included certain mortgage-related activities , and fixed-income net revenue comprised approximately 57-59% of Bear's total capital markets net revenue for the years 2004-2006.  *See* Henken Decl. Ex. 3, 2006 10-K at 4, 40.  Fixed-income revenue therefore accounted for a large portion of Bear's *capital markets* revenues for those three years; it did not account for a large portion of Bear's *overall* net revenue for any time period.

Plaintiff denies that the Atlantic Equities research report cited above states that mortgage-related activities made up the largest part of Bear's fixed-income revenue.  The report estimated that Bear's mortgage business was 30-40% of its fixed-income revenue and did not foreclose the possibility that another revenue source made up more than 40% of the remaining 60-70% of fixed-income revenue.  *See* Carey Decl. Ex. 17, Joe Dickerson & Camilla Petersen, Atlantic Equities, *Bear Stearns: Expect* Q2 *07 Below Street on Fixed Income*, at 1 (May 30, 2007).

Plaintiff denies that Defendants disclosed Bear's fixed-income net revenues for FY 2007 as a loss of $685 million, down from a net positive of $4.19 billion from the prior year quarter.  Bear's 2007 fixed-income net revenue was a net *positive* $685 million (not a loss of that amount), down from a net positive of $4.19 billion from the prior *year* (not year quarter).  Henken Decl. Ex. 4, 2007 10-K at 41.

## 28.  **Defendants' Statement:**

The scope of Bear Stearns's involvement in the mortgage market and reliance on its mortgage business was also recognized by the market.

a.  Analysts stated as early as the spring of 2006 that "Lehman and Bear Stearns are more vulnerable than rivals such as Goldman because their mortgage-bond revenue is 'several times' the industry average of 2 percent of revenue," and that "Bear Stearns and Lehman rode the U.S. housing boom from 2000 to 2005 as the top two underwriters of new mortgage securities."  (Carey Decl. Ex. 18, Bradley Keoun & Al Yoon, *Bear Stearns, Lehman Mortgage Growth Crimped by Housing Market*, Bloomberg, Mar. 20, 2006 (quoting Fox-Pitt Kelton analyst David Trone).)

b.  Analysts also reported in the fall of 2006 that Bear Stearns had "the largest exposure to the MBS market among the brokers."  (Carey Decl. Ex. 19, Brad Hintz, BernsteinResearch, *BSC Q3 2006 EPS – Saved by Hedge Fund Performance Fees*, at 3 (Sept. 15, 2006); *see also* Carey Decl. Ex. 20, Richard X. Bove, Punk Ziegel & Co.,

*Bear Stearns Update Report*, at 1 (Sept. 15, 2006) ("Bear Stearns is the largest issuer of mortgage backed bonds in the country.").)

c.   Analysts noted that Bear Stearns had "close ties with the mortgage industry."  (Carey Decl. Ex. 21, Meredith Whitney, CIBC World Markets, *Earnings Update*, at 1 (Sept. 14, 2006).)

d.   Analysts observed that Bear Stearns's "higher exposure to domestic MBS" was an "area of strength" for the Company.  (Carey Decl. Ex. 22, James Mitchell, Buckingham Research Group, *Research Note for December 6, 2006*, at 1 (Dec. 6, 2006).)

e.   Bear Stearns, it was noted, "ha[d] publicly stated its intention to keep building all facets of the mortgage business."  (Carey Decl. Ex. 23, Richard X. Bove, Punk Ziegel & Co., *Bear Stearns Update Report*, at 1 (Oct. 11, 2006).)

f.   Analysts observed that Bear Stearns "claim[ed] to be the largest originator of mortgage securities in the world."  (Carey Decl. Ex. 16, Richard X. Bove, Punk Ziegel & Co., *Bear Stearns Upgrade Report*, at 1 (Nov. 21, 2006).)

g.   In its rankings of debt underwriters for the third quarter of 2006, Thomson Financial ranked Bear Stearns #1 for U.S. RMBS, #2 for U.S. MBS, and #3 for global MBS. (Carey Decl. Ex. 24, Thomson Financial, *Debt Capital Markets Review: Third Quarter 2006*, at 4, 7, 8.)

h.   In early 2007, analysts continued to report that Bear Stearns had more exposure to the U.S. mortgage market than its peers.  (*See, e.g.*, Carey Decl. Ex. 25, Lauren Smith, Keefe, Bruyette & Woods, *Equity Research: Bear Stearns Companies Inc.*, at 2 (Mar. 16, 2007) ("With more exposure to the U.S. mortgage market than its peers, we believe that a negative sentiment will continue to hang over shares of BSC."); *see also* Carey Decl. Ex. 26, Mike Mayo and Matthew Fischer, Deutsche Bank, *Bear Stearns Companies Inc.: Lowering Estimates and Price Target*, at 1 (Dec. 20, 2007) (observing that Bear Stearns had "higher exposure to the softening mortgage market and less diversification... than peers," and that "a deterioration in the mortgage market could specifically affect Bear more than peers as [they] estimate ~15% of revenue is mortgage related vs. less than 10% at Lehman and less than 5% at the others"); Carey Decl. Ex. 27, Mike Mayo and Matthew Fischer, Deutsche Bank, *Bear Stearns Companies Inc.: Lowering Estimates and Target*, at 1, (Feb. 28, 2008) (commenting on "Bear's higher exposure to the softening mortgage market and less diversification... than peers.").)

**Plaintiff's Response:**

Plaintiff denies that the Buckingham Research Group report cited in paragraph 28(d) above states that Bear's "higher exposure to domestic MBS" was an "area of strength."  The analysts state that they believe Bear had solid growth prospects *despite* higher exposure to domestic MBS."  Carey Decl. Ex. 22, James Mitchell, Buckingham Research Group, *Research Note for December 6, 2006*, at 1 (Dec. 6, 2006) (emphasis added).

Plaintiff admits that the general public observations in paragraphs 28(a)-(c) and 28(e)-(h) reflect market participants' perception of Bear's involvement in the mortgage market. However, these statements do not reflect that Bear's subprime mortgage exposure was far greater than publicly known, particularly its indirect exposure to subprime mortgages. *See infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks).

**29.   Defendants' Statement:**

All three of the Company's 2007 10-Qs and its 2007 10-K emphasized that "the Company may retain interests in securitized assets." (Carey Decl. Ex. 13, 1Q07 10-Q at 18; Carey Decl. Ex. 14, 2Q07 10Q07 at 18; Carey Decl. Ex. 15, 3Q07 at 18; Carey Decl. Ex. 11, 2007 10-K at 100.)

   **Plaintiff's Response:**

Plaintiff denies that the statement quoted above is emphasized in any way in the cited quarterly and annual reports. The statement comprises half of one sentence in the middle of lengthy reports and is not emphasized visually or linguistically. *See* Carey Decl. Ex. 13, 1Q07 10-Q at 18; Carey Decl. Ex. 14, 2Q07 10-Q at 18; Carey Decl. Ex. 15, 3Q07 10-Q at 18; Henken Decl. Ex. 4, 2007 10-K at 100.

**30.   Defendants' Statement:**

Bear Stearns disclosed the risk that a downturn in the fixed income market, which included mortgage-related activities, could result in losses. In its 2005, 2006, and 2007 10-Ks, the Company stated:

> We generally maintain large trading and investment positions in the fixed income . . . market[]. To the extent that we own assets, *i.e.*, have long positions, in [the fixed income market], *a downturn in [that market] could result in losses from a decline in the value of those long positions.*

(Carey Decl. Ex. 11, 2007 10-K at 16; Carey Decl. Ex. 1, 2006 10-K at 20; Carey Decl. Ex. 28, 2005 10-K at 18 (emphasis added).)

   **Plaintiff's Response:**

Plaintiff admits that Bear's 2005-2007 10-K reports contained this general statement regarding its fixed-income exposure, however Plaintiff denies that those reports adequately disclosed Bear's actual exposure to the fixed-income market. Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's actual fixed-income exposure, such as its indirect exposure to subprime assets, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse. *See infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks).

31.   __Defendants' Statement:__

Bear Stearns's disclosures concerning its exposure to subprime mortgages were consistent with industry and regulatory standards.  There was no uniform industry practice requiring disclosure of subprime holdings.  (*See* Carey Decl. Ex. 29, Finnerty Tr. at 145:16-146:5.)  Bear Stearns began making additional disclosures concerning its exposure to subprime shortly after receiving a comment letter from the SEC.  (*See* Carey Decl. Ex. 30, OIG Audit Rpt at 111.)  Bear Stearns's peer institutions received similar letters.  (*See* Carey Decl. Ex. 31, 8/1/07 Letter from the Rufus Decker, Division of Corporation Finance ("CF"), SEC, to Christopher M. O'Meara, Chief Financial Officer, Lehman Brothers 2-4 (Aug. 1, 2007); Carey Decl. Ex. 32, Letter from John Hartz, CF, SEC, to David H. Sidwell, Chief Financial Officer, Morgan Stanley 2-4 (Aug. 1, 2007); Carey Decl. Ex. 33, Letter from Terence O'Brien, CF, SEC, to David A. Viniar, Chief Financial Officer, Goldman Sachs 1-4 (Sept. 20, 2007); Carey Decl. Ex. 34, Letter from Rufus Decker, CF, SEC, to Jeffrey N. Edwards, Chief Financial Officer, Merrill Lynch 3-5 (Sept. 25, 2007).)

   __Plaintiff's Response:__

Plaintiff admits that "[t]here was not a uniform practice" with regard to disclosure of subprime holdings; however, some other investment banks were disclosing greater detail about their subprime assets than Bear was in 2008.  Henken Decl. Ex. 5, Finnerty Tr. at 145:16-146:5.

Plaintiff admits that Defendants disclosed some additional detail regarding Bear's subprime holdings following receipt of a comment letter from the SEC, however Plaintiff denies that these disclosures adequately disclosed Bear's actual subprime exposure.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's actual subprime exposure, such as its indirect exposure to subprime assets, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 131-32 (evidencing that Bear made additional disclosures in response to the SEC's criticism, but that such disclosures lacked information investors would have considered material).

32.   __Defendants' Statement:__

In November 2007, Bear Stearns explicitly disclosed the extent of its exposure to subprime mortgages, including whole loans, investment grade and non-investment grade subprime securities, and asset-backed security credit default swaps.  Bear Stearns disclosed that as of November 9, 2007, it was net short subprime by $52 million.  (Carey Decl. Ex. 35, 11/15/07 8-K.)

   __Plaintiff's Response:__

Plaintiff admits that Bear's November 2007 8-K stated that its subprime exposures were net short by $52 million, however Plaintiff denies that this statement adequately disclosed Bear's actual subprime exposure.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's actual subprime exposure, such as its indirect exposure to subprime assets, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 130-33 (detailing

Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks).

**33.   Defendants' Statement:**

In December 2007, Bear Stearns disclosed as of November 30, 2007, it was net short subprime by $582 million.  (Carey Decl. Ex. 36, 12/21/07 8-K.)

**Plaintiff's Response:**

Plaintiff admits that Bear's December 2007 8-K stated that its subprime exposures were net short by $582 million, however Plaintiff denies that this statement adequately disclosed Bear's actual subprime exposure.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's actual subprime exposure, such as its indirect exposure to subprime assets, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks).

**34.   Defendants' Statement:**

Bear Stearns's 2007 Form 10-K included a schedule of the Company's subprime exposure.  (Carey Decl. Ex. 11, 2007 10-K at 42.)

**Plaintiff's Response:**

Plaintiff admits that Bear's 2007 10-K included a schedule of its subprime exposure, however Plaintiff denies that this schedule adequately disclosed Bear's complete subprime exposure.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's subprime exposure, such as its indirect exposure to subprime assets, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks).

**Bear Stearns's Mortgage-Related Asset Valuation Practices**

**35.   Defendants' Statement:**

Bear Stearns's reported valuations were based on the "most observable data point available."  (Carey Decl. Ex. 37, Simeone Tr. at 95:24-96:23.)  Bear Stearns would "rely on what [it] saw in the marketplace first" to value an asset.  (Carey Decl. Ex. 38, Marano Tr. at 264:8-265:5.)

**Plaintiff's Response:**

Plaintiff admits that for certain assets under certain market conditions (primarily its Level 2 assets) Bear's valuations were based on the most observable data point available, and it would

rely on "assumptions . . . observable in the marketplace." Henken Decl. Ex. 3, 2006 10-K at 60; Henken Decl. Ex. 4, 2007 10-K at 63. However, for the vast majority of Bear's assets, there were no observable data points available, and observations in the market place were not the starting point for Bear's valuations. *See id.*; Pl.'s Resp. to ¶ 38 (explaining that Level 2 and Level 3 assets combined accounted for $255 billion of Bear's $285 billion in assets); *infra* ¶¶ 135-37 (explaining that Bear relied heavily on its deficient modeling, not observable data, in order to value its Level 2 and Level 3 assets).

36.    **Defendants' Statement:**

For the vast majority of Bear Stearns's mortgage assets, its valuations were based on quoted market prices, independent external valuation information, or readily observable data from objective sources. (Carey Decl. Ex. 1, 2006 10-K at 60; Carey Decl. Ex. 37, Simeone Tr. at 56:5-10 ("There are not a lot of models in valuing mortgage securities. Most of it was finding transaction prices or mortgage quotes."); Carey Decl. Ex. 39, Schwartz Tr. at 32:8-18, 36:18-37:5 ("[T]hey looked at the descriptions of the securities that were made available to them and looked at comparable – what they thought were the most comparable types of securities and what the trading levels were of those. And I think that's the main way they assigned values."); Carey Decl. Ex. 62, Spector Tr. at 34:15-22.)

       **Plaintiff's Response:**

Denied. Although Bear's Level 1 assets were with "[i]nputs based on quoted market prices or observable inputs that [were] corroborated by market data," Henken Decl. Ex. 4, 2007 10-K at 63, Bear's inaccurate modeling based on inaccurate data affected the valuation of both its Level 2 and Level 3 assets, or a total of 89% of its assets. *See* Henken Decl. Ex. 4, 2007 10-K at 64; *and see* Pl.'s Resp. to ¶ 38 (explaining that Level 2 and Level 3 assets combined accounted for $255 billion of Bear's $285 billion in assets; *infra* ¶¶ 135-37 (explaining that Bear relied heavily on its deficient modeling, not observable data, in order to value its Level 2 and Level 3 assets).

37.    **Defendants' Statement:**

When models were used to value these assets, those models generally were "primarily industry-standard models" that "employ[ed] data that [was] readily observable from objective sources" (Carey Decl. Ex. 1, 2006 10-K at 60; *see also* Carey Decl. Ex. 11, 2007 10-K at 63; Carey Decl. Ex 37 Simeone Tr. at 64:7-17), and the models were "ultimately validated by where the instruments traded in the market" (Carey Decl. Ex. 40, Molinaro Tr. at 60:21-61:16; *see also* Carey Decl. Ex. 38, Marano Tr. at 264:8-265:16).

       **Plaintiff's Response:**

Denied. Valuation of Bear's Level 2 assets required a "degree of subjectivity," and valuation of its Level 3 assets "utilize[ed] significant assumptions or other data that [was] generally less readily observable from objective sources. Henken Decl. Ex. 4, 2007 10-K at 63-64. Moreover, Bear's models could not have been industry standard given the severe and ongoing criticism its models received, including from the SEC and Bear's own employees, beginning in 2005 and continuing until Bear collapsed. *See infra* ¶¶ 135-38 (detailing the

criticism Bear Stearns' models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that those deficient models were used to value the vast majority of its assets).

**38.** __Defendants' Statement:__

During the Relevant Period, between 8% and 10% of the Company's assets reported on a fair value basis were considered Level III assets, which were "complex financial instruments and other investments [that had] significant data inputs that cannot be validated by reference to readily observable data" (Carey Decl. Ex. 13, 1Q07 10-Q at 14 (reporting $18,962,839,000 of the Company's assets were Level 3, compared to $30,808,994,000 that were Level 1 and $159,780,372,000 that were Level 2); Carey Decl. Ex. 14, 2Q07 10-Q at 15 (reporting $18,014,572,000 of the Company's assets were Level 3, compared to $38,716,993,000 that were Level 1 and $163,228,187,000 that were Level 2); Carey Decl. Ex. 15, 3Q07 10-Q at 15 (reporting $20,254,094,000 of the Company's assets were Level 3, compared to $29,796,163,000 that were Level 1 and $188,010,668,000 that were Level 2); Carey Decl. Ex. 11, 2007 10-K at 97 (reporting $28,169,000,000 of the Company's total assets were Level 3, compared to $29,467,000,000 that were Level 1 and $227,146,000,000 that were Level 2)). These assets were valued using internally developed models or methodologies. (Carey Decl. Ex. 1, 2006 10-K at 60.) However, these models were "fairly standard" and used "standard techniques" to value Level 3 assets. (Carey Decl. Ex. 37, Simeone Tr. at 65:4-65:20.) The SEC's Division of Trading and Markets ("T&M") reported that "[i]n some instances where data sources were limited, the instruments were immaterial. For example, mortgage derivatives, which were distinct from CDS and ABS CDO positions, were an immaterial exposure with only de minimis impact on Bear's profit and loss." (Carey Decl. Ex. 30, OIG Audit Rpt at 94.) Although the Securities and Exchange Commission's ("SEC") Office of Inspector General's Office of Audits ("OOA") which prepared the OIG Audit Report, responded to T&M's report, its response did not rebut this finding. (*Id.*, Appx. VIII.)

__Plaintiff's Response:__

Plaintiff admits that Defendants disclosed the fair value of Bear's Level 3 assets at between 8-10% of its total assets during the Relevant Period. Defendants also admit that for 2007, Bear reported approximately $227 billion in Level 2 assets and approximately $28 billion in Level 3 assets, out of approximately $285 billion in total assets. Carey Decl. Ex. 11, 2007 10-K at 97 (reporting $28,169,000,000 of the Company's total assets were Level 3, compared to $29,467,000,000 that were Level 1 and $227,146,000,000 that were Level 2). However, Plaintiff denies that this figure was accurate or that the models that Bear used to value its Level 3 assets were adequate or standard. *See infra* ¶¶ 135-38 (detailing the criticism Bear's models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that those deficient models were used to value the vast majority of its assets). Indeed, the OIG Report included significant criticism of Bear's modeling and the material exposure it caused. *See infra* Pl.'s Resp. to ¶¶ 53-58 (providing background information about the OIG Report); *infra* ¶ 137 (detailing some of the OIG Report's criticisms of Bear's modeling). Moreover, Plaintiff denies that the OIG did not rebut T&M's statements. The OIG submitted a global response to T&M's Management Commentary, rebutting its overall approach and rhetoric, and

stating that T&M's criticisms, "even if true, [] have no impact on the overall findings and conclusions of the [OIG] report."  Carey Decl. Ex. 30, OIG Rep. at 116-17.

**39.**   **Defendants' Statement:**

The Company's internal control policies to verify the accuracy of its pricing for financial reporting included analysis by risk management and the business unit controller, "typically on a monthly basis but often on an intra-month basis as well."  (Carey Decl. Ex. 1, 2006 10-K at 61; *see also* Carey Decl. Ex. 40, Molinaro Tr. at 69:9-23; Carey Decl. Ex. 37, Simeone Tr. at 110:24-111:16, 139:4-142:17.)  The results of the monthly validation process were reported to the Mark-to-Market Committee, which was composed of senior management from the risk management and controllers departments. (Carey Decl. Ex. 1, 2006 10-K at 61.).

   **Plaintiff's Response:**

Plaintiff admits that Bear's 2006 10-K included the above statements, however Plaintiff denies that that report and the cited testimony show that Bear undertook meaningful steps to verify the accuracy of its pricing for financial reporting.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's valuation and risk management practices, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 135-38 (detailing the criticism Bear's models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that those deficient models were used to value the vast majority of its assets); Pl.'s Resp. to ¶¶ 57-72 (detailing deficiencies in Bear's risk management operations and disclosures); *infra* ¶¶ 140-53 (same).

**40.**   **Defendants' Statement:**

Bear Stearns's internal controls with respect to its valuations for financial reporting purposes were reviewed by the Company's independent, outside auditor, Deloitte & Touche LLP ("Deloitte") which found that valuations were "generally following [Bear Stearns's] control process."  (Carey Decl. Ex. 37, Simeone Tr. at 142:18-145:5.)

   **Plaintiff's Response:**

Denied.  Deloitte reviewed "[o]nly the part [of Bear's internal controls with respect to valuations for financial reporting] dealing with the business unit controllers, how they obtained independent prices and made sure that the values that were recorded in the financial statements were accurate . . . ."  Henken Decl. Ex. 6, Simeone Tr. at 142:22-143:2.  Deloitte also had no process in place to evaluate whether the trading desks were having an influence on the prices that Bear's business unit controllers were putting on the assets unless a change in the recorded value was made after a business unit validated the recorded value.  *See id.* at 143:23-145:5 (noting that Deloitte would receive a report "after . . . business unit controllers validate, if someone went in and intentionally changed the price").

17

41.  **Defendants' Statement:**

As part of its audit, Deloitte also tested the Company's valuation methodologies, "utilizing team members with specialized skills to assess the reasonableness of the methodologies, including assumptions and inputs the Company utilized to estimate the fair value presented." (Carey Decl. Ex. 41, Schubert Rpt at 10; *see also* Carey Decl. Ex. 37, Simeone Tr. at 70:3-18, 72:19-74:5, 110:24-113:5, 143:23-145:5, 173:9-174:6.) The audit included an independent verification of the data used in pricing and use of Deloitte's "own industry kind of standard models to run data through to see if [Deloitte was] getting similar results using independent inputs." (Carey Decl. Ex. 37, Simeone Tr. at 110:24-1l3:5.)

**Plaintiff's Response:**

Admitted.

42.  **Defendants' Statement:**

Deloitte did not raise any concerns with the assumptions underlying the Company's valuations. (*Id.* at 173:18-174:6, 175:15-20 ("The company had adequate controls to validate their significant assumptions.").)

**Plaintiff's Response:**

Admitted.

43.  **Defendants' Statement:**

The OOA did not review Bear Stearns's valuations for its mortgage related assets and reached no conclusion that any of Bear Stearns's assets were overvalued. (*See generally* Carey Decl. Ex. 30, OIG Audit Rpt at 70-71.)

**Plaintiff's Response:**

Denied. Based on data disclosed by Bear to the SEC and the SEC's internal memoranda and model reviews, the OOA concluded that Bear's modeling had "numerous issues." Carey Decl. Ex. 30, OIG Rep. at 23; *and see id.* at vii-viii, 72 (noting that OOA and its expert's audit was based on analysis of non-public information and data from Bear gathered by the SEC in connection with its Consolidated Supervised Entity program). For example, the OOA concluded that Bear's mortgage modeling inadequately accounted for "default risks," and the rise in these same default risks caused "the market value of the mortgage securities to decrease." *Id.* at 5, 22; *and see infra* ¶¶ 135-38 (detailing the criticism Bear's models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that those deficient models were used to value the vast majority of its assets).

44.  **Defendants' Statement:**

Plaintiffs expert did not conduct an independent analysis of the valuation of Bear Stearns's mortgage-related assets. (Carey Decl. Ex. 29, Finnerty Tr. at 59:14-20, 67:19-68:7.)

**Plaintiff's Response:**

Denied.  Dr. Finnerty reviewed and analyzed Bear's valuations, valuations summarized in its quarterly and annual reports, numerous internal documents that discussed valuation issues and mark-to-market disputes, and the OIG Report.  *See* Henken Decl. Ex. 5, Finnerty Tr. at 58:25-60:12.

**45.    Defendants' Statement:**

Plaintiff cannot identify any particular assets that were actually overvalued in Bear Stearns's financial reporting and cannot identify the amount of any purported overvaluation.  (*Id.* at 67:14-68:18, 69:18-79:16 (admitting that he cannot tell based on the documents he cites which assets were overvalued or if they actually were overvalued).)

**Plaintiff's Response:**

Denied.  Dr. Finnerty concluded that the evidence indicated that many of Bear's mortgage assets were overvalued.  Henken Decl. Ex. 5, Finnerty Tr. at 67:14-79:16 (taking note of "numerous indications" that this was the case; *id.* at 63:21-64:7 ("[E]ven recognizing that there [were] reasons why the financial condition of Bear Stearns and its relatively weak negotiating position would lead to a discount, the huge gap between the book value of equity, which is supposed to be a on a marked-to-market basis, and $2 a share [price] suggests that the assets were carried on Bear Stearns' books . . . at an overvaluation."); *and see infra* ¶¶ 135-38 (detailing the criticism Bear's models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that those deficient models were used to value the vast majority of its assets).

**46.    Defendants' Statement:**

Plaintiffs expert stated that he could not conduct the necessary analysis because he did not have access to the work papers from Deloitte (*Id.* at 37:23-38:12 ("I asked for the work papers and I never – I was never able to get those."), 77:13-21 ("Unless I got the Deloitte & Touche work papers . . . I couldn't provide a full analysis")), which were produced to plaintiff nearly four years ago (*see* Carey Decl. Ex. 77, 8/15/11 Deloitte Production Letter; Carey Decl. Ex. 42, 8/23/11 Deloitte Production Letter), and he did not have access to the any valuations made by JPMorgan in connection with the acquisition of Bear Stearns (Carey Decl. Ex. 29, Finnerty Tr. at 37:23-38:12 ("I specifically asked for the JPMorgan valuations at the time JPMorgan completed the acquisition of Bear Stearns.")).  As plaintiffs expert himself stated, he "didn't have the information... to get to the nuts and bolts of the portfolio."  (*Id.* at 148:13-149:4, *id.* 62:6-68:18 ("I don't know whether [the overvaluations] were systematic and I don't know the full extent of them because I don't have the evidence.").)

**Plaintiff's Response:**

Denied.  Dr. Finnerty conducted the complete analysis that was necessary for him to form an expert opinions that he offered in his report and testimony.  Dr. Finnerty merely testified that in order to conduct the additional calculations proposed by Defendants, which were unnecessary for his report and testimony, he would have needed additional documentation that was not

produced in this litigation.  *See* Henken Decl. Ex. 5, Finnerty Dep. Tr. at 57:14-58:5, 67:19-25, 68:4-10.

**47.**   <u>**Defendants' Statement:**</u>

A mark dispute can arise in the context of repurchase ("repo") financing when a borrower and a lender disagree about the value of the collateral underlying the collateral exchange agreement.  (Carey Decl. Ex. 30, OIG Audit Rpt at 27-28.)

   <u>**Plaintiff's Response:**</u>

Admitted.

**48.**   <u>**Defendants' Statement:**</u>

Mark disputes were widespread during the relevant time period as the markets became more volatile (Carey Decl. Ex. 44, Stulz Rpt, ¶ 122) and are an issue faced by all dealers.  (Carey Decl. Ex. 30, OIG Audit Rpt at 95.)

   <u>**Plaintiff's Response:**</u>

Plaintiff admits that T&M and Dr. Finnerty acknowledged that margin disputes were an issue faced by all dealers, however such generalizations overlook the unusual character of Bear's mark disputes.  *See infra* ¶ 139 (detailing the increasing number and size of mark disputes Bear had with major broker-dealers beginning in the summer of 2007 and continuing through its collapse).

**49.**   <u>**Defendants' Statement:**</u>

While the counterparty's position on the value of the collateral involved in a mark dispute was one piece of information that Bear Stearns and its auditor would have considered in the valuation process, it was not considered third-party observable data to be used in valuing the collateral because a counterparty to a repo agreement has a self-interest in undervaluing the collateral and overstating the amount of collateral that they need for a given agreement.  (*See* Carey Decl. Ex. 37, Simeone Tr. at 181:17-182:13.)

   <u>**Plaintiff's Response:**</u>

Plaintiff admits that Deloitte's 30(b)(6) witness testified provided this testimony, however it does not account for the unusual character of Bear's mark disputes.  *See infra* ¶ 139 (detailing the increasing number and size of mark disputes Bear had with major broker-dealers beginning in the summer of 2007 and continuing through its collapse).

**50.**   <u>**Defendants' Statement:**</u>

The traders at Bear Stearns marked their books to fair value on a daily basis, but the month-end and quarter-end valuation process for financial reporting involved additional review and analysis beyond the day to day marking of the books by traders.  (*See id.* at 141:6-142:17.)

**Plaintiff's Response:**

Denied.  While Deloitte's 30(b)(6) witness testified that certain processes were "more robust," he did not testify regarding any "additional review or analysis" involved in monthly or quarterly processes.  *See* Henken Decl. Ex. 6, Simeone Tr. at 141:6-142:17.  Moreover, the traders at Bear did not mark their books to fair value.  Henken Decl. Ex. 5, Finnerty Tr. at 67:14-79:16 (noting some assets were "substantially" overvalued leading directly to "mark-to-market disputes"); Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 160(d), (g), 164-66, 180(c) (cataloging deficiencies and misrepresentations pertaining to Bear's valuation models); *and see infra* ¶¶ 135-38 (detailing the criticism Bear's models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that those deficient models were used to value the vast majority of its assets).

**51.   Defendants' Statement:**

A mark dispute of $100 million dollars in July of 2007 would have represented only 0.025 percent of the total assets of $397.1 billion reported by Bear Stearns as of August 31, 2007.  (Carey Decl. Ex. 15, 3Q07 10-Q at 44.)

**Plaintiff's Response:**

Plaintiff admits that this particular mark dispute is as described; however, as Bear's own employees stated as early as November 2007, as little as a 2% haircut on Bear's assets could have put Bear out of business.  *See* Carey Decl. Ex. 2, Finnerty Rep. Ex. 51, E-mail from Barry Cohen to Elizabeth Ventura and Samuel Molinaro (Nov. 30, 2007); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 174(d).

**52.   Defendants' Statement:**

Mark disputes of $1.1 billion on March 12, 2008 would have represented only 0.275 percent of the Company's total assets of $399 billion as reported by Bear Stearns as of February 29, 2008.  (Carey Decl. Ex. 43, 1Q08 10-Q at 61.)

**Plaintiff's Response:**

Plaintiff admits that this particular mark dispute is as described; however, as Bear's own employees stated as early as November 2007, as little as a 2% haircut on Bear's assets could have put Bear out of business.  *See* Carey Decl. Ex. 2, Finnerty Rep. Ex. 51, E-mail from Barry Cohen to Elizabeth Ventura and Samuel Molinaro (Nov. 30, 2007); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 174(d).

**Bear Stearns's Risk Management Practices**

**The OIG Audit Report**

53.   **Defendants' Statement:**

The OIG Audit Report was a review of T&M's oversight of the Consolidated Supervised Entity ("CSE") program, of which Bear Stearns was a member.  (Carey Decl. Ex. 30, OIG Audit Rpt at 9.)

**Plaintiff's Response:**

Denied.  In his request to the OIG, Senator Charles H. Grassley specifically requested that the SEC conduct an audit "relevant to issues surrounding Bear Stearns."  Carey Decl. Ex. 30, OIG Rep. at 55 (Letter from Sen. Charles E. Grassley, Ranking Member, U.S. Senate Comm. on Fin., to Hon. David Kotz, Inspector Gen., U.S. SEC (Apr. 2, 2008).  As part of the audit, Senator Grassley requested an analysis of the SEC Division of Trading and Markets ("T&M"), the arm of the SEC responsible for regulating Bear, and "the adequacy of any reviews [it] conducted regarding Bear Stearns."  *Id.*  As a result, the audit underlying the OIG Report "emphasiz[ed] the Commission's oversight of Bear Stearns."  *Id.* at 9; *and see id.* at vii (noting that the OOA expert's analysis had "a particular focus on Bear Steams").

54.   **Defendants' Statement:**

The OIG Audit Report did not determine the cause Bear Stearns's collapse (*Id.* at 71), and explicitly stated that it had "no specific evidence indicating whether any of these issues directly contributed to Bear Stearns' collapse since [its] audit scope did not include a determination of the cause of Bear Stearns's collapse" (*Id.* at ix n.12).

**Plaintiff's Response:**

Denied.  The OIG Report "provided a detailed examination of the adequacy of the Commission's monitoring of Bear Stearns, *including the factors that led to its collapse*."  Henken Decl. Ex. 7, *Assessing the Madoff Ponzi Scheme & Regulatory Failures: Hearing Before the Subcomm. on Capital Mkts., Ins., & Gov't Sponsored Enterprises of the H. Comm. on Fin. Servs.*, 111th Cong. 2 (2009) (statement of H. David Kotz, SEC Inspector Gen.), at 4-5 (emphasis added).  For example, it made factual findings regarding various factors that "could have contributed" to Bear's collapse.  *See, e.g.*, Carey Decl. Ex. 30, OIG Rep. at 13 ("[T]his audit found that it is entirely possible that Bear Steams' capital levels could have contributed to its collapse by making lenders unwilling to provide Bear Stearns the funding it needed.")  The OIG Report did not determine the exact cause of Bear's collapse only insofar as it did not exclude other theories that were "beyond the scope of th[e] audit."  *Id.* at 71.

55.   **Defendants' Statement:**

The OIG Audit Report did not conclude that Bear Stearns engaged in any fraud.  (*See generally id.*)

**Plaintiff's Response:**

Plaintiff admits that the OIG Report did not make any legal conclusions about whether Bear engaged in fraud.

56.   **Defendants' Statement:**

The OOA did not "perform an independent assessment of [Bear Stearns's risk management systems (*e.g.,* internal controls, models, etc.) or their financial condition (e.g. compliance with capital and liquidity requirements)." (*Id.* at 71; *see also id.* at 101 (The OOA "did not directly review the models, related documents, and the firm's books and records.").)

**Plaintiff's Response:**

Denied.  The OOA "did not visit the CSE firms and perform an independent assessment of CSE firms and perform an independent assessment of the firm's risk management systems (*e.g.,* internal controls, models, etc.), or their financial condition (*e.g.,* compliance with capital and liquidity requirements)" and thus "may not have identified certain findings and recommendations (*i.e.,* improvements)."  Carey Decl. Ex. 30, OIG Rep. at 71.  However, "Bear Stearns had collapsed" and was not a CSE firm at the time of the OOA's fieldwork, so it is not apparent that this statement applies to OOA's assessment of Bear.  See i*d.* at iv.

Moreover, as the OIG Report states, the OOA and its expert relied on non-public information and data from Bear gathered by the SEC in connection with its Consolidated Supervised Entity program.  *Id.* at vii-viii, 72; *and see, e.g., id.* at 12 & nn.77, 79 (citing data provided by Bear to the SEC).  Specifically, the well-credentialed expert retained by the OOA analyzed Bear's "financial data, holdings, risk management strategies, [and] tolerance for risk and assessed the adequacy of [Bear's] filings," focusing particularly on Bear's "capital, liquidity, and leverage ratios, access to secured and unsecured funding, and its compliance with industry and worldwide standards such as the Basel Standards." *Id.* at vii-viii; *and see id.* at vii, 56-69, 72-73 (providing credentials of the OOA's expert, Professor Albert S. (Pete) Kyle, "a renowned expert on many aspects of capital markets, with a particular focus on market microstructure").  Professor Kyle also "analyzed how [T&M] supervised or oversaw Bear Steams' mortgage-backed securities portfolio, its use of models to measure risk, the adequacy of its models, its model review process, the relationship between its traders and risk management department, and its risk-management scenarios." *Id.* at viii; *and see id.* at 72 (noting that Professor Kyle "reviewed the adequacy of [T&M's] review of models, scenario analysis, etc[.,] as well as the associated internal risk management controls").  Finally, Professor Kyle "examined how [T&M] supervised Bear Steams' internal operations, including its funding of two prominent hedge funds that collapsed in the summer of 2007." (*Id.*)  The OIG Report is therefore based on a thorough analysis of Bear's risk management systems and financial condition.

57.   **Defendants' Statement:**

The OOA did not interview Bear Stearns's management regarding the report.  (*Id.* at 83.)

**Plaintiff's Response:**

Denied.  T&M's criticism of the OIG Report only states that the OOA did not interview "Bear Stearns managers regarding critical aspects of the OIG Report," not that those managers were not interviewed on any subject.  Carey Decl. Ex. 30, OIG Rep. at 83.  Additionally, the OOA and its expert did review T&M's documentation of its meetings with Bear's management. *Id.* at 116 (noting that the OIG's auditors had "weekly and sometimes daily conversations" with

T&M management and worked closely with Professor Kyle, who "spent countless hours reviewing detailed notes and memoranda that [T&M] staff had prepared during the time periods pertinent to the audit . . ."); *and see, e.g., id.* at 18, n.101 (citing internal T&M memorandum).

**58.**    **Defendants' Statement:**

T&M, the division that actually oversaw Bear Stearns (*id.* at 1), issued a response to the OIG Audit Report, describing it as "fundamentally flawed in its process, premises, analysis, and key findings" and stating that the "OIG Audit Report starts from incorrect assumptions and reaches inaccurate, unrealistic, and impracticable conclusions" (*id.* at 83).

   **Plaintiff's Response:**

Denied.  Although T&M did issue a critical response stating that the Report was "fundamentally flawed," T&M adopted 20 of 23 recommendations addressed to it, and overall, responsible management adopted 21 of the 26 recommendations in the OIG Report, all of which the SEC Chairman found to be "well-considered and worthy of support."  Carey Decl. Ex. 30, OIG Rep. at at ii, 81; *and see id.* at 70 (noting that the OIG Report was produced "in accordance with Generally Accepted Government Auditing Standards," which required its authors to "obtain sufficient, appropriate evidence to provide a reasonable basis for [its] findings and conclusions based on [the] audit objectives").  Indeed, even while criticizing the Report, T&M regularly agreed with OOA's conclusions.  *See, e.g., id.* at 86 (noting that T&M "concurs with [the OOA's] recommendation, even though [it] believe[s] it is based on a fundamentally flawed understanding of the Bear Stearns crisis").   As the OIG noted in response to T&M, "while [T&M'] commentary asserts that the report [is] fundamentally flawed in all aspects, it provides only a few examples of actual statements being inaccurate, all of [which] are relatively minor . . . ."  *Id.* at 117.  As a result, the OIG concluded that even if T&M's criticisms were true, they had "no impact on the overall findings and conclusions of the report."  *Id.*

**Valuation and VaR Models and Risk Management Practices**

**59.**    **Defendants' Statement:**

Bear Stearns's internal models were, in most cases, developed and overseen by the Financial Analytics and Structured Transactions Group ("FAST"), a group of quantitative analysts in the risk management department.  (Carey Decl. Ex. 11, 2007 10-K at 8, Carey Decl. Ex. 1, 2006 10-K at 11; Carey Decl. Ex. 38, Marano Tr. at 281:16-282:3, 282:20-283:4; Carey Decl. Ex. 40, Molinaro Tr. at 70:11-72:19.)  FAST regularly updated the models used by the traders in the mortgage area.  (Carey Decl. Ex. 45, Verschleiser Tr. at 166:4-15; Carey Decl. Ex. 38, Marano Tr. at 282:4-19.)  For example, "every month the projections from those models [for prepayments]... were compared to the reality of what happened when Fannie Mae and trustees released prepayment numbers."  (Carey Decl. Ex. 38, Marano Tr. at 282:8-15; *see also id.* at 282:16-19 (discussing updates to the default model).)  T&M reported that Bear Stearns "regularly improved and expanded its data sources."  (Carey Decl. Ex. 30, OIG Rep. at 93-95.)

**Plaintiff's Response:**

Plaintiff denies that Bear's valuation models were regularly updated.  Notwithstanding T&M's assertion that Bear "regularly improved and expanded its data sources," Carey Decl. Ex. 30, OIG Rep. at 94, T&M did not and could not dispute the OIG's finding "the reviews of mortgage models that should have taken place before the subprime crisis erupted in February 2007 appear[ed] to have never occurred, [and were] still a work in progress when Bear Stearns collapsed in March 2008."  *Id.* at 23.  Furthermore, T&M acknowledged that regardless of any improvements, "[i]n some instances . . . data sources were limited."  *Id.* at 94; *and see infra* ¶¶ 135-38 (detailing the criticism Bear's models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that those deficient models were used to value the vast majority of its assets).

60.   **Defendants' Statement:**

An independent model review team within the risk management department also performed a further level of review of the Company's models.  (Carey Decl. Ex. 38, Marano Tr. at 263:23-264:7 (Bear Stearns had "a mortgage model review going" that "dealt with all of [its] models, everything from prepayment risk to credit risk to VAR models."); Carey Decl. Ex. 40, Molinaro Tr. at 67:24-69:8; Carey Decl. Ex. 11, 2007 10-K at 69-70.)  That review was ongoing in March 2008.  (Carey Decl. Ex. 38, Marano Tr. at 271:21-272:4 (noting that "people continued to work on model reviews and [he] kn[ew] that various models were approved and had been reviewed [before Bear was sold in March of 2008]").)

**Plaintiff's Response:**

Plaintiff denies that Marano testified that an independent model review team within the risk management department also performed a further level of review of the Company's models.  Marano testified that Bear had a "mortgage model review going," but he did not testify that this review was conducted by the risk management department or that it was independent from the modeling done by the FAST group.  *See* Henken Decl. Ex. 8, Marano Tr. at 263:23-24, 281:16-282:3.  In fact, Marano testified that "an employee in the risk area" interacted with the FAST group.  *Id.* at 283:16-20.  Plaintiff further denies that Marano testified that model review was ongoing in March 2008.  In response to a question about model review conducted "before Bear was sold in March of 2008," Marano testified that he knew reviews were done "but [he] couldn't tell you which ones," and he did not specify the time period when such reviews of which he was only vaguely aware were supposedly conducted.  *See id.* at 271:21-272:4.

Plaintiff admits that Molinaro testified that risk management independently reviewed the models developed by the FAST group, though he repeatedly testified that he "d[id]n't know the specifics of what was done to test and review the valuation models."  Henken Decl. Ex. 9, Molinaro Tr. at 67:21-70:7.

Plaintiff admits that Bear's 2007 10-K report stated that an independent model review team within the risk management department performed model review.  Henken Decl. Ex. 4, 2007 10-K at 69-70.  However, Plaintiff denies that the risk management team actually operated

independently.  *See infra* ¶ 148 (describing the risk management department's lack of independence).

**61.**   **Defendants' Statement:**

Deloitte did not identify any material weakness in Bear Stearns's valuation models that were used for financial reporting, nor did it recommend any changes to those models.  (Carey Decl. Ex. 37, Simeone Tr. at 184:4-20.)

**Plaintiff's Response:**

Plaintiff admits that Deloitte's 30(b)(6) witness testified that Deloitte did not raise any weaknesses with financial-reporting models with Bear's management, and that Deloitte did not recommend any changes to the models that Bear was using for purposes of its financial reporting.  Henken Decl. Ex. 6, Simeone Tr. at 184:4-20.

**62.**   **Defendants' Statement:**

In fact, according to Deloitte, Bear Stearns was, "more often than not," "a few months ahead of Deloitte in updating these models.  (*Id.* at 182:21-183:7.)

**Plaintiff's Response:**

Plaintiff admits that Deloitte's 30(b)(6) witness testified that Bear was "more often than not . . . probably a few months ahead of" Deloitte in updating its models.  Henken Decl. Ex. 6, Simeone Tr. at 182:21-183:7.

**63.**   **Defendants' Statement:**

Bear Stearns disclosed that "[t]he complexities and reduced transparency inherent in financial instruments that are valued using models, as compared with exchange traded prices or other quoted market valuations, introduce a particular element of operational risk into the Company's business."  (Carey Decl. Ex. 1, 2006 10-K at 67.)

**Plaintiff's Response:**

Plaintiff admits that Bear's 2006 10-K included the statement quoted above, however Plaintiff denies that report adequately disclosed the risks posed by Bear's inaccurate modeling.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's modeling and valuation, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 135-38 (detailing the criticism Bear's models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that those deficient models were used to value the vast majority of its assets).

64. **Defendants' Statement:**

With respect to Value at Risk or "VaR", T&M stated that Bear Stearns, "made significant progress in improving its VaR infrastructure subsequent to approval in response to Commission staff concerns. For example, the firm followed through on recommendations to enhance control over the VaR system. Inputs to VaR models were regularly updated following application approval." (Carey Decl. Ex. 30, OIG Audit Rpt at 94; *see also* Carey Decl. Ex. 40, Molinaro Tr. at 52:22-53:12.) Although the OOA responded to T&M's report, its response did not rebut this finding. (Carey Decl. Ex. 30, OIG Audit Rpt, Appx. VIII.)

**Plaintiff's Response:**

Denied. Regardless of any progress T&M claimed Bear made on its VaR models, numerous sources confirm the OIG Report's conclusion that "Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models. . . . Bear Stearns used outdated models that were more than ten years old . . . . As a result, Bear Stearns' daily VaR amounts could have been based on obsolete data." Carey Decl., Ex. 30, OIG Audit Rpt. at 20; *and see* ¶ 143-44 (describing outdated nature of Bear's VaR modeling). In addition, Plaintiff denies that the OIG did not rebut T&M's statements. The OIG submitted a global response to T&M's Management Commentary, rebutting its overall approach and rhetoric, and stating that T&M's criticisms, "even if true, [] have no impact on the overall findings and conclusions of the [OIG] report." Carey Decl., Ex. 30, OIG Rep. at 116-17.

65. **Defendants' Statement:**

Bear Stearns disclosed the limitations of VaR and of relying on historical simulations. For example, Bear Stearns disclosed "VaR [i.e., value-at-risk] has inherent limitations, including reliance on historical data... may not accurately predict future market risk, and the quantitative risk information generated is limited by the parameters established in creating the models." (Carey Decl. Ex. 1, 2006 10-K at 69; Carey Decl. Ex. 13, 1Q07 10-Q at 57; Carey Decl. Ex. 14, 2Q07 10-Q at 60; Carey Decl. Ex. 15, 3Q07 10-Q at 60.) "[VaR is] not likely to accurately predict exposures in markets that exhibit sudden fundamental changes or shifts in market conditions or established trading relationships... Furthermore, VaR calculated for a one-day horizon does not fully capture the market risk of positions that cannot be liquidated in a one-day period. However, the Company believes VaR models are an established methodology for the quantification of risk in conjunction with other financial disclosures in order to assess the Company's risk profile." (Carey Decl. Ex. 28, 2005 10-K at 67; Carey Decl. Ex. 12, 3Q06 10-Q at 56; Carey Decl. Ex. 1, 2006 10-K at 69; Carey Decl. Ex. 13, 1Q07 10-Q at 57; Carey Decl. Ex. 14, 2Q07 10-Q at 60; Carey Decl. Ex. 15, 3Q07 10-Q at 60; Carey Decl. Ex. 11, 2007 10-K at 71; *see also* Carey Decl. Ex. 44, Stulz Rpt ¶¶ 84-86.)

**Plaintiff's Response:**

Plaintiff admits that the statement above and the Stulz Report accurately quote the cited quarterly and annual reports, however Plaintiff denies that those reports adequately disclosed the limitations of and risks posed by Bear's VaR models. Notwithstanding any generic statements Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's risk

management operations, including its VaR models, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See* Pl.'s Resp. to ¶¶ 64-67 (detailing deficiencies in Bear's VaR models and disclosures); *infra* ¶¶ 142-44 (same).

**66.    Defendants' Statement:**

VaR models were reviewed by "the people that ran risk management that were responsible for this area and whoever the individuals were in the FAST area that were doing the quantitative work."  (Carey Decl. Ex. 40, Molinaro Tr. at 50:14-23.)

**Plaintiff's Response:**

Plaintiff admits that Molinaro testified that risk management and FAST personnel reviewed VaR models, however Plaintiff denies that any meaningful review of Bear's VaR models was conducted during the relevant time period.  *See* Pl.'s Resp. to ¶ 64-67 (detailing deficiencies in Bear's VaR models and disclosures); *infra* ¶¶ 142-44 (same).

**67.    Defendants' Statement:**

Bear Stearns's VaR modeling was implemented firm-wide (Carey Decl. Ex. 30, OIG Audit Rpt at 96), and the Company's Daily VaR and Stress Test Reports during the relevant time period compared this firm-wide VaR to its established firm-wide limit (*See, e.g.*, Carey Decl. Ex. 47, Daily VaR and Stress Testing Summary; *see also* Carey Decl. Ex. 44, Stulz Rpt ¶ 100).

**Plaintiff's Response:**

Denied.  As of December 2005, "[t]he firm [did] not maintain an overall firmwide Value-at-Risk ('VaR') limit."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 4, Letter from Mary Ann Gadziala, Assoc. Dir., SEC Office of Compliance Inspections & Examinations, to Jeffrey M. Farber, Senior Managing Dir., Bear, Stearns & Co., Inc., at 5 (Dec. 2, 2005) [hereinafter 2005 SEC Letter].  At that time, the SEC expressed concern about the lack of a firm-wide limit in its 2005 comment letter and instructed Bear to consider implementing a firm-wide limit or explain in detail why it would not.  *Id.* at 5-6; *and see infra* ¶ 135 (providing background information about the 2005 SEC comment letter).

These deficiencies with entity-wide use of VaR modeling persisted throughout the relevant period as revealed by a series of reports issued from July 2007 through March 2008 by Oliver Wyman ("Wyman"), an outside consultant engaged by Bear to evaluate its risk management policies.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 149-53 (detailing Wyman reports' findings and recommendations); *and see infra* ¶ 143(e)-(f) (same).  For example, a November 2007 report stated Bear lacked "a risk measure that allows comparison across risk types" and "regular reporting that gives an integrated view across risk types."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 10, Oliver Wyman, Risk Management Diagnostic 1st Checkpoint at 9, 10 (Nov. 20, 2007).  According to the Bear employees interviewed by the consultant, "[l]imits are not tied to any firm-wide risk appetite that is set at the top" and "[l]imits are set at a low level of granularity, but may not add up to anything sensible."  *Id.* at 12.

Likewise, the 2008 OIG Report stated that "Bear Stearns' risk managers had difficulty explaining how firmwide VaR numbers related to desk-specific VaR numbers," and that Bear "used VaR numbers more for regulatory reporting than for internal risk management."  Carey Decl. Ex. 30, OIG Rep. at 29.

**68.**   **Defendants' Statement:**

T&M stated that "[m]odel control work on mortgages was unaffected" by employee turnover at Bear Stearns in late 2006 and early 2007 and that the "model control function was shifted to the product line risk managers while a new Head of Model Validation was hired." (Carey Decl. Ex. 30, OIG Audit Rpt at 94.)  Although the OOA responded to T&M's report, its response did not rebut this finding.  (*Id.*, Appx. VIII.)

   **Plaintiff's Response:**

Plaintiff admits that T&M made the statements quoted above, however Plaintiff denies that mortgage model work was unaffected by employee turnover and staffing issues.  *See infra* ¶¶ 137, 138(e), 150 (explaining that Bear's models were affected by employee understaffing and a reluctance to take such an issue seriously).  In addition, Plaintiff denies that the OIG did not rebut T&M's statements.  The OIG submitted a global response to T&M's Management Commentary, rebutting its overall approach and rhetoric, and stating that T&M's criticisms, "even if true, [] have no impact on the overall findings and conclusions of the [OIG] report." Carey Decl., Ex. 30, OIG Rep. at 116-17.

**69.**   **Defendants' Statement:**

According to Deloitte, the turnover in Bear Stearns's risk management was "nothing out of the ordinary" for a company of its size, and Bear Stearns had "adequate senior resources at all times" throughout the period it observed the Company. (Carey Decl. Ex. 37, Simeone Tr. at 152: 12-25.)

   **Plaintiff's Response:**

Plaintiff admits that Deloitte's 30(b)(6) witness testified that changes in Bear's senior risk management personnel were "[n]othing out of the ordinary" for a company of its size, and Bear had "adequate senior resources at all times" throughout the period it observed the Company. Henken Decl. Ex. 6, Simeone Tr. at 152: 12-25.  However, Plaintiff denies that Bear's risk management operations were unaffected by employee staffing and resource issues.  *See infra* ¶ 137, 138(e), 150 (detailing employee-resource issues within risk management).

**70.**   **Defendants' Statement:**

T&M stated that "Bear Stearns' use of scenario analysis was consistent with industry practices: virtually the entire banking sector failed to anticipate the magnitude and scope of the housing decline that [was] still ongoing" (Carey Decl. Ex. 30, OIG Audit Rpt at 94), a conclusion not disputed by the OOA (*id.* Appx. VIII), which emphasized that its purpose was not "to claim that Bear Stearns' use of scenario analysis was better or worse than other CSE firms" (*Id.* at 27).  Although the OOA responded to this finding, it did not rebut this finding.  (*Id.* at 27.)

**Plaintiff's Response:**

Plaintiff admits that T&M made the statement quoted above, and that the OIG Report states that its purpose was not "to claim that Bear Stearns' use of scenario analysis was better or worse than other CSE firms." Carey Decl. Ex. 30, OIG Rep. at 27. However, Plaintiff denies this statement to the extent it implies that the OIG Report did not conclude that Bear's use of scenario analysis was in fact deficient. The OIG Report and several other sources reveal that Bear's use of scenario analysis was in fact deficient throughout the relevant time period. *See id.* at 24-27; *and see infra* ¶¶ 142-45 (describing deficiencies in Bear's stress testing and disclosures). In addition, Plaintiff denies that the OIG did not rebut T&M's statements. The OIG submitted a global response to T&M's Management Commentary, rebutting its overall approach and rhetoric, and stating that T&M's criticisms, "even if true, [] have no impact on the overall findings and conclusions of the [OIG] report." Carey Decl., Ex. 30, OIG Rep. at 116-17.

**71.   Defendants' Statement:**

Bear Stearns did incorporate into its risk scenarios the risks discussed with T&M, including a housing-led recession scenario. (*Id.* at 95.)

**Plaintiff's Response:**

Denied. "The OIG expert did not find documentary evidence indicating that [certain risk] scenarios [not captured by Bear's VaR models] were implemented [in its stress testing] or subsequently discussed with TM until 2007" even though "both TM and Bear Stearns knew [as early as 2005] that incorporating these features into Bear Stearns' risk management was important for effective risk management." Carey Decl. Ex. 30, OIG Rep. at 24-25; *and see infra* ¶ 143(c) (describing OIG's conclusion that Bear's stress testing was deficient at the time Bear joined the CSE program). The OIG expert found no evidence that T&M and Bear's management discussed incorporation into stress testing "of the most serious forward-looking risk scenario that Bear might face, which was a complete meltdown of the mortgage market liquidity accompanied by a fundamental deterioration in the mortgages themselves, resulting from falling housing prices." Carey Decl. Ex. 30, OIG Rep. at 25. T&M and Bear had information available to them as early as April 2006 about "precisely the types of risks that evolved into the subprime crisis in the U.S. less than one year later." *Id.* However, this information was not incorporated into Bear's scenarios until the end of 2007, by which time Bear already "had large inventories of mortgage related assets, which has lost both their value and liquidity." *Id.* at 25-27; *and see infra* ¶¶ 142-45 (describing deficiencies in Bear's stress testing and disclosures).

**72.   Defendants' Statement:**

Bear Stearns disclosed its exposure stemming from its risk management policies: "Our risk management policies and procedures may leave us exposed to unidentified or unanticipated risk. . . . [O]ur policies and procedures to identify, assess and manage risks may not be fully effective. *Some of our methods of managing risk are based upon our use of observed historical market behavior. As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate.*" (Carey Decl. Ex. 28, 2005 10-K

at 19; Carey Decl. Ex. 1, 2006 10-K at 20; Carey Decl. Ex. 11, 2007 10-K at 17 (emphasis added).)

**Plaintiff's Response:**

Plaintiff admits that the annual reports cited above included the statement quoted above, however Plaintiff denies that this statement adequately disclosed the risks stemming from Bear's risk management policies.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's risk management operations, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See* Pl.'s Resp. to ¶ 67 (detailing deficiencies in Bear's risk management operations and disclosures); *infra* ¶¶ 140-53 (same).

**73.    Defendants' Statement:**

Plaintiffs expert conducted no review of Bear Stearns's models or independent analysis of Bear Stearns's risk management practices. (*See, e.g.*, Carey Decl. Ex. 29, Finnerty Tr. at 103:4-9 (admitting that he did not review Bear Stearns's models), 105:11-19 (admitting he did not review Bear Stearns's scenario analysis), 91:19-92:9 (admitting that he "did not do [his] own independent assessment of VaR").)

**Plaintiff's Response:**

Denied.  Dr. Finnerty reviewed Bear's disclosures related to risk management "as well as what was said about the actual condition of the risk management systems and the deficiencies of those systems."  Henken Decl. Ex. 5, Finnerty Tr. at 91:2-5.  This review included analysis of internal Bear e-mails and reports discussing deficiencies with the Company's risk management practices.  *Id.* at 94:2-3, 98:7-99:22, 100:13-17, 103:23-104:23.  Dr. Finnerty also reviewed and analyzed the opinion of Professor Kyle, the expert hired by the OOA, *see id.* 91:23-92:9, 94:3, 100:13-17, as well as analyses and recommendations compiled by Oliver Wyman, a firm "hired by Bear Stearns to try to improve the risk management systems."  *Id.* at 100:13-17, 101:4-7, 101:25-102:6, 106:7:4, 110:8-17.  Dr. Finnerty found these analyses to be well substantiated and did not find it necessary to redo this work.  *See id.* at 105:11-106:4; 110:8-11.

**The Bear Stearns Asset Management Hedge Funds**

**74.    Defendants' Statement:**

The two Bear Stearns Asset Management hedge funds identified by plaintiff were operated independently from Bear Stearns.  (Carey Decl. Ex. 48, Cioffi Tr. at 44:23-45:15.) ("Well, there was always a Chinese wall in the sense that the broker dealer and the asset manager had to operate independently.  There were rules with regards to, you know, safe dealing and what have you.  So it was just-it's pretty much standard operating procedure in the asset management business."); Carey Decl. Ex. 39, Schwartz Tr. at 66:04-12 ("[E]arly on in the life of the fund, the broker-dealer was going to, in essence, interact with the fund and offer to transact with it.  And then it was reported some time after that, that, upon review, that they decided it would be better if the funds operated completely separately and didn't transact or have discussions about its

positions with the people in our sales and trading operation.").)  The two hedge funds did not use the same models as Bear Stearns.  (Carey Decl. Ex. 48, Cioffi Tr. at 137:2-138:23.)

**Plaintiff's Response:**

Denied.  According to due diligence documents from a leading global industry association, the two Bear hedge funds used Bear's trading and risk management systems (Bear's BondStudio analytical system), the Bear repo desk marked the hedge funds' investments to market, and Bear and BSAM risk management departments monitored the hedge funds' investment positions.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 3, The Alternative Investment Management Association Limited (AIMA), *AIMA's Illustrative Questionnaire for Due Diligence of Bear Stearns High Grade Structured Credit Strategies Fund*, at 17 (May 1, 2006); *and see* Carey Decl., Ex. 2, Finnerty Rep. ¶¶ 138(f), 200-04 & n.322 (concluding that "the failure of the two Bear Stearns Hedge Funds had adverse implications for Bear Stearns, because it alerted the market to potential weaknesses in Bear Stearns' risk management systems"); *and see* Pl.'s Resp. to ¶ 75 (detailing how the hedge funds' risk management issues were reflected at the parent company).

**75.    Defendants' Statement:**

The record contains no evidence that any risk management issues at the two hedge funds were reflected at the parent company.  (*See* Carey Decl. Ex. 44, Stulz Rpt ¶¶ 152-53.)

**Plaintiff's Response:**

Denied.  The failure of the two Bear hedge funds was due largely to their over-exposure to subprime mortgage risk.  *See* Carey Decl. Ex. 30, OIG Rep. at 5.  Bear admitted that it faced similar risks, stating a non-public response to an SEC comment letter  "that based on the Company's level of involvement in subprime mortgage lending and the broader impact on global credit markets, a material adverse impact on the Company's financial condition, results of operations[,] or liquidity [was] reasonably possible . . . ."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 7, Letter from Samuel J. Molinaro, The Bear Stearns Cos. Inc. Exec. VP, CFO and COO, to John Cash, Accounting Branch Chief, Division of Corp. Fin., SEC, at 17 (Jan. 31, 2008) [hereinafter 2007 SEC Comment Letter Response]; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 206-09 (analyzing Bear's overexposure to subprime mortgages); *infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to subprime mortgages and attendant risks).

Furthermore, internal company e-mails show that Bear had "concerns that the failure of the two hedge funds was a failure of risk management, [including a] . . . failure to value the securities properly[.]  Henken Decl. Ex. 5, Finnerty Tr. at 46:16-25.  "While the spokeswoman at Bear Stearns noted that the fund was separate from the two Bear Stearns Hedge Funds that had failed in June 2007 . . . the change in valuation technique [used by the hedge funds and attributed to their fall in value] would inevitably raise suspicions concerning the reliability of Bear Stearns' valuation models and risk controls."  Carey Decl. Ex. 2, Finnerty Rep. ¶ 226; *and see* Henken Decl. Ex. 10, Jody Shenn, *Bear Stearns Asset-Backed Hedge Fund Declined 52.5% in 2007*, Bloomberg, L.P., Feb. 12, 2008.  Overall there "were concerns that because those two funds were sponsored by Bear Stearns and headed by Ralph Cioffi who had been a senior fixed income

person at Bear Stearns, that the problems of the two funds were symptomatic of problems at Bear Stearns." Henken Decl. Ex. 5, Finnerty Tr. at 47:2-8.

Finally, the collapse of the hedge funds was "reputationally damaging" for Bear. Henken Decl. Ex. 9, Molinaro Tr. at 145:2-21. In July 2007, Steven Meyer, who was in charge of the prime brokerage business, emphasized that "[t]he impact of the [hedge funds] problem on [the prime brokerage business] is very significant," not least because it gave brokerage clients "a reason to question [Bear's] judgment and risk management practices." Carey Decl. Ex. 2, Finnerty Rep. Ex. 69, E-mail from Steven Meyer to Warren Spector and Samuel Molinaro (July 20, 2007). The 2008 OIG Report also concluded that, subsequent to the collapse of the two Bear hedge funds, "significant questions were raised about some of Bear' senior managements' lack of involvement in handling the crisis." Carey Decl. Ex. 30, OIG Rep. at x, 36.

**Bear Stearns's Capital Levels**

**76.   Defendants' Statement:**

Bear Stearns disclosed its capital levels:

a.   In its 1Q07 10-Q, Bear Stearns disclosed that its total capital base as of February 28, 2007 was $71.7684 billion. (Carey Decl. Ex. 13, 1Q07 10-Q at 42.)

b.   In its 2Q07 10-Q, Bear Stearns disclosed that its total capital base as of May 31, 2007 was $75.0984 billion. (Carey Decl. Ex. 14, 2Q07 10-Q at 45.)

c.   In its 3Q07 10-Q, Bear Stearns disclosed that its total capital base as of August 31, 2007 was $78.1515 billion. (Carey Decl. Ex. 15, 3Q07 10-Q at 44.)

d.   In its 2007 10-K, Bear Stearns disclosed that its total capital base as of November 30, 2007 was $80.331 billion. (Carey Decl. Ex. 11, 2007 10-K at 54.)

e.   In its 1Q08 10-Q, Bear Stearns disclosed that its total capital base as of February 29, 2008 was $83.649 billion. (Carey Decl. Ex. 43, 1Q08 10-Q at 63.)

**Plaintiff's Response:**

Plaintiff admits that the quarterly and annual reports cited above provided the figures stated above, however Plaintiff denies that those reports adequately disclosed the risks associated with Bear's capital levels. Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's capital levels, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse. *See* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same).

**77.   Defendants' Statement:**

At all relevant times, including at the time of its acquisition by JPMorgan, the Company had "a capital cushion well above what is required to meet supervisory standards calculated

33

using the Basel II standard." (*See* Carey Decl. Ex. 49, letter from SEC Chairman Christopher Cox to the Chairman of the Basel Committee on Banking Supervision, dated March 20, 2008 at 2; *see also* Carey Decl. Ex. 50, *Turmoil in U.S. Credit Markets – Examining the Recent Actions of Federal Financial Regulators: Hearing Before the United* States S. Comm. *on Banking, Housing, and Urban Affairs*, 110th Cong. 100 (Apr. 3, 2008) (statement of Christopher Cox, Chairman, SEC) ("[E]ven at the time of its sale, Bear Stearns's consolidated capital, and its broker-dealers' net capital, exceeded relevant supervisory standards."); Carey Decl. Ex. 30, OIG Audit Rpt at 86-87; *see also* Carey Decl. Ex. 51, Brad Hintz, Bernstein Research, *BSC: An Update on Bear Stearns*, at 1 (Aug. 6, 2007).)  According to the requirements of the CSE program, Bear Stearns was actually overcapitalized.  (Carey Decl. Ex. 30, OIG Audit Rpt at 11.)

> **Plaintiff's Response:**

Denied.  The OIG Report stated only that "[a]ccording to Bear Stearns' data, it exceeded the [CSE program's] required capital amounts at the holding company and broker-dealer level the entire time it was in the CSE program, including the week of March 10, 2008."  Carey Decl. Ex. 30, OIG Rep. at 11.  The OIG Report did not represent that Bear was "actually overcapitalized."  Indeed, the OIG report concluded that "Bear Stearns was not compliant with the spirit of certain Basel II standards," and "[t]he fact that Bear Stearns collapsed while it was compliant with the CSE program's capital requirements raise[d] serious questions about the adequacy of the CSE program's capital ratio requirements."  *Id.* at x, 13.  "In fact, a former Director of TM has stated [that] [t]he losses incurred by Bear Stearns and other large broker-dealers were not caused by 'rumors' or a 'crisis of confidence,' but rather by inadequate net capital and the lack of constraints on the incurring of debt."  *Id.* at 11.  In short, "although Bear Stearns was compliant with the CSE program's ten percent Basel capital requirement, it was not sufficiently capitalized to attract the funding it needed to support its business model" and the OIG's "audit found that it is entirely possible that Bear Stearns' capital levels could have contributed to its collapse by making lenders unwilling to provide Bear Stearns the funding it needed."  *Id.* at 13; *and see* Pl.'s Resp. to ¶¶ 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same).

**78.    Defendants' Statement:**

Plaintiffs expert has not undertaken any analysis to actually demonstrate the Company's capital level was materially inadequate at the time the alleged misstatements were made.  (Carey Decl. Ex. 29, Finnerty Tr. at 59:21-60:7.)

> **Plaintiff's Response:**

Denied.  From the voluminous record evidence, Dr. Finnerty reviewed and analyzed evidence regarding Bear's capital position, which he found to be reliable.  For example, he reviewed material from the OIG Report, "which found that Bear Stearns was undercapitalized."  Henken Decl. Ex. 5, Finnerty Tr. at 59:21-60:12.

**Bear Stearns's Liquidity**

79. <u>**Defendants' Statement:**</u>

Bear Stearns disclosed its total liquidity:

a. In its 1Q07 10-Q, Bear Stearns disclosed that it "maintain[ed] a minimum of $5.0 billion of liquidity immediately accessible by the Parent Company." (Carey Decl. Ex. 13, 1Q07 10-Q at 45.)

b. In its 2Q07 10-Q, Bear Stearns disclosed that "[a]s of May 31, 2007 the Parent Company Liquidity Pool was $7.6 billion," and further that "[t]he Parent Company Liquidity Pool was $11.3 billion at the end of June 2007." (Carey Decl. Ex. 14, 2Q07 10-Q at 48.)

c. In its 3Q07 10-Q, Bear Stearns disclosed that "[a]s of August 31, 2007 the Parent Company Liquidity Pool was $13.6 billion," and that "[a]s of September 19, 2007, the Parent Company Liquidity Pool had increased to a record level of $19.0 billion." (Carey Decl. Ex. 15, 3Q07 10-Q at 48.)

d. In its 2007 10-K, Bear Stearns disclosed that "[a]s of November 30, 2007 the Parent Company Liquidity Pool was $17.4 billion." (Carey Decl. Ex. 11, 2007 10-K at 47.)

e. In its 1Q08 10-Q, Bear Stearns disclosed that "[a]s of February 29, 2008 the Parent Company Liquidity Pool was $17.3 billion." (Carey Decl. Ex. 43, 1Q08 10-Q at 58.)

<u>**Plaintiff's Response:**</u>

Plaintiff admits that the quarterly and annual reports cited above provided the figures stated above, however Plaintiff denies that those reports adequately disclosed the risks posed by Bear's liquidity levels. Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's liquidity, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse. *See* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same).

80. <u>**Defendants' Statement:**</u>

The OIG Audit Report observed that Bear Stearns significantly increased its liquidity levels between May 2007 and early March 2008, from $7.6 billion to approximately $21 billion. (Carey Decl. Ex. 30, OIG Audit Rpt at 15 n.92.)

<u>**Plaintiff's Response:**</u>

Denied. The statement above misrepresents the OIG Report's conclusion regarding Bear's liquidity levels. The OIG Report concluded that although (according to T&M) Bear increased its liquidity levels between May 2007 and March 2008, and although "this more realistic approach may have helped Bear Stearns in the summer of 2007, it was not sufficient to save the firm in March 2008." Carey Decl. Ex. 30, OIG Rep. at 14-16. Moreover, the OIG Report concluded that "Bear Stearns' liquidity planning indicates that Bear Stearns was well

aware of these impractical aspects of the CSE program's approach to liquidity more than a year before it failed." *Id.* at 15; *and see* Pl.'s Resp. to ¶¶ 77, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same).

**81.   Defendants' Statement:**

Bear Stearns's liquidity on March 10, 2008 was $18.1 billion, almost exactly the same as the Company's liquidity at prior year and the most recent quarter end. (*See* Carey Decl. Ex. 49, letter from SEC Chairman Christopher Cox to the Chairman of the Basel Committee on Banking Supervision, dated March 20, 2008 at 2; Carey Decl. Ex. 43, 1Q08 10-Q at 57.)

    **Plaintiff's Response:**

Plaintiff admits that on March 10, 2008, Bear's liquidity pool was $18.1 billion ($15.1 billion adjusted for consumer protection rule). Carey Decl. Ex. 49, Letter from Christopher Cox, SEC Chairman, to Dr. Nout Wellink, Chairman, Basel Comm. on Banking Supervision, at 3 (Mar. 20, 2008). Plaintiff denies that the sources cited above provide any information about Bear's liquidity "at prior year and the most recent quarter end."

**82.   Defendants' Statement:**

As of the end of the day on March 11, 2008, Bear Stearns's liquidity remained at $15.8 billion. (*See* Carey Decl. Ex. 49, letter from SEC Chairman Christopher Cox to the Chairman of the Basel Committee on Banking Supervision dated March 20, 2008.)

    **Plaintiff's Response:**

Plaintiff admits that on March 11, 2008, Bear's liquidity pool was $11.5 billion ($15.8 billion adjusted for consumer protection rule). Carey Decl. Ex. 49, Letter from Christopher Cox, SEC Chairman, to Dr. Nout Wellink, Chairman, Basel Comm. on Banking Supervision, at 3 (Mar. 20, 2008).

**83.   Defendants' Statement:**

At all relevant times, Bear Stearns's liquidity complied with all applicable regulatory requirements. (Carey Decl. Ex. 30, OIG Audit Rpt at 14-16.) Indeed, the OIG Audit Report noted that even as early as November 2006 Bear Stearns was "implementing a more realistic approach to liquidity planning than required by the SEC." (*Id.* at 15 n.92, 16; *see also* Carey Decl. Ex. 37, Simeone Tr. at 195:6-8 (At the end of FY 2007, Bear Stearns "had amassed $17-1/2 billion in cash, which was well above what the SEC suggested.").)

    **Plaintiff's Response:**

Plaintiff admits that Bear complied with the CSE liquidity requirements, but Plaintiff denies this statement to the extent it implies that the OIG Report concluded that Bear's liquidity levels were adequate. The OIG Report concluded that "[w]hile this more realistic approach may have helped Bear Stearns in the summer of 2007, it was not sufficient to save the firm in March 2008." Carey Decl. Ex. 30, OIG Rep. at 16. Moreover, the OIG Report concluded that "Bear

Stearns' liquidity planning indicates that Bear Steams was well aware of these impractical aspects of the CSE program's approach to liquidity more than a year before it failed." *Id.* at 15. In short, the OIG Report concluded that because "Bear Steams was compliant with the CSE program's capital and liquidity requirements . . . its collapse raises questions about the adequacy of these requirements." *Id.* at 10; *and see* Pl.'s Resp. to ¶¶ 77, 80 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same).

**84.**   **Defendants' Statement:**

Plaintiffs expert has not undertaken any analysis to demonstrate the Company's liquidity was materially inadequate at the time the alleged misstatements were made.  (Carey Decl. Ex. 29, Finnerty Tr. at 60: 13-62:5; *see also id.* at 202:14-204:24, 206:13-17 ("Q: Did you analyze during the period of December 14, 2006 to December 20, 2007 the severity of the liquidity problems at Bear Stearns? A: No….").)

  **Plaintiff's Response:**

Denied.  Dr. Finnerty's performed independent calculations regarding Bear's liquidity, which are embodied in Attachment 28 of his report, where he compared Bear to the other four large, publicly traded broker-dealers.  Henken Decl. Ex. 5, Finnerty Tr. at 60:17-61:2.  Dr. Finnerty also analyzed "the market's assessment of the credit quality [of Bear], because credit quality is fundamentally tied to liquidity." *Id.* at 61:7-10.  He "looked [at] and analyzed the changes in Bear Stearns' credit spreads on its bonds, its swap spread and . . . analyzed the changes in those spreads," in addition to "the 5 year CDS spread" and "10 year yield spread over the course of the relevant period." *Id.* at 61:11-18.  Furthermore, Dr. Finnerty thoroughly reviewed and analyzed "whatever was [ ] written during the relevant period by people inside and outside of Bear on [the] issue [of Bear's liquidity]." *Id.* at 61:25-62:5; *and see id.* at 50:12-51:11, 51:16-52:12 (explaining that Dr. Finnerty reviewed documents including e-mail traffic and internal reports regarding liquidity).

**Bear Stearns's Disclosure of the Risks to its Liquidity and its Vulnerability to a Bank Run**

**85.**   **Defendants' Statement:**

Bear Stearns disclosed the risk it faced stemming from a loss of market confidence: "A reduction in our credit ratings could adversely affect our liquidity and competitive position and increase our borrowing costs."  (Carey Decl. Ex. 28, 2005 10-K at 20; Carey Decl. Ex. 1, 2006 10-K at 21; Carey Decl. Ex. 11, 2007 10-K at 18.)

  **Plaintiff's Response:**

Plaintiff admits that the annual reports cited above included the statement quoted above, however Plaintiff denies that this statement adequately disclosed the risks posed by a potential reduction in its credit ratings.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's liquidity, competitive position, and borrowing costs, and they did not disclose the fact that the risks posed by those deficiencies materialized following reductions in Bear's credit ratings and prior to Bear's

collapse.  *See* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same).

**86.    Defendants' Statement:**

Bear Stearns also disclosed the risks to its liquidity and its vulnerability to a run on the bank, including its significant reliance on short-term repo financing, its high level of customer payables due to its large prime brokerage business, and its capital and leverage.  (*See* Carey Decl. Ex. 52, Ferrell Rpt at ¶¶ 24-30.)

a.   Investment banks by the nature of their business are inherently susceptible to a run on the bank.  (*See* Carey Decl. Ex. 2, Finnerty Rpt ¶ 170; Carey Decl. Ex. 52, Ferrell Rpt ¶¶ 31.)

**Plaintiff's Response:**

Plaintiff admits that Defendants' disclosures suggested Bear's heavy reliance on repo financing and high level of customer payables, however Plaintiff denies that Defendants adequately disclosed the risks posed by that funding strategy.  Notwithstanding any generic disclosures regarding Bear's repo financing and high level of customer payables, Defendants did not disclose the specific risks related to this funding strategy, and they did not disclose that those risks strategy materialized prior to Bear's collapse.  *See* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); Pl.'s Resp. to ¶ 92 (discussing Bear's inadequate disclosures regarding its customer payables); *infra* ¶ 129 (detailing Bear's inability to engage in repo transactions or replace lost funding with new repo counterparties starting in the summer of 2007); *infra* ¶¶ 154-66 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

Plaintiff denies that Dr. Finnerty concluded that investment banks are inherently susceptible to a run on the bank.  Dr. Finnerty concluded that Bear greatly increased its use of repurchase financing between 2002 and 2007, and this over-reliance on short-term repo financing potentially placed the entire firm at risk because this form of financing could dry up in period of financial distress.  Carey Decl. Ex. 30, Finnerty Rep. ¶ 170.  In addition, Dr. Finnerty concluded that Bear's "heavy reliance on short-term funding coupled with its very high financial leverage and the long duration of its assets created a serious asset-liability mismatch, which could expose the firm to the risk of financial failure."  *Id.*  Bear's "high ratios of repurchase financing to short-term borrowing, repurchase financing to total debt, repurchase financing to total assets, repurchase financing and customer payables to current assets, repurchase financing and customer payables to total assets, long-term debt to total assets, and total debt to total assets [were] similar to those of Lehman Brothers, which went bankrupt in September 2008, and Merrill Lynch, which was acquired by Bank of America in September 2008 before it likely would have failed."  *Id.*  Dr. Finnerty never represented that these risks were inherent to investment banks; rather his report explains that Bear deliberately took on these risks.  *See id.* ¶¶ 31-32; *and see infra* ¶ 186 (regarding term "run on the bank").

**87.**   **Defendants' Statement:**

In its 2006 and 2007 10-Ks, Bear Stearns disclosed that "[l]iquidity, i.e., ready access to funds, is essential to our businesses" and "[l]iquidity risk could impair out ability to fund operations and jeopardize our financial condition."  (Carey Decl. Ex. 1, 2006 10-K at 21; Carey Decl. Ex. 11, 2007 10-K at 18.)

   **Plaintiff's Response:**

Plaintiff admits that the annual reports cited above included the statement quoted above, however Plaintiff denies that this statement adequately disclosed the risks associated with Bear's liquidity levels and access to funding.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific deficiencies with regard to Bear's liquidity and access to funding, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same).

**88.**   **Defendants' Statement:**

The information necessary to calculate the ratios of repurchase financing to short-term borrowing, repurchase financing to total debt, repurchase financing to total assets, repurchase financing and customer payables to current assets, repurchase financing and customer payables to total assets, long-term debt to total assets, and total debt to total assets, was all disclosed by Bear Stearns.  (*See* Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82.)

   **Plaintiff's Response:**

Plaintiff admits that Bear's 2006 and 2007 10-K reports contained information necessary to calculate these ratios.  *See* Henken Decl. Ex. 3, 2006 10-K at 21; Henken Decl. Ex. 4, 2007 10-K at 18.  However, Plaintiff denies that these reports adequately disclosed the risks posed by Bear's funding strategy, particularly its heavy reliance on repurchase financing.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose the specific risks related to Bear's heavy reliance on repo financing, and they did not disclose that those risk materialized prior to Bear's collapse.  *See* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); Pl.'s Resp. to ¶ 92 (discussing Bear's inadequate disclosures regarding its customer payables); *infra* ¶ 129 (detailing Bear's inability to engage in repo transactions or replace lost funding with new repo counterparties starting in the summer of 2007); *infra* ¶¶ 154-66 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

**Bear Stearns's Disclosures Concerning Repo Financing**

**89.**   **Defendants' Statement:**

Bear Stearns also disclosed that a significant portion of its liability was due to obligations owing to "[s]ecurities sold under agreements to repurchase."  (Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82.)  A repurchase agreement (or repo) is "essentially a short term cash loan collateralized by securities."  (Carey Decl. Ex. 52, Ferrell Rpt ¶ 25.)  Bear

Stearns disclosed that it depended on repo agreements for approximately $70 billion and $102.4 billion of funding as of November 30, 2006 and November 30, 2007, respectively.  (Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82.)

**Plaintiff's Response:**

Plaintiff admits that Bear's 2006 and 2007 10-K reports contained these statements, however Plaintiff denies these reports adequately disclosed the risks posed by this funding strategy, particularly Bear's heavy reliance on repurchase financing.  Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose the specific risks related to Bear's funding strategy, and they did not disclose that those risk materialized prior to Bear's collapse. *See infra* ¶ 129 (detailing Bear's inability to engage in repo transactions or replace lost funding with new repo counterparties starting in the summer of 2007).

**90.    Defendants' Statement:**

Entering the first quarter of 2008, Bear Stearns disclosed that it "modified its general funding structure, beginning in late 2006," including "[i]ncreased use of secured funding[,]" "[i]ntroduc[ing] substantially greater amounts of longer tenor secured funding into the repo and bank loan portions of its secured funding mix[,]" "[r]educed reliance on short-term unsecured funding sources," "[e]xpand[ing] the size and scope of the Parent Company Liquidity Pool," and "[i]ncreas[ing] the target for net cash capital."  (Carey Decl. Ex. 11, 2007 10-K at 48.)

**Plaintiff's Response:**

Plaintiff admits that Bear's 2007 10-K report included the statements quoted above, however Plaintiff denies that report adequately disclosed the risks associated with Bear's funding structure and liquidity.  Notwithstanding any generic statements in its public filings, Defendants did not disclose specific deficiencies with regard to Bear's funding structure and liquidity, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66  (same).

**91.    Defendants' Statement:**

Bear Stearns disclosed in both its 2006 and 2007 10-Ks that "[a]n inability to raise money in the long-term or short-term debt markets, or to engage in repurchase agreements or securities lending, could have a substantial negative effect on our liquidity.  Our access to debt in amounts adequate to finance our activities could be impaired by factors that affect the Company in particular or the financial services industry in general.  For example, lenders could develop a negative perception of our long-term or short-term financial prospects if we incurred large trading losses, if the level of our business activity decreased due to a market downturn or if regulatory authorities took significant action against the Company.  Our ability to borrow in the debt markets also could be impaired by factors that are not specific to us, such as a severe disruption of the financial markets or negative views about the prospects for the investment banking, securities or financial services industries generally."  (Carey Decl. Ex. 1, 2006 10-K at

21, *see also* Carey Decl. Ex. 11, 2007 10-K at 18; *see also* Carey Decl. Ex. 52, Ferrell Rpt ¶ 25, Carey Decl. Ex. 44, Stulz Rpt ¶ 29,63.)

### Plaintiff's Response:

Plaintiff admits that Bear's 2006 and 2007 10-K reports contained this statement, however Plaintiff denies that these reports adequately disclosed the risks posed by this funding strategy, particularly Bear's heavy reliance on repurchase financing.  Notwithstanding any generic statements in its public filings, Defendants did not disclose specific deficiencies with regard to Bear's funding structure and liquidity, and they did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶ 129 (detailing Bear's inability to engage in repo transactions or replace lost funding with new repo counterparties starting in the summer of 2007); *infra* ¶¶ 154-66 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

## Bear Stearns's Disclosures Concerning Customer Payables

### 92.   Defendants' Statement:

Bear Stearns disclosed the subcategories of customer payables that create liquidity risk (Carey Decl. Ex. 52, Ferrell Rpt ¶¶ 27-29):

    a.  Bear Stearns disclosed that its prime brokerage clients had Free Credit Balances, which are funds payable by a broker-dealer to its customer on demand (*id.* ¶ 28), of $32.6 billion and $36.1 billion as of November 30, 2006 and November 30, 2007, respectively.  (Carey Decl. Ex. 1, 2006 10- K at 43; Carey Decl. Ex. 11, 2007 10-K at 44.)

    b.  Bear Stearns disclosed that its customers had borrowed $78.6 billion and $85.8 billion in margin as of November 30, 2006 and November 30, 2007, respectively.  (Carey Decl. Ex. 1, 2006 10-K at 43; Carey Decl. Ex. 11, 2007 10-K at 44.)

    c.  Bear Stearns disclosed its customer payable liabilities as $72.989 billion and $83.204 billion on November 30, 2006 and November 30, 2007, respectively.  (Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82.)

### Plaintiff's Response:

Plaintiff admits that Bear's 2006 and 2007 10-K reports contained these statements, however Plaintiff denies that these reports adequately disclosed the risks posed by Bear's customer payables.  Notwithstanding any generic statements in its 10-K reports, Defendants did not disclose the specific risks related to Bear's customer payables, and they did not disclose that those risks materialized prior to Bear's collapse.  For example, in late 2007 while Defendants were publicly stating that Bear's funding was strong, *see infra* ¶ 160,  Bear's employees were actually every concerned about a loss of customer accounts.  In a December 15, 2007 e-mail, Paul Friedman discussed various scenarios, concluding: "Either way we're dead, whether from lack of cash or lack of customers."  Carey Decl. Ex. 30, Finnerty Rep. Ex. 46, E-mail from Paul

Friedman to Thomas Marano, Subject: Mortgage Co. (Dec. 15, 2007).  Friedman further noted that even if Bear was not downgraded and managed to "raise[] a couple billion dollars of new equity [it woud] still have all the same funding and liquidity issues [it has] now."  *Id.* Defendants did not disclose these risks or concerns to investors.

**Bear Stearns's Leverage**

**93.**   **Defendants' Statement:**

Plaintiffs expert speculates that "it is entirely possible that Bear Stearns' high leverage contributed to a lack of confidence in the firm (including unsubstantiated rumors) which had an impact on its collapse."  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 196.)

**Plaintiff's Response:**

Admitted.

**94.**   **Defendants' Statement:**

Bear Stearns disclosed its leverage.

    a.   In its 2006 10-K, Bear Stearns disclosed that its gross leverage was 26.5x and its net adjusted leverage was I3.6x.  (Carey Decl. Ex. 1, 2006 10-K at 47.)

    b.   In its 2007 10-K, Bear Stearns disclosed that its gross leverage was 32.8x and its net adjusted leverage was 19.3x.  (Carey Decl. Ex. 11, 2007 10-K at 53.)

    c.   Bear Stearns disclosed that gross leverage "equals total assets divided by stockholders' equity, inclusive of preferred and trust preferred equity" and that net adjusted leverage "equals net adjusted assets divided by tangible equity capital, which excludes goodwill and intangible assets from both the numerator and the denominator."  (*Id.* at 52.)

**Plaintiff's Response:**

Plaintiff admits that these statements were included in Bear's 10-K reports.  However, these calculations were based on Bear's own deficient valuations of its assets, so the leverage ratios disclosed were artificially lower than they truly were.  *See infra* ¶¶ 135-38 (detailing the criticism Bear's valuation models received as early as 2005, Bear's refusal to update those models in any meaningful way, and the fact that these deficient models were used to value the vast majority of its assets).

**The Events of the Relevant Period and the Financial Crisis**

**95.**   **Defendants' Statement:**

In 2007 and into early 2008, the mortgage market significantly deteriorated.  (*See* Carey Decl. Ex. 29, Finnerty Tr. at 135:13-136:4, 206:22-210:15; Carey Decl. Ex. 53, "Bernanke: 2008

Meltdown Was Worse Than Great Depression," *The Wall Street Journal*, August 26, 2014; *see also* Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 22-29 (stating that December 14, 2006 through March 14, 2008, encompassed the start of a tumultuous period for the global economy," "[s]ales of both existing and new homes declined sharply in 2007," "there was a sharp increase in mortgage delinquencies, especially among subprime mortgages," and that "beginning in December 2007, the country entered a severe recession.").)

**Plaintiff's Response:**

Admitted.

96.   **Defendants' Statement:**

Bear Stearns disclosed its exposure to the risk of a deterioration in market conditions: *"In the event of a market downturn, our businesses could be adversely affected in many ways . . . Our revenues are likely to decline in such circumstances and, if we were unable to reduce expenses at the same pace, our profit margins would erode."* (Carey Decl. Ex. 1, 2006 10-K at 19; Carey Decl. Ex. 11, 2007 10-K at 16 (emphasis added).)  In addition, "[c]hanges in business, political and/or economic conditions could have an adverse effect on the Company." (Carey Decl. Ex. 1, 2006 10-K at 22; *see also* Carey Decl. Ex. 11, 2007 10-K at 19.)

**Plaintiff's Response:**

Plaintiff admits that the annual reports cited above included the statements quoted above (without emphasis), however Plaintiff denies that these statements adequately disclosed the risks posed by a deterioration in market, business, political, and/or economic conditions. Notwithstanding any generic statements in Bear's public filings, Defendants did not disclose specific risks Bear faced with regard to its overreliance on repo transactions, excessive leverage, exposure to subprime mortgages, inadequate valuation models, inadequate risk management operations, and inadequate capital and liquidity positions, and Defendants did not disclose the fact that those risks materialized prior to Bear's collapse. *See infra* ¶¶ 129 (detailing Defendants' deficient disclosure of Bear's overreliance on repo transactions and the attendant risks); *infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks); *infra* ¶¶ 133-39 (detailing Defendants' deficient disclosure of the inadequacy of Bear's valuation models and attendant risks); Pl.'s Resp. to ¶¶ 86, 129 (detailing Defendants' overreliance on repo transactions and attendant risks); Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same); *infra* ¶¶ 154 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

97.   **Defendants' Statement:**

Bear Stearns also disclosed as the crisis developed that it was impacting the Company's business.

a.   On March 15, 2007, the Company reported reductions in its "[r]esidential mortgage-related revenues . . . reflecting weakness in the U.S. residential mortgage-backed securities market." (Carey Decl. Ex. 54, 3/15/07 8-K.)

b.  On April 10, 2007, the Company cautioned that the mortgage market was continuing to deteriorate, noting that "mortgage markets became more challenging later in the quarter as investor concern over the rising delinquency levels in the subprime mortgage market escalated."  (Carey Decl. Ex. 13, 1Q07 10-Q at 34.)

c.  On June 14, 2007, Bear Stearns reported a decline in total second quarter earnings compared to the prior year resulting from "industry-wide declines in residential mortgage origination and securitization volumes and challenging market conditions in the sub-prime and Alt-A mortgage sectors."  (Carey Decl. Ex. 55, 6/14/07 8-K; *see also* Carey Decl. Ex. 14, 2Q07 10-Q at 35.)

d.  On a conference call on June 14, 2007, Bear Stearns's CFO Samuel Molinaro, Jr. stated that "[t]he decline in fixed income revenues reflects weaker U.S. mortgage market conditions when compared to the prior year and benign global interest rate markets which reduced mortgage and interest rate product revenues... Residential mortgage origination volumes industry-wide declined when compared to the prior year reflecting a combination of weaker housing market and tighter subprime and Alt-A underwriting standards" (Carey Decl. Ex. 56, 6/14/07 Call Tr. at 3), and that "the challenge that we're all going to have is the level of delinquencies and defaults in the 2006 vintage subprime continues to be a challenge though it hasn't spilled into other sectors of the market, and of course the overall level of origination volume is continuing to be challenging with the tightened underwriting standards and sluggish home price situation, origination volumes will continue to be challenging, though hopefully gradually building back off of what will hopefully this second quarter be a floor" (*Id.* at 10).

e.  On a conference call on June 22, 2007, Molinaro noted that the Company's mortgage business was operating "in a lower volume environment and a more difficult operating environment given . . . the macro picture in the marketplace."  (Carey Decl. Ex. 57, 6/22/07 Call Tr. at 9.)

f.  On an August 3, 2007 investor call held to address Standard & Poor's downward revision of its outlook on Bear Stearns's credit rating, Molinaro stated that "there's a great deal of uncertainty in the fixed income markets over the level of default and loss expectations in the subprime mortgage market and I guess generally in the broader mortgage market."  (Carey Decl. Ex. 58, 8/3/07 Call Tr. at 5.)  He continued, "I've been at this for twenty-two years.  *It's about as bad as I have seen it in the fixed-income market during that period of time*." (*Id.* at 8 (emphasis added).)

g.  When Bear Stearns announced its third quarter earnings on September 20, 2007, the Company disclosed that its fixed income net revenues, including revenues from the firm's mortgage activities, were down 88% from the prior year, and that "[m]arket conditions in both the mortgage and credit businesses were extremely challenging this quarter."  Bear Stearns also explained that "[a] general re-pricing of risk in the market led to significant reductions in both mortgage and credit-related revenues as volumes decreased while asset values declined."  (Carey Decl. Ex. 59, 9/20/07 8-K.)

h.  On September 20, 2007, Bear Stearns disclosed that it took net inventory markdowns of approximately $700 million for the quarter, which it attributed largely to declines in the value of residential mortgages and leveraged finance activities.  (Carey Decl. Ex. 60, 9/20/07 Call Tr. at 3.)

i.  On the September 20, 2007 conference call to discuss the third quarter earnings release, Molinaro stated that "[f]ixed income activity suffered as transaction volumes declined significantly and inventory valuations came under severe pressure."  (*Id.* at 2.)

j.  On November 15, 2007, Bear Stearns took additional write-downs reflecting the further deterioration in the value of mortgage-related assets.  On November 14, 2007, more than a month before the official earnings release, Bear Stearns disclosed its intention to write down $1.2 billion for the quarter (net of hedges), which it attributed primarily to losses in its CDO and CDO warehouse portfolio.  (Compl. ¶ 217; Carey Decl. Ex. 35, 11/15/07 8-K.)

k.  On December 21, 2007, the Company disclosed that it wrote down a net of $1.9 billion at the end of the fourth quarter of 2007, further reflecting the rapid decline in the value of mortgage-related assets.  (Carey Decl. Ex. 36, 12/21/07 8-K.)

**Plaintiff's Response:**

Plaintiff admits that the sources cited in paragraphs 97(a)-(e), (g)-(h), and (j)-(k) disclose that general market conditions were having some effect on Bear's business, however Plaintiff denies that these sources adequately disclosed the specific risks Bear faced with regard to its overreliance on repo transactions, excessive leverage, exposure to subprime mortgages, inadequate valuation models, inadequate risk management operations, and inadequate capital and liquidity positions.  Notwithstanding any generic statements in Bear's public filings or the other sources noted in paragraph 97, Defendants did not disclose specific risks Bear faced with regard to its overreliance on repo transactions, excessive leverage, exposure to subprime mortgages, inadequate valuation models, inadequate risk management operations, and inadequate capital and liquidity positions, and Defendants did not disclose the fact that those risks materialized prior to Bear's collapse.  *See infra* ¶¶ 129 (detailing Defendants' deficient disclosure of Bear's overreliance on repo transactions and the attendant risks); *infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks); *infra* ¶¶ 133-39 (detailing Defendants' deficient disclosure of the inadequacy of Bear's valuation models and attendant risks); Pl.'s Resp. to ¶¶ 86, 129 (detailing Defendants' overreliance on repo transactions and attendant risks); Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same); *infra* ¶¶ 154 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

Plaintiff also notes that the second sentence in paragraph 97(f) and cited material in paragraph 97(i) above is not contained in the cited exhibits submitted by Defendants.  *See* Carey Decl. Ex. 60, Thomson StreetEvents, *BSC – Q3 2007 Bear Stearns Earnings Conference Call* (Sept. 20, 2007).

98.   **Defendants' Statement:**

Analysts also cautioned investors about the risks that the subprime crisis posed to Bear Stearns's business:

a.   In March 2007, one analyst wrote that "investors will not know the ultimate impact of the sub-prime market problems until the slow motion train wreck of rising mortgage delinquencies and defaults is played out over the rest of this year.  As one of the largest fixed income houses and the third largest MBS underwriter this uncertainty will likely affect Bear's stock valuation over the remainder of the year."  He added that among brokerage firms, Bear Stearns had "the highest percent of its equity capital committed to the mortgage business."  (Carey Decl. Ex. 61, Brad Hintz, BernsteinResearch, *BSC Q1 2007 – Weakest Results Thus Far; But Subprime Fears Assuaged*, at 2, 10 (Mar. 16, 2007).)

b.   In August 2007, recognizing that Bear Stearns had "the second largest exposure to fixed income sales and trading in the U.S. Securities Industry," the same analyst wrote that "with the sub-prime mortgage market still dismal and US credit spreads having gapped out, *this largely domestic firm is probably most at risk among the large capitalization brokers.  At this point, Bear faces a challenging situation - the problems of [the] sub-prime sector will negatively impact CDO issuance, MBS issuance, market making revenues and residual valuations, the related risk associated with margin loans and repo provided certain fixed income hedge funds raises the risk of credit losses and will limit prime brokerage revenues and the reputational fall-out from [the] BSAM hedge fund problems will constrain asset management performance."  (Carey Decl. Ex. 51, Brad Hintz, BernsteinResearch, *BSC: An Update on Bear Stearns*, at 6 (Aug. 6, 2007) (emphasis added).)

c.   Another analyst, noting the same risk, wrote that "*No other broker has maintained the concentrated exposure to US sub-prime mortgages that Bear Stearns is now famous for.  In addition, no other broker has the geographic concentration to the US Capital Markets that Bear Stearns has.  Accordingly, our EPS outlook is most ominous for BSC.*"  (Carey Decl. Ex. 63, Meredith Whitney, CIBC World Markets, *Cutting Rating and Earnings Outlook on Bear Stearns*, at 1 (Aug. 28, 2007) (emphasis added).)

**Plaintiff's Response:**

Plaintiff admits the analysts stated the above opinions based on publicly available information that Defendants disclosed to the market, however Plaintiff contends that these analyses would be different had Defendants disclosed Bear's specific weaknesses and the fact that certain risks had materialized, including those regarding Bear's overreliance on repo transactions, excessive leverage, exposure to subprime mortgages, inadequate valuation models, inadequate risk management operations, and inadequate capital and liquidity positions, and Defendants did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 129 (detailing Defendants' deficient disclosure of Bear's overreliance on repo transactions and the attendant risks); *infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to

subprime assets, and attendant risks); *infra* ¶¶ 133-39 (detailing Defendants' deficient disclosure of the inadequacy of Bear's valuation models and attendant risks); Pl.'s Resp. to ¶¶ 86, 129 (detailing Defendants' overreliance on repo transactions and attendant risks); Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same); *infra* ¶¶ 154 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

Additionally, paragraph 98(b) is not supported by the cited authority.  That report is more optimistic than characterized by Defendants, stating that such losses "would be manageable for the firm," and that the "'worst case' scenario playing out [is] highly doubtful."  Carey Decl. Ex. 51, Brad Hintz, BernsteinResearch, *BSC: An Update on Bear Stearns*, at 6 (Aug. 6, 2007).

99. **Defendants' Statement:**

Market regulators, participants, and government officials, assessing the impact of the subprime crisis in real time, viewed the probable impact of the crisis as limited well into the summer of 2007.

  a. In February 2007, Federal Reserve Chairman Ben Bernanke told the Budget Committee of the United States House of Representatives that *the housing downturn was not "a broad financial concern or a major factor in assessing the state of the economy*."  (Carey Decl. Ex. 64, John Cassidy, *Anatomy of a Meltdown – Ben Bernanke and the Financial Crisis*, The New Yorker, Dec. 1, 2008, at 8 (emphasis added).)

  b. In March 2007, Federal Reserve Director of Banking Supervision and Regulation Roger T. Cole stated that "at this time, *we are not observing spillover effects from the problems in the subprime market to traditional mortgage portfolios or, more generally, to the safety and soundness of the banking system*."  (Carey Decl. Ex. 65, *Mortgage Market Turmoil – Causes and Consequences: Hearing Before the United States* S. *Comm. on banking, Housing, and Urban Affairs*, 110th Cong. 1 (Mar. 22, 2007) (statement of Roger T. Cole, Dir., Div. of Banking Supervision and Regulation, Board of Governors of the Federal Reserve System) (emphasis added).)

  c. In April 2007, Treasury Secretary Henry Paulson said, "*I don't see* (*subprime mortgage market troubles*) *imposing a serious problem.  I think it's going to be largely contained*."  (Carey Decl. Ex. 66, *Treasury's Paulson – subprime woes likely contained*, Reuters UK, Apr. 20, 2007 (emphasis added).)

  d. In April 2007, the International Monetary Fund's Global Financial Stability Report stated that the mortgage market "*weakness has been contained to certain portions of the subprime market* (and, to a lesser extent, the Alt-A market), and is not likely to pose a serious systemic threat. Stress tests conducted by investment banks [including Lehman Brothers, Bear Stearns, and JPMorgan] show that, even under scenarios of nationwide house price declines that are historically unprecedented; most investors with exposure to subprime mortgages through securitized structures will not face

losses."  (Carey Decl. Ex. 67, Int'l Monetary Fund, *Global Financial Stability Report: Market Developments and Issues* 7 (Apr. 2007) (emphasis added).)

e.  In May 2007, Federal Reserve Chairman Bernanke stated that "*the effect of the troubles in the subprime sector on the broader housing market will likely be limited, and we do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system*." (Carey Decl. Ex. 68, Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System, Address at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition at 6 (May 17, 2007) (emphasis added).)

f.  In June 2007, Jeff Harte, analyst for Sandler O'Neill + Partners, stated, "*I don't expect mortgages to be a major near-term revenue driver for the investment banks, but they won't cause major problems*." (Carey Decl. Ex. 69, Greg Morcroft, *Subprime woes weigh on Goldman, Bear results*, MarketWatch, June 14, 2007 (emphasis added).)

g.  In July 2007, Treasury Secretary Paulson said that *the housing market correction was "at or near the bottom.*"  (Carey Decl. Ex. 70, Emily Kaiser, *Paulson Sees U.S. Housing Downturn Near End*, Reuters, July 2, 2007 (emphasis added).)

h.  In July 2007, Treasury Secretary Paulson told CNBC, "I don't deny you're going to see money lost in subprime mortgages. . . .  *But do I think these risks are contained? Yes, I do*." (Carey Decl. Ex. 71, *US's Paulson: Subprime 'At, Near Bottom;' Need Vigilance*, Market News Serv., July 24, 2007 (emphasis added).)

i.  As T&M later concluded, "virtually the entire banking sector failed to anticipate the magnitude and scope of the housing decline that is still ongoing."  (Carey Decl. Ex. 30, OIG Audit Rpt at 94.)

**Plaintiff's Response:**

Although the above market regulators, participants, and officials gave the above opinions, such opinions were not based on how such market effects would affect firms like Bear, which did not disclose its specific weaknesses, including its overreliance on repo transactions, excessive leverage, exposure to subprime mortgages, inadequate valuation models, inadequate risk management operations, and inadequate capital and liquidity positions, and Defendants did not disclose the fact that the risks posed by those deficiencies materialized prior to Bear's collapse.  *See infra* ¶¶ 129 (detailing Defendants' deficient disclosure of Bear's overreliance on repo transactions and the attendant risks); *infra* ¶¶ 130-33 (detailing Defendants' deficient disclosure of Bear's exposure to the mortgage market, particularly with respect to subprime assets, and attendant risks); *infra* ¶¶ 133-39 (detailing Defendants' deficient disclosure of the inadequacy of Bear's valuation models and attendant risks); Pl.'s Resp. to ¶¶ 86, 129 (detailing Defendants' overreliance on repo transactions and attendant risks); Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same); *infra* ¶¶ 154 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

100.   **Defendants' Statement:**

In late February and early March 2008, conditions in the financial markets deteriorated significantly.

  a.   On March 10, 2008, officials at the Federal Reserve Board observed that "[f]inancial conditions [had] worsened considerably in recent days" and expressed concern that the U.S. "may have entered a new, dangerous phase of the crisis."  (Carey Decl. Ex. 72, 3/10/08 FOMC Call Tr. at 4; Carey Decl. Ex. 52, Ferrell Rpt ¶ 38.)

  b.   The bid-ask spread, which is the discount one must accept to sell a financial instrument immediately had widened for many types of financial instruments, indicating a liquidity problem in the market. (Carey Decl. Ex. 72, 311 0/08 FOMC Call Tr. at 5; Carey Decl. Ex. 29, Finnerty Tr. at 207:10-19; Carey Decl. Ex. 52, Ferrell Rpt ¶ 39.)  There was also a sharp increase in haircuts, the amount a lender holds back when they make a loan under a repurchase agreement, for mortgage-backed securities. (Carey Decl. Ex. 72, 3/10/08 FOMC Call Tr. at 5; Carey Decl. Ex. 29, Finnerty Tr. at 207:20-208:2; Carey Decl. Ex. 52, Ferrell Rpt ¶ 39-41; Carey Decl. Ex. 73, JPMorgan, "U.S. Fixed Income Markets Weekly" at 1-2 (3/7/08).)

  c.   The value of mortgage-backed securities was also falling during this time period. (Carey Decl. Ex. 52, Ferrell Rpt ¶ 41 (citing Ferrell Rpt Ex. 4, Table 1); Carey Decl. Ex. 29, Finnerty Tr. at 208:3-10.)  In addition, analysts at Foxx-Pitt Kelton wrote on February 29, 2008 that they believed Alt-A values were down 15% in the year to date.  (Carey Decl. Ex. 74, David Trone & Ivy De Dianous, Fox-Pitt Kelton, *Alt-A Deterioration Prompting Additional Write-Downs*, (Feb. 29, 2008); *see also* Carey Decl. Ex. 52, Ferrell Rpt ¶ 41.)

  **Plaintiff's Response:**

Plaintiff admits that the sources cited above are accurately cited, however Plaintiff denies this statement to the extent it suggest that Bear's financial and risk management deficiencies began only in late February or early March.  *See infra* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures beginning as early as the June 2007); ¶¶ 154-66 (same).

**The Week of March 10th and Bear Stearns's Acquisition by JPMorgan**

101.   **Defendants' Statement:**

During the week of March 10, 2008 rumors began swirling in the market concerning the Company's liquidity.  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 35; *see also* Carey Decl. Ex. 39, Schwartz Tr. at 111:6-11.)

  **Plaintiff's Response:**

Denied.  Information related to Bear's inadequate liquidity began leaking into the market after the failure of its hedge funds in June 2007.  Carey Decl. Ex. 30, Finnerty Rep. ¶ 192; *and*

*see* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); *infra* ¶¶ 154-66 (same); *infra* ¶¶ 167-71 (regarding leakage).

**102.  Defendants' Statement:**

Beginning on Wednesday, March 12, clients and counterparties pulled their funds from Bear Stearns, drawing down the Company's liquidity pool.  (*See, e.g.*, Carey Decl. Ex. 39, Schwartz Tr. at 119:14-122:6, 128:2-18; Carey Decl. Ex. 44, Stulz Rpt ¶ 57(a), (c), n. 88 (citing Carey Decl. Ex. 50, *Turmoil in Us. Credit Markets – Examining the Recent Actions of Federal Financial Regulators: Hearing Before the* S. *Comm. on Banking, Housing, and Urban* Affairs, 110th Cong. 75 (Apr. 3, 2008) (statement of Alan Schwartz, President and Chief Executive Officer, Bear Stearns) ("[B]y Thursday of that week [March 13], a tipping point was reached on liquidity. The market rumors became self-fulfilling and Bear Stearns' liquidity pool began to fall sharply").)

**Plaintiff's Response:**

Denied.  Bear knew well before March 12, 2008 that its counterparties were pulling their funds and drawing significantly on the Company's liquidity pool. starting as early as mid-2007. *See* Carey Decl. Ex. 30 Finnerty Rep. ¶¶ 169-82; *and see* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); Pl.'s Resp. to ¶ 92 (discussing Bear's inadequate disclosures regarding its customer payables); *infra* ¶ 129 (detailing Bear's inability to engage in repo transactions or replace lost funding with new repo counterparties starting in the summer of 2007); *infra* ¶¶ 154-66 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

**103.  Defendants' Statement:**

The run intensified on March 13, 2008, and by that evening Bear Stearns's liquidity had declined to $2 billion.  (*See* Carey Decl. Ex. 39, Schwartz Tr. at 129:14-130:4; Carey Decl. Ex. 50, *Turmoil in Us. Credit Markets – Examining the Recent Actions of Federal Financial Regulators: Hearing Before the* S. *Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 26 (Apr. 3, 2008).

**Plaintiff's Response:**

Denied.  Bear's liquidity began to deteriorate well before March 13, 2008, starting as early as mid-2007.  *See* Carey Decl. Ex. 30 Finnerty Rep. ¶¶ 169-82; *and see* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); Pl.'s Resp. to ¶ 92 (discussing Bear's inadequate disclosures regarding its customer payables); *infra* ¶ 129 (detailing Bear's inability to engage in repo transactions or replace lost funding with new repo counterparties starting in the summer of 2007); *infra* ¶¶ 154-66 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

**104.  Defendants' Statement:**

Prior to the market opening on Friday, March 14, 2008, Bear Stearns announced that its "liquidity position in the last 24 hours had significantly deteriorated" and "it reached an

agreement with JPMorgan Chase & Co. (JPMC) to provide a secured loan facility for an initial period of up to 28 days allowing Bear Stearns to access liquidity as needed." (Carey Decl. Ex. 75, 3/14/08 BSC Press Release; *see also* Carey Decl. Ex. 2, Finnerty Rpt ¶ 238; Carey Decl. Ex. 52, Ferrell Rpt ¶ 15).

**Plaintiff's Response:**

Plaintiff admits that Bear made these announcements, however Plaintiff denies this statement to the extent it suggest that Bear's liquidity position only began to deteriorate on March 14, 2008.  *See* Carey Decl. Ex. 30 Finnerty Rep. ¶¶ 169-82; *and see* Pl.'s Resp. to ¶¶ 77, 80, 83 (describing deficiencies related to Bear's capital and liquidity levels and disclosures); Pl.'s Resp. to ¶ 92 (discussing Bear's inadequate disclosures regarding its customer payables); *infra* ¶ 129 (detailing Bear's inability to engage in repo transactions or replace lost funding with new repo counterparties starting in the summer of 2007); *infra* ¶¶ 154-66 (describing deficiencies related to Bear's capital and liquidity levels and disclosures).

**105.   Defendants' Statement:**

As plaintiffs expert acknowledged, Bear Stearns "expected the secured loan facility JPMorgan extended to Bear Stearns on March 14, 2008 would be sufficient to shore up Bear Stearns's liquidity."  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 247; Carey Decl. Ex. 29, Finnerty Tr. at 169:5-12.)

**Plaintiff's Response:**

Admitted.

**106.   Defendants' Statement:**

After the close of business on March 14, 2008 Bear Stearns was informed that after the weekend the credit facility would no longer be available.  (Carey Decl. Ex. 29, Finnerty Tr. at 169:13-170:10; Carey Decl. Ex. 39, Schwartz Tr. at 148:2-13.)

**Plaintiff's Response:**

Denied.  Bear learned that the facility "wouldn't have the duration they originally thought," which was "for a period of a month . . . and then [Bear was] told over the course of the weekend that that was not the deal, that the facility would have a limited duration of a matter of days," or at least "substantially shorten[ed]."  Henken Decl. Ex. 5, Finnerty Tr. at 176:3-8, 169:13-170:10.

**107.   Defendants' Statement:**

On March 16, 2008, Bear Stearns announced that it had entered into an agreement to be acquired by JPMorgan for $2.00 per share.  (Carey Decl. Ex. 76, 3/16/08 Bear Stearns Press Release; Carey Decl. Ex. 2, Finnerty Rpt ¶ 35.)

**Plaintiff's Response:**

Admitted.

**108.    Defendants' Statement:**

Bear Stearns's announcement of its merger with JPMorgan could not have been made before March 16, 2008 as the board "approved [the transaction] on Sunday, the 16th." (Carey Decl. Ex. 29, Finnerty Tr. at 164:12-166:2; *see also* Carey Decl. Ex. 39, Schwartz Tr, at 164:3-14.)

**Plaintiff's Response:**

Admitted.

**109.    Defendants' Statement:**

The $2 per share sale price to JPMorgan did not reflect the true value of the Company or its assets, but rather was a political decision.  Contemporaneous minutes from the March 16, 2008 meeting of the Bear Stearns Board of Directors state that "the government would not permit a higher number" and "would not support a transaction where [Bear Stearns's] equity holders received any significant consideration because of the 'moral hazard' of the federal government using taxpayer money to 'bailout' the investment bank's stockholders." (Carey Dec1. Ex. 78, DT_WP_000389091 at DT_WP_000389095.)

**Plaintiff's Response:**

Denied.  "[E]ven recognizing that there [were] reasons why the financial condition of Bear Stearns and its relatively weak negotiating position would lead to a discount, the huge gap between the book value of equity, which is supposed to be a on a marked-to-market basis, and $2 a share [price] suggests that the assets were carried on Bear Stearns' books . . . at an overvaluation."  Henken Decl. Ex. 5, Finnerty Tr. 63:21-64:7.

**110.    Defendants' Statement:**

The $2 per share sale price also reflected "a significant discount" due to "the speed and complexity of trying to get something done in two days." (Carey Decl. Ex. 39, Schwartz Tr. at 161:15-24.)

**Plaintiff's Response:**

Plaintiff admits that the $2 per share sale price reflected some discount, but not necessarily a significant one given that such a price also indicates that Bear's "assets were carried on Bear Stearns's books at an overvaluation" given "the huge gap between the book value of equity, which is supposed to be a on mark to market basis, and $2 a share." (Henken Decl. Ex. 5, Finnerty Tr. 59:19-60:4.)

**111.**   **Defendants' Statement:**

Plaintiff s expert admitted that he was not offering an opinion that the $2 per share sale price to JPMorgan was due to any overvaluation of the Company's assets and that he has "no basis for checking" whether the acquisition price reflected an overvaluation of assets.  (Carey Decl. Ex. 29, Finnerty Tr. at 65:15-67:13.)

   **Plaintiff's Response:**

Denied.  Dr. Finnerty stated that, "even recognizing that there [were] reasons why the financial condition of Bear Stearns and its relatively weak negotiating position would lead to a discount, the huge gap between the book value of equity, which is supposed to be a on a marked-to-market basis, and $2 a share [price] suggests that the assets were carried on Bear Stearns' books . . . at an overvaluation."  Henken Decl. Ex. 5, Finnerty Tr. 63:21-64:7.

**112.**   **Defendants' Statement:**

As plaintiffs expert acknowledged, the acquisition price reflected, at least in part, "Bear Stearns' weak negotiating leverage owing to its financial distress and the paucity of potential bidders for Bear Stearns during the weekend of March 15-16, 2008."  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 257.)

   **Plaintiff's Response:**

Admitted.

**113.**   **Defendants' Statement:**

Bear Stearns merged with JPMorgan at a price of $10.00 per share as a result of the merger renegotiation that took place after the initial agreement (Carey Decl. Ex. 2, Finnerty Rpt ¶.35, n.13), a sale price announced on March 24, 2008 (Carey Decl. Ex. 79, 3/24/08 Press Release).

   **Plaintiff's Response:**

Admitted.

**114.**   **Defendants' Statement:**

Senior industry regulators later concluded that Bear Stearns's near collapse was the result of a "run on the bank"—an unanticipated and unprecedented refusal by counterparties to provide short-term secured financing (even for high quality collateral) to a well-capitalized and otherwise liquid financial institution.

   a.   Christopher Cox, Chairman of the SEC, observed: "What happened to Bear Stearns during the week of March 10th was likewise unprecedented.  *For the first time, a major investment bank that was well-capitalized and apparently fully liquid experienced a crisis of confidence that denied it not only unsecured financing, but*

*short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.* Counter-parties would not provide securities lending services and clearing services. Prime brokerage clients moved their cash balances elsewhere. These decisions by counterparties, clients, and lenders to no longer transact with Bear Stearns in tum influenced other counterparties, clients, and lenders to also reduce their exposure to Bear Stearns." Chairman Cox characterized what happened to Bear Stearns as a "run on the bank." (Carey Decl. Ex. 50, *Turmoil in Us. Credit Markets – Examining the Recent Actions of Federal Financial Regulators: Hearing Before the United States* S. *Comm. on Banking, Housing, and Urban Affairs,* 110th Cong. 101 (Apr. 3, 2008) (statement of Christopher Cox, Chairman, SEC) (emphasis added).)

b. Kathleen Casey, an SEC Commissioner, stated that "In a nutshell, Bear Stearns, the fifth largest U.S. investment bank, experienced what amounted to a 'run on the bank.'" (Carey Decl. Ex. 80, Kathleen L. Casey, SEC Commissioner, *An Agenda for Europe and the United States*, Address Before the Sixth Annual Symposium on Building the Financial System of the 21st Century (Apr. 3, 2008).)

c. Ben Bernanke, Chairman of the Federal Reserve, explained: "The collapse of Bear Stearns was triggered by a run of its creditors and customers, analogous to the run of depositors on a commercial bank. This run was surprising, however, in that Bear Stearns's borrowings were largely secured—that is, its lenders held collateral to ensure repayment even if the company itself failed." (Carey Decl. Ex. 81, Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System, *Reducing Systemic Risk*, Address Before the Federal Reserve Bank of Kansas City's Annual Economic Symposium (Aug. 22, 2008).)

**Plaintiff's Response:**

Plaintiff admits that these observers made these statements shortly after the collapse of Bear in the absence of review of documentary evidence to support such views. *See* Henken Decl. Ex. 11, Ferrell Tr. at 101:9-102:11. Plaintiff denies this statement to the extent it suggests that these observations are conclusive proof that Bear's collapse was caused by a "run on the bank" as defined in the statement. Other observers have rejected this conclusion, including a former Director of TM who stated that the "losses incurred by Bear Steams and other large broker-dealers were not caused by 'rumors' or a 'crisis of confidence,' but rather by inadequate net capital and the lack of constraints on the incurring of debt." Carey Decl. Ex. 30, OIG Rep. at 11; *and see infra* ¶ 186 (regarding term "run on the bank").

**Loss Causation**

**115.   Defendants' Statement:**

The share price of Bear Stearns's common stock fell by $69.36 from the beginning of the Relevant Period to December 20, 2007, *i.e.* from $159.96 at the close of the market on December 14, 2006 to $90.60 at the close of the market on December 19, 2007. (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

**Plaintiff's Response:**

Admitted.

**116.** **Defendants' Statement:**

Plaintiffs expert did not find that any of plaintiffs losses prior to December 20, 2007 were caused by the alleged fraud.  (Carey Decl. Ex. 29, Finnerty Tr. at 319:7-25.)

**Plaintiff's Response:**

Admitted.

**117.** **Defendants' Statement:**

The share price of Bear Stearns's common stock fell $33.60 between December 20, 2007 and March 13, 2008 (the "Leakage Period"), *i.e.*, from a closing price of $90.60 on December 19, 2007, to a closing price of $57.00 on March 13, 2008.  (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

**Plaintiff's Response:**

Admitted.

**118.** **Defendants' Statement:**

The movement of the share price of Bear Stearns's common stock between December 20, 2007 and March 7, 2008 was consistent with the movement of the share prices of the firms to which plaintiffs expert compares Bear Stearns.  (*See* Carey Decl. Ex. 52, Ferrell Rpt ¶ 59, Ex. 7.)

**Plaintiff's Response:**

Denied.  Bear's stock price movement was not in line with the stock price movement of its peers during, for example, the periods between December 20, 2007 and December 24, 2007, between January 4, 2008 and January 9, 2008, and between January 22, 2008 and January 25, 2008.  Finnerty Decl. ¶ 39.[3]  It is also improper for Defendants to conveniently carve off days on which significant leakage has occurred.  *See id.* ¶¶ 38, 42.

**119.** **Defendants' Statement:**

Plaintiff s expert identified no specific disclosures that supposedly revealed the fraud prior to March 14, 2008.  (Carey Decl. Ex. 29, Finnerty Tr. at 212:2-16, 303:15-304:18.)

**Plaintiff's Response:**

---

[3] All citations to "Finnerty Decl." refer to the concurrently filed October 13, 2015 Declaration of John D. Finnerty and accompanying attachments.

Denied.  Dr. Finnerty identified many specific disclosures that partially revealed the fraud prior to March 14, 2008.  *See, e.g.*, Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 192, 205, 210, 216-23, 225-31, & Attachs. 30; a*nd see infra* ¶ 167 (regarding leakage).

**120.  Defendants' Statement:**

Plaintiffs expert has never used the leakage methodology he seeks to use in this case to establish loss causation and calculate damages in any case in which he has previously served as a damages expert.  (*Id.* at 29:4-30:4, 309:8-310:11 ("[W]hen I prepared my loss causation and damages report [in *Silverman* v. *Motorola*], counsel asked me, actually told me it just wasn't necessary to include the leakage damages in the calculation.  So I did it in the, and referred to it in the market efficiency report.  I think I referred to it in the loss causation report if I recall correctly, but I was not actually asked to perform the calculation of damages for the leakage period.").)

**Plaintiff's Response:**

While Dr. Finnerty has not previously been involved in a case calling for a leakage analysis, he undoubtedly has the qualifications to perform such an analysis, which has been accepted by the courts and the relevant academic community, and has an extensive academic literature extending over 25 years, to which Dr. Finnerty has contributed.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 1-7 (Dr. Finnerty's qualifications); *id.* App. A (Dr. Finnerty's curriculum vitae); Finnerty Decl. ¶¶ 5-9 (citing cases and reviewing literature); *and see* Henken Decl. Ex. 12, John Finnerty & George Pushner, *An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions*, 8 Stan. J. L. Bus. & Fin. 213-63 (2003).

**121.  Defendants' Statement:**

Plaintiff s expert admits that he must disaggregate the effects of firm specific, non-fraud-related news in his leakage model.  (*Id.* at 228:6-12 ("I'm specifically adjusting for company-specific news, which I believe you have to put in there."); Carey Decl. Ex. 2, Finnerty Rpt ¶ 190 ("[I]t is very important to exclude company-specific information that is not related to the alleged fraud from the damage calculation.").)

**Plaintiff's Response:**

Admitted.

**122.  Defendants' Statement:**

Plaintiffs expert admitted that he made no attempt to control for company-specific, non-fraud-related news on days where he found both "fraud-related" and "non-fraud" related Company-specific news (as determined by plaintiffs expert), on days where he found only "non-fraud" related news, but no statistically significant abnormal return, and on days where he found no Company-specific news at all during the Leakage Period.  (Carey Decl. Ex. 29, Finnerty Tr. at 253:3-16; 254:12-15; 275:14-276:10).  On each of those days, he attributed the entirety of the abnormal return to the fraud.  (*Id.*; Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

**Plaintiff's Response:**

Denied.  On days when there was "no Company-specific news at all," there was no "company-specific, non-fraud-related news" to control for.  On days when there was only non-fraud-related news and no statistically abnormal return, and on days when there was both fraud-related and non-fraud-related company specific news, Dr. Finnerty properly controlled for company-specific, non-fraud-related news.  *See* Finnerty Decl. ¶¶ 15-30.  Even if Dr. Finnerty were to adopt Defendants' preferred approach and control for such company-specific non-fraud related news, there would be no substantial change in his damages calculation.  *See id.* ¶¶ 31-36.

**123.   Defendants' Statement:**

Plaintiffs expert admits that he does not know what is actually causing the alleged inflation in the share price of Bear Stearns's common stock to change on any given day during his purported Leakage Period, saying, "I'm comparing [how I would expect the price to behave in the absence of fraud] to the actual behavior and that difference in any given day is the amount of inflation. What actually causes that day to day I don't know because there aren't press releases that identify what's being disclosed.  But what I can see is that I can see the decline in the price of the stock, the persistent price in the decline of the stock over the leakage period."  (Carey Decl. Ex. 29, Finnerty Tr. at 228:10-22.)

**Plaintiff's Response:**

Denied.  Dr. Finnerty concluded on the basis of his event study and related analysis that leakage of information concerning Bear's financial condition caused the $32.94 of decline in Bear's stock price during the Leakage Period.  *See infra* ¶¶ 167-72 (regarding leakage).

**124.   Defendants' Statement:**

Plaintiffs expert admits that he does not know what particular information was causing the share price of Bear Stearns common stock to change on any given day.  (*Id.* at 269:18-270:17 ("No one could know that unless you actually knew what information was being exchanged among all the parties privately.  You couldn't -- you couldn't determine that.  That's the nature of the private information.  That's the essence of leakage.")

**Plaintiff's Response:**

Denied.  Dr. Finnerty admitted only that knowing whether "the entire abnormal return was caused by non-fraud news on days when [he has] a one in the non-fraud related column" would require knowing what information was being exchanged among all the parties privately, which cannot be determined.  Henken Decl. Ex. 5, Finnerty Tr. at 269:18-270:17.  Dr. Finnerty concluded on the basis of his event study and related analysis that leakage of information concerning Bear's financial condition caused the $32.94 of decline in Bear's stock price during the Leakage Period.  *See infra* ¶¶ 167-72 (regarding leakage).

**125.**  **Defendants' Statement:**

The share price of Bear Stearns's common stock fell from a closing price of $57.00 on March 13, 2008 to a closing price of $30.00 on March 14, 2008.  (Carey Decl. Ex. 2, Finnerty Rpt, Att. 3l.)

  **Plaintiff's Response:**

Admitted.

**126.**  **Defendants' Statement:**

The share price of Bear Stearns's common stock fell from a closing price of $30.00 on March 14, 2008 to a closing price of $4.81 on March 17, 2008.  (*Id.*)

  **Plaintiff's Response:**

Admitted.

**127.**  **Defendants' Statement:**

Plaintiffs expert admits that the market would not have reacted the same way in early 2007 as it did during the week of March 10, 2008 to the purported revelation of the alleged fraud. (Carey Decl. Ex. 29, Finnerty Tr. at 211:3-25 ("Going back to January of '07, I doubt the consequences would have been as severe.  And that's what my comment earlier about I think the ship could have sunk as early as December 20th of '07.  In other words, the run on the bank could have started earlier.  I think it's unlikely going back to January '07 that a run on the bank would have occurred under those circumstances.  I think that's much less likely.").)

  **Plaintiff's Response:**

Denied.  Dr. Finnerty admitted only that it was much less likely that a run on the bank would have occurred in January 2007 in response to the revelation of the fraud than during the month of March 2008.  Henken Decl. Ex. 5, Finnerty Tr. at 211:3-25; *and see infra* ¶ 186 (regarding term "run on the bank").

**128.**  **Defendants' Statement:**

Plaintiff's expert admits that he does not know whether the stock price reaction to the disclosure of the alleged fraud would have been as severe prior to the start of the Leakage Period on December 20, 2007 as it was in March 2008.  (*Id.* at 322:23-323:20 ("I've not done a hypothetical calculation of what might have happened if [Bear Stearns had] made disclosures before December 20th, 2007.").)

  **Plaintiff's Response:**

Denied.  Dr. Finnerty calculated the amount of the inflation in the price of Bear stock due to the fraud for each day during the relevant period and thus the amount by which the stock

would decline on each day as a result of any disclosure which removed the entirety of the inflation from Bear's stock price. *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 215, 235, 263-66. This calculation of inflation for the period prior to the Leakage Period was made using the "constant dollar method," which has been accepted as essentially the only method for calculating inflation consistent with the Supreme Court's ruling in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). *Id.* at ¶ 266; Finnerty Decl. ¶ 44.

## II.    STATEMENT OF ADDITIONAL MATERIAL FACTS TO BE TRIED

### Bear Stearns' Reliance on Repo Financing

129.    By "late summer and into the fall of '07," Bear was already seeing "a lot of turnover" in its lenders.  Henken Decl. Ex. 14, Schwartz Tr. at 132:8-132:10.  By this time, Bear was already experiencing significant inability to engage in repo transactions and replace lost funding with new repo counterparties. *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 169, 170, 173-74.

   a.   In an e-mail exchange dated August 9, 2007 between Paul Friedman, John Stacconi, Robert Upton and others, Stacconi wrote that Bear was "losing $1.650B of equity repo cash today."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 35, E-mail from John Stacconi to Robert Upton et al. (Aug. 9, 2007).  Friedman continued: "Right now no one is lending to anyone." *Id.*, E-mail from Paul Friedman to John Stacconi et al. (Aug. 9, 2007).

   b.   In an e-mail exchange dated August 14, 2007, Sal Dimaggio told Samuel Molinaro that "so far [Bear had] lost $6.6 billion of repo funding, desk anticipates losing $2.75 billion more in the next month."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 37, E-mail from Sal Dimaggio to Sam Molinaro (Aug. 14, 2007).

   c.   In an e-mail exchange dated August 17, 2007 between Paul Friedman, Patrick Lewis, and others discussing Natixis and other banks that had been providing "evergreen" funding to Bear Stearns, Lewis writes that "Nataxis wants out - but because we have an evergreen agreement they can't get their money back for 5 more months.  We now have 5 months to replace the money (the market had better be more liquid in 6 months or we are indeed in trouble)."  Friedman replies: "They're wonderful.  I just think that unless the banks all have amnesia, they will be far less willing to give out new ones in the future and we'll need to come up with something else to take their place.  But I hope I'm wrong."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 41, E-mails between Paul Friedman to Patrick Lewis (Aug. 17, 2007).

   d.   Then on August 20, 2007, Paul Friedman wrote to Jeff Mayer and others: "Over the last 2½ weeks we've lost $14.5 billion in funding, primarily money we had that was available to be used against whole loans and non-Agency securities. Against that we're taken in only $2.7 billion of money from new sources. . . . We have an additional $3.1 billion of funding that is either already scheduled to be pulled or at risk of leaving. Roughly $500mm is going back this week. Another $1.9 billion is borrowed from CP conduits that are having trouble rolling . . . ."  Carey Decl. Ex. 2,

Finnery Rep. Ex. 38, E-mail from Paul Friedman to Jeff Mayer et al. (Aug. 20, 2007); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 169(f), 173(d), and 180(a) (collecting similar internal correspondence).

e.   On September 5, 2007, Friedman wrote to Molinaro and others: "I sat with the Repo Desk this afternoon and, after much painful discussion, came up with a list of customers who we are going to tell to take their repo business elsewhere."  Friedman warned about "irreparable harm" to customers due to the possibility that Bear would not have the cash to service them and the possibility of tapping into Bear's liquidity reserve.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 42, E-mail from Paul Friedman to Sam Molinaro et al. (Sep. 5, 2007).

f.   On December 18, 2007, Marano and Schwartz exchanged e-mails about a draft press release that admitted: "[T]here are several reasons why we must focus on raising outside capital asap. Our traditional model of aggregating assets for distribution via securitization is currently broken[.] … The trading desks … are very constrained in their opportunity to serve customers because of a need to shrink balance sheet for fear of losing funding. … We are not able to offer the full suite of repo financing to clients for fear of losing balance sheet. Clients are concerned about our potential down grade and lack of ability to commit capital to facilitate trades. … We have inadequate long term and short term financing facilities [.] …Our traditional sources of term funding are increasingly burdened by their own balance sheet issues. We may have inadequate funding resources to address investment in technology for risk management and reporting of positions[.]"  Carey Decl. Ex. 2, Finnerty Rep. Exs. 47-48, E-mail with attachment from Tom Marano to Alan Schwartz (Dec. 18, 2007).

## Bear Stearns' Involvement in the Mortgage Market

130.   On September 27, 2007, the SEC Division of Corporation Finance completed its second of two levels of review of Bear's 2006 10-K and sent Bear a comment letter summarizing its findings.  Carey Decl. Ex. 30, OIG Rep. at 44.  Among other things, the letter criticized Bear's 2006 10-K because it did "not appear to . . . fully clarif[y] [Bear's] exposure to subprime loans."  *See* Carey Decl. Ex. 2, Finnerty Rep. Ex. 7, 2007 SEC Comment Letter Response at 2.  The letter requested that Bear provide "a comprehensive analysis of [its] exposure to subprime loans."  *Id.* at 4; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 145 (cataloging detailed information requested by the SEC).

131.   In its January 31, 2008 response letter, Bear provided extensive information about its subprime risk exposure to the SEC.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 146-47 (describing response letter).

a.   Among other things, "Bear Steams' response letter described its criteria for classifying loans as sub-prime, information about its risk management philosophy, how it defines non-performing loans and a quantification of its investments in securities backed by subprime mortgages."  *Id.*  "The OIG expert believe[d] that all of the[] criteria [contained in Bear's response letter] would have been helpful to investors."  *Id.*

    b.  Bear also admitted "that based on the Company's level of involvement in subprime lending and the broader impact on global credit markets, a material adverse impact on the Company's financial condition, results of operations[,] or liquidity [was] reasonably possible . . . ."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 7, 2007 SEC Comment Letter Response, at 17.  Bear stated: "In future filings, we will consider our level of involvement in subprime lending, and we will seek to enhance our disclosure of positions which drive such exposures, if necessary."  *Id.*

    c.  The OIG Report concluded that "Bear Stearns response letter (coupled with CF's comment letter) contained material information that investors could have used to make well-informed investment decisions."  Carey Decl. Ex. 30, OIG Rep. at 45; *and see* Henken Decl. Ex. 5, Finnerty Tr. at 145:5-13 (concluding that the information in Bear's response letter that was not disclosed to the public "would have been significant to investors").

**132.**  Defendants did not disclose to investors the information in the 2007 SEC Comment Letter Response concerning the scope of Bear's involvement in the mortgage market or its reliance on revenues from mortgage securitizations and trading.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶ 148.

    a.  Because of delays by the SEC Division of Corporation Finance in conducting the review of Bear's 2006 10-K, and by Bear in responding, Bear's responses were not made public prior to Bear's collapse.  Carey Decl. Ex. 30, OIG Rep. at 44-45.

    b.  At a conference on February 9, 2007, Spector assured Sherman that Bear "reduced [its] exposure to subprime so substantially in this period."  Henken Decl. Ex. 1, Sherman Tr. 318:5-319:3.

    c.  During Bear's first quarter earnings call on March 15, 2007, approximately one month after its 2006 10-K was filed, Molinaro continued to represent that the subprime market was only a small part of Bear's overall business and stated that the Company had reduced the number of subprime mortgages it was purchasing and securitizing.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 20, Samuel L. Molinaro, Jr., Exec. VP and CFO., The Bear Stearns Cos., Inc., Bear Stearns 2007 First Quarter Earnings Conference Call at 6, 14-15 (Mar. 15, 2007).

    d.  Future additional disclosures made by Defendants "didn't have anywhere near the richness of detail as indicated in the [response] letter."  Henken Decl. Ex. 5, Finnerty Tr. at 143:19-144:3; *and see id.* at 147:5-21, 151:19-152:13 (noting that assessment of risk requires consideration of indirect exposures, which were not apparent from Bear's financials).

**133.**  Some other investment banks were disclosing greater detail about their subprime assets than Bear was in 2008.  Henken Decl. Ex. 5, Finnerty Tr. at 145:16-146:5.

**Bear Stearns's Mortgage-Related Asset Valuation Practices**

134.   Defendants represented that Bear's valuation practices were up-to-date and reliable, and that its valuations were therefore accurate. *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 138(b), 162(c)-(d), 163 (describing Defendants' representations regarding Bear's valuations).

   a.   Defendants represented that Bear "engage[d] in an ongoing internal review of its valuations" and that it analyzed its internal valuations "typically on a monthly basis but often on an intra-month basis as well." Henken Decl. Ex. 3, 2006 10-K at 61; Henken Decl. Ex. 4, 2007 10-K at 64.

   b.   Defendants represented that Bear's risk management procedures "begin with the Company marking is financial instruments owned to fair value on a daily basis." Henken Decl. Ex. 3, 2006 10-K at 67; Henken Decl. Ex. 4, 2007 10-K at 72 ("The Company utilizes a wide variety of market risk management methods, including . . . marking all positions to market on a daily basis[.]").

   c.   Molinaro stated at Bear's Investor's Day conference on October 4, 2007 that Bear marked all of its assets to market, and that all asset values were verified by Bear's risk controllers. Carey Decl. Ex. 2, Finnerty Rep. Ex. 22, Samuel L. Molinaro, Jr., COO and CFO, The Bear Stearns Cos., Inc., Financial Summary and Outlook, at 3 (Oct. 4, 2007).

   d.   On January 9, 2008, Schwartz stated during a CNBC interview that Bear was "adequately marked" to market. Henken Decl. Ex. 13, Elizabeth Hester, *Bear Stearns CEO Says Firm Is Adequately Marked to Market*, Bloomberg, L.P., Jan. 9, 2008.

   e.   On "numerous" occasions, Cayne assured that Bear's internal valuations of its assets were accurate. Henken Decl. Ex. 1, Sherman Tr. at 255:24-256:23, 259:16-260:5 (testifying that he was given repeated assurances about the accuracy of Bear's marks).

135.   Bear's mortgage and mortgage derivatives valuation models were criticized by the SEC as early as 2005.

   a.   On December 2, 2005, the United States Securities and Exchange Commission (SEC) sent a letter to Bear, describing its findings following the SEC's examination conducted in connection with Bear's application under Appendix E of Rule 15c3-1 of the Securities Exchange Act of 1934 to be regulated as a consolidated supervised entity ("CSE"). The examination focused on several business areas, including, among others, Bear's internal control systems for managing market, credit, funding and liquidity, and operational risks. Carey Decl. Ex. 2, Finnerty Rep. Ex. 4, 2005 SEC Letter at 8. This letter was not made available to the public. Carey Decl. Ex. 2, Finnerty Rep. ¶ 140.

   b.   In this letter, the SEC observed Bear's valuation procedures depended on "outdated models created over a decade ago" and that Bear had "limited documentation on how the models work." *Id.*

136. Bear had to rely more heavily on its own modeling to value its Level 2 and Level 3 assets as they became more illiquid.

   a. When models were used to value Bear's Level 2 assets, "[a] degree of subjectivity [was] required to determine the appropriate models or methodologies as well as the appropriate underlying assumptions.  This subjectivity [made] these valuations inherently less reliable than quoted market prices."  Henken Decl. Ex. 3, 2006 10-K at 60; *see also* Henken Decl. Ex. 4, 2007 10-K at 63-64.  In such cases, "[t]hese inputs can be readily observable, market corroborated, or generally unobservable firm inputs."  Henken Decl. Ex. 4, 2007 10-K at 63; *see also* Henken Decl. Ex. 3, 2006 10-K at 64.

   b. When models were used to value Bear's Level 3 assets, those models "utilize[ed] significant assumptions or other data that are generally less readily observable from objective sources," and which had "significant data inputs that [could not] be validated by reference to readily observable data" and which "require[d] considerable judgment by traders and their management . . . to estimate data inputs that are less readily observable."  Henken Decl. Ex. 3, 2006 10-K at 60; *see also* Henken Decl. Ex. 4, 2007 10-K at 64.

   c. For Bear's Level 2 assets, the observable inputs into the models were deficient.  *See, e.g.*, Carey Decl. Ex. 30, OIG Rep. at 23 (stating default rates were inaccurate); Henken Decl. Ex. 6, Simeone Tr. at 66:15-22 (stating default rates were important to Level 2 asset modeling).

   d. For Bear's Level 3 assets, given the fact that those assets are subject to "less observable" data, accurate modeling is crucial.  *See* Henken Decl. Ex. 6, Simeone Tr. at 88:9-14 (stating such assets are "are more subject to management estimation").

   e. As early as June 2007, Bear Steams told the SEC "that it found it difficult to find ways to establish objective market values for assets as they became more thinly traded and therefore, less liquid."  Carey Decl. Ex. 30, OIG Rep. at 29.

137. Based on data disclosed by Bear to the SEC and the SEC's internal memoranda and model reviews, the OIG Report concluded that Bear's modeling had "numerous shortcomings."  Carey Decl. Ex. 30, OIG Audit Report at 23.

   a. The OIG found that though Bear had a "tremendous need" to review and update its mortgage models, its mortgage review function was understaffed "and lacked key senior risk modelers to engage in this process" *Id.* at 22-23.  As a result, "mortgage modeling by risk managers floundered for many months." *Id.*

   b. The OIG found that "the reviews of mortgage models that should have taken place before the subprime crisis erupted in February 2007 appears to have never occurred, [and] was still a work in progress when Bear Stearns collapsed in March 2008." *Id.* at 23 (noting there was a "lack of timely formal review of mortgage models" at Bear).

c.   There was, the OIG summarized, "an inability or unwillingness to update models quickly enough to keep up with changing circumstances." *Id.* at 23.

d.   "Bear Stearns' model review process lacked coverage of mortgage-backed and other asset-backed securities, in part because the models were not used for pricing and in part because the sensitivities to various risks implied by the models did not reflect risk sensitivities consistent with price fluctuations in the market." *Id.* at 21.

e.   Bear inadequately accounted for "default risks" in its mortgage models, the rise in these same default risks caused "the market value of the mortgage securities to decrease," and that "[g]iven the risk managers' lack of expertise in mortgages, it would have been difficult for risk managers at Bear Stearns to advocate a bigger focus on default risk in its mortgage models." *Id.* at 5, 22-23.

138.   Bear's senior managers and auditors were aware of deficiencies related to Bear's valuation practices.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶ 165(a)

a.   In an e-mail exchange dated February 14, 2007, Deloitte employees discussed an internal audit report produced by Bear Stearns that identified "86 counterparties whose internal ratings were more than 2 grades above/below their external ratings."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 23, E-mail from Edward Hida to Michele Crish et al. (Feb. 14, 2007).

b.   An email exchange dated August 21, 2007 between Samuel Molinaro and Wendy Demonchaux discusses Bear Stearns' balance sheet and the impact the declining housing market was having on its balance sheet. Demonchaux explains in detail the steps that her division had taken to counter that decline but notes that "everyone else did nothing[.]"  Demonchaux also states that "the real problem is in the mortgage and asset backed area, whole loans are the funding issue, shouldn't they be the target? Have those traders been selling or are they afraid to see what the mark would be? Historically the traders just claim there is no market until the market rebounds, so they avoid the loss and avoid locking it in by cutting the position in stress. If you want to know where the real market is you have to sell something. . . . They say there is no market, but I almost always find a market, it is just a matter of price."  Molinaro responded: Plan is simply to reduce those positions that free up either unsecured funding or repo capacity at the lowest possible cost to the firm. I'm avoiding the discussion of fairness by focusing on above agenda. Unfortunately most liquid things often go first with this approach."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 24, E-mails between Samuel Molinaro and Wendy Demonchaux (Aug. 21, 2007).

c.   In another e-mail exchange dated November 8, 2007, Bear employees discussed issues in Bear's risk management, with one commenting that risk management's treatment of the trading desk's marks suggested to others at Bear "that the desk is being dishonest and systematically mismarking the book."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 25, E-mail from Peter Bainlardi to Michael Nierenberg (Nov. 7, 2007).

d. On December 10, 2007, Bear risk management personnel discussed the pricing of a specific asset on Bear books, with one noting: "Though our net exposure on this position is hedged, this could have wider pricing implications for the book.  If the customer mark is demonstrated to be more accurate than our own and we remark the rest of our ABS-backed CDO inventory consistently with it, the desk would take substantial write-downs."  Carey Decl. Ex. 2, Finnerty Rep. Ex 26, E-mail from Risk Management Web (Exchange) to Michael Alix and Sam Molinaro (Dec. 10, 2007).

e. In an e-mail exchange dated January 3, 2008 Bear employees discussed the backlog of mortgage models to be reviewed, and Bear's failure to adequately staff its model review team.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 15, E-mails between Tom Marano and Jonathan Kinlay (Jan. 3, 2008).   Tom Marano, specifically questioned the "wisdom of hiring 8 people in this market to review models that have not had substantial changes in 5 years." Jonathan Kinlay defended the request to hire additional risk managers stating:  These are all replacement hires, to rebuild the Model Review team back up to the level we were at last year (everyone left).  You might be interested to know that Bear Stearns has a comparatively very light touch in MR compared to most of our competitors. . . . Bear's team looks significantly under-resourced by comparison. . . .We also have outstanding commitments to regulators and auditors from last year, not least of which is to review some 25 cash/mortgage models which have not so far been looked at.  This task was supposed to be completed in 2007, but in fact we will only manage to complete the reviews by end 2008 if I have two people working on it full-time.  In the current climate, to be seen to be neglecting the clear mandate given by regulators to ensure that the Bank is operating risk controls that are commensurate with market norms would be to court disaster."  *Id.*

139. The increasing number and size of mark disputes Bear had with major broker-dealers beginning in the summer of 2007 further evidences the overvaluations of Bear's assets that Bear concealed from the investing public.  *See* Henken Decl. Ex. 5, Finnerty Tr. at 67:19-23 ("I believe that there are numerous indications that certain assets were overvalued.  Some of them substantially because that led to mark-to-market disputes."); Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 160(g), 166.

a. "Bear Steams tended to use the traders' more generous marks for profit and loss purposes, even when Bear Steams conceded to the counterparty for collateral valuation purposes." Carey Decl. Ex. 30, OIG Rep. at 28.

b. Bear told the SEC that during July 2007 that there were two large dealers with whom Bear had mark disputes in excess of $100 million each.  These dealers were important to Bear because Bear had thousands of trades with each of them.  *Id.*

c. By March 2008, Bear's mark disputes involved even greater amounts.  *Id.*  For example, on March 12, 2008, "Bear Stearns paid out $1.1 billion in disputes to numerous counterparties in order to squelch rumors that Bear Stearns could not meet its margin calls. . . . Bear Stearns tended to use the traders' more generous marks for

profit and loss purposes, even when Bear Stearns conceded to the counterparty for collateral valuation processes."  *Id.*

d.  Bear paid out more than $3 billion in disputed margin calls on March 12, 2008. Henken Decl. Ex. 14, Schwarz Tr. at 123:18-124:16.

**Bear Stearns' Risk Management Operations**

140.  "Value at Risk" or "VaR" models are "statistical models . . . that seek to predict risk of loss based on historical and/or market implied price and volatility patterns."  Henken Decl. Ex. 3, 2006 10-K at 69; Henken Decl. Ex. 4, 2007 10-K at 71.

141.  "Stress testing (also referred to as scenario analysis) measures the risk of loss over a variety of extreme market conditions that are defined in advance."  Henken Decl. Ex. 3, 2006 10-K at 70; Henken Decl. Ex. 4, 2007 10-K at 72.

142.  Defendants made representations concerning the reliability and utility of Bear's VaR models and stress testing.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶ 138.

a.   The "Company regularly evaluates and enhances [its] VaR models in an effort to more accurately measure risk of loss."  Henken Decl. Ex. 3, 2006 10-K at 69; Henken Decl. Ex. 4, 2007 10-K at 71.

b.  The "Company has performed an entity-wide VaR analysis of the Company's financial assets and liabilities, including financial instruments owned and sold, repurchase and resale agreements and funding assets and liabilities."  Henken Decl. Ex. 3, 2006 10-K at 69; Henken Decl. Ex. 4, 2007 10-K at 71.

c.  "[S]tress testing [is] employed" as one measure to "better ensure that trading strategies are followed within acceptable risk parameters."  Henken Decl. Ex. 3, 2006 10-K at 67; Henken Decl. Ex. 4, 2007 10-K at 69.

d.  "Stress tests are performed on a regular basis as well as on an ad hoc basis, as deemed appropriate," and that the "Company expects to continue to develop and refine its formal stress testing methodologies."  Henken Decl. Ex. 3, 2006 10-K at 70; Henken Decl. Ex. 4, 2007 10-K at 72.

e.  At Bear's Fixed Income Investor Day held on February 1, 2007, Michael J. Alix, Bear's Chief Risk Officer, delivered a presentation representing that Bear's "independent" risk management department conducted "[f]irmwide VaR and stress-testing" that enabled Bear to "set limits, highlight large/unusual risks, and evaluate hedging strategies."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 1, Michael J. Alix, Chief Risk Officer, The Bear Stearns Cos., Inc., Global Risk Management Overview, at 12 (Feb. 1, 2007).

143.  Bear's regulators and consultants concluded that Bear's VaR models and stress testing remained outdated and ineffective throughout the relevant time period:

a.  According to the 2005 SEC Letter, data inputs[] for which the firm's internal practice requires a weekly update[] had gaps of several weeks and up to a month without [] updated spread/sensitivity information.  As a result, the firm's daily VaR amounts could be based on stale data at any point in time."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 6, 2005 SEC Letter at 7-8; *and see* Carey Decl. Ex. 30, OIG Rep. at 20 (recapping 2005 findings).

b.  The 2005 SEC Letter stated that Bear's "stress testing results [were] not formally incorporated into the firm's risk management framework" and the "firm's funding contingency plan does not [] consider realistic stress scenarios."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 6, 2005 SEC Letter at 6, 24.

c.  At the time Bear joined the CSE program in November 2005, "fundamental factors includ[ing] housing price appreciation, consumer credit scores, patterns of delinquency rates, and potentially other data" were not incorporated into Bear's stress testing models even though "both TM and Bear Steams knew that incorporating these features into Bear Steams' risk management was important for effective risk management."  Carey Decl. Ex. 30, OIG Rep. at 1 n.16, 24.

d.  On September 19, 2007, the Financial Services Authority ("FSA"), the U.K.'s principal securities regulator, sent a non-public letter (the "2007 FSA Letter") to Bear providing feedback in response to the CAD2 model applications filed by two of Bear's UK subsidiaries, Bear Stearns International Limited ("BSIL") and Bear Stearns International Trading ("BSIT"), for authorization to use Bear's internal VaR models to calculate their risk exposure for regulatory purposes.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 6, Letter from Einar Holstad, Traded Risk Team, FSA, to Kanwardeep Ahluwalia, Bear Stearns International Ltd. (Sep. 19, 2007).  Accordin to the FSA's letter,  Bear's "VaR model documentation was not up to date" and there were "risks . . . inherent in [Bear's] business, but that [its] VaR model [did] not capture or [did] not capture sufficiently well."  *Id.* at 3-4.

e.  Oliver Wyman, or Mercer Oliver Wyman ("Wyman"), an outside consultant engaged by Bear, evaluated Bear's risk management policies and economic capital development procedures during the Relevant Period.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 149; Henken Decl. Ex. 9, Molinaro Tr. at 100:12-102:03 (noting that Wyman was hired to assist in "making changes in [Bear's] risk governance process" and ended up also "working on an economic capital model").  Wyaman produced reports dated July 17, 2007, February 5, 2008 and March 7, 2008,  containing assessments of Bear's risk management practices and proposing a significant reorganization and firm-wide restructuring of Bear's risk management operations.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 150, 152, 153; *id.* Exs. 9, 11, 12.

f.  In addition, a Wyman report dated November 20, 2007 contains an assessment of Bear's risk management practices and states, among other things, that Bear's VaR modeling was not "accurate and timely."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 10, Oliver Wyman, Risk Management Diagnostic 1st Checkpoint at 10 (Nov. 20, 2007).

g.  The 2008 OIG Report stated that "Bear Steams'.VaR models did not capture risks associated with credit spread widening of non-agency mortgages that are prime or near-prime (Alt-A)."  Carey Decl. Ex. 30, OIG Rep. at 24; *and see id.* at 24.

144.  Bear's senior managers recognized that Bear's VaR models and stress testing remained outdated and ineffective throughout the relevant time period.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶ 155.

a.  In an e-mail exchange dated January 7, 2007 between Rupert Cox and Michael Alix, Rupert Cox states "[t]he commentary is actually pretty simple. The main trends in risk were driven by the mortgage desks' short position in interest rate risk which swelled to a peak in March and then drifted back down through the rest of the year. . . . Our positions in risky tranches contributed a fairly stable and in some ways surprisingly small amount of risk but I think that's due to the fact that VaR doesn't really capture the risk of these products which is fundamentally a tail risk."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 13, E-mail from Rupert Cox to Michael Alix (Jan. 5, 2007).

b.  An e-mail dated June 5, 2007 from Rupert Cox to Michael Alix and other employees at Bear discusses problems Wyman, the outside consultant, identified during Bear's stress testing, and in particular, the way it performed its VaR calculations.  In the e-mail exchange, Cox states: "The stress scenarios [of Bear] appear a bit arbitrary. MOW is used to seeing capital models based more on a VaR style analysis, looking back over every week for the last five years. . . . Our stress scenarios are plucked from the last twenty years' history based on our intuition about which ones are most likely to matter to us . . . ."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 16, E-mail from Rupert Cox to Michael Alix et al. (Jun. 5, 2007).

c.  Bear's CFO Samuel Molinaro testified that during the relevant period, there was "a backlog of models that needed to be reviewed by risk management independently." Henken Decl. Ex. 9, Molinaro Tr. at 68:5-6.

145.  Defendants represented that Bear utilized a variety methods, including stress testing, to assess the credit risk of its counterparties.  Henken Decl. Ex. 3, 2006 10-K at 70, 72-74; Henken Decl. Ex. 4, 2007 10-K at 72, 74.

146.  According to the 2005 SEC Letter, Bear did "not perform timely reviews of all counterparties as required by its written policies and procedures."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 4, 2005 SEC Letter at 20.  Based on a report reviewed during the SEC's 2005 examination of Bear, "745 counterparties, representing more than $2.5 billion in exposure were overdue for a review."  *Id.*  According to the SEC, "without timely credit reviews of the counterparties, the firm [would] not be aware of changes in the credit risk profile of its counterparties and could expose the firm to greater credit risk than it is aware of."  *Id.*  Furthermore, the SEC detected "numerous weaknesses in the firm's written policies and procedures" relating to certain credit risk management functions.  *Id.*; *and see id.* at 21 (listing numerous problems with Bear's credit risk

management policies).  "[W]ritten procedures [were] not complete in many areas," and "the written procedures frequently offer[ed] guidelines instead of requirements."  *Id.*

147.  Defendants made representations concerning the independence of Bear's risk management department and the relationship between its risk management and trading departments:

   a.  The "Risk Management Department is independent of all trading areas and reports to the chief risk officer."  Henken Decl. Ex. 3, 2006 10-K at 67; Henken Decl. Ex. 4, 2007 10-K at 69.

   b.  The "cornerstone of [its risk management] procedures is constant communication between trading department management and senior management concerning inventory positions and market risk profile."  Henken Decl. Ex. 3, 2006 10-K at 67; *see also id.* ("The department supplements the communication between trading managers and senior management by providing its independent perspective on the Company's market risk profile via a daily risk highlights report that is distributed to a number of senior managers in the Company."); Henken Decl. Ex. 4, 2007 10-K at 69 (same).

148.  Bear's trading department exercised considerable influence over Bear's risk management operations, and there was a breakdown in communications between the two departments:

   a.  According to the 2005 SEC letter, Bear used a "bottom-up" trader driven approach to risk management in which "risk taking is evaluated first and foremost at the trading desk level" and that "[c]ertain business heads can establish new trading limits and approve existing limit breaches with their sole written approval without direct approval from risk management."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 4, 2005 SEC Letter at 5, 6.

   b.  In an e-mail dated April 14, 2007 from Thomas Marano to Michael Alix, Marano states, among other things: "I think it is critical for you and others in senior management to understand the current tense and toxic relationship that is developing between Risk and the business units at all levels and frankly across many desks and areas in fixed income. I have not ccd anybody on this e-mail but I am seriously considering approaching Warren, Sam, Jeff, and Craig to discuss this situation… I am seriously concerned about the consequences of the developing relationship between RISK and the business units for the firm."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 14, E-mail from Tom Marano to Michael Alix (Apr. 14, 2007).

   c.  The November 20, 2007 Wyman report states that Bear's risk policy and limits were "proposed by business and frequently overridden."  Carey Decl. Ex. 2, Carey Decl. Ex. 2, Finnerty Rep. Ex. 10, Oliver Wyman, Risk Management Diagnostic 1st Checkpoint at 8 (Nov. 20, 2007).

   d.  At Bear, "[m]odel validation personnel, modelers, and traders all sat together at the same desk.  The OIG's expert concluded this proximity may have had the "disadvantage of reducing the independence of the risk management function from

the trader function, in both fact and appearance." Carey Decl. Ex. 30, OIG Rep. at 22; *and see* Henken Decl. Ex. 9, Molinaro Tr. 71:15-20 ("We felt it was an appropriate separation of duties to not have situations where the models were wholly developed by the trader and, therefore, had not been subjected to some independent review to determine propriety.").

e.  At Bear, traders used their own hedge ratios "even though the risk managers' VaR models indicated that different hedge ratios would have been more appropriate." Carey Decl. Ex. 30, OIG Rep. at 21-22.  As a result, the VaR measures Bear was reporting to T&M were different from the risks the traders thought they were bearing. *Id.* at 22.  According to the OIG, the "fact that VaR spiked as a result of these disagreements also raises the question of whether VaR risk measures were taken seriously enough by Bear Stearns' traders." *Id.*

f.  In March 2007 that Bear's head of model validation, who resigned around that time just as the subprime crisis was beginning, "had difficulty communicating with senior managers in a productive manner." Carey Decl. Ex. 30, OIG Rep. at 22-23.  "In the opinion of the OIG expert, difficulties in communication are a potential red flag indicating that a risk manager could be telling the traders to take on less risk than they would otherwise choose to do (*i.e.*, information that traders would presumably not want to hear)." *Id.* at 23.

149.  Defendants made representations concerning Bear's overall risk management approach and firm culture of risk management:

a.  "[C]omprehensive risk management procedures have been established to identify, monitor and control each of [the] Company's major risks."  Henken Decl. Ex. 3, 2006 10-K at 65; Henken Decl. Ex. 4, 2007 10-K at 68.

b.  Molinaro stated at UBS Financial Services Conference on May 14, 2007 that Bear risk management personnel "[u]nderstand, measure and monitor the risk" assumed by Bear, and that Bear had a "[c]ulture of risk management." Carey Decl. Ex. 2, Finnerty Rep. Ex. 2, Samuel L. Molnaro, Jr., Exec. V.P. and C.F.O., The Bear Stearns Cos., Inc., Presentation at the UBS Financial Services Conference, at 39 (May 14, 2007).

150.  Bear's overall risk management approach and firm culture of risk management was flawed:

a.  According to the 2005 SEC Letter, Bear had "a set of general policies but no procedures for its risk management functions." Carey Decl. Ex. 2, Finnerty Rep. Ex. 4, 2005 SEC Letter at 5.

b.  "In 2006, the expertise of Bear Stearns' risk managers was focused on pricing exotic derivatives and validating derivatives models.  At the same time, Bear Steams' business was becoming increasingly concentrated in mortgage securities, an area in which its model review still needed much work.  The OIG expert concluded that, at

this time, the risk managers at Bear Steams did not have the skill sets that best matched Bear Steams' business model."  Carey Decl. Ex. 30, OIG Rep. at 22.

    c.   The November 20, 2007 Wyman report concluded that Bear had "[n]o formal risk appetite in place" and had "[c]ultural resistance to VaR and tail risk measures." Carey Decl. Ex. 2, Finnerty Rep. Ex. 10, Oliver Wyman, Risk Management Diagnostic 1st Checkpoint at 8, 9 (Nov. 20, 2007).  According to the report, Bear employees said during interviews that the "risk people . . . don't have the number or the respect" to consistently produce "good aggregated information" and "Bear doesn't' have [a] culture" that requires justification of risks before they are taken."  *Id.* at 12.

    d.   The OIG Report concluded that there was "turnover of Bear Stearns' risk management personnel at critical times," leaving Bear's risk management operations in "disarray."  According to the OIG expert, this disarray in risk management tended to give trading desks more power over risk managers."  Carey Decl. Ex. 30, OIG Rep. at 22-23.

**151.**   During a conference call held on June 22, 2007 following the Hedge Fund's collapse, Molinaro stated that "[t]he asset management side and the broker-dealer side are very much separate."  Henken Decl. Ex. 15, Thomson StreetEvents, *Preliminary Transcript: BSC-Bear Stearns Comments on BSAM Structured Credit Strategies Funds*, at 4 (June 22, 2007).

    a.   Cayne also assured Sherman that Bear's "policies" and "committees" protected it from exposure to the hedge funds.  Henken Decl. Ex. 1, Sherman Tr. at 266:6-15.

**152.**   According to due diligence documents from a leading global industry association, the two Hedge Funds used Bear's trading and risk management systems (Bear's BondStudio analytical system), the Bear repo desk marked the Hedge Funds' investments to market, and Bear and BSAM risk management departments monitored the two Hedge Funds' investment positions.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 3, Alternative Investment Mgmt. Ass'n Ltd., AIMA's Illustrative Questionnaire for Due Diligence of Bear Stearns High Grade Structured Credit Strategies Fund at 16-17 (May 1, 2006).

**153.**   In July 2007, Steven Meyer, who was in charge of the prime brokerage business, emphasized that "[t]he impact of the [Hedge Funds'] problem on [the prime brokerage business] is very significant," not least because it gave brokerage clients "a reason to question [Bear's] judgment and risk management practices."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 69, E-mail from Steve Meyer to Warren Spector & Sam Molinaro (Jul. 20, 2007).

## Bear Stearns' Capital and Liquidity Positions

**154.**   As explained by the SEC, "capital is not synonymous with liquidity.  A firm can be highly capitalized, that is, can have more assets than liabilities, but can have liquidity problems if the assets cannot quickly be sold for cash or alternative sources of liquidity, including credit, obtained to meet other demands.  While the ability of a securities firm to

withstand market, credit, and other types of stress events is linked to the amount of capital the firm possesses, the firm also needs sufficient liquid assets, such as cash and U.S. Treasury securities, to meet its financial obligations as they arise."  Carey Decl. Ex. 30, OIG Rep. at 14 n.88.

155.   During a conference call held on June 22, 2007 in the wake of the liquidity difficulties experienced by the Bear hedge funds, Molinaro stated that "the Company's financial condition remains strong and we have ample liquidity to make the loans" to the BSAM Structured Credit Strategies Funds in an amount up to $3.2 billion.  Henken Decl. Ex. 15, Thomson StreetEvents, *Preliminary Transcript: Bear Stearns Comments on BSAM Structured Credit Strategies Funds*, at 1-2 (June 22, 2007); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 168(a).

   a.   Following the hedge funds' collapse, in discussions with Spector and Cayne, Sherman was repeatedly assured that Bear "didn't need to raise capital as a result of it and that the tangible book value was intact because the losses were going to be very minimal." Henken Decl. Ex. 1, Sherman Tr. at 275:21-276:11; *and see id.* at 370:7-14 (stating that Tese represented that Bear "didn't have substantial exposure [to the hedge funds] beyond trading a limited amount in the beginning").

156.   Bear's senior managers recognized problems at Bear even before the Hedge Funds' collapse.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶ 173.

   a.   In a May 9, 2007 e-mail, Thomas Marano stated: "I do not run the repo desk or manage what is increasingly becoming an obvious balance sheet problem at this firm."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 39, E-mail from Tom Marano to Paul Friedman et al. (May 9, 2007).

   b.   In a May 11, 2007 e-mail, Marano stated: "You guys need to get a hit team on blowing the retained interest bonds out asap. This is the biggest source of balance sheet problems."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 40, E-mail from Tom Marano to Paul Friedman et al. (May 11, 2007).

157.   Bear's senior managers recognized that the Hedge Funds' collapse threatened Bear's own liquidity position.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 169, 173, 179.

   a.   In an e-mail exchange dated June 25, 2007, Timothy Greene wrote: "We are being very careful not to signal any hint of liquidity distress and would not want to do so as a result of a spike in the balance sheet."  Paul Friedman responded: "We're going to think how to craft the message in terms getting rid of aged positions, paring down risk, etc. so as not to spook anyone."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 31, E-mails between Paul Friedman and Timothy Greene (June 25, 2007).

   b.   Raymond Mcgarrigal wrote in a July 19, 2007 e-mail to Tom Marano and Ralph Cioffi: "Liquidity is definitely shrinking."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 32, E-mail from Ray Mcgarrigal to Thomas Marano & Ralph Cioffi (Jul. 19, 2007); *and see* Carey Decl. Ex. 2, Finnerty Rep. Ex. 68, E-mail from Michael Minikes to Sam

Molinaro (Jul. 18, 2007) (expressing concern that Bear "again risk[s] losing substantial balances").

    c.   Friedman wrote in a July 28, 2007 e-mail: "[W]e absolutely need to be vigilant about raising cash and minimizing funding risk we also need to be careful we don't send a signal that we're having problems." Carey Decl. Ex. 2, Finnerty Rep. Ex. 33, E-mail from Paul Friedman to David Marren et al. (Jul. 28, 2007).

**158.**   On August 3, 2007, subsequent to S&P's cutting its outlook on Bear to negative from stable, Bear assured investors in a press release that its balance sheet was strong. *See* Carey Decl. Ex. 2, Finnerty Rep. ¶ 168.

    a.   In an August 3, 2007 press release, Bear stated that "[c]ontrary to rumors in the marketplace, our franchise is profitable and healthy and our balance sheet is strong and liquid. . . . [T]he company has been solidly profitable . . . , while the balance sheet, capital base and liquidity profile have never been stronger. Bear Stearns' risk exposures to high profile sectors are moderate and well-controlled . . . ." Henken Decl. Ex. 16, *Bear Stearns Responds to S&P Action*, Bloomberg, L.P., Aug. 3, 2007.

    b.   On August 3, 2007, Bear held an investor conference call hosted by Jimmy Cayne, Samuel Molinaro, Bear's Chief Risk Officer Michael Alix, and Bear's Treasurer Robert Upton. During the call, Molinaro stated that "with respect to liquidity, our balance sheet, capital base and liquidity profile remain strong." Upton added that "Bear Stearns' liquidity and capital position is very solid . . . the firm's liquidity position, capital adequacy and funding capacity remains extremely solid notwithstanding the difficult market conditions." Carey Decl. Ex. 2, Finnerty Rep. Ex. 28, Samuel L. Molinaro, Jr., Exec. V.P. and C.F.O. et al., The Bear Stearns Cos., Inc., Bear Stearns Investor Conference Call at 3-4 (Aug. 3, 2007).

    c.   On August 5, 2007, Bear issued to its brokers, stating that Bear's "liquidity position, capital adequacy and funding capacity remains extremely solid notwithstanding the current difficult market conditions" and also that Bear "continues to have ample liquidity to support our full range of business activities." Carey Decl. Ex. 2, Finnerty Rep. Ex. 29, E-mail from Elizabeth Ventura to Sam Molinaro et al. (Aug. 5, 2007).

**159.**   During August and early September 2007, Bear lost significant sources of funding, and its senior managers expressed concern over the strength of Bear's liquidity position. *See* Finnerty ¶¶ 169, 173, 174.

    a.   Writing in an August 3, 2007 e-mail to Michael Minikes and others: "We need to create more liquidity asap." Carey Decl. Ex. 2, Finnerty Rep. Ex. 34, E-mail from Sam Molinaro to Michael Minikes (Aug. 3, 2007); *and see* Henken Decl. Ex. 9, Molinaro Tr. at 168:15-169:16 (Bear needed to "create more liquidity ASAP" following S&P downgrade), 171:18-172:3 (testifying that he feared that a failure to raise liquidity could cause a "doomsday scenario [where] you get a [herd] mentality and you get a run on the bank"), 192:25-193:13 (testifying that "on balance, [Bear]

lost balances" following the S&P ratings downgrade.); Carey Decl. Ex. 2, Finnerty Rep. ¶ 179(a)-(c), (e) (recapping Molinaro testimony).

b. On August 9, 2007, John Stacconi wrote: "We have over $1.0B of unsecured USD loans out of Europe which we need to roll.  We're also losing $1.650B of equity repo cash today."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 35, Carey Decl. Ex. 2, Finnerty Rep. Ex. 35, E-mail from John Stacconi to Robert Upton et al. (Aug. 9, 2007)..

c. By August 11, 2007, "after a week of being denied additional credit by [their] banks and actually losing credit on the margin," Bear had such a "need to raise cash capital" that John Stacconi began advocating for a deal he previously thought unwise "because of the signal it would send to [the] market about [Bear's] liquidity."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 36, E-mails among John Stacconi, Robert Upton, et al. (Aug. 11, 2007).

160.  During the Fall and early Winter of 2007, Defendants continued to state that Bear's capital reserves and liquidity position were healthy.  *See* Finnerty Rep. ¶ 168.

a. On September 20, 2007, Bear held its third-quarter earnings conference call where Samuel Molinaro stated that "[w]ith respect to our balance sheet capital and liquidity position, our profile has never been stronger."  Molinaro stated that during the quarter, Bear "moved to enhance our liquidity position by reducing our balance sheet, reducing commercial paper outstandings, and increasing our cash liquidity pool."  Molinaro further stated that "[o]ver the last several months we have materially reduced reliance on short-term unsecured funding while simultaneously building excess liquidity at the parent company."  Henken Decl. Ex. 17, Thomson StreetEvents, *BSC – Q3 2007 Bear Stearns Earnings Conference Call*, at 6 (Sept. 20, 2007).

b. On October 4, 2007 at Bear's "Investor Day" conference, Molinaro assured investors regarding Bear's risk exposure to subprime mortgage securities and the adequacy of Bear's capital.  In particular, Molinaro told investors that Bear had reduced its risk exposures, enhanced its liquidity, and materially increased its cash liquidity pool and claimed that Bear's liquidity profile remained strong.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 22, Samuel L. Molinaro, Jr., C.O.O. and C.F.O., The Bear Stearns Cos., Inc., Financial Summary and Outlook at 3 (Oct. 4, 2007).  Marano told investors at this meeting that Bear did not need to raise capital.  Henken Decl. Ex. 1, Sherman Tr. at 386:2-6.

c. On November 14, 2007 at the Merrill Lynch Banking and Financial Services Conference in New York, Molinaro stated: "Our capital and liquidity position, we think, is very strong.  Liquidity, in particular, is strong as it's ever been.  We think our funding structure is very prudent, mostly secured term repo facilities."  Henken Decl. Ex. 18, Bloomberg News, *Bear Stearns Presentation Teleconference (Transcript) BSC US* (Nov. 14, 2007).

    d.  During the fourth-quarter earnings conference call on December 20, 2007, Molinaro stated: "With respect to our balance sheet, capital and liquidity position, our profile is strong" and that "[d]uring the quarter, we moved to enhance our liquidity position by reducing the risk on our balance sheet, continuing to reduce commercial paper out standings and increasing secure term funding and maintaining our strong cash liquidity pool."  Henken Decl. Ex. 19, Thomson StreetEvents, *BSC – Q4 2007 Bear Stearns Earnings Conference Call*, at 7 (Dec. 20, 2007).

**161.**    During the Fall and early Winter of 2007, Bear continued to lose funding, and its capital and liquidity positions continued to deteriorate, as recognized in internal e-mails amongst Bear employees.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 173.

    a.  In an e-mail exchange dated October 4, 2007, Sal Dimaggio noted that "[s]ome banks have started to express concern that too many areas of [B]ear are reaching out for liquidity" and John Stacconi worried that Bear's chronic, futile attempts to secure funding would make it "look dysfunctional to some of [its] largest lenders."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 43, E-mail exchange among Sal Dimaggio, John Stacconi, et al. (Oct. 4, 2007).

    b.  On October 15, 2007, Victor Bulzacchelli admitted frankly in an e-mail to Paul Friedman and others: "We are liquidity challenged - swapping one illiquid for another seems unproductive for us."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 44, E-mail from Victor Bulzacchelli to Paul Friedman (Oct. 15, 2007).

    c.  In an e-mail dated December 3, 2007, Paul Friedman wrote to Jeff Mayer and others: "We are starting to see some significant pullback in funding and have lost close to $2 billion in cash today. . . . It's getting ugly out there."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 45, E-mail from Paul Friedman to Jeff Mayer et al. (Dec. 3, 2007).

    d.  In a December 15, 2007 e-mail, Friedman discussed various scenarios, concluding: "Either way we're dead, whether from lack of cash or lack of customers."  He further noted that even if Bear was not downgraded and managed to "raise[] a couple billion dollars of new equity [it would] still have all the same funding and liquidity issues [it has] now."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 46, E-mail from Paul Friedman to Tom Marano (Dec. 15, 2007).

    e.  On December 18, 2007, Marano and Schwartz exchanged e-mails about a draft press release that admitted: "The repo desk is in a constant state of concern with respect to funding the firm.  We have inadequate long term and short term financing facilities. . . . We may have inadequate funding resources to address investment in technology for risk management and reporting of positions."  Carey Decl. Ex. 2, Finnerty Rep. Exs. 47-48 (E-mail with attachment from Tom Marano to Alan Schwartz (Dec. 18, 2007).

**162.**    At a presentation delivered on February 8, 2008 at the Credit Suisse Financial Services Forum, Molinaro represented that Bear's "capital [was] fine; the funding mix has been improved (more secured; less reliance on [commercial paper]), and the liquidity profile

has been enhanced[,]" and also that "Bear's unfunded commitments are down to $0; funded exposure, while not disclosed, is small enough such that incremental mark-downs are expected to be immaterial." Carey Decl. Ex. 2, Finnerty Ex. 30, Credit Suisse, Credit Suisse Financial Services Forum Highlights at 9-10 (Feb. 12, 2008).

163.   Around the same time, however, Bear employees privately disagreed with the public representations of Bear's financial position. *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 173-74.

a.   On February 9, 2008, according to Thomas Marano, Bear's situation was so bad that if certain funding did not come through, "it will reinforce my suspicion that this place is done because mgt will not allow us to operate any form of business since we really do not have the capital they tell us is plentiful." Carey Decl. Ex. 2, Finnerty Rep. Ex. 49, E-mail from Tom Marano to Paul Friedman (Feb. 9, 2008).

b.   On February 12, 2008 Marano warned Schwartz that Bear needed to be "careful" in its negotiations or else risk "transmitting an indication of how distressed [Bear is] as a firm which could spil[l] in to market and make [its] problems turn in to a death spiral." Carey Decl. Ex. 2, Finnerty Rep. Ex. 53, E-mail from Tom Marano to Alan Schwartz & Richie Metrick (Feb. 12, 2008).

164.   In the week leading up to Bear's collapse, Defendants denied rumors about deficiencies in Bear's capital and liquidity positions and continued to assert that they were strong. *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 174-75.

a.   On March 10, 2008, Bear "publicly issued a statement to all the media outlets saying that there [was] no truth to the liquidity rumors." Carey Decl. Ex. 2, Finnerty Rep. Ex. 57, E-mail from Russell Sherman to Alan Schwartz & Samuel Molinaro (Mar. 10, 2008).

b.   On March 12, 2008, Alan Schwartz appeared on CNBC and publicly assured investors that Bear had no liquidity issues. He stated: "[O]ur liquidity position has not changed at all. The balance sheet hasn't weakened at all. . . . As the year has gone on since year-end, that liquidity cushion has been unchanged. . . . We don't see any pressure on our liquidity, let alone a liquidity crisis." Carey Decl. Ex. 2, Finnerty Rep. Ex. 58, Alan Schwartz, C.E.O., The Bear Stearns Cos., Inc., Appearance on CNBC's Squawk on the Street, at 2 (Mar. 12, 2008).

165.   During the week leading up to Bear's collapse, its capital and liquidity positions fully deteriorated. *See* Carey Decl. Ex. 2, Finnerty Rep. ¶ 179-80.

a.   In early March 2008, Bear was bleeding free cash balances, and it was losing its sources of short-term secured financing both at rapid rates. *See* Henken Decl. Ex. 20, Friedman Tr. at 132:21-133:33, 156:5-156:9 (during March 2008, some of Bear's long-term lenders stopped providing repo financing to Bear and some lenders were no longer willing to roll over Bear's unsecured debt); Henken Decl. Ex. 9, Molinaro Tr. at 226:2-23 (HSBC pulled all of its funding for Bear in early March 2008); Henken Decl. Ex. 14, Schwartz Tr. at 129:20-130:19, 133:5-8, 133:14-17, 136:19-137:17

(balances and repo loans were being withdrawn at such rapid rates that it was impossible for Bear to fund its balance sheet and it needed a credit facility of around $25 billion to satisfy demands of customers and lenders).

    b.    As of March 13, 2008, Bear's customers had wired out a total of $7.8 billion.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 66 (E-mail from Robert Upton to Patrick Lewis (Mar. 13, 2008).

    c.    Bear's position was so desperate that T.J. Greene suggested approaching the Fed for a loan. Carey Decl. Ex. 2, Finnerty Rep. Ex. 67, E-mail from T.J. Greene to Paul Friedman (Mar. 13, 2008).

**166.**    "By May 2007, Bear Steams· short-term borrowing was 60 percent secured and by September 2007, it was 74 percent secured. Finally by March 2008, Bear Steams' short-term borrowing was 83 percent secured.  Nevertheless, Bear Steams was still unable to obtain adequate secured funding to save the firm in March 2008."  Carey Decl. Ex. 30, OIG Rep. at 12.  "Bear Steams' increasing reliance on secured funding indicates that, although it appeared to be compliant with CSE program's capital requirement, the market did not perceive it to be sufficiently capitalized to justify extensive unsecured lending. In this sense, Bear Steams was not adequately capitalized."  *Id.* at 13.

**Loss Causation**

**167.**    Relevant information about Bear's financial condition leaked into the market during the period December 20, 2007 through March 13, 2008 (the "Leakage Period").  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 185, 192, 212.

    a.    On December 20, 2007, Bear announced its first quarterly loss in its history.  The loss was primarily driven by a $1.9 billion write-down due to the decreased value of its mortgage-related assets, indicating to the public that Bear had been overvaluing its assets.  Henken Decl. Ex. 21, *Bear Stearns Reports Full Year and Fourth Quarter 2007*, Bloomberg, L.P., Dec. 20, 2007; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 192, 216-17.

    b.    On December 20, 2007, Moody's downgrade of Bear's long-term credit rating from A1 to A2 became effective.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 210.

    c.    On December 20 and 21, 2007, several analyst reports were issued questioning Bear's capital position.  Henken Decl. Ex. 22, Deutsche Bank, *More Broad Based Problems* (Dec. 20, 2007); Henken Decl. Ex. 23, Deutsche Bank, *Lowering Estimates and Price Target* (Dec. 20, 2007); Henken Decl. Ex. 24, Wachovia, *BSC: A Year to Forget But Franchise Has Long Term Value* (Dec. 20, 2007); Henken Decl. Ex. 25, UBS, *Managing Through Tough Times* (Dec. 21, 2007); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 218-21.  Deutsche Bank, for example, believed that the earnings report implied "weakness beyond mortgages."  Henken Decl. Ex. 23, Deutsche Bank, *Lowering Estimates and Price Target* (Dec. 20, 2007).  Commentators also discussed Bear's need for a capital infusion.  Henken Decl. Ex. 26, *BSC: Bear Stearns: CNBC Commentator Says Sources Indicate BSC in Talks with Fortress for Additional*

*Capital Infusion*, Bloomberg, L.P., Dec. 21, 2007; Henken Decl. Ex. 27, *Bear Stearns-BSC: Down on Spec*, Bloomberg, L.P., Dec. 21, 2007; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 222.

d.  On January 8, 2008, JPMorgan notified Bear that it was backing out of a $4 billion secured/unsecured backstop facility.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 52, E-mail from Sam Molinaro to Alan Schwartz (Jan. 8, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 174(e).

e.  On January 8, 2008, Punk Ziegel & Company lowered its target price for Bear, directly commending that Bear's "focused its efforts too heavily on the mortgage and credit derivatives markets" and that "it apparently never had an adequate risk management system in place."  Henken Decl. Ex. 28, Punk Ziegel & Co., *Failed Business Model? Lowering Price Target to $67 from $94* (Jan. 8, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 223.

f.  On January 31, 2008, Bear sent a letter to investors, informing that that it was implementing a new valuation technique, resulting in a 22.1% decline in the value of a hedge fund it was liquidating. Carey Decl. Ex. 2, Finnerty Rep. ¶ 226; Henken Decl. Ex. 10, *Bear Stearns Asset-Backed Hedge Fund Declined 52.5% in 2007*, Bloomberg, L.P., Feb. 12, 2008.

g.  On February 8, 2008, Punk Ziegel & Company issued a second report after discussions with other market participants in the previous few days, expressly voicing concern about Bear's funding strategies and the quality of the assets on its books. Henken Decl. Ex. 29, Punk Ziegel & Co., *Bear Stearns (NYSE: BSC), Update Report – Price $80.79* (Feb. 8, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 225.

h.  On February 12, 2008, Bear again reported a decline, this time of 52%, in the value of a hedge fund it was liquidating.  Henken Decl. Ex. 10, *Bear Stearns Asset-Backed Hedge Fund Declined 52.5% in 2007*, Bloomberg, L.P. (Feb. 12, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 226.

i.  On February 28, 2008, Deutsche Bank lowered its estimates for Bear's earnings for the first quarter 2008, fiscal year 2008, and fiscal year 2009 due to the greater than expected mark-to-market losses on leveraged loans and commercial real estate and the somewhat weaker investment fundamentals it perceived in Bear.  Henken Decl. Ex. 23, Deutsche Bank, *Lowering Estimates and Target* (Feb. 28, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 227.

j.  In early March 2008, numerous lenders pulled their funding from Bear.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶ 176 & n.266; *id.* ¶ 179(d).

(i)  *See, e.g.*, Carey Decl. Ex. 2, Finnerty Ex. 59, E-mail from John Stacconi et al to Jeremy Hill (Mar. 10, 2008) (Rabobank pulled funding); *id.* Ex. 60, E-mail from Jon Ferber to David Marren et al. (Mar. 11, 2008) (Bear "was seeing several of the European liquidity providers pulling back this morning"); *id.* Ex. 61, E-mail from Paul Friedman to David Rawlings (Mar. 12, 2008)

(discussing concern that reaching out for additional funding might "spook[]" lenders and cause them to withdraw their existing balances); *id.* Ex. 62, E-mail from Robert Schwartz to David Marren (Mar. 13, 2008) (discussing a repo counterparty that was "pulling [their] $500 mil. of repo").

(ii) Molinaro testified that during July 2007, there were concerns within Bear regarding the substantial loss of client balances, and that HSBC pulled all of its funding for Bear in early March 2008.  Henken Decl. Ex. 9, Molinaro Tr. at 38:21-140:21, 226:2-226:23.

k.  In early March 2012, Defendants were aware of rumors about Bear's liquidity circulating the in public forum:

(i) In a March 10, 2008 e-mail to Alan Schwartz and Samuel Molinaro discussing a potential press release, Russell Sherman stated: "We are a little reluctant to put out the release because we do not want to create another headline.  We have already publicly issued a statement to all the media outlets saying that there is no truth to the liquidity rumors."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 57, E-mail from Russell Sherman to Alan Schwartz & Samuel Molinaro (Mar. 10, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 174(j).

(ii) In e-mails dated March 12, 2008 between Samuel Molinaro and Michael Nierenberg, Nierenberg states that it is "imperative that some type of press conference is held to dispel the rumors in the market.. . . need to try and put an end to the rumors before everyone cuts us off."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 65, E-mail from Michael Nierenberg to Samuel Molinaro et al. (Mar. 12, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 176(c).

(iii) Schwartz also testified that he was aware of and had heard rumors regarding Bear's liquidity in March 2008, and that he appeared on CNBC on March 12, 2008 to "quell the rumors that we'd had a bad first quarter[.]"  Henken Decl. Ex. 14, Schwartz Tr. at 123:18-124:16; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 180(c).

l.  On March 10, 2008, during an interview on CNBC, Ace Greenberg, a former Bear CEO, called the liquidity rumors "ridiculous."  Henken Decl. Ex. 31, *Bear Stearns Ex-Chairman Calls Rumors `Ridiculous,' CNBC Says*, Bloomberg, L.P., Mar. 10, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 228.

m.  After Greenberg's CNBC interview, Bear's stock price dropped to $61.65 in the afternoon from $70.08 at the previous trading day's close.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 228.

n.  On March 10, 2008, news articles reported that Bear's stock price declined due to the "cash crunch rumors."  Henken Decl. Ex. 33, *HousingWire: Bear Stearns Drops on Cash Crunch Rumors*, Bloomberg, L.P., Mar. 10, 2008; *MarketWatch: Bear Stearns Shares Drop on Liquidity Concerns*, Bloomberg, L.P., Mar. 10, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 228.

o.  By March 10, 2008, Bear's 5-year CDS spread had soared to 619 from 200 in November 2007.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 210 & Attach. 29.

p.  By March 10, 2008, Bear's 10-year bond credit spread and reached 6.4% from 1.4% in June 2007.  Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 181, 210-11 & Attach. 29; *and see* Carey Decl. Ex. 30, OIG Rep. at 11 ("By March 2008, a ten-year bond which had recently been issued at a spread of 362 basis points over Treasury rates was trading at 460 basis points over Treasury rates.  The high spread indicates that market participants believed that Bear Steams' creditworthiness was deteriorating in a manner consistent with downgrades by ratings agencies.").

q.  After the market closed on March 10, 2008, Bloomberg news reported that Bear stock price fell 9.3%, the most since 1998, based on speculation over Bear's lack of "sufficient access to capital."  Henken Decl. Ex. 34, *Asia Day Ahead: Bear Stearns Declines on Liquidity Speculation*, Bloomberg, L.P., Mar. 10, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 229.

r.  On March 11, 2008, multiple news articles cited Punk Ziegel & Company's analysis asserting that Bear needed a new business model and that the Company would probably be forced to merge.  *See, e.g.*, Henken Decl. Ex. 35, *Bear Stearns Needs New Business Model, Says Punk Ziegel's Bove*, Bloomberg, L.P., Mar. 11, 2008; Henken Decl. Ex. 36, *Punk Ziegel's Bove Cuts Bear Stearns Price Target to $45*, Bloomberg, L.P., Mar. 11, 2008; Henken Decl. Ex. 37, *Bear Stearns Falls for Second Day on Cash Concerns (Update1)*, Bloomberg, L.P., Mar. 11, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 230.

s.  On March 11, 2008, the Buckingham Group issued an analyst report regarding the rumors about Bear's liquidity problems.  Henken Decl. Ex. 38, The Buckingham Research Group, *Bear Stearns (BSC), Liquidity Concerns Seem Overdone; But Lowering 1Q08 EPS On Continuing Mortgage Market Woes*, at 30 (Mar. 11, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 231.

168.  During the Leakage Period, Bear dropped to a March 13, 2008 close of $57.00, a loss of $33.60 from the December 19, 2007 closing price of $90.60.  Carey Decl. Ex. 2, Finnerty Rep., Attachs. 31, 34; Finnerty Decl., Attach. B.

169.  Dr. Finnerty performed an event study in order to determine how much of the drop in Bear's stock price during the Leakage Period was due to leakage of information concerning Defendants' fraud which removed inflation from Bear's stock price.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 213-15; *see also id.* ¶¶ 56-63, 190 (providing background on event study methodology).

170.  Dr. Finnerty concludes that of the total $33.60 drop in Bear's stock price during the Leakage Period, a drop of $32.94 was caused by the leakage of information concerning Defendants' fraud, which removed inflation from Bear's stock price.  Finnerty Decl., Attach. B.

171.  Even prior to December 20, 2007, signs of Bear's precarious funding situation had already been leaked to certain market participants.  *See* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 192, 200, 205, 210-12.

   a.  By August 2007, in order to raise cash Bear was forced to start considering deals, the terms of which would send a "signal . . . to the market about [Bear's] liquidity." Carey Decl. Ex. 2, Finnerty Rep. Ex. 36, E-mails among John Stacconi, Robert Upton, et al. (Aug. 11, 2007).; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 174(a).

   b.  In September 2007, Bear had to tell certain customers "to take their repo business elsewhere."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 42, E-mail from Paul Friedman to Sam Molinaro et al. (Sep. 5, 2007); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 173(f).

   c.  By October 2007, "[s]ome banks [had] started to express concern that too many areas of [B]ear [were] reaching out for liquidity," which Bear insiders recognized was the equivalent of "shooting blanks all over the street and making [Bear] look dysfunctional to some of our largest lenders."  Carey Decl. Ex. 2, Finnerty Rep. Ex. 43, E-mail exchange among Sal Dimaggio, John Stacconi, et al. (Oct. 4, 2007); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 173(g).

   d.  Around the same time, one of largest trade counterparties of the Structured Funds expressed concern about Bear's liquidity.  Carey Decl. Ex. 2, Finnerty Rep. Ex. 50, E-mail from Michael Moriarty to Sam Molinaro et al. (Sep. 24, 2007) ; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 174(c).

172.  If Dr. Finnerty had begun the Leakage Period during the summer or fall of 2007, the damages he would have calculated as due to leakage of the information concerning Defendants' fraud would have been greater.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 189 (reviewing academic literature with regard to choosing disclosure period); *id.* ¶ 212 (noting that December 20, 2007 was a conservative choice for the start of the Leakage Period).

173.  Dr. Finnerty used the constant dollar method to determine the amount of inflation in Bear's stock price prior to the Leakage Period.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 266; Finnerty Decl. ¶ 44.

174.  Dr. Finnerty concluded that between the beginning of the relevant period through December 19, 2007, Bear's stock price was inflated by $78.73 as a result of Defendants' fraud.  Finnerty Decl., Attach. B.

175.  If Dr. Finnerty had used the constant percentage method rather than the constant dollar method to determine the amount of inflation in Bear's stock price prior to the Leakage Period, the calculated inflation would have been greater than $78.73, up to a maximum of approximately $150.  Finnerty Decl. ¶ 45 & n.48; Henken Decl. Ex. 11, Ferrell Tr. at 121:10-16.

176.   On March 14, 2008:

    a.   JPMorgan announced that it agreed to provide emergency financing to Bear in the form of a secured loan facility.  Henken Decl. Ex. 39, *Bear Stearns Agrees to Secured Loan Facility with JPMorgan Chase*, Bloomberg, L.P., Mar. 14, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 238.

    b.   Alan Schwartz, Bear's President and CEO, acknowledged that Bear's liquidity position had "significantly deteriorated."  Henken Decl. Ex. 39, *Bear Stearns Agrees to Secured Loan Facility with JPMorgan Chase*, Bloomberg, L.P., Mar. 14, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 238.

    c.   Oppenheimer commented that "Bear Stearns is facing a crisis of liquidity and concerns about creditworthiness" and noted that when a "company that is leveraged over 30-to-1 faces [such] a crisis of liquidity . . . its leverage will be forced down to 1-to-1," rendering Bear's equity "worthless" and triggering a "cannibalization of remaining capital." Consequently, it downgraded Bear. Henken Decl. Ex. 40, Oppenheimer & Co. Inc., Downgrading BSC Shares to Underperform from Perform, at 1 (Mar. 14, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 241.

    d.   Credit Suisse, S&P, and Fitch Ratings also downgraded Bear in response to the news of the JPMorgan loan facility.  Henken Decl. Ex. 41, Credit Suisse Securities (USA) LLC, *Bear Stearns (BSC), Downgrade Rating* (Mar. 14, 2008); Henken Decl. Ex. 42, Mark Pittman and Caroline Salas, *Bear Stearns Has Credit Ratings Slashed After Bailout (Update3)*, Bloomberg, L.P., Mar. 14, 2008; Henken Decl. Ex. 43, Fitch Downgrades Bear Stearns to 'BBB'; Places Ratings on Watch Negative, Bloomberg, L.P., Mar. 14, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 242-43.

177.   On March 14, 2008, Bear's stock dropped to close at $30.00, a loss of $27.00 from its March 13, 2008 close at $57.00.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 244 & Attach. 34; Finnerty Decl. Attach. B.

178.   Dr. Finnerty performed an event study in order to determine how much of the drop in Bear's stock price on March 14, 2008 was due to the partial corrective disclosure of information concerning Defendants' fraud which removed inflation from Bear's stock price. Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 245-46; *see also id.* ¶¶ 56-63, 190 (providing background on event study methodology).

179.   Dr. Finnerty concluded that $23.42 of the total $27.00 drop in the price of Bear's stock on March 14, 2008 was caused by the partial corrective disclosure of information concerning Defendants' fraud, which removed inflation from Bear's stock price.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 271 & Attach. 34; Finnerty Decl., Attach. C.

180.   After the markets closed on March 14, 2008, several media outlets began reporting on the possibility that JPMorgan would buy out Bear.  Henken Decl. Ex. 44, *JPMorgan Closer On Deal for Bear Stearns*, Associated Press, Mar. 16, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 248.

**181.**   On March 16, 2008, Bear announced that it would be acquired by JPMorgan for approximately $2.00 per share.  Henken Decl. Ex. 45, *JPMorgan Chase to Acquire Bear Stearns*, Bloomberg, L.P., Mar. 16, 2008; *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 249.

**182.**   On March 17, 2008, a Buckingham Research Group report analyzed the problems faced by Bear leading up to the buy-out, reporting that Bear's liquidity position had been the lowest of any of major broker-dealers, that it was the only broker with a net repo borrowing position, and that its "sizable prime brokerage business also contributed to its downfall."  Henken Decl. Ex. 46, The Buckingham Research Group, *Security Brokers, Evaluating Liquidity at the Rest of the Brokers in a "Run on the Bank" Scenario*, at 2-3 (Mar. 17, 2008); *and see* Carey Decl. Ex. 2, Finnerty Rep. ¶ 250.

**183.**   On March 17, 2008, Bear's stock dropped to close at $4.81, a drop of $25.19 from its close of $30.00 on March 14, 2008.  Carey Decl. Ex. 2, Finnerty Rep. ¶ 254 & Attach. 34; Finnerty Decl., Attach. C.

**184.**   Dr. Finnerty performed an event study in order to determine how much of the drop in Bear's stock price between the March 14, 2008 close and the March 17, 2008 close was due to the partial corrective disclosure of information concerning Defendants' fraud which removed inflation from Bear's stock price.  Carey Decl. Ex. 2, Finnerty Rep. ¶¶ 259-60; *see also id.* ¶¶ 56-63, 190 (providing background on event study methodology).

**185.**   Dr. Finnerty concluded that $23.17 of the total $25.19 drop in the price of Bear's stock between the March 14, 2008 close and the March 17, 2008 close was caused by the corrective disclosure of information concerning Defendants' fraud, which removed inflation from Bear's stock price. Carey Decl. Ex. 2, Finnerty Rep. ¶ 272 & Attach. 34; Finnerty Decl., Attach. C.

**186.**   A "run on the bank" is not inherently a sudden occurrence and can be cause by deep-rooted, long-running factors.  *See* Henken Decl. Ex. 11, Ferrell Tr. at 48:20-24 (agreeing that "the idea of a run on the bank doesn't say, one way or the other, what causes the depositors to start running").

Dated:   October 13, 2015              BOIES, SCHILLER & FLEXNER LLP

Richard B. Drubel
Matthew J. Henken
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
Phone: (603) 643-9090
Fax:    (603) 643-9010

Philip C. Korologos
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Phone: (212) 446-2300
Fax:    (212) 446-2350

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Phone: (312) 641-9750
Fax:    (312) 641-9751

Stephen M. Tillery
Douglas R. Sprong
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Phone: (314) 241-2844
Fax:    (314) 241-3525

*Attorneys for Plaintiff*