UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE BEAR STEARNS COMPANIES, INC. SECURITIES, DERIVATIVE, AND ERISA LITIGATION | Master File No.: 08 MDL 1963 (RWS) |
| This Document Relates To: Securities Action, No. 08 Civ. 2793 (RWS) | ECF Case |
| BRUCE S. SHERMAN, Plaintiff, v. BEAR STEARNS COMPANIES INC., JAMES CAYNE, WARREN SPECTOR AND DELOITTE & TOUCHE LLP, Defendants. | Index No.: 09 Civ. 8161 (RWS) **FILED UNDER SEAL** |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Brad S. Karp
John F. Baughman
Jessica S. Carey
Jonathan H. Hurwitz
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns
Companies Inc.*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
David S. Frankel
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
*Attorneys for Defendant James E. Cayne*

WACHTELL, LIPTON, ROSEN & KATZ
David B. Anders
51 West 52nd Street
New York, New York 10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES........................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 8

ARGUMENT ............................................................................................................................ 8

I.      Relevant Legal Standards ........................................................................................... 8

II.     The Undisputed Facts Show That Defendants Made No Material Misstatements or
        Actionable Omissions .............................................................................................. 11

        A.     Plaintiff Cannot Show Any Material Misstatement or Actionable Omission About
               Bear Stearns's Financing, Leverage, or Mortgage Exposure ............................... 11

        B.     Plaintiff Cannot Show any Material Misstatement or Omission Regarding Bear
               Stearns's Mortgage Valuations ...................................................................... 15

        C.     Plaintiff Cannot Show any Material Misstatement or Omission About Bear
               Stearns's Risk Management............................................................................. 20

        D.     Plaintiff Cannot Show any Material Misstatement or Actionable Omission
               Regarding Bear Stearns's Liquidity or Capital ................................................... 24

III.    Plaintiff Cannot Prove the Alleged Fraud Caused His Losses ......................................... 26

        A.     Defendants Are Entitled to Summary Judgment Because Finnerty's Expert
               Testimony is Inadmissible .............................................................................. 27

        B.     In Any Event, Even With Finnerty's Testimony, Plaintiff Cannot Establish Loss
               Causation for March 14-17 ............................................................................. 29

               1.     The March 14 and March 16 Statements Are Not Corrective Disclosures 29

               2.     Plaintiff Cannot Establish that the Losses on March 14 and March 17
                      Were Due to a Materialization of an Undisclosed Risk............................ 31

IV.     Plaintiff's Section 18 Claim Is Time-Barred ............................................................. 33

V.      Plaintiff's Holder Claims Are Not Actionable under New York Common Law............. 34

VI.     Defendants Are Entitled to Summary Judgment on Plaintiff's Section 20 Claim........... 36

VII.    Defendants Are Entitled to Summary Judgment on Plaintiff's Claims Based on Purchases
        on August 15, 2007, March 11, 2008, and March 13, 2008 ............................................ 36

        A.     Sherman Cannot Bring Claims Related to the 7,000 Shares Purchased on August
               15, 2007 Because He Did Not Own Those Shares .............................................. 36

        B.     Defendants Are Entitled To Summary Judgment on Purchases Made on March 11,
               2008 and March 13, 2008 Because Plaintiff Cannot Show That Those Purchases
               Caused Injury to Him...................................................................................... 38

CONCLUSION.......................................................................................................................... 40

i

TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Adelphia Comms. Corp. Sec. and Deriv. Litig.,*
2010 WL 3528872 (S.D.N.Y. 2010)................................................................................10

*In re Aegon N.V. Sec. Litig.,*
2004 WL 1415973 (S.D.N.Y. 2004)................................................................................13

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)...........................................................................................................8

*In re AOL Time Warner, Inc. Secs. Litig.,*
503 F. Supp. 2d 666 (S.D.N.Y. 2007)..............................................................................30

*In re Ashanti Goldfields Sec. Litig.,*
184 F. Supp. 2d 247 (E.D.N.Y. 2002) .............................................................................15

*Ashland Inc. v. Morgan Stanley & Co.,*
652 F.3d 333 (2d Cir. 2011).............................................................................................9

*In re Avista Corp. Secs. Litig.,*
415 F. Supp. 2d 1214 (E.D. Wash. 2005)........................................................................30

*In re Axis Capital Holdings Ltd. Sec. Litig.,*
456 F. Supp. 2d 576 (S.D.N.Y. 2006)..............................................................................15

*In re Bank of America Corp. Secs., Deriv., and ERISA Litig.,*
2012 WL 1353523 (S.D.N.Y. 2012).................................................................................14

*Bank Hapoalim v. WestLB AG,*
995 N.Y.S.2d 7 (1st Dep't 2014).....................................................................................35

*Basic, Inc. v. Levinson,*
485 U.S. 224 (1988)...........................................................................................................9

*In re Bear Stearns,*
763 F. Supp. 2d 423 (S.D.N.Y. 2011)...............................................................................6

*In re Bear Stearns Cos., Inc. Secs. Deriv. & ERISA Litig ,*
995 F. Supp. 2d 291 (S.D.N.Y. 2014)..............................................................................33

*Beleson v. Schwartz,*
599 F. Supp. 2d 519 (S.D.N.Y. 2009)..............................................................................36

*Bloor v. Carro, Spanbock, Londin, Rodman & Rass,*
754 F.2d 57 (2d Cir. 1985)..............................................................................................40

ii

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
 506 F. App'x 32 (2d Cir. 2012) ...................................................................14, 24

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA)*
 *LLC*, 752 F.3d 82 (1st Cir. 2014)...................................................................28

*Carroll* v. *LeBoeuf, Lamb, Greene & MacRae, LLP*,
 623 F. Supp. 2d 504 (S.D.N.Y. 2009).............................................................10

*In re Centerline Holding Co. Sec. Litig.*,
 380 F. App'x 91 (2d Cir. 2010).......................................................................9

*Charas* v. *Sand Tech. Sys. Int'l, Inc.*,
 1992 WL 296406 (S.D.N.Y. 1992).................................................................13

*Ciresi* v. *Citicorp*,
 782 F. Supp. 819 (S.D.N.Y. 1991)..................................................................13

*In re Citigroup, Inc. Sec. Litig.*,
 330 F. Supp. 2d 367 (S.D.N.Y. 2004).........................................................12, 20

*In re Citigroup Inc. Sec. Litig.*,
 987 F. Supp. 2d 377 (S.D.N.Y. 2013)..............................................................25

*Dalberth* v. *Xerox Corp.*,
 766 F.3d 172 (2d Cir. 2014)........................................................................9, 21

*Daubert* v. *Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)....................................................................................11

*In re Duke Energy Corp. Sec. Litig.*,
 282 F. Supp. 2d 158 (S.D.N.Y. 2003).............................................................13

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009).........................................................................19

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
 131 S. Ct. 2179 (2011).................................................................................27

*Fener* v. *Operating Eng'rs Constr. Indus. Pension Fund*,
 579 F.3d 401 (5th Cir. 2009) .......................................................................27

*Fezzani* v. *Bear Stearns & Co.*,
 592 F. Supp. 2d 410 (S.D.N.Y. 2008).............................................................10

*First Gen. Res. Co.* v. *Hartman & Craven*,
 1989 WL 135383 (S.D.N.Y. 1989).................................................................13

iii

*Garber* v. *Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008)................................................................................30

*Gissin* v. *Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010)................................................................................25

*Gordon Partners* v. *Blumenthal*,
  2007 WL 431864 (S.D.N.Y. 2007)....................................................................................28

*Heilweil* v. *Mount Sinai Hosp.*,
  32 F.3d 718 (2d Cir. 1994)..................................................................................................8

*Hubbard* v. *BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) ..........................................................................................28

*Hutchison* v. *Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011)...............................................................................................19

*Int'l Fund Mgmt.* v. *Citigroup Inc.*,
  822 F. Supp. 2d 368 (S.D.N.Y. 2011)................................................................................10

*Jeffrys* v. *City of New York*,
  426 F.3d 549 (2d Cir. 2005)................................................................................................8

*In re JP Morgan Chase Sec. Litig.*,
  2007 WL 950132 (S.D.N.Y. 2007)....................................................................................23

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................................................................26

*Kumho Tire Co.* v. *Carmichael*,
  526 U.S. 137 (1999)...........................................................................................................29

*Lentell* v. *Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005)................................................................................26, 27, 39

*Lerner* v. *FNB Rochester Corp.*,
  841 F. Supp. 97 (W.D.N.Y. 1993) .....................................................................................13

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014)............................................................................9

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................................................13

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008)................................................................................10

*In re N. Telecom Ltd. Sec. Litig.,*
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)............................................................................9

*In re N.Y. Cmty. Bancorp,*
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) .......................................................................15

*In re Omnicom Grp., Inc. Sec. Litig.,*
    541 F. Supp. 2d 546 (S.D.N.Y. 2008)..........................................................................28

*In re Omnicom Grp., Inc. Sec. Litig.,*
    597 F.3d 501 (2d Cir. 2010)................................................................................ *passim*

*In re Pfizer Sec. Litig.,*
    2014 WL 3291230 (S.D.N.Y. 2014)............................................................................28

*Plumbers Local Union No. 392 Pension Fund v. Fairfax Fin. Holds. Ltd.,*
    886 F. Supp. 2d 328 (S.D.N.Y. 2012)........................................................................30

*Powell v. Nat'l Bd. of Med. Exam'rs,*
    364 F.3d 79 (2d Cir. 2004)..........................................................................................8

*Raines v. Byrd,*
    521 U.S. 811 (1997)...................................................................................................37

*Ross v. Lloyds Banking Grp., PLC,*
    2012 WL 4891759 (S.D.N.Y. 2012)....................................................................25, 36

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977)...................................................................................................12

*Sciallo v. Tyco Int'l, Inc.,*
    2012 WL 2861340 (S.D.N.Y. 2012)............................................................................27

*In re Sec. Capital Assurance Ltd. Sec. Litig.,*
    2011 WL 4444206 (S.D.N.Y. 2011)............................................................................29

*Solow v. Citigroup, Inc.,*
    2012 WL 1813277 (S.D.N.Y. 2012)............................................................................26

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.,*
    775 F. Supp. 2d 227 (D. Mass. 2011).........................................................................34

*SRM Global Fund L.P. v. Countrywide Fin. Corp.,*
    2010 WL 2473595 (S.D.N.Y. 2010).....................................................................10, 24

*Starr Foundation v. Am. Int'l Grp., Inc.,*
    901 N.Y.S.2d 246 (1st Dep't 2010).............................................................................35

Doc# US1:10180686v1

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
    802 F. Supp. 2d 1125 (C.D. Cal. 2011) ...................................................................34

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)........................................................................................................9

*Varga v. McGraw Hill Fin. Inc.*,
    2015 WL 4627748 (N.Y. Sup. Ct. 2015)......................................................................35

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche, LLP*,
    549 F.3d 100 (2d Cir.2008)...........................................................................................37

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985)................................................................................28

*In re Williams Sec. Litig.*,
    558 F.3d 1130 (10th Cir. 2009) ....................................................................................29

*In re Worldcom, Inc. Sec. Litig.*,
    2005 WL 2319118 (S.D.N.Y. 2005).............................................................................32

## STATUTES AND RULES

15 U.S.C. § 78j.........................................................................................................................8

15 U.S.C. § 78r.................................................................................................................8, 33

15 U.S.C. § 78t.........................................................................................................................9

15 U.S.C. § 78u-4(b)..............................................................................................................39

Fed. R. Civ. P. 56.................................................................................................................1, 8

## REGULATIONS

17 C.F.R. 240.10b-5...............................................................................................................9

Defendants The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), James Cayne, and Warren Spector submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 56, for summary judgment on all of plaintiff's claims.

### PRELIMINARY STATEMENT

This is the only remaining actively litigated case before this Court arising from the near collapse of Bear Stearns in March 2008—and the only such case in which the Court will have occasion to rule on the sufficiency of the evidence to support the plaintiff's claims. Plaintiff Sherman, a decades-long professional investor and the CEO of his own investment management firm, alleges that his losses on Bear Stearns stock resulted, not from the unprecedented financial crisis that led to the worst recession since the 1930s, but from alleged misrepresentations by defendants about the value of the Company's mortgage assets, the quality of its risk management, and the adequacy of its capital and liquidity. Sherman's claims mirror those asserted in the Bear Stearns securities class action and in the other actions brought by traders in Bear Stearns stock who opted out of the class action settlement, all of which have been settled, stayed by consent, or dismissed.

While the Court sustained the pleadings in the class action on a motion to dismiss, that is no longer enough. Now, almost six years after this action was commenced, the parties have concluded discovery, and Sherman can no longer rely on bare allegations. Instead, to defeat summary judgment, he has the burden of coming forward with evidence that would allow a jury to return a verdict in his favor. The information available to him from discovery and otherwise is vast: more than eight million pages of documents produced in this case, including nearly every email to or from senior Bear Stearns executives over a multiyear period, inventories of Bear Stearns's mortgage holdings, dozens of ordinary course reports generated by Bear

Stearns personnel, and all of the work papers prepared by its independent auditors; depositions of every one of the eleven witnesses whose testimony plaintiff noticed, including Bear Stearns's most senior executives; and an enormous volume of documents and testimony from other lawsuits and investigations about Bear Stearns. But despite having every opportunity to obtain evidence that would entitle him to present his claims to the jury, he cannot discharge this burden.

That is because, on the undisputed evidence, there was no fraud. The evidence shows that Bear Stearns and its professionals sought diligently and honestly to steer the Company through increasingly challenging and unpredictable markets; that they looked for ways to improve the way the business was run and to adapt to changing conditions; and that they accurately and fully disclosed to investors the material facts about their business. It also shows—not surprisingly—employees disagreeing in good faith about the risks the Company faced and the best ways to manage them, and expressing strong views about the hazardous market conditions the Company faced and their potential impact on the Company. But, despite plaintiff's effort to portray as a smoking gun routine emails by Bear Stearns employees expressing criticism or concern, none of this evidence is remotely enough to establish that defendants committed fraud.

Plaintiff's claims rely crucially on the testimony of his sole purported expert, Professor John D. Finnerty, and upon statements in an audit prepared by the SEC Office of Inspector General's Office of Audits ("OOA") (the "OIG Audit Report"). As we show in the accompanying motions to exclude, neither of these is sufficiently reliable to be admissible in evidence, and without either of them there is little or nothing left of plaintiff's claims. But even if plaintiff can establish that Finnerty's testimony and the OIG Audit Report satisfy the Rules of Evidence, defendants are still entitled to summary judgment on all of plaintiff's claims.

2

Defendants' motion for summary judgment should be granted for at least the following reasons.

*No material misstatements or actionable omissions.* Plaintiff alleges that defendants, in Bear Stearns's public disclosures and in private conversations with Sherman, made misstatements and omitted material information about the value of its assets, including particularly mortgage assets; the quality of its risk management; and the adequacy of its capital and liquidity. Plaintiff further contends that Bear Stearns was unduly reliant on short term repo financing (*i.e.,* the financing of financial assets through repurchase agreements, or repos), excessively exposed to risks associated with mortgages, and too highly leveraged. On the undisputed evidence, however, Sherman cannot establish any material misrepresentations or actionable omissions about any of these subjects.

*First,* the evidence shows that Bear Stearns accurately disclosed its leverage, reliance on repo financing, and exposure to mortgage assets, and specifically emphasized the risks associated with each of these aspects of its business. Plaintiff has not identified any alleged misstatements about these matters, or any way in which Bear Stearns failed to disclose material facts that it was required to disclose. Allegations that Bear Stearns was over-leveraged, too reliant on repo financing, or too exposed to mortgages are only challenges to the business decisions made by the Company and its management, not the basis for a fraud claim. Plaintiff also asserts that the individual defendants made false statements to him that Bear Stearns had "unique expertise" in the mortgage market and was conservatively managing its exposure to subprime mortgages, but he cites no evidence that those statements were false, and, in any event, such statements are too general to be actionable as a matter of law.

*Second,* plaintiff alleges that Bear Stearns fraudulently overstated the value of its

mortgages and mortgage-related assets. But the undisputed evidence—including contemporaneous documents and the consistent testimony of the Company's CFO, its head of mortgages, its outside auditor, and other witnesses—shows that, contrary to plaintiff's allegations, Bear Stearns's valuations were the result of rigorous processes, reviewed and approved by its auditors, and based principally on quoted market prices or other independent external information sources.

Plaintiff relies primarily on statements in the OIG Audit Report that unspecified valuation models allegedly used by Bear Stearns at unspecified times to value unspecified assets or categories of assets were not sufficiently updated or internally reviewed. Even if the OIG Audit Report were admissible into evidence (and it should not be), it is not enough to enable plaintiff to survive summary judgment on these claims. It is undisputed that the OOA did not review Bear Stearns's models or valuations, and reached no conclusion that any of the Company's assets were overvalued.

And plaintiff has nothing more. Plaintiff's expert himself admittedly made no effort to value any of Bear Stearns's assets or to analyze its valuation processes or the valuation models it used. He was unable to identify any models that he contends were insufficient or unreliable, what assets, if any, those models were allegedly used to value, whether the values were erroneous as a result, or whether any errors resulted in overvaluation or undervaluation (much less any material overvaluation). His expert report does not identify a single asset or category of assets that he contends was overvalued, or show that Bear Stearns's valuations in aggregate were materially overvalued at any time relevant to plaintiff's claims. Finally, the snippets of internal emails that plaintiff cites, as we show in detail below, do not come close to establishing any material overvaluation.

4

*Third*, plaintiff also alleges that defendants made misstatements about the quality of Bear Stearns's risk management and the nature of its risk management procedures. Again, however, plaintiff cannot substantiate these claims. The specific statements in Bear Stearns's public filings that plaintiff cites—such as statements that the Company marked financial instruments to fair value on a daily basis, and compared model-based valuations with counterparties—are demonstrably accurate. And purported statements that individual defendants allegedly made to Sherman such as that the Company's risk management was "excellent" are not actionable as a matter of law.

Plaintiff relies principally on documents—including the OIG Audit Report and reports by a risk management consultant that Bear Stearns engaged—that plaintiff contends show deficiencies in Bear Stearns's risk management. But allegations of deficient risk management, like other allegations of mismanagement, do not establish fraud. And, even assuming that the OIG Audit Report is admissible, neither it nor the other documents on which plaintiff relies establishes that defendants made any material misrepresentations or actionable omissions. Indeed, the authors of the OIG Audit Report concededly did not "perform an independent assessment of [Bear Stearns's] risk management systems (*e.g.*, … models ….)." (Carey Decl. Ex. 30, OIG Audit Rpt at 71.)

*Fourth*, plaintiff's allegations that the defendants misstated the adequacy of the Company's capital and liquidity are unsupported by the evidence. Bear Stearns disclosed the amount of its capital and the level of its liquidity, and plaintiff does not and cannot allege that these disclosures were inaccurate. Instead, plaintiff complains that defendants committed fraud by stating that the Company's liquidity and capital levels were "strong" or "solid," that its liquidity was sufficient, and that it did not need to raise capital. But these statements are matters

of opinion that are not actionable as a matter of law. That Bear Stearns—*after* these disclosures were made—suffered from a dramatic run on the bank that drained it of billions of dollars in liquidity in a matter of days does not establish that its disclosures were inaccurate at the time they were made.

*No evidence of loss causation.* Defendants are also entitled to summary judgment because plaintiff cannot prove that his losses were caused by the alleged fraud rather than other intervening factors. Plaintiff's expert's opinions on loss causation are fundamentally flawed, as discussed in the accompanying motion to exclude, and therefore plaintiff cannot rely on those opinions to prove loss causation. Without reliable expert testimony, plaintiff cannot prove loss causation.

Even if the expert's testimony is admissible, it would not establish loss causation. As plaintiff's expert admits, Bear Stearns nearly collapsed because of a run on the bank that resulted in a loss of billions of dollars in customer funds and financing during the latter part of the week of March 10, 2008. The run on the bank resulted in an announcement on March 14, 2008 (the Friday of that week) that the Company had suffered a significant loss of liquidity and had obtained a short term emergency loan from JPMorgan, backstopped by the Federal Reserve, and a subsequent announcement on March 16, the following Sunday, of an agreement to merge with JPMorgan. Plaintiff's expert does not even claim to find any purported corrective disclosures prior to March 14, 2008, and his theory that corrective information "leaked" into the market in some unspecified manner before that date and led to the bank run is unsupported by any evidence, so plaintiff cannot show that any losses prior to March 14, 2008 were caused by the alleged fraud. The record likewise contains no evidence that the bank run was caused in some other manner by any alleged fraud, or that the disclosures on March 14 and March 17

6

corrected any prior alleged misstatements. Because plaintiff is unable to establish that any alleged fraud caused his losses, the defendants are entitled to summary judgment.

        ***Other bases for summary judgment.*** Defendants are also entitled to summary judgment for the following additional reasons.

        *First*, plaintiff's claim under Section 18 of the Securities Exchange Act, which was brought more than a year after plaintiff was on notice of his claim, is untimely, for the reasons given by this Court in another Bear Stearns opt-out case, *SRM Global Master Fund Ltd. P'ship* v. *The Bear Stearns Cos. LLC*, No. 13 Civ. 2692 (RWS) (S.D.N.Y.).

        *Second*, plaintiff's common law fraud claim fails as a matter of law to the extent it is based on an alleged decision to hold his shares rather than a decision to purchase or sell. As this Court held in *SRM* (and as since reaffirmed by the New York courts), such holder claims are not recognized under New York law.

        *Third*, because plaintiff cannot establish a primary violation of the federal securities laws, his secondary claim for control person liability under Section 20 of the Exchange Act also fails as a matter of law.

        *Finally*, defendants are entitled to summary judgment on plaintiff's claims related to shares purchased on August 15, 2007, because plaintiff did not own those shares, and on plaintiff's claims related to shares purchased on March 11 and March 13, 2008, because those shares were purchased in an escrow account, and plaintiff cannot show that he, and not the grantor of the escrow, suffered any loss on the shares in that account.

        For these and the reasons set forth below, summary judgment should be granted on all of plaintiff's claims.

7

**STATEMENT OF FACTS**

The facts relevant to this motion are set forth in the accompanying Statement of Material Undisputed Facts pursuant to Local Civil Rule 56.1 and in the Argument below.

**ARGUMENT**

**I.     Relevant Legal Standards**

Defendants are entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(a).    Plaintiff cannot defeat summary judgment by relying on "conclusory allegations or unsubstantiated speculation," *Jeffrys* v. *City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), or "conjecture or surmise," *Heilweil* v. *Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994). Summary judgment is not "precluded because there are conflicting experts"; rather, "if the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to … grant summary judgment for defendant." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (citation omitted).   Summary judgment should be granted where "the party… against whom summary judgment is sought[] has not shown that evidence of an essential element of her case—one on which she has the burden of proof— exists." *Powell* v. *Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986)).

Plaintiff asserts claims against all defendants under Sections 10(b) and 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j, 78r, and SEC Rule 10b-5, 17 C.F.R. 240.10b-5, and common law fraud, and against the individual defendants under

8

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

   To establish a violation of Section 10(b), plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *see also Ashland Inc.* v. *Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011). Plaintiff bears the burden of proof of identifying the statements that he alleges to be false and establishing that the challenged statement "was false *at the time it was made*." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2014). A failure to prove any one of these elements "necessarily renders all other facts immaterial and requires summary judgment in favor of defendants." *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000) (internal quotation marks omitted).

   Omissions, even material omissions, are not actionable under Section 10(b) unless they render the statements the defendants made misleading or defendants had an independent duty to disclose the omitted facts. *Basic, Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (disclosure is not required "merely because a reasonable investor would very much like to know that fact"); *In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93 (2d Cir. 2010) (summary order) ("For an omission to be considered actionable under Section 10(b) and the SEC's implementing regulation, the defendant must be subject to an underlying duty to disclose.").

   The elements of a claim under Section 18 and for common law fraud are similar

9

to those of a claim under Section 10(b).  To survive summary judgment on his claim under Section 18, plaintiff must prove "(1) a false or misleading statement was contained in a document filed pursuant to the Exchange Act (or any rule or regulation thereunder); (2) defendant made or caused to be made the false or misleading statement; (3) plaintiff relied on the false statement; and (4) the reliance caused loss to the plaintiff." *Int'l Fund Mgmt.* v. *Citigroup Inc.*, 822 F. Supp. 2d 368, 385 (S.D.N.Y. 2011) (quoting *In re Alstom SA*, 406 F. Supp. 2d 433, 478 (S.D.N.Y. 2005)); *In re Adelphia Comms. Corp. Sec. and Deriv. Litig.*, 2010 WL 3528872 (S.D.N.Y. 2010) (dismissing Section 18 claim for failure to plead loss causation "[f]or the reasons set forth in [the Court's analysis under Section 10(b)]"); *SRM Global Fund L.P.* v. *Countrywide Fin. Corp.*, 2010 WL 2473595, at *12 (S.D.N.Y. 2010) (dismissing Section 18 claim because plaintiff had not sufficiently alleged a false or misleading statement under Section 10(b)).

Likewise, to establish a claim for common law fraud under New York law, plaintiff "must show (1) an omission or misrepresentation of a material fact, (2) which defendants knew to be false when made, (3) which defendants made with the intent to induce plaintiffs' reliance, (4) upon which plaintiffs reasonably relied, and (5) which caused injury to plaintiffs." *Carroll* v. *LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 510 (S.D.N.Y. 2009); *Fezzani* v. *Bear Stearns & Co.*, 592 F. Supp. 2d 410, 423, 426 (S.D.N.Y. 2008) (observing that the "elements of common law fraud are essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b-5" and dismissing claim for common law fraud for failure to establish a misrepresentation or omission); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 366 (S.D.N.Y. 2008) (holding that because

10

plaintiff "failed to plead that the [d]efendants' alleged fraud was the proximate cause of his losses, his common law fraud claim [] must be dismissed.").

## II.     The Undisputed Facts Show That Defendants Made No Material Misstatements or Actionable Omissions

Plaintiff alleges that defendants made misstatements concerning the value of the Company's assets, including its mortgage-related assets (*see* Compl. ¶¶ 60, 71, 84, 87, 116, 120, 131, 137, 144, 145; hereinafter cited by paragraph number only), the quality of its risk management (¶¶ 58, 59, 73, 75, 91, 99, 102, 122, 129, 134), and the adequacy of its capital and liquidity (¶¶ 88, 108, 110, 114, 120, 152, 154).

Plaintiff seeks to establish his claims principally by pointing to the OIG Audit Report and snippets of emails and other documents from among the millions of documents produced in this case, and by relying on the opinions of Finnerty, his sole purported expert. As shown in the accompanying motions to exclude, the OIG Audit Report is inadmissible and unreliable hearsay, and Finnerty's opinions—which are concededly not based on any independent analysis of the Company's valuations, risk management, or capital and liquidity (*see, e.g.,* Carey Decl. Ex. 29, Finnerty Tr. at 59:14-60:7, 103:4-9, 105:11-105:19, 202:14-204:24)—do not satisfy the stringent standards for reliable expert testimony under Fed. R. Evid. 702 and *Daubert* v. *Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). Even if both the OIG Audit Report and Finnerty's testimony were admissible, however, plaintiff still could not establish any misstatement or actionable omission by defendants.

### A.     Plaintiff Cannot Show Any Material Misstatement or Actionable Omission About Bear Stearns's Financing, Leverage, or Mortgage Exposure

Plaintiff and his expert contend that Bear Stearns's near collapse resulted in part from alleged overreliance on repo financing, excessive leverage, and undue exposure to

Doc# US1.10189686v1

mortgage assets.  (Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 193, 195, 196.)  But the undisputed evidence shows that Bear Stearns accurately disclosed the material facts, and alleged mismanagement does not support a claim for fraud.

Thus, Bear Stearns regularly reported to investors on its leverage (Carey Decl. Ex. 1, 2006 10-K at 46-47; Carey Decl. Ex. 11, 2007 10-K at 52-53) and its reliance on repo financing (Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82), including specifically that "[a]n inability to raise money in the long-term or short-term debt markets, or to engage in repurchase agreements or securities lending, could have a substantial negative effect on our liquidity" (Carey Decl. Ex. 1, 2006 10-K at 21; Carey Decl. Ex. 11, 2007 10-K at 18). Plaintiff likewise cannot dispute that Bear Stearns disclosed that mortgage origination and securitization were a significant component of Bear Stearns's business, and reported regularly on the size of its mortgage holdings. (¶¶ 50-51; Def. 56.1 ¶¶ 24-27, 29.)  The Company also disclosed the risks associated with its concentration in mortgages and, as the mortgage markets became increasingly illiquid, the difficulty in valuing such assets. (Def. 56.1 ¶¶ 30-34.)  Bear Stearns's exposure to mortgages was widely known to investors. (*Id.* ¶¶ 27-28.)  Plaintiff does not and cannot demonstrate that these disclosures were inaccurate when made.

Absent evidence of a material misrepresentation or actionable omission, allegations that Bear Stearns was overleveraged, too reliant on repo financing, or too exposed to mortgages are no more than a claim of mismanagement, which the courts have consistently held are insufficient to establish fraud. *See Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 479-80 (1977) (holding that allegations of mismanagement are not within the scope of Section 10(b)); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006) ("Such allegations of mismanagement . . . are insufficient to support a securities

12

fraud claim under section 10(b)."); *In re Aegon N.V Sec. Litig.*, 2004 WL 1415973, at \*8 (S.D.N.Y. 2004) (RWS) (dismissing Section 10(b) claim based on allegations of "simply imperfect economic forecasting"); *First Gen. Res. Co. v. Hartman & Craven*, 1989 WL 135383, at \*3 (S.D.N.Y. 1989) (noting that "[c]ases in the Second Circuit... uniformly reject efforts to bootstrap such acts of corporate mismanagement and breach of faith into claims for federal securities fraud"). Likewise, companies have no obligation to accuse themselves of mismanagement, and thus allegations of mismanagement cannot be converted into claims for securities fraud merely by alleging that the defendants failed to disclose the alleged mismanagement. *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006) (holding that there is no "general duty to disclose corporate mismanagement"); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 159–60 (S.D.N.Y. 2003) (dismissing securities fraud claims based on company's failure to disclose "insufficient internal accounting controls and improper 'mark-to-market' accounting practices"); *Charas v. Sand Tech. Sys. Int'l, Inc.*, 1992 WL 296406, at \*5 (S.D.N.Y. 1992) ("Merely alleging nondisclosure does not transform a state law claim for corporate mismanagement into a federal securities claim"); *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (rejecting attempt by plaintiffs to plead securities fraud by alleging that defendants failed to disclose the alleged mismanagement); *Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97, 101 (W.D.N.Y. 1993) (dismissing securities fraud complaint because "plaintiff is more accurately expressing his displeasure with the judgment calls made by management, which turned out to have been poorly made, and with management's failure to anticipate that its portfolio would be particularly vulnerable in an economic slump").

Plaintiff tries to overcome this obvious deficiency in his claims by pointing to

13

general statements he alleges the individual defendants made to him that Bear Stearns had "unique expertise" in the mortgage market, was conservatively managing its exposure to the subprime market, and was in "no danger" from that market. (¶¶ 58, 59, 122.) But such general statements of opinion are not actionable as a matter of law. *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (summary order) (dismissing as nonactionable "puffery" defendants' statement that "[t]he integrity, reliability and credibility of S&P has enabled us to compete successfully in an increasingly global and complex market, and that is true today and we are confident it will be so in the future."); *In re Bank of America Corp. Secs., Deriv., and ERISA Litig.*, 2012 WL 1353523, at *9-*10 (S.D.N.Y. 2012) (rejecting as puffery defendant's statements that its acquisition of a bank represented "a unique opportunity" and that the acquired bank "has product expertise and a sales culture that tops our capabilities.").

Plaintiff's allegation that Bear Stearns failed to disclose sufficient detail about its exposure to subprime mortgages (Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 206-209), is also insufficient. It is undisputed that in November 2007 Bear Stearns disclosed that it was net *short* subprime mortgage assets (Carey Decl. Ex. 35, 11/15/07 8-K (disclosing the Company was net short subprime by $52M); Carey Decl. Ex. 36, 12/21/07 8-K (disclosing the Company was net short subprime by $582M).) Plaintiff proffers no evidence that these disclosures were inaccurate or that they were inconsistent with regulatory requirements or industry standards. Indeed, Finnerty recognized that there was no uniform industry practice regarding disclosure of subprime holdings (Carey Decl. Ex. 29, Finnerty Tr. at 145:16-146:5), and in their response to the OIG Audit Report, the Division of Corporation Finance pointed out that Bear Stearns "began making additional disclosures concerning its subprime exposures in its public filings soon after it received our [comment letter]" (Carey Decl. Ex. 30, OIG Audit Rpt at 111). Absent any

14

requirement to disclose Bear Stearns's subprime holdings in more detail, defendants' alleged failure to do so does not violate the federal securities laws or constitute fraud. *See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (finding defendants had no duty to break out costs for broker contracts in disclosure of acquisition costs); *In re N.Y. Cmty. Bancorp*, 448 F. Supp. 2d 466, 479 (E.D.N.Y. 2006) (additional disclosure not required where "it is apparent from the quarterly reports disclosed to the public that the company was heavily involved in investing in mortgage-backed securities"); *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247 (E.D.N.Y. 2002) (finding no actionable 10b-5 omission where defendants disclosed overall structure of hedge book, but did not disclose details of hedge book).

**B.    Plaintiff Cannot Show any Material Misstatement or Omission Regarding Bear Stearns's Mortgage Valuations**

Plaintiff alleges that Bear Stearns "fraudulently overstated the value of the Company's mortgages, mortgage- and asset-backed securities and other derivative financial instruments" (¶¶ 3, 131, 145), and that defendants falsely stated that the Company's valuations were accurate (¶ 120), that the Company disclosed the "fair value of its assets" (¶ 73), that "[a]ll assets were marked to market" (¶ 116), and that "[a]sset values [were] verified by risk/controllers" (*id.*). But the discovery record does not support these charges.

To the contrary, the factual record—including the contemporaneous documents and the consistent testimony of the Company's CFO, its independent auditor, and other witnesses—demonstrates that Bear Stearns's reported asset values were developed through rigorous, reliable processes that were reviewed and signed off on by its auditors (Def. 56.1 ¶¶ 35-42), and that the statements plaintiff challenges were factually accurate. For the vast majority of Bear Stearns's mortgage assets, its valuations were based on quoted market prices, independent

15

external valuation information, or readily observable data from objective sources. (Carey Decl. Ex. 1, 2006 10-K at 60; Carey Decl. Ex. 37, Simeone Tr. at 56:5-10; Carey Decl. Ex. 39, Schwartz Tr. at 32:8-18, 36:18-37:5; Carey Decl. Ex. 62, Spector Tr. at 34:15-22.) To the extent models were used to value these assets, the models were "primarily industry-standard models" that "employ[ed] data that [was] readily observable from objective sources" (Carey Decl. Ex. 1, 2006 10-K at 60; Carey Decl. Ex 37 Simeone Tr. at 64:7-17), and the resulting valuations were "ultimately validated by where the instruments traded in the market" (Carey Decl. Ex. 40, Molinaro Tr. at 60:21-61:16; Carey Decl. Ex. 38, Marano Tr. at 264:8-265:16).

Consistent with applicable accounting standards, assets that could not be valued using available trading prices (so-called Level 3 assets) were valued using internally developed models or methodologies based on standard techniques. (Def. 56.1 ¶ 38.) These assets represented a small fraction of the Company's total assets. (Carey Decl. Ex. 13, 1Q07 10-Q at 14 (reporting $18.9 billion of Level 3 assets, or approximately 9% of $210 billion in total assets reported on a fair value basis); Carey Decl. Ex. 11, 2007 10-K at 97 (reporting $28.2 billion, or approximately 10% of $285 billion in total assets reported on a fair value basis, under Level 3); Def. 56.1 ¶¶ 59-62.)

The Company also had "robust" control processes to verify the accuracy of its pricing, which involved a review by risk management and the business unit controller. (Def. 56.1 ¶ 39.) Its independent auditor, Deloitte, also tested its valuation methodologies and independently verified its reported pricing. (*Id.* ¶¶ 40-41.) Deloitte did not raise any concerns with the assumptions underlying the Company's valuations (Carey Decl. Ex. 37, Simeone Tr. at 173:18-174:6, 175:15-20), or identify any deficiencies or weaknesses in the Company's models (*id.* at 184:4-20).

Doc# US1 10180686v1

The evidence plaintiff cites does not establish that the values that Bear Stearns reported for its mortgage-related assets or any other assets were materially overstated. *First*, plaintiff has proffered no expert opinion about the value of Bear Stearns's assets. Plaintiff's only expert witness, John D. Finnerty, acknowledged that he performed no such valuation analysis. (Carey Decl. Ex. 29, Finnerty Tr. at 59:14-20 ("Q. Dr. Finnerty, did you conduct an independent analysis of the valuations of any of Bear Stearns' assets during the relevant time period? ... A. No. I relied on the documents I reviewed. I didn't do my own."); *id.* at 77:13-21 ("I couldn't provide a full analysis"); *id.* at 148:13-149:4 ("I didn't drill down .... I didn't have the information ... to get into the nuts and bolts of the portfolio.").) Nowhere in Finnerty's 136-page expert report or hundreds of additional pages of exhibits and appendices does he provide any such analysis, identify any assets or category of assets that he contends was overvalued, or state the amount by which he contends any assets were overvalued. Finnerty concededly also did not review or analyze any of Bear Stearns's valuation models. (*Id.* at 103:4-9 ("Q. Other than the criticisms that you read of Bear Stearns' risk management, what analysis did you conduct of Bear Stearns' models? A. I didn't, I didn't test their models myself.").)

*Second*, the OIG Audit Report, on which Finnerty principally relies, does not establish that Bear Stearns materially overvalued any of its assets (even if it were admissible). Like Finnerty, the OOA did not review the Company's models or conduct any independent valuation of any of its assets. (Carey Decl. Ex. 30, OIG Audit Rpt at vii, 83, 101.) The OOA likewise did not speak to any Bear Stearns employees or review any internal Bear Stearns documents other than those previously collected by the SEC's Division of Trading and Markets ("T&M"). (*Id.* at 83-84.)

Plaintiff relies heavily on statements in the OIG Audit Report that, as of the end

17

of 2005, some unspecified models were "outdated" and had limited documentation, and that Bear Stearns's risk managers did not complete their review or validation of the Company's models before the Company nearly collapsed. (¶¶ 87, 100; Carey Decl. Ex. 2, Finnerty Rpt at 160(a), (d) (citing Carey Decl. Ex. 30, OIG Audit Rpt at 20, 23).) But the OIG Audit Report does not identify which models were allegedly outdated or not reviewed or validated; it does not specify which assets, if any, those models were used to value; it makes no effort to determine whether the failure to update, review, or validate the models resulted in erroneous valuations; it does not compare the valuations that Bear Stearns assigned to any of its assets to any other relevant pricing source; and it does not (and given the limitations of its analysis, cannot) conclude that any of Bear Stearns's assets were overvalued, much less that its assets were, in aggregate, overvalued by a material amount. Finnerty acknowledged that the information available to him, including the OIG Audit Report, was not sufficient to establish that the Company systematically overvalued its assets. (Carey Decl. Ex. 29, Finnerty Tr. at 67:19-68:7.)

Finnerty also cites statements in the OIG Audit Report that Bear Stearns had disputes with counterparties in the summer of 2007 and in March 2008 over the correct valuation of derivative positions or repo collateral (so-called "mark disputes"). (Carey Decl. Ex. 2, Finnerty Rpt ¶ 160(g); Carey Decl. Ex. 29, Finnerty Tr. at 156:4-156:25.) The OIG Audit Report states that during July 2007 Bear Stearns had mark disputes with two large dealers "in excess of $100 million each," and that on March 12, 2008, the SEC was told that Bear Stearns "paid out $1.1 billion in disputes to numerous counterparties in order to squelch rumors that Bear Stearns could not meet its margin calls." (Carey Decl. Ex. 30, OIG Audit Rpt at 28.) But the mere fact that Bear Stearns and another dealer disagreed over the correct price of an asset does not establish a misvaluation, nor does it establish that it was Bear Stearns, rather than the

18

counterparty, that had the incorrect price. (*See* Def. 56.1 ¶¶ 47-52.)  Indeed, T&M noted in its response to the OIG Audit Report--and the OOA did not dispute—that "mark disputes are an unavoidable issue faced by all dealers ... and the total disputed numbers at Bear Stearns are much smaller than at other institutions."  (OIG Audit Report at 28, 95.)  Moreover, the OIG Audit Report did not conclude (and plaintiff has offered no evidence) that the mark disputes affected Bear Stearns's quarter-end financial reporting rather than merely its internal books and records.  Indeed, the OOA does not dispute the statement by T&M that, as a matter of "universal industry practice" and recognized "best practice," while traders' marks were used for the Company's books and records, financial reporting at Bear Stearns was subject to an "independent price verification process" by an "independent control group."  (*Id.* at 96; *see* pp. 15-16 above.)  Finally, the amounts at issue in the mark disputes the OIG Audit Report cites are a fraction of 1% of Bear Stearns nearly \$400 billion in total assets (Def. 56.1 ¶¶ 51-52), and this is presumptively immaterial.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (holding that a five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement and that it "may provide the basis for a preliminary assumption that... a deviation of less than [5 percent] with respect to a particular item on the registrant's financial statements is unlikely to be material") (quoting SEC Staff Accounting Bulletin No. 99, 63 Fed. Reg. at 45, 151); *see also Hutchison v. Deutsche Bank Sec Inc.*, 647 F.3d 479, 489 n.5 (2d Cir. 2011) (recognizing that the impairment of loans in defendant's portfolio "fell well short of [the] 5% threshold and is therefore presumed to be quantitatively immaterial.").

      Finally, while plaintiff has asserted that the initially negotiated \$2 per share price that Bear Stearns shareholders were to receive in the JPMorgan merger (an amount later

19

increased to $10) was evidence that Bear Stearns's reported book value was inflated (*see* ¶ 230), even Finnerty admitted that he had "no basis" to determine whether the acquisition price reflected an overvaluation of the Company's assets (Carey Decl. Ex. 29, Finnerty Tr. at 65:15-67:13), and that the merger price could well reflect the "weak negotiating leverage" held by Bear Stearns after it experienced a bank run in the week leading up to the merger (Carey Decl. Ex. 2, Finnerty Rpt ¶ 257). Finnerty's testimony on this point is consistent with the testimony and contemporaneous documents, including the testimony by Bear Stearns's CEO that the price reflected a "significant discount" due to the "speed and complexity of trying to get things done in two days" (Carey Decl. Ex. 39, Schwartz Tr. at 161:15-24), and contemporaneous minutes of the Bear Stearns Board meeting on March 16, 2008 stating that "the government would not permit a higher number" and "would not support a transaction where [Bear Stearns's] equity holders received any significant consideration because of the 'moral hazard' of the federal government using taxpayer money to 'bail out' the investment bank's stockholders" (Carey Decl. Ex. 78, DT_WP_000389091 at DT_WP_000389095).

## C.  Plaintiff Cannot Show any Material Misstatement or Omission About Bear Stearns's Risk Management

Absent a misrepresentation or actionable omission, alleged deficiencies in a company's risk management do not establish a claim for fraud. *See, e.g., In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 375-77 (finding that allegations of deficient risk management practices in connection with the series of transactions at issue were mere allegations of mismanagement, not rising "to the level of depicting manipulative or deceptive conduct within the meaning of the securities laws"). Rather, to state a claim for fraud, the plaintiff must show that the defendants failed to disclose material information in "violation of a duty to disclose the

20

omitted facts." *Dalberth*, 766 F.3d at 183.  As discussed above (pp. 12-13), alleged deficiencies in risk management do not create such an affirmative obligation of disclosure.

Thus, plaintiff cannot defeat summary judgment on his claims relating to risk management merely by contending that Bear Stearns's risk management was "deficient" or had "shortcomings" (¶¶ 103-104).  For example, plaintiff's reliance on statements in the OIG Audit Report questioning the quality of Bear Stearns's risk management, the reliability of the models used by its risk management personnel, or the independence of its risk managers do not support a claim for fraud.  Likewise, plaintiff relies on reports given to Bear Stearns's management by Oliver Wyman, a risk management consulting firm, recommending ways in which the Company could strengthen its risk management.  But these documents, even if they demonstrated some risk management shortcomings, do not establish fraud.  Rather, plaintiff must identify specific statements by defendants, and must present evidence sufficient for a jury to find that they were materially false or misleading.

Here, plaintiff attempts to discharge his burden by pointing to statements in Bear Stearns's public filings that (i) the Company compared its model-based valuations with counterparties in conjunction with collateral exchange agreements (¶ 71); (ii) it marked financial instruments to fair value on a daily basis (¶ 73); and (iii) it regularly evaluated and enhanced its models for estimating "value at risk," or VaR (a statistical measure of risk exposure) (¶¶ 75, 99, 129, 134).  Plaintiff also alleges that the individual defendants, and other Bear Stearns board members or executives, characterized Bear Stearns's risk management practices as "very good" or "excellent," and said that two hedge funds managed by a Bear Stearns subsidiary that collapsed in 2007 did not use the same risk management practices Bear Stearns used.  (¶¶ 91, 102.)

21

The evidence does not establish that any of these statements was false or misleading.

*First*, there is no evidence in the record that Bear Stearns did not, as it disclosed, regularly compare its valuations with counterparties, including in conjunction with collateral exchange agreements. Tellingly, plaintiff did not ask any of the eleven witnesses it deposed about this subject. But, as noted above, the witnesses testified consistently that Bear Stearns's asset valuations were derived by means of a thorough and rigorous process based principally on quoted market prices or independent external valuation information. (*See* pp. 15-16 above.)

The Complaint alleges that Bear Stearns's statements about comparing its model-based valuations with counterparties were false and misleading because, according to the OIG Audit Report, in mark disputes with counterparties "'Bear Stearns tended to use [its own] traders' more generous marks for profit and loss as reported in Bear's SEC filings." (¶ 144 (quoting Carey Decl. Ex. 30, OIG Audit Rpt at 27-28).) But, as discussed above, the mere fact of disputes with counterparties over the pricing of collateral does not establish that Bear Stearns's pricing was wrong. As noted, T&M concluded, "mark disputes are an unavoidable issue faced by all dealers." (Carey Decl. Ex. 30, OIG Audit Rpt at 95.) And, as Bear Stearns's independent auditor testified, while the counterparties' position on the value of collateral would be "a piece of data to consider" in valuing the collateral on Bear Stearns's books, the counterparties' position would not represent "observable third party data" for valuation purposes for the obvious reason that the counterparty is "a self-interested party in the transaction. It's in their interest to overstate the collateral they need...." (Carey Decl. Ex. 37, Simeone Tr. at 181:17-182:13.)

*Second*, the evidence likewise shows that Bear Stearns did, as it disclosed, mark

22

its financial instruments to fair value on a daily basis. Deloitte's witness explained the daily marking process in detail, as well as the procedures that Deloitte followed to ensure that the values that the Company reported were accurate and reliable, including inputs used by the Company to estimate the fair value presented. (*Id.* at 70:3-18, 72:19-74:5, 110:24-113:5, 139:4-145:5.) Plaintiff alleges that the Company's statements were misleading because, he contends, the OIG Audit Report concluded (without reviewing any of the Company's models) that some of its models were out-of-date and unreliable (¶ 74), but, as discussed above (pp. 15-18), there is no evidence of what these models were, in what way they were unreliable, how, if at all, they were used for valuation, or whether the alleged unreliability resulted in any overvaluation of any of Bear Stearns's assets.

*Third*, contrary to plaintiff's allegation, the evidence shows that Bear Stearns regularly evaluated and enhanced its VaR models, consistent with its public disclosures. Testimony from former Bear Stearns employees, as well as the T&M response to the OIG Audit Report, confirms that the Company's models and model infrastructure, for both the VaR and valuation models, were regularly tested and updated. (*See* Def. 56.1 ¶¶ 59-68.) T&M reported that Bear Stearns "regularly improved and expanded its data sources." (Carey Decl. Ex. 30, OIG Audit Rpt at 93-95.) The OOA did not dispute this statement.

*Fourth*, the undisputed evidence shows that the Bear Stearns hedge funds did *not* employ the same risk management policies and procedures as did Bear Stearns itself. (Carey Decl. Ex. 48, Cioffi Tr. at 44:23-45:15; 137:2-138:23.)

*Finally*, the purported statements made to Sherman that Bear Stearns's risk management practices were "very good" or "excellent" are statements of opinion that are not actionable opinion as a matter of law. *See In re JP Morgan Chase Sec. Litig.*, 2007 WL 950132,

23

at *12 (S.D.N.Y. 2007) (holding that statements that defendant "set the standard for best practices in risk management," had "risk management processes that are highly disciplined," and that it would "continue to reposition and strengthen its franchises with a focus on financial discipline" fit the category of "generalizations regarding integrity, fiscal discipline and risk management [that] constitute precisely the type of puffery that this and other circuits have consistently held to be inactionable") (internal punctuation omitted), *aff'd sub nom*, *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009); *see also Boca Raton Firefighters and Police Pension Fund*, 506 F. App'x at 37 (2d Cir. 2012) (summary order) (dismissing statements touting defendant's integrity and credibility and transparent and independent decision-making as mere puffery).

**D.    Plaintiff Cannot Show any Material Misstatement or Actionable Omission Regarding Bear Stearns's Liquidity or Capital**

Although plaintiff claims that Bear Stearns made misstatements concerning its capital and liquidity during the relevant period, he does not dispute that Bear Stearns's capital and liquidity were accurately reported. Instead, he alleges that statements describing the Company's liquidity and capital as "strong" and "solid" (¶¶ 108, 110, 114, 152, 154), that its liquidity was sufficient (¶¶ 108), and that it did not need to raise capital (¶ 88), were false or misleading because, he contends its capital and liquidity were purportedly inadequate (¶¶ 89, 111, 115; Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 137, 168, 237).

As a matter of law, statements that a company's capital or liquidity is "strong" are not actionable. *See SRM Global Fund L.P.* v. *Countrywide Fin. Corp.*, 2010 WL 2473595, at *11 (S.D.N.Y. 2010), *aff'd*, 448 F. App'x 116 (2d Cir. 2011) (statements that defendant's "liquidity plan was impressive. . . [were] plainly an expression of optimism that is too indefinite

24

to be actionable under the securities laws."); *In re Citigroup Inc. Sec. Litig.*, 987 F. Supp. 2d 377, 381, 385 (S.D.N.Y. 2013) (rejecting claims based upon statements by defendant concerning its "strong capital position"); *Ross* v. *Lloyds Banking Grp., PLC*, 2012 WL 4891759, at *5-6 (S.D.N.Y. 2012) (finding statement about impending acquisition that combined entity would have "very strong liquidity" not actionable); *Gissin* v. *Endres*, 739 F. Supp. 2d 488, 511 (S.D.N.Y. 2010) (statement that company "continue[d] to maintain a strong balance sheet" was an inactionable "expression[] of puffery or corporate optimism").

In any event, plaintiff cannot establish that Bear Stearns's statements about the strength of its capital and liquidity were false at the time they were made. The OIG Audit Report acknowledges that Bear Stearns increased its liquidity levels between May 2007 and March 2008, from $7.6 billion to approximately $21 billion. (Carey Decl. Ex. 30, OIG Audit Rpt at 15 n.92.) By the end of the day on March 11, 2008, the Company's liquidity was still at $15.8 billion, "consistent with what the SEC had seen over the preceding weeks." (*See* Carey Decl. Ex. 49, letter from SEC Chairman Christopher Cox to the Chairman of the Basel Committee on Banking Supervision dated March 20, 2008 at 2). These liquidity levels were in full compliance with SEC requirements. (Carey Decl. Ex. 30, OIG Audit Rpt at 14-16.) Indeed, the OIG Audit Report noted that as early as November 2006 Bear Stearns was "implementing a more realistic approach to liquidity planning than required by the SEC." (*Id.* at 15 n.92, 16.) Likewise, at all relevant times, the Company had "a capital cushion well above what is required to meet supervisory standards ...." (*See* Carey Decl. Ex. 49, letter from SEC Chairman Christopher Cox to the Chairman of the Basel Committee on Banking Supervision dated March 20, 2008 at 2; *see also* Carey Decl. Ex. 30, OIG Audit Rpt at 11.)

Plaintiff also contends the Company's capital and liquidity became inadequate "in

25

light of market conditions." (¶ 111.)  But Finnerty undertook no analysis to determine the adequacy of the Company's capital and liquidity.  (Carey Decl. Ex. 29, Finnerty Tr. at 59:21-60:7, 60:13-62:5.)  And the mere fact that the Company ultimately could not survive a run on the bank does not demonstrate that defendants' earlier statements were untrue when they were made. *See Solow* v. *Citigroup, Inc.*, 2012 WL 1813277, at *3-5 (S.D.N.Y. 2012) (finding that, following statements that defendant was "well in excess of the well-capitalized regulatory minimums" and had "a very strong Tier 1 ratio," defendant had no obligation to disclose that its capital position was deteriorating); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 612, 624 (S.D.N.Y. 2005) (dismissing claim based on statements that defendant had adequate reserves and had a "disciplined approach to managing capital" where plaintiffs did not "allege facts indicating that the statements were false and misleading at the time they were made").

\*     \*     \*     \*     \*     \*

Because plaintiff cannot establish a false statement or actionable omission about a material fact, defendants are entitled to summary judgment on all of plaintiff's claims.

## III.    Plaintiff Cannot Prove the Alleged Fraud Caused His Losses

To prove loss causation, plaintiff must show that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005) (citation omitted); *see also In re Bear Stearns*, 763 F. Supp. 2d 423, 488 (S.D.N.Y. 2011) (plaintiff "must allege that the Company's share price fell significantly after the truth became known.") (internal citations omitted).  If "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct, loss

26

causation is established; but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the 'harm actually suffered,' a fraud claim will not lie." *Lentell*, 396 F.3d at 174 (citation omitted). Plaintiff bears the burden of proving that his loss was caused by the alleged fraud, and not "other intervening causes, such as 'changed economic circumstances, changed investor expectations, new industry specific or firm-specific facts, conditions, or other events.'" *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) (citing *Dura Pharmaceuticals*, 544 U.S. at 342). In this Circuit, plaintiffs can seek to prove loss causation by showing either that "the market reacted negatively to a corrective disclosure of the alleged fraud," or that developments at the Company were "a foreseeable materialization of the risk concealed by the fraudulent statement." *In re Omnicom*, 597 F.3d at 511.

Here, defendants are entitled to summary judgment on plaintiff's claims because Finnerty's testimony is not admissible under Fed. R. Evid. 702 for the reasons given in the accompanying motion to exclude, and plaintiff thus cannot offer admissible expert testimony of loss causation or damages. And, even if the Court holds that Finnerty's testimony is admissible, it is insufficient to establish loss causation.

## A.   Defendants Are Entitled to Summary Judgment Because Finnerty's Expert Testimony is Inadmissible

Courts have held that "the testimony of an expert—along with some kind of analytical research or event study—is required to show loss causation." *Fener* v. *Operating Eng'rs Constr. Indus. Pension Fund*, 579 F.3d 401, 409 (5th Cir. 2009); *see also Sciallo* v. *Tyco Int'l, Inc.*, 2012 WL 2861340, at *4-6 (S.D.N.Y. 2012) (granting summary judgment where plaintiff failed to present an admissible expert opinion on loss causation). Without competent

27

expert testimony, there is "simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *see also In re Pfizer Sec. Litig.*, 2014 WL 3291230, at *3 (S.D.N.Y. 2014) (finding defendants entitled to summary judgment after excluding plaintiff's expert because "[w]ithout a loss causation expert, Plaintiffs cannot prove either [loss causation or damages]."). For the same reasons, an expert is needed to establish and quantify damages. *See, e.g., In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744 (S.D.N.Y. 1985) ("Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages."), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

A plaintiff's failure to proffer admissible expert testimony on loss causation and damages entitles defendants to summary judgment. Thus, for example, in *In re Omnicom*, 597 F.3d at 512-13, the Second Circuit affirmed summary judgment where the plaintiffs' economic expert failed to reliably isolate losses caused by fraud from the impact of other market forces on defendant's stock price. *See also Gordon Partners* v. *Blumenthal*, 2007 WL 431864, at *14 (S.D.N.Y. 2007) ("Because the Gordon Plaintiffs have not provided this Court with any evidence as to what their true damages are and therefore cannot show loss causation, defendants are entitled to summary judgment"), *adopted*, 2007 WL 1438753 (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 815 (2d Cir. 2008). The law in other Circuits is to the same effect. *See, e.g., Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 96-97 (1st Cir. 2014) (affirming summary judgment in federal securities fraud class action following exclusion of plaintiffs' loss causation expert); *Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725-26 (11th Cir. 2012) (affirming post-verdict judgment as a matter of law in federal securities fraud class action where expert's event study failed to establish loss causation or

28

damages); *In re Williams Sec. Litig.*, 558 F.3d 1130, 1143 (10th Cir. 2009) (affirming summary judgment in federal securities fraud class action after affirming exclusion of expert's unreliable loss causation analysis under *Daubert*); *cf. Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999) (reinstating district court order granting summary judgment based on exclusion of unreliable expert evidence).

As discussed in the accompanying motion to exclude Finnerty's testimony, Finnerty's analysis suffers from fundamental flaws that require exclusion of his report and testimony on loss causation and damages. Plaintiff will thus be unable to prove loss causation or damages as to any portion of his claim.

**B.      In Any Event, Even With Finnerty's Testimony, Plaintiff Cannot Establish Loss Causation for March 14-17**

For the period between March 14 and March 17, 2008, Finnerty asserts that plaintiff's losses were caused by two alleged corrective disclosures, on March 14 and March 16, which purportedly revealed the alleged fraud to the market. (*See* Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 238, 245-46, 249, 258-60.) As we show below, however, these disclosures are not corrective disclosures and thus cannot establish loss causation. And plaintiffs cannot rely on a theory that his losses during that period resulted from the materialization of an undisclosed risk. Accordingly, even if Finnerty's testimony is admissible, plaintiff cannot establish loss causation for the period March 14-17, 2008.

**1.      The March 14 and March 16 Statements Are Not Corrective Disclosures**

Where loss causation is pled through one or more corrective disclosures, a plaintiff must show that each corrective disclosure "addressed the *specific fact* allegedly concealed by the misrepresentation." *In re Sec. Capital Assurance Ltd. Sec. Litig.*, 2011 WL

29

4444206, at *4 (S.D.N.Y. 2011) (emphasis added) (internal quotation marks omitted). In other words, the alleged corrective disclosure must "possess[] a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement." *Plumbers Local Union No. 392 Pension Fund* v. *Fairfax Fin. Holds. Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012); *see also In re AOL Time Warner, Inc. Secs. Litig.*, 503 F. Supp. 2d 666, 680 (S.D.N.Y. 2007) (revelation did not constitute a "corrective disclosure" because it did "not reveal to the market the falsity of the prior [misrepresentation]").

Plaintiff identifies two purported corrective disclosures: (1) Bear Stearns's disclosure on March 14, 2008 that its liquidity position had significantly deteriorated and it had entered into a new credit facility with JPMorgan (Carey Decl. Ex. 75, "Bear Stearns Agrees to Secured Loan Facility with JPMorgan Chase," March 14, 2008) and (2) the March 16, 2008 announcement of Bear Stearns's merger with JPMorgan (Carey Decl. Ex. 76, Press Release, "JPMorgan Chase to Acquire Bear Stearns," March 16, 2008). (Carey Decl. Ex. 29, Finnerty Tr. at 212:2-16; Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 245-46, 259-60.)

But neither of these disclosures was "corrective" as a matter of law, because they did not reveal a "then-undisclosed fact with regard to the specific misrepresentations alleged." *See In re Omnicom*, 597 F.3d at 511; *see also In re AOL*, 503 F. Supp. 2d at 679-80 (holding statement was not a corrective disclosure where disclosure of director's resignation amidst concerns related to a particular transaction did not purport to reveal any facts concerning the transaction itself); *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 617 (S.D.N.Y. 2008) (rejecting plaintiffs' characterization of statements as "corrective disclosures," where statements "failed to specifically attribute the losses" to the alleged omissions); *In re Avista Corp. Secs. Litig.*, 415 F. Supp. 2d 1214, 1221 (E.D. Wash. 2005) (dismissing claim of fraud based on risk

30

management representations because neither of the putative corrective disclosures "mentions [defendant's] risk management policy or procedures").

Thus, neither announcement mentions Bear Stearns's mortgage valuations or risk, and neither corrects any prior misstatements about the Company's liquidity. Rather, they were timely disclosures of changed circumstances facing Bear Stearns. Bear Stearns's disclosure on March 14 that its liquidity position had "significantly deteriorated" does not imply that its liquidity position was worse at some earlier time than it had disclosed. Likewise, the announcement of Bear Stearns's merger with JPMorgan on Sunday, March 16, 2008 could not have been disclosed at some earlier date. (*See* Carey Decl. Ex. 29, Finnerty Tr. at 164:12-166:2; *see also* Carey Decl. Ex. 39, Schwartz Tr. at 164:3-14.) Both announcements represented timely disclosure of recently changed circumstances, not a correction of a previously misrepresented or undisclosed fact.

### 2.    Plaintiff Cannot Establish that the Losses on March 14 and March 17 Were Due to a Materialization of an Undisclosed Risk

Plaintiff likewise cannot establish that his losses between March 14 and 17 were due to a materialization of an undisclosed risk. (*See* Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 255-57.)

Finnerty asserts that prior to March 14, 2008 Bear Stearns was concealing its "liquidity issues, and the known deficiencies in the Company's risk management and valuation models and procedures," in order to avoid the bank run that ultimately occurred. (*Id.* ¶ 137.) But the record does not support this conclusion. As discussed above (pp. 15-26), plaintiff cannot establish that Bear Stearns's risk management was deficient, that its assets were overvalued, or that the Company had liquidity problems prior to the bank run the same week. And, even if such deficiencies could be shown, plaintiff points to no evidence that the loss of confidence that led to

31

the bank run was due to the market learning of and reacting to the alleged fraud. As we discuss at pp. 11-15 in the motion to exclude Finnerty's testimony, Finnerty simply assumes the market was learning of and reacting to an alleged fraud during this period, but is unable to point to supporting evidence. This is not sufficient to establish loss causation. *See In re Worldcom, Inc. Sec. Litig.*, 2005 WL 2319118, at *23 (S.D.N.Y. 2005) ("[Plaintiff must] establish that his losses were attributable to some form of revelation to the market of the wrongfully concealed information[.]").

Instead, as Finnerty's own analysis shows, the bank run was a materialization of *disclosed* risks coupled with a sharp deterioration in market conditions. Investment banks by the nature of their business are inherently susceptible to a run on the bank (as evidenced by the fact that within months of Bear Stearns's near collapse, none of the major independent investment banks remained, having either failed, been acquired, or converted to bank holding companies). (*See* Carey Decl. Ex. 2, Finnerty Rpt ¶ 170; Carey Decl. Ex. 52, Ferrell Rpt ¶¶ 31.) But Bear Stearns disclosed the risk it faced of losing access to funding. (*See* Def. 56.1 ¶ 87.) And the risk factors that Finnerty claims made Bear Stearns more likely to collapse—including various financial ratios (Carey Decl. Ex. 2, Finnerty Rpt ¶ 170); its reliance on repurchase financing and customer payables (*id.* ¶¶ 31-32); and its leverage (*id.* ¶¶ 195-96)—were all disclosed in its public filings during the Relevant Period. (*See* Def. 56.1 ¶¶ 88-94.) Moreover, Finnerty acknowledges, as he must, that the financial markets were in a state of increasing turmoil leading up to Bear Stearns's near collapse. (*See, e.g.*, Carey Decl. Ex. 2, Finnerty Rpt ¶ 29 ("The mortgage crisis intensified, and, beginning in December 2007, the country entered a severe recession."); Carey Decl. Ex. 29, Finnerty Tr. 208:16-210:15.)

Because he cannot establish that Bear Stearns's near collapse was caused by

32

alleged fraud and not by other factors, there is no triable issue of fact as to loss causation on plaintiff's alleged losses between March 14 and 17.

## IV.    Plaintiff's Section 18 Claim Is Time-Barred

Section 18 of the Exchange Act provides that "[n]o action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." 15 U.S.C. § 78r(c). The one-year limitations period begins when "plaintiff is put on either actual notice or constructive notice, also known as inquiry notice, of the facts giving rise to his claim." *In re Bear Stearns Cos., Inc. Secs. Deriv. & ERISA Litig*, 995 F. Supp. 2d 291, 307 (S.D.N.Y. 2014) (RWS) ("*SRM*") (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005)). Plaintiff was on either actual or constructive notice of his claim by at least March 16, 2008, when the merger with JPMorgan was announced, yet he did not file his claim until September 24, 2009, more than one year later.

Plaintiff's claims in this action are substantially the same as the claims made by SRM Global Master Fund Limited Partnership ("SRM") in a related case brought by another investor who opted out of the Securities Class Action. *SRM Global Master Fund Ltd. P'ship* v. *The Bear Stearns Cos. LLC*, No. 13 Civ. 2692 (RWS) (S.D.N.Y.). In its opinion dismissing SRM's claims, this Court held that SRM was on notice of those claims by March 16, 2008. *In re Bear Stearns*, 995 F. Supp. 2d at 307-308. The same result applies here. As in *SRM*, plaintiff's own Complaint demonstrates that he was on either actual or constructive notice of his claim by March 16, 2008 at the latest, since he alleges that a series of "partial disclosures," the last of which was made on March 16, 2008, revealed to the market defendants' purported "fraud." (¶ 203.) *SRM*, 995 F. Supp. 2d at 308. And this Court has already rejected plaintiff's claim (¶ 247)

33

that he could not have discovered his cause of action before the publication of the OIG Audit Report on September 25, 2008. *In re Bear Stearns*, 995 F. Supp. 2d at 308.

Nor is plaintiff's Section 18 claim saved by the tolling of any limitations period by the filing of the securities class action because the complaint in that action did not assert any claims under Section 18. As this Court held in *SRM*, "*American Pipe* tolling can apply to a statute of limitations only when the earlier-filed class action 'involved exactly the same cause of action subsequently asserted.'" 995 F. Supp. 2d at 303. (quoting *Johnson* v. *Railway Express Agency, Inc.*, 421 U.S. 454, 467 (1975)). Consistent with that principle, numerous courts have held that "[t]he legal standards for proving Section 18 and Section 10(b) claims are sufficiently distinct that filing a class action alleging a violation of Section 10(b) does not toll the statute of limitations for a Section 18 claim." *Special Situations Fund III, L.P.* v. *Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 246 (D. Mass. 2011); *see also. e.g., Stichting Pensioenfonds ABP* v. *Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1133-34 (C.D. Cal. 2011).

Plaintiff's Section 18 claim is not timely and should be dismissed.

## V.    Plaintiff's Holder Claims Are Not Actionable under New York Common Law

Plaintiff alleges, for purposes of his common law fraud claims, that he was defrauded into retaining his investment in Bear Stearns in addition to making that investment. (*See, e.g.,* ¶¶ 260-61, 264.) These holder claims are barred under New York law.

This Court has also already considered and rejected the existence of holder claims under New York law in the related case brought by SRM, discussed above. In *SRM*, this Court recognized that the "most persuasive" view of holder claims under New York law is that they are not actionable. *SRM*, 995 F. Supp. 2d at 314-15. The Court relied on case law from the Appellate Division finding holder claims are not actionable under New York law. *See id.* (citing

34

*Starr Foundation* v. *Am. Int'l Grp., Inc.*, 901 N.Y.S.2d 246, 248-50 (1st Dep't 2010)).  As the Court noted, *Starr* dismissed the plaintiff's holder claims as a matter of law, describing the claims as "virtually the paradigm" of the "undeterminable and speculative losses" that New York's out-of-pocket rule precludes.  *Starr*, 901 N.Y.S.2d at 248-49 (quoting *Lama Holding Co.* v. *Smith Barney Inc.*, 668 N.E.2d 1370, 1374 (N.Y. 1996).)

Although, when this Court issued its decision in *SRM*, a minority of post-*Starr* courts interpreted *Starr* to permit holder claims where the plaintiff alleges a loss of its "entire investment," the First Department has now foreclosed this interpretation.  In *Bank Hapoalim* v. *WestLB AG*, 995 N.Y.S.2d 7, 11 (1st Dep't 2014), the defendant sponsor of a special investment vehicle was alleged to have fraudulently concealed the collapse of the vehicle.  As a consequence of the alleged fraud, the vehicle was not timely liquidated and the plaintiff investors suffered a total loss on their investment.  *Id.* (noting that plaintiffs were left with "no recovery").  The First Department affirmed dismissal of the complaint, which asserted holder claims, on the ground that plaintiffs suffered no cognizable out-of-pocket loss.  *Id.* ("This case is essentially a 'holder' fraud case— that is, the alleged fraud is that the structured investment vehicles held their assets instead of liquidating them.  As a result, plaintiffs suffered no out-of-pocket loss.")).  Thus, following *Bank Hapoalim*, New York law is clear: holder claims are not cognizable, even where (unlike here) plaintiff is left with "no recovery."  *Id.*; *see also Varga* v. *McGraw Hill Fin. Inc.*, 2015 WL 4627748, at *12 (N.Y. Sup. Ct. 2015) (holding that holder claims are not actionable under New York law) (citing *Starr*, 901 N.Y.S.2d at 249; *Bank Hapoalim*, 995 N.Y.S.2d at 11).

Plaintiff's holder claims, like SRM's, are not actionable, and summary judgment should be granted.

35

**VI.    Defendants Are Entitled to Summary Judgment on Plaintiff's Section 20 Claim**

"In order to establish a *prima facie* case of liability under Section 20(a), a plaintiff must show: (1) a primary violation [of Section 10(b)] by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Ross* v. *Lloyds Banking Grp., PLC*, 2012 WL 4891759, at *11 (S.D.N.Y. 2012) (quoting *Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).  For the reasons given above (pp. 11-33), plaintiff cannot establish a primary violation of the federal securities laws, and accordingly defendants are entitled to summary judgment on his claim under Section 20.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 n.6 (2d Cir. 2010) (granting summary judgment on Section 20 claims where plaintiff failed to establish a primary violation of Section 10(b)); *see also Beleson* v. *Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009) (same).

**VII.   Defendants Are Entitled to Summary Judgment on Plaintiff's Claims Based on Purchases on August 15, 2007, March 11, 2008, and March 13, 2008**

Finally, defendants are entitled to summary judgment on plaintiff's claims based on stock purchases made on August 15, 2007 and March 11 and 13, 2008.  That is because (i) the purchases on August 15 were made by a trust of which Sherman is the trustee, not by Sherman for his own benefit; and (ii) the purchases on March 11 and 13, 2008 were made in an escrow account, and plaintiff's losses on that account are not traceable to any investment losses on the purchases of Bear Stearns stock.

**A.    Sherman Cannot Bring Claims Related to the 7,000 Shares Purchased on August 15, 2007 Because He Did Not Own Those Shares**

Bear Stearns is entitled to summary judgment on claims related to the 7,000 shares of the Company purchased on August 15, 2007.  Those shares were purchased by the

36

Bruce & Cynthia Sherman Charitable Foundation, Inc. (the "Foundation"). Plaintiff lacks Article III standing to seek any damages on those shares.

Trading records confirm that the Foundation purchased 7,000 shares of Bear Stearns on August 15, 2007. (Carey Decl. Ex. 3.) When plaintiff was asked at his deposition about the purchase of these shares, he admitted that the "beneficiary" of the shares was the Foundation, *not* himself. (Carey Decl. Ex. 4, Sherman Tr. at 91:3-11.) Nevertheless, plaintiff's expert has put forward a damages calculation that seeks $922,371 in damages related to these shares. (Carey Decl. Ex. 2, Finnerty Rpt, Att. 37, Panel C.) Sherman does not assert that the shares or any associated claims were ever transferred to him.

Article III standing is a "bedrock requirement" that mandates that "the plaintiff [be] the proper party to bring this suit." *Raines* v. *Byrd*, 521 U.S. 811, 818 (1997) (citations omitted). In *W.R. Huff Asset Mgmt. Co., LLC* v. *Deloitte & Touche, LLP*, 549 F.3d 100 (2d Cir.2008), the Second Circuit held that investment managers such as Sherman lack Article III standing to bring federal securities law claims related to the purchases of shares in accounts they do not own, because they lack "legal title to, or a proprietary interest in" those accounts, and therefore do not satisfy Article III's "injury-in-fact" requirement. *Id.* at 108-111.

Even were the Foundation a proper plaintiff in this case, its claims for damages would be required to be dismissed as the Foundation did not opt out of the settlement in the Securities Class Action. (*See* 08 Civ. 2793, Dkt. No. 249, Ex. A.) Having failed to validly exclude itself from the settlement in the Securities Class Action, the Foundation has "waived, released, discharged, and dismissed" any claims it had related to the purchase of Bear Stearns common stock between December 14, 2006 and March 14, 2008 and is "BARRED, ENJOINED AND RESTRAINED from commencing, instituting, prosecuting or maintaining" any such

Doc#: US1-10180686v1

claims against Defendants. (*See id.*, ¶ 1, 10, incorporating by reference 08 M.D.L. 1963, Dkt. No.279, Ex. 1, ¶ 1(z).)

Because the 7,000 shares purchased on August 15, 2007 were owned by the Foundation and not by him, Sherman lacks standing to seek any damages regarding those shares.

**B.    Defendants Are Entitled To Summary Judgment on Purchases Made on March 11, 2008 and March 13, 2008 Because Plaintiff Cannot Show That Those Purchases Caused Injury to Him**

Defendants are entitled to summary judgment on claims related to the purchases of approximately 70,000 Bear Stearns shares on March 11, 2008 and March 13, 2008 because Plaintiff cannot prove that any losses on those purchases, for which he seeks $5.7 million in damages (Carey Decl. Ex. 2, Finnerty Rpt, Att. 37, Panel C), proximately caused injury *to him.* The March 11 and March 13 purchases (and their corresponding sales on March 19) were made with funds in an escrow account established when Sherman sold his investment management business to Legg Mason, Inc. ("Legg Mason").                                          these facts, plaintiff cannot meet his burden of establishing that any trading losses in the escrow account on its purchases of Bear Stearns stock were the proximate cause of any losses to him, or that absent any fraud on the part of Bear Stearns he would have received more money than he eventually did.

The escrow account was established as part of the 2001 sale of Sherman's investment management business (Private Capital Management, or "PCM") to Legg Mason. (Carey Decl. Ex. 4, Sherman Tr. at 43:12-44:7.)  Plaintiff and his partners were paid $682 million in cash up front, with the possibility of receiving additional payments in the future if

38

PCM's earnings met certain targets.  (Carey Decl. Ex. 7, 5/30/01 Legg Mason 8-K at 17.)
Pursuant to the agreement, in 2006, Legg Mason placed $300 million into escrow, with the funds
to be released over the next three years only if PCM continued to meet its earnings targets or
clawed back by Legg Mason if it did not.  (*See* Carey Decl. Ex. 8, Legg Mason Purchase
Agreement § 2.15(a), (b), and (c).)

   Sherman, ███████████████████████████████████████

███████████████████████ purchased 70,000 shares of Bear Stearns stock in the account on
March 11 and 13, 2008, amidst a storm of negative market rumors about the Company, and sold
those shares at a loss on March 19.  (Carey Decl. Ex. 5, SH00002 at SH00003.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Subsequently, in the fall of 2008, plaintiff and his partners returned $68.4 million of the
escrowed funds to Legg Mason.  (Carey Decl. Ex. 10, Legg Mason 4Q08 10-Q at 16.)  ███████

████████████████████████████████████████████████████

████████████████████████

   Under the PSLRA, a plaintiff bears the burden of proving that a defendant's acts
or omissions "caused" a loss. 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this
chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant
alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.").
The Second Circuit has held that a plaintiff can only show "loss causation" if he can show that he
"would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell*,

39

396 F.3d at 173-75. A plaintiff cannot prevail on securities fraud claims where an "intervening" or "superseding cause"—other than the defendants' conduct—led to plaintiff's loss. *See Bloor* v. *Carro, Spanbock, Londin, Rodman & Rass*, 754 F.2d 57, 62 (2d Cir. 1985) (rejecting Section 10(b) claims brought against a law firm that had allegedly helped prepare fraudulent SEC filings for a company that subsequently diverted the funds into "unwise investments" or "personal use" of the company's directors, on the ground that "any damages sustained by [plaintiff], occurred later, after the securities transactions were completed").

Here, plaintiff cannot prove that any losses on the March 11 and March 13 trades proximately caused an "ascertainable" injury *to him*, or that, absent fraud by Bear Stearns, he would ultimately have received more money from the escrow account. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Because plaintiff cannot establish loss causation on these purchases, defendants are entitled to summary judgment.

### CONCLUSION

For the foregoing reasons, the Court should grant defendants' motion for summary judgment against all of plaintiff's claims.

40

Dated: August 17, 2015
      New York, New York

                Respectfully Submitted,

                PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

                By: _____

                    Brad S. Karp (bkarp@paulweiss.com)
                    John F. Baughman (jbaughman@paulweiss.com)
                    Jessica S. Carey (jcarey@paulweiss.com)
                    Jonathan H. Hurwitz (jhurwitz@paulweiss.com)

                1285 Avenue of the Americas
                New York, New York  10019-6064
                (212) 373-3000
                *Attorneys for Defendant The Bear Stearns Companies Inc.*

                David S. Frankel (dfrankel@kramerlevin.com)
                KRAMER LEVIN NAFTALIS & FRANKEL LLP
                1177 Avenue of the Americas
                New York, New York  10036
                (212 715-9100)
                *Attorneys for Defendant James E. Cayne*

                David B. Anders (DBAnders@wlrk.com)
                WACHTELL, LIPTON, ROSEN & KATZ
                51 West 52nd Street
                New York, New York  10019
                (212) 403-1000
                *Attorneys for Defendant Warren J. Spector*

Doc#: US1:10180686v1