UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE BEAR STEARNS COMPANIES, INC. SECURITIES, DERIVATIVE, AND ERISA LITIGATION<br><br>This Document Relates To:<br>Securities Action, No. 08 Civ. 2793 (RWS) | Master File No.:<br>08 MDL 1963 (RWS)<br><br>ECF Case |
| BRUCE S. SHERMAN,<br><br>Plaintiff,<br><br>v.<br><br>BEAR STEARNS COMPANIES INC., JAMES CAYNE, WARREN SPECTOR AND DELOITTE & TOUCHE LLP,<br><br>Defendants. | Index No.:<br>09 Civ. 8161 (RWS)<br><br>**FILED UNDER SEAL** |

## DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, defendants The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), James Cayne, and Warren Spector submit this statement of the material facts as to which they contend there is no genuine issue to be tried. Defendants expressly preserve all of their objections to the admissibility of the evidence cited herein and in the accompanying memoranda of law and do not waive any objections by making this submission.

**Background – Defendants**

1.  Prior to its acquisition by JPMorgan Chase & Co. ("JPMorgan") on June 2, 2008 (Compl. ¶ 18), Bear Stearns was a leading publicly traded investment banking, securities and derivatives trading, clearance and brokerage firm. (Carey Decl. Ex. 1, 2006 10-K at 32, 122.)[1]  Its principal business lines included capital markets, which was "comprised of the institutional equities, fixed income and investment banking areas," global clearing services, and wealth management, which was "comprised of the Private Client Services… and asset management areas." (*Id.* at 4.)

2.  The individual defendants were directors and/or officers of Bear Stearns before the JPMorgan merger.  They are James E. Cayne, Bear Stearns's former CEO and Chairman of the Board (Compl. ¶ 19) and Warren J. Spector, former co-President and co-COO until August 2007 and former Senior Managing Director until December 2007 (Compl. ¶ 20).

**Plaintiff Bruce Sherman and his Stock Purchases**

3.  Plaintiff Bruce Sherman was at all relevant times CEO and CIO of Private Capital Management L.P. ("PCM").  (Compl. ¶ 2.)

4.  Plaintiff claims to have made the following purchases during the relevant period, as defined by plaintiff's expert, from December 14, 2006 through March 14, 2008 ("Relevant Period") (Carey Decl. Ex. 2, Finnerty Rpt ¶ 10):

> a.  15,000 shares of Bear Stearns common stock on June 25, 2007 at a price of $140.76 per share.  (Carey Decl. Ex. 2, Finnerty Rpt, Att. 37, Panel A.)

> b.  45,000 shares of Bear Stearns common stock on August 3, 2007 at a price of $110.14 per share.  (*Id.*)

        c.      10,000 shares of Bear Stearns common stock on August 10, 2007 at a price of $108.60 per share. (*Id.*)

        d.      5,000 shares of Bear Stearns common stock on August 14, 2007 at a price of $106.12 per share.  (*Id.*)

        e.      7,000 shares of Bear Stearns common stock on August 15, 2007 at a price of $103.15 per share.  (*Id.*)

        f.      10,000 shares of Bear Stearns common stock on October 8, 2007 at a price of $126.74 per share.  (*Id.*)

        g.      10,000 shares of Bear Stearns common stock on December 18, 2007 at a price of $91.54 per share.  (*Id.*)

        h.      12,000 shares of Bear Stearns common stock on January 9, 2008 at a price of $72.13 per share.  (*Id.*)

        i.      13,000 shares of Bear Stearns common stock on January 10, 2008 at a price of $75.95 per share.  (*Id.*)

        j.      50,000 shares of Bear Stearns common stock on March 11, 2008 at a price of $61.37 per share.  (*Id.*)

        k.      20,000 shares of Bear Stearns common stock on March 13, 2008 at a price of $53.77 per share.  (*Id.*)

    5.      Plaintiff claims to have sold 229,150 shares of Bear Stearns common stock on March 19, 2008 at a price of $5.23 per share.  (*Id.*)

    6.      Among the shares at issue in this case are 7,000 shares of Bear Stearns common stock purchased on August 15, 2007 (*Id.*, Panel C) in an account owned by the Bruce

---

[1] Citations in the form of "Carey Decl. Ex. __" refer to exhibits to the accompanying Declaration of Jessica S. Carey in Support of Defendants' Motion for Summary Judgment and Motion to Exclude the Report and

and Cynthia Sherman Charitable Foundation Inc. (the "Foundation"), not by plaintiff. (*See* Carey Decl. Ex. 3.) Plaintiff is seeking $922,371 in damages related to these shares. (Carey Decl. Ex. 2, Finnerty Rpt, Att. 37, Panel C.)

7.  ███████████████████████████████████████

███████████████████████████████████

8.  The Foundation is not a plaintiff in this case. (*See generally* Compl.)

9.  The Foundation did not opt out of the settlement of the related securities class action, *In re The Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.*, 08 Civ. 2793 (S.D.N.Y.) (RWS) (the "Securities Class Action"). (08 Civ. 2793, Dkt. No. 249, Ex. A.)

10. Plaintiff is also seeking $5,734,636 in damages for 50,000 shares of Bear Stearns common stock purchased on March 11, 2008 and 20,000 shares of common stock purchased on March 13, 2008. (*See* Carey Decl. Ex. 2, Finnerty Rpt, Att. 37, Panel C.)

11. These shares were purchased with funds held in an escrow account in connection with the sale of PCM to Legg Mason, Inc. (the "Escrow Account"). (*See* Carey Decl. Ex. 5 at SH00002; Carey Decl. Ex. 4, Sherman Tr. at 85:19-86:15.)

12. In 2001, Plaintiff and his partners sold PCM to Legg Mason, Inc. ("Legg Mason") (Carey Decl. Ex. 4, Sherman Tr. at 43:12-44:7), a publicly-traded financial services firm based in Baltimore, MD (Carey Decl. Ex. 6, Legg Mason 2010 10-K at 1).

13. This purchase was structured as an upfront payment of $682 million in cash, with two contingent payments based on PCM's performance in the subsequent years, which would be made after three years, in 2004 (the "Year 3 Earnout"), and after five years, in 2006 (the "Year 5 Earnout"), if PCM reached certain earnings targets. (*See* Carey Decl. Ex. 7, 5/30/01 Legg Mason 8-K at 17 (Ex. 99.2, "Transaction Overview").) The Year 3 Earnout was

capped at $400 million, and the aggregate transaction value was capped at $1.382 billion (meaning that since the purchase price was $682 million, the combined Year 3 and Year 5 Earnouts could not exceed $700 million). (*Id.*)

14.     The first $300 million of the Year 5 Earnout was to be placed in escrow, and would only be released out of escrow in installments in subsequent years if PCM continued to meet additional earnings targets in 2007, 2008, and 2009. (Carey Decl. Ex. 8, Legg Mason Purchase Agreement § 2.15(a), (b), and (c).) Otherwise, the escrowed funds remained subject to claw back by Legg Mason. (*Id.*)

15.     In 2004, Legg Mason paid the full amount of the Year 3 Earnout, $400 million, directly to plaintiff and his partners. (Carey Decl. Ex. 9, Legg Mason 2007 10-K at 49.)

16.     In 2006, Legg Mason paid the maximum possible Year 5 Earnout, $300 million, into one or more escrow accounts for plaintiff and his partners, with the moneys remaining subject to claw back based on PCM's continued performance. (*Id.*)

17.     ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

18.     On March 11, 2008, $3,068,550.00 from the escrow account was invested in 50,000 shares of Bear Stearns common stock. (Carey Decl. Ex. 5 at SH00002.) On March 13, 2008, $1,075,380.60 from the escrow account was invested in 20,000 shares of Bear Stearns common stock. (*Id.*)

19.     On March 19, 2008, plaintiff sold those 70,000 shares of Bear Stearns common stock. (*Id.* at SH00003.) The proceeds of the sale were returned to the Escrow Account. (*Id.*)

20. ████████████████████████████████

████████████████████████████████████

21.     In the fall of 2008, plaintiff and his partners made an "early return" to Legg Mason of $68.4 million from the escrowed funds. (Carey Decl. Ex. 10, Legg Mason 4Q08 10-Q at 16.)

22. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

23.     Legg Mason is not a plaintiff in this case (*see* Compl.) and did not opt out of the Securities Class Action. (*In re The Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation*, 08 M.D.L. 1963, Dkt. No. 338, Ex. A.)

**Bear Stearns's Disclosures Related to Its Involvement in the Mortgage Market**

24.     Bear Stearns was extensively involved in originating, distributing, and trading mortgage-backed securities ("MBS") and other mortgage derivatives (*see* Compl. ¶¶ 50-51; *see also* Carey Decl. Ex. 11, 2007 10-K at 3).

25.     Through its subsidiaries, Bear Stearns originated residential mortgage loans, packaged them into residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"), and sold them to investors. (*See* Compl. ¶¶ 50-51; *see also* Carey Decl. Ex. 11, 2007 10-K at 7.)

26.     The scope of Bear Stearns's involvement in the mortgage market and its reliance on revenues from mortgage securitizations and trading was disclosed to investors.

a.     Bear Stearns characterized itself as a "market leader in mortgage-backed securitization and other structured financing arrangements." (Carey Decl. Ex. 12, 3Q06 10-Q at 16.)

        b.    Bear Stearns disclosed that it was "a leading underwriter of and market-maker in, residential and commercial mortgages" and specifically disclosed that its mortgage loan portfolios were "of varying quality." (Carey Decl. Ex. 1, 2006 10-K at 8.)

        27.    Bear Stearns disclosed that its fixed income division, which housed its mortgage-related activities, accounted for a large portion of its revenues. (Carey Decl. Ex. 1, 2006 10-K at 4, 40). Analysts reported that mortgage-related activities made up the largest part of this revenue. (*See, e.g.*, Carey Decl. Ex. 16, Richard X. Bove, Punk Ziegel & Co., *Bear Stearns Upgrade Report*, at 1 (Nov. 21, 2006); *see also* Carey Decl. Ex. 17, Joe Dickerson and Camilla Petersen, Atlantic Equities, *Bear Stearns:  Expect Q2 07 Below Street on Fixed Income*, at 1 (May 30, 2007) ("Expect fixed income trading (~40% of total) down 10% QoQ and YoY[], as Bear likely experienced prolonged weakness in its mortgage business (which we estimate to be 30-40% of fixed income revenues) over the quarter.")

        a.    Bear Stearns reported that approximately 41% of its net revenues for the third quarter of 2006 were attributable to fixed income. (Carey Decl. Ex. 12, 3Q06 10-Q at 28.)

        b.    In its 2006 10-K, the Company disclosed that fixed income net revenues for fiscal year 2006 were $4.19 billion, approximately 45% of its total net revenues. (Carey Decl. Ex. 1, 2006 10-K at 33.)

        c.    On April 10, 2007, the Company disclosed that fixed income net revenues for the first quarter of 2007 were $1.15 billion, approximately 46% of its total net revenues. (Carey Decl. Ex. 13, 1Q07 10-Q at 30.)

      d.     On July 10, 2007, the Company disclosed that fixed income net revenues for the second quarter of 2007 were $962.3 million, approximately 38% of its total net revenues.  (Carey Decl. Ex. 14, 2Q07 10-Q at 31.)

      e.     On October 10, 2007, the Company disclosed that fixed income net revenues for the third quarter of 2007 were a loss of $179.1 million, down from a net positive of $789.3 million from the prior year quarter.  (Carey Decl. Ex. 15, 3Q07 10-Q at 38.)

      f.     On January 29, 2008, the Company disclosed that fixed income net revenues for FY 2007 were a loss of $685 million, down from a net positive of $4.19 billion from the prior year quarter.  (Carey Decl. Ex. 11, 2007 10-K at 41.)

      28.     The scope of Bear Stearns's involvement in the mortgage market and reliance on its mortgage business was also recognized by the market.

      a.     Analysts stated as early as the spring of 2006 that "Lehman and Bear Stearns are more vulnerable than rivals such as Goldman because their mortgage-bond revenue is 'several times' the industry average of 2 percent of revenue," and that "Bear Stearns and Lehman rode the U.S. housing boom from 2000 to 2005 as the top two underwriters of new mortgage securities."  (Carey Decl. Ex. 18, Bradley Keoun & Al Yoon, *Bear Stearns, Lehman Mortgage Growth Crimped by Housing Market*, Bloomberg, Mar. 20, 2006 (quoting Fox-Pitt Kelton analyst David Trone).)

      b.     Analysts also reported in the fall of 2006 that Bear Stearns had "the largest exposure to the MBS market among the brokers."  (Carey Decl. Ex. 19, Brad Hintz, BernsteinResearch, *BSC Q3 2006 EPS – Saved by Hedge Fund Performance Fees*, at 3 (Sept. 15, 2006); *see also* Carey Decl. Ex. 20, Richard X. Bove, Punk Ziegel & Co.,

*Bear Stearns Update Report*, at 1 (Sept. 15, 2006) ("Bear Stearns is the largest issuer of mortgage backed bonds in the country.").)

      c.    Analysts noted that Bear Stearns had "close ties with the mortgage industry." (Carey Decl. Ex. 21, Meredith Whitney, CIBC World Markets, *Earnings Update*, at 1 (Sept. 14, 2006).)

      d.    Analysts observed that Bear Stearns's "higher exposure to domestic MBS" was an "area of strength" for the Company. (Carey Decl. Ex. 22, James Mitchell, Buckingham Research Group, *Research Note for December 6, 2006*, at 1 (Dec. 6, 2006).)

      e.    Bear Stearns, it was noted, "ha[d] publicly stated its intention to keep building all facets of the mortgage business." (Carey Decl. Ex. 23, Richard X. Bove, Punk Ziegel & Co., *Bear Stearns Update Report*, at 1 (Oct. 11, 2006).)

      f.    Analysts observed that Bear Stearns "claim[ed] to be the largest originator of mortgage securities in the world." (Carey Decl. Ex. 16, Richard X. Bove, Punk Ziegel & Co., *Bear Stearns Upgrade Report*, at 1 (Nov. 21, 2006).)

      g.    In its rankings of debt underwriters for the third quarter of 2006, Thomson Financial ranked Bear Stearns #1 for U.S. RMBS, #2 for U.S. MBS, and #3 for global MBS. (Carey Decl. Ex. 24, Thomson Financial, *Debt Capital Markets Review: Third Quarter 2006*, at 4, 7, 8.)

      h.    In early 2007, analysts continued to report that Bear Stearns had more exposure to the U.S. mortgage market than its peers. (*See, e.g.*, Carey Decl. Ex. 25, Lauren Smith, Keefe, Bruyette & Woods, *Equity Research: Bear Stearns Companies Inc*, at 2 (Mar. 16, 2007) ("With more exposure to the U.S. mortgage market than its peers,

we believe that a negative sentiment will continue to hang over shares of BSC."); *see also* Carey Decl. Ex. 26, Mike Mayo and Matthew Fischer, Deutsche Bank, *Bear Stearns Companies Inc.: Lowering Estimates and Price Target*, at 1 (Dec. 20, 2007) (observing that Bear Stearns had "higher exposure to the softening mortgage market and less diversification… than peers," and that "a deterioration in the mortgage market could specifically affect Bear more than peers as [they] estimate ~15% of revenue is mortgage related vs. less than 10% at Lehman and less than 5% at the others"); Carey Decl. Ex. 27, Mike Mayo and Matthew Fischer, Deutsche Bank, *Bear Stearns Companies Inc.: Lowering Estimates and Target*, at 1, (Feb. 28, 2008) (commenting on "Bear's higher exposure to the softening mortgage market and less diversification… than peers.").)

29.     All three of the Company's 2007 10-Qs and its 2007 10-K emphasized that "the Company may retain interests in securitized assets." (Carey Decl. Ex. 13, 1Q07 10-Q at 18; Carey Decl. Ex. 14, 2Q07 10-Q at 18; Carey Decl. Ex. 15, 3Q07 at 18; Carey Decl. Ex. 11, 2007 10-K at 100.)

30.     Bear Stearns disclosed the risk that a downturn in the fixed income market, which included mortgage-related activities, could result in losses.  In its 2005, 2006, and 2007 10-Ks, the Company stated:

> We generally maintain large trading and investment positions in the fixed income . . . market[].  To the extent that we own assets, i.e., have long positions, in [the fixed income market], *a downturn in [that market] could result in losses from a decline in the value of those long positions.*

(Carey Decl. Ex. 11, 2007 10-K at 16; Carey Decl. Ex. 1, 2006 10-K at 20; Carey Decl. Ex. 28, 2005 10-K at 18 (emphasis added).)

31.     Bear Stearns's disclosures concerning its exposure to subprime mortgages were consistent with industry and regulatory standards.  There was no uniform industry practice

10

requiring disclosure of subprime holdings. (*See* Carey Decl. Ex. 29, Finnerty Tr. at 145:16-146:5.) Bear Stearns began making additional disclosures concerning its exposure to subprime shortly after receiving a comment letter from the SEC. (*See* Carey Decl. Ex. 30, OIG Audit Rpt at 111.) Bear Stearns's peer institutions received similar letters. (*See* Carey Decl. Ex. 31, 8/1/07 Letter from the Rufus Decker, Division of Corporation Finance ("CF"), SEC, to Christopher M. O'Meara, Chief Financial Officer, Lehman Brothers 2-4 (Aug. 1, 2007); Carey Decl. Ex. 32, Letter from John Hartz, CF, SEC, to David H. Sidwell, Chief Financial Officer, Morgan Stanley 2-4 (Aug. 1, 2007); Carey Decl. Ex. 33, Letter from Terence O'Brien, CF, SEC, to David A. Viniar, Chief Financial Officer, Goldman Sachs 1-4 (Sept. 20, 2007); Carey Decl. Ex. 34, Letter from Rufus Decker, CF, SEC, to Jeffrey N. Edwards, Chief Financial Officer, Merrill Lynch 3-5 (Sept. 25, 2007).)

32.     In November 2007, Bear Stearns explicitly disclosed the extent of its exposure to subprime mortgages, including whole loans, investment grade and non-investment grade subprime securities, and asset-backed security credit default swaps. Bear Stearns disclosed that as of November 9, 2007, it was net short subprime by $52 million. (Carey Decl. Ex. 35, 11/15/07 8-K.)

33.     In December 2007, Bear Stearns disclosed as of November 30, 2007, it was net short subprime by $582 million. (Carey Decl. Ex. 36, 12/21/07 8-K.)

34.     Bear Stearns's 2007 Form 10-K included a schedule of the Company's subprime exposure. (Carey Decl. Ex. 11, 2007 10-K at 42.)

**Bear Stearns's Mortgage-Related Asset Valuation Practices**

35.     Bear Stearns's reported valuations were based on the "most observable data point available." (Carey Decl. Ex. 37, Simeone Tr. at 95:24-96:23.)  Bear Stearns would

"rely on what [it] saw in the marketplace first" to value an asset.  (Carey Decl. Ex. 38, Marano Tr. at 264:8-265:5.)

36.     For the vast majority of Bear Stearns's mortgage assets, its valuations were based on quoted market prices, independent external valuation information, or readily observable data from objective sources.  (Carey Decl. Ex. 1, 2006 10-K at 60; Carey Decl. Ex. 37, Simeone Tr. at 56:5-10 ("There are not a lot of models in valuing mortgage securities.  Most of it was finding transaction prices or mortgage quotes."); Carey Decl. Ex. 39, Schwartz Tr. at 32:8-18, 36:18-37:5 ("[T]hey looked at the descriptions of the securities that were made available to them and looked at comparable – what they thought were the most comparable types of securities and what the trading levels were of those.  And I think that's the main way they assigned values."); Carey Decl. Ex. 62, Spector Tr. at 34:15-22.)

37.     When models were used to value these assets, those models generally were "primarily industry-standard models" that "employ[ed] data that [was] readily observable from objective sources" (Carey Decl. Ex. 1, 2006 10-K at 60; *see also* Carey Decl. Ex. 11, 2007 10-K at 63; Carey Decl. Ex 37 Simeone Tr. at 64:7-17), and the models were "ultimately validated by where the instruments traded in the market" (Carey Decl. Ex. 40, Molinaro Tr. at 60:21-61:16; *see also* Carey Decl. Ex. 38, Marano Tr. at 264:8-265:16).

38.     During the Relevant Period, between 8% and 10% of the Company's assets reported on a fair value basis were considered Level III assets, which were "complex financial instruments and other investments [that had] significant data inputs that cannot be validated by reference to readily observable data" (Carey Decl. Ex. 13, 1Q07 10-Q at 14 (reporting $18,962,839,000 of the Company's assets were Level 3, compared to $30,808,994,000 that were Level 1 and $159,780,372,000 that were Level 2); Carey Decl. Ex. 14, 2Q07 10-Q at

12

15 (reporting $18,014,572,000 of the Company's assets were Level 3, compared to $38,716,993,000 that were Level 1 and $163,228,187,000 that were Level 2); Carey Decl. Ex. 15, 3Q07 10-Q at 15 (reporting $20,254,094,000 of the Company's assets were Level 3, compared to $29,796,163,000 that were Level 1 and $188,010,668,000 that were Level 2); Carey Decl. Ex. 11, 2007 10-K at 97 (reporting $28,169,000,000 of the Company's total assets were Level 3, compared to $29,467,000,000 that were Level 1 and $227,146,000,000 that were Level 2)). These assets were valued using internally developed models or methodologies. (Carey Decl. Ex. 1, 2006 10-K at 60.) However, these models were "fairly standard" and used "standard techniques" to value Level 3 assets. (Carey Decl. Ex. 37, Simeone Tr. at 65:4-65:20.) The SEC's Division of Trading and Markets ("T&M") reported that "[i]n some instances where data sources were limited, the instruments were immaterial. For example, mortgage derivatives, which were distinct from CDS and ABS CDO positions, were an immaterial exposure with only de minimis impact on Bear's profit and loss." (Carey Decl. Ex. 30, OIG Audit Rpt at 94.) Although the Securities and Exchange Commission's ("SEC") Office of Inspector General's Office of Audits ("OOA") which prepared the OIG Audit Report, responded to T&M's report, its response did not rebut this finding. (*Id.*, Appx. VIII.)

39. The Company's internal control policies to verify the accuracy of its pricing for financial reporting included analysis by risk management and the business unit controller, "typically on a monthly basis but often on an intra-month basis as well." (Carey Decl. Ex. 1, 2006 10-K at 61; *see also* Carey Decl. Ex. 40, Molinaro Tr. at 69:9-23; Carey Decl. Ex. 37, Simeone Tr. at 110:24-111:16, 139:4-142:17.) The results of the monthly validation process were reported to the Mark-to-Market Committee, which was composed of senior management from the risk management and controllers departments. (Carey Decl. Ex. 1, 2006 10-K at 61.)

Doc#: US1:10180758v1

40.     Bear Stearns's internal controls with respect to its valuations for financial reporting purposes were reviewed by the Company's independent, outside auditor, Deloitte & Touche LLP ("Deloitte") which found that valuations were "generally following [Bear Stearns's] control process." (Carey Decl. Ex. 37, Simeone Tr. at 142:18-145:5.)

41.     As part of its audit, Deloitte also tested the Company's valuation methodologies, "utilizing team members with specialized skills to assess the reasonableness of the methodologies, including assumptions and inputs the Company utilized to estimate the fair value presented." (Carey Decl. Ex. 41, Schubert Rpt at 10; *see also* Carey Decl. Ex. 37, Simeone Tr. at 70:3-18, 72:19-74:5, 110:24-113:5, 143:23-145:5, 173:9-174:6.)  The audit included an independent verification of the data used in pricing and use of Deloitte's "own industry kind of standard models to run data through to see if [Deloitte was] getting similar results using independent inputs." (Carey Decl. Ex. 37, Simeone Tr. at 110:24-113:5.)

42.     Deloitte did not raise any concerns with the assumptions underlying the Company's valuations.  (*Id.* at 173:18-174:6, 175:15-20 ("The company had adequate controls to validate their significant assumptions.").)

43.     The OOA did not review Bear Stearns's valuations for its mortgage-related assets and reached no conclusion that any of Bear Stearns's assets were overvalued. (*See generally* Carey Decl. Ex. 30, OIG Audit Rpt at 70-71.)

44.     Plaintiff's expert did not conduct an independent analysis of the valuation of Bear Stearns's mortgage-related assets. (Carey Decl. Ex. 29, Finnerty Tr. at 59:14-20, 67:19-68:7.)

45.     Plaintiff cannot identify any particular assets that were actually overvalued in Bear Stearns's financial reporting and cannot identify the amount of any purported

14

overvaluation. (*Id.* at 67:14-68:18, 69:18-79:16 (admitting that he cannot tell based on the documents he cites which assets were overvalued or if they actually were overvalued).)

46.     Plaintiff's expert stated that he could not conduct the necessary analysis because he did not have access to the work papers from Deloitte (*Id.* at 37:23-38:12 ("I asked for the workpapers and I never – I was never able to get those."), 77:13-21 ("Unless I got the Deloitte & Touche workpapers . . . I couldn't provide a full analysis")), which were produced to plaintiff nearly four years ago (*see* Carey Decl. Ex. 77, 8/15/11 Deloitte Production Letter; Carey Decl. Ex. 42, 8/23/11 Deloitte Production Letter), and he did not have access to the any valuations made by JPMorgan in connection with the acquisition of Bear Stearns (Carey Decl. Ex. 29, Finnerty Tr. at 37:23-38:12 ("I specifically asked for the JPMorgan valuations at the time JPMorgan completed the acquisition of Bear Stearns.")).  As plaintiff's expert himself stated, he "didn't have the information… to get to the nuts and bolts of the portfolio." (*Id.* at 148:13-149:4, *id.* 62:6-68:18 ("I don't know whether [the overvaluations] were systematic and I don't know the full extent of them because I don't have the evidence.").)

47.     A mark dispute can arise in the context of repurchase ("repo") financing when a borrower and a lender disagree about the value of the collateral underlying the collateral exchange agreement.  (Carey Decl. Ex. 30, OIG Audit Rpt at 27-28.)

48.     Mark disputes were widespread during the relevant time period as the markets became more volatile (Carey Decl. Ex. 44, Stulz Rpt ¶ 122) and are an issue faced by all dealers.  (Carey Decl. Ex. 30, OIG Audit Rpt at 95.)

49.     While the counterparty's position on the value of the collateral involved in a mark dispute was one piece of information that Bear Stearns and its auditor would have considered in the valuation process, it was not considered third-party observable data to be used

in valuing the collateral because a counterparty to a repo agreement has a self-interest in undervaluing the collateral and overstating the amount of collateral that they need for a given agreement. (*See* Carey Decl. Ex. 37, Simeone Tr. at 181:17-182:13.)

50.     The traders at Bear Stearns marked their books to fair value on a daily basis, but the month-end and quarter-end valuation process for financial reporting involved additional review and analysis beyond the day to day marking of the books by traders. (*See id.* at 141:6-142:17.)

51.     A mark dispute of $100 million dollars in July of 2007 would have represented only 0.025 percent of the total assets of $397.1 billion reported by Bear Stearns as of August 31, 2007. (Carey Decl. Ex. 15, 3Q07 10-Q at 44.)

52.     Mark disputes of $1.1 billion on March 12, 2008 would have represented only 0.275 percent of the Company's total assets of $399 billion as reported by Bear Stearns as of February 29, 2008. (Carey Decl. Ex. 43, 1Q08 10-Q at 61.)

**Bear Stearns's Risk Management Practices**

**The OIG Audit Report**

53.     The OIG Audit Report was a review of T&M's oversight of the Consolidated Supervised Entity ("CSE") program, of which Bear Stearns was a member. (Carey Decl. Ex. 30, OIG Audit Rpt at 9.)

54.     The OIG Audit Report did not determine the cause Bear Stearns's collapse (*Id.* at 71), and explicitly stated that it had "no specific evidence indicating whether any of these issues directly contributed to Bear Stearns' collapse since [its] audit scope did not include a determination of the cause of Bear Stearns's collapse" (*Id.* at ix n.12).

55.     The OIG Audit Report did not conclude that Bear Stearns engaged in any fraud. (*See generally id.*)

Doc#: US1 10180758v1

56.     The OOA did not "perform an independent assessment of [Bear Stearns's risk management systems (*e.g.,* internal controls, models, etc.) or their financial condition (e.g. compliance with capital and liquidity requirements)." (*Id.* at 71; *see also id.* at 101 (The OOA "did not directly review the models, related documents, and the firm's books and records.").)

57.     The OOA did not interview Bear Stearns's management regarding the report. (*Id.* at 83.)

58.     T&M, the division that actually oversaw Bear Stearns (*id.* at 1), issued a response to the OIG Audit Report, describing it as "fundamentally flawed in its process, premises, analysis, and key findings" and stating that the "OIG Audit Report starts from incorrect assumptions and reaches inaccurate, unrealistic, and impracticable conclusions" (*id.* at 83).

**Valuation and VaR Models and Risk Management Practices**

59.     Bear Stearns's internal models were, in most cases, developed and overseen by the Financial Analytics and Structured Transactions Group ("FAST"), a group of quantitative analysts in the risk management department. (Carey Decl. Ex. 11, 2007 10-K at 8, Carey Decl. Ex. 1, 2006 10-K at 11; Carey Decl. Ex. 38, Marano Tr. at 281:16-282:3, 282:20-283:4; Carey Decl. Ex. 40, Molinaro Tr. at 70:11-72:19.) FAST regularly updated the models used by the traders in the mortgage area. (Carey Decl. Ex. 45, Verschleiser Tr. at 166:4-15; Carey Decl. Ex. 38, Marano Tr. at 282:4-19.) For example, "every month the projections from those models [for prepayments]... were compared to the reality of what happened when Fannie Mae and trustees released prepayment numbers." (Carey Decl. Ex. 38, Marano Tr. at 282:8-15; *see also id.* at 282:16-19 (discussing updates to the default model).) T&M reported that Bear Stearns "regularly improved and expanded its data sources." (Carey Decl. Ex. 30, OIG Audit Rpt at 93-95.)

60.     An independent model review team within the risk management department also performed a further level of review of the Company's models.  (Carey Decl. Ex. 38, Marano Tr. at 263:23-264:7 (Bear Stearns had "a mortgage model review going" that "dealt with all of [its] models, everything from prepayment risk to credit risk to VAR models."); Carey Decl. Ex. 40, Molinaro Tr. at 67:24-69:8; Carey Decl. Ex. 11, 2007 10-K at 69-70.)  That review was ongoing in March 2008.  (Carey Decl. Ex. 38, Marano Tr. at 271:21-272:4 (noting that "people continued to work on model reviews and [he] kn[e]w that various models were approved and had been reviewed [before Bear was sold in March of 2008]").)

61.     Deloitte did not identify any material weakness in Bear Stearns's valuation models that were used for financial reporting, nor did it recommend any changes to those models. (Carey Decl. Ex. 37, Simeone Tr. at 184:4-20.)

62.     In fact, according to Deloitte, Bear Stearns was, "more often than not," "a few months ahead of" Deloitte in updating these models.  (*Id.* at 182:21-183:7.)

63.     Bear Stearns disclosed that "[t]he complexities and reduced transparency inherent in financial instruments that are valued using models, as compared with exchange-traded prices or other quoted market valuations, introduce a particular element of operational risk into the Company's business." (Carey Decl. Ex. 1, 2006 10-K at 67.)

64.     With respect to Value at Risk or "VaR", T&M stated that Bear Stearns, "made significant progress in improving its VaR infrastructure subsequent to approval in response to Commission staff concerns.  For example, the firm followed through on recommendations to enhance control over the VaR system.  Inputs to VaR models were regularly updated following application approval." (Carey Decl. Ex. 30, OIG Audit Rpt at 94; *see also*

Carey Decl. Ex. 40, Molinaro Tr. at 52:22-53:12.)   Although the OOA responded to T&M's report, its response did not rebut this finding. (Carey Decl. Ex. 30, OIG Audit Rpt, Appx. VIII.)

65.   Bear Stearns disclosed the limitations of VaR and of relying on historical simulations.   For example, Bear Stearns disclosed "VaR [i.e., value-at-risk] has inherent limitations, including reliance on historical data… may not accurately predict future market risk, and the quantitative risk information generated is limited by the parameters established in creating the models." (Carey Decl. Ex. 1, 2006 10-K at 69; Carey Decl. Ex. 13, 1Q07 10-Q at 57; Carey Decl. Ex. 14, 2Q07 10-Q at 60; Carey Decl. Ex. 15, 3Q07 10-Q at 60.) "[VaR is] not likely to accurately predict exposures in markets that exhibit sudden fundamental changes or shifts in market conditions or established trading relationships… Furthermore, VaR calculated for a one-day horizon does not fully capture the market risk of positions that cannot be liquidated in a one-day period.   However, the Company believes VaR models are an established methodology for the quantification of risk in conjunction with other financial disclosures in order to assess the Company's risk profile." (Carey Decl. Ex. 28, 2005 10-K at 67; Carey Decl. Ex. 12, 3Q06 10-Q at 56; Carey Decl. Ex. 1, 2006 10-K at 69; Carey Decl. Ex. 13, 1Q07 10-Q at 57; Carey Decl. Ex. 14, 2Q07 10-Q at 60; Carey Decl. Ex. 15, 3Q07 10-Q at 60; Carey Decl. Ex. 11, 2007 10-K at 71; *see also* Carey Decl. Ex. 44, Stulz Rpt ¶¶ 84-86.)

66.   VaR models were reviewed by "the people that ran risk management that were responsible for this area and whoever the individuals were in the FAST area that were doing the quantitative work." (Carey Decl. Ex. 40, Molinaro Tr. at 50:14-23.)

67.   Bear Stearns's VaR modeling was implemented firm-wide (Carey Decl. Ex. 30, OIG Audit Rpt at 96), and the Company's Daily VaR and Stress Test Reports during the relevant time period compared this firm-wide VaR to its established firm-wide limit (*See, e.g.,*

Carey Decl. Ex. 47, Daily VaR and Stress Testing Summary; *see also* Carey Decl. Ex. 44, Stulz Rpt ¶ 100).

68.     T&M stated that "[m]odel control work on mortgages was unaffected" by employee turnover at Bear Stearns in late 2006 and early 2007 and that the "model control function was shifted to the product line risk managers while a new Head of Model Validation was hired." (Carey Decl. Ex. 30, OIG Audit Rpt at 94.)  Although the OOA responded to T&M's report, its response did not rebut this finding. (*Id.*, Appx. VIII.)

69.     According to Deloitte, the turnover in Bear Stearns's risk management was "nothing out of the ordinary" for a company of its size, and Bear Stearns had "adequate senior resources at all times" throughout the period it observed the Company. (Carey Decl. Ex. 37, Simeone Tr. at 152:12-25.)

70.     T&M stated that "Bear Stearns' use of scenario analysis was consistent with industry practices: virtually the entire banking sector failed to anticipate the magnitude and scope of the housing decline that [was] still ongoing" (Carey Decl. Ex. 30, OIG Audit Rpt at 94), a conclusion not disputed by the OOA (*id.* Appx. VIII), which emphasized that its purpose was not "to claim that Bear Stearns' use of scenario analysis was better or worse than other CSE firms" (*Id.* at 27).  Although the OOA responded to this finding, it did not rebut this finding. (*Id.* at 27.)

71.     Bear Stearns did incorporate into its risk scenarios the risks discussed with T&M, including a housing-led recession scenario. (*Id.* at 95.)

72.     Bear Stearns disclosed its exposure stemming from its risk management policies: "Our risk management policies and procedures may leave us exposed to unidentified or unanticipated risk. . . . [O]ur policies and procedures to identify, assess and manage risks may

not be fully effective. *Some of our methods of managing risk are based upon our use of observed historical market behavior. As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate.*" (Carey Decl. Ex. 28, 2005 10-K at 19; Carey Decl. Ex. 1, 2006 10-K at 20; Carey Decl. Ex. 11, 2007 10-K at 17 (emphasis added).)

73.    Plaintiff's expert conducted no review of Bear Stearns's models or independent analysis of Bear Stearns's risk management practices. (*See, e.g.*, Carey Decl. Ex. 29, Finnerty Tr. at 103:4-9 (admitting that he did not review Bear Stearns's models), 105:11-19 (admitting he did not review Bear Stearns's scenario analysis), 91:19-92:9 (admitting that he "did not do [his] own independent assessment of VaR").)

**The Bear Stearns Asset Management Hedge Funds**

74.    The two Bear Stearns Asset Management hedge funds identified by plaintiff were operated independently from Bear Stearns. (Carey Decl. Ex. 48, Cioffi Tr. at 44:23-45:15.) ("Well, there was always a Chinese wall in the sense that the broker dealer and the asset manager had to operate independently. There were rules with regards to, you know, safe dealing and what have you. So it was just—it's pretty much standard operating procedure in the asset management business."); Carey Decl. Ex. 39, Schwartz Tr. at 66:04-12 ("[E]arly on in the life of the fund, the broker-dealer was going to, in essence, interact with the fund and offer to transact with it. And then it was reported  some time after that, that, upon review, that they decided it would be better if the funds operated  completely separately and didn't transact or have discussions about its positions with the people in our sales and trading operation.").) The two hedge funds did not use the same models as Bear Stearns. (Carey Decl. Ex. 48, Cioffi Tr. at 137:2-138:23.)

75.     The record contains no evidence that any risk management issues at the two hedge funds were reflected at the parent company.  (*See* Carey Decl. Ex. 44, Stulz Rpt ¶¶ 152-53.)

**Bear Stearns's Capital Levels**

76.     Bear Stearns disclosed its capital levels:

a.     In its 1Q07 10-Q, Bear Stearns disclosed that its total capital base as of February 28, 2007 was $71.7684 billion.  (Carey Decl. Ex. 13, 1Q07 10-Q at 42.)

b.     In its 2Q07 10-Q, Bear Stearns disclosed that its total capital base as of May 31, 2007 was $75.0984 billion.  (Carey Decl. Ex. 14, 2Q07 10-Q at 45.)

c.     In its 3Q07 10-Q, Bear Stearns disclosed that its total capital base as of August 31, 2007 was $78.1515 billion.  (Carey Decl. Ex. 15, 3Q07 10-Q at 44.)

d.     In its 2007 10-K, Bear Stearns disclosed that its total capital base as of November 30, 2007 was $80.331 billion.  (Carey Decl. Ex. 11, 2007 10-K at 54.)

e.     In its 1Q08 10-Q, Bear Stearns disclosed that its total capital base as of February 29, 2008 was $83.649 billion.  (Carey Decl. Ex. 43, 1Q08 10-Q at 63.)

77.     At all relevant times, including at the time of its acquisition by JPMorgan, the Company had "a capital cushion well above what is required to meet supervisory standards calculated using the Basel II standard." (*See* Carey Decl. Ex. 49, letter from SEC Chairman Christopher Cox to the Chairman of the Basel Committee on Banking Supervision, dated March 20, 2008 at 2; *see also* Carey Decl. Ex. 50, *Turmoil in U.S. Credit Markets – Examining the Recent Actions of Federal Financial Regulators: Hearing Before the United States S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 100 (Apr. 3, 2008) (statement of Christopher Cox, Chairman, SEC) ("[E]ven at the time of its sale, Bear Stearns's consolidated capital, and its broker-dealers' net capital, exceeded relevant supervisory standards."); Carey

Decl. Ex. 30, OIG Audit Rpt at 86-87; *see also* Carey Decl. Ex. 51, Brad Hintz, Bernstein Research, *BSC: An Update on Bear Stearns,* at 1 (Aug. 6, 2007).)    According to the requirements of the CSE program, Bear Stearns was actually overcapitalized. (Carey Decl. Ex. 30, OIG Audit Rpt at 11.)

       78.    Plaintiff's expert has not undertaken any analysis to actually demonstrate the Company's capital level was materially inadequate at the time the alleged misstatements were made. (Carey Decl. Ex. 29, Finnerty Tr. at 59:21-60:7.)

**Bear Stearns's Liquidity**

      79.    Bear Stearns disclosed its total liquidity:

        a.    In its 1Q07 10-Q, Bear Stearns disclosed that it "maintain[ed] a minimum of $5.0 billion of liquidity immediately accessible by the Parent Company." (Carey Decl. Ex. 13, 1Q07 10-Q at 45.)

        b.    In its 2Q07 10-Q, Bear Stearns disclosed that "[a]s of May 31, 2007 the Parent Company Liquidity Pool was $7.6 billion," and further that "[t]he Parent Company Liquidity Pool was $11.3 billion at the end of June 2007." (Carey Decl. Ex. 14, 2Q07 10-Q at 48.)

        c.    In its 3Q07 10-Q, Bear Stearns disclosed that "[a]s of August 31, 2007 the Parent Company Liquidity Pool was $13.6 billion," and that "[a]s of September 19, 2007, the Parent Company Liquidity Pool had increased to a record level of $19.0 billion." (Carey Decl. Ex. 15, 3Q07 10-Q at 48.)

        d.    In its 2007 10-K, Bear Stearns disclosed that "[a]s of November 30, 2007 the Parent Company Liquidity Pool was $17.4 billion." (Carey Decl. Ex. 11, 2007 10-K at 47.)

e.     In its 1Q08 10-Q, Bear Stearns disclosed that "[a]s of February 29, 2008 the Parent Company Liquidity Pool was $17.3 billion." (Carey Decl. Ex. 43, 1Q08 10-Q at 58.)

80.     The OIG Audit Report observed that Bear Stearns significantly increased its liquidity levels between May 2007 and early March 2008, from $7.6 billion to approximately $21 billion. (Carey Decl. Ex. 30, OIG Audit Rpt at 15 n.92.)

81.     Bear Stearns's liquidity on March 10, 2008 was $18.1 billion, almost exactly the same as the Company's liquidity at prior year and the most recent quarter end. (*See* Carey Decl. Ex. 49, letter from SEC Chairman Christopher Cox to the Chairman of the Basel Committee on Banking Supervision, dated March 20, 2008 at 2; Carey Decl. Ex. 43, 1Q08 10-Q at 57.)

82.     As of the end of the day on March 11, 2008, Bear Stearns's liquidity remained at $15.8 billion. (*See* Carey Decl. Ex. 49, letter from SEC Chairman Christopher Cox to the Chairman of the Basel Committee on Banking Supervision dated March 20, 2008.)

83.     At all relevant times, Bear Stearns's liquidity complied with all applicable regulatory requirements. (Carey Decl. Ex. 30, OIG Audit Rpt at 14-16.) Indeed, the OIG Audit Report noted that even as early as November 2006 Bear Stearns was "implementing a more realistic approach to liquidity planning than required by the SEC." (*Id.* at 15 n.92, 16; *see also* Carey Decl. Ex. 37, Simeone Tr. at 195:6-8 (At the end of FY 2007, Bear Stearns "had amassed $17-1/2 billion in cash, which was well above what the SEC suggested.").)

84.     Plaintiff's expert has not undertaken any analysis to demonstrate the Company's liquidity was materially inadequate at the time the alleged misstatements were made. (Carey Decl. Ex. 29, Finnerty Tr. at 60:13-62:5; *see also id.* at 202:14-204:24, 206:13-17 ("Q:

Did you analyze during the period of December 14, 2006 to December 20, 2007 the severity of the liquidity problems at Bear Stearns? A: No….").)

**Bear Stearns's Disclosure of the Risks to its Liquidity and its Vulnerability to a Bank Run**

85.     Bear Stearns disclosed the risk it faced stemming from a loss of market confidence:  "A reduction in our credit ratings could adversely affect our liquidity and competitive position and increase our borrowing costs."  (Carey Decl. Ex. 28, 2005 10-K at 20; Carey Decl. Ex. 1, 2006 10-K at 21; Carey Decl. Ex. 11, 2007 10-K at 18.)

86.     Bear Stearns also disclosed the risks to its liquidity and its vulnerability to a run on the bank, including its significant reliance on short-term repo financing, its high level of customer payables due to its large prime brokerage business, and its capital and leverage.  (*See* Carey Decl. Ex. 52, Ferrell Rpt at ¶¶ 24-30.)

a.     Investment banks by the nature of their business are inherently susceptible to a run on the bank.  (*See* Carey Decl. Ex. 2, Finnerty Rpt ¶ 170; Carey Decl. Ex. 52, Ferrell Rpt ¶¶ 31.)

87.     In its 2006 and 2007 10-Ks, Bear Stearns disclosed that "[l]iquidity, i.e., ready access to funds, is essential to our businesses" and "[l]iquidity risk could impair out ability to fund operations and jeopardize our financial condition."  (Carey Decl. Ex. 1, 2006 10-K at 21; Carey Decl. Ex. 11, 2007 10-K at 18.)

88.     The information necessary to calculate the ratios of repurchase financing to short-term borrowing, repurchase financing to total debt, repurchase financing to total assets, repurchase financing and customer payables to current assets, repurchase financing and customer payables to total assets, long-term debt to total assets, and total debt to total assets, was all disclosed by Bear Stearns.  (*See* Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82.)

Doc# US1 10180758v1

**Bear Stearns's Disclosures Concerning Repo Financing**

89.    Bear Stearns also disclosed that a significant portion of its liability was due to obligations owing to "[s]ecurities sold under agreements to repurchase." (Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82.) A repurchase agreement (or repo) is "essentially a short term cash loan collateralized by securities." (Carey Decl. Ex. 52, Ferrell Rpt ¶ 25.) Bear Stearns disclosed that it depended on repo agreements for approximately $70 billion and $102.4 billion of funding as of November 30, 2006 and November 30, 2007, respectively. (Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82.)

90.    Entering the first quarter of 2008, Bear Stearns disclosed that it "modified its general funding structure, beginning in late 2006," including "[i]ncreased use of secured funding[,]" "[i]ntroduc[ing] substantially greater amounts of longer tenor secured funding into the repo and bank loan portions of its secured funding mix[,]" "[r]educed reliance on short-term unsecured funding sources," "[e]xpand[ing] the size and scope of the Parent Company Liquidity Pool," and "[i]ncreas[ing] the target for net cash capital." (Carey Decl. Ex. 11, 2007 10-K at 48.)

91.    Bear Stearns disclosed in both its 2006 and 2007 10-Ks that "[a]n inability to raise money in the long-term or short-term debt markets, or to engage in repurchase agreements or securities lending, could have a substantial negative effect on our liquidity. Our access to debt in amounts adequate to finance our activities could be impaired by factors that affect the Company in particular or the financial services industry in general. For example, lenders could develop a negative perception of our long-term or short-term financial prospects if we incurred large trading losses, if the level of our business activity decreased due to a market downturn or if regulatory authorities took significant action against the Company. Our ability to borrow in the debt markets also could be impaired by factors that are not specific to us, such as a severe disruption of the financial markets or negative views about the prospects for the

26

investment banking, securities or financial services industries generally." (Carey Decl. Ex. 1, 2006 10-K at 21, *see also* Carey Decl. Ex. 11, 2007 10-K at 18; *see also* Carey Decl. Ex. 52, Ferrell Rpt ¶ 25, Carey Decl. Ex. 44, Stulz Rpt ¶ 29, 63.)

### Bear Stearns's Disclosures Concerning Customer Payables

92.     Bear Stearns disclosed the subcategories of customer payables that create liquidity risk (Carey Decl. Ex. 52, Ferrell Rpt ¶¶ 27-29):

a.     Bear Stearns disclosed that its prime brokerage clients had Free Credit Balances, which are funds payable by a broker-dealer to its customer on demand (*id.* ¶ 28), of $32.6 billion and $36.1 billion as of November 30, 2006 and November 30, 2007, respectively. (Carey Decl. Ex. 1, 2006 10-K at 43; Carey Decl. Ex. 11, 2007 10-K at 44.)

b.     Bear Stearns disclosed that its customers had borrowed $78.6 billion and $85.8 billion in margin as of November 30, 2006 and November 30, 2007, respectively. (Carey Decl. Ex. 1, 2006 10-K at 43; Carey Decl. Ex. 11, 2007 10-K at 44.)

c.     Bear Stearns disclosed its customer payable liabilities as $72.989 billion and $83.204 billion on November 30, 2006 and November 30, 2007, respectively. (Carey Decl. Ex. 1, 2006 10-K at 80; Carey Decl. Ex. 11, 2007 10-K at 82.)

### Bear Stearns's Leverage

93.     Plaintiff's expert speculates that "it is entirely possible that Bear Stearns' high leverage contributed to a lack of confidence in the firm (including unsubstantiated rumors) which had an impact on its collapse." (Carey Decl. Ex. 2, Finnerty Rpt ¶ 196.)

94.     Bear Stearns disclosed its leverage.

a.     In its 2006 10-K, Bear Stearns disclosed that its gross leverage was 26.5x and its net adjusted leverage was 13.6x. (Carey Decl. Ex. 1, 2006 10-K at 47.)

Doc#: US1:10180758v1

b.      In its 2007 10-K, Bear Stearns disclosed that its gross leverage was 32.8x and its net adjusted leverage was 19.3x.  (Carey Decl. Ex. 11, 2007 10-K at 53.)

c.      Bear Stearns disclosed that gross leverage "equals total assets divided by stockholders' equity, inclusive of preferred and trust preferred equity" and that net adjusted leverage "equals net adjusted assets divided by tangible equity capital, which excludes goodwill and intangible assets from both the numerator and the denominator." (*Id.* at 52.)

### The Events of the Relevant Period and the Financial Crisis

95.    In 2007 and into early 2008, the mortgage market significantly deteriorated.  (*See* Carey Decl. Ex. 29, Finnerty Tr. at 135:13-136:4, 206:22-210:15; Carey Decl. Ex. 53, "Bernanke: 2008 Meltdown Was Worse Than Great Depression," *The Wall Street Journal*, August 26, 2014; *see also* Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 22-29 (stating that December 14, 2006 through March 14, 2008, encompassed the start of a tumultuous period for the global economy," "[s]ales of both existing and new homes declined sharply in 2007," "there was a sharp increase in mortgage delinquencies, especially among subprime mortgages," and that "beginning in December 2007, the country entered a severe recession.").)

96.    Bear Stearns disclosed its exposure to the risk of a deterioration in market conditions: "*In the event of a market downturn, our businesses could be adversely affected in many ways . . . .  Our revenues are likely to decline in such circumstances and, if we were unable to reduce expenses at the same pace, our profit margins would erode.*"  (Carey Decl. Ex. 1, 2006 10-K at 19; Carey Decl. Ex. 11, 2007 10-K at 16 (emphasis added).)  In addition, "[c]hanges in business, political and/or economic conditions could have an adverse effect on the Company." (Carey Decl. Ex. 1, 2006 10-K at 22; *see also* Carey Decl. Ex. 11, 2007 10-K at 19.)

Doc#: US1.10180758v1

97.     Bear Stearns also disclosed as the crisis developed that it was impacting the Company's business.

a.     On March 15, 2007, the Company reported reductions in its "[r]esidential mortgage-related revenues . . . reflecting weakness in the U.S. residential mortgage-backed securities market." (Carey Decl. Ex. 54, 3/15/07 8-K.)

b.     On April 10, 2007, the Company cautioned that the mortgage market was continuing to deteriorate, noting that "mortgage markets became more challenging later in the quarter as investor concern over the rising delinquency levels in the subprime mortgage market escalated." (Carey Decl. Ex. 13, 1Q07 10-Q at 34.)

c.     On June 14, 2007, Bear Stearns reported a decline in total second quarter earnings compared to the prior year resulting from "industry-wide declines in residential mortgage origination and securitization volumes and challenging market conditions in the sub-prime and Alt-A mortgage sectors." (Carey Decl. Ex. 55, 6/14/07 8-K; *see also* Carey Decl. Ex. 14, 2Q07 10-Q at 35.)

d.     On a conference call on June 14, 2007, Bear Stearns's CFO Samuel Molinaro, Jr. stated that "[t]he decline in fixed income revenues reflects weaker U.S. mortgage market conditions when compared to the prior year and benign global interest rate markets which reduced mortgage and interest rate product revenues... Residential mortgage origination volumes industry-wide declined when compared to the prior year reflecting a combination of weaker housing market and tighter subprime and Alt-A underwriting standards" (Carey Decl. Ex. 56, 6/14/07 Call Tr. at 3), and that "the challenge that we're all going to have is the level of delinquencies and defaults in the 2006 vintage subprime continues to be a challenge though it hasn't spilled into other

sectors of the market, and of course the overall level of origination volume is continuing to be challenging with the tightened underwriting standards and sluggish home price situation, origination volumes will continue to be challenging, though hopefully gradually building back off of what will hopefully this second quarter be a floor" (*Id.* at 10).

   e.  On a conference call on June 22, 2007, Molinaro noted that the Company's mortgage business was operating "in a lower volume environment and a more difficult operating environment given . . . the macro picture in the marketplace." (Carey Decl. Ex. 57, 6/22/07 Call Tr. at 9.)

   f.  On an August 3, 2007 investor call held to address Standard & Poor's downward revision of its outlook on Bear Stearns's credit rating, Molinaro stated that "there's a great deal of uncertainty in the fixed income markets over the level of default and loss expectations in the subprime mortgage market and I guess generally in the broader mortgage market." (Carey Decl. Ex. 58, 8/3/07 Call Tr. at 5.) He continued, "I've been at this for twenty-two years. *It's about as bad as I have seen it in the fixed-income market during that period of time.*" (*Id.* at 8 (emphasis added).)

   g.  When Bear Stearns announced its third quarter earnings on September 20, 2007, the Company disclosed that its fixed income net revenues, including revenues from the firm's mortgage activities, were down 88% from the prior year, and that "[m]arket conditions in both the mortgage and credit businesses were extremely challenging this quarter." Bear Stearns also explained that "[a] general re-pricing of risk in the market led to significant reductions in both mortgage and credit-related revenues as volumes decreased while asset values declined." (Carey Decl. Ex. 59, 9/20/07 8-K.)

Doc# US1 10180758v1

        h.      On September 20, 2007, Bear Stearns disclosed that it took net inventory markdowns of approximately $700 million for the quarter, which it attributed largely to declines in the value of residential mortgages and leveraged finance activities. (Carey Decl. Ex. 60, 9/20/07 Call Tr. at 3.)

        i.      On the September 20, 2007 conference call to discuss the third quarter earnings release, Molinaro stated that "[f]ixed income activity suffered as transaction volumes declined significantly and inventory valuations came under severe pressure." (*Id.* at 2.)

        j.      On November 15, 2007, Bear Stearns took additional writedowns reflecting the further deterioration in the value of mortgage-related assets. On November 14, 2007, more than a month before the official earnings release, Bear Stearns disclosed its intention to write down $1.2 billion for the quarter (net of hedges), which it attributed primarily to losses in its CDO and CDO warehouse portfolio. (Compl. ¶ 217; Carey Decl. Ex. 35, 11/15/07 8-K.)

        k.      On December 21, 2007, the Company disclosed that it wrote down a net of $1.9 billion at the end of the fourth quarter of 2007, further reflecting the rapid decline in the value of mortgage-related assets. (Carey Decl. Ex. 36, 12/21/07 8-K.)

        98.      Analysts also cautioned investors about the risks that the subprime crisis posed to Bear Stearns's business:

        a.      In March 2007, one analyst wrote that "investors will not know the ultimate impact of the sub-prime market problems until the slow motion train wreck of rising mortgage delinquencies and defaults is played out over the rest of this year. As one of the largest fixed income houses and the third largest MBS underwriter this

Doc# US1 10180758v1

uncertainty will likely affect Bear's stock valuation over the remainder of the year." He added that among brokerage firms, Bear Stearns had "the highest percent of its equity capital committed to the mortgage business." (Carey Decl. Ex. 61, Brad Hintz, BernsteinResearch, *BSC Q1 2007 – Weakest Results Thus Far; But Subprime Fears Assuaged*, at 2, 10 (Mar. 16, 2007).)

       b.     In August 2007, recognizing that Bear Stearns had "the second largest exposure to fixed income sales and trading in the U.S. Securities Industry," the same analyst wrote that "with the sub-prime mortgage market still dismal and US credit spreads having gapped out, *this largely domestic firm is probably most at risk among the large capitalization brokers*. At this point, Bear faces a challenging situation—the problems of [the] sub-prime sector will negatively impact CDO issuance, MBS issuance, market making revenues and residual valuations, the related risk associated with margin loans and repo provided certain fixed income hedge funds raises the risk of credit losses and will limit prime brokerage revenues and the reputational fall-out from [the] BSAM hedge fund problems will constrain asset management performance." (Carey Decl. Ex. 51, Brad Hintz, BernsteinResearch, *BSC: An Update on Bear Stearns*, at 6 (Aug. 6, 2007) (emphasis added).)

       c.     Another analyst, noting the same risk, wrote that "*No other broker has maintained the concentrated exposure to US sub-prime mortgages that Bear Stearns is now famous for*. In addition, no other broker has the geographic concentration to the US Capital Markets that Bear Stearns has. *Accordingly, our EPS outlook is most ominous for BSC*." (Carey Decl. Ex. 63, Meredith Whitney, CIBC World Markets,

Doc#: US1:10180758v1

*Cutting Rating and Earnings Outlook on Bear Stearns*, at 1 (Aug. 28, 2007) (emphasis added).)

99.     Market regulators, participants, and government officials, assessing the impact of the subprime crisis in real time, viewed the probable impact of the crisis as limited well into the summer of 2007.

a.     In February 2007, Federal Reserve Chairman Ben Bernanke told the Budget Committee of the United States House of Representatives that *the housing downturn was not "a broad financial concern or a major factor in assessing the state of the economy."* (Carey Decl. Ex. 64, John Cassidy, *Anatomy of a Meltdown – Ben Bernanke and the Financial Crisis*, The New Yorker, Dec. 1, 2008, at 8 (emphasis added).)

b.     In March 2007, Federal Reserve Director of Banking Supervision and Regulation Roger T. Cole stated that "at this time, *we are not observing spillover effects from the problems in the subprime market to traditional mortgage portfolios or, more generally, to the safety and soundness of the banking system."* (Carey Decl. Ex. 65, *Mortgage Market Turmoil – Causes and Consequences: Hearing Before the United States S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 1 (Mar. 22, 2007) (statement of Roger T. Cole, Dir., Div. of Banking Supervision and Regulation, Board of Governors of the Federal Reserve System) (emphasis added).)

c.     In April 2007, Treasury Secretary Henry Paulson said, "*I don't see (subprime mortgage market troubles) imposing a serious problem. I think it's going to be largely contained."* (Carey Decl. Ex. 66, *Treasury's Paulson – subprime woes likely contained*, Reuters UK, Apr. 20, 2007 (emphasis added).)

Doc#: US1:10180758v1

        d.      In April 2007, the International Monetary Fund's Global Financial Stability Report stated that the mortgage market *"weakness has been contained to certain portions of the subprime market* (and, to a lesser extent, the Alt-A market), and is not likely to pose a serious systemic threat. Stress tests conducted by investment banks [including Lehman Brothers, Bear Stearns, and JPMorgan] show that, even under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to subprime mortgages through securitized structures will not face losses." (Carey Decl. Ex. 67, Int'l Monetary Fund, *Global Financial Stability Report: Market Developments and Issues* 7 (Apr. 2007) (emphasis added).)

        e.      In May 2007, Federal Reserve Chairman Bernanke stated that "*the effect of the troubles in the subprime sector on the broader housing market will likely be limited, and we do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system.*" (Carey Decl. Ex. 68, Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System, Address at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition at 6 (May 17, 2007) (emphasis added).)

        f.      In June 2007, Jeff Harte, analyst for Sandler O'Neill + Partners, stated, "*I don't expect mortgages to be a major near-term revenue driver for the investment banks, but they won't cause major problems.*" (Carey Decl. Ex. 69, Greg Morcroft, *Subprime woes weigh on Goldman, Bear results*, MarketWatch, June 14, 2007 (emphasis added).)

        g.      In July 2007, Treasury Secretary Paulson said that *the housing market correction was "at or near the bottom."* (Carey Decl. Ex. 70, Emily Kaiser,

Doc#: US1:10180758v1

*Paulson Sees U.S. Housing Downturn Near End*, Reuters, July 2, 2007 (emphasis added).)

        h.     In July 2007, Treasury Secretary Paulson told CNBC, "I don't deny you're going to see money lost in subprime mortgages. . . . *But do I think these risks are contained? Yes, I do*." (Carey Decl. Ex. 71, *US's Paulson: Subprime 'At, Near Bottom;' Need Vigilance*, Market News Serv., July 24, 2007 (emphasis added).)

        i.     As T&M later concluded, "virtually the entire banking sector failed to anticipate the magnitude and scope of the housing decline that is still ongoing." (Carey Decl. Ex. 30, OIG Audit Rpt at 94.)

     100.    In late February and early March 2008, conditions in the financial markets deteriorated significantly.

        a.     On March 10, 2008, officials at the Federal Reserve Board observed that "[f]inancial conditions [had] worsened considerably in recent days" and expressed concern that the U.S. "may have entered a new, dangerous phase of the crisis." (Carey Decl. Ex. 72, 3/10/08 FOMC Call Tr. at 4; Carey Decl. Ex. 52, Ferrell Rpt ¶ 38.)

        b.     The bid-ask spread, which is the discount one must accept to sell a financial instrument immediately had widened for many types of financial instruments, indicating a liquidity problem in the market. (Carey Decl. Ex. 72, 3/10/08 FOMC Call Tr. at 5; Carey Decl. Ex. 29, Finnerty Tr. at 207:10-19; Carey Decl. Ex. 52, Ferrell Rpt ¶ 39.) There was also a sharp increase in haircuts, the amount a lender holds back when they make a loan under a repurchase agreement, for mortgage-backed securities. (Carey Decl. Ex. 72, 3/10/08 FOMC Call Tr. at 5; Carey Decl. Ex. 29, Finnerty Tr. at 207:20-

208:2; Carey Decl. Ex. 52, Ferrell Rpt ¶ 39-41; Carey Decl. Ex. 73, JPMorgan, "U.S. Fixed Income Markets Weekly" at 1-2 (3/7/08).)

           c.    The value of mortgage-backed securities was also falling during this time period. (Carey Decl. Ex. 52, Ferrell Rpt ¶ 41 (citing Ferrell Rpt Ex. 4, Table 1); Carey Decl. Ex. 29, Finnerty Tr. at 208:3-10.) In addition, analysts at Foxx-Pitt Kelton wrote on February 29, 2008 that they believed Alt-A values were down 15% in the year to date. (Carey Decl. Ex. 74, David Trone & Ivy De Dianous, Fox-Pitt Kelton, *Alt-A Deterioration Prompting Additional Write-Downs*, (Feb. 29, 2008); *see also* Carey Decl. Ex. 52, Ferrell Rpt ¶ 41.)

**The Week of March 10th and Bear Stearns's Acquisition by JPMorgan**

    101.    During the week of March 10, 2008 rumors began swirling in the market concerning the Company's liquidity. (Carey Decl. Ex. 2, Finnerty Rpt ¶ 35; *see also* Carey Decl. Ex. 39, Schwartz Tr. at 111:6-11.)

    102.    Beginning on Wednesday, March 12, clients and counterparties pulled their funds from Bear Stearns, drawing down the Company's liquidity pool. (*See, e.g.*, Carey Decl. Ex. 39, Schwartz Tr. at 119:14-122:6, 128:2-18; Carey Decl. Ex. 44, Stulz Rpt ¶ 57(a), (c), n. 88 (citing Carey Decl. Ex. 50, *Turmoil in U.S. Credit Markets – Examining the Recent Actions of Federal Financial Regulators: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 75 (Apr. 3, 2008) (statement of Alan Schwartz, President and Chief Executive Officer, Bear Stearns) ("[B]y Thursday of that week [March 13], a tipping point was reached on liquidity. The market rumors became self-fulfilling and Bear Stearns' liquidity pool began to fall sharply").)

    103.    The run intensified on March 13, 2008, and by that evening Bear Stearns's liquidity had declined to $2 billion. (*See* Carey Decl. Ex. 39, Schwartz Tr. at 129:14-130:4;

Doc#: US1:10180758v1

Carey Decl. Ex. 50, *Turmoil in U.S. Credit Markets – Examining the Recent Actions of Federal Financial Regulators: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 26 (Apr. 3, 2008).

104.    Prior to the market opening on Friday, March 14, 2008, Bear Stearns announced that its "liquidity position in the last 24 hours had significantly deteriorated" and "it reached an agreement with JPMorgan Chase & Co. (JPMC) to provide a secured loan facility for an initial period of up to 28 days allowing Bear Stearns to access liquidity as needed." (Carey Decl. Ex. 75, 3/14/08 BSC Press Release; *see also* Carey Decl. Ex. 2, Finnerty Rpt ¶ 238; Carey Decl. Ex. 52, Ferrell Rpt ¶ 15).

105.    As plaintiff's expert acknowledged, Bear Stearns "expected the secured loan facility JPMorgan extended to Bear Stearns on March 14, 2008 would be sufficient to shore up Bear Stearns's liquidity." (Carey Decl. Ex. 2, Finnerty Rpt ¶ 247; Carey Decl. Ex. 29, Finnerty Tr. at 169:5-12.)

106.    After the close of business on March 14, 2008 Bear Stearns was informed that after the weekend the credit facility would no longer be available. (Carey Decl. Ex. 29, Finnerty Tr. at 169:13-170:10; Carey Decl. Ex. 39, Schwartz Tr. at 148:2-13.)

107.    On March 16, 2008, Bear Stearns announced that it had entered into an agreement to be acquired by JPMorgan for $2.00 per share. (Carey Decl. Ex. 76, 3/16/08 Bear Stearns Press Release; Carey Decl. Ex. 2, Finnerty Rpt ¶ 35.)

108.    Bear Stearns's announcement of its merger with JPMorgan could not have been made before March 16, 2008 as the board "approved [the transaction] on Sunday, the 16th." (Carey Decl. Ex. 29, Finnerty Tr. at 164:12-166:2; *see also* Carey Decl. Ex. 39, Schwartz Tr, at 164:3-14.)

109.    The $2 per share sale price to JPMorgan did not reflect the true value of the Company or its assets, but rather was a political decision.  Contemporaneous minutes from the March 16, 2008 meeting of the Bear Stearns Board of Directors state that "the government would not permit a higher number" and "would not support a transaction where [Bear Stearns's] equity holders received any significant consideration because of the 'moral hazard' of the federal government using taxpayer money to 'bail out' the investment bank's stockholders."  (Carey Decl. Ex. 78, DT_WP_000389091 at DT_WP_000389095.)

110.    The $2 per share sale price also reflected "a significant discount" due to "the speed and complexity of trying to get something done in two days." (Carey Decl. Ex. 39, Schwartz Tr. at 161:15-24.)

111.    Plaintiff's expert admitted that he was not offering an opinion that the $2 per share sale price to JPMorgan was due to any overvaluation of the Company's assets and that he has "no basis for checking" whether the acquisition price reflected an overvaluation of assets. (Carey Decl. Ex. 29, Finnerty Tr. at 65:15-67:13.)

112.    As plaintiff's expert acknowledged, the acquisition price reflected, at least in part, "Bear Stearns' weak negotiating leverage owing to its financial distress and the paucity of potential bidders for Bear Stearns during the weekend of March 15-16, 2008."  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 257.)

113.    Bear Stearns merged with JPMorgan at a price of $10.00 per share as a result of the merger renegotiation that took place after the initial agreement (Carey Decl. Ex. 2, Finnerty Rpt ¶ 35, n.13), a sale price announced on March 24, 2008 (Carey Decl. Ex. 79, 3/24/08 Press Release).

Doc#: US1:10180758v1

114.    Senior industry regulators later concluded that Bear Stearns's near-collapse was the result of a "run on the bank"—an unanticipated and unprecedented refusal by counterparties to provide short-term secured financing (even for high quality collateral) to a well-capitalized and otherwise liquid financial institution.

a.    Christopher Cox, Chairman of the SEC, observed: "What happened to Bear Stearns during the week of March 10th was likewise unprecedented. *For the first time, a major investment bank that was well-capitalized and apparently fully liquid experienced a crisis of confidence that denied it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.* Counter-parties would not provide securities lending services and clearing services. Prime brokerage clients moved their cash balances elsewhere. These decisions by counterparties, clients, and lenders to no longer transact with Bear Stearns in turn influenced other counterparties, clients, and lenders to also reduce their exposure to Bear Stearns." Chairman Cox characterized what happened to Bear Stearns as a "run on the bank." (Carey Decl. Ex. 50, *Turmoil in U.S. Credit Markets – Examining the Recent Actions of Federal Financial Regulators: Hearing Before the United States S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 101 (Apr. 3, 2008) (statement of Christopher Cox, Chairman, SEC) (emphasis added).)

b.    Kathleen Casey, an SEC Commissioner, stated that "In a nutshell, Bear Stearns, the fifth largest U.S. investment bank, experienced what amounted to a 'run on the bank.'" (Carey Decl. Ex. 80, Kathleen L. Casey, SEC Commissioner, *An Agenda*

*for Europe and the United States*, Address Before the Sixth Annual Symposium on Building the Financial System of the 21st Century (Apr. 3, 2008).)

        c.    Ben Bernanke, Chairman of the Federal Reserve, explained: "The collapse of Bear Stearns was triggered by a run of its creditors and customers, analogous to the run of depositors on a commercial bank. This run was surprising, however, in that Bear Stearns's borrowings were largely secured—that is, its lenders held collateral to ensure repayment even if the company itself failed." (Carey Decl. Ex. 81, Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System, *Reducing Systemic Risk*, Address Before the Federal Reserve Bank of Kansas City's Annual Economic Symposium (Aug. 22, 2008).)

**Loss Causation**

        115.    The share price of Bear Stearns's common stock fell by $69.36 from the beginning of the Relevant Period to December 20, 2007, *i.e.* from $159.96 at the close of the market on December 14, 2006 to $90.60 at the close of the market on December 19, 2007. (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

        116.    Plaintiff's expert did not find that any of plaintiff's losses prior to December 20, 2007 were caused by the alleged fraud. (Carey Decl. Ex. 29, Finnerty Tr. at 319:7-25.)

        117.    The share price of Bear Stearns's common stock fell $33.60 between December 20, 2007 and March 13, 2008 (the "Leakage Period"), *i.e.*, from a closing price of $90.60 on December 19, 2007, to a closing price of $57.00 on March 13, 2008. (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

        118.    The movement of the share price of Bear Stearns's common stock between December 20, 2007 and March 7, 2008 was consistent with the movement of the share

prices of the firms to which plaintiff's expert compares Bear Stearns.  (*See* Carey Decl. Ex. 52, Ferrell Rpt ¶ 59, Ex. 7.)

119.   Plaintiff's expert identified no specific disclosures that supposedly revealed the fraud prior to March 14, 2008.  (Carey Decl. Ex. 29, Finnerty Tr. at 212:2-16, 303:15-304:18.)

120.   Plaintiff's expert has never used the leakage methodology he seeks to use in this case to establish loss causation and calculate damages in any case in which he has previously served as a damages expert.  (*Id.* at 29:4-30:4, 309:8-310:11 ("[W]hen I prepared my loss causation and damages report [in *Silverman v. Motorola*], counsel asked me, actually told me it just wasn't necessary to include the leakage damages in the calculation.  So I did it in the, and referred to it in the market efficiency report.  I think I referred to it in the loss causation report if I recall correctly, but I was not actually asked to perform the calculation of damages for the leakage period.").)

121.   Plaintiff's expert admits that he must disaggregate the effects of firm-specific, non-fraud-related news in his leakage model.  (*Id.* at 228:6-12 ("I'm specifically adjusting for company-specific news, which I believe you have to put in there."); Carey Decl. Ex. 2, Finnerty Rpt ¶ 190 ("[I]t is very important to exclude company-specific information that is not related to the alleged fraud from the damage calculation.").)

122.   Plaintiff's expert admitted that he made no attempt to control for company-specific, non-fraud-related news on days where he found both "fraud-related" and "non-fraud" related Company-specific news (as determined by plaintiff's expert), on days where he found only "non-fraud" related news, but no statistically significant abnormal return, and on days where he found no Company-specific news at all during the Leakage Period.  (Carey Decl.

Doc#: US1:10180758v1

Ex. 29, Finnerty Tr. at 253:3-16; 254:12-15; 275:14-276:10).   On each of those days, he attributed the entirety of the abnormal return to the fraud. (*Id.*; Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

123.    Plaintiff's expert admits that he does not know what is actually causing the alleged inflation in the share price of Bear Stearns's common stock to change on any given day during his purported Leakage Period, saying, "I'm comparing [how I would expect the price to behave in the absence of fraud] to the actual behavior and that difference in any given day is the amount of inflation.  What actually causes that day to day I don't know because there aren't press releases that identify what's being disclosed.  But what I can see is that I can see the decline in the price of the stock, the persistent price in the decline of the stock over the leakage period." (Carey Decl. Ex. 29, Finnerty Tr. at 228:10-22.)

124.    Plaintiff's expert admits that he does not know what particular information was causing the share price of Bear Stearns common stock to change on any given day.  (*Id.* at 269:18-270:17 ("No one could know that unless you actually knew what information was being exchanged among all the parties privately.  You couldn't -- you couldn't determine that.  That's the nature of the private information.  That's the essence of leakage.")

125.    The share price of Bear Stearns's common stock fell from a closing price of $57.00 on March 13, 2008 to a closing price of $30.00 on March 14, 2008.  (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

126.    The share price of Bear Stearns's common stock fell from a closing price of $30.00 on March 14, 2008 to a closing price of $4.81 on March 17, 2008.  (*Id.*)

127.    Plaintiff's expert admits that the market would not have reacted the same way in early 2007 as it did during the week of March 10, 2008 to the purported revelation of the

42

alleged fraud.  (Carey Decl. Ex. 29, Finnerty Tr. at 211:3-25 ("Going back to January of '07, I doubt the consequences would have been as severe.  And that's what my comment earlier about I think the ship could have sunk as early as December 20th of '07.  In other words, the run on the bank could have started earlier.  I think it's unlikely going back to January '07 that a run on the bank would have occurred under those circumstances.  I think that's much less likely.").)

128.    Plaintiff's expert admits that he does not know whether the stock price reaction to the disclosure of the alleged fraud would have been as severe prior to the start of the Leakage Period on December 20, 2007 as it was in March 2008.  (*Id.* at 322:23-323:20 ("I've not done a hypothetical calculation of what might have happened if [Bear Stearns had] made disclosures before December 20th, 2007.").)

Doc#: US1:10180758v1

Dated: August 17, 2015
New York, New York

Respectfully Submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Brad S. Karp (bkarp@paulweiss.com)
John F. Baughman (jbaughman@paulweiss.com)
Jessica S. Carey (jcarey@paulweiss.com)
Jonathan H. Hurwitz (jhurwitz@paulweiss.com)

1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns Companies Inc.*

David S. Frankel (dfrankel@kramerlevin.com)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100)
*Attorneys for Defendant James E. Cayne*

David B. Anders (DBAnders@wlrk.com)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*