UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE BEAR STEARNS COMPANIES, INC. SECURITIES, DERIVATIVE, AND ERISA LITIGATION | Master File No.: 08 MDL 1963 (RWS) |
| This Document Relates To: Securities Action, No. 08 Civ. 2793 (RWS) | ECF Case |
| BRUCE S. SHERMAN, | |
| Plaintiff, | |
| v. | Index No.: 09 Civ. 8161 (RWS) |
| BEAR STEARNS COMPANIES INC., JAMES CAYNE, WARREN SPECTOR AND DELOITTE & TOUCHE LLP, | **FILED UNDER SEAL** |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF JOHN D. FINNERTY

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Brad S. Karp
John F. Baughman
Jessica S. Carey
Jonathan H. Hurwitz
1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns Companies Inc.*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
David S. Frankel
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100
*Attorneys for Defendant James E. Cayne*

WACHTELL, LIPTON, ROSEN & KATZ
David B. Anders
51 West 52nd Street
New York, New York  10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*

TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES.................................................................................... ii

PRELIMINARY STATEMENT............................................................................1

THE FACTS ...........................................................................................................3

ARGUMENT ..........................................................................................................5

I.      Finnerty's Opinions on Loss Causation and Damages During the "Leakage
        Period" Should Be Excluded ..................................................................7
        A.      Finnerty's Leakage Opinions Should Be Excluded Because They
                Are Not Generally Accepted or Peer Reviewed .........................9
        B.      Finnerty's Leakage Opinions Should Be Excluded Because They
                Are Unreliable ...........................................................................11

II.     Finnerty's Opinions on Loss Causation and Damages Should be Excluded
        Because His Estimates of Inflation Are Unreliable...............................15

III.    Finnerty Should Not Be Allowed to Give Testimony That Is Nothing
        More Than Summaries and Characterizations of the Evidence.............18

CONCLUSION ....................................................................................................25

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Home Assur. Co.* v. *Merck & Co.*,
   462 F. Supp. 2d 435 (S.D.N.Y. 2006) .......................................................23

*Arista Records LLC* v. *Usenet.com, Inc.*,
   608 F. Supp. 2d 409 (S.D.N.Y. 2009) .......................................................23

*Astra Aktiebolag* v. *Andrx Pharms., Inc.*,
   222 F. Supp. 2d 423 (S.D.N.Y. 2002) .....................................................6, 7

*Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*,
   650 F. Supp. 2d 314 (S.D.N.Y. 2009) .......................................................15

*Daubert* v. *Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...................................................................*passim*

*Dura Pharmaceuticals, Inc.* v. *Broudo*,
   544 U.S. 336 (2005)................................................................1, 7, 13

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
   131 S. Ct. 2179 (2011)..................................................................8

*Faulkner* v. *Arista Records LLC*,
   46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014) .......................................... 22-23

*Gary Price Studios, Inc.* v. *Randolph Rose Collection, Inc.*,
   2006 WL 1319543 (S.D.N.Y. 2006)...................................................... 10-11

*Gen. Elec. Co.* v. *Joiner*,
   522 U.S. 136 (1997).................................................................. 18-19, 23

*Glickenhaus & Co.* v. *Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ...........................................................9, 13

*Hygh* v. *Jacobs*,
   961 F.2d 359 (2d Cir. 1992) ................................................................7

*Kumho Tire Co.* v. *Carmichael*,
   526 U.S. 137 (1999).......................................................................... 6-7

*Lentell* v. *Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................7

Doc#: US1:10180901v1

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    32 F. Supp. 3d 453, 461-62 (S.D.N.Y. 2014) .........................................................24

*Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................................................23, 24

*Major League Baseball Props., Inc.* v. *Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) .............................................................................6, 19

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
    593 F. Supp. 2d 549 (S.D.N.Y. 2008) .................................................................10

*Nimely* v. *City of New York*,
    414 F.3d 381 (2d Cir. 2005) ..................................................................................7

*Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) .................................................................13

*In re Pfizer Inc. Sec. Litig.*,
    2014 WL 3291230 (S.D.N.Y. 2014) ....................................................................10

*Primavera Familienstifung* v. *Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001) .................................................................24

*Snyder* v. *Wells Fargo Bank, N.A.*,
    2012 WL 4876938 (S.D.N.Y. 2012) ......................................................................7

*Solow* v. *Citigroup, Inc.*,
    827 F. Supp. 2d 280 (S.D.N.Y. 2011) ...................................................................8

*In re Williams Sec. Litig.*,
    558 F.3d 1130 (10th Cir. 2009) .......................................................................9, 11

*In re Worldcom, Inc. Sec. Litig.*,
    2005 WL 2319118 (S.D.N.Y. 2005) ......................................................................8

*Zaremba* v. *Gen. Motors Corp.*,
    360 F.3d 355 (2d Cir. 2004) ................................................................................10

**Rules**

Fed. R. Evid. 104 ......................................................................................................25

Fed. R. Evid. 403 ...........................................................................................3, 24, 25

Fed. R. Evid. 702 .............................................................................................2, 6, 22

Fed. R. Evid. 703 ......................................................................................................25

Doc#: US1·10180901v1

Defendants The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), James Cayne and Warren Spector (collectively, "defendants") respectfully submit this memorandum of law in support of their motion to exclude the testimony of John D. Finnerty.

### PRELIMINARY STATEMENT

Plaintiff Bruce S. Sherman proffers the testimony of John D. Finnerty as plaintiff's expert on loss causation and damages, but Finnerty's testimony does not meet the applicable standards. While it is common to present expert testimony on loss causation and damages in securities cases like this, the expert's methodology must be reliable, and his testimony must assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Finnerty's proposed expert testimony does not meet this standard.

***Finnerty's Leakage Speculation***. A significant portion of plaintiff's alleged damages stem from Finnerty's speculation that information concerning Bear Stearns's financial condition "leaked" into the market between December 20, 2007 and March 13, 2008, causing the price of Bear Stearns stock to decline. Finnerty's leakage model is manufactured for this action, has never been proffered by Finnerty in any other case, endorsed by any court, or subjected to any peer review. And the only two Circuit courts to have considered leakage methodologies for loss causation and damages have found them deficient under *Dura Pharmaceuticals, Inc.* v. *Broudo* ("*Dura*"), 544 U.S. 336, 342-44 (2005).

Finnerty's leakage analysis is flawed for the additional reason that he offers no evidence that Bear Stearns's stock price actually moved in reaction to leakage of particular information concerning the alleged fraud; instead, the most Finnerty can say is that the stock price decline is "consistent" with fraud. Indeed, Finnerty admits he has no idea what information was leaking and when. Finnerty's speculation on leakage also does not adequately account for

the possibility that the decline in Bear Stearns's stock price during this period was due to factors unrelated to the alleged fraud, including negative news concerning the Company as it navigated the onset of the worst financial crisis since the Great Depression.  Courts have consistently held that controlling for changes in the stock price based on non-fraud related news is a necessary step in any loss causation analysis.  For all of these reasons, Finnerty's speculation on leakage is unreliable and therefore inadmissible. Fed. R. Evid. 702. (*See infra* pp. 11-15.)

*Finnerty's Inflation Calculation*.  Finnerty's calculation of the inflation in Bear Stearns's stock price during the relevant period should be excluded as unreliable because Finnerty assumes, without any basis, that the market's reaction to disclosure of the alleged fraud would have been as severe throughout the relevant period (December 14, 2006 through March 17, 2008) as it was at the end of that period when Bear Stearns experienced a run on the bank. Because Finnerty admits that disclosure of the alleged fraud in early 2007 would have been unlikely to cause the same market reaction as occurred in March 2008, his estimate of inflation— and therefore his damages calculation—is significantly overstated. (*See infra* pp. 15-18.)

*Finnerty's Other "Opinions"*.  Although Finnerty limits his opinions to market efficiency, loss causation, and damages in his expert report, he testified that Bear Stearns's risk management and liquidity were deficient and its mortgage-related assets overvalued, and that the disclosure of these issues spurred the run on bank.  Finnerty conducted no independent analysis of Bear Stearns's valuations, risk management, or liquidity, however.  Instead, he relies on a handful of documents and snippets of testimony—often cherry-picked to the exclusion of contrary evidence—claiming he could rely on the analysis of others rather than perform any analysis himself.  Finnerty's testimony on these topics therefore offers the jury no assistance and is unreliable.  Finnerty does no more than counsel for plaintiff will do in argument, *i.e.*,

2

summarize the evidence in the record.  Even if any of the proffered testimony could overcome these objections, it should still be excluded under Federal Rule of Evidence 403, because any probative value it might have is vastly outweighed by the prejudice to defendants of having Finnerty provide "expert" testimony on these topics.  (*See infra* pp. 18-25.)

## THE FACTS

John D. Finnerty, a Managing Director of AlixPartners, LLP, a financial and operational consulting firm, is plaintiff's sole testifying expert in this action.  (Carey Decl. Ex. 2, Mar. 2, 2015 Report of John D. Finnerty ("Finnerty Rpt") ¶ 1.)  On March 2, 2015, Finnerty submitted a report in this action (the "Report") covering three topics:  (i) market efficiency; (ii) loss causation; and (iii) damages.  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 11.)  Finnerty was deposed in this action on May 14, 2015.

Finnerty's opinions on loss causation and damages are as follows:

*First*, Finnerty concludes that the price of Bear Stearns stock declined on March 14, 2008 and March 17, 2008 (the "Corrective Disclosure Dates") following the "public revelation of previously undisclosed facts" regarding Bear Stearns's "risk management deficiencies and deteriorating financial condition, especially related to Bear Stearns' growing liquidity problems." (*Id.* ¶ 261.)  Finnerty also concludes that the stock price declined between December 20, 2007 and March 13, 2008, which he refers to as the "Leakage Period," as these same facts "leaked" into the market.  (*Id.*)

*Second*, Finnerty concludes that the declines in Bear Stearns's stock price on the Corrective Disclosure Dates and during the Leakage Period were "substantially caused" by the revelation of the alleged fraud, not by any (i) market-wide or industry-wide effects, or (ii) news about Bear Stearns unrelated to the alleged fraud.  (*Id.* ¶¶ 11, 261.)  Finnerty claims he controlled for these effects in his calculation of the daily inflation in Bear Stearns's stock price:  (i) he

3

controlled for market and industry effects using an event study and regression model to calculate the "abnormal return"[1] in the stock price each day, which he then used to calculate the daily stock price inflation attributable to the alleged fraud.; and (ii) Finnerty purportedly controlled for non-fraud related Bear Stearns news after reviewing news items for each day and categorizing them as "fraud related" or "non-fraud related."  He then determined inflation as follows:

- On days where he found the news about Bear Stearns was exclusively non-fraud related **and** there was a statistically significant stock price movement, Finnerty ignored the abnormal return in the stock price (which could be explained by the non-fraud news) and used the actual return on the stock to calculate the inflation due to the alleged fraud ("Non-Fraud Days").  (Carey Decl. Ex. 29, Finnerty Tr. at 261:19-263:11.)

- On all other days—*e.g.*, days where Finnerty found a mix of fraud and non-fraud related news, where he found only non-fraud related news but the stock price movement was not statistically significant, or where he found no Bear Stearns-specific news at all—he used the expected return (the difference between the actual return and the abnormal return) to calculate inflation due to the alleged fraud.  (*Id.* at 253:3-16; 275:14-276:10.)

*Third*, Finnerty opines that plaintiff suffered an economic loss of $78.45 per share, and that his aggregate damages are $13,147,777, or $21,833,155 including prejudgment interest.  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 11.)  Finnerty's damages calculation is based on his estimation of the amount of inflation in Bear Stearns stock due to the alleged fraud between December 14, 2006—the date of Bear Stearns's 2006 Form 10-K, which plaintiff contends contained misstatements—and March 17, 2008, when Bear Stearns announced that JPMorgan Chase & Co. ("JPMorgan") would acquire it for $2 per share (the "Relevant Period").  He begins by calculating the inflation in the stock price on the last day of the Relevant Period (March 17,

---

[1]   As explained by Finnerty, "[a] security's abnormal return is the difference between the security's actual return and its expected return.  A security's expected return is the return one would expect based on general stock market price movements and industry-related factors that are unrelated to the specific event that is being examined, as reflected in the changes in the prices of stocks of firms in the same industry."  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 58.)

2008) and proceeds backwards, calculating the inflation on the immediately preceding trading day (*i.e.*, March 14, 2008) and adding the inflation from March 17 to his calculation of inflation on March 14, to get the total stock price inflation on March 14, as follows:

- For March 17, 2008, Finnerty multiplies the closing price of Bear Stearns stock on March 14, 2008 ($30.00) by the abnormal return on the stock on March 17, 2008 (-77.24%) which results in inflation of $23.17 per share.

- For March 14, 2008, Finnerty completes the same steps, multiplying the closing price of Bear Stearns stock on March 13, 2008 ($57.00) by the abnormal return on the stock on March 14, 2008 (41.08%), which equals $23.42.  He then adds $23.42 to the inflation from March 17, 2008 ($23.17) to get total inflation of $46.59 per share on March 14, 2008.

(*Id.* ¶ 267, Atts. 31, 34; Carey Decl. Ex. 29, Finnerty Tr. at 160:14-161:5.)  Finnerty continues to work backwards as he calculates stock price inflation due to the alleged fraud during his Leakage Period.[2]  (Carey Decl. Ex. 2, Finnerty Rpt, Atts. 31, 34.)  Finnerty concludes that the abnormal return on the stock price on each Corrective Disclosure Date, and the stock price's cumulative abnormal return during his Leakage Period, are statistically significant.  (*Id.* ¶ 236, Att. 34.)

## ARGUMENT

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

---

[2] Finnerty calculates stock price inflation differently on the Corrective Disclosure Dates than he does during the Leakage Period; however, both calculations carry back the entirety of the purported inflation due to the alleged fraud from March 14 and March 17, 2008.  Thus, starting on March 13, 2008, the last day in the Leakage Period, the "but-for price" of Bear Stearns stock—the price Finnerty would have expected in the absence of fraud—is equal to the actual stock price that day minus the inflation that Finnerty calculated on March 14 and March 17.  During the Leakage Period, Finnerty works backwards using the actual return (on Non-Fraud Days, as described above) or the expected return on all other days, to calculate the "but-for price," and then subtracts the "but-for price" from the actual price to get inflation on a particular day.  (*See* Carey Decl. Ex. 2, Finnerty Rpt, Atts. 31, 34.)  In contrast, Finnerty simply uses the inflation in Bear Stearns's stock on December 20, 2007 ($79.09 per share) for each day between December 14, 2006 and December 19, 2007.  (*Id.* ¶¶ 266, 269, Att. 31.)

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Rule 702, as amended, codifies the holdings of *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny.   Under Rule 702 and *Daubert*, "the district court functions as the gatekeeper for expert testimony," *Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks omitted), and courts must exclude expert testimony if it: (1) lacks a "reliable foundation" or (2) is not "relevant to the task at hand." *Daubert*, 509 U.S. at 597.   The proponent of expert testimony has "the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 advisory committee's note (2000 Amend.); *see Astra Aktiebolag* v. *Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002).

To assess the reliability and validity of an expert's method, a court should consider: (1) "whether [the method] can be (and has been) tested"; (2) "whether [it] has been subjected to peer review and publication"; (3) "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation"; and (4) whether the method has achieved "general acceptance" within the relevant community.   *Daubert*, 509 U.S. at 593-94 (internal citations omitted).

Courts consider additional factors when assessing the reliability of expert testimony, including "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" Fed. R. Evid. 702 advisory committee's note (2000 Amend.) (quoting *Daubert* v. *Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)); s*ee also Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999) (holding that an expert must "employ[] . . . the same level of intellectual rigor that characterizes

the practice of an expert in the relevant field"). *Daubert*'s reliability standards apply not only where an expert relies on a specific scientific methodology, but also "where an expert relies on 'skill- or experience-based observation.'" *Kumho Tire*, 526 U.S. at 151 (citation omitted).

*Daubert*'s second prong—relevance, or "fit"—requires that the court determine "whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593. In order to be admissible, "the expert's theory or methodology [must be] relevant in that it 'fits' the facts of the case." *Astra Aktiebolag*, 222 F. Supp. 2d at 487. That is, "[i]f the expert has failed to consider the necessary factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded for lack of probative value." *Id.* at 488 (citing *Lightfoot* v. *Union Carbide Corp.*, 1999 WL 110424, at *2 (2d Cir. 1999)).

Finally, the use of expert testimony is not permitted if it usurps "the role of the jury in applying [the] law to the facts before it." *Nimely* v. *City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citation omitted); *see also Snyder* v. *Wells Fargo Bank, N.A.*, 2012 WL 4876938, at *2 (S.D.N.Y. 2012). Thus, experts may not "merely tell the jury what result to reach." *Hygh* v. *Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (emphasis removed) (quoting Rule 704 advisory committee's note).

## I.      Finnerty's Opinions on Loss Causation and Damages During the "Leakage Period" Should Be Excluded

In order to prove loss causation, plaintiff must demonstrate that "the defendant's misrepresentation . . . proximately caused the plaintiff's economic loss." *Dura*, 544 U.S. at 346 (interpreting 15 U.S.C. §§ 78u–4(b)); *see also Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005) (holding that plaintiff must show that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security") (citation omitted). In order to prove that his losses were caused by the alleged fraud,

7

plaintiff must establish that the decline in stock price that resulted in his losses was a result of the market learning of the alleged fraud, *see In re Worldcom, Inc. Sec. Litig.*, 2005 WL 2319118, at *23 (S.D.N.Y. 2005), and that it was the alleged fraud, and not "other intervening causes, such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events'" that caused the stock price to decline. *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) (citation omitted).

      In federal securities fraud actions, loss causation is typically established by showing that news of the fraud, or news of the materialization of an undisclosed risk of the fraud, was revealed to the market on a specific date or series of dates, called "corrective disclosure" dates, and then analyzing the stock price decline on those dates. *Solow* v. *Citigroup, Inc.*, 827 F. Supp. 2d 280, 292 (S.D.N.Y. 2011) ("Loss causation 'is typically shown by the reaction of the market to a "corrective disclosure" which reveals a prior misleading statement' but 'may also be shown by the "materialization of risk" method, whereby a concealed risk—[such as] a liquidity crisis—comes to light in a series of revealing events that negatively affect stock price over time.'" (quoting *In re Vivendi Universal, S.A., Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011))). Indeed, Finnerty uses this methodology to analyze loss causation on the Corrective Disclosure Dates—March 14, 2008 and March 17, 2008. Unable, however, to identify any corrective disclosures prior to March 14, 2008, Finnerty claims that between December 20, 2007 and March 13, 2008, information regarding the alleged fraud was leaking into the market and causing the stock price to decline (Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 185, 187), and he concludes that plaintiff's losses were caused, in part, by leakage (*id.* ¶ 261).

      Finnerty's speculation about leakage should be excluded for at least two reasons: (i) Finnerty's leakage model is not endorsed by courts, generally accepted in the relevant

scientific community, or peer reviewed; and (ii) Finnerty has not established that the market was reacting to leakage of any particular information concerning the alleged fraud, and his leakage model fails adequately to control for non-fraud-related news about Bear Stearns; therefore, Finnerty cannot demonstrate that plaintiff's losses were caused by the alleged fraud rather than by non-fraud related factors.  For these reasons, Finnerty's leakage opinions are unreliable and should be excluded.

A.      **Finnerty's Leakage Opinions Should Be Excluded Because They Are Not Generally Accepted or Peer Reviewed**

Finnerty's leakage opinions should be excluded because his leakage model has not achieved "general acceptance" within the relevant scientific community or "been subjected to peer review and publication." *Daubert*, 509 U.S. at 593-94.  Indeed, no court has ever endorsed Finnerty's leakage model for loss causation and damages, and the only two Circuit Courts to have addressed leakage models have found that they "did not adequately account for the possibility that firm-specific, nonfraud related information may have affected the decline in [the] stock price during the relevant time period."  *Glickenhaus & Co.* v. *Household Int'l, Inc.*, 787 F.3d 408, 423 (7th Cir. 2015) (ordering new trial on loss causation); *see also In re Williams Sec. Litig.,* 558 F.3d 1130, 1138-39 (10th Cir. 2009) (excluding expert opinion for failure to establish that the stock price decline was a result of leakage of the fraud rather than the "tangle of factors" affecting the stock price, including other non-fraud related news related to the Company).  Finnerty's leakage analysis here suffers from the same fundamental issues identified in *Glickenhaus* and *In re Williams*.

Nor has Finnerty's leakage theory of loss causation and damages been accepted by the scientific community or peer reviewed.  Finnerty claims his analysis is derived from an article written over twenty-five years ago by Bradford Cornell and R. Gregory Morgan entitled

9

*Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883 (1990) (attached as Carey Decl. Ex. 82).   That article, however, does not support the particular methods Finnerty has devised here to estimate stock price inflation and to calculate damages due to leakage.  Finnerty himself indicates that he has "extended" the approach outlined by Cornell and Morgan in order to eliminate "potential bias" in the inflation calculation.  (Carey Decl. Ex. 2, Finnerty Rpt ¶ 191 n.310.)   And although Finnerty has written numerous expert reports concerning loss causation and damages, and has testified as an expert between 100 and 150 times, he has never before testified about leakage at trial, and has written about leakage in only one prior expert report.  (Carey Decl. Ex. 29, Finnerty Tr. at 29:4-30:4, 309:8-310:11.)   In that report, per the plaintiff's request, he calculated the abnormal return on the stock price during the leakage period, but was instructed by the plaintiff not to use the leakage damages in his damages calculation.  (*Id.*, Finnerty Tr. at 309:8-310:11.)

> Accordingly, Finnerty's leakage speculation does not pass muster under Rule 702: it has never been used successfully in litigation, nor has it been generally accepted by the scientific community or peer reviewed.  Courts, including the Second Circuit, have routinely precluded expert opinions under these circumstances. *See, e.g.*, *Zaremba* v. *Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (affirming exclusion of expert testimony where expert's proposed methodology was not subject to peer review and had not attained general acceptance in the field); *In re Pfizer Inc. Sec. Litig.*, 2014 WL 3291230, at *2 (S.D.N.Y. 2014) (rejecting expert's revised report in part because the expert failed to "offer[] any peer-reviewed analytical basis for [his] methodology"); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 561 (S.D.N.Y. 2008) (excluding expert testimony where expert could "not name another scientist who ha[d] ever employed, much less approved of," his method); *Gary Price Studios,*

10

*Inc.* v. *Randolph Rose Collection, Inc.*, 2006 WL 1319543, at *8 (S.D.N.Y. 2006) (excluding economic expert's theory that had not been subject to peer review where there "appear[ed] to be no prior application of his theories or methodology").

**B.    Finnerty's Leakage Opinions Should Be Excluded Because They Are Unreliable**

Finnerty is unable to establish that the decline in Bear Stearns's stock price during the Leakage Period was due to the market learning of the alleged fraud, as he must in order to demonstrate loss causation.  *See, e.g.*, *In re Williams*, 558 F.3d at 1138 (citing *In re Worldcom*, 2005 WL 2319118, for the proposition that plaintiff must "establish that his losses were attributable to some form of revelation to the market of the wrongfully concealed information.").  Finnerty readily admits that he does not know what actually caused Bear Stearns's stock price to move on any given day during the Leakage Period:

> I'm comparing [how I would expect the price to behave in the absence of fraud] to the actual behavior and that difference in any given day is the amount of inflation.   ***What actually causes that day to day I don't know because there aren't press releases that identify what's being disclosed.***  But what I can see is that, I can see the decline in the price of the stock, the persistent price in the decline of the stock over the leakage period.

(Carey Decl. Ex. 29, Finnerty Tr. at 228:10-22 (emphasis added).)  Finnerty can point to no public information during the Leakage Period that revealed the alleged fraud—even if only partially.   And while he speculates that unspecified "private disclosures" to Bear Stearns's trading parties of the Company's alleged overvaluation of assets and liquidity problems caused the stock price to decline, his Report contains no evidence of Bear Stearns's counterparties becoming aware of the alleged fraud, much less trading on the so-called "private" news.  (*Id.* at 120:2-121:21; 218:23-220:10.)   It is not enough for Finnerty simply to assume—without any basis whatsoever—that the market was reacting to leakage of the fraud throughout the entire Leakage Period.  (*Id.* at 227:14-228:22; 258:15-260:13; 261:19-266:20.)

11

Given his inability to tie Bear Stearns's stock price movements during the Leakage Period to actual revelations of the alleged fraud, Finnerty's opinions on loss causation rely entirely on his leakage model.  Using his model, Finnerty attempts to control for market- and industry-wide effects on Bear Stearns's stock price, as well as Bear Stearns-specific news that he does not attribute to the alleged fraud.  (*Id.* at 228:6-12 ("I'm specifically adjusting for company-specific news, which I believe you have to put in there . . . ."); *see also* Carey Decl. Ex. 2, Finnerty Rpt ¶ 235.)  He then concludes that any inflation in Bear Stearns's stock price—after application of these controls—is attributable to leakage of the alleged fraud.

But Finnerty's attempt to control for Bear Stearns-specific non-fraud news is fundamentally flawed.  Finnerty only excludes consideration of the abnormal return from his calculation of the inflation in Bear Stearns stock on Non-Fraud Days—*i.e.*, where he finds only Company-specific, non-fraud news ***and*** the stock price movement is statistically significant.  *See supra* at 4; (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31; Carey Decl. Ex. 29, Finnerty Tr. at 253:3-16; 261:19-262:8.)  Thus, on all other days in the Leakage Period, Finnerty attributes the ***entire*** abnormal return in the stock price to fraud, including on days were he finds a mix of Company-specific fraud and non-fraud related news as well as on days where he finds there is ***only*** Company-specific, non-fraud news but the stock price movement that day is not statistically significant (together, the "Fraud Days").[3]  (Carey Decl. Ex. 29, Finnerty Tr. at 253:3-16; 275:14-276:10.)  Finnerty admits he made no attempt to control for non-fraud news on Fraud Days:

> **Question**:  How did you control for company-specific non-fraud news on days that you designated as [Fraud Days]?
>
> **Finnerty**:  I did not.

---

[3]   Finnerty also attributes the entire abnormal return to fraud on days when there was no Bear Stearns-specific news at all, although he has no basis to do so.  (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

(*Id.* at 254:12-15.)   This is improper.   "Because the law requires the disaggregation of confounding factors, disaggregating only *some* of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss." *Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008).   Indeed, in one recent action involving a loss causation leakage model, the Seventh Circuit ordered a new trial on loss causation because of the plaintiff's expert's failure to control for company-specific, non-fraud news. *Glickenhaus & Co.* v. *Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015); *see also Dura*, 544 U.S. at 343 (holding that, to establish loss causation, plaintiff must disaggregate the effect of the alleged fraud from "the tangle of [other] factors affecting price").

Finnerty's leakage model is flawed for the additional reason that even on Non-Fraud Days, he sometimes attributes a change in stock price inflation to leakage of the alleged fraud.   (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31; Carey Decl. Ex. 29, Finnerty Tr. at 258:15-260:13, 261:19-266:20.)   For example, on March 6, 2008, a Non-Fraud Day, Finnerty found that $5 of inflation leaked out of Bear Stearns stock, even though he determined that all of the Bear Stearns news that day was non-fraud related and the stock price movement was statistically significant, and he therefore did not take the abnormal return into account when calculating the stock price inflation that day.   (*See* Carey Decl. Ex. 52, April 16, 2015 Report of Alan Ferrell ("Ferrell Rpt") ¶¶ 57, 61; Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)   That Finnerty's model finds a change in inflation due to fraud despite the fact that he could not attribute any abnormal return to fraud on that day is a further indication that his leakage model is unreliable.   (Carey Decl. Ex. 52, Ferrell Rpt ¶ 57; Carey Decl. Ex. 46, Ferrell Tr. at 160:21-163:7.)

Finnerty's speculation on leakage is further undermined by his selection of the Leakage Period.   In his Report, Finnerty provides no particular reason for choosing December

20, 2007 as the start of the Leakage Period, pointing only to certain purported credit indicators (such as widening credit default spreads and credit rating downgrades) that he contends are "consistent" with leakage of information about the alleged fraud. (Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 210-12.) Finnerty does not claim, however, that these credit indicators were *caused* by leakage. (Carey Decl. Ex. 29, Finnerty Tr. at 285:15-286:9.) Nor could he, as the timing of those indicators, ranging from June 2007 to March 10, 2008, provides no basis for beginning the Leakage Period on December 20, 2007 (Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 210-12.) Finnerty testified that he picked December 20, 2007 as the start of the Leakage Period because he noticed "increased interest and increased concern" expressed by analysts about the liquidity and financial condition of Bear Stearns around that date, following the announcement of Bear Stearns's first quarterly loss as a public company and its write-down of $1.9 billion in mortgage-related assets. (Carey Decl. Ex. 29, Finnerty Tr. at 282:15-283:18.) However, Finnerty categorized both of these announcements as Bear Stearns-specific, non-fraud related news in his Report (Carey Decl. Ex. 2, Finnerty Rpt, Att. 30), belying his contention that analysts' reactions to those announcements evidence leakage of the alleged fraud.

In addition, Finnerty's inclusion of a handful of days at the end of his Leakage Period drives the statistical significance of the aggregate stock price decline that he claims is attributable to the fraud over the entire Leakage Period. That is, if Finnerty had excluded March 10, 2008 through March 13, 2008 from his Leakage Period—when rumors about Bear Stearns ultimately resulted in a run on the bank—the cumulative decline in Bear Stearns's stock price that he attributes to leakage would not have been statistically significant. (*See id.* ¶¶ 59-62, Ex. 8.) Finnerty's inclusion of the week of March 10, 2008 in his Leakage Period therefore distorts the statistical significance of the rest of the Leakage Period, making the return on Bear Stearns's

14

stock price between December 20, 2007 and March 9, 2008 appear abnormal, when, in fact, it was in line with that of Bear Stearns's peer firms. (*Id.* Ex. 7.) The lack of any statistically significant cumulative abnormal return on Bear Stearns's stock during this earlier time period undercuts Finnerty's contention that the market was reacting to the disclosure of the alleged fraud during the Leakage Period.

The unreliability of Finnerty's leakage methodology, and his overestimation of inflation, is illustrated by the fact that Finnerty attributes nearly the entire stock price decline over the course of the Leakage Period ($32.50 of a total decline of $33.60)[4] to fraud. This result is simply not plausible given the severe market turmoil during this period, the similar stock price declines experienced by Bear Stearns's peer firms, and the fact that the Company released significant, non-fraud related, negative news during this period. This is particularly true given the absence of specific evidence that the market was reacting to the leakage of fraud rather than these other factors.

## II.   Finnerty's Opinions on Loss Causation and Damages Should be Excluded Because His Estimates of Inflation Are Unreliable

Because Finnerty's inflation calculations depend on an implausible and untested assumption about the market's reaction to the revelation of the alleged fraud, his opinions as to the amount by which Bear Stearns's stock price was inflated during the Relevant Period, and his damages calculations based on those opinions, must be excluded as unreliable. *Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of

---

[4]   The share price of Bear Stearns's common stock fell from a closing price of $90.60 on December 19, 2007, to a closing price of $57.00 on March 13, 2008. Finnerty estimated that inflation fell from $79.09 to $46.59 over the course of the Leakage Period. (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31.)

15

that unreliable opinion testimony." (quoting *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)) (internal quotation marks omitted)).

Finnerty's inflation calculation is flawed because he assumes that Bear Stearns's stock price would have reacted in the same way at the beginning of the Relevant Period as it did at the end of the Relevant Period.  Specifically, Finnerty's inflation calculation starts on March 17, 2008, the last day in the Relevant Period, and works backwards, incorporating the $23.17 of stock price inflation he calculates on March 17, 2008 in his inflation calculation for each and every other day in the Relevant Period.  *See supra* at 3-4; (*See* Carey Decl. Ex. 52, Ferrell Rpt ¶ 16.)  Similarly, on the other Corrective Disclosure Date, March 14, 2008 (the trading day preceding March 17), Finnerty calculates $23.42 in stock price inflation, and then adds the $23.17 of inflation from March 17, for a total of $46.57 in inflation per share on March 14, 2008. That $46.57 per share of inflation is then incorporated in Finnerty's inflation calculations on each preceding day, all the way back to December 14, 2006.  (*See* Carey Decl. Ex. 29, Finnerty Tr. at 321:20-322:2 ("The effect is to carry back the last two, that is the inflation amounts from . . . March 14th and 17th."); Carey Decl. Ex. 52, Ferrell Rpt ¶ 47.)  In carrying back the stock price inflation this way, Finnerty necessarily assumes that throughout the Relevant Period, the market would have reacted the same way to disclosure of the alleged fraud—*i.e.*, the severe deterioration in Bear Stearns's liquidity and subsequent announcement that Bear Stearns would be acquired by JPMorgan—as it did on March 14, 2008 and March 17, 2008.  (Carey Decl. Ex. 52, Ferrell Rpt ¶¶ 48-51.)

Finnerty has admitted, however, that such an assumption is unfounded.  At his deposition, Finnerty conceded that the market likely would ***not*** have reacted the same way to the

disclosure of the alleged fraud prior to December 20, 2007 (the start of the Leakage Period) as it

did during the week of March 10, 2008:

> **Question**:   [D]o you think that if Bear Stearns had disclosed a significant
> deterioration in its liquidity in January of 2007 it would have been as likely to
> have experienced a run on the bank as it was in March of 2008?
>
> **Finnerty**: . . . . I doubt it.  The situation was, was certainly more serious by the
> end of '08.  Going back to January of '07, I doubt the consequences would have
> been as severe. . . . I think the ship could have sunk as early as December 20th of
> '07.  In other words, the run on the bank could have started earlier.  I think it's
> unlikely going back to January '07 that a run on the bank would have occurred
> under those circumstances.  I think that's much less likely.

(Carey Decl. Ex. 29, Finnerty Tr. at 211:3-25.)  In the absence of a run on the bank, there is no

basis to conclude that Bear Stearns's stock price would have declined as it did on March 14 and

March 17, 2008, in reaction to the Company's announcements that its liquidity had significantly

deteriorated and it was merging with JPMorgan.  Indeed, the magnitude of the market's reaction

to the announcement of the merger necessarily reflected a reaction to the announcement of the

acquisition price of $2 per share, which would not have happened in the absence of the run on

the bank.  (*See* Carey Decl. Ex. 52, Ferrell Rpt ¶ 77.)  Finnerty's concession that a bank run

would not have occurred if the "truth" about Bear Stearns had been revealed prior to December

20, 2007 means, at a minimum, his calculation of inflation prior to December 20, 2007 is faulty.

Finnerty also concedes, as he must, that market conditions, and conditions at Bear

Stearns in particular, changed significantly over the Relevant Period, as the country entered a

"severe recession."  (Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 22-29, 192; 210-11; Carey Decl. Ex. 29,

Finnerty Tr. at 130:14-131:11, 206:22-210:15, 211:3-25.)  He nevertheless conducted no analysis

to determine whether the stock price reaction to the disclosure of the alleged fraud would have

been as severe earlier in the Relevant Period as it was in March 2008.  (Carey Decl. Ex. 29,

Finnerty Tr. at 322:23-323:10 ("I've not done a hypothetical calculation of what might have

17

happened if [Bear Stearns had] made disclosures before December 20th, 2007.").)  Accordingly, Finnerty's inflation calculations, which carry back $46.57 in stock price inflation from March 14, 2008 and March 17, 2008 all the way to December 14, 2006, rest on unreliable assumptions and must be excluded.[5]

### III.   Finnerty Should Not Be Allowed to Give Testimony That Is Nothing More Than Summaries and Characterizations of the Evidence

As Finnerty's testimony confirms, his Report contains opinions on only three topics: (1) the efficiency of the market for Bear Stearns stock, (2) loss causation, and (3) plaintiff's damages.  (Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 10-11 (Section III:  "Summary of Opinions"); ¶¶ 279-83 (Section IX:  "Conclusions"); Carey Decl. Ex. 29, Finnerty Tr. at 339:20-340:12; *see also id.* 87:6-15.)  Nevertheless, during his deposition, Finnerty also claimed to have "opinions" on a number of additional topics, namely the valuation of Bear Stearns's mortgage-related assets (Carey Decl. Ex. 29, Finnerty Tr. at 67:14-68:4), the Company's risk management practices (*id.* at 88:2-13), and the adequacy of Bear Stearns's liquidity (*id.* at 49:23-50:8).  These "opinions" should be excluded because they are not derived from any reliable principles or methods and will not assist the trier of fact.

In order to meet the standard for admissibility, an expert opinion must have an adequate analytical basis of support.  *See Daubert*, 509 U.S. at 590 (noting that expert testimony must "connote[] more than subjective belief or unsupported speculation").  Generally, the district court should focus on the expert's methodology rather than the conclusions that the expert reaches.  *See id.* at 594-95.  However, the expert's conclusions are not immune from scrutiny: "[a] court may conclude that there is simply too great an analytical gap between the data and the

---

[5]   Finnerty carries back the inflation from the Leakage Period in a similar way without any analysis of how the market would have reacted to the leakage of information at an earlier point in time (Carey Decl. Ex. 2, Finnerty Rpt, Att. 31; Carey Decl. Ex. 29, Finnerty Tr. at 320:23-322:12), so the inflation attributable to leakage must be excluded for the same reason.

opinion proffered." *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997); *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment." (internal citation omitted)).

Finnerty summarizes or excerpts a handful of documents and testimony he claims represents the "best evidence" of plaintiff's allegations that Bear Stearns's mortgage-related valuations were overstated, its risk management deficient, and its liquidity inadequate. (*See* Carey Decl. Ex. 29, Finnerty Tr. at 85:4-87:5). However, Finnerty's recitation of this "evidence"—much of which he mischaracterizes or takes out of context—does not reflect any analysis by Finnerty, and his regurgitation of the views of others would not assist the trier of fact.[6]

For instance, Finnerty readily admits that he conducted no independent analysis or evaluation of Bear Stearns's mortgage valuations to determine whether they were misstated:

> **Question**: [D]id you conduct an independent analysis of the valuations of any of Bear Stearns' assets during the relevant time period?
>
> **Finnerty**: No, I relied on the documents I reviewed. I didn't do my own.

(*Id.* at 59:14-20.) Indeed, Finnerty stated that he was unable to analyze Bear Stearns's mortgage valuations during the Relevant Period because he lacked information sufficient to perform the analysis. Specifically, Finnerty had requested the workpapers of Bear Stearns's auditor, Deloitte & Touche ("Deloitte"),[7] as well as the valuations performed by JPMorgan in connection with its

---

[6] As discussed in the accompanying motion for summary judgment, none of the documents cited by Finnerty as the "best evidence" of the purported fraud comes close to establishing that Bear Stearns's valuations were inaccurate, its risk management deficient, or its liquidity and capital inadequate, much less that defendants made material misstatements or omissions on these topics. (*See* Defs.' Br. in Supp. of Summary Judgment at 11-26.)

[7] Deloitte, also a defendant in this action, produced its work papers to plaintiff nearly four years ago. (*See* Carey Decl. Ex. 77, August 15, 2011 Deloitte Production letter; *see also* Carey Decl. Ex. 42, August 23, 2011 Deloitte Production Letter.)

acquisition of Bear Stearns in March 2008,[8] in order to analyze Bear Stearns's mortgage valuations, but counsel for plaintiff did not provide him with the requested documents. (*Id.* at 77:13-21 ("Unless I got the Deloitte & Touche workpapers . . . I couldn't provide a full analysis"); 62:6-68:10 ("I don't know whether [the overvaluations] were systematic and I don't know the full extent of them because I don't have the evidence"); 148:13-149:4 ("I didn't drill down . . . I didn't have the information . . . to get into the nuts and bolts of the portfolio").) And despite baldly claiming that the evidence shows that certain of Bear Stearns's assets were overvalued, Finnerty did not perform any analysis (or point to any documents) detailing which assets were purportedly overvalued and by how much. (*See, e.g., id.* at 67:14-68:18, 70:10-71:17, 72:23-73:8.)

Similarly, Finnerty did not analyze Bear Stearns's risk management practices during the Relevant Period, instead relying heavily on a September 25, 2008 report by the SEC Office of Inspector General, Office of Audits, and its technical consultant, Professor Albert S. Kyle ("OIG Audit Report") (Carey Decl. Ex. 2, Finnerty Rpt ¶ 160),[9] as well as a smattering of internal Bear Stearns documents, for his conclusion that Bear Stearns's risk management practices were deficient:

> **Question:** [D]id you determine that Bear Stearns' value at risk disclosures in its financial statements were inaccurate?
>
> **Finnerty:** I read the opinions of others which seem to me to be well supported. I did not do my own independent assessment of VaR, I didn't think I needed to

---

[8]   Although discovery in the consolidated and coordinated Bear Stearns actions, including this action, had been ongoing since 2011, plaintiff did not attempt to subpoena JPMorgan for its valuations of Bear Stearns's mortgage assets until the last day of fact discovery. (Carey Decl., Ex. 83, Plaintiffs' Notice of Issuance of Subpoena for Production of Documents to Non-Party JPMorgan Chase & Co., dated December 10, 2014.) The Court held that the subpoena was untimely. (08 Civ. 2793, Dkt. No. 354.)

[9]   The OIG Audit Report is the subject of a separate motion to exclude filed by defendants concurrently with this motion and their motion for summary judgment. As we explain in more detail in the motion to exclude the OIG Audit Report, the purpose of that report was to review the SEC's program for overseeing investment banks, not Bear Stearns, and its purported "findings" about Bear Stearns are untrustworthy.

because others such as Professor Kyle, who assisted the SEC[,] have opined on the issue.

*     *     *

**Question**: [W]hat analysis did you conduct of Bear Stearns' models?

**Finnerty**: I didn't, I didn't test their models myself.

*     *     *

**Question**: And in terms of the scenario analysis, have you done an analysis of which scenarios were being run by Bear Stearns over which portfolios?

**Finnerty**: No, I'm citing to others who did do that and found them deficient, but I've not . . . done that. I didn't think it was necessary to redo their work.

(Carey Decl. Ex. 29, Finnerty Tr. at 91:19-92:9; 103:4-9; 105:7-19; *see id.* 110:3-12.) Indeed, Finnerty admits that his views on Bear Stearns's risk management do not "rise to the level of a formal opinion." (*Id.* at 88:2-13.)

Finnerty also claims that Bear Stearns's liquidity was inadequate during the Relevant Period, but does not dispute that Bear Stearns's liquidity was accurately reported:

**Question**: Are you contending at all that the number that was disclosed in Bear Stearns' financial statements for its liquidity was inaccurate?

**Finnerty**: No, I'm not.

(*Id.* at 115:9-13.) Instead, Finnerty asserts that Bear Stearns's liquidity was deficient based on his review of internal documents (*id.* at 50:9-13; *see also* 49:23-50:22), his analysis of Bear Stearns's short-term repurchase financing relative to other investment banks (Carey Decl. Ex. 2, Finnerty Rpt. Att. 28), and his analysis of Bear Stearns's corporate bond credit spreads, credit default swap spreads, and credit ratings (*id.*, Att. 29), which he claims reflects "the market's assessment of liquidity and credit" (*See* Carey Decl. Ex. 29, Finnerty Tr. at 60:13-62:5). But Finnerty has not actually analyzed Bear Stearns's liquidity during the Relevant Period; he cannot say when Bear Stearns's liquidity was allegedly inadequate and by how much. His liquidity

21

"opinion" should be excluded because it is not based on reliable principles and methods. *See* Fed. R. Evid. 702(c).[10]

Further, Finnerty bases his "opinions" on mortgage valuation, risk management, and liquidity on cherry-picked facts, ignoring contradictory information.  For instance, while Finnerty relies on the OIG Audit Report, he does not address the highly critical response to the report from the SEC's Division of Trading and Markets ("T&M")—the division that supervised Bear Stearns—which found that the OIG Audit Report was based on incomplete data, "starts from incorrect assumptions and reaches inaccurate, unrealistic, and impracticable conclusions." (Carey Decl. Ex. 30, OIG Audit Report at 83.)  T&M found that the OIG failed to recognize numerous improvements by Bear Stearns, including in the areas of mortgage valuation and risk management.  (*Id.* at 94-95.)  Although Finnerty stated that he had reviewed the T&M response to the OIG Audit Report (Carey Decl. Ex. 29, Finnerty Tr. at 44:21-45:12.), he does not mention it in his Report, much less explain how he reached his conclusions in spite of these findings. Finnerty likewise ignores relevant testimony that contradicts his "opinions," including testimony that the Company's mortgage valuation models were regularly updated.  (*See, e.g.*, Carey Decl. Ex. 45, Verschleiser Tr. at 166:11-15.)  This Court has observed that an expert's failure to consider evidence that refutes his conclusions negatively impacts its admissibility, noting specifically that "to ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of an expert's methodology." *Faulkner* v. *Arista Records LLC*, 46 F.

---

[10]   Although Finnerty also alludes to deficiencies in Bear Stearns's capital in his Report (*see, e.g.*, Carey Decl. Ex. 2, Finnerty Rpt ¶ 169), he testified that he conducted no analysis of Bear Stearns's capital during the Relevant Period to determine whether it was misstated (Carey Decl. Ex. 29, Finnerty Tr. at 59:21-60:7), and in fact does not believe that the Company's capital was misstated (*see id.* 134:17-135:5).  While he claims that Bear Stearns's capital was insufficient (*id.* at 117:5-22; *see also* Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 137, 169), his "opinion"—like his liquidity "opinion"—is not based on reliable principles and methods.  *See* Rule 702(c); *supra* at 18-20.

Supp. 3d 365, 381 (S.D.N.Y. 2014) (citing *E.E.O.C.* v. *Bloomberg, L.P.*, 2010 WL 3466370, at *17 (S.D.N.Y. 2010)) (alterations omitted).

In sum, Finnerty's "opinions" on mortgage valuation, risk management, liquidity and capital should be excluded because the analytical gap between his purported opinions and the "evidence" he cites is simply too great to clear *Daubert*'s bar against "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Moreover, an expert may not simply summarize the opinions of others and grant such individuals the imprimatur of his expertise, but rather must offer his own unique opinion based on reliable scientific, technical or other specialized methods. *Arista Records LLC* v. *Usenet.com, Inc.*, 608 F. Supp. 2d 409, 428 (S.D.N.Y. 2009) (excluding an expert because "his opinions [were] merely a restatement of [defendant's] views and [were] not the product of independent analysis"); *Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) ("It is true that experts are permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field. But in doing so, the expert witness must in the end be giving his *own* opinion. He cannot simply be a conduit for the opinion of an unproduced expert."); *cf. Am. Home Assur. Co.* v. *Merck & Co.*, 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006) (admitting report of an expert who "reviewed all the underlying materials that informed [an earlier expert report] and reached similar conclusions [and] then add[ed] additional observations"). Summarizing the factual record requires no specialized knowledge or expertise that Finnerty is uniquely qualified to

provide. *See, e.g.*, *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 461-62 (S.D.N.Y. 2014) (excluding portion of expert's report and testimony that merely "summarize[d] the findings of various audit opinions, the actions allegedly taken by [Defendant], and the contents of other documents in the record"). Finnerty does no more than counsel for plaintiff "will do in argument, *i.e.*, propound a particular interpretation of [the evidence in the record]. This is not justification for the admission of expert testimony." *Primavera Familienstifung* v. *Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001); *see also Louis Vuitton Malletier*, 525 F. Supp. 2d at 654 ("an expert is not supposed to be doing the work of counsel; an expert must bring to the jury more than the lawyers can offer in argument"). The trier of fact is perfectly capable of reviewing the evidence, without any assistance from Finnerty, and without Finnerty acting as an inappropriate filter or summarizer of the record.

Permitting testimony that consists of a mere retelling of some of the facts, albeit with a spin, is also highly prejudicial to defendants. Federal Rule of Evidence 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Because Finnerty's summaries of the record have been filtered through and colored by his perspective, there is serious risk of bias (*see, e.g.*, Carey Decl. Ex. 2, Finnerty Rpt ¶¶ 138, 141-44, 155, 160, 166, 173, 179, 181, noting "emphasis supplied" by Finnerty to various portions of the factual record). Finnerty also puts his own emphasis on portions of testimony and documents without noting that he is doing so in a number of places. (*Compare, e.g.*, *id.* ¶ 165 *with id.* Ex. 23; *id.* ¶ 168 *with id.* Ex. 27; *id.* ¶ 169 *with id.* Ex. 31; *id.* ¶ 174 *with id.* Ex. 36; and *id.* ¶ 176 *with id.* Ex. 63.)

Doc#: US1:10180901v1

This serious risk of bias is perhaps best exemplified by portions of Finnerty's Report that blatantly misrepresent several documents in the record by taking them entirely out of context. To take just one example, in paragraph 165(c) of his Report, Finnerty misleadingly quotes from an email between three Bear Stearns employees, bolding the portion of the email that he claims implies "that the desk is being dishonest and systematically mis-marking the book" but deliberately omitting the very next sentence, in which the employee observes that "[t]his is just not the case." (*Id.* Ex. 25.)

The fact-finder is perfectly capable of evaluating the documents and testimony in this case. Any factual summaries should be provided by counsel of record during argument to the Court and the jury, and not by a supposed expert witness who is nothing more than a vehicle for plaintiff to provide a blatantly biased and out-of-context recitation of some portion of the evidence by way of a supposed "expert" opinion. Finnerty's summary of the record, without any analysis, much less analysis based on reliable scientific, technical or other specialized principles and methods as required by Rules 702 and 703, adds no probative value and should be further excluded as prejudicial to defendants under Rule 403.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court grant their motion to exclude the testimony of John D. Finnerty as described above. To the extent the Court has questions concerning Finnerty's testimony, defendants respectfully request a hearing pursuant to Federal Rule of Evidence 104.

Dated: August 17, 2015
       New York, New York

Respectfully Submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
       Brad S. Karp (bkarp@paulweiss.com)
       John F. Baughman (jbaughman@paulweiss.com)
       Jessica S. Carey (jcarey@paulweiss.com)
       Jonathan H. Hurwitz (jhurwitz@paulweiss.com)

1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns Companies Inc.*


David S. Frankel (dfrankel@kramerlevin.com)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
(212 715-9100)
*Attorneys for Defendant James E. Cayne*


David B. Anders (DBAnders@wlrk.com)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*