# EXHIBIT 3



**Alternative Investment Management Association**

# AIMA'S ILLUSTRATIVE QUESTIONNAIRE FOR DUE DILIGENCE OF

# Bear Stearns High Grade Structured Credit Strategies Fund

Published by
**The Alternative Investment Management Association Limited (AIMA)**

## IMPORTANT NOTE

All/any reference to AIMA should be removed from this document once any amendment is made of any question or information added - including details of a company/fund.

Only AIMA can distribute this questionnaire in its current form to its member companies and institutional investors on its confidential database.

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568638

# AIMA's Illustrative Questionnaire for Due Diligence Review of
# HEDGE FUND MANAGERS

This due diligence questionnaire is a tool to assist investors when considering a hedge fund manager and a hedge fund. Most hedge fund strategies are more of an investment nature than a trading activity. Each strategy has its own peculiarities. The most important aspect is to understand clearly what you plan to invest in. You will also have to:

- identify the markets covered,
- understand what takes place in the portfolio,
- understand the instruments used and how they are used,
- understand how the strategy is operated,
- identify the sources of return,
- understand how ideas are generated,
- check the risk control mechanism,
- know the people you invest with professionally and, sometimes, personally.

Not all of the following questions are applicable to all managers but we recommend that you ask as many questions as possible before making a decision.

**IMPORTANT**

The copyright in this questionnaire belongs to AIMA. You may copy the questionnaire for your own company's use and may distribute it (unamended or amended) for the purposes of a due diligence review, but you may not distribute nor copy it for any other purpose or to any other person, including any representative of the media, without the prior written consent of AIMA which will only be given in exceptional circumstances. If you amend the questionnaire, all references to AIMA must be removed. If you wish to share the questionnaire with others, please provide their details to AIMA.

**DISCLAIMER**

Whilst AIMA has used all reasonable efforts to produce a questionnaire of general application in connection with a due diligence appraisal of hedge fund managers, in any particular case an investor is likely to have its own individual requirements and each hedge fund manager its own characteristics. As a result, prior to any individual investor sending out the questionnaire, it is strongly recommended that the questions are reviewed and, where necessary, amended to suit its own requirements and its state of knowledge of the hedge fund manager's operations.

In addition, responses to the questionnaire should not be relied upon without review and, where considered appropriate, further investigation and they are unlikely to have contractual force. The contractual terms of an investment in any hedge fund will normally be confined to the terms of the application or subscription documents, private placement memorandum or other offering document and the constitutional documents of the hedge fund. [Hedge funds and hedge fund managers are discouraged from providing to investors side letters or other forms of collateral agreement]. In order to obtain the best possible information on any specific hedge fund manager, additional questions should be raised to clarify any point of uncertainty, and where practicable verbal examination should be undertaken. In particular, AIMA recommends that in respect of special areas of concern, such as fund performance or risk profile, independent third party data should, if possible, be obtained in order to verify these facts. Accordingly, none of AIMA, its officers, employees or agents make any representation or warranty, express or implied, as to the adequacy, completeness or correctness of the questionnaire. No liability whatsoever is accepted by AIMA, its officers, employees or agents for any loss howsoever arising from any use of this questionnaire or its contents or otherwise arising in connection therewith.

Other AIMA questionnaires available for selection of:

Managed Futures Managers/CTAs
Fund of Hedge Funds Managers
Hedge Fund Administration for Managers
Hedge Fund Administration for Investors
Prime Brokers

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568639

# AIMA's Illustrative Questionnaire for Due Diligence Review of HEDGE FUND MANAGERS

## CONTENTS

| Sections | Page no. |
|---|---|
| Investment Manager Information | 4 |
| Contact Information | 4 |
| Company | 4 |
| Ownership | 6 |
| Organisation | 6 |
| Manager References | 7 |
| Fund Information | Error! Bookmark not defined. |
| Fund Details | 7 |
| Fees | 7 |
| Investment/Redemption And Lock Up Terms | 8 |
| Fund Directors | 8 |
| Fund Administrator | 9 |
| Fund Pricing | 10 |
| Prime Broker | 10 |
| Custodian | 10 |
| Auditor | 10 |
| Legal Adviser(s) | 11 |
| General | 11 |
| Fund Promoters | 11 |
| Data Overview | Error! Bookmark not defined. |
| Fund Assets | 11 |
| Capacity Management | 11 |
| Withdrawals | 12 |
| Management Team's Co-Investment | 12 |
| Fund Performance | 12 |
| Drawdowns | 12 |
| Other | 12 |
| Manager Track Record | 13 |
| Investment Strategy | 14 |
| Risk | 16 |
| Leverage | 16 |
| Hedging | 16 |
| Liquidity | 16 |
| Diversification | 16 |
| Risk Management | 16 |
| External Controls | 17 |
| Investment Research | 18 |
| Investor Service / Reporting | 18 |
| Execution & Trading | 19 |
| Compliance | 19 |
| Legal | 20 |
| Anti-Money Laundering Policy | 20 |
| Insurance | 21 |
| Business Continuity | 21 |

Published by
Alternative Investment Management Association (AIMA)
Lower Ground Floor, 10 Stanhope Gate, Mayfair, London W1K 1AL
Tel +44 (0)20 7659 9920      Fax +44 (0)20 7659 9921      www.aima.org

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE and DORR LLP

CONFIDENTIAL

BEAR 01568640

NB: THE INFORMATION GIVEN HEREIN IS CORRECT AS AT MONDAY, 01 MAY 2006

| NAVIGATING THIS DOCUMENT | Please use tab-key or point mouse to the beginning of the input field |
|---|---|
| INPUTTING DATA | The size of the fields will automatically adjust to the length of your input |
| UPDATING PAGE NUMBERS | As this questionnaire is completed (thus grows), page numbers on the index page will NOT be updated automatically.  To update the index page (which is a table), click to the left of the table (at any point) then press F9 on your keyboard.  Select the first option: to update page numbers only |

## INVESTMENT MANAGER INFORMATION

### CONTACT INFORMATION

| Company name: | Bear Stearns Asset Management Inc. |
|---|---|
| Address: | 383 Madison Avenue<br>New York, NY 10179 |
| Telephone: | 1-800-436-4148 |
| Fax: | 917-849-1418 |
| E-mail: | bsamhedgefundproductmanagement@bear.com |
| Name of contacts: | Heather Malloy<br>Ken Mak |
| Title of contacts: | Hedge Fund Product Specialists |
| Telephone of contacts : | (212) 272-3226<br>(212) 272-8375 |
| E-mail of contacts: | hmalloy@bear.com<br>kmak@bear.com |
| Internet/website: | www.bsamonline.com<br>www.bearstearns.com |

### COMPANY

| Please give a brief history of the company: | In 1985, our company was established to centralize the investment management activities of The Bear Stearns Companies Inc. ("Bear Stearns") and to focus on a broader institutional client base.  Today, we manage approximately $36 billion in assets across a wide spectrum of investment disciplines for corporations, endowments, foundations, Taft-Hartley plans, public funds, insurance companies and high-net-worth individuals. Bear Stearns is a publicly-traded global investment banking, securities trading and brokerage firm (NYSE: BSC). |
|---|---|
| Type of company/entity: | Bear Stearns Asset Management ("BSAM"), which is the investment manager to the High Grade Structured Credit Strategies Fund ("HGSCS"), is the asset management subsidiary of The Bear Stearns Companies Inc., a corporation. |
| Date and place of incorporation and registered number: | BSAM was formed in New York in 1985. New York corporations are not assigned a registered number. |
| Domicile: | BSAM is domiciled in New York and has its headquarters in New York City. |
| Branch offices or other locations, if any: | BSAM has additional offices in San Francisco, Chicago, London and Tokyo. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers<br>© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment<br>Requested by<br>WILMER CUTLER PICKERING<br>HALE and DORR LLP

CONFIDENTIAL

BEAR 01568641

| | |
|---|---|
| What functions are performed at these branches and locations? | The majority of BSAM's business, including portfolio management, research, administration and operations, is conducted at its headquarters in New York City. BSAM also has an investment management presence in San Francisco.  BSAM's marketing and client service group is also headquartered in BSAM's New York City office and represented in the branch offices in Chicago, London and Tokyo. The members of the High Grade Structured Credit Strategies team are located in the Bear Stearns headquarters in New York City. |
| Which regulatory authority is the company registered with?<br>• Name(s) of regulatory bodies:<br>• Date of registration:<br>• Registration number:<br>• Scope of registered activities:<br>• List individuals also registered with the same authority in relation to the company's registration: | BSAM is registered with the U.S. Securities and Exchange Commission as a registered investment adviser (SEC File Number: 801-29862) as of June 18, 1987; and with the U.S. Commodity Futures Trading Commission and the National Futures Association as a commodity pool operator and commodity trading advisor (NFA # 0236656) as of February 19, 1998. |
| | BSAM is not a registered broker-dealer and, therefore, not registered with the New York Stock Exchange ("NYSE") or the NASD and does not carry the individual securities licenses of employees.  Bear, Stearns & Co. Inc. ("BSC"), an affiliated broker-dealer, is registered with both the NYSE and the National Association of Securities Dealers Inc (the "NASD"). |
| List any affiliations, directorships and memberships of the company and/or its principals; | The Bear Stearns Companies Inc., the parent company of BSAM, is also the parent company of Bear, Stearns & Co. Inc. ("BSCI"), Bear Stearns Securities Corp. ("BSSC"), and Custodial Trust Company ("CTC").<br><br>BSCI is a registered broker/dealer.  Because BSAM is affiliated with BSCI, it may engage in transactions for clients which coincide with similar or opposite transactions conducted by BSCI for its own accounts or for the accounts of its customers.  To ensure that no conflicts of interest occur, BSAM's portfolio managers make investment decisions independent of BSCI and an information barrier has been established between BSCI's investment banking business and BSAM.  In addition, BSCI maintains a restricted list which contains the names of securities issuers to whom investment banking services have been publicly announced.  Once a name has been added to the restricted list, BSAM may not purchase such security and may not sell such security beginning one day after the addition of the name to the restricted list unless permission is granted by the Compliance Department of BSCI.  BSAM is responsible for the management of the investment portfolios of our clients and therefore, our affiliation with BSCI would not affect investment performance of our client's accounts.<br><br>BSAM can execute agency transactions and can engage in principal transactions with BSCI for client accounts with the consent of the client and otherwise in accordance with applicable SEC regulations. BSAM honors all client requests to trade away from our affiliate broker/dealer.<br><br>BSSC is a securities trading and execution services broker registered with the Securities and Exchange Commission. BSSC provides BSAM with securities execution clearing and custodial services. CTC is an FDIC-insured, commercial bank which provides custodial services to certain clients advised by BSAM. |
| Specify nature of services provided by the company (discretionary investment management or advisory): | BSAM provides investment management services to corporations, trusts, employee benefit plans, public authorities, foundations, endowments, religious organizations, high net worth individuals, mutual funds, private investment funds, venture capital funds and issuers of collateralized bond and loan obligations and other structured securities products. BSAM offers investment expertise across a wide spectrum of investment strategies including: hedge funds; private equity; large, small and mid-cap domestic equities; corporate, government, municipal and high yield bonds; balanced portfolio management; mortgage-backed and mortgage derivative securities; systematic equity and collateralized loan accounts. |
| Please list the total assets under management | As of March 31, 2006, BSAM managed a total of $36.1 billion of assets, |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568642

| | |
|---|---|
| by the company across its different categories of client including the fund: | including $15.7 billion in equity products, $15.0 billion in fixed income products and $5.4 billion in alternative investments. The alternative investments total includes the $1.5 billion in assets managed by the HGSCS team as of that date. |

### OWNERSHIP

| | |
|---|---|
| Describe the company's ownership structure, name of its owners, their percentage ownership, and their role within the company: | BSAM is a wholly-owned subsidiary of Bear Stearns. Bear Stearns employees hold approximately 40% of Bear Stearns' stock with the remainder publicly-held. According to a February 2006 filing with the SEC, only one entity (other than Bear Stearns' employees as a group, Directors and Executive officers) is known to be the owner of more than 5% of Bear Stearns' outstanding common stock: Private Capital Management, L.P. owns 6.1% of the common stock. The largest shareholder within senior management is James Cayne, Chief Executive Officer of Bear Stearns, with 5.6% of the firm's stock. |

### ORGANISATION

| | |
|---|---|
| How many full-time employees are there? | As of March 31, 2006 Bear Stearns has approximately 12,000 full-time employees. Of this number, 331 work full-time within BSAM. |
| Please provide a short background of principals (education, career background, etc.): <br> • Please, attach information if necessary. | Please refer to the attached document for biographies on our principals. |
| How many investment professionals (portfolio managers, analysts, etc) in the company? | BSAM currently employs 125 investment professionals. Comprising this total are 30 portfolio managers, 43 research analysts, and 52 other investment professionals, which includes traders, hedge fund administrators, and private equity professionals. |
| What are the average years of professional experience in the company, both years as a professional as well as years in the company? | Our equity and fixed income portfolio managers have approximately 20 years of professional experience on average and have been with the firm for approximately 8 years. |
| Please enclose an organisation chart depicting the names of senior managers in charge of the following areas and headcount: <br> • Trading: <br> • Reporting, performance analysis: <br> • Research and development: <br> • IT/Programming: <br> • Administration: <br> • Risk Management: <br> • Compliance: <br> • Marketing and business development: <br> • Others (please specify): | Please refer the attached document pertaining to BSAM principals. |
| What has been the turnover rate among the company's personnel? | Not applicable. |
| Where do the primary trading, research, and portfolio management activities take place? | The majority of Bear Stearns Asset Management's business, including portfolio management, research, marketing, client service, administration and operations, is conducted at our headquarters in New York City. |
| Where are the accounts maintained? | Accounts are maintained at BSAM's headquarters in New York City. |
| Are outside representatives or consultants used for any activities? If so, give details: | Yes, we occasionally utilize third party marketers to assist in raising assets. |
| Is the firm a member of AIMA or any other relevant trade association? | Yes, the firm is a member of AIMA. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL
BEAR 01568643

## MANAGER REFERENCES

| | |
|---|---|
| Please provide at least two references for the company and for each of the principals involved in the management of the fund?<br>• Name:<br>• Profession:<br>• Company:<br>• Title:<br>• Telephone:<br>• Fax:<br>• E-mail:<br>• Current and past relationship with the company or its principal: | Not applicable. |

## FUND DETAILS

| | |
|---|---|
| Contact details:<br>• Name:<br>• Address:<br>• Telephone:<br>• Fax:<br>• E-mail:<br>• Internet:<br>• Fund structure:<br>• Legal entity:<br>• Domicile: | Heather Malloy<br>383 Madison Avenue New York, NY 10179<br>(212) 272-3226<br>(917) 849-1418<br>hmalloy@bear.com<br>www.bearstearns.com<br>Bear Stearns High Grade Structured Credit Strategies Fund, L.P. is a Delaware limited partnership which commenced operations on October 1, 2003. Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. is a Cayman Islands exempted company, and also commenced operations on October 1st, 2003. Both feeders invest substantially all assets through the Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd., a "master-feeder" arrangement. All investment and trading decisions on behalf of the Master Fund will be made by the Investment Manager. In addition to the onshore and offshore feeders, 2x and 3x leveraged versions of the Fund are available for investment. |
| Date of inception: | October 1, 2003 |
| Is the fund regulated? If so, please provide details and explain any requirements for regulation: | The Fund's advisor is registered with the SEC. |
| Is the fund listed on any exchange(s)? | No, The Fund is not listed on any exchange. |

## FEES

| | |
|---|---|
| Management fee: | 2% of the net asset value. |
| Administration fee: | No administration fee is charged by the Funds. |
| Incentive fee: | The Fund charges a 20% incentive fee that is subject to a lifetime high water mark. |
| Hurdle rate/high water mark: | No performance fee is charged until all previous declines in NAV in previous periods are offset by increases in NAV in subsequent periods. |
| Sales fee: | None. |
| Redemption fee: | A Shareholder may generally withdraw any or all of their Capital Balance as of the last Business Day of the month of the month of the annual anniversary of their initial contribution upon not less than 60 days' prior written notice without being subject to a withdrawal fee. In addition, a Shareholder may make special withdrawals as of the last Business Day of any month upon not less than 40 days prior written notice, subject to a 2% withdrawal fee. |
| Any other fees: | None. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568644

| What costs, if any, are recharged to the fund? | The Fund shares its administrative costs with BSAM. |
|---|---|
| Are your fees calculated and charged in terms of equalisation structure by:<br>• Issuing a different series of shares every time shareholders subscribe?<br>• The Equalisation Share method?<br>• The Equalisation and Depreciation Deposit method?<br>• The Equalisation-Adjustment method?<br>• Others? (Please describe) | The fees are calculated by share rollup to the initial series.<br><br>The fund issues a new series of shares between rollup periods. |
| Do you ever share fees with a third party? | Yes. |
| Have any investors been granted rebates? | No. |
| Disclose any soft dollar/soft commission agreement(s): | None. |
| Ratio of expenses (other than the company's management and incentive fee) to NAV: | Ratio of Expenses to Equity:<br>Administrative fee to equity: 0.000057<br>Custodian fee to equity: 0.000043<br>Auditors' fee to equity: 0.008 |

### INVESTMENT/REDEMPTION AND LOCK UP TERMS

| | |
|---|---|
| Minimum initial investment: | The minimum investment is $1,000,000. |
| Minimum subsequent investment: | The Fund may accept or reject any initial and additional subscriptions and waive the minimum subscription amounts in its sole discretion. |
| Subscription frequency (when): | Monthly. |
| Redemption frequency (when): | Annually. |
| Redemption notice period: | 60 days with no fee. 40 days with a 2% fee. |
| Redemption cash proceeds time period: | 90% of the withdrawal proceeds will be paid within 30 days of the relevant withdrawal date. The balance (based on unaudited data), without interest, will be paid within 60 days of the withdrawal date. |
| Does the fund have any lock-up period or any other liquidity constraints? | 1 year lock-up period. |
| Does the fund allow for transfer of shares or limited partnership interests between nominees? | Interests may not be transferred or pledged without prior written consent of the General Partner and compliance with applicable federal and state securities laws. No transferee or pledge may become a substitute Limited Partner without the consent of the General Partner. |

### FUND DIRECTORS

| | |
|---|---|
| Please list the number of directors, their names, the degree of relationship with company manager and service providers and the duration of the company's professional relationship with each director: | **Ralph Cioffi**<br>Senior Managing Director, Senior Portfolio Manager<br>From 1985 through 1991, Mr. Cioffi worked in institutional fixed income sales where he specialized in structured finance products. He served as the New York head of fixed income sales from 1989 thru 1991. From 1991 through 1994, Mr. Cioffi served as global product and sales manager for high grade credit products. He was involved in the creation of the Structured Credit effort at Bear Stearns and has been a principal force behind Bear's position as a leading underwriter and secondary trader of structured finance securities; specifically Collateralized Debt Obligations and Esoteric Asset Backed Securities. He has a particular expertise in deal structure and brings an "insiders" knowledge to the three most important components of the investment strategy: Security Evaluation, Price Negotiation and Portfolio Hedging. Mr. Cioffi holds a BS / Business Administration with honors from Saint Michaels College in Vermont. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568645

**Matthew Tannin**
Senior Managing Director, Portfolio Manager

Mr. Tannin has been with Bear Stearns for nine years, seven of which have been spent on the Collateralized Debt Obligation structuring desk. He has been an innovator in the Emerging Markets and Mortgage-Backed Market Value CDO sectors. From June of 2001 through February of 2003 he followed the CDO market as a CDO research analyst in the asset-backed research group. His expertise in the CDO market in general and his analytical and legal grasp of the entire range of deal structures enable him to focus on the day-to-day supervision of the portfolio. Mr. Tannin holds a J.D. from the University of San Francisco and a BA from Bucknell University.

**Ray McGarrigal**
Senior Managing Director, Portfolio Manager

Mr. McGarrigal started his Wall Street career with Bear Stearns in 1991 in the Financial Analytics and Structured Transactions (F.A.S.T.) group as an analyst. He moved to UBS in 1993-1995 to work as a CMO structurer and CMO floater trader. Following his time at UBS, Mr. McGarrigal was a member of the New York Mercantile Exchange where he traded options on energy futures as a local. He returned to Bear in 1997 and has structured a wide variety of fixed income structured products in the F.A.S.T. group. His product specialties include all types of Collateralized Debt Obligations (CDO's), Residential Mortgage Backed Securities (RMBS) and structured credit derivatives. He brings to the fund an in-depth understanding of structure, risk, the ratings process and relative value analysis across a wide range of fixed income structured credit products. Mr. McGarrigal holds an MBA in Finance New York University and a BS in Mathematics and Business Economics from the State University College at Oneonta.

**Please see the attached Biographies for the rest of the High Grade team.**

| FUND ADMINISTRATOR | |
|---|---|
| | PFPC Trust Company (onshore) and PFPC International (offshore). |
| | PFPC Inc.<br>400 Bellevue Parkway<br>Wilmington, Delaware 19809<br>Bill Hayes<br>(302) 791-1331<br>William.hayes@pfpc.com<br><br>PFPC International Ltd.<br>Abbey Court, Block C<br>Irish Life Center<br>Lower Abbey Street<br>Dublin 1, Ireland<br>John Kelly<br>353-1-790-6012<br>john.kelly@pfpc.ie |
| | |
| | |
| | |
| | |
| Duration of the company's professional relationship with the Administrator? | BSAM has had a professional relationship with PFPC since the beginning of its hedge fund business in 1995. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL                                                                    BEAR 01568646

## FUND PRICING

| Who is responsible for obtaining valuations and how are any difficult-to-price assets or instruments priced? | Not applicable. |
|---|---|

## PRIME BROKER

| Details: | |
|---|---|
| • Name: | Paul Fanelli |
| • Address: | Bear Stearns Securities Corporation |
| | One MetroTech Center |
| • Telephone: | Brooklyn, NY 11201 |
| • Fax: | (212) 272-1000 |
| • E-mail: | |
| Duration of your professional relationship: | Not applicable. |
| Are the assets held in the name of the fund? If not, please explain: | All assets are subject to Reg. T, and ISDP agreement, or repurchase agreements. |
| Are all or any of the assets segregated from the Prime Broker's assets? | All assets are subject to Reg. T, and ISDP agreement, or repurchase agreements. |
| Do you use multiple Prime Brokers? If so, please give details: | No. |
| How is cash at the Prime Broker held? | Significant cash amounts are invested in money markets. Small amounts of cash are mainained as free credit balances. Generally, the Fund holds diminimus amounts of cash. |
| Does the Prime Broker have insurance? If so, please detail scope: | Yes. |
| Can the assets of the fund be pledged or in any other manner used to support another entity's liabilities? | Only subject to Reg. T, and ISDP agreement, or repurchase agreements. |
| Does the company or any affiliate ever take "custody" of client assets? | Under Rule 206 (4)-2 of the advisors act, an advisor may be deemed to have custody of a fund's assets based on its relationship to the general partner. However, neither the fund nor the advisor takes actual physical "custody" of assets. |

## CUSTODIAN

| Details: | |
|---|---|
| • Name: | Paul Fanelli |
| • Address: | Bear Stearns Securities Corporation |
| | One MetroTech Center |
| • Telephone: | Brooklyn, NY 11201 |
| • Fax: | (212) 272-1000 |
| • E-mail: | |
| Duration of the companys' professional relationship with the Custodian: | Not applicable. |

## AUDITOR

| Details: | Deloitte & Touche LLP. |
|---|---|
| | Onshore: |
| • Name: | 1700 Market Street, 25th Floor |
| • Address: | Philadelphia, PA 19103-3984 |
| • Telephone: | Attn: Tim Mundy |
| • Fax: | (215) 299-4558 |
| • E-mail: | tmundy@deloitte.com |
| | Offshore: |
| | 1 Capital Place, P.O. Box 1787 GT |
| | Grand Cayman, Cayman Islands |
| | Brtish West Indes |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568647

| | |
|---|---|
| Duration of the company's professional relationship with the auditor: | BSAM has had a relationship with Deloitte & Touche since the beginning of its hedge fund business in 1995. |

## LEGAL ADVISER(S)

| | |
|---|---|
| Details:<br>• Name:<br>• Address:<br>• Telephone:<br>• Fax:<br>• E-mail: | Onshore: Sidley Austin Brown & Wood LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Offshore: Walkers<br>Walker House<br>Box 265<br>Georgetown, Cayman Islands |
| Duration of the company's professional relationship with the Legal Advisers: | BSAM has an extensive working relationship with Sidley Austin Brown & Wood LLP and Walkers. |

## GENERAL

| | |
|---|---|
| Have the Administrator, Prime Broker, Custodian or Auditors been changed within the past 3 years? If so, why? | No. |
| Do either the Prime Broker(s) or Administrator hold a credit rating and are they insured? Please provide details: | The Administrator is PFPC. PFPC does not hold a credit rating but, it is covered by insurance provided by its parent company, PNC Financial Services Group. |

## FUND PROMOTERS

| | |
|---|---|
| What external promoters, if any, have been appointed by the company for the fund? | Bear Stearns & Co. Inc. ("BSCI"), a wholly-owned subsidiary of Bear Stearns and an affiliate of BSAM, currently serves as a placement agent for the Fund for which BSCI and its employees receive compensation from BSAM. |
| Duration of the company's professional relationship with any promoter: | |

## FUND ASSETS

| | |
|---|---|
| Please list the size of the fund's net assets: | $1.495 billion as of March 31, 2006. |
| What percentage of assets is represented by the largest investor? | Currently, the largest investor represents about 2% of the Master Fund's assets. |
| Please list the size of assets by investment vehicle: | The Onshore Feeder currently has approximately $450 Million. The Offshore Feeder has approximately $1.0 Billion. There is a Yen Feeder which has approximately $30 million. |
| List the total assets under management and their respective changes over the last year: | $1.495 billion as of March 31, 2006, up from $1.267 Billion as of March 31, 2005. |

## CAPACITY MANAGEMENT

| | |
|---|---|
| What is the maximum capacity of your fund? | We are always looking for opportunities and ideas and seek to raise money accordingly. |
| What is the projected time frame to reach capacity? | Dependant on market conditions and opportunities. |
| Will new money be accepted after capacity is reached? | No. |
| How will front/back-office operations be affected in the event of significant increase in assets under management, and what measures will be taken? | BSAM has a strategic plan to manage growth and infrastructure over the next five years. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568648

| WITHDRAWALS | |
|---|---|
| What were the largest withdrawals in your fund since inception?<br>• Date:<br>• % of NAV:<br>• Reasons: | The largest withdrawal from the fund was made in May 2005. The withdrawal occurred after the required lockup period and was for about 4.5% of NAV. |

| MANAGEMENT TEAM'S CO-INVESTMENT | |
|---|---|
| What is the total amount invested by the principals/management in the fund and other investment vehicles managed pari passu with the fund? | Each of the senior members of the fund management team has made a significant personal investment in the fund. |
| Has the management reduced its personal investment?<br>• Date:<br>• Amount:<br>• Reasons:<br>Disclose conditions of subscription/redemptions of team and owners' assets: | No. |

| FUND PERFORMANCE | |
|---|---|
| Historical performance since inception:<br>• Monthly NAV's since inception (in table format):<br>• Monthly RoR since inception: | Please refer to the attached spreadsheet. |
| Please explain any major factors affecting performance and drawdowns (i.e. a manager change, a change in strategy, etc): | Not applicable. |
| Is the fund performance audited? | Yes. |

| DRAWDOWNS | |
|---|---|
| List the 5 maximum drawdowns, in percent of equity for each fund, the recovery period and explain why they have happened: | The fund has not experienced any drawdowns. |
| Over the past 12 months, how many drawdowns greater than 5% have occurred, when did they occur and what was the length of recovery? | None. |

| OTHER | |
|---|---|
| Is the company (thus the fund's reporting) AIMR/GIPS compliant? | Yes. |
| Are there any side letter agreements that can negatively impact the fund? If so please give details. | No. |
| Are there any special terms given to certain investors in relation to fees or redemption? | No. |

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568649

| MANAGER TRACK RECORD | |
|---|---|
| Number of portfolios/accounts managed by the company: | The High Grade Structured Credit Strategies Team manages the High Grade Structured Credit Strategies Fund, as well as the High Yield Opportunities Fund (which currently has approximately $50 Million in AUM). |
| Number of funds managed/advised by the company:<br>• Names of these funds: | BSAM currently manages the following Hedge Funds:<br><br>Bear Stearns Asset Backed Securities Fund<br>Bear Stearns Emerging Markets Macro Fund<br>Bear Stearns Healthcare Value Partners<br>Bear Stearns Institutional Loan Fund<br>Bear Stearns Multi-Strategy Fund<br>Bear Stearns Multi-Strategy Offshore<br>Bear Stearns Multi-Strategy Protected<br>Bear Stearns Multi-Strategy Protected II<br>Bear Stearns Private Equity Opportunity Fund II<br>Bear Stearns Private Equity Opportunity Fund<br>Bear Stearns Private Opportunity Ventures<br>Bear Stearns Health Innoventures I<br>Bear Stearns Health Innoventures Offshore I<br>Bear Stearns Systematic Equity Partners<br>Bear Stearns Venture Partners<br>Constellation Venture Capital II<br>Constellation Venture Capital Offshore II Constellation Venture Capital<br>Offshore Constellation Venture Capital,<br>Lynx New Media<br>New Castle Fallen Angels (U.S.)<br>New Castle Market Neutral Fund (U.S.)<br>New Castle Market Neutral Offshore<br>New Castle Millennium II<br>New Castle Millennium,<br>New Castle Partners (U.S.)<br>New Castle Partners Offshore<br><br>And the following products in the traditional equity and fixed income space:<br><br>Large Cap Value<br>Large Cap Growth<br>Systematic Small-Mid Cap Growth<br>Systematic Small Cap Growth<br>Systematic Small Cap Value<br>Core Plus Fixed Income<br>Core Fixed Income<br>Intermediate Duration Gov't Corp<br>3-Year STAMP |
| Total assets managed/advised by the company: | As of March 31, 2006, BSAM managed a total of $36.1 billion of assets |
| Oldest continuously active account: | BSAM's oldest continuously active product is 3-Year STAMP which began operations in 1988.  The oldest continuously active hedge fund is New Castle Partners, which began operations in 1995. |
| Largest current account: | N/A |
| Length of track record: | N/A |
| Has the track record been audited? | N/A |
| What is your level of portfolio turnover? | |
| Average annual commission costs as a percentage of total assets:<br>• Brokerage to equity ratio: | |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers<br>© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment<br>Requested by<br>WILMER CUTLER PICKERING<br>HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568650

| | |
|---|---|
| • Administrator fee to equity ratio: | Administrative fee to equity: 0.000057 |
| • Custodian fee to equity ratio: | Custodian fee to equity: 0.000043 |
| • Auditors' fee to equity ratio: | Auditors' fee to equity: 0.0080 |

## INVESTMENT STRATEGY

| | |
|---|---|
| Characterise your investment style in terms of: <br>• Strategy: <br>• Hedging: <br>• Market exposure: <br>• Portfolio concentration in terms of amount of instruments and exposure bias (min/max/avg. number of instruments, min/max/avg. long or short bias): <br>• Geographical market focus: | The Fund generally takes positions in the high end of the capital structure which is primarily hedged through the use of credit default swaps. These investments coupled with broad diversification across positions and sectors should mitigate a majority of credit oriented risks associated with fixed income. <br><br>The Fund would perform poorly during times of financial crisis or a broad deterioration of credit quality in each asset class in which the Fund invests. During theses exogenous market conditions, the Fund would experience a mark to market decline but not necessarily a loss of principal or coupon. Since the Fund utilizes repo financing, the portfolio managers have further mitigated their risk by maintaining a significant portion of un-margined securities in case of "run on the bank" <br><br>The Fund generally invests, on a leveraged basis, in investment-grade structured finance securities rated AA or higher. In addition, various derivatives, primarily credit-default swaps, but also options, swaps, swaptions, futures and forward contracts, equity securities and currencies, may be used for hedging purposes. |
| List the instrument types you use by percentage: | Credit Quality: At least 90% "AAA" and "AA-" <br>Average Life: 4 years or less <br>Credit Hedges: 10% – 20% of notional amount of portfolio <br>Cash Position: 10% – 20% of capital <br>Net Leverage: 10 to 1 <br>Repackaging Vehicles: 20% of capital <br>Interest Rate Sensitivity: Targeted interest rate duration of zero |
| Describe your strategy (in as much detail as possible): | The Fund's primary objective is to seek high current income and capital appreciation relative to LIBOR primarily through leveraged investments in investment-grade structured finance securities with an emphasis on triple-A and double-A rated structured finance securities. The Fund will leverage, through the use the repo and non-recourse financing. Generally, a majority of the monthly returns will be realized and interest income. Furthermore, the Fund will engage in capital markets arbitrage transactions to enhance returns by unwinding, repackaging, etc. of structured financial securities when opportunities exist. Please see attached for the returns stream. |
| What is your investment/trading philosophy? | The Fund's assets are generally analyzed and purchased on a "hold to maturity" basis. As a result, the team does not need to or expects to trade very actively. However, active trading occurs in the Fund's credit derivative hedges. When the team does trade a position generally it is a result of price appreciation such that its full value has been realized or more attractive reinvestment options exist. |
| Do you believe that there are persistent structural inefficiencies in the area you invest in? Please explain: <br>• How do you think these market inefficiencies will change over time? | The managers feel that many investment grade structured finance credits, particularly collateralized debt obligations ("CDOs"), trade wide to their fundamental credit risk because structures are complex. |
| What makes your strategy unique? | |

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568651

| | |
|---|---|
| What makes your strategy different from your peers? | Very few fixed income funds, if any at all, focus solely on the strategy we do.  Furthmore, all three portfolio managers have very extensive capital markets experience. |
| Describe your strategy for today's market: | |
| What are the strengths/weaknesses of your investment strategy? | |
| Why do you feel you will generate absolute returns? | |
| In which markets do you believe your strategy performs best/worst? (Give examples of time periods): • Volatility: • Trends: • Liquidity: • Correlation: | Due to the floating rate nature, high credit quality of the securities and various hedging techniques in the Fund, we believe that the Fund should perform well in most market conditions.   Additionally, the Fund is significantly diversified, in terms of positions and sectors, and does not take single any company specific credit risk.  In addition, the Fund invests in over 200 positions across 10 or more assets classes in the fixed income universe.

Moreover, the Fund generally takes positions in the high end of the capital structure which is primarily hedged through the use of credit default swaps.  These investments coupled with broad diversification across positions and sectors should mitigate a majority of credit oriented risks associated with fixed income.  Having said that, the Fund would perform poorly during times of financial crisis or a broad deterioration of credit quality in each asset class in which the Fund invests.  During theses exogenous market conditions, the Fund would experience a mark to market decline but not necessarily a loss of principal or coupon.  Since the Fund utilizes repo financing, the portfolio managers have further mitigated their risk by maintaining a significant portion of un-margined securities in case of "run on the bank". |
| What is your average holding period for: • All investments? • Profitable investments? • Losing investments? | Investments are held until the portfolio manager perceives that the investment has either achieved maximum profitability, or no longer exhibits upside potential. |
| Does the strategy have a long or short bias? | The fund is primarily long-biased with the intention of holding securities until maturity.  However the fund maintains short CDS positions for credit hedging. |
| What investment criteria must new positions meet? | Each security for the fund must comply with the teams AAA stress test. |
| How do you invest new capital into the market? | |
| How do you deal with redemptions? | A Shareholder may generally withdraw any or all of their Capital Balance as of the last Business Day of the month of the month of the annual anniversary of their initial contribution upon not less than 60 days' prior written notice without being subject to a withdrawal fee.  In addition, a Shareholder may make special withdrawals as of the last Business Day of any month upon not less than 40 days prior written notice, subject to a 4% withdrawal fee. |
| Have the strategy or trading processes changed over time due to capital flows? | The strategy/trading process has not changed over time and we have never encountered position limit problems. |
| Have you encountered position limit problems? If yes, please explain: | No. |

Confidential Treatment Requested by
WILMER CUTLER PICKERING HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568652

| What is the percentage of assets in non-exchange traded instruments? How long do you expect it would take to liquidate these assets under normal circumstances? | |
|---|---|
| Describe your cash management policy: | Generally the fund intends to reamain fully invested. |
| Do you outsource this function? If so, please give name of provider and method used. | No. |

## RISK

### LEVERAGE

| Discuss your leverage exposure policy and its management over different market cycles: | The Partnership will generally operate a Net Leverage (as defined herein) of its investments of 10 to 1, though the General Partner may use greater leverage or less leverage at times in its discretion. Please see the latest Marketing Fact Sheet for the Fund's current leverage ratio.

2x and 3x levered versions of the Fund are also currently available for investment. |
|---|---|
| What are your portfolio financing constraints/limits? | Positions may be financed by various sources of funding, including bank lines and the repurchase markets. |
| Discuss sensitivity (cost) to LIBOR levels: | |

### HEDGING

| How is the portfolio hedged? | The Partnership may use credit default swaps to hedge a portion of the credit risk in the portfolio. The credit default swaps will generally not hedge a specific Partnership position but will hedge exposure to a group of credits the managers believe to reflect the credit markets in general. It is possible these credit hedges will not be correlated with the portfolio as intended which will lead to a greater decline in the portfolio's value than that anticipated by the managers. |
|---|---|
| How do you determine size and limits for each position/basket? | |
| How often do you re-hedge? | |
| Are short positions profit centres? | |

### LIQUIDITY

| Discuss the nature of illiquid holdings in the fund: | N/A |
|---|---|
| What is the liquidity of the underlying assets and what is the appropriate time period to liquidate? | Over the past 10 years, the CDO and structured finance market has grown rapidly with total assets over a trillion dollars invested in this space. Additionally, the Fund's positions are fairly liquid due to its position in the capital structure. |

### DIVERSIFICATION

| Discuss the depth of diversification: | Please see the attached risk report. |
|---|---|
| How do you calculate the correlation between each investment in the portfolio? | The correlation between securities is calculated using the PORC model. |
| What are the main sources of marginal risk in your strategy? | Prepayment speeds presents the main source of marginal risk. |
| How has performance been distributed across positions and time? | Please see the attached risk report and performance summary. |

### RISK MANAGEMENT

| Discuss position and stop-loss limits and their management: | Positions are limited to a maximum 5% exposure per name with a target of 1% per name and no more than 1/3rd in any one asset class.

The team will exit a position if the price has risen to fully reflect the relative value of an investment, better reinvestment options and/or a perceived |
|---|---|

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568653

| | |
|---|---|
| | change to the credit worthiness of the investment. Furthermore, the Fund does not maintain a formal stop-loss rule. In effect, the stop loss is more of a re-election of stress testing and if something fundamentally changed within one of the positions such that there was risk of principal loss. |
| How often are these limits applied? When were their peaks observed? | N/A |
| How do you adjust your risk capital allocation when there is a significant increase in equity due to trading profits? | N/A |
| Do you use an external risk monitor? If so, who and why that particular one? | We also maintain a separate risk management group which operates independent of the portfolio management function and separate from general compliance activities. The group is managed by Mr. Frank Galdi. |
| Please describe the operational risk management policy: | There are three layers of risk management, the broker dealer, BSAM and the portfolio managers. The Fund's daily mark to market, which is done in house by Bear Stearns' repo desk and the team, keeps them in touch with any prices movements that could foretell problems in any one of the Fund's investments. The team receives monthly marks on each of the Fund's investments from up to 15 broker dealers.

The team monitors their positions through two main analytical systems: BondStudio, Bear Stearns's trading and risk management system, and Intex, an outside vendor's system. These systems allow them to monitor each deal, run stress tests, monitor monthly trustee reports on each deal and use technology to effectively monitor each position.

In addition to the portfolio management team, Bear Stearns' and BSAM's risk management departments monitor the Fund's positions as well. They monitor things such as minimum rating requirements, overall and net leverage and any portfolio concentrations. On a monthly basis, the portfolio managers meet with BSAM's CIO and hedge fund risk management team to discuss the portfolio and its performance. The team also meets with Bear Stearns' global credit department to discuss their positions, risk management and hedging techniques. As part of managing the Fund's risk, the team actively engages in various hedging techniques in the credit derivatives market, monitor and maintain adequate liquidity and look to minimize leverage while attempting to achieve the Fund's cash on cash targets.

The trend toward more transparency is very apparent in the institutional marketplace. To establish BSAM as a leader in transparency and risk reporting, BSAM purchased Measurisk in February 2004. Renamed BearMeasurisk, it will provide institutional investors and asset managers with sophisticated risk transparency and risk measurement solutions designed to help assess, manage and communicate risk across multi-manager, multi-asset class, global portfolios. Bear Measurisk's independent, third party risk solutions are designed to address the needs of pension plans, endowments and foundations, insurance companies, hedge funds and funds of hedge funds. |
| How do you measure minimum liquidity of positions? | N/A. |
| What risk system/software is used in your middle office? | Bear Measurisk. |
| **EXTERNAL CONTROLS** | |
| Are any third parties involved in verifying adherence to risk limits, e.g. the fund's administrator? | No. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

## INVESTMENT RESEARCH

| | |
|---|---|
| What outside sources are used? | No outside sources are used. |
| What proportion of research is generated internally? | 100% of the research is generated internally. |
| Describe the typical flow of an investment idea from inception to a trading position: | Please see the attached latest marketing fact sheet. |
| Describe your back testing of investment ideas: | N/A |
| Have you published or commissioned any research/academic papers? | No. |

## INVESTOR SERVICE / REPORTING

| | |
|---|---|
| Can the prospectus/offering memorandum be transmitted to us electronically? | Yes. |
| Who calculates the NAV? What is the frequency of calculation? | The Fund's external administrator is PFPC Inc., a division of PNC Bank. PFPC is responsible for calculating the monthly NAV. |
| Do you make any adjustments to the NAV valuation received from your source? If yes, please explain what kind in terms of: <br> • Liquidity: <br> • Time zone: <br> • Size: <br> • Holding period: <br> • Other: <br> • Percentage of adjustments to total NAV: <br> • What instruments are subject to adjustments? | No. |
| Can fund performance (NAV, RoR) be transmitted to us electronically on a regular basis, and at what periodicity? | Yes, monthly. |
| List all reports and correspondence usually sent to clients, and please explain the frequency and the detail the manager reports performance to investors. | See attached monthly reports. |
| Can you provide copies of historical reports? <br> • Please provide examples. | Yes, we can provide investors with historical reports. |
| Are investors informed when minor/major changes are made to the trading, money management, or risk control methods? | Yes. |
| What databases, publications or other available sources does the manager regularly report performance figures to? If none, explain why? | We subscribe to numerous hedge fund databases. We report monthly assets, performance, and NAV. In addition we provide general fund details, such as philosophy, strategy and fee's. |
| What portfolio data can you provide (electronically) in terms of: <br> • Position? <br> • Concentration? <br> • Exposure? <br> • Performance attributes? <br> • Hedge? | See attached risk and transparency report. |
| Can all trades be reported on a daily basis to the client? | No. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568655

## EXECUTION & TRADING

| | |
|---|---|
| Describe members of the trade execution group, their functions and experience: | The fund management team is responsible for trade execution. |
| Who is authorised to place orders on behalf of the fund? | The fund management team. |
| Is there clear separation of functions between front and back office? | Yes, BSAM maintains a dedicated operations/back office at our headquarters in New York City. We do not outsource any operations. Operations professionals include portfolio accounting, trade support, systems, new account opening and portfolio administration. Rigorous procedures and policies are in place to maintain a controlled environment. |
| How are executed trades allocated to accounts? Please explain in detail, particularly with respect to split fills: | N/A |
| Are any positions allocated as of the end of the trading day or immediately after execution, rather than prior to or at the time of order entry? | N/A |
| What is the company's policy with respect to trading and system errors? Please explain in detail: | As a policy, BSAM will make our clients whole for any trading error or operation mistakes and non-compliance of investment guidelines. |
| Have there been any major "trade breaks"? If so, please describe. | N/A |
| Are trades reconciled to broker confirmations? How often? | Yes, trades are reconciled to broker confirmations same day. |
| Are cash positions reconciled? How often? | Yes, daily. |
| What is the company's policy with respect to personal account dealing by:<br>• Staff?<br>• Principals?<br>• The company itself? | BSAM requires all personnel to pre-clear any and all trades with the compliance departments. No outside accounts are permitted other than fully managed accounts. |
| Does the company make use of "soft dollars"? | BSAM uses soft dollars to pay for sell-side research, independent accounting reports, and research-related services (including financial databases such as Holt Analytics, FactSet, First Call and Autex). All trading which involves a soft dollar payment is done on a best execution basis and does not in any way impact either the performance of our portfolios or the price that the client pays for securities. All soft dollar payments are fully disclosed and documented. All trades are always subject to best execution standards. |
| Does the company or advisor have any relationship which may affect its trading flexibility, e.g. associated broker/dealer? | The fund adheres to a best execution policy for all trading activities. |

## COMPLIANCE

| | |
|---|---|
| Who is responsible for compliance in the company? | BSAM's Legal and Compliance Department is responsible for developing policies and procedures to ensure firm compliance with applicable state and federal laws. The Legal and Compliance Department is comprised of three full-time attorneys, including the Compliance Director, and three Compliance Officers. The Department is responsible for all the legal and compliance affairs of BSAM. Various systems, policies and procedures are in place to maintain a controlled environment for investment advisory activities. These include trade allocation, best execution, soft dollar, trade error, portfolio valuation and other procedures. |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568656

| Does the company maintain a written Compliance Manual? If yes, please provide details: | No, BSAM's compliance department continually develops policies and procedures to ensure firm compliance. We have policies and procedures in place to maintain a controlled environment for investment advisory activities. |
|---|---|
| Please describe any current or potential conflict of interest or any relationships which may affect its trading, trading flexibility, e.g. associated broker/dealer. | Bear Stearns Asset Management has developed compliance check points, trade approvals, and regular documentation of handling conflicts of interest. Currently there are no conflicts of interest to date. |
| What are the company's employees' own account dealing procedures? | All trades must be pre-approved by compliance. |
| Does the company have regular compliance monitoring programs?   If so, please give brief details: | Yes, BSAM has policies and procedures in place to monitor and review all client accounts, soft dollar activity and trades. |
| Has the company or its principals ever been the subject of any action or warnings from a regulatory body? | No. |
| Has any application to a regulatory body on behalf of the company ever been withdrawn? If so, please give details: | No. |
| Do any of the company's principals have other business involvement? If yes, describe and quantify how much of their professional time is dedicated to each: | Principals are contracted to exclusively manage the assets of BSAM clients and/or subadvisory clients. Additionally, any involvement with outside boards and/or organizations must be precleared by the Firms Investment Committee/Management Committee and General Counsel. |
| Has an employee of the company ever been refused authorisation or had it withdrawn? If so, please provide details: | No. |

## LEGAL

| Are there or have there ever been any criminal, civil, regulatory or administrative proceedings against the company or any of its principals, or any similar such matters including reparations, arbitrations and negotiated settlements? | BSAM and its current employees have not been involved in any litigation or legal proceedings related to our investment activities in the last three years that could have a material adverse effect on the financial condition of BSAM and/or its parent/affiliates nor could impair the ability of BSAM to carry out its duties as an investment advisor. All material matters pertaining to the Bear Stearns Companies Inc. and its subsidiaries are required to be disclosed in the firm's Form 10K. |
|---|---|

## ANTI-MONEY LAUNDERING POLICY

| Confirm that the company has established Anti-money Laundering (AML) procedures: | Bear, Stearns & Co. Inc. has adopted a comprehensive Anti-Money Laundering Program along with Associated Customer Identification Procedures. |
|---|---|
| Please advise which jurisdiction's regulations you comply with: | BSAM complies with the Securities Exchange Commission and the Investment Company Act of 1940. |
| Please advise who your MLRO (Money Laundering Reporting Officer) is: | Ms. Arlene Semaya, Bear Stearns Legal Department, AML Group. |
| Elaborate on the procedure to ensure compliance with AML policies: | All BSAM employees with securities licenses are required, as a condition of employment, to participating in AML training to become familiar with AML policies and procedures. These polices and procedures include specific action steps and oversight at both corporate and branch locations. As an example, in certain instances, the CIP requires the approval of the AML Group before an account may be opened (e.g., non-U.S. individual accounts). |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568657

## INSURANCE

| Do you currently hold insurance for the following:<br>• Director & Officers Liability?<br>• Professional Indemnity?<br>• Crime (Employee fidelity/third party fraud)?<br>• Key Person Insurance?<br>• Other?<br>N.B.: if you are not restricted from disclosing such information under your policy(ies) | Bear Stearns Asset Management maintains a $10 million errors and omissions insurance policy with Indian Harbor Insurance Company. We also maintain a $200 million Fidelity Bond with National Union Fire Insurance Company and Excess SIPC insurance from Travelers Casualty & Surety Company. |
|---|---|

## BUSINESS CONTINUITY

| | Yes, BSAM has a complete disaster recovery plan for our employees in case an emergency occurs and we are unable to enter our offices at 383 Madison Avenue in New York. Bear Stearns has five primary processing and backup sites that collectively give us the redundancy required to protect our books and records, protect our balance sheet, defend capital and provide a degree of business continuity and client protection. One backup site includes Bear Stearns' Whippany, New Jersey office. This facility is home to 2 disaster recovery trading floors ("hot" sites) that function solely in case of emergency. It is complete with desks, PC's, appropriate software and market data feeds, telephones, faxes and additional requirements for business units as needed. IBM's Sterling Forest facility is used as the primary recovery site for our mainframe processing capabilities. IBM's facility is a dedicated and specialized facility that provides disaster recovery services to many large corporations. All mainframe applications are backed up at the Sterling Forest facility. A disk-shadowing technology is employed to achieve this capability. |
|---|---|
| Does the company have a formal disaster recovery plan? Please describe the basic provisions: | Times are set aside during the year for Bear Stearns to test its recovery plan. Six regularly scheduled disaster recovery tests are conducted on our mainframe environment each year. We also regularly test the fail over and backup capabilities of redundant AS/400 platforms, recovery of our email servers and individual tests of our other distributed computing platforms. In addition to internal efforts, Bear Stearns has joined the Securities Industry Association's Business Continuity Management Group, a consortium of leading investment banks, whose members are working together to develop a consistent and viable response to any future disaster scenarios.<br><br>Within BSAM the following steps have also been taken:<br><br>• An Emergency Control Team has been formed into three departments, Portfolio Management, Marketing and Administration, each with separate Division Managers<br>• In the event of a disaster, our Emergency Control Team Director would immediately notify each Division Manager<br>• Each Division Manager is responsible for contacting division team members for instructions on where to go in the event of a disaster |

AIMA's Illustrative Questionnaire for Due Diligence Review of Hedge Fund Managers
© The Alternative Investment Management Association Limited (AIMA), 2004

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568658

| What contingency plans do you have in terms of:<br>• Computer system fault?<br>• Incapacitated investment decision makers?<br>• Technical failure at Prime Broker's location?<br>• Presence of in-house computer technician?<br>• Back-up systems? | Please refer to the answer above. |
|---|---|

Please attach the most recent disclosure document, information memorandum, and marketing literature.

In the event of amendments to the aforementioned documents, notably the memorandum, please ensure that we will receive those directly from you within reasonable time, as well as copies of proxy's and notification of the Annual General Meeting (the latter only for information purposes).

Please state the name and title of the officer at your company who has prepared and reviewed this questionnaire.

| Signature: | *Heather J. Malloy* (signature) |
|---|---|
| Name: | Heather Malloy |
| Position: | Hedge Fund Product Manager |
| Date: | March 31, 2006 |

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568659

• **From:** Van Solkema, Steven (Exchange)
**Sent:** Sunday, April 08, 2007 10:03 PM
**To:** Cioffi, Ralph (Exchange)
**Subject:** Re: Analysis of ABX Current Loans vs. Those Already in the Delinquency Pipeline

Understood.

-----Original Message-----
From: Cioffi, Ralph (Exchange)
To: Van Solkema, Steven (Exchange)
Sent: Sun Apr 08 21:37:55 2007
Subject: RE: Analysis of ABX Current Loans vs. Those Already in the Delinquency Pipeline

Yes correct but the weak ones may not take 100% write down etc. This is especially important re. the ABspoke's because
we are getting ready to pay a big premium for protection on those deals.

Mr. Ralph Cioffi
Senior Managing Director
Bear Stearns Asset Management
383 Madison Ave. NYC 10167
212 272 3498
rcioffi@bear.com

　　　　-----Original Message-----
　　　　From: Van Solkema, Steven (Exchange)
　　　　Sent: Sunday, April 08, 2007 9:21 PM
　　　　To: Cioffi, Ralph (Exchange)
　　　　Subject: RE: Analysis of ABX Current Loans vs. Those Already in the Delinquency Pipeline


　　　　　　On the side (manually), I've been working on runs for the three indices keeping everything constant but HPA
(and running that at -2, -1, 0, +1, and +2). I should have that too show you in the next day or two. I too am trying to
ascertain the model's sensitivity to HPA assumptions. Again though, the best way to use the model's output is not
necessarily to find the "true absolute value", but, to look for the variance between one deal and another.....and, to see the
change in one deal from period to period. Because then, even if our HPA assumptions are not 100% accurate, or, if the
model is too sensitive, etc... as long as we're using the same approach to review all 30,000 cusips, the weak ones are still
going to be the weak ones.

　　　　　　I'll have more for you tomorrow or Tues.


256143

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568660

From:   Cioffi, Ralph (Exchange)
Sent:   Sunday, April 08, 2007 9:15 PM
To:     Van Solkema, Steven (Exchange)
Subject:     RE: Analysis of ABX Current Loans vs. Those Already in the Delinquency Pipeline

Steve the one area that still causes me pause is how the model treats HPA. Ie. what hpa would be required to return 100% of the principal on 06-2 and 07-1? The results seem very sensitive to HPA and that seems to simplistic.

Mr. Ralph Cioffi
Senior Managing Director
Bear Stearns Asset Management
383 Madison Ave. NYC 10167
212 272 3498
rcioffi@bear.com

-----Original Message-----
From: Van Solkema, Steven (Exchange)
Sent: Sunday, April 08, 2007 9:13 PM
To: Cioffi, Ralph (Exchange)
Cc: Mcgarrigal, Raymond (Exchange); Karper, James (Exchange); Mohindra, Dhruv (Exchange); Lipton, Andrew (Exchange); Rothenberg, Stuart (Exchange); Mobasheri, Ardavan (Exchange); Freed, Laurence (Exchange); Farcasiu, Simina (Exchange); Crystal, Jim (Exchange); Yuan, Mingwei (Exchange); Ferry, Danielle (Exchange); Dasgupta, Som (Exchange); Cherniack, Anne (Exchange); Wang, Yikai (Exchange); Wang, Yikai (Exchange); Tannin, Matthew (Exchange)

Subject: RE: Analysis of ABX Current Loans vs. Those Already in the Delinquency Pipeline

Correct. The prepay/loss models are elegantly simple in that they look at each individual loan and determine the probability for that one loan of default, cure, prepay, etc... in each period. So, those models don't rely on the initial stats of the pool or anything to come up with their projections. In other words, they are only forward looking from the most recent information available at the loan level (whether still current or already delinquent).

From:   Cioffi, Ralph (Exchange)

256143

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568661

Sent:   Sunday, April 08, 2007 9:10 PM
To:     Van Solkema, Steven (Exchange)
Cc:     Mcgarrigal, Raymond (Exchange); Karper, James (Exchange); Mohindra, Dhruv
(Exchange); Lipton, Andrew (Exchange); Rothenberg, Stuart (Exchange); Mobasheri, Ardavan (Exchange); Freed,
Laurence (Exchange); Farcasiu, Simina (Exchange); Crystal, Jim (Exchange); Yuan, Mingwei (Exchange); Ferry, Danielle
(Exchange); Dasgupta, Som (Exchange); Cherniack, Anne (Exchange); Wang, Yikai (Exchange); Wang, Yikai
(Exchange); Tannin, Matthew (Exchange)

Subject:    RE: Analysis of ABX Current Loans vs. Those Already in the Delinquency Pipeline

So yes obviously the pool is being "cleaned out" but as you say there is still some cleaning to go
and the question is their performance of the remaining pool. As I've indicated cdp cdr obviously takes that in to
consideration in their model so there is probably no silver lining here to speak of.

Mr. Ralph Cioffi
Senior Managing Director
Bear Stearns Asset Management
383 Madison Ave. NYC 10167
212 272 3498
rcioffi@bear.com

-----Original Message-----
From: Van Solkema, Steven (Exchange)
Sent: Sunday, April 08, 2007 9:06 PM
To: Cioffi, Ralph (Exchange)
Cc: Mcgarrigal, Raymond (Exchange); Karper, James (Exchange); Mohindra, Dhruv
(Exchange); Lipton, Andrew (Exchange); Rothenberg, Stuart (Exchange); Mobasheri, Ardavan (Exchange); Freed,
Laurence (Exchange); Farcasiu, Simina (Exchange); Crystal, Jim (Exchange); Yuan, Mingwei (Exchange); Ferry, Danielle
(Exchange); Dasgupta, Som (Exchange); Cherniack, Anne (Exchange); Wang, Yikai (Exchange); Wang, Yikai
(Exchange); Tannin, Matthew (Exchange)

Subject: Analysis of ABX Current Loans vs. Those Already in the Delinquency Pipeline

Ralph -

To answer the questions from your Saturday phone call, I put this analysis together which
shows, for each ABX series, the various loan characteristics of those borrowers who are still current vs. those who are
already delinquent. The full analysis is in the attached spreadsheet, but, to highlight a few key points and clarify how to
read the workbook, I've put a few summary characteristics below for each index. The analysis is logical in that the
characteristics of the delinquent borrower are -- in every case -- worse than the borrower who is still current on their
mortgage. However, I would point out that there are still plenty of borrowers who are current that share the same if not
worse characteristics as those who have already become delinquent. I agree that at some point, one must think that the bad
borrowers are getting "cleaned out" of the pools, but, I think we still have a ways to go.

256143

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568662

<< File: ABX Current vs Delinquent Summary Data.xls >>

### In ABX 06-1:

* The average borrower had a FICO of 634, LTV of 82, and a combined (including second liens) LTV of 87.
* On average, 29.5% of borrowers took a second lien piggy back, 26.3% had a FICO less than 600, 11.4% had a LTV > 90, and over 40.5% filed low doc applications.

* The average borrower who is current on loan payments, has a FICO of 640, LTV of 81, and a combined LTV of 87.
* Similarly, out of the current borrowers, 28.6% took a piggy back second lien, 23.1% had a FICO less than 600, 11.2% had a LTV > 90, and over 39.2% filed low doc applications.

* In contrast, the average borrower who is 90+ days delinquent (but not yet in foreclosesure or REO), has a FICO of 612, LTV of 83, and a combined LTV of 90.

* Similarly, out of the 90+ delinquent borrowers, 34.5% took a piggy back second lien, 40.2% had a FICO less than 600, 14.4% had a LTV > 90, and over 44.1% filed low doc applications.

### In ABX 06-2:

* The average borrower had a FICO of 627, LTV of 81, and a combined (including second liens) LTV of 87.
* On average, 26.7% of borrowers took a second lien piggy back, 29.9% had a FICO less than 600, 13.2% had a LTV > 90, and over 42.1% filed low doc applications.

* The average borrower who is current on loan payments, has a FICO of 632, LTV of 81, and a combined LTV of 86.
* Similarly, out of the current borrowers, 25.2% took a piggy back second lien, 27.2% had a FICO less than 600, 13.3% had a LTV > 90, and over 39.9% filed low doc applications.

* In contrast, the average borrower who is 90+ days delinquent (but not yet in foreclosesure or REO), has a FICO of 612, LTV of 84, and a combined LTV of 90.

* Similarly, out of the 90+ delinquent borrowers, 32.1% took a piggy back second lien, 39.1% had a FICO less than 600, 17.9% had a LTV > 90, and over 48.1% filed low doc applications.

### In ABX 07-1:

* The average borrower had a FICO of 627, LTV of 81, and a combined (including second liens) LTV of 87.
* On average, 28.5% of borrowers took a second lien piggy back, 30.3% had a FICO less than 600, 14.0% had a LTV > 90, and over 40.9% filed low doc applications.

256143

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568663

- The average borrower who is current on loan payments, has a FICO of 630, LTV of 81, and a combined LTV of 86.
- Similarly, out of the current borrowers, 27.7% took a piggy back second lien, 28.2% had a FICO less than 600, 14.0% had a LTV > 90, and over 39.4% filed low doc applications.

- In contrast, the average borrower who is 90+ days delinquent (but not yet in foreclosesure or REO), has a FICO of 617, LTV of 84, and a combined LTV of 90.

- Similarly, out of the 90+ delinquent borrowers, 36.2% took a piggy back second lien, 35.1% had a FICO less than 600, 17.7% had a LTV > 90, and over 55.7% filed low doc applications.

256143

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568664

**From:** Cioffi, Ralph (Exchange)
**Sent:** Thursday, May 31, 2007 9:50 PM
**To:** 'ADAM KUGLER'
**Subject:** RE: Update

We are working 24-7 on this.

Mr. Ralph Cioffi
Senior Managing Director
Bear Stearns Asset Management
383 Madison Ave. NYC 10167
212 272 3498
rcioffi@bear.com

-----Original Message-----
From: ADAM KUGLER [mailto:akugler@mtb.com]
Sent: Thursday, May 31, 2007 9:47 PM
To: Cioffi, Ralph (Exchange)
Subject: Re: Update

Hang in there
Adam Kugler

-----Original Message-----
From: "Cioffi, Ralph (Exchange)" <rcioffi@bear.com>
To: KUGLER, ADAM <akugler@mtb.com>
Creation Date: 5/31 9:38 pm
Subject: RE: Update

Ok enjoy. The April final number is going to be ugly still working on
final numbers from dealers having hard time getting any real numbers. In

some cases there are 10 points bid offer spreads on marks. Worst time in

my professional career. I'll make it up to you. Promise.

Mr. Ralph Cioffi
Senior Managing Director
Bear Stearns Asset Management
383 Madison Ave. NYC 10167
212 272 3498
rcioffi@bear.com

-----Original Message-----
From: ADAM KUGLER [mailto:akugler@mtb.com]

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

BEAR 01568665

Sent: Thursday, May 31, 2007 1:17 PM
To: Cioffi, Ralph (Exchange)
Subject: RE: Update

no golf this weekend too much soccer softball and field hockey

Adam Kugler
Treasurer, M&T Bank
212-350-2486 or 201-838-5360
>>> "Cioffi, Ralph (Exchange)" <rcioffi@bear.com> 05/30/07 6:12 PM >>>
not this month so far we have talked any June redemptions of note (other

than about $5M) to pull their redemptions. So we are good for another
month . The only surprise will be are CDO marks market still crappy as
you know. Ill try and give you a better read on may  returns next week.
any golf this weekend?


Ralph R. Cioffi

Senior Managing Director

Bear Stearns Asset Management

Structured Credit Group

237 Park Ave. NY, NY. 10017

212-272-3498

rcioffi@bear.com




————

From: ADAM KUGLER [mailto:akugler@mtb.com]
Sent: Wednesday, May 30, 2007 5:36 PM
To: Cioffi, Ralph (Exchange)
Subject: RE: Update

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE and DORR LLP

any surprises to worry about?

>>> "Cioffi, Ralph (Exchange)" <rcioffi@bear.com> 05/29/07 8:47 AM >>>

CONFIDENTIAL

BEAR 01568666

we agree 100% and would not allow that to happen. Ill have an official response for you shortly but rest assured we would not allow that.


Ralph R. Cioffi

Senior Managing Director

Bear Stearns Asset Management

High Grade Structured Credit Strategies L.P.

383 Madison Ave. NY, NY. 10179

212-272-3498

rcioffi@bear.com

 

---

From: ADAM KUGLER [mailto:akugler@mtb.com]
Sent: Tuesday, May 29, 2007 8:45 AM
To: Cioffi, Ralph (Exchange)
Subject: RE: Update


I spent the weekend thinking about this (as I am sure you did also) and I don't think you have a choice but to halt the redemptions because the losses could really escalate for the remainders (maybe even approach a complete loss for the last man standing with all the embedded leverage).

If you were forced to liquidate spreads could really widen especially for anything rated below "A" and I have no idea how you unwind the funding trades?  If you do a control liquidation it would be another story.  Paying the first guy with your cash on hand would be a terrible thing for the remaining partners and you know they will redeem immediately especially since one guy holds so much capital.

My two senses for what it is worth.  Adam

please keep me in the loop

>>> "Cioffi, Ralph (Exchange)" <rcioffi@bear.com> 05/25/07 3:50 PM >>>

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568667

Well things have developed real fast. Just leaving the office now Ill
call you from the car phone


Ralph R. Cioffi
Senior Managing Director
Bear Stearns Asset Management
High Grade Structured Credit Strategies L.P.
383 Madison Ave. NY, NY. 10179
212-272-3498
rcioffi@bear.com


-----Original Message-----
From: ADAM KUGLER [mailto:akugler@mtb.com]
Sent: Friday, May 25, 2007 1:32 PM
To: Cioffi, Ralph (Exchange)
Subject: Re: Update

Please do Bob surprised me with some info that I didn't know.
Adam Kugler

-----Original Message-----
From: "Cioffi, Ralph (Exchange)" <rcioffi@bear.com>
To: KUGLER, ADAM <akugler@mtb.com>
Creation Date: 5/25 12:17 pm
Subject: RE: Update


Ill call you shortly


Ralph R. Cioffi
Senior Managing Director
Bear Stearns Asset Management
High Grade Structured Credit Strategies L.P.
383 Madison Ave. NY, NY. 10179
212-272-3498
rcioffi@bear.com


-----Original Message-----
From: ADAM KUGLER [mailto:akugler@mtb.com]
Sent: Friday, May 25, 2007 12:03 PM
To: Cioffi, Ralph (Exchange)
Subject: Update

Are you freezing the fund

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568668

Adam Kugler

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
This email may contain privileged and/or confidential information that
is intended solely for the use of the addressee.  If you are not the
intended recipient or entity, you are strictly prohibited from
disclosing, copying, distributing or using any of the information
contained in the transmission.  If you received this communication in
error, please contact the sender immediately and destroy the material in


its entirety, whether electronic or hard copy.  This communication may
contain nonpublic personal information about consumers subject to the
restrictions of the Gramm-Leach-Bliley Act and the Sarbanes-Oxley Act.
You may not directly or indirectly reuse or disclose such information
for any purpose other than to provide the services for which you are
receiving the information.
There are risks associated with the use of electronic transmission.  The


sender of this information does not control the method of transmittal or


service providers and assumes no duty or obligation for the security,
receipt, or third party interception of this transmission.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *




* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
Bear Stearns is not responsible for any recommendation, solicitation,
offer or agreement or any information about any transaction, customer
account or account activity contained in this communication.

Bear Stearns does not provide tax, legal or accounting advice.  You
should consult your own tax, legal and accounting advisors before
engaging in any transaction. In order for Bear Stearns to comply with
Internal Revenue Service Circular 230 (if applicable), you are notified
that any discussion of U.S. federal tax issues contained or referred to
herein is not intended or written to be used, and cannot be used, for
the purpose of:  (A) avoiding penalties that may be imposed under the
Internal Revenue Code; nor (B) promoting, marketing or recommending to
another party any transaction or matter addressed herein.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568669

**From:**   Cook, Todd - Communication of Counsel (Exchange)
**Sent:**   Wednesday, April 26, 2006 2:22 PM
**To:**   Dantus, Steve (Exchange); Dicks, Vinnie (Exchange); Donnellan, Andrew - Communication of Counsel (Exchange); Sommers, Barry (Exchange); Sheresky, Steve (Exchange); Godin, Larry - Communication of Counsel (Exchange); Crea, Mary (Exchange); Willis, Linda (Exchange); Lafer, Lawrence (Exchange); Munowitz, Gary (Exchange)
**Cc:**   Tepper, Eric (Exchange); Tannin, Matthew (Exchange)
**Subject:** NPC Meeting - Bear Stearns High Grade Structured Credit Strategies Master Fund

Attached are minutes for the above-referenced PCS New Products Committee meeting, which was held on April 25, 2006.

The Committee deferred a decision on the product until a later date, as outlined in the minutes.

J. Todd Cook
Managing Director
CONFIDENTIAL COMMUNICATION FROM COUNSEL
Bear, Stearns & Co. Inc.
Legal Department
320 Park Avenue, 12th Floor
New York, NY 10022
(212) 272-3295 (p)
(917) 849-1622 (f)
jtcook@bear.com

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568670

Minutes of the Meeting of the
PCS New Products Committee – April 25, 2006

A meeting of the Bear Stearns PCS New Products Committee (the "NPC") was held at 383 Madison Avenue, New York, New York on April 25, 2006 at 3:00 p.m.

1.      The following members of the NPC were in attendance: Steve Dantus, Vincent Dicks, Andrew Donnellan, Barry Sommers, Gary Munowitz, Todd Cook, Larry Godin, Larry Lafer, Linda Willis, Mary Crea and Steve Sheresky.

        At the invitation of the Committee, Eric Tepper and Matthew Tannin of Bear Stearns Asset Management Ltd. ("BSAM") were in attendance.

2.      The Committee heard a presentation from Matthew Tannin concerning the offering of a 2x and 3x leveraged version of the Bear Stearns High Grade Structured Credit Strategies Master Fund (the "Fund"), which is currently being offered to a limited number of PCS clients.

        Whereupon, the Committee discussed the terms and characteristics of the Fund and a 2x and 3x leveraged version of the Fund, with an emphasis on the incremental risks to investors, the need for training and surveillance, and the suitability issues with respect to a 2x and 3x leveraged version of the Fund. The Committee noted that a communication concerning the availability of the 2x and 3x leveraged version of the Fund had been mailed by BSAM to current Fund investors in mid-April.

        Whereupon, the Committee determined to defer a decision on whether the 2x and 3x leveraged version of the Fund should be made available through PCS Account Executives.

3.      There being no further business to come before the Committee, the meeting was, on motion duly made, seconded, and unanimously carried, adjourned.

                                    J. Todd Cook

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

1

CONFIDENTIAL                                    BEAR 01568671

| From: | Cook, Todd - Communication of Counsel (Exchange) |
|---|---|
| Sent: | Wednesday, June 28, 2006 3:25 PM |
| To: | Crea, Mary (Exchange); Dantus, Steve (Exchange); Dicks, Vinnie (Exchange); Donnellan, Andrew - Communication of Counsel (Exchange); Godin, Larry - Communication of Counsel (Exchange); Hyman, John (Exchange); Lafer, Lawrence (Exchange); Munowitz, Gary (Exchange); Sheresky, Steve (Exchange); Sommers, Barry (Exchange); Willis, Linda (Exchange) |
| Cc: | Malloy, Heather (Exchange); Raheja, Previn (Exchange); Tannin, Matthew (Exchange); Tepper, Eric (Exchange); Whille, Tracy (Exchange) |

**Subject:** NPC Meeting - 5/25/06

Attached are minutes of the PCS New Products Committee meeting held on May 25, 2006.

J. Todd Cook
Managing Director
CONFIDENTIAL COMMUNICATION FROM COUNSEL
Bear, Stearns & Co. Inc.
Legal Department
320 Park Avenue, 12th Floor
New York, NY 10022
(212) 272-3295 (p)
(917) 849-1622 (f)
jtcook@bear.com

Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP

CONFIDENTIAL

BEAR 01568672

Minutes of the Meeting of the
PCS New Products Committee – May 25, 2006

The meeting of the Bear Stearns PCS New Products Committee (the "NPC") was held at 383 Madison Avenue, New York, New York on May 25, 2006, at 1:00 p.m.

1.  The following members of the NPC were in attendance:
    Steven Dantus, Vincent Dicks, Andrew Donnellan, Gary Munowitz, Linda Willis, Larry Godin, Larry Lafer and Todd Cook.

    At the invitation of the Committee, Craig Goos of Advisory Services and Heather Malloy, Previn Raheja and, by conference call, Matthew Tannin of Bear Stearns Asset Management Inc. ("BSAM") were in attendance.

2.  The Committee heard a presentation from Heather Malloy concerning a leveraged version of the Bear Stearns High Grade Structured Credit Strategies Fund, L.P. (the "Fund"), a private investment fund managed by BSAM that seeks high current income and capital appreciation relative to LIBOR primarily through leverage investments in investment grade structured finance securities. A copy of the private placement memorandum of the Fund was distributed to the Committee.

    Whereupon, the Committee discussed the terms and characteristics of a leveraged version of the Fund, the risks to investors, the compensation to the firm and PCS brokers, the relationship of product with respect to other products available through PCS, the training to be provided to PCS brokers, as well as other issues pertaining to the product and its suitability for certain PCS investors.

    Whereupon, the Committee voted to approve the sale of the product to PCS investors who are current investors in the Fund, subject to a review of the suitability of each such investment by senior PCS management, in consultation, as necessary, with the Law and Compliance Department.

3.  There being no further business to come before the Committee, the meeting was, on motion duly made, seconded and unanimously approved, adjourned.

                                                 J. Todd Cook

**Confidential Treatment
Requested by
WILMER CUTLER PICKERING
HALE AND DORR LLP**

1

CONFIDENTIAL                                            BEAR 01568673

# EXHIBIT 4



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

OFFICE OF COMPLIANCE
INSPECTIONS AND
EXAMINATIONS

December 2, 2005

Mr. Jeffrey M. Farber
Senior Managing Director
Bear, Stearns & Co., Inc.
383 Madison Avenue
New York, NY 10179

Dear Mr. Farber:

An examination of Bear, Stearns & Co., Inc. ("BS&Co.") was conducted by staff of the U.S. Securities and Exchange Commission (hereinafter referred to as the "staff"). This examination was conducted in connection with BS&Co.'s application under Appendix E of Rule 15c3-1 of the Securities Exchange Act of 1934 ("Exchange Act") to be regulated as a consolidated supervised entity ("CSE").

Exchange Act Rule 15c3-1(a)(7)(iii) allows a broker-dealer to use an alternative method of computing deductions to net capital provided that it complies with Exchange Act Rule 15c3-4 as though it were an OTC derivatives dealer. Exchange Act Rule 15c3-4(a) requires that an OTC derivatives dealer establish, document, and maintain a system of internal risk management controls to assist it in managing the risks associated with its business activities, including market, credit, leverage, liquidity, legal, and operational risks.

To be eligible to become a CSE and compute capital deductions under the alternative method, a broker-dealer must, among several other requirements, maintain tentative net capital of $1 billion and net capital of at least $500 million. The ultimate holding company of the broker-dealer also would have to consent to supervision by the Commission, and the holding company would have to maintain a robust risk management and internal control structure.

The examination focused on the following areas: internal audit; anti-money laundering controls; capital computations; Sarbanes Oxley internal controls; and the firm's internal control systems for managing market, legal and compliance ("L&C"), credit, funding and liquidity, and operational risks, including business continuity planning.

The staff conducted various tests of the firm's implementation of its procedures and the firm's internal risk management control system to asses its compliance with the requirements under Exchange Act Rule 15c3-4 focusing on the following businesses

CONFIDENTIAL

conducted within material affiliates: credit derivatives – primarily credit default swaps ("CDS"), fixed income derivatives ("FID") – primarily municipal and mortgage derivatives, residential whole loans, and commercial mortgages. The staff's examination covered: Bear Stearns Credit Products Inc.; Bear Stearns Capital Markets Inc.; EMC Mortgage Corporation ("EMC"); and Bear Stearns Commercial Mortgage, Inc. as well as The Bear Stearns Companies Inc. ("TBSCI"), the ultimate holding company (collectively, BS&Co. and its affiliates are referred to as "Bear Stearns" or "the firm"). The examination was limited in scope, focusing on a risk-based sampling of selected transactions and activities in certain affiliates.

The staff held an examination exit interview with the firm on October 26, 2005 outlining the findings from the examination. The staff's findings are summarized in bold below. This is followed by a description of the finding, and where provided, the firm's preliminary response in italics. Where the staff's review has noted incomplete policies and procedures or inadequate or potentially inadequate application of those procedures, we request that your firm conduct a comprehensive review of that area to assess whether additional improvements should be made.

## INTERNAL AUDIT

The staff conducted a review of the firm's internal audit function, particularly emphasizing the adequacy of the audit procedures used by the Internal Audit Department ("IAD"), the department's structure and staffing, and the adequacy of reporting to senior management.

**1. IAD has a policy of discarding certain audit workpapers 60 days after the issuance of the Audit Report.** The IAD Reference Guide requires that IAD discard certain supporting documents such as the Potential Issues Log, general testing schedules, narratives describing procedures performed, and other underlying documents that evidence the review, testing, and potential findings of the audit 60 days after the Audit Report is issued. The staff found that the policy of discarding IAD audit supporting documents leaves no evidentiary support that IAD performed its planned audit work. The lack of workpapers also deprives IAD of a useful source of information in evaluating the need for and scope of future audits.

*Firm's Response: The firm has indicated that beginning with audits commenced after November 1, 2005, IAD will retain lists of the sample items selected for testing, results of such testing, and any narratives prepared describing the overall workflows in the area.*

**2. IAD did not complete all audits scheduled for its 2004 Audit Plan in a timely manner, and it appears that IAD may not complete its 2005 Audit Plan in a timely manner. As a result, it appears that IAD may not cover all audit universe items**

CONFIDENTIAL                                           BEAR 01409440

**within its five-year audit cycle.** IAD may not be completing its Audit Plans in a timely manner due to a lack of personnel resources. Although meeting audit schedules should not be achieved at the expense of thoroughness, the staff has a concern that an apparent lack of personnel resources may affect IAD's timely performance of periodic reviews of the firm's risk management systems, as required pursuant to Exchange Act Rule 15c3-4.

*Firm's Response: IAD accepted the staff's statements concerning the 2004 Audit Plan, but asserted that it is premature to predict that IAD may not complete its 2005 Audit Plan on time. The firm also stated that, although it defers some audits, it does so primarily for audits of lower priority. Finally, the firm stated that only about 10% of IAD's 2005 hours were spent on deferred or late 2004 audits.*

Staff's Concern: The staff remains concerned regarding IAD's ability to cover all audit universe items within its five-year audit cycle.

**3. The Confirmations Group ("CG"), a group within IAD, performs an operations or compliance function and has not been subject to review by IAD personnel.** CG provides the integral services of centralizing the receipt, distribution, and administration of non-trade related confirmations; responding to the confirmation requests of various counterparties; and confirming balances and positions. Therefore, the CG should be subject to review by IAD personnel. The staff is concerned that it may be a conflict of interest for the CG to perform functions that should be subject to review by IAD.

*Firm's Response: IAD noted that it has been in discussion with the firm's senior management regarding whether to move this function out of IAD. IAD added that, although the current structure may tend to give the appearance of a conflict of interest, the CG receives extensive informal management review and its existence within IAD provides IAD with useful information about potential problems with confirmations.*

Staff's Concern: Because of the function that the CG performs, the group should be reviewed by an independent party. The staff is concerned about the ability of the IAD to perform that review if the CG remains a part of the IAD.

**4. Low risk findings are not included in the Audit Report, are not maintained by IAD in its workpapers, and are not tracked in the Follow-Up Tracking System ("FUTS").** Although a finding may appear to be of low risk at the time of the audit, it could potentially become of increased significance to the firm at a later date. Additionally, low risk findings aggregated across audits may pose a larger risk to the firm than they may appear to pose as individual low risk findings. Therefore, the firm should maintain a record of low risk findings to assess there relevance in the aggregate.

CONFIDENTIAL

BEAR 01409441

**5. IAD's procedures do not contain a formal continuing education requirement.** The staff is concerned that the lack of a written formal continuing education requirement may prevent audit personnel from receiving the continuing education needed to continue to perform their audit related duties effectively. This will become increasingly important as IAD takes on additional responsibilities under SOX, and especially if IAD continues to hire more junior employees.

*Firm's Response: IAD agreed that there is no formal continuing education requirement, but stated that its personnel do receive significant continuing education. IAD also stated that it is looking into instituting a more formal continuing education requirement.*

**6. IAD's procedures appear to permit senior management of the business audited to have undue influence in the drafting of the Audit Report and to require that approval of the Audit Report be obtained from auditee senior management before its issuance.** The staff is concerned that such procedures appear to permit business personnel rather than the independent audit team to make a determination on findings.

*Firm's Response: IAD asserted that the senior management's input in the process of audit report drafting is limited to confirming facts that the auditors include in the report. The firm also stated that it will revise the procedures to reflect the role that the senior management of the audited business has in the preparation of the Audit Report.*

**7. The staff's review of thirteen audit files revealed a number of procedural inconsistencies.** Several of the files were missing documents that IAD's procedures require to be retained. In addition, certain documents contained incorrect dates and failed to include signatures evidencing supervisory review.

*Firm's Response: IAD responded that it relies on its quality assurance program to ensure that all files are maintained according to IAD's procedures.*

Staff's Concern: The staff is concerned that the quality assurance program did not cover the files selected for review by the staff and requests that the firm advise how the procedural inconsistencies will be prevented in the future.

**8. The staff did not find evidence that IAD provides to the Audit Committee analysis of aggregated audit findings to supplement the Audit Reports that it provides; nor did the staff find evidence that IAD provides to the Audit Committee detailed written information on the status of IAD's progress on the Audit Plan.** Although IAD provides the Audit Committee with every Audit Report that it issues, the staff is concerned that IAD does not provide supplemental analytical information on audit findings to the Audit Committee that could highlight potential themes or areas of risk.

4

BEAR 01409442

*Firm's Response: IAD asserted that, although the IAD Guide does not require such reporting, it does in fact provide such information to its Audit Committee.*

Staff's Concern: The staff believes that the firm should maintain written documentation regarding the information that is presented to the Audit Committee.

## MARKET RISK MANAGEMENT

The staff reviewed the firm's market risk management controls, procedures, and practices. The staff focused its review on the internal controls surrounding the development and review of models, the management and reporting of risk throughout the firm, the mark review process, market risk limit management, back testing, and scenario analysis.

**1. The firm has a set of general policies but no procedures for its market risk management functions.** The firm has established limited policies addressing new trading limits, limit breaches, exceptions, limit reporting and all other risk management controls. These policies should be enhanced to provide more specificity of the risk management procedures utilized to ensure that the procedures are adequate and complete.

**2. The firm does not maintain an overall firmwide Value-at-Risk ("VaR") limit.** Bear Stearns does not have a Board or Committee level approved overall firmwide VaR limit for its aggregate businesses which is sub-allocated downstream to its individual business lines.

*Firm's Response: To date Bear Stearns has not made it a priority to have a firmwide VaR limit. The firm generally takes a "bottom-up" approach to setting limits. "Bottom-up" is an approach which emphasizes knowledge of the details of the risk and scrutiny of it. Well justified risk-taking will be approved. The firm then evaluates the sum-total of the approved risks for overall acceptability.*

*At Bear Stearns, risk taking is evaluated first and foremost at the trading desk level. Bear Stearns doesn't tend to take big positions in the risk factors most common across all desks and thus doesn't often find itself with VaR spikes driven by everyone having the same position. When a risk measure does not tend to spike there is less need to set a limit on it to constrain the spikes. Desk-level exposures to the most ubiquitous risk factors (e.g. general level of interest rates) have typically been kept to a moderate level. As a result, the firm believes that its risk profile tends to be dominated by a diversity of risk factors. Firmwide VaR is measured daily and disseminated but has not exhibited sufficient magnitude or volatility to compel the firm to place a limit upon it.*

*The firm indicated that it would not be difficult to implement a firmwide VaR limit. However, the firm does not believe that the previous lack of this limit is indicative of any*

CONFIDENTIAL

BEAR 01409443

*weakness in its internal controls nor does it feel that the introduction of such a limit would add in a meaningful way to its control environment.*

Staff's Concern: Bear Stearns should consider whether implementing a firmwide VaR limit established at a Board or Committee level would enhance its internal risk management controls or explain, in response to this letter, in more detail why this is not appropriate for the firm's particular business model.

**3. Certain business heads can establish new trading limits and approve existing limit breaches with their sole written approval without direct approval from risk management.** Risk management receives a copy of the limit approval memorandum after the limit has been established. The staff believes that requiring Risk Management approval in establishing trading limits and limit breaches will strengthen the Risk Management control function.

*Firm's Response: With regard to the limit approval process, the firm noted that Risk Management is currently a signatory to new limit approvals but they will modify their policy so that new limits are not officially approved until signed-off upon by Risk Management.*

**4. The firm's stress testing results are not the subject of periodic formal discussions of risk committees or other management discussion.** Stress testing is produced daily for a variety of historical and hypothetical stress scenarios, which is distributed to senior management. However, the stress testing results are not formally incorporated into the firm's risk management framework. Also, two business areas, Max Recovery and EMC, are not included in stress testing scenarios.

*Firm's Response: Since the staff's fieldwork completion, EMC is now added to the firm's stress test scenarios.*

Staff's Concern: The staff also requests a response regarding the status of including Max Recovery in the stress test scenarios and the incorporation of the stress testing results into the firm's risk management framework.

**5. Differences in the firm's Market Risk Management reports were identified by the staff.** The staff conducted various risk management reviews and tests of the daily risk management reports and systems. The reviews identified certain differences which are noted below. Since the staff conducted only limited testing, the firm may wish to consider a comprehensive review to ensure the accuracy of its reports.
(i)     The staff's data integrity review of EMC Core Loan Group's loans revealed that the EMC whole loan feed into Risk Information Organized ("RIO"), the firm's VaR calculation engine, did not properly include unsettled positions.

6

*Firm's Response: The staff was informed that a new feed is to be completed shortly.*

(ii)   The staff is concerned that a mortgage derivative trader has the ability to prevent new trades from flowing into RIO. For example, a sample review of three mortgage derivative trades revealed that one trade with trade date July 6, 2005, was not processed by RIO, the firm's VaR engine, until approximately July 18, 2005. This timing delay was due to the fact that the desk trader was still programming a pricing model for the aforementioned trade in the Unix database, a trade entry system.

(iii)  For residential and commercial mortgages, the Mortgages risk management reports included VaR figures which are different than those in the Firmwide VaR Report. The differences were due to the fact that Mortgage risk management utilized an earlier version of the Firmwide VaR Report for that day.

(iv)   Further, the staff's review of CDS limit reporting for the period July 1, 2005 through August 31, 2005, revealed that certain issuer limit approvals were not obtained in a timely manner. The review also revealed that certain CDS issuers which had exceeded their Spread Limits, Market Value limits and/or Default to Zero limits were not reported by risk management in the daily limit notification reports during the same period.

**6. At the time of our review the firm's backtesting of "clean" P&L had not incorporated various businesses.** The firm has completed its programming and coding for "dirty PNL", while static or clean P&L is still in development for many trading areas. Basel guidance states that it is most appropriate to utilize clean P&L when performing backtesting.[1] The staff believes that the firm should consider implementing the Basel guidance as soon as practicable.

**7. According to the firm, the Financial Analytics and Structured Transactions team conducts a one-time validation process for its VaR models upon release, however, the firm needs to establish controls and written procedures related to the update of VaR data inputs and a periodic model review process.** The staff sought to review the data inputs that are read by RIO, for purposes of calculating daily VaR. The staff reviewed six data files within the Unix Database, which are inputs into the RIO system. The staff noted the firm's failure to update on a timely basis two of the six files used for sensitivities of corporate/credit spreads in that the data inputs, for which the firm's internal practice requires a weekly update, had gaps of several weeks and up to a month without the updated spread/sensitivity information. As a result, the firm's daily VaR

---

[1]   See Supervisory Framework for the use of "Backtesting" in Conjunction with the Internal Models Approach to Market Risk Capital Requirements (January 1996).

7

CONFIDENTIAL

BEAR 01409445

amounts could be based on stale data at any point in time. Additionally, the staff recommends that the firm establish a periodic model review process as required by Exchange Act Rule 15c3-1(e)(d)(1)(ii).

*Firm's Response: The firm will implement a "maintenance manual" for its RIO system which will identify a program of review and updates of key RIO models, assumptions and inputs.*

**8. The firm should enhance its pricing model validation policies to provide more specificity (i.e., written procedures).** The pricing model validation team has focused on reviewing pricing model validation for derivatives. Additionally, the team has completed one EMC performing model review and is in the process of validating the EMC non-performing model. The staff reviewed ten model review reports from early 2004 to early 2005. The staff's findings are noted below. The staff is concerned that the lack of specificity in the pricing model validation policies can result in inconsistent actions being taken by the firm.

(i)     The staff noted that a "Mark-to-Market Valuation Review" report issued on the valuation of mortgage derivatives cited concerns with outdated models created a decade ago and limited documentation on how the models work, however, no recommendations for corrective action were made in this review.

(ii)    Three of the ten pricing model reports reviewed recommended that a more advanced pricing model approach be implemented; however, the staff noted delays in the implementation of the pricing models. For the three aforementioned pricing models they are either pending release or are yet to be programmed/modeled for release.

**9. Price verification policies and procedures need to be enhanced.** A review of the firm's price verification process revealed that existing policies need to be enhanced to include procedural controls to require trader level or portfolio level reviews based upon predetermined thresholds. Additionally, Risk Management and Business Unit Controller responsibilities regarding price verification should be documented. The staff believes that such enhancements are needed to document and clarify the accountability of those responsible for the price verification process.

**10. The firm needs to enhance its policies and procedures regarding aging of inventory.** For the products reviewed by the staff, the firm currently ages inventory for residential and commercial mortgages, as well as CDS. Bear Stearns policies and procedures need to be enhanced to encompass each business' aged inventory procedures. The staff is concerned with residential mortgage loans in that Risk Management does not receive an aging inventory report on a timely basis. Moreover, Mortgage Risk Management is not the primary reviewer of this report, but rather the report is disseminated to various managers for their review. For example, the staff noted that on

8

BEAR 01409446

August 23, 2005, Mortgage Risk Management received a copy of an EMC Aged Report for the period ending May 31, 2005; as a result, Risk Management reviewed a document that was about 11 weeks aged.

## OPERATIONAL TESTING

The staff conducted a review of the firm's systems and procedures for processing credit and fixed income derivatives transactions as well as residential and commercial mortgage transactions. In addition, the staff reviewed the firm's business continuity plan ("BCP") along with evaluations of the firm's BCP testing.

### A. *Residential and Commercial Mortgages*

**1. Reconciliation differences or "breaks" between the EMC front office (i.e., MORT) and back office (i.e., GOTS) do not appear to be corrected in a timely manner.** As of July 15, 2005 there was a total of 492 breaks, of which, 234 (48%) were aged greater than 100 days. It appears that once loans have been sold or securitized, there may be a small position remaining that represents a difference between actual cash received or paid and the amount anticipated. These items require research by operations, however once the loans have been sold, MORT is adjusted to reflect that there is no longer a position, thereby causing a break between MORT and GOTS.

*Firm's Response: The firm has indicated that as of November 1, the number of aged items over 100 days had dropped to 83 and resources will continue to be deployed to streamline the process.*

**2. The firm should enhance and/or develop formalized policies and procedures regarding Middle Office and Operation's controls in processing transactions.** Formal policy and procedure manuals should be enhanced and/or developed that describe the transaction flow and the reconciliations conducted between systems utilized in the processing of mortgage transactions in order to document and clarify the firm's operational controls.

**3. The process for calculating Profit and Loss ("P&L") for the ARMs desk is inconsistent with other mortgage desks. The staff believes that the ARMs desk should utilize HYDRA, which contains P&L modules, in order to provide a source of P&L independent of the trader's own input.** The majority of the traders on the ARMs desk do not utilize HYDRA for P&L; they utilize their own spreadsheets. Controllers often make adjustments in the Management Reporting System ("MRS") to reconcile the traders' P&L to the back-office P&L.

9

BEAR 01409447

*Firm's Response: The staff was informed that the ARMs desk will begin switching over to HYDRA in mid-October 2005.*

**4. The firm failed to maintain documentation evidencing required approvals prior to releasing term sheets for commercial loans greater than $40 million.** Approval signatures are required on a "Large Loan Authorization" form prior to releasing a term sheet on fixed rate loans greater than $40 million and on all securitized floating rate loans. The firm failed to maintain this authorization form for any of the five loans included in the staff's sample, all of which were greater than $40 million.

*Firm's Response: Going forward, evidence of such approval will be documented and maintained.*

### B. Credit and Fixed Income Derivatives

**1. The firm should enhance and/or develop formalized policies and procedures regarding Middle Office and Operation's controls in processing transactions.** Formal policy and procedure manuals should be enhanced and/or developed that describe the transaction flow and the reconciliations conducted between systems utilized in the processing of derivative transactions in order to document and clarify the accountability of the firm's operational controls. Middle Office policies and procedures should also indicate that the Middle Office is required to conduct a verbal confirmation for all derivatives trades. In addition, the time frame within which verbal confirmations are required to be obtained should be defined.

**2. Amendments to CDS transactions are not reflected on the trade blotter, which is utilized by the front-office. Although these transactions are amended in the operational systems and accurately reflected on the firm's books and records, this discrepancy could cause the front-office to misunderstand its true risk position.** When a change or amendment to a trade occurs, the trade ticket is changed, but the trade blotter is not, therefore creating discrepancies between the blotter and the trade processing systems.

*Firm's Response: This issue was corrected subsequent to the staff's review.*

**3. The front office to middle office reconciliation of non-Straight-Through-Processing ("STP") fixed income derivative transactions should be enhanced. The current process is manually intensive, evidence of reconciliation breaks and resolutions are not maintained, and the identity of the individual conducting the reconciliation is not required.** In addition to being input into the Tiger 2 trade blotter, non-STP trades are manually input into the Summit / Exotica Risk and Valuation systems. At the end of the day, the Middle Office manually compares the Tiger 2 trade

10

blotter to the New Trades Report which is fed from the Summit / Exotica systems. There is no documentation or signoff evidencing this manual review which raises concerns regarding the accountability of the review.

**4. Several FID sales trades were input directly by the trader instead of the salesperson as required by internal policy. This practice decreases the salesperson's accountability for the accuracy of the trade details being input into the firm's processing systems.** The FID group requires that internal marketer trades be input by the salesperson and reviewed by the trader and the Middle Office. However, four out of 11 internal marketer trades reviewed by the staff were input directly by the trader.[2] The exclusion of the salesperson's input weakens the firm's existing controls.

*Firm's Response: The firm will enhance its policies and procedures to reflect its limitations to the trading system for individual salespeople.*

**5. The Derivatives Documentation Handbook should include guidelines defining the time frame within which the first follow-up attempt, as well as subsequent follow-up attempts, should be made with counterparties that have outstanding unsigned confirmations.** The staff noted inconsistent practices with regard to the process surrounding unsigned confirmations. The staff is concerned that these inconsistent practices weaken the effectiveness of this control.

### C. Business Continuity Planning

**1. Bear Stearns does not test the ability of the Sterling Forest facility to function as an emergency backup to its primary data center.** The firm contends that it operates two data centers at Whippany and that each one is a backup for the other. The Sterling Forest site is treated as a secondary backup, not subject to the testing expected of a primary backup site. The staff believes that while Whippany A can backup Whippany B (and vice versa) in the event of a small scale disruption such as an IT intrusion or building specific event, the firm runs the risk of both facilities being affected by the same event in that they are close in proximity and share infrastructure and personnel. If the two Whippany facilities are affected in a single event, Sterling Forest would be the primary backup site. As such, the firm should have tested Sterling Forest as the backup site. When the Boulder site becomes active, Bear Stearns should test that site as its primary data center backup.

---

[2]     The four trades input by the trader were associated with one salesperson.

11

BEAR 01409449

## LEGAL AND COMPLIANCE

The staff reviewed the firm's overall Legal and Compliance ("L&C") risk systems, including organizational structure, written procedures, and the firm's surveillance documentation, escalation and resolution of issues. The staff also reviewed Bear Stearns' Anti-Money Laundering ("AML") program focusing on the AML Group's organizational structure, policies and procedures, surveillance, customer identification program ("CIP"), and training as well as the Internal Audit Department's independent test of the program.

### A.    General L&C Weaknesses

The staff noted several weaknesses in the firm's L&C controls during the staff's examination as follows:

**1. The firm failed to sufficiently document the identification, escalation and resolution of L&C issues.** According to Exchange Act Rule 15c3-4, the firm is required to establish, document and maintain a system of internal risk management controls to assist in managing legal risks. The firm's written procedures generally state that matters should be escalated to the appropriate parties, but there is no specific escalation process. Thus, the firm failed to maintain an audit trail of issues identified and escalated from subordinates to L&C senior management. The firm's practices prevented the staff from reviewing the escalation and resolution process in most areas because the issues were not documented. As a result of the lack of documentation, it appears that the firm is in violation of Rule 15c3-4.

**2. The firm's L&C monitoring and surveillance system is based on an informal process and does not have the capability to track issues or trends that develop over time.** Representatives from L&C believe the firm will be better able to identify trends that develop over time by simply staying abreast of the issues that arise in L&C through daily interaction or meetings. The firm stated that documenting issues that have developed will be burdensome and expose the firm to significant legal risk. However, the staff believes the documentation of issues is an essential tool for L&C to discover trends and proactively manage the L&C function, particularly in view of the possibility of personnel changes over time and the fact that as the business grows, it will become difficult even for long term employees to remember all the issues.

**3. L&C has not formally documented the identification or assessment of all applicable rules, laws, regulatory requirements and risks pertinent to the entire organization.** The staff requested a description of how the firm identifies and monitors all laws to which it is subject. The firm responded by stating that L&C professionals must have an understanding of the rules and regulations that are applicable to the business unit that they cover. In addition, the organization does not have an inventory of

12

BEAR 01409450

laws and risks that impact its businesses or a formal risk assessment of those laws. However, the firm expects L&C personnel to keep abreast of the L&C risks for each business unit. Interviews with the firm revealed that certain senior L&C personnel were not aware of all the L&C risks that threaten the specific business unit under their responsibility. By relying on an informal process, the firm could miss important legal issues, thereby increasing L&C risks.

**4. Many of the firm's written procedures were newly created or updated during the staff's examination.** The staff requested L&C's written procedures for each business unit reviewed. In many instances, the written procedures were created or updated during the course of the staff's examination. As a result, the staff was unable to test the adequacy of the firm's written procedures in most areas because the written procedures were not in place during the staff's review period.

**5. The firm does not maintain any charters, mission statements or written procedures defining the purpose of the working groups and other formal L&C meetings included in the L&C Guidelines.** There are several working groups included in the L&C Guidelines including the Regulatory Working Group, Litigation Working Group, Transactional Working Group, and the L&C Internal Audit Coordinating Group. In addition, the firm conducts weekly L&C Senior Staff Meetings and Compliance Senior Staff Meetings to discuss L&C issues. The firm maintains minutes for the L&C Senior Staff Meeting, but does not maintain a charter or mission statement. There is also no charter, mission statement or minutes recorded for the Compliance Senior Staff Meeting. The staff believes that maintaining written documentation regarding these working groups is an integral part of an effective internal control system.

**6. There is no formal process by which individuals are assigned to issues that warrant the creation of a temporary ad-hoc working group.** There is no written documentation of the initiation, progress or resolution of issues addressed in the working groups. The firm provided the staff with a list of working groups with EMC Legal and/or Compliance participation from August 2004 to July 2005. However, this list was based solely on the recollections of EMC employees. A list of working groups was not provided for the other areas the staff reviewed because based on the employee recollections in each area, no working groups were formed. As noted before, the possibility of personnel changes over time and the fact that as the business grows, it will become difficult even for long term employees to remember all the issues, therefore the staff believes that further documentation is warranted.

**7. The firm should consider enhancing its process of addressing conflicts of interest between customers and the firm.** The Ethics Compliance Committee currently addresses conflicts of interest that arise between the firm and senior management. According to the Ethics Compliance Committee charter "*the Committee shall evaluate*

13

CONFIDENTIAL

BEAR 01409451

*potential conflicts of interest between the Corporation and its Senior Executives.*"
However, the firm does not have formalized procedures which discuss conflicts of
interest between the firm and its customers. According to the firm, conflicts of interest
are addressed monthly in the L&C Senior Staff Meeting. Due to the complex nature of
the transactions in which Bear Stearns' engages in, there is an inherent risk that conflicts
of interests can arise between the firm and its customers, therefore the firm should have a
formalized process for addressing these risks.

**8. At the time of the staff's review, the firm did not have a centralized function
responsible for writing and updating policies and procedures across the entire
organization.** The firm has recently implemented the Compliance Coordination Group
that is responsible for writing and updating policies and procedures and vetting any new
rules. The group is currently staffed by two persons who commenced employment on
September 26 and October 10, 2005. A centralized function responsible for updating
policies and procedures will enable the firm to maintain consistent procedures that are
updated in a timely fashion. Without this function in place, the staff found the firm's
policies and procedures to be of varying levels of completeness, or in some cases, to be
outdated or newly created.

**9. The Compliance Department has undergone significant personnel changes, which
have left various areas of the Compliance Department understaffed.** At the
commencement of the staff's examination, the firm had two senior level positions open in
Fixed Income and Equity Compliance. The firm has recently assigned two individuals to
be the acting managers of Fixed Income and Equity Compliance. Both individuals work
in Legal and already have full time responsibilities. In addition, the Senior Managing
Director of Global Compliance was in her current position for approximately one month
and employed by the firm for only six months, upon commencement of the staff's
examination. As a result, the staff is concerned with the many personnel movements
within Compliance which have resulted in employees taking on multiple responsibilities.

The staff also noted that there are three senior manager positions within EMC. One of
the mangers was hired in July 2005 and a second manager commenced his employment
several months later, upon the completion of the staff's field work. Additionally, the
Compliance function for EMC was newly created and filled by Gail Andrews
("Andrews"), Senior Vice President & Chief Compliance Officer. Andrews has only
been in her position at EMC since July 2005. EMC is in the process of hiring a licensing
specialist who will report directly to Andrews. The three senior managers of EMC
Compliance have less than one year of experience at EMC.

**10. The firm has not performed an adequate follow-up review of new products
submitted to the New Products Committee in that an independent control function
has not performed its own review. In addition, the firm's written procedures do not**

14

BEAR 01409452

**address the new product follow-up process.** A New Products and Special Structured Transactions Committee composed of senior level executives was formed in November 2003. Ken Kopelman, Senior Managing Director of Derivatives and Fixed Income within Legal is the secretary of the committee. The committee was formed to review new businesses, products, transactions and arrangements that may increase the firm's risk exposure.

Each new product must be sponsored by a business unit. The sponsor presents the new product to the committee and also submits a written proposal. The Chairman of the committee communicates the disposition of the committee to the sponsor. In July 2005, the firm created a new procedure to document the firm's follow-up on approved new products. The committee submits a document to the business unit requesting a status report of the new product. The business unit's response to this is provided to the Internal Audit Department. The firm provided some evidence that the business unit has responded to the Committee's request for information. However, the firm has not fully implemented the procedure, in that an independent control function has not performed its own assessment of the new product. The staff believes that an independent control function (i.e., internal audit department) should be responsible for commenting on the status of the new product as opposed to the business unit, which could create a conflict of interest. Furthermore, the firm has not established a written procedure for the follow-up review of new products. Thus, the firm has failed to follow the recommendations stated in the *NASD Notice to Members 05-26: New Products – NASD Recommends Best Practices for Reviewing New Products.*

**11. The firm failed to maintain procedures for its Centralized Compliance Unit ("CCU") in accordance with NASD Conduct Rule 3010 and NYSE Rule 342.** The CCU is responsible for conducting surveillance reviews for the firm's PCS unit. The CCU is also responsible for conducting firm-wide reviews of employee e-mails by business line. Interviews with the firm revealed that the businesses perform an in depth review of employee e-mails and the CCU performs a *"buzz word"* search on employee e-mails. The staff believes that the CCU plays an important role in performing surveillance, and as such, should have effective written procedures in place.

### B.   Weaknesses in Unregulated Products

The staff noted the following L&C procedure weaknesses as a result of the examination:

**1. The firm has not created adequate L&C controls and procedures for unregulated businesses such as the residential mortgage business conducted in EMC and the FID business.** The staff's review disclosed that the firm has not formally identified and documented the L&C risks associated with EMC and FID. The firm verbally communicated to the staff the three main legal risks that EMC L&C personnel monitor on

15

a daily basis. They include state law risk, vendor contract risk, and transactional risk. The firm monitors for these types of risks by reviewing a series of reports, some of which are produced by EMC and some of which are produced by Quality Control, which is a part of the business unit. The staff noted that although Legal performs these reviews, the reviews are also not formally documented. Additionally, the firm was unable to define the compliance risks associated with EMC's business. The firm also informed the staff that the majority of EMC's compliance surveillance is performed by Quality Control.

In addition, the EMC Compliance Department does not utilize any surveillance reports to monitor EMC's operations. Although EMC has embedded many required elements of applicable law in its operating systems, these elements are not defined in the written procedures. Furthermore, EMC uses subsystems such as ComplianceEase to check compliance with loans it purchases. However, this function is performed by the business unit as opposed to Compliance. The firm has not developed adequate L&C controls for the EMC residential mortgage business and the FID business as is required by Rule 15c3-4.

**2. The EMC L&C written procedures are inadequate in that:**
- The EMC Legal procedures do not address the various reports utilized by Legal such as the Internal Audit reports, Quality Assurance reports, Weekly Intake Report and Weekly Action Log.
- The EMC Legal procedures do not address the Mortgage L&C Committee or the New Laws Committee. The Mortgage L&C Committee meets every other week to oversee high cost loan issues. There are seven committee members. On the weeks that the committee does not meet, a sub-committee of three members, called the New Laws Committee, meets to discuss legal developments.
- The EMC Legal procedures do not address law changes. A working group called the Law Change Group was formed in July 2005 to address law changes.
- The EMC Compliance procedures are dated 2001 and apply to the Compliance Audit Department, which no longer exists.

### C.   Weaknesses in Regulated Products

The following comments relate to weaknesses and deficiencies in the firm's written procedures in which the firm failed to establish, maintain or enforce its written procedures in accordance with NASD Conduct Rule 3010 and NYSE Rule 342:

**1. The firm failed to maintain written procedures discussing the vetting process of prime brokerage clients.** Approximately six months ago, the firm implemented a New Client Vetting Committee. The purpose of the committee is to perform reviews of

CONFIDENTIAL                                                BEAR 01409454

existing hedge fund clients as well as assist in the vetting process of new clients. During the staff's examination, the firm provided the staff with the newly created written procedures regarding this process however, these procedures were not in place during the staff's review period and therefore, their implementation could not be evaluated.

**2. The firm's written procedures relating to the Capital Introduction Group ("CIG") do not state the role that L&C has in the CIG process.** Interviews with the firm revealed that a member from L&C is involved in the CIG, however, the CIG written procedures do not state L&C's roles and responsibilities in this group. The staff is concerned that the lack of documentation of the L&C role in the procedures is a weakness.

**3. L&C failed to follow its written procedures concerning the review for Qualified Institutional Buyer ("QIB") Compliance for Leveraged Finance transactions in that the firm failed to document the review of the BCP047-A report.** The BCP047-A is a report containing accounts that have conducted activity in Rule 144A securities from the previous day and are not coded in the firm's system as having a current QIB certification on file. According to the Fixed Income Surveillance Procedures, the report is reviewed "for accounts for which Bear Stearns does not have a QIB certification on file on the firm's Excel spreadsheet of QIB certifications. If a QIB certification is required, check Dealogic to ascertain if Dealogic has a certification. If a certification is located on Dealogic, review it for accuracy and print for inclusion of the firm's Excel spreadsheet. If Dealogic does not have a certification, send an e-mail to RR to obtain one, and list the request on the QIB list request list until such time as it is received." The firm stated that there is a surveillance analyst responsible for reviewing the Dealogic system, however no documentation of the review is maintained. The staff is concerned regarding the lack of an audit trail for this review.

**4. The written procedures for the Control Group do not address all surveillance reviews conducted by the Control Group.** For example, the Expected Announcements List ("EAL") and the Pipeline Surveillance Reports were not included in these written procedures.

*Firm's Response: The firm provided the staff with written procedures for the EAL that were created during the staff's examination and were not in place during the staff's review period.*

**5. The Control Group failed to enforce its written procedures by not documenting all surveillance reviews.** The staff requested evidence that the Control Group surveillance analysts had performed Watch List reviews for a sample of four leveraged finance deals from the past year. Although the firm did provide evidence that some reviews had been performed, the firm could not produce sufficient evidence that all

CONFIDENTIAL

reviews had been conducted for the deals the staff selected. For example, the firm provided the staff with a report which documented the review of trading in securities recently added to the Watch List. However, the firm failed to produce records that evidence the review of the Watch List for the duration the security remained on the Watch List, thus there is a lack of an audit trail for these reviews.

**6. The Control Group failed to establish written procedures to document items escalated through the L&C chain of command to the Senior Managing Director of Global Compliance.** The staff noted that the Control Group does not maintain written procedures for the escalation of items from the Control Group surveillance analysts to the Managing Director of the Control Group or from the Managing Director to the Senior Managing Director of Global Compliance. The firm also had not documented the items that were escalated.

*Firm's Response: The firm updated its written procedures in this area during the staff's examination.*

**7. The firm does not review mortgage securities transactions in accordance with the criteria identified in their written procedures.** The Fixed Income Surveillance Procedures state that the *"MBS/ABS Transaction Report #BMB733"* is reviewed for the following: suitability, authority, markups, and manipulative conduct. Interviews with the surveillance analyst that reviews mortgage transactions revealed that he reviews the report solely for markups. The remaining reviews are performed by the business unit, which was not in compliance with the written procedures.

**8. The firm failed to follow its written procedures regarding the escalation and documentation of surveillance review exceptions of mortgage securities transactions.** The Fixed Income Surveillance Procedures state that, "Exceptions are maintained by the compliance analyst in accordance with regulatory requirements." There is no documentation of issue escalation or resolution for Compliance issues noted in surveillance reviews. Although surveillance analysts review an exception report called the *"48 Hour Price Look Back Report #BMB736"* for markups on mortgage products, issues that are escalated are not documented and maintained. There is no record other than miscellaneous notes maintained by the surveillance analyst.

*Firm's Response: Subsequent to the staff commenting on this weakness, the firm informed the staff that it began to document and retain evidence of its surveillance reviews.*

**9. The Fixed Income Surveillance Procedures are inadequate in that they do not address all compliance issues or concerns such as wash trades and parking. In addition, the firm failed to document these reviews.** The firm indicated that it is

CONFIDENTIAL

BEAR 01409456

planning to implement surveillance reports to identify wash trades and parking however, these written procedures have not been established and the firm has no evidence that these reviews have been conducted.

### D. Weakness in Information Barriers

The staff noted a physical weakness in the firm's L&C controls during the staff's examination. The following weakness applies to the firm's Fixed Income trading desks located on the 8th Floor of 383 Madison Avenue:

**1. The firm's physical separation of the Fixed Income trading desks and Leveraged Finance employees should be strengthened to be more consistent with Section 15(f) of the Exchange Act.** Fixed Income traders are situated on the same floor as the Leveraged Finance employees and there are few physical barriers separating the areas except for a hallway and a glass room for some leveraged finance employees. Traders could theoretically walk by someone's desk in Leveraged Finance and gain access to material non-public information regarding an issuers' pending leveraged deal. Thus, the firm's physical barriers for these areas appear to be ineffective.

### E. Anti-Money Laundering

**1. The firm has not evaluated the money laundering risks associated with its proprietary transactions and has not adopted an appropriate system for monitoring those transactions that pose money laundering risks.** Pursuant to Exchange Act Rule 15c3-1e(a)(viii)(D), the ultimate holding company must agree as part of the "internal risk manage control system for the affiliate group, [to] establish, document, and maintain procedures for the detection and prevention of money laundering and terrorist financing." The staff noted that the firm did not incorporate proprietary transactions in the AML program.

**2. The staff's review noted that Bear Stearns is not surveilling the firm's proprietary trading accounts trading through the registered broker-dealer for suspicious activity.** Under 31 C.F.R. § 103.19(a)(2), adopted pursuant to USA PATRIOT Act § 356, the registered broker-dealer must, among other things, report a suspicious transaction if the transaction "is conducted or attempted *by, at, or through* a broker-dealer. . ." (Emphasis added). As the firm is not surveilling any proprietary transactions, the firm cannot determine if there are suspicious proprietary transactions to report.

**3. Reviews of the firm's branch offices are not submitted to the AML Committee as part of the yearly Independent Test.** The staff was advised that activities taking place at branch offices, including those that relate to the AML program, are reviewed as part of the Internal Audit Department's review of the branch office. As such, those activities,

19

BEAR 01409457

including any identification of findings and weaknesses related to AML, are not incorporated into the firm's designated AML independent test. Since the results of this test are not forwarded to the AML Committee, the committee is not receiving a full picture of the effectiveness of the program.

**4. The firm has not consistently performed due diligence on piggyback firms.** The firm's written supervisory procedures do not address due diligence requirements of Piggyback Firms (i.e., third party firms that have an introducing arrangement with a broker-dealer that introduces its trades through Bear Stearns). The staff requested two due diligence files from the firm's list of Piggyback Firm relationships. The firm was unable to provide a due diligence file for one of those selected, an Argentina based broker-dealer trading through an introducing firm in Miami, Florida.

## CREDIT RISK MANAGEMENT

The staff conducted a review of the firm's credit risk management controls, procedures and practices. The staff focused its review on the Global Credit Department's ("GCD") organizational structure, policies and procedures, limit monitoring and reporting, credit ratings, collateral management, credit files, and trade capture.

**1. The firm does not perform timely reviews of all counterparties as required by its written policies and procedures.** The firm's policies and procedures require that all counterparties be reviewed on at least an annual basis. During the review the client's limits and ratings are also reassessed. The firm maintains a *Clients to be Reviewed* report that details all counterparty credit reviews that are overdue. Staff reviewed the September 22, 2005 *Clients to be Reviewed* report. The report revealed that 745 counterparties, representing more than $2.5 billion in exposure, were overdue for a credit review. Of these, nine were overdue by greater than 90 days. Staff also found one instance where a counterparty on the *Clients to be Reviewed* report also appeared on the firm's *Watch List*. The staff is concerned that without timely credit reviews of the counterparties, the firm will not be aware of changes in the credit risk profile of its counterparties and could expose the firm to greater credit risk than it is aware of.

**2. The firm has weaknesses in its policies and procedures relating to certain credit risk management functions.** Staff's review of Bear Stearns' credit risk management function uncovered numerous weaknesses in the firm's written policies and procedures. Staff determined that GCD's written procedures are not complete in many areas. Further, the written procedures frequently offer guidelines instead of requirements. The staff believes that the firm should review its credit risk management policies and procedures as comprehensive written procedures are necessary to insure consistency and efficiency in the credit risk management function. Below are a few instances noted by the staff that should be addressed by the firm:

CONFIDENTIAL

BEAR 01409458

- Derivatives Operations does not have written procedures regarding how to resolve disputed margin calls and how to handle delinquent margin calls.
- GCD's written procedures do not detail the types of reports that are sent to senior management, the frequency of each report and the distribution lists of each report.
- The procedures also do not give clear guidance regarding when a counterparty should be placed on the firm's *Watch List*, and what enhanced monitoring is performed on counterparties on this list. The *GCD Policies and Procedures Manual* also references a second watch list, titled *The SCS Watch List*. The written policies, however, fail to adequately describe this watch list.

**3. The firm does not document why items are removed from the firm's *Watch List*. The firm also does not age items on the *Watch List*.** GCD maintains a watch list in order to identify counterparties that require enhanced scrutiny. Analysts may tag any counterparty, regardless of rating, for inclusion on the *Watch List*. The firm does not, however, require that the analyst document within the credit file the date and reason for placing a counterparty on the *Watch List*. GCD also does not require that analysts document the reasons for removing a counterparty from the *Watch List*. Moreover, the firm currently has no ability to run reports detailing when a counterparty is removed from the *Watch List*.

*Firm's Response: The firm is in the process of implementing tighter controls and reporting for the Watch List based on recommendations from the GCC.*

**4. The firm has not completed the specific CSE reports for credit risk management as required by Exchange Act Rule 15c3-1(g).** At the time of the staff's review, GCD had not begun to plan or test for the CSE reporting requirement pertaining to credit risk management as required by Rule 15c3-1(g)(b)(1). Staff is particularly concerned because if the firm is approved, Bear Stearns will be required to produce these reports on a monthly basis beginning in just a few months.

*Firm's Response: Subsequent to the staff's review, the firm is the now beginning to plan for the CSE reporting requirement.*

**5. The firm did not provide the rationale for changing the category ratings on several of the scorecards.** Bear Stearns makes use of a scorecard system for determining the internal credit rating for the majority of its counterparties. Analysts rate each counterparty by a series of categories, such as size and liquidity. Based on the specific characteristics of each counterparty, the *Scorecard* will also suggest a rating for each category. The analyst then manually enters a score for the category. If the analyst's rating differs from the suggested rating, the analyst must record the rationale for the deviation. The staff reviewed twelve *Scorecards*, and found that the analyst did not record the rationale in five of the eleven instances where one or more category ratings

CONFIDENTIAL

BEAR 01409459

differed from the *Scorecard's* suggested rating. The staff is concerned that the lack of documentation for the rationale may be indicative of an inconsistent application of the scorecard methodology which is relied upon for the internal credit rating system.

## OPERATIONAL RISK MANAGEMENT

The staff reviewed the operational risk management framework and infrastructure at Bear Stearns focusing on the firm's policies and procedures and their implementation.

**1. Bear Stearns has not yet fully developed comprehensive policies and procedures for its independent Operational Risk Management ("ORM") function.** The firm has begun to develop policies and procedures around the operational risk management function. At this stage, its written policies and procedures appear to be incomplete. The staff has identified the following areas which the firm should consider:

- Procedures that clearly delineate the appropriate responsibilities for those employees performing operational risk management functions, including event reporting by controllers and event resolution and escalation by business unit managers.
- More explicit ORM staff guidance regarding the process for collection of and verification for event entries, since the staff's review of ORM's internal loss data reporting database revealed a number of incomplete event descriptions.
- Comprehensive policies and procedures for collecting internal profit and loss data pertaining to operational events incurred in the trading area since current procedures fail to ensure consistency and completeness. The firm has not adopted a sufficiently comprehensive listing of events that should be included in (or excluded from) operational risk reporting.
- ORM written policies and procedures that explain the selection criteria it uses in populating its own external loss data reporting database from events posted in the FIRST database.
- Updating the policy manual entitled: *Operational Risk Management Policy and Framework: The Bear Stearns Companies, Inc.*, to identify the Audit Committee's ("AC") operational risk-related responsibilities and naming the AC as a recipient of its periodic risk reports.

**2. ORM current policy requirement is for annual reporting to the Audit Committee. As Bear Stearns moves closer to the advanced measurement approach, ORM should consider reporting to the Audit Committee on a more frequent basis.** The staff is concerned that the Audit Committee may not be aware of significant events in operational risk management, and decisions ORM has made, as they occur.

**3. The firm's Audit Committee Charter should be updated to include its responsibility of oversight of the Operational Risk Management function.** The

22

BEAR 01409460

staff's review of the January 5, 2005 Audit Committee Charter disclosed that the charter did not identify responsibility for oversight of the Operational Risk Management function.

**4. Bear Stearns should adopt a firm-wide definition of operational risk.** The staff's review of the internal audit policies and procedures that relate to operational risks revealed that the Internal Audit Department uses a different definition of operational risk from ORM's. Bear Stearns should ensure that all areas of the firm are basing their operational risk decisions on a common definition.

*Firm's Response: The firm stated this was a technical error as one definition was for "operational risk" while the other was for "operations risk".*

## CAPITAL REVIEWS

The staff's review of the capital computations included the computation for the holding company as well as the combined capital computation at the broker-dealer level for BS&Co. and Bear Stearns Securities Corp. ("BSSC") for the period of May 31, 2005. The staff understands that Bear Stearns is continuing to implement and refine its CSE capital calculation process. For testing purposes, the staff was provided the May 31, 2005 calculation and reviewed the process for generating the capital calculations at both the holding company and broker-dealer levels. The staff noted the following issues that should be addressed to insure accurate capital calculations:

- **Bear Stearns did not calculate sufficient specific risk charges on its trading book assets as part of its May 2005 capital calculation, thereby overstating its CSE capital ratios.**

  *Firm's Response: The firm incorporated $12.038 billion in Risk Weighted Assets for additional specific risk charges as part of its July 2005 capital calculation.*

- **The firm's reconciliation processes between the general ledger, the market risk and credit risk systems, and the capital calculator are currently in various stages of development.** The firm should finalize this reconciliation process to ensure the completeness of the capital calculations going forward.

- **The market risk and credit risk systems, which are used to determine the majority of the charges included in the capital calculations, do not include month-end adjustments (e.g., accrued interest).** The staff is concerned that any material adjustments made at month-end would not be incorporated in the capital charges, thereby leading to a possible inaccurate capital calculation.

23

BEAR 01409461

- The firm did not calculate credit risk charges on long settlement and forward-settling trades or on transactions related to its retail margin business as part of its May 2005 capital calculation. In addition, the staff noted that the credit risk system does not capture transactions from systems that record certain foreign repurchase and reverse repurchase transactions, as well as repurchase and reverse repurchase transactions with Custodial Trust Company customers and as a result, the firm did not calculate credit risk charges on these transactions.

- The firm did not apply, or otherwise include, credit risk charges on OTC derivatives positions held by the U.S. Broker-Dealers for the May 2005 CSE capital calculation.

    *Firm's Response: The firm completed further analysis and included a credit risk charge of $100 million for OTC derivatives positions in its July 2005 Broker-Dealers CSE capital calculation.*

## FUNDING AND LIQUIDITY

The staff reviewed the firm's funding and liquidity management process and certain related practices as of May 31, 2005.

**1. The firm has not implemented written policies and procedures related to the funding and liquidity area, with the exception of a limited contingency funding plan. The firm should implement a system of internal risk management controls associated with its funding and liquidity area as is required by Rule 15c3-4.**

**2. The firm's contingency funding plan does not: 1) consider realistic stress scenarios; 2) contain projected weekly cash flow analyses; or 3) require specific actions when liquidity falls below stated goals in a stress environment according to internal analyses.** The staff believes that more specificity is needed in the firm's contingency funding plan to provide more guidance to assist the firm in managing its funding risks in the event of a liquidity event.

## CONCLUSION

Thank you for the courtesy and cooperation extended to the staff during the examination. The firm's prompt response to requests for documents and accessibility to the firm's personnel facilitated the examination process.

The staff has some concerns based upon findings during our examination. You should not assume that other activities of the firm that are not discussed in this letter are

24

BEAR 01409462

in full compliance with the federal securities laws or other applicable rules and regulations. The above findings are based on the staff's examination and are not findings or conclusions of the U.S. Securities & Exchange Commission.

Please submit your written response to each of the findings, including those where we have summarized a preliminary firm response, by December 30, 2005. Please advise the staff where corrective actions have already been taken and provide proposed corrective actions, with applicable timeframes, for the remainder of the issues raised. In addition, please be advised that staff will continue to review the firm's progress with respect to proposed improvements during future examinations.

Sincerely,

Mary Ann Gadziala
Associate Director
Office of Compliance Inspections & Examinations

25

CONFIDENTIAL

BEAR 01409463

# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
IN RE BEAR STEARNS COMPANIES, INC.
SECURITIES, DERIVATIVE, AND ERISA
LITIGATION:
This Document Relates To:
Securities Action, 08 Civ. 2793 (RWS)
- - - - - - - - - - - - - - - - - - x
BRUCE S. SHERMAN,

       Plaintiff,

                   Index No.
   -against-          09 Civ. 8161 (RWS)

BEAR STEARNS COMPANIES INC., JAMES CAYNE,
WARREN SPECTOR and DELOITTE & TOUCHE LLP,
       Defendants.
- - - - - - - - - - - - - - - - - - x

        C O N F I D E N T I A L

      Videotaped oral deposition of
SAMUEL L. MOLINARO, JR., taken pursuant
to notice, was held at the law offices
of BOIES SCHILLER & FLEXNER LLP, 575
Lexington Avenue, New York, New York,
commencing December 4, 2014, 9:35 a.m.,
on the above date, before Leslie Fagin,
a Court Reporter and Notary Public in
the State of New York.

              - - -

      MAGNA LEGAL SERVICES
   1200 Avenue of the Americas
   New York, New York 10026



Page 46

1        S. Molinaro - Confidential
2        Q.   Did Bear change its process for
3    discussing stress testing results as a result
4    of this SEC comment?
5        A.   My recollection is that when the
6    SEC did this review, a variety of these risk
7    management practices, we're in an
8    evolutionary phase and we were in the process
9    of adopting a new risk system that would
10   enable us to aggregate data across the
11   various trading books in a VAR orientation
12   and I believe that the stress testing that's
13   alluded to here was similarly, in some
14   development stage, may not have been done
15   across every book in a consistent way and we
16   were building capabilities here and my
17   recollection is that it wasn't in direct
18   response to this letter, I believe, but as
19   these capabilities became more robust, one of
20   the things that risk management did on a
21   monthly basis is report to the executive
22   committee and one of the topics that would be
23   reported upon would be the stress test
24   results.
25       Q.   Do you recall when risk management

Page 47

1        S. Molinaro - Confidential
2    began reporting on the stress test results to
3    the executive committee?
4        A.   I do not.
5        Q.   Was it doing so in 2008?
6        A.   It was.
7        Q.   Was it doing so in 2007?
8        A.   I believe so, but I couldn't be
9    positive.
10       Q.   Now, in the second sentence of No.
11   4, it says, Stress testing is produced daily
12   for a variety of historical and hypothetical
13   stress scenarios which is distributed to
14   senior management.
15           Do you see that?
16       A.   I do.
17       Q.   Is that consistent with the
18   practice that you described of risk
19   management distributing to the executive
20   committee results of stress testing?
21           MS. CHEPIGA:  Objection.
22           MS. CAREY:  Objection.
23       A.   I don't recall there being a daily
24   distribution of this material, although it's
25   possible it was included in some daily report

Page 48

1        S. Molinaro - Confidential
2    that was sent around.  My recollection is
3    that it was still in development in 2005,
4    when this audit was done, and we were
5    building our capabilities to do firm-wide
6    stress testing, including the scenario
7    analyses that we would apply because, of
8    course, scenario analyses are only as good as
9    the assumptions that are being made and we
10   needed to get some sense as to what scenarios
11   to run.
12       Q.   The third sentence of this No. 4
13   is, However, the stress testing results are
14   not formally incorporated into the firm's
15   risk management framework.
16           Do you see that?
17       A.   I do.
18       Q.   Do you understand what that means?
19       A.   I believe what they were referring
20   to is that there was no limit structure in
21   place for the stress testing.
22       Q.   Can you explain what that means?
23       A.   At this point, I believe, and it
24   may have been the case throughout, that the
25   stress testing was informational for

Page 49

1        S. Molinaro - Confidential
2    management's purposes, there was no formally
3    approved limit that if the stress test
4    resulted in a number over X, we needed to do
5    something.
6        Q.   You say that that may have been
7    true throughout?
8        A.   I don't recall whether we ever put
9    in place an absolute formal stress limit.
10       Q.   Can I ask you to turn to page 7 of
11   this letter ending in 320.
12           Do you see it says, According to
13   the firm, the financial analytics and
14   structured transaction teams conducts a
15   one-time validation process for its VAR
16   models upon release, however, the firm needs
17   to establish controls and written procedures
18   related to the update of VAR data inputs and
19   a periodic model review process?
20           Do you see that?
21       A.   I do.
22       Q.   Is that comment by the SEC, was it
23   accurate when it was made?
24       A.   I have no reason to believe it
25   wasn't.



Page 50

1    S. Molinaro - Confidential
2    Q.   So at this time, there was a
3    one-time validation process for Bear's VAR
4    models?
5    A.   My recollection is that Bear's VAR
6    models were relatively newly developed, so
7    these comments that were being made and my
8    recollection were not surprising, because
9    this was a process that we were in the
10   process of putting in place and I don't
11   believe that anybody was terribly troubled by
12   this.  There were things we felt we needed to
13   do to ultimately put a VAR model in place.
14   Q.   Did Bear eventually conduct
15   periodic reviews of its VAR models?
16   A.   As far as I know.
17   Q.   Who would have been responsible for
18   periodic reviews of the VAR models at Bear?
19   A.   That responsibility rested between
20   the people that ran risk management that were
21   responsible for this area and whoever the
22   individuals were in the FAST area that were
23   doing the quantitative work.
24   Q.   Do you know what steps Bear took
25   during the period 2006 to 2008 in order to

Page 51

1    S. Molinaro - Confidential
2    test and validate its VAR models?
3    A.   Not off the top of my head, no.
4    Q.   Was the accuracy of the VAR models
5    something that was important to you in your
6    position as CFO of Bear Stearns?
7    A.   We needed to have a reasonable
8    accuracy for the VAR models for several
9    purposes; one of which is we reported the
10   results, so we did report our VAR results, we
11   needed to be certain they were reasonably
12   accurate for that measure, however,
13   reasonably accurate is a relative term in
14   terms of VAR modeling.  We did not use VAR
15   modeling consistently across every business
16   and every desk as the primary measure of risk
17   management or risks that we were consuming in
18   those areas because we thought there were
19   many shortcomings in the VAR models and VAR
20   modeling technology and the way people looked
21   at risk, so in many of our businesses, it was
22   not a primary risk measurement that we were
23   utilizing.  It was a data point, but not one
24   we would necessarily use for setting limits.
25   Q.   Do you have any experience as to

Page 52

1    S. Molinaro - Confidential
2    whether or not Bear's reported VAR was higher
3    or lower or about the same as its peer banks
4    during the period 2006 to 2008?
5    A.   I don't think you can look at it
6    that way because in absolute terms, it's not
7    relevant.  It's relevant in terms of how it
8    relates to each firm's risk appetite capital
9    levels and we thought our numbers looked
10   consistent with what we would have expected
11   them to be.
12   Q.   Was it important that the VAR data
13   inputs were kept up to date?
14        MS. CAREY:  Objection.
15   A.   What does that mean?
16   Q.   Reading here, in No. 7, this first
17   sentence, it says, The firm needs to
18   establish controls and written procedures
19   related to the update of the VAR data inputs.
20        Do you see that?
21   A.   I do.
22   Q.   So I'm asking whether the keeping
23   the VAR data inputs updated, was that
24   important to Bear?
25   A.   Of course it was important to Bear.

Page 53

1    S. Molinaro - Confidential
2        I don't know exactly what they were
3    referring to here, but I will point out they
4    said written procedures, so that doesn't mean
5    we didn't have procedures.  That may have
6    meant we didn't have written procedures
7    around how that was done and, certainly, the
8    data inputs that were coming into the model
9    were important to be kept updated, as well as
10   where we were getting the information from
11   out of the underlying trading systems, which
12   we did.
13   Q.   How often, in your view, do sort of
14   VAR data inputs need to be updated?
15        MS. CHEPIGA:  Objection.
16        MS. CAREY:  Objection.
17   A.   Again, I don't know what data
18   inputs we're referring to.
19   Q.   Could you take a look, another
20   three sentences down, it begins on the left
21   margin saying, The staff.  It says, The staff
22   noted the firm's failure to update on a
23   timely basis, two of the six files used for
24   sensitive practice of corporate/credit
25   spreads in that the data inputs, for which



1     S. Molinaro - Confidential
2  actually, previously, page 8 of this letter,
3  Exhibit 4, ending 321.
4         I would ask you to look at No. 8
5  there, in particular, little Roman I.  It
6  says here, The staff noted that a mark to
7  market valuation review report issued on the
8  valuation of mortgage derivatives cited
9  concerns with outdated models created a
10 decade ago and limited documentation on how
11 the models work.
12        Since we've been talking about VAR
13 models, am I right in thinking that we are
14 now talking about models used to value
15 mortgage derivatives?
16        MS. CAREY:  Objection.
17     A.   I don't recall what this was about.
18     Q.   Did Bear use models to value
19 mortgage derivatives?
20     A.   Mortgage derivatives is a broad
21 term, but, certainly, there were models that
22 were used to develop a mark to market view
23 for a variety of different products.
24 Ultimately, generally mark to market was
25 validated by seeing where the instruments

1     S. Molinaro - Confidential
2  actually traded in the market.  That was the
3  acid test, if you will, of your models.
4     Q.   If you could see where the things
5  traded in the market, did you -- withdraw
6  that.
7         With respect to that broad group
8  called mortgage derivatives, were there times
9  when you used models to value certain
10 mortgage derivatives where you did not have
11 market pricing to test those models?
12        MS. CAREY:  Objection.
13        MS. CHEPIGA:  Objection.
14     A.   I don't know.  We would have to be
15 much more specific.  I can't answer it that
16 generally.
17     Q.   Were there any mortgage derivatives
18 at Bear Stearns -- withdrawn.
19        Let me ask it this way.  Did Bear
20 Stearns ever use models to value any mortgage
21 derivatives when Bear Stearns did not have
22 market price information for those
23 derivatives?
24     A.   Ever?  It seems like an awfully
25 long timeframe.

1     S. Molinaro - Confidential
2     Q.   During the period 2006 to 2008.
3        MS. CHEPIGA:  Objection.
4     A.   During that period, certainly in
5  the late 2007 until March of 2008, there was
6  certainly a lack of liquidity in the market,
7  there was not as much trading volume as there
8  had been prior, and given the lack of
9  liquidity in the market, models became more
10 of a factor in marking certain instruments to
11 market.
12     Q.   And among those certain instruments
13 were certain mortgage derivatives?
14     A.   We should be clear about what
15 you're talking about.  You're just using the
16 term, mortgage derivatives.  I don't know
17 what they're referring to specifically in
18 this document, but what I was referring to
19 are mortgages, generally, whether they were
20 derivatives or whole loans.
21     Q.   So during the period that you
22 identified, late 2007 through March of 2008,
23 models became increasingly important in the
24 valuation of at least certain mortgages or
25 mortgage derivatives, is that right?

1     S. Molinaro - Confidential
2        MS. CHEPIGA:  Objection.
3        MS. CAREY:  Objection.
4     A.   Models were always used to value
5  assets.  The benefit, prior to that period of
6  time, was there was liquid markets and the
7  assumptions that are being made in the models
8  could be validated to where you are seeing
9  things traded and adjusted appropriately, and
10 in a lack of trading activity and lower level
11 of liquidity, it became more challenging, not
12 impossible, but more challenging, so, yes,
13 models were used and the issue I'm referring
14 to is that all models were ultimately
15 validated by where the instruments traded in
16 the market.
17     Q.   So looking at little I that we were
18 just discussing, do you understand what was
19 meant by a concern with outdated models
20 created a decade ago?
21     A.   I don't.
22     Q.   Do you recall understanding that at
23 the time you read this letter in 2005?
24     A.   I don't.
25     Q.   Do you recall whether you didn't



```
 1        S. Molinaro - Confidential
 2   understand it then?
 3        MS. CAREY:  Objection.
 4        A.   I don't really recall this topic.
 5   I don't recall this issue that they were
 6   alluding to, so I don't know, I can't
 7   remember the specifics of what the problem
 8   was that they were actually trying to get at
 9   and whether we thought it was an issue or
10   not.
11        Q.   So was there any discussion that
12   you recall following on this SEC comment
13   letter -- withdraw that.
14        Do you recall any discussions
15   within Bear Stearns in response to this SEC
16   comment letter regarding the adequacy of
17   Bear's valuation models?
18        MS. CAREY:  Objection.
19        A.   I don't recall there being a
20   concern from the business perspective about
21   the adequacy of our ability to price our
22   inventory and mark these assets to market or
23   the models that we were using, so I believe
24   this was more of a technical issue than it
25   was a practical issue.
```

```
 1        S. Molinaro - Confidential
 2        Q.   Let me just go back to the
 3   question.  I want to make sure I understand.
 4        Do you recall any discussions
 5   within Bear Stearns in response to the SEC
 6   comment letter regarding the adequacy of
 7   Bear's valuation models?
 8        MS. CAREY:  Same objection.
 9        A.   I think I just answered that
10   question, did I not?
11        Q.   I was looking for a yes, I recall a
12   discussion or no, I don't recall discussion
13   or tell me why you can't answer either way,
14   so let me ask it one more time.
15        Do you recall any discussions
16   within Bear Stearns in response to this SEC
17   comment letter regarding the adequacy of
18   Bear's valuation models?
19        MS. CAREY:  Objection.
20        MS. CHEPIGA:  Objection.
21        A.   Let me try this answer.  I don't
22   recall there ever being a discussion within
23   Bear Stearns with the executive committee,
24   management committee or any other committee
25   where there was a concern expressed by the
```

```
 1        S. Molinaro - Confidential
 2   people that were involved day to day in
 3   running this business and supervising this
 4   business where they felt that their valuation
 5   models were not adequate.
 6        Q.   Does that same answer hold if you
 7   get rid of the limitation to committees, so,
 8   for example, do you remember there ever being
 9   a discussion within -- between any
10   executives, whether in a committee or not,
11   where they expressed a concern that the
12   valuation models were not adequate?
13        MS. CAREY:  Objection.
14        A.   I don't recall ever having a
15   conversation with anybody who was involved in
16   running this business who felt that their
17   models were not appropriate and adequate for
18   the purposes they were using them for.
19        Q.   Now, let me try to expand that
20   again and find out if we go wrong.
21        Let's say we get rid of the
22   limitation of the people who were running the
23   business.
24        Do you recall having any discussion
25   with other executives at Bear Stearns,
```

```
 1        S. Molinaro - Confidential
 2   whether or not they ran this business day to
 3   day?
 4        A.   You mean whether or not they had
 5   any knowledge?
 6        Q.   I don't want -- let me finish the
 7   question and then you can answer it as you
 8   will.
 9        Do you recall ever having a
10   conversation with any executives, whether or
11   not those executives were involved in the
12   valuation business day to day, where the view
13   was expressed that Bear's mortgage valuation
14   models were inadequate?
15        MS. CAREY:  Objection.
16        MS. CHEPIGA:  Objection.
17        A.   I do not recall ever having a
18   discussion with anybody who felt that our
19   valuation models of our assets was not
20   adequate.
21        Q.   I think this just follows from what
22   you just said, but let me just make sure.
23        You don't recall, is it right to
24   say, that you don't recall ever having a
25   discussion with anybody who felt that Bear
```



1    S. Molinaro - Confidential
2  Stearns' valuation models of its assets were
3  not adequate, even in response to the SEC
4  comment letter?
5        MS. CAREY: Objection.
6        MS. CHEPIGA: Objection.
7        Q.  That we just discussed?
8        A.  I think you keep trying to expand
9  the envelope here.  As it relates to our
10  mortgage securities, as it relates to this
11  comment, I don't recall having a conversation
12  with anybody in Bear Stearns who had a
13  concern that our valuation models that were
14  utilized in pricing our mortgage-backed
15  securities inventory were inadequate and I
16  will add something, and, to the contrary, I
17  would say, the general view was that our
18  models and our technology was as good as
19  anybody in the business, if not, the best.
20        Q.  I think that -- thank you.  I think
21  the question I will ask you now, the answer
22  falls out of what you just said, but I just
23  want to make sure I understand.
24        Were you aware of a mark to market
25  valuation review report that cited concerns

1    S. Molinaro - Confidential
2  with outdated models created a decade ago?
3        A.  I wasn't familiar with that report.
4        Q.  And little Roman II under No. 8
5  says, Three of the 10 pricing model reports
6  reviewed recommended that a more advanced
7  pricing model approach be implemented.
8        Were you aware of those
9  recommendations?
10        A.  No.
11        Q.  Do you have any -- withdraw that.
12        What actions did Bear take during
13  the period 2006 to 2008 to test and validate
14  its valuation models?
15        MS. CHEPIGA: Objection.
16        A.  I couldn't tell you specifically.
17        Q.  Can you recall any steps that Bear
18  took during the period 2006 to 2008 to test
19  and validate its valuation models?
20        MS. CAREY: Objection.
21        A.  I can't tell you specifically what
22  steps we took to test and validate valuation
23  models.  There were a variety of different
24  models that were used.  There was a process
25  that we were going through to have models

1    S. Molinaro - Confidential
2  that had been developed by the FAST area
3  prior to a time and place where we had risk
4  management also signing off on those models.
5  We had a backlog of models that needed to be
6  reviewed by risk management independently.
7  We previously had a view, because FAST was
8  independent of the trading desk, whether it
9  was mortgages or anything else, that once a
10  model was build by our FAST area, which was
11  the team of quants, they were independent,
12  they were setting the model parameters and
13  their signoff was adequate.
14        We, ultimately, as I recall it,
15  implemented a procedure, I can't recall if it
16  was before 2005, I think it was, where we had
17  risk management people reviewing those models
18  that were done.  Either they were reviewing
19  them before they were implemented or they
20  were reviewing them for those that were
21  already implemented and hadn't been reviewed,
22  they were reviewing them afterwards and it's
23  possible that part of this was getting at
24  that process, there was a backlog of models
25  to review.  That did not tell us or suggest

1    S. Molinaro - Confidential
2  to us that because those models had not been
3  reviewed by risk management, there was
4  anything wrong with them.  They simply needed
5  to be reviewed, so we were working through
6  that backlog.  That may have been part of
7  what was going on here.  I don't recall the
8  specifics.
9        Generally speaking, the way that we
10  satisfied ourselves, we had a fairly robust
11  process around the price verification of
12  assets that was done every month.  Traders
13  had primary responsibility to price their
14  assets.  Some assets, obviously, were
15  publicly traded, listed securities, many were
16  not listed securities, they traded in the
17  dealer markets.  Most securities were
18  relatively liquid and, therefore, relatively
19  equally observed the way they were traded,
20  some were not, and we had a procedure where
21  risk management, together with the controller
22  staff, did a review at the end of every month
23  of the pricing of those assets.
24        Q.  Are there any other steps that you
25  can recall that Bear took in the period 2006

Page 86

1      S. Molinaro - Confidential
2      A.   Bear Stearns International Trading
3   was another U.K. based subsidiary, if I
4   remember right, was a market maker in U.K.
5   equity securities.
6      Q.   Were you involved, other than --
7   were you involved in the process -- withdraw
8   that.
9           Did you review any of the CAD 2
10   model application before it was sent to the
11   Financial Services Authority?
12      A.   I doubt it.
13      Q.   Did Bear Stearns International
14   Limited use internal VAR models that were
15   either the same as or similar to the models,
16   the internal VAR models used by Bear Stearns?
17           MS. CAREY: Objection.
18      A.   I don't know the answer to that. I
19   would assume they were generally similar.
20   There may have been some differences.
21      Q.   Let me ask the same question about
22   Bear Stearns International Trading.
23           Were the internal VAR models used
24   at Bear Stearns International Trading similar
25   to those used at Bear Stearns?

Page 87

1      S. Molinaro - Confidential
2      A.   The VAR models that were being
3   applied here were being applied to Bear
4   Stearns International Limited and Bear
5   Stearns International Trading. They were
6   specific models that were going to be
7   approved by the U.K. regulator. As I said
8   before, I don't know if there were any
9   differences between the VAR models used in
10   U.S., could have been.
11      Q.   But you suspect they were similar?
12      A.   Similar, that would be my
13   expectation.
14      Q.   When you received this letter, did
15   you review it?
16      A.   I suspect I did.
17      Q.   Can I ask you to take a look at the
18   page number ending Bates 849.
19      A.   Sure.
20      Q.   Take a look at the documentation.
21           Do you see that at the top of the
22   page?
23      A.   Yeah.
24      Q.   There is little A, Documentation is
25   lacking in a number of areas and we found

Page 88

1      S. Molinaro - Confidential
2   some of the documentation provided to be
3   deficient, for example, the VAR model
4   documentation was not up to date.
5           Do you see that?
6      A.   I do.
7      Q.   Do you recall that comment by the
8   FSA?
9      A.   Not specifically.
10      Q.   Did you believe that this comment
11   by the FSA was accurate when made?
12           MS. CAREY: Objection.
13      A.   I don't have any recollection. I
14   don't know if it was accurate or not.
15      Q.   Do you recall if anyone at BSIL or
16   BSIT did anything to improve the VAR model
17   documentation at those entities?
18           MS. CHEPIGA: Objection.
19      A.   I think there is a distinction
20   between documentation and paperwork and
21   effectiveness. I don't think they're
22   commenting on effectiveness. I think they're
23   commenting on paperwork. My expectation
24   would be, because they were ultimately the
25   gatekeepers here and the ones who decided

Page 89

1      S. Molinaro - Confidential
2   whether we got approval to use these models
3   or not, that we satisfy them on whatever
4   paperwork or documentation they wanted to
5   see.
6      Q.   Do you know if Bear Stearns itself
7   undertook similar -- withdraw that.
8           Did you have any concern around
9   this time that the documentation of Bear
10   Stearns VAR models might not be up to date?
11           MS. CAREY: Objection.
12      A.   No.
13      Q.   Could I ask you to take a look at
14   the next page, the one ending 850. At the
15   top of the page, under A, says, The risk
16   capture of ABS warehouse positions within VAR
17   seems inconsistent with the marking
18   methodology. The warehouse is marked to the
19   lower of cost or market value, whereas the
20   VAR does not take this into account.
21           Do you see that?
22      A.   I do.
23      Q.   Do you recall that comment by the
24   FSA?
25      A.   No, not specifically.



Page 134

1  S. Molinaro - Confidential
2  mortgage-backed securities.
3  Q.  Do you recall the reaction of
4  Bear's customers to the announcement that it
5  would be providing this financing to the High
6  Grade fund?
7  A.  The reaction of our customers to
8  that?
9  Q.  Yes.
10  A.  Not particularly.
11  Q.  Do you remember any other --
12  withdraw that.
13  Do you recall any reaction by
14  investors to the announcement that Bear was
15  providing this funding to the High Grade
16  fund?
17  A.  I believe that when we did that,
18  ultimately, I think the amount we provided
19  was below 3 billion because of further
20  liquidation that took place in the funds, but
21  I believe we had an analyst call, public
22  call, where analysts and the press were
23  invited.  We addressed why we were doing and
24  what we were doing and why we thought that
25  this was a safe loan to make and why we

Page 135

1  S. Molinaro - Confidential
2  thought we were secured and what we thought
3  the ramifications of it would be, and I don't
4  recall there being any specific overriding
5  concern from investors about that specific
6  issue.
7  Q.  I would like to hand you what we
8  will mark as Exhibit 8 in this deposition.
9  (Molinaro Exhibit 8, documents
10  bearing Bates stamp Nos. Bear 00501435
11  and Bear 00501436, marked for
12  identification.)
13  Q.  This an email from Michael Minikes,
14  M-I-N-I-K-E-S, to you, dated July 18, 2007,
15  bearing the Bates No. Bear 00501435 through
16  436.
17  This is -- do you recognize this
18  email chain, Mr. Molinaro?
19  A.  Yes.
20  Q.  What does this email chain concern?
21  A.  So this is coming, the beginning of
22  this chain, Stu Beretz was a prime brokerage
23  salesman in our global clearing division.  He
24  is sending it to the two people who were
25  running prime brokerage at that time, Lou

Page 136

1  S. Molinaro - Confidential
2  Lebedin, L-E-B-E-D-I-N, and Michael Minikes
3  and he is expressing a view that -- I believe
4  this fund was called Vicis Capital, I was not
5  really familiar with them, but that Vicis was
6  concerned about the mortgage-backed
7  securities market generally and worried about
8  the implication that might have on Bear
9  Stearns and they were at least making noise
10  that they might move their clearing, either
11  balances or business or both, and they
12  were -- what they were looking to do was to
13  elevate that so we could get a discussion
14  with them and, hopefully, address their
15  issues.
16  Q.  Now, the email from David Rawlings,
17  which is the second email in this chain as
18  you read vertically, it says, I think that PB
19  business continues to be at risk, at the end
20  of that paragraph.
21  Do you see that?
22  A.  Yes.
23  Q.  Do you understand what that means?
24  A.  I think I understand what he was
25  trying to get at, yes.

Page 137

1  S. Molinaro - Confidential
2  Q.  What was that?
3  A.  I think that during that period of
4  time, as the mortgage market was continuing
5  to develop difficulties and more -- there
6  were lots of things going on in the market
7  away from Bear Stearns that were causing
8  concerns and hedge funds.  Some hedge funds
9  were worrying about that and what the
10  ramifications of those issues might be on the
11  firms that they prime brokered with.  We were
12  certainly not alone.  We were a large
13  mortgage-backed securities house, so,
14  therefore, naturally, if you are worried
15  about the state of the mortgage-backed
16  securities market, you might be worried about
17  what is going on at Bear Stearns, and these
18  folks, I believe, had, for them, a material
19  amount of their net worth held with us as
20  their prime broker, and as far as I can tell,
21  they were doing what they believed to be
22  their fiduciary responsibility to their
23  investors, ask questions and decide if they
24  should move their business.
25  Q.  If they weren't satisfied with the



Page 138

1    S. Molinaro - Confidential
2    answers you gave, they could move their
3    business?
4        A.   They would always move their
5    business.  If they were worried enough, they
6    may decide, regardless of what answers we
7    gave, that, you know, there is other prime
8    brokers and we will move the business and we
9    will figure it out later.
10       Q.   The email from Mike Minikes, and
11   remind me, who is Michael Minikes?
12       A.   Michael was the co-head of the
13   clearing business.
14       Q.   He says in his email, Sam, This one
15   is really important.  We, again, risk losing
16   substantial balances.
17       Do you see that?
18       A.   I do.
19       Q.   Do you know what does he means
20   by -- withdraw that.
21       Do you understand what he means by,
22   We, again, risk losing substantial balances?
23       A.   I do.
24       Q.   Can you explain to me what that
25   means?

Page 139

1    S. Molinaro - Confidential
2        A.   As I said, many, many hedge funds
3    during this period of time had concerns about
4    what was happening in the mortgage market
5    broadly, but certainly in the subprime
6    mortgage market specifically and customers
7    were voicing concerns of questions.
8        Q.   So this was not the first concerns
9    or questions that you had received, is that
10   right?
11       A.   I think, again, it's hard for me to
12   remember exactly the timelines here, but,
13   clearly, the hedge funds have been in the
14   news.  They already failed at this point, I
15   believe.  It's not surprising that in a
16   period of heightened sensitivity, we
17   might get painted with the same brush that
18   the hedge funds.  People don't know what you
19   have and what you own and what risks you
20   have, so there was concern and there were
21   hedge funds that were voicing concern.  As I
22   recall it, Vicis was one of the first ones
23   that actually sought to move balances, as I
24   remember it, there may have been some others,
25   but, for whatever reason, this one was

Page 140

1    S. Molinaro - Confidential
2    getting attention at the time and you can see
3    there was about a 10 or $11 million client,
4    so not trivial and, you know, we were trying
5    to address these issues head on.
6        Q.   Do you recall what happened with
7    Vicis Capital?
8        A.   I think they moved their balances.
9        Q.   Did you have any -- did you take
10   any steps on the basis of this email to try
11   to retain their business?
12       A.   If I recall, we ended up having a
13   conference call with them, which I think
14   Warren may have been involved with, but I am
15   not positive, and we tried to answer their
16   questions.
17       Q.   But were not ultimately successful
18   in retaining the business, is that your
19   recollection?
20       A.   I believe they moved their
21   balances, but I am not positive.
22       Q.   I would like to hand you what we
23   will mark as Exhibit 9 to this deposition.
24       (Molinaro Exhibit 9, document
25   bearing Bates stamp Nos. Bear 00117203,

Page 141

1    S. Molinaro - Confidential
2    marked for identification.)
3        Q.   It's a two email chain, dated July
4    20, 2007, bearing the Bates No. Bear
5    00117203.
6        I will ask you if recall these
7    emails?
8        A.   I didn't recall this specific
9    email, but I've read it.
10       Q.   Do you have any reason to doubt
11   that you received it?
12       A.   No.
13       Q.   Could I ask you, who is Steve
14   Meyer?
15       A.   Steve Meyer, at this point, Steve
16   had run our equities derivatives business and
17   at this point in time, I think he may have
18   had the prime brokerage business reporting to
19   him.
20       Q.   You see it says here, I believe
21   that the issues that Vicis has raised are
22   echoed throughout a number of our PB
23   customers.
24       Do you see that?
25       A.   I do.



Page 142

```
 1        S. Molinaro - Confidential
 2      Q.   Then he says, There is still
 3   significant concern over the riskiness over
 4   the $1.4 billion repo line to the fund and
 5   this gives them a reason to question our
 6   judgment and risk management practices.
 7        Do you see that?
 8      A.   Yeah, I do.
 9      Q.   Do you understand what Mr. Meyer is
10   saying?
11      A.   He is editorializing a bit,
12   probably talking his own book a bit, but the
13   simple fact was Vicis -- we had hundreds, if
14   not over 1,000 prime brokerage clients, many,
15   many clients, some clients were nervous
16   generally, some clients may have had a view
17   on the mortgage market, which I believe these
18   guys did, I don't know much about them, but
19   my recollection is that they had a particular
20   point of view on the mortgage market, which
21   led them to have a point of view about other
22   stuff and this was commonplace in the
23   industry, we were not alone here.  Every
24   investment bank that I was aware of was
25   dealing with similar issues, lack of
```

Page 143

```
 1        S. Molinaro - Confidential
 2   information about these kind of assets,
 3   generally, because prior to this, they
 4   weren't something that was in particular
 5   focus.  The hedge fund loan at a billion-4,
 6   in my opinion, is not what the concern was.
 7        The concern was that Bear, like
 8   other investment banks who had large
 9   mortgage-backed securities businesses, could
10   be exposed if their worst fear, you know,
11   whatever their thesis was on the market, if
12   it played out the way they thought it might,
13   presumably they should be worried.  Maybe
14   they got rich, I don't know.  I don't know
15   much about these guys.
16      Q.   You used a phrase back there I want
17   to ask about because I don't know quite what
18   you meant.
19        You said Steve Meyer might have
20   been talking his own book.
21        Can you tell me what that means?
22      A.   He was running, he was a relatively
23   new manager running the prime brokerage
24   business and he is advocating for his
25   business.
```

Page 144

```
 1        S. Molinaro - Confidential
 2      Q.   And do you recall responding to
 3   this email?
 4      A.   I don't know if I responded
 5   specifically, but throughout this period of
 6   time, I was, on a fairly regular basis,
 7   available to our prime brokerage clients, who
 8   were very important clients to us, trying to
 9   answer the questions that they had as
10   truthfully and honestly as we could, given
11   whatever public information was out there at
12   the time and, again, I can't recall
13   specifically the dates around -- I know we
14   made disclosures throughout this period of
15   time on what was going on with this repo
16   line, so we were available to talk to our
17   prime brokerage clients and we were talking
18   to our prime brokerage clients.
19      Q.   Here, on the second paragraph of
20   the email from Steve Meyer, The impact of the
21   BSAM problem on PB is very significant.  Even
22   if we handle it aggressively, I think that we
23   will start to see our customers move
24   positions away with, it says, telling us why?
25      A.   Yes.
```

Page 145

```
 1        S. Molinaro - Confidential
 2      Q.   Do you believe the BSAM problem had
 3   a significant impact on the prime brokerage
 4   business?
 5        MS. CAREY:  Objection.
 6      A.   I believe that what was transpiring
 7   with the BSAM funds getting in trouble ended
 8   up in a very -- in a period of time when the
 9   markets were beginning to become quite
10   stressed, ended up putting us in the
11   headlines of the newspapers for days on end
12   while those funds were being liquidated
13   effectively, which, of course, couldn't
14   possibly be good in an environment like that
15   and led us to have to deal with rumors and
16   innuendo that were in the market because
17   people didn't know, speculation, and we dealt
18   with that through the month of July, so do I
19   think that the BSAM problems were helpful,
20   no, of course, I think they were
21   reputationally damaging.  I think people
22   assumed all kinds of things in an environment
23   like that, most of which I think we
24   ultimately disproved, at least as it related
25   to the fund itself and the kind of assets
```



37 (Pages 142 to 145)

Page 146

```
1        S. Molinaro - Confidential
2    that we held with subsequent disclosures that
3    we gave and, ultimately, this storm passed,
4    they're alluding to, the concern of prime
5    brokerage clients all running away, so they
6    didn't all run away, a few left.  Some
7    balances were moved and things stabilized.
8        Q.  The next sentence says, However, at
9    this point in time, I feel it would be very
10   helpful if we could point to the exposure
11   from the repo line being brought down.
12        Do you see that?
13        A.  I do.
14        Q.  And this refers to the repo line
15   offered to the High Grade fund.
16        Is that your understanding?
17        MS. CAREY:  Objection.
18        A.  I believe so.
19        Q.  Do you understand why Mr. Meyer
20   would recommend that it would be very helpful
21   to point to the exposure from the repo line
22   being brought down?
23        A.  It was obvious.
24        Q.  Can you explain it to me?
25        A.  From his perspective, his problem
```

Page 147

```
1        S. Molinaro - Confidential
2    goes away if we can tell his clients that
3    we've liquidated all the assets and there is
4    no more exposure there.  I don't agree with
5    his view.  It would have raised 25 other
6    issues at that time.
7        Q.  Can you give me an example of the
8    other issues it would have raised?
9        A.  Generally speaking, people were
10   getting increasingly nervous about the
11   mortgage market and some funds who had a
12   point of view on the mortgage market, that
13   may have been particularly negative, maybe
14   really negative, hard to know.  If they had
15   that point of view, then they should be
16   worried about firms that were exposed to the
17   mortgage business in a material way.
18        Q.  And Bear Stearns was a significant
19   player in the mortgage business?
20        A.  I believe that's a fact, yes.
21        Q.  I will hand you what's been marked
22   as Exhibit 10 to this deposition.
23        (Molinaro Exhibit 10, documents
24        bearing Bates stamp Nos. Bear 00117336
25        and Bear 00117337, marked for
```

Page 148

```
1        S. Molinaro - Confidential
2        identification.)
3        Q.  This is an email chain from Warren
4    Spector to you, dated July 22, 2007, bearing
5    the Bates number Bear 00117336 through 7337.
6        Do you recognize this chain?
7        A.  I do.
8        Q.  Could you look at the second email
9    which is one from you to Mr. Spector dated
10   July 21st?
11        A.  Yes.
12        Q.  2007?
13        A.  Yes.
14        Q.  It says, FYI, We are getting lots
15   of heat over the repo facility.
16        Do you see that?
17        A.  Yes, I do.
18        Q.  Do you have an understanding of
19   what you meant?
20        A.  What was the date of the email that
21   we just looked at a moment ago?
22        MS. CAREY:  July 18th.
23        A.  We had customers asking questions
24   about the repo facility, amongst other
25   things, but that seemed to be a topic on
```

Page 149

```
1        S. Molinaro - Confidential
2    people's mind because it was in the press and
3    it was fresh and that is what was out there.
4        Q.  So by lots of heat, you had in mind
5    prime brokerage customers asking questions?
6        A.  There may have been others, there
7    may have been others.  We were certainly
8    answering a lot of questions about what was
9    happening with the funds and what exposures
10   we might have to the funds or with what
11   exposures we might have to assets that looked
12   like assets that the fund had, so there were
13   many issues we were dealing with at the time.
14        Q.  The next sentence says, I think
15   the, heads, they win; tails, we lose, nature
16   of the repo has everyone concerned.
17        Do you see that?
18        A.  Yeah.
19        Q.  Do you understand in what way you
20   meant that the repo was of a heads, they win;
21   tails, we lose nature?
22        A.  Clearly, so the funds have limited
23   ability at this point to take defensive
24   measures, meaning, they have limited ability
25   to hedge because people won't trade with
```



Page 166

1    S. Molinaro - Confidential
2    Q.  I'm handing you what has been
3  marked as Exhibit 13.
4        (Molinaro Exhibit 13, document
5    bearing Bates stamp Nos. Bear 00505732,
6    marked for identification.)
7    Q.  This is an email chain, the top
8  email from you to Michael Minikes, on August
9  3, 2007, bearing the Bates No. Bear 00505732.
10       Do you recognize these emails?
11   A.  Yes.
12   Q.  Robert Upton, in the bottom email,
13  emails a number of people, including
14  yourself, saying, Just got a call and there
15  is no reprieve?
16   A.  Yes.
17   Q.  The subject is S&P doing it today.
18       Do you understand that to refer to
19  S&P downgrading Bear?
20       MS. CAREY:  Objection.
21   A.  I understand it to mean that they
22  are going to issue this announcement about
23  the change in outlook.
24   Q.  And you forward that email to Bruce
25  Lisman, Jeff Meyer and Michael Minikes.

Page 167

1    S. Molinaro - Confidential
2    Do you see that?
3    A.  I do.
4    Q.  Why did you forward it?
5    A.  Because those were the people who
6  were involved in running our prime brokerage
7  business and I thought they needed to get a
8  heads up on this because our prime brokerage
9  clients were already expressing sensitivities
10  or likely to having a heightened sensitivity
11  to this announcement.
12   Q.  The top email that is from you to
13  Michael Minikes, you say, We need to create
14  more liquidity ASAP.
15       Do you see that?
16   A.  Yes, I do.
17   Q.  They worry about free credits.
18       Can you explain to me -- can you
19  explain to me what you mean by free credits?
20   A.  Free credits are the funds that
21  customers leave with broker/dealers, in
22  particular, the large balances would be with
23  prime brokerage clients, hedge funds that we
24  have unencumbered assets with their prime
25  broker and they are referred to as free

Page 168

1    S. Molinaro - Confidential
2  credits because they are not required to meet
3  their margin requirements, so, therefore,
4  they are free to take them out.
5    Q.  When you say, they are free to take
6  them out, do you mean the customers are free
7  to withdraw them?
8    A.  Yes, without impacting their margin
9  requirement.
10   Q.  So that is money that can go off
11  the books of Bear Stearns easily?
12       MS. CAREY:  Objection.
13   A.  They have the right to request that
14  money to be moved, if they choose to do that.
15   Q.  You say in that first sentence, We
16  need to create more liquidity ASAP.
17       Can I ask how Bear determines
18  whether its liquidity levels are adequate?
19   A.  We had an alternative liquidity
20  model that we ran that we created a parent
21  company only liquidity pool and we held
22  substantial excess cash at a given point in
23  time.
24       We also had unencumbered
25  securities, so we could raise more cash if we

Page 169

1    S. Molinaro - Confidential
2  needed to.  We had a model we were following.
3  I don't remember the exact formula at the
4  time, but we had a minimum level of parent
5  company only liquidity that we wanted to
6  maintain.
7    Q.  So this email that you sent on
8  August 3rd at the top of this email chain,
9  had you run some sort of quantitative
10  analysis in order to conclude that you needed
11  to create more liquidity ASAP?
12   A.  No, it was my business instincts.
13  I'm telling Mike Minikes that we need to be
14  prepared for a firestorm today and we are
15  going to be responding to this, so we need to
16  be on our toes.
17   Q.  Did that firestorm occur?
18   A.  It did.
19   Q.  What was your view of what would
20  happen -- do you recall what your view was --
21  withdraw that.
22       Can you explain to me why, at this
23  point, Bear needed to raise more liquidity
24  ASAP?
25       MS. CAREY:  Objection.



43 (Pages 166 to 169)

Page 170

1  S. Molinaro - Confidential
2  A.  I didn't say that.  I was telling
3  him that we were going to go through a very
4  stressful period, which I think he would have
5  quickly understood when he saw what was
6  happening with the S&P announcement, and we
7  were going to need to raise liquidity in the
8  short run because we were likely going to
9  have customers who would look to move free
10 credit balances, basically people who say,
11 let's move the money now and we will figure
12 it out later, type of folks, and I was
13 concerned about this report.  Principally,
14 because we read it, it's not that bad, but I
15 knew we were in a very stressful period in
16 the marketplace and my feeling was even an
17 outlook change at this point from a rating
18 agency would be perceived by investors
19 extremely negatively as though S&P knew
20 something that they didn't know.
21 The fact was, S&P hadn't spent 30
22 minutes with us before they put this release
23 out and didn't know anything anymore than the
24 rest of the market did.  They didn't have any
25 crystal ball.  They were simply basically

Page 171

1  S. Molinaro - Confidential
2  telling the market what the market already
3  knew.  The market already knew that we had a
4  big business in the mortgage area and the
5  market knew that the business would suffer
6  with the downturn in the marketplace if, for
7  no other reason, the volume of revenues would
8  likely go down and we would be exposed to
9  potential losses if the value of the
10 securities we held would go down in value, so
11 this report from S&P, which did say things
12 that were positive about our liquidity
13 picture, which wasn't a direct result of
14 conversation we had with them about it, my
15 view is nobody would bother to read it.  They
16 would react and act and figure out the facts
17 later.
18 Q.  Did you have a view about what
19 would happen if the free credits left Bear
20 and Bear failed to create more liquidity?
21 A.  The doomsday scenario is always
22 that you get a hard mentality and you get a
23 run on the bank and if all your customers
24 pull all their cash all at once, it wouldn't
25 matter what your alternative liquidity

Page 172

1  S. Molinaro - Confidential
2  measures were, you couldn't possibly meet all
3  the obligations that fast.
4  So the way that the free credit
5  balance system worked, there were certainly
6  defensive measures built into the regulatory
7  rules about how excess customer funds could
8  be utilized, all of which we were in
9  compliance with.  We held substantial excess
10 customer funds.  I don't remember what the
11 number was, but I believe it was north of 10
12 billion.  That money was locked up in a
13 segregated account, so that was where the
14 money would come from to meet customer free
15 credit balance outflows, but at any given
16 moment in time, you could still get a spike
17 in flow of funds that you would have to deal
18 with.
19 Q.  And if you hadn't raised more
20 liquidity when that happened, what would have
21 happened?
22 A.  We would have met the requirements,
23 we would have met the requirements, so it
24 wasn't if we don't raise money, we are out of
25 business.  This was simply to a guy who had

Page 173

1  S. Molinaro - Confidential
2  been my colleague for 20 years, that we are
3  about to be in a firestorm today with this
4  announcement, we need to be on our toes,
5  that's what that message was.
6  Q.  So why did you frame that message,
7  We need to create more liquidity ASAP?
8  MS. CAREY:  Objection.
9  A.  I just told you.
10 Q.  I'm looking at the transcript and I
11 see that the message that you say is that We
12 need to be on our toes, and perhaps I just
13 don't understand how he would need to create
14 more liquidity ASAP, express that message, so
15 if you could explain to me why you told Mr.
16 Minikes that we need to create more liquidity
17 ASAP, maybe I would understand it better?
18 MS. CAREY:  Objection.
19 A.  First of all, we're reading one
20 email correspondence in the context of
21 conversations and other things that were
22 going on between Mike and I at the time, so
23 to pull this one out, it's not in context, so
24 there is no -- the thing that any CFO or any
25 treasurer in any investment bank or bank is



Page 182

1    S. Molinaro - Confidential
2  are raising more liquidity is that you need
3  more liquidity and if you are willing to
4  spend a hundred over what it was costing you
5  two days ago, maybe you need a lot of excess
6  liquidity, so that's this constant balancing
7  act about trying to deal with market
8  expectations in an environment where
9  confidence might be shakier than normal.
10    The point, though, I think in all
11 of this, was that we had ample demand from
12 our institutional client base to take our
13 name and to issue bonds to, so I believe --
14 again, I don't recall, this is several years
15 ago now, but I believe we had done a
16 five-year deal during that week, mostly not
17 because we needed the cash, but mostly
18 because we wanted to send a signal to the
19 market we were still liquid and we could
20 still fund our service and notwithstanding
21 all the misinformation that might be floating
22 around in the market, the source of which we
23 will never know where all that came from,
24 that we were quite liquid and I believe we
25 took the opportunity to access more liquidity

Page 183

1    S. Molinaro - Confidential
2  this week, though, I couldn't be positive.
3    Q.  Who is John Stacconi?
4    A.  He was in our treasury group.
5    Q.  And it says here in the next
6  sentence, But after a week of being denied
7  additional credit by our banks and actually
8  losing credit at the margin, I think we
9  should tee this up.
10    Do you see that?
11    A.  I do.
12    Q.  By tee this up, does he mean go
13 ahead with the three-year deal with Teachers'
14 Reinsurance?
15    A.  I believe that's what he is
16 referring to.
17    Q.  Do you know if, in fact, you did
18 that deal with Teachers' Reinsurance?
19    A.  I don't recall.
20    Q.  Do you remember any further
21 discussion about what signal doing such a
22 deal might send to the market regarding
23 Bear's liquidity?
24    A.  I don't recall.
25    Q.  Is Mr. Stacconi accurate to

Page 184

1    S. Molinaro - Confidential
2  describe the previous week as a week of being
3  denied additional credit by our bank and
4  actually losing credit at the margin?
5    A.  He is accurate in the context of
6  what was happening that specific week, so I
7  think that what he is referring to is that
8  that specific week in the aftermath of that
9  S&P announcement, we had spent time talking
10 to a few of the money center banks about
11 increasing our committed lines materially and
12 what we found amongst the banks that we were
13 talking to is, for reasons mostly of their
14 own, they didn't really have an appetite to
15 increase committed lines, notwithstanding we
16 were doing a lot of business with them, so I
17 don't believe it had much to do with us.  It
18 had to with them and their ability to take on
19 more significantly committed lines and losing
20 credit around the margin is straight repo
21 counterparty here and there that, you know,
22 backed away or didn't roll or something like
23 that, but there was nothing material.
24    Q.  I hand you what's been marked as
25 Exhibit 15 to this deposition.

Page 185

1    S. Molinaro - Confidential
2    (Molinaro Exhibit 15, documents
3  bearing Bates stamp Nos. Bear 00509006
4  and Bear 00509007, marked for
5  identification.)
6    Q.  It's an email with attachment from
7  Sal Dimaggio to you, bearing Bates No. Bear
8  00509006 through 007, dated August 14, 2007.
9    Do you see that?
10    A.  I do.
11    Q.  Do you recognize this email?
12    A.  I don't.
13    Q.  Can you tell me who Sal Dimaggio
14 is?
15    A.  Sal was in our treasurer's area.
16    Q.  And it says, Not sure if you have
17 seen this.  So far, we have lost $6.6 billion
18 of repo funding.  Desk anticipates losing 2.7
19 billion more in the next month.
20    Do you see that?
21    A.  Yes.
22    Q.  Do you recall when this loss, it
23 says -- withdraw that.
24    Where it says, so far, we have lost
25 $6.6 billion.



Page 186

```
1        S. Molinaro - Confidential
2          Do you see that?
3     A.  Yes, I do.
4     Q.  Do you have any understanding of,
5  so far, since when you've lost that $6.6
6  billion?
7        MS. CAREY:  Objection.
8     A.  I'm presuming it's since the
9  announcement of the S&P action.
10    Q.   So in discussing the previous
11 email, you had said that losing credit around
12 the margin is a straight repo counterparty
13 here or there or backed away or didn't roll
14 or something like that, but is not material.
15        Is a $6.6 billion loss of repo
16 funding material to Bear Stearns?
17        MS. CAREY:  Objection.
18    A.  Not necessarily, and it would also
19 be a function of whether we were able to
20 replace it, which we were, so the fact that,
21 you know, hot money lenders who -- kind of
22 fair weather lenders backed away, there is
23 noise, they pull out.  The fact that we could
24 replace that capacity with other people,
25 which is what happened, I would consider to
```

Page 187

```
1        S. Molinaro - Confidential
2  be straight repo counterparty.
3     Q.  Do you remember responding to this
4  email?
5     A.  I don't.
6     Q.  Do you remember responding to the
7  situation of the loss of $6.6 billion in repo
8  funding?
9     A.  Generally.
10    Q.  And how did you generally respond?
11    A.  We were actively seeking other repo
12 lines or drawing down an existing repo
13 facilities and monitoring our cash position
14 and repo position funding liquidity position
15 date.
16    Q.  I will hand you what is marked as
17 Exhibit 16.
18        (Molinaro Exhibit 16, documents
19        bearing Bates stamp Nos. Bear 00509373
20        through Bear 00509375, marked for
21        identification.)
22    Q.  It's an email chain bearing Bates
23 No. Bear 00509373 through 9375.
24        Do you recognize these emails?
25    A.  It's a rather lengthy one, so I
```

Page 188

```
1        S. Molinaro - Confidential
2  need to take a look at it.
3     Q.  Absolutely.
4     A.  Yes.  Okay.
5     Q.  Do you recognize these emails?
6     A.  Vaguely, yes.
7     Q.  These emails concern a gathering of
8  more than 27 principals and partners of hedge
9  funds hosted by Bear Stearns, is that right?
10    A.  That's what it says, yes.
11    Q.  Were you at that meeting?
12    A.  I think so.
13    Q.  The second paragraph of the second
14 email, it lists some of the names.  Carl
15 Ichan, Renaissance Technologies, Soros,
16 Paulson Partners, Perry Partners, SAC,
17 Fortress, Marathon, HBK.  It says, et cetera,
18 and the list goes on.
19        Can you add any of the additional
20 names?
21    A.  No.
22    Q.  Do you know who would be able to
23 list those names?
24    A.  No.  Alex Garbuio, I don't know who
25 Alex is, but I kind of remember his name.
```

Page 189

```
1        S. Molinaro - Confidential
2     Q.  You will throw him under the bus.
3     A.  He wrote the email, so I presume he
4  knows who was there.
5     Q.  Do you know if anyone, other than
6  hedge funds, if any investors, other than
7  hedge funds, attended the meeting?
8     A.  So I don't remember this specific
9  meeting.  There were a series of meetings
10 that we had with institutional investors,
11 including hedge funds that followed on the
12 heels of the S&P announcement, as well as an
13 investor called it, we did that afternoon,
14 where we disseminated information to the
15 market and with that information into the
16 market, we were, therefore, free to go out
17 and talk to investors and we did.  We had a
18 number of investor meetings, both one on
19 ones, as well as with larger groups.
20        This one that he is referring to,
21 again, I'm not sure that I remember this
22 specific meeting, though I think I might, and
23 we attempted to answer all of their questions
24 to the best that we could.
25    Q.  Do you recall if in this meeting,
```

Page 190

```
1        S. Molinaro - Confidential
2    you circulated presentation materials or gave
3    a presentation to the investors?
4        A.  I don't think we gave a
5    presentation.  I think it was mostly question
6    and answer.
7        Q.  Do you recall whether in the
8    similar meetings with investors, you, around
9    this time, if you circulated presentation
10   materials or gave a presentation?
11       A.  I don't recall.
12       Q.  And the purpose of this meeting and
13   meetings like it was to provide information
14   about Bear Stearns?
15           MS. CAREY:  Objection.
16           MS. CHEPIGA:  Objection.
17       Q.  Is that right?
18       A.  The purpose of these meetings were
19   several things; one, to let them see the
20   whites of management's eyes, give them an
21   opportunity to sit with us and ask questions,
22   because people take feedback from body
23   language and how people react and what
24   they're saying, to be able to reenforce the
25   points that were made in the earnings call
```

Page 191

```
1        S. Molinaro - Confidential
2    with the public information that we had put
3    out there and we gave a fair amount of public
4    information about our situation, both from
5    the standpoint of earnings, from the
6    standpoint of exposures and from the
7    standpoint of funding and liquidity.
8        We have the S&P report out, so,
9    therefore, there was ample information that
10   was in the public domain that we could
11   reenforce the points, of which we did.  Many
12   of these customers who were customers of our
13   prime brokerage department had questions
14   about the safety and soundness of Bear
15   Stearns Securities Corp. and basically how
16   that entity functioned, its separation from
17   the parent entity, et cetera, et cetera.
18   These were all generally public information
19   and subject to contractual arrangements
20   between them and us, how SIPC worked, all
21   kinds of things that they might have concerns
22   about in the normal running of any prime
23   brokerage business and gave them an
24   opportunity with senior management there,
25   together with the people that ran the prime
```

Page 192

```
1        S. Molinaro - Confidential
2    brokerage business, to feel like they're
3    getting their questions answered.
4        Q.  Did it satisfy them all?
5        A.  It's hard to know.  If we read the
6    last paragraph of Alex's commentary.  It's
7    hard to know whether or not this addresses --
8    I don't know if it's the last paragraph
9    towards the end here.  Hard to know whether
10   or not we actually made significant progress
11   here, however, I would tell you that in the
12   days and weeks following this, it felt like
13   we made significant progress, things calmed
14   down and the heightened level of
15   sensitivities seemed to abate, and I suspect
16   that's because people who are really worried,
17   those people, like Vicis, that we talked
18   about before, who might have had a view on
19   the mortgage market, they left and went to
20   somebody who presumably didn't have market
21   exposure.  I don't know who that was.  They
22   went someplace.  I think they actually went
23   to Goldman, if I recall, and that was the
24   situation.
25       Q.  The institutional investors that
```

Page 193

```
1        S. Molinaro - Confidential
2    you hosted at this meeting and the ones like
3    it, do you have any understanding as to
4    whether or not they increased or decreased
5    their level of business with Bear Stearns
6    through, say, the end of February 2008?
7        A.  I think on balance, we lost
8    balances during this period of time.  I
9    believe this was publicly disclosed that we
10   lost balances and by February of 2008,
11   balances were returning.  I don't know that
12   we were quite back to where we were, but we
13   were getting close to where we were.
14       Q.  Just before the JP Morgan/Bear
15   Stearns deal was announced, were the
16   institutional investors that you hosted at
17   this meeting and meetings like it around this
18   time, do you have an understanding as to
19   whether they stayed around longer than other
20   customers as a result of these meetings?
21           MS. CAREY:  Objection.
22       A.  I don't know the answer to that.  I
23   believe a few of them stuck around.  Whether
24   it was because of these meetings or
25   otherwise, I don't know.  I think a few of
```



Page 194

1    S. Molinaro - Confidential
2  them moved on, notwithstanding the meetings
3  and looking in the whites of our eyes, they
4  moved on, otherwise. I think all of these
5  people had differing views of the situation
6  and differing relationships with the firm,
7  but, overall, prior to the week of March 10th
8  or 11th, whatever that was, the situation
9  stabilized and the situation that we're
10 talking about in August of 2007, it lasted
11 for a couple of weeks, is what we saw
12 reoccurrence of that week of March of 2008,
13 except more in stampede-like fashion.
14    Q.  I would like to hand you what has
15 been marked as Exhibit 17 to this deposition.
16        (Molinaro Exhibit 17, document
17        bearing Bates stamp Nos. Bear 00510868,
18        marked for identification.)
19    Q.  This is an email chain dated August
20 20, 2007, bearing the Bates No. Bear
21 00510868.
22        Do you recognize this email, Mr.
23 Molinaro?
24    A.  Not really.
25    Q.  In the second email, the one from

Page 195

1    S. Molinaro - Confidential
2  Paul Friedman that gets forwarded to you by
3  Richie Metrick.
4        First of all, could I ask you, who
5  was Richie Metrick?
6    A.  Richie Metrick was an individual in
7  the investment banking department who worked
8  closely with Alan Schwartz and was one of,
9  for lack of -- I don't know how to describe
10 the role he had, but he was one of Alan's
11 confidants.
12    Q.  In the email that he forwards to
13 you, Paul Friedman? Could you tell me who
14 Paul Friedman is?
15    A.  Paul ran the repo desk for us.
16    Q.  Mr. Friedman writes, The repo desk
17 just presented me with the following funding
18 snapshot.
19        Do you see that?
20    A.  I do.
21    Q.  It says, Over the last two and a
22 half weeks, we've lost $14.2 billion in
23 funding primarily money we had that was
24 available to be used against whole loans and
25 nonagency securities.

Page 196

1    S. Molinaro - Confidential
2        Do you see that?
3    A.  I do.
4    Q.  Is that consistent with your
5  understanding of the funding situation in
6  August 2007?
7    A.  I don't recall this.
8    Q.  Does that strike you as, obviously,
9  way off?
10       MS. CAREY:  Objection.
11   A.  What I don't know and I can't tell
12 here is whether we lost funded balances or we
13 lost available capacity, so it's not
14 consistent with my understanding and my
15 recollection of what was happening. That's
16 all I can tell you about it.
17   Q.  Do you recall responding to this
18 email from Mr. Metrick?
19   A.  Not specifically, no.
20   Q.  Can you explain to me -- excuse me.
21       Do you understand what Mr. Friedman
22 means by, primarily money we had that was
23 available to be used against whole loans and
24 nonagency securities?
25   A.  Yeah. I think he is saying that

Page 197

1    S. Molinaro - Confidential
2  the lines that we lost and, again, I don't
3  know whether these were drawn, I'm guessing
4  they weren't drawn, were lines we could have
5  pledged whole loans or nonagency residential
6  mortgage securities against.
7    Q.  In the next sentence, it says,
8  Against that, we've taken in only $2.7
9  billion of money from new sources.
10       Is that consistent with your
11 understanding of the funding situation?
12   A.  He is talking about what is going
13 on on the repo desk and, again, I don't know
14 the details of that, but he is only focusing
15 on what is happening on the repo desk and not
16 cognizant of what is going on away from him,
17 which includes bank loans which he wasn't
18 responsible for, unsecured funding, like what
19 was issued to Pimco, he did not have the
20 whole picture, he had had a limited view of
21 what was going on in the world.
22   Q.  At this time was -- withdraw that.
23       In the last sentence of that last
24 bullet, he says, While the balance sheet has
25 shrunk during that time, it's been heavily



Page 222

1      S. Molinaro - Confidential
2  will expect an asked and answered.
3       Do you recall any discussion about
4  this email?
5       MS. CAREY:  Objection, asked and
6  answered.
7       Q.  You can answer again.
8       A.  I don't.
9       Q.  Do you recall having any discussion
10  with or being present for any discussion with
11  anyone at Bear about the dangers to Bear of
12  Bear's leveraged position?
13       MS. CAREY:  Objection.
14       A.  I don't.
15       Q.  I will hand you what is being
16  marked Exhibit 20 to this deposition.
17       (Molinaro Exhibit 20, document
18       bearing Bates stamp Nos. Bear 00128463,
19       marked for identification.)
20       Q.  This is an email from you to Alan
21  Schwartz, dated January 8, 2008, Bates No.
22  Bear 00128463.
23       Do you see that?
24       A.  I do.
25       Q.  It says, JPM Chase has notified us

Page 223

1      S. Molinaro - Confidential
2  that they are backing out of our 4 bill
3  secured/unsecured backstop facility.
4       Do you see that?
5       A.  I do.
6       Q.  Do you recall this email?
7       A.  No.
8       Q.  Do you recall this event?
9       A.  Vaguely.
10       Q.  Do you have any understanding of
11  what you meant when you described the -- what
12  they are backing out of as a backstop
13  facility?
14       A.  We had a $4 billion undrawn
15  facility with a variety of banks and the JP
16  Morgan was the lead arranger of, they weren't
17  the sole provider, there was a syndicate of
18  banks involved with it, but they were the
19  lead arranger and they apparently told us
20  they were not going to be the lead arranger
21  on the renewal.
22       Q.  Do you have any understanding of
23  why JP Morgan did that?
24       A.  I could only surmise.  I don't
25  know.  I don't recall exactly.  I don't

Page 224

1      S. Molinaro - Confidential
2  recall exactly.
3       Q.  Do you have a surmise?
4       MS. CHEPIGA:  Objection.
5       A.  I think that this was probably two
6  weeks after we announced or three weeks after
7  we announced the $1.8 billion writedown on
8  our mortgage portfolio and I think that they
9  were -- they were not looking to renew their
10  credit facility.
11       Q.  Do you know if anyone else in the
12  investing community would know that JP Morgan
13  Chase backed out of this backstop facility?
14       MS. CHEPIGA:  Objection.
15       A.  First, I don't know if they backed
16  out.  If I recall it right, there was lengthy
17  discussion that took place after that as to
18  whether they were going to continue to be in
19  the facility and, if not, could we place them
20  as the lead with somebody else and my
21  recollection is that we were working on both.
22       Q.  The group of banks that were
23  supplying this $4 billion backstop facility
24  would know, wouldn't they, that JP Morgan
25  Chase had backed out, if, in fact, they did

Page 225

1      S. Molinaro - Confidential
2  back out?
3       MS. CHEPIGA:  Objection.
4       A.  If it got to that point, they would
5  know.
6       Q.  I would like to hand you what has
7  been marked as Exhibit 21.
8       (Molinaro Exhibit 21, document
9       bearing Bates stamp Nos. Bear 001131788,
10       marked for identification.)
11       Q.  It's an email chain, dated
12  Wednesday, March 5th, bearing Bates No. Bear
13  001131788.
14       Do you recognize this exchange?
15       A.  Again, not precisely.
16       Q.  Do you recognize -- do you recall
17  this event?
18       A.  I believe so, yes.
19       Q.  There is an email, the bottom email
20  in the chain is from Robert Upton?
21       A.  Yes.
22       Q.  We talked about him a bit.
23       Can you explain what his role was
24  at the time?
25       A.  He was the treasurer.

MAGNA
LEGAL SERVICES

Page 226

1    S. Molinaro - Confidential
2    Q.  Mr. Upton writes, Also, please
3  raise the issue of HSBC moving to pull all
4  credit from BSC.  Would like to get that
5  partially reversed.
6       Do you see that?
7    A.  Yeah.
8    Q.  Do you -- can you explain what HSBC
9  meaning to pull all credit from BSC means?
10   A.  I can.  We had a relatively small
11 line of credit with HSBC, they were not a
12 significant liquidity provider to us and they
13 told us they were not going to renew their
14 line because it was small and we didn't do
15 enough business with them.
16   Q.  Now, do you have any understanding,
17 in light of the size of the line, why Mr.
18 Upton says, would like to get that partially
19 reversed?
20      MS. CAREY:  Objection.
21   A.  I think, for obvious reasons,
22 because we were not looking to lose credit
23 providers, even if they were small.
24   Q.  Do you have any recollection of why
25 you wrote, I need to speak to you on this, to

Page 227

1    S. Molinaro - Confidential
2  Mr. Upton?
3    A.  Probably because I needed to get
4  more information.
5    Q.  I would like to hand you what has
6  been marked as Exhibit 22 to this deposition.
7       (Molinaro Exhibit 22, email from
8    Warren, underscore, Spector, at
9    Yahoo.com to a number of people,
10   including Mr. Molinaro, marked for
11   identification.)
12   Q.  This is an email from Warren,
13 underscore, Spector at Yahoo.com to a number
14 of people, including you.
15      Have you seen this email before?
16   A.  Yes, within the last couple of
17 days.
18   Q.  Have you seen this email before?
19   A.  I think I did.
20   Q.  Do you recall any discussion among
21 any people about this email?
22   A.  My recollection is it wasn't Warren
23 and that's really all I recall about it.
24   Q.  Did you know as soon as you read it
25 that it wasn't Warren?

Page 228

1    S. Molinaro - Confidential
2    A.  I think we all surmised, as soon as
3  we read it, it wasn't Warren.  I don't
4  remember whether somebody spoke to Warren or
5  what have you, but I think we all safely
6  assumed it was not Warren.
7    Q.  Do you get this sort of -- let me
8  ask this.  Am I right in saying you do not
9  recall any discussion among any people
10 regarding this email?
11      MS. CHEPIGA:  Objection.
12   A.  No, I didn't say that I don't
13 recall any discussion.  I don't recall a
14 discussion.  I would expect there might have
15 been some discussion.
16   Q.  Do you recall if you got any other
17 emails from that address, Warren, underscore,
18 Spector, at Yahoo.com?
19   A.  I have no idea.
20   Q.  Do you recall if you received any
21 other faux Spector emails?
22   A.  I don't recall.
23   Q.  Do you recall any discussion of any
24 other faux Spector emails?
25   A.  I don't recall getting any other

Page 229

1    S. Molinaro - Confidential
2  faux Spector emails.  I didn't remember this
3  one until I saw it.
4    Q.  I would like to hand you what has
5  been marked as Exhibit 23.
6       (Molinaro Exhibit 23, document
7    bearing Bates stamp Nos. Bear 00039037,
8    marked for identification.)
9    Q.  This is an email from Warren,
10 underscore, Spector, at Yahoo.com to you and
11 others bearing the Bates stamp Bear 00039037.
12      Do you recall having received this
13 email?
14   A.  I don't remember this email, no.
15   Q.  Do you recall any discussion of
16 this email?
17   A.  I don't.
18   Q.  Does this refresh your recollection
19 of any conversations about any emails which
20 were questionably from Warren Spector?
21   A.  I don't remember that, no.
22   Q.  I hand what you is being marked as
23 Exhibit 24 to this deposition, which is a --
24      (Molinaro Exhibit 24, documents
25    bearing Bates stamp Nos. Bear 001165949

# EXHIBIT 6

Financial Services Authority



| | |
|---|---|
| Direct line: | +44 20 7066 1842 |
| Local fax: | +44 20 7066 1843 |
| Email: | einar.holstad@fsa.gov.uk |

1.

Kanwardeep Ahluwalia                                    19 September 2007
Bear Stearns International Limited
One Canada Square                              Our Ref:
London E14 5AD
                                               Your Ref:

Dear Kan

## BSIL and BSIT CAD2 Application

I am writing to provide feedback on your CAD2 model application to use your internal VaR model to calculate your regulatory market risk capital for Bear Stearns International Limited (BSIL) and Bear Stearns International Trading (BSIT).

As you are aware, a team from the Traded Risk Team of the FSA have been on site at Bear Stearns holding meetings with the relevant front office areas and associated independent control functions. In particular, we have had meetings with IT, Risk Management, Business Unit Controllers, Operations and Internal Audit.

In the course of these meetings, Bear Stearns staff have undertaken to provide follow up information, answers to questions, and certain analyses we have requested. (Please see email from James Bell dated 13 July 2007, email from Jon Hollis dated 3 August 2007 and the list you gave us at the end of the Risk Management meetings summarising the outstanding information from that week.) The amount of outstanding information is quite extensive and receiving this information is important for taking your application forward to the CAD2

CONFIDENTIAL

BEAR 01652024

technical panel, which will opine on the technical merits of your application and its consistency with the requirements set out in BIPRU 7.10 (the chapter of the handbook concerning VaR model approval).

We have a further week of on-site review work scheduled for the week beginning 8 October 2007. We have requested that you provide us with the outstanding information discussed above, at least a week prior to our visit in October. As discussed previously, we intend to pick two dates shortly before the visit and review in detail the work of the control functions for those days. This should allow us to test the control framework that we have discussed with you during the process thus far.

Below we set out a number of observations and findings arising, thus far, from the review process. Please note, to more fully understand these observations and findings, please read this letter in conjunction list of requested information and follow-up actions referenced in the third paragraph, above. We will follow these matters up during the course of our review work in October.

As a general point, we are somewhat disappointed that we have not made more progress in the first part of our review. This suggests, perhaps, a lack of preparedness for the CAD2 application and a lack of resources to deal with the workload associated with preparing, and making this application. We are of course aware of the increased pressure staff are under at the current time, given market conditions. We would therefore encourage you to factor this into scope of the recognition that you choose to pursue, following the feedback contained in the remainder of this letter.

Scope of the VaR Model

We have discussed the scope of the application and a revised scope document was given to us. However, we expect certain parts of your model application, in particular specific credit risk, to face more difficulties getting through CAD panel at this time. Furthermore, before we would be prepared to take an application for a flexible VaR model scope to panel, we would require further evidence of the controls ("point-of-entry standards", if you like) that you will operate to ensure that any new business introduced into the model scope, is controlled in a manner consistent with the standards associated with CAD2 model

BEAR 01652025

recognition. Alternatively, you may wish to concentrate on the recognition of certain businesses at this point in time, and then to apply for the inclusion of other businesses at a later date.

A. Documentation

    a. Documentation is lacking in a number of areas and we found some of the documentation provided to be deficient, for example, the VaR model documentation was not up to date. You have undertaken to update this documentation. Up to date and accurate documentation of policies, procedures and models is an important component of the CAD2 framework.

B. Transfer Pricing

    a. In the meeting to discuss transfer pricing, we were unable to get sufficiently detailed information about the transfer pricing policies that affect BSIL and BSIT. Furthermore, we understand that some businesses may not have transfer pricing policies or have policies which are currently under review.

    b. In addition to the information requested in the 3 August email, for each business in the grey rectangle and in the BSIL circle of the BSIL Booking Locations document, we will need a line by line description of the transfer methodology, along with the transfer pricing statistics. We will then need to have further discussions with you about any aspects of these transfer pricing arrangements that may have implications for the proposed use of VaR as the basis for the capitalisation of BSIL and BSIT market risk.

C. Incremental Default Risk Capital (IDRC)

    a. We have not yet received any proposals on how you will model IDRC. Such a model must be in place before we can consider approving a CAD2 model that covers Interest Rate Specific Risk.

D. ABS VaR

BEAR 01652026

a. The risk capture of ABS warehouse positions within VaR seems inconsistent with the marking methodology: the warehouse is marked to the lower of cost or market value whereas the VaR does not take this into account. We need to understand how you will deal with this in your VaR model.

b. We also have concerns, particularly in light of recent market events, regards the adequacy of the methods for capturing the risk of secondary ABS and CDO of ABS in the VaR model. In addition, will your proposal for IDRC extend to ABS securities?

E. Event Risk for Equity Risk

a. We have not received any proposal on how you will identify and analyse the equity event risk you are exposed to. We will discuss further where you are in your discussion on event risk / concentration with the SEC. The analysis and measurement of this type of risk may fit well into the risks not in VaR framework that is mentioned below.

F. Risks not in VaR framework

a. We have discussed with you the need for putting together a 'risks not in VaR' framework to identify, and quantify the risks that are inherent in your business, but that your VaR model does not capture or does not capture sufficiently well. Such a framework will be a useful tool to evidence that your VaR model captures the material risks in your portfolio, and if it does not, will allow us to agree appropriate risk-based capital add-ons.

b. In the VaR methodology meetings we discussed cases where your VaR model does not capture the risks in your portfolio accurately and you undertook to provide us with analyses to show the accuracy of the VaR model. These analyses and tests could therefore feed into the risks not in VaR framework discussed above.

CONFIDENTIAL

G. Business Unit Controllers

    a.  For SEP there is no explicit mapping of products to models; hence it is possible for two traders trading the same product to be using different models for risk and valuation purposes.  Whilst it is possible that any material differences in valuation or risk may be identified through other procedures, an explicit mapping established as part of the new product set-up process would eliminate such risks.  Traders also seem to have considerable flexibility with respect valuation adjustments (the "fixed" adjustments reported in a valuation adjustment schedule provided to us by James Bell).  We usually expect to see documented valuation adjustment methodologies, often following from model validation processes, which the front-office apply and the control functions periodically check.  Generally, therefore, we are concerned that the high-level of flexibility, and potentially informality, in the front-office valuation process, make the IPV process more difficult and less reliable.  We would recommend that you consider introducing greater structure and formality to front-office valuations, and better documentation of these methods.

    b.  The IPV reporting for Equity Derivatives states the coverage obtained. However, this coverage level is only in relation to Vega, and in some instances forwards.  This does not accurately portray overall IPV coverage against all material risk factors.

    c.  The reserving policy with respect to Day One P&L Reserving is currently being drafted.  We will need to understand your policy ahead of taking your application to panel, as part of our broader review of your valuation adjustment and reserving methodologies.

    d.  You have requested VaR approval for hybrids, but no reserving policies exist yet for this business.  (This is relevant to our earlier observation about "point-of-entry" standards for a flexible CAD2 recognition).

    e.  There is no formal daily P&L attribution reporting.  In addition, there is no independent daily P&L commentary produced by BUC and there appears to be

CONFIDENTIAL

BEAR 01652028

little challenge to the P&L commentary supplied by Front Office.   Risk Management produce occasional commentary on large P&L moves, however this does not constitute formal daily P&L explanation.  The lack of daily P&L attribution and independent explanation / commentary may be due, in part, to the unusual split in responsibilities between BUC and RM.  We understand that the data and functionality exists within LYNX and ATLAS, but that this is not used in a systematic manner.  We did see a monthly P&L explain, produced as part of the monthly reporting, but $4.7mn of the $13mn revenue for exotics was not explained.    The FSA consider daily P&L attribution/explanation to be a key control, and this would certainly seem to be a control gap, relative to the controls we expect to see and do see at your peers.

H.  Model Validation

    a.  FAST build and validate models and can also release models into the live environment. Whilst it is possible to obtain a system-generated list of models used for books and records valuations, this is not reconciled to the list of validated models to ensure completeness of validation.  In addition, validated models can still be amended post validation.  A copy of the validated model is however stored and locked down such that no changes can be made.  We were told that on an ad-hoc basis, regression tests are run against the locked down models to identify any subsequent changes to models.  However, management were unable to recall the last time this procedure had been run.  We would expect this test to be formalised and conducted periodically.

I.  Prudent Valuation

    a.  We discussed FSA's prudent valuation requirements at the end of the last visit. We asked you to evaluate Bear Stearns' compliance with these requirements and, as necessary make proposals for additional regulatory valuation adjustments or capital buffers. This includes, but is not limited to, model risk

BEAR 01652029

on positions which are marked-to-model, which is not presently specifically measured and limited within Bear Sterns.

J.   IT and Data

    a.  Bear Stearns is proposing to move to a single front-office system (Calypso) shortly. There are well-known risks attached to moving to a single front-to-back system. Please provide an up-date on the migration schedule, and please keep us apprised of progress and any issues with the migration.

    b.  Data ownership. In order for VaR to be effective, the data coming into the VaR system must be accurate, and correctly interpreted by the VaR engine. ADP is the system that manages static data, including product and market data codes, and we understand ADP is vital for ensuring that the market data associated with a particular product in the transaction system, is connected to the right piece of market data held in the historical time series database. We were unable to establish whether there are any checks on the accuracy of the mappings and the accuracy of the data.

    c.  Market data completeness and accuracy. We discussed controls around the accuracy of market data. We expect to see a process around cleaning and signing off that critical market data is accurate. We did not see evidence that such a process is in place.

K.  Internal Audit

    a.  In the meetings with Internal Audit, we discussed their work in relation to the BIPRU 7.10 internal audit requirements. This work is due to finish later this year. Please let us know when this work is expected to be completed and provide an update on work they have already finished.

BEAR 01652030

Please copy this letter to your external auditors.   Where this letter asks for specific information, please provide this information along with the other requested information one week before the next week of on-site review work.

If you have any questions please contact myself or Jon Hollis on 020 7066 1614.

Regards,

Einar Holstad

Traded Risk Team, FSA

Cc. Andy Murfin, FSA; Mark Pearlman, Bear Stearns

CONFIDENTIAL

BEAR 01652031

# EXHIBIT 7

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

**CONTACT:  JEFFREY FARBER; TELEPHONE NUMBER: (212) 272-6631;
FACSIMILE: (212) 272-5921**

January 31, 2008

Mr. John Cash
Accounting Branch Chief
Division of Corporation Finance
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

Re:    **The Bear Stearns Companies Inc.
Form 10-K filed February 13, 2007
File No. 1-8989**

Dear Mr. Cash:

This letter is in response to your letter dated September 27, 2007 regarding the aforementioned filing of The Bear Stearns Companies Inc. (together with its consolidated subsidiaries, the "Company" or "Bear Stearns"). Our responses repeat the captions and comments contained in your letter of September 27, 2007.

As you requested in your letter dated September 27, 2007 we acknowledge the following:

- We are responsible for the adequacy and accuracy of the disclosure in our filings;

- The staff comments or changes to disclosure in response to staff comments do not foreclose the Commission from taking any action with respect to the filing; and

- We may not assert staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

1

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

John Cash
United States Securities and Exchange Commission

## Form 10-K for the Fiscal Year Ended November 30, 2006

### Note 1. Summary of Significant Accounting Policies, page 84
### General

1.      Please consider revising future filings to include more of a comprehensive
description of your revenue recognition policy for each source of revenue and to present
the policies in one location. Also, please specifically explain to us your revenue
recognition policies for performance incentive fees and tell us where you provided the
disclosures required by EITF D-96 or explain why the disclosures are not applicable.

**Bear Stearns Response:**

As requested by the Staff, beginning with our Quarterly Report on Form 10-Q for the
quarter ended August 31, 2007, which was filed on October 10, 2007, we began
presenting our comprehensive revenue recognition policies in one location in Note 1,
Summary of Significant Accounting Policies.

We accrue performance incentive fees throughout the year based on a fund's performance
to date against specified performance targets.  Performance incentive fees are typically
not finalized until the end of the contract period (which is normally the end of the
calendar year).  We record the amount due at each interim date. Amounts accrued at
interim dates are reversed at the next interim date if that performance level is not
maintained.  Our revenue recognition policy for performance incentive fees appears in
Note 1, Summary of Significant Accounting Policies, (page 82) in the Company's Annual
Report on Form 10-K. As of November 30, 2006, we had accrued performance fees
through the year end. By December 31, 2006, we knew the final level of performance
incentive fees. The amount accrued for performance incentive fees was not significantly
different from the actual amount of performance incentive fees. Accordingly, disclosure
of future performance contingencies was unnecessary.

### Note 5. Transfers of Financial Assets and Liabilities, page 94

2. We note that you have interests in what you describe as "subprime" residential
mortgages, however, it does not appear to us that your filing fully clarifies your exposure
to subprime loans.

Although there may be differing definitions of subprime residential mortgages, they are
sometimes recognized to be loans that have one or more of the following features:

- A rate above prime to borrowers who do not qualify for prime rate loans;
- Borrowers with low credit ratings (FICO scores);

2

DT_JK_000003593

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

- Interest-only or negative amortizing loans;
- Unconventionally high initial loan-to-value ratios;
- Low initial payments based on a fixed introductory rate that expires after a short initial period then adjusts to a variable index rate plus a margin for the remaining term of the loan;
- Borrowers with less than conventional documentation of their income and/or net assets;
- Very high or no limits on how much the payment amount or the interest rate may increase at reset periods, potentially causing a substantial increase in the monthly payment amount and/or;
- Including substantial prepayment penalties and /or prepayment penalties that extend beyond the initial interest rate adjustment period.

Based on your current public disclosures, it is possible that more clarity about your exposure to subprime loans could be helpful. Regardless of materiality of your exposure, we respectfully request that you provide us with the supplemental information about your involvement in subprime loans.

Preface your response by how you specifically define your subprime loans in practice, if at all. However, we ask that you consider the above definition, in general, as part of your response. In other words, we request that the information you provide be based, more or less, on the above definition. Where it does not, please provide specific guidance. Also, we may ask for information which may be hard for you to provide on a timely basis. Please consider alternative information that may address the concern, at least in part, but which can be readily provided.

**2. Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 1:[1]**

We define residential mortgage lending principally based upon the qualifications of the borrower, rather than the attributes of the loan. Subprime mortgage loans are originated or purchased based on the then current underwriting or sellers' guidelines that we have established. These guidelines evolve as historical performance is evaluated or as market conditions dictate. Subprime loans have generally been loans to borrowers with FICO scores of ▓▓▓ or less, however, other factors are considered.

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 2:[2]**

---

[1] The Company requests that the highlighted information contained in Request Number 1 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.
[2] The Company requests that the highlighted information contained in Request Number 2 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

3

DT_JK_000003594

FICO scores and prior mortgage or rent payment histories are the main drivers of a subprime designation. Borrowers that have had a foreclosure ("FC") within the last ▊▊ months or a bankruptcy ("BK") in the last ▊▊ months are designated as subprime regardless of the FICO score. Other considerations include borrower's reserve funds, residual household income and debt to income ratio. Loans designated as subprime may have some of the features you noted above, however, the presence of these features may not in and of themselves, warrant a subprime designation.

## RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 3:[3]

The Company maintains a product matrix that presents the maximum loan-to-value (LTV) ratio and maximum loan amount allowed for different documentation types, credit grades, BK/FC seasoning and FICO scores. Under current guidelines for full documentation loans, the maximum LTV is ▊▊%. Credit grades are determined based upon the number of ▊▊ day delinquencies for mortgage or rent payments. The minimum FICO score allowed is ▊▊▊.

The Company offers fixed rate and adjustable rate mortgage loans to subprime borrowers. Interest-only features are available to both types with specific qualifications.

In direct response to your definitional points above, we would not consider interest-only, or unconventionally high LTVs to be subprime loans unless accompanied by low FICO score, delinquent payment history, bankruptcy or foreclosure. Historically we have not offered a negative amortization feature in our subprime loans. Additionally, light documentation of income or net assets, low initial rates, high payment increases or prepayment penalties are not determinants of subprime, but may be features of a loan that is subprime.

During 2005 and 2006 the majority of our subprime production was hybrid ARMs, such as 2/28 ARMs. During 2007 our production of hybrid ARMs decreased as our production of 30 year fixed rate loans increased.

Our responses to the Comment Letter requests for data related to subprime residential mortgages are based upon our definition above. For your convenience, we have repeated each of the staff's points below in order of appearance within the Comment Letter and have keyed our responses accordingly.

2. (a) - (l) Please provide us with a comprehensive analysis of your exposure to subprime loans. In particular:

---

[3] The Company requests that the highlighted information contained in Request Number 3 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

4

DT_JK_000003595

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

2. (a) Provide us with your risk management philosophy as it specifically relates to subprime loans. Please address:

- Your origination policies;
- The purchase, securitization and retained interests in loans;
- Investments in subprime mortgage-backed securities; and
- Loans, commitments, and investments to/in subprime lenders.

**2. (a) Bear Stearns Response:**

Origination, Purchase and Securitization:

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 4:[4]**

The Company provides residential mortgage loans for securitizations with the resulting mortgage-backed securities sold to investors. These loans are sourced through our subsidiaries - EMC Mortgage Corporation ("EMC") and Bear Stearns Residential Mortgage Corporation ("BSRM"). We only originate or purchase mortgage loans that can be sold into securitization structures. The pricing at the time of origination or purchase is impacted by the expected exit price through securitization. EMC and BSRM each have subprime underwriting guidelines that represent the standards and practices that apply to each loan. All guidelines are periodically amended as historical performance is evaluated or as market conditions dictate. As a result of changes to our guidelines and market conditions, subprime production was reduced to $9.3 billion in 2006 from $14.9 billion in 2005. Throughout 2007, tightened guidelines produced higher quality loans in EMC and BSRM. For example, our subprime LTV went from 82.02% for the quarter ended February 28, 2007 to 76.93% for the quarter ended August 31, 2007. In addition, the percentage of loans closed with "full documents" went from 51.33% to 74.44% for the same time period.

Due diligence is performed on all loans internally or by an independent third party diligence firm prior to purchase or origination for acceptability of credit, collateral and compliance guidelines. Loan packages generally include an application completed by the borrower that provides information with respect to the applicant's liabilities, income, credit history and employment history, as well as certain other personal information (except under reduced documentation programs such information may not be independently verified). The mortgage loan file also contains a credit report on each applicant from an approved credit reporting company. Credit history is measured on credit depth, number of obligations, delinquency patterns and demonstrated intent to repay reports.

---

[4] The Company requests that the highlighted information contained in Request Number 4 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

5

DT_JK_000003596

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 5:[5]**

All loans purchased or originated must be in compliance with applicable federal and state laws and regulations and require a full appraisal of the mortgaged property. Under our guidelines, the maximum allowable LTV ratio varies based upon the income documentation, property type, creditworthiness, debt service-to income ratio of the applicant and the overall risks associated with the loan decision. As of August 31, 2007, our guidelines provided that maximum LTV was ▓▓▓▓. In addition, we conduct a fraud check, through either Interthinx DISSCO or DataVerify's DRIVE, to verify the borrower's social security number and name as well as provide chain of title information and possible undisclosed debts.

Each mortgaged property relating to an EMC or BSRM mortgage loan has been appraised by a qualified independent appraiser who is approved by each lender. All appraisals generally conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Also, appraisals are generally in conformity with the requirements of Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraised value will generally have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used.

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 6:[6]**

We approve all of our mortgage brokers and sellers. For brokers this process includes accessing reference and credit history of brokers and correspondents from Market Asset Research Institute (MARI) for the initial approval review and on an on going basis to monitor changes. We also review financial information and licenses. In addition, we perform a recertification process annually. We require prospective sellers to have a minimum net worth of ▓▓▓▓▓▓▓ with at least ▓▓▓ years experience originating subprime loans. They must be HUD approved. Prospective sellers must provide principal party resumes, most recent audited financial statements, have applicable state licensing and insurance, provide quality control reports and policies and procedures. We perform background checks using D&B, MARI, Factiva, etc. We also perform continual seller

---

[5] The Company requests that the highlighted information contained in Request Number 5 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.
[6] The Company requests that the highlighted information contained in Request Number 6 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

6

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

monitoring and an annual recertification.  In addition, we conduct ongoing portfolio performance monitoring of both brokers and sellers for early payment defaults, early payoffs, delinquencies and repurchases.  We suspend and/or terminate brokers and sellers for poor performance.

Retained interests in loans and investments in subprime mortgage securities:
Our objective is to securitize all originated and purchased loans.  All securitized retained interests from our subprime originations are recorded as financial instruments owned, at fair value, along with any other investments in subprime securities purchased through our trading operations.  Fair value is determined based on the net present value of a future stream of cash flows.  Econometric models are used by the trading desk and risk management to generate these expected cash flows.  Such models are primarily industry standard models that consider various assumptions, including time value, yield curve, volatility factors, prepayment speeds, default rates, loss severity, as well as other relevant economic factors.  A degree of subjectivity is required to determine the appropriate models or methodologies as well as the appropriate underlying assumptions.

## RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 7:[7]

Our models are estimated on a data sample of over 4.5 million loans with performance history extending more than ten years.  To better capture the impact of risk layers in mortgage loans, these models are estimated and implemented at the loan level.  The underlying structure of the model is a competing hazards model with the prepayment and charge-off as the two possible terminal states for a mortgage.  The model parameters are recalibrated on a regular basis to reflect the most recent data.  A key input to these models is home price projections.  Over the last year, we have developed a model in conjunction with Moody's Economy.com that provide MSA (Metropolitan Statistical Area) level home price forecast consistent with economic projection for wage, employment and population at the local and national level.

Risk limits are established for residential loans and mortgaged backed securities which dictate the level of market risk and position size a trader is allowed to maintain, including the impact of their related hedges.  Traders hedge both interest rate and credit exposure.  Interest rate hedges include interest rate swaps and credit hedges include both ABX indices and single name credit default swaps.  Risk reports are reviewed daily by senior trading and risk management.

Loans, commitments and investments to/in subprime lenders:
The Company provides financing of subprime whole loan collateral to its counterparties, through warehouse facilities and reverse repurchase agreements.  An in depth credit approval process for all warehouse clients and reverse repo clients is done prior to giving a term sheet and signing the Master Repurchase Agreement.  This credit analysis includes

---

[7] The Company requests that the highlighted information contained in Request Number 7 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

7

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

a review of operating profile, financial data and on-site due diligence by the Global Credit Department, Finance Desk, and Warehouse Finance.

During normal operation of business there is a review of all loan level data prior to funding on the warehouse line to determine that all collateral conforms to the credit approval guidelines for that lender as well as a review that the loan data meets our compliance guidelines.  Advance rates are determined by the quality of the underlying collateral as well as the creditworthiness of the counterparty.  The loan collateral is pledged to us under the terms of the Master Repurchase Agreement and in many cases, credit enhancement is received from the borrowers' corporate parent.

The loan data file is priced with each funding or payoff and monitored daily by our warehouse group.  Changes to the market or a particular lender would also require the trading desk to re-price the loans. Each month the collateral is reviewed for aging and delinquency which may require that loans are removed from the warehouse line.

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 8:[8]**

The Company also provides financing for securities backed by subprime collateral.  Our Global Credit Department sets reverse repurchase ("repo") credit limits based on the credit quality and funding capacity of the counterparties who enter into these transactions with us.  Global Credit conducts periodic credit reviews of all counterparties with repo limits based on the department's assessment of the financial condition of the counterparty, industry conditions, management and other factors relevant to the counterparty's ability to meet its obligations.  This credit opinion is expressed in the form of a numerical internal credit rating and aggregate credit risk limit.  A product limit for repo includes notional amount lent, term of trade and a measure of stress loss exposure after collateral.  Our Finance Desk, in consultation with Global Credit is responsible for approving individual securities and associated advance rates against this collateral to meet over-collateralization requirements.  Our Finance Desk is also responsible for obtaining daily market prices of the securities and making margin calls when aggregate collateral value declines.  The average margin for various collateral types are as follows:

| Security Rating | Current Margin Requirement | Margin Requirement August 2007 |
|---|---|---|
| AAA | 10-15% | 8.5% |
| AA | 15-20% | 10% |
| A | 25-30% | 15% |
| BBB | 50-60% | 20% |
| BB | 50% | 30% |

---

[8] The Company requests that the highlighted information contained in Request Number 8 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

8

DT_JK_000003599

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

| B | 50-60% | 40% |
| Unrated | 50-75% | 50% |

2. (b) Quantify your portfolio of subprime residential mortgages. If practicable, please breakout the portfolio to show the underlying reason for subprime definition, in other words, subject to payment increase, high LTV ratio, interest only, negative amortizing, and so on.

**2. (b) Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 9:[9]**

We define residential mortgage lending principally based upon the qualifications of the borrower, rather than the attributes of the loan.  Subprime mortgage loans are originated or purchased based on the then current underwriting or sellers' guidelines that we have established.  These guidelines evolve as historical performance is evaluated or as market conditions dictate.  Subprime loans have generally been loans to borrowers with FICO scores of 620 or less, however, other factors are considered, as discussed in our response to question 2 above.

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 10:[10]**

The Company's inventory of subprime mortgage loans is stated at fair value.  Total fair value of subprime mortgage loans owned as of November 30, 2006 was $4.1 billion.  As of August 31, 2007 the total fair value was approximately $1.3 billion and it consisted of $683 million in hybrid ARMs and $604 million in fixed rate loans.

Because we define subprime residential mortgage lending based primarily upon the borrower's ability to repay the debt, rather than the attributes of the loan, we do not in the ordinary course of business maintain our portfolio of subprime residential mortgage lending based upon the characteristics listed in the Comment Letter's request.

2. (c) Quantify the following regarding subprime residential mortgages.  Explain how you define each category:
- Non-performing loans;
- Non-accrual loans;
- The allowance for loan losses, and;
- The most recent provision for loan losses.

---

[9] The Company requests that the highlighted information contained in Request Number 9 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.
[10] The Company requests that the highlighted information contained in Request Number 10 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

9

DT_JK_000003600

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

**2. (c) Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 11:[11]**

Non performing and non accrual loans are carried at fair value. Non performing and non accrual loans are defined as loans for which the principal and interest payment has not been received 90 days past its due date. At this point, the interest receivable balance is 100% reserved. The unpaid principal balance of non performing subprime loans and the related fair value as of November 30, 2006 were $145 million and $116 million respectively. The unpaid principal balance and the related fair value as of August 31, 2007 were $172 million and $124 million, respectively.

2. (d) Quantify the principal amount and nature of any retained securitized interest in subprime residential mortgages.

**2. (d) Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 12:[12]**

Our retained interests in subprime securitizations are comprised of investment grade and non investment grade securities that are carried at fair value. The underlying assets are subprime residential loans or ABS CDOs whose ultimate underlying assets are subprime residential loans. The fair value of these retained interests as of November 30, 2006 and August 31, 2007 were $370 million and $770 million, respectively. Please see the table below:

| Investment Grade (in millions) | 8/31/07 | 11/30/06 |
|---|---|---|
| AAA | $316.7 | $71.5 |
| AA | 126.1 | 20.1 |
| A | 96.4 | 19.9 |
| BBB | 75.4 | 48.4 |
| Total Investment Grade | $614.6 | $159.9 |

| Non Investment Grade (in millions) | 8/31/07 | 11/30/06 |
|---|---|---|

---

[11] The Company requests that the highlighted information contained in Request Number 11 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.
[12] The Company requests that the highlighted information contained in Request Number 12 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

10

DT_JK_000003601

| | | |
|---|---|---|
| BB | $ 19.7 | $ 49.4 |
| Unrated | 135.2 | 161.2 |
| Total Non Investment Grade | $154.9 | $210.6 |
| Total | $769.5 | $370.5 |

We typically hedge our cash subprime exposure with a combination of ABX index and single name credit default swaps (CDS).  At August 31, 2007 our subprime exposure was reduced by our $1.7 billion net short CDS position. This short CDS position hedges both our subprime retained securitized interests described here as well as the subprime exposure described in item 2 (e).

2. (e) Quantify your investments in any securities backed by subprime mortgages.

**2. (e) Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 13:[13]**

Our investments in securities backed by subprime loans are included in "Financial instruments owned, at fair value" or "Financial instruments owned and pledged as collateral, at fair value" on the Consolidated Statement of Financial Condition. They are comprised of investment grade and non investment grade securities.  The underlying assets are subprime residential loans or ABS CDOs whose ultimate underlying assets are subprime residential loans.  The fair value of investments in these securities as of November 30, 2006 and August 31, 2007 were $1.1 billion and $2.2 billion, respectively.

2. (f) Quantify the current delinquencies in retained securitized subprime residential mortgages.

**2. (f) Bear Stearns Response:**

There are two standards for reporting delinquency status.  The first is known as the OTS/FFIEC rule.  Essentially, a loan increases its delinquency status if a monthly payment is not received by the loan's due date in the following month.  The second method is known as the Mortgage Bankers Association (MBA) method.  In this calculation, a loan increases its delinquency status if a monthly payment is not received by the end of the day immediately preceding the loan's next due date.  This measurement distinction is important because the MBA calculation is the standard in the "prime" mortgage markets, while the OTS calculation is the standard used in "non-prime" (subprime, Alt-A, home equity, etc.) markets.

---

[13] The Company requests that the highlighted information contained in Request Number 13 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

11

DT_JK_000003602

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 14:[14]**

As of August 31, 2007, we have retained interests with a fair value of $770 million from subprime securitization trusts.  Using the OTS methodology, delinquency is defined as 60+ days delinquent, foreclosures and REOs.  As of August 31, 2007, the average delinquency of these trusts was 18.22%.

2. (g) Quantify any write-offs/impairments related to retained interests in subprime residential mortgages.

**2. (g) Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 15:[15]**

The Company's inventory of retained interests in subprime securitizations is stated at fair value with resulting net unrealized gains and losses reflected in "Principal Transactions" in the Consolidated Statements of Operations.  Our retained interests in subprime securitizations loans are comprised of investment grade and non investment grade securities.  The underlying assets are subprime residential loans or ABS CDOs whose ultimate underlying assets are subprime residential loans.   As of November 30, 2006, our retained interests reflected unrealized losses of $2.6 million.  As of August 31, 2007, our retained interests reflected unrealized losses of $189.4 million.

2. (h) Please address all involvement with special purpose entities or variable interest entities and quantify the subprime exposure related to such entities, regardless of whether they are consolidated for the purposes of generally accepted accounting principles.

**2. (h) Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 16:[16]**

The Company has securitized through SPEs $8.0 billion of subprime residential mortgage loans for fiscal year ended November 30, 2006 and $6.7 billion of subprime residential mortgage loans for the nine months ended August 31, 2007. In the normal course of business, our ongoing involvement with such SPEs and other SPEs which have

---

[14] The Company requests that the highlighted information contained in Request Number 14 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.
[15] The Company requests that the highlighted information contained in Request Number 15 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.
[16] The Company requests that the highlighted information contained in Request Number 16 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

12

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

securitized subprime mortgage loans consists primarily of mortgage loan servicing and
derivative transactions.

## RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 17:[17]

As of November 30, 2006 and August 31, 2007, we were servicing subprime mortgage
loans with an unpaid principal balance of $17.5 billion and $18.6 billion, respectively.

## RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 18:[18]

The Company enters into derivative transactions with SPEs (ABS CDOs) which
reference subprime securities (ABS CDS). ABS CDOs accumulate exposure to subprime
assets either by purchasing subprime securities (Cash ABS CDOs) or by selling credit
protection on subprime reference assets (Synthetic ABS CDOs). In the latter case the
Syntheitic ABS CDO will have cash to invest from the proceeds of notes they have sold
to investors. The ABS CDO will use this cash to invest in AAA collateral which may in
addition be wrapped (*i.e.*, guaranteed) by a third party. This collateral is used to pay any
losses related to the CDS contracts and whatever remains will be paid back to
noteholders. In a typical Synthetic ABS CDO, the payments due to the credit derivative
counterparty are senior, in terms of cash flow priority, to all certificate holders. As the
credit derivative counterparty who has bought protection from the Synthetic ABS CDO
we are therefore relying on this collateral to pay any claims we may make under our CDS
trades. We therefore typically incorporate various contractual terms relating to the
collateral in which the CDO's note proceeds may be invested, including for example
limitations on the kinds of securities which are eligible, the requirement that the securities
be marked to the market regularly with any discount to par made up by the wrapper, and
the requirement that the wrapper find a replacement for itself at its own cost if it is
downgraded below a certain level. We monitor compliance with these terms as part of
our ongoing credit risk management process. As of August 31, 2007, we bought
protection from SPEs on a notional value of $5.4 billion, resulting in a fair value
receivable of $1.9 billion. In some cases we may ourselves provide the wrap on the
collateral within the Synthetic ABS CDO via a total return swap. The swap pays the
CDO a LIBOR based return, guarantees to make up any shortfall relative to par, and is
entitled to receive any premium to par, when the collateral is sold. As of August 31,
2007, the notional value of these total return swaps were $1 billion, representing a fair
value payable of $2.3 million.

---

[17] The Company requests that the highlighted information contained in Request Number 17 be
treated as confidential information and that the Commission provide timely notice to the contact
person identified on Page 1 before it permits any disclosure of the highlighted information.
[18] The Company requests that the highlighted information contained in Request Number 18 be
treated as confidential information and that the Commission provide timely notice to the contact
person identified on Page 1 before it permits any disclosure of the highlighted information.

13

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

## RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 19:[19]

In addition to buying protection from Synthetic ABS CDOs which are accumulating subprime exposure, we will occasionally purchase interests issued by the ABS CDO. These purchased interests may include synthetic superior CDS.  In these cases the Synthetic ABS CDO sells notes to investors for a portion of the total notional of protection it has sold and invests the proceeds in collateral as described above.  For the remaining part of the notional it buys super senior protection rather than selling notes.  If losses on the protection it has sold exceed the amount of the notes, the counterparty to the super senior protection purchased is responsible for making up any further losses.  As of August 31, 2007, the notional value of these synthetic super senior interests were $3.0 billion, representing a fair value payable of ($0.3) billion.  Approximately 90% of our market risk on this synthetic super senior risk has been sold to other, non-SPE, counterparties.

The Company will also enter into derivative transactions with SPEs where the derivative itself does not reference subprime securities but the SPE may have subprime exposure.  SPEs through which subprime assets are securitized may use different forms of interest rate derivatives, primarily swaps and caps, to manage interest rate risk.  We are typically the interest rate derivative counterparty for our own subprime securitizations and may act as swap counterparty for other subprime securitizers transactions.  The payments due to the swap counterparty are senior, in terms of cash flow priority, to all certificate holders.

## RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 20:[20]

In April 2006, the Company established a SPE which purchased residual interests of subprime securitizations and sold interests in the SPE to investors.  In order to provide investors with a levered return, we also provided a loan to the SPE which was collateralized by the subprime residual interests.  As of November 30, 2006, our loan to the SPE was $24.1 million collateralized by subprime residual interests with a fair value of $48.7 million.  As of August 31, 2007, our loan to the SPE was $83.2 million collateralized by subprime residual interests with a fair value of $93.3 million.

2. (i) Please quantify and describe any and all potential repurchase commitments you may have regarding subprime residential mortgages.

**2. (i) Bear Stearns Response:**

---

[19] The Company requests that the highlighted information contained in Request Number 19 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.
[20] The Company requests that the highlighted information contained in Request Number 20 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

14

DT_JK_000003605

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

The Company provides mortgage loan representations and warranties in connection with our mortgage loan securitizations. If a representation or warranty is breached and the breach is not cured within the time period specified by the Pooling and Servicing Agreement for that securitization trust, we have the obligation to repurchase the loan with the breach at the price it was sold into the securitization trust, plus related expenses. To mitigate these risks we perform due diligence on assets purchased and maintain underwriting standards for assets originated. In addition, with respect to assets that have been originated by third parties, we seek to obtain appropriate representations from such third-party originators upon the acquisition of such assets.

If a mortgage loan was originated by us and sold into a securitization, management will estimate our exposure for potential repurchases related to breaches of representations and warranties. Also, if we sold a subprime mortgage loan originated by a third party into a securitization and we believe such third party may not fulfill its obligations to repurchase the related subprime mortgage loan which has had a breach, management will estimate our exposure for potential repurchases. We have recorded liabilities for exposures to these potential obligations

The maximum potential amount of future payments we could be required to make would be equal to the current outstanding balance of all subprime loans we sold into securitizations. However, based on our experience, it is unlikely that these arrangements will have a material impact on the consolidated financial statements of the Company.

We do not provide any early period default ("EPD") protection for subprime loans sold into subprime securitizations and therefore have no potential repurchase commitments related to EPD.

2. (j) Quantify and describe any loans to, commitments in, or investments in subprime lenders. Describe any other potential exposures you may be subject to, such as repurchase commitments related to the receipt of assets in bankruptcy, for example.

**2. (j) Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 21:[21]**

The Company provides financing of subprime collateral to its counterparties. Through warehouse lending facilities, the Company provides loans to subprime mortgage originators and investors collateralized by newly originated subprime mortgage loans. As of November 30, 2006, we had customer facilities of $7.3 billion of which $2.3 billion was funded. As of August 31, 2007, we had customer facilities of $27.8 million of which $1.6 million was funded. In addition, we provide funding to investors

---

[21] The Company requests that the highlighted information contained in Request Number 21 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

15

DT_JK_000003606

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

collateralized by subprime loans.  As of August 31, 2007, we had total facilities of $1.9 billion of which $992 million was funded.

## RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 22:[22]

Additionally, the Company provides financing for it's customers through collateralized reverse repurchase agreements.  These reverse repurchase agreements are collateralized by mortgage-backed securities whose underlying assets consist of subprime residential loans or, ABS CDOs whose ultimate underlying assets are subprime residential loans. As of November 30, 2006 and August 31, 2007, the amount outstanding under these reverse repurchase agreements was $1.5 billion and $1.3 billion, respectively.

We do not have any investments in any subprime lender, other than our wholly owned subsidiaries.

2. (k) Quantify your revenues from involvement in subprime loans.  Breakout such revenues based on fees, interest earned, servicing rights and other sources.

## 2. (k) Bear Stearns Response:

## RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 23:[23]

The Company's inventory of mortgage loans and securities is stated at fair value. Realized and unrealized gains and losses, fees, interest earned are reflected in "Principal Transactions" in the Consolidated Statements of Operations.  Resulting revenues are below:

| Revenues | FY 2004 (000) | FY 2005 (000) | FY 2006 (000) | FYTD 3rd Q 2007 (000) | |
|---|---|---|---|---|---|
| Loans & Securitization | $124,884 | $82,015 | $71,976 | ($37,990) | |
| Servicing | $10,362 | $44,002 | $78,580 | $77,396 | |
| Warehouse Finance | $6,678 | $14,189 | $15,828 | $12,494 | |
| Total | $141,925 | $140,806 | $166,384 | $52,500 | |

---

[22] The Company requests that the highlighted information contained in Request Number 22 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.
[23] The Company requests that the highlighted information contained in Request Number 23 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

16

DT_JK_000003607

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR STEARNS COMPANIES INC.; REQUEST NUMBER 24:[24]**

In addition, the Company has revenue of ▨▨▨ million for fiscal 2005, ▨▨▨ million for fiscal 2006 and losses of ▨▨▨ million for the third quarter of fiscal 2007 from CDOs with subprime collateral.

As a matter of course, we do not track our secondary trading revenue by asset class, such as securities backed by subprime residential mortgage loans. Therefore, these revenues are not reflected above.

2. (l) Where we have asked you to quantify amounts as of a point in time, please do so as of the end of your last full fiscal year and as of the most recent date practicable. Where we have asked you to quantify amounts for a period, please provide this for the last three full fiscal years and any more recent period if practicable. If you believe that you have provided any of the information requested in public filings please direct us to such disclosures.

The above list is not intended to be all encompassing. To the extent that you are aware of other asset quality or performance information, or other factors that provide material information about your involvement with subprime residential mortgage loans, please provide that information as well.

If you believe that a material adverse impact on your financial condition, results of operations or liquidity, resulting from your involvement in subprime lending, is remote, please explain. If so, tell us what consideration you may give to a more transparent disclosure about this to inform readers of your level of involvement.

If you believe that a material adverse impact resulting from this exposure is reasonably possible, tell us what disclosures you may consider in order to provide a clearer understanding of this exposure.

**2. (l) Bear Stearns Response:**

We believe that based on the Company's level of involvement in subprime lending and the broader impact on global credit markets, a material adverse impact on the Company's financial condition, results of operations or liquidity is reasonably possible (*i.e.*, the chance of a future event or events occurring that will result in a material adverse impact is more than remote but less than likely). In future filings, we will consider our level of involvement in subprime lending, and we will seek to enhance our disclosure of positions which drive such exposures, if necessary.

**Note 13, Stock Compensation Plans, page 104**

---

[24] The Company requests that the highlighted information contained in Request Number 24 be treated as confidential information and that the Commission provide timely notice to the contact person identified on Page 1 before it permits any disclosure of the highlighted information.

17

DT_JK_000003608

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

3. Please clarify for us how you concluded that, in years prior to fiscal 2006, it was appropriate to include stock-based compensation granted in December in stockholders' equity at November year end.

**Bear Stearns Response:**

We have historically finalized our stock-based compensation in December following the end of the related fiscal year. Grants of stock-based compensation are approved by the Compensation Committee of our Board of Directors in December and employees are generally notified of the grants in the second week of December.

Paragraph 17 of SFAS 123 states that the objective of the measurement process is to estimate the fair value, based on the stock price at the grant date, of stock options or other equity instruments to which employees become entitled when they have rendered the requisite service and satisfied any other conditions necessary to earn the right to benefit from the instruments. Under SFAS 123, the grant of a stock-based award for current service may be the end of the fiscal period instead of a subsequent date when the award is made if (a) the award is provided for by the terms of an established formal plan, (b) the plan designates the factors that determine the total dollar amount of awards to employees for that period, and (c) the award is attributable to the employee's service during that period. Stock-based awards granted under SFAS 123 were based on performance measures under an established formal plan and the dollar amount of stock-based compensation was not adjusted when approved by the Company's Compensation Committee. Additionally, changes in the price of the Company's stock after year end did not affect the amount recognized in the consolidated financial statements. As such, prior to the adoption of SFAS 123R, stock-based compensation granted in December was included in stockholders' equity at November year-end.

The Company adopted SFAS 123R as required on December 1, 2005. SFAS 123R defines the grant date as the date at which an employer and an employee reach a mutual understanding of the key terms and conditions of a share-based payment award. The employer becomes contingently obligated on the grant date to issue equity instruments or transfer assets to an employee who renders the requisite service. Awards made under an arrangement that is subject to shareholder approval are not deemed to be granted until that approval is obtained unless approval is essentially a formality (or perfunctory), for example, if management and the members of the board of directors control enough votes to approve the arrangements. Similarly, individual awards that are subject to approval by the board of directors, management, or both are not deemed to be granted until all such approvals are obtained. The grant date for an award of equity instruments is the date that an employee begins to benefit from, or be adversely affected by, subsequent changes in the price of the employer's equity shares.

The employee does not begin to benefit from and is not adversely impacted by changes in the stock price until the awards are approved by the Compensation Committee. Accordingly, we concluded that the grant date is the date the awards are approved (in

18

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

mid-December). While the grant date is subsequent to year end, the Company accrues the costs of the awards over the service period.

4. With a view towards future disclosure, please explain to us why you classify amounts related to earnings adjustments for CAP units as an "Other Expense" in your Consolidated Statement of Income.

**Bear Stearns Response:**

Our Capital Accumulation Plan ("CAP") provides that outstanding CAP units have an unsecured right to receive, on an annual basis, a participation in income based on a fixed formula ("CAP Earnings"). CAP Earnings are credited to each participant in the form of additional CAP units. We view CAP Plan units as a second class of common stock with a preferred return which participates in earnings based on a fixed formula. CAP Earnings are viewed in a manner similar to an enhanced dividend on an RSU. Additionally, we disclose in the footnotes to our financial statement the following: "Amounts recognized attributable to CAP units with respect to the earnings adjustment are recorded in "Other Expenses" in the Consolidated Statements of Income."

5. With a view towards future disclosure, please explain to us why certain amounts related to your CAP units, restricted stock units and stock option awards are included in Accrued Employee Compensation and Benefits in your Consolidated Statement of Financial Condition.

**Bear Stearns Response:**

As discussed in our response to question #3 above, we adopted SFAS 123R as required on December 1, 2005. In accordance with SFAS 123R, we concluded that the grant date is the date the awards are approved by the Compensation Committee. While the grant date was subsequent to November 30, 2006, the Company accrued the costs of the awards over the service period (fiscal 2006). If the stock-based compensation awards were not approved by the Compensation Committee, such value would have been paid in cash. These costs were reflected in "Accrued Employee Compensation and Benefits" in the Consolidated Statement of Financial Condition as of November 30, 2006. Upon approval by the Compensation Committee in mid December (grant date), the amounts accrued with respect to fiscal 2006 awards were reclassified to "Employee Stock Compensation Plans" on the Consolidated Statement of Stockholders' Equity.

Beginning with the stock-based compensation awards granted in December 2007 under the CAP Plan and the Restricted Stock Unit Plan, the Company adopted a three year requisite service period. As a result of this change, the costs related to these awards will no longer be accrued in "Accrued Employee Compensation and Benefits" in the Consolidated Statement of Financial Condition."

**Note 17. Commitments and Contingencies, page 113**

19

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

6. We note your disclosures here and under legal proceedings, including your disclosure
   that you cannot estimate losses or ranges of losses for matters where
   there is only a reasonable possibility that a loss may have been incurred. Given the
   number of proceedings identified and the length of time some of those proceedings
   have been in process, it is unclear to us why you do not have the ability to provide
   any quantitative disclosures required by paragraph 10 of SFAS 5 for at least some of
   the proceedings. In addition, please tell us, and revise future filings to disclose, the
   amounts accrued related to contingencies at each balance sheet date and the amounts
   expensed or reversed during each period.

**Bear Stearns Response:**

**RULE 83 CONFIDENTIAL TREATMENT REQUEST MADE BY THE BEAR
STEARNS COMPANIES INC.; REQUEST NUMBER 25:[25]**

The Company records loss accruals for litigation matters meeting the SFAS 5 criteria of a
probable loss and for which the loss amount can be reasonably estimated. The amount
reserved for these legal matters as of November 30, 2006 was $145 million. This amount
was not disclosed as it was not deemed material to the consolidated statement of financial
condition. The amount reserved for legal matters as of November 30, 2005 was $414
million, of which $285 million related to investigations relating to mutual fund trading. In
December 2005, the Company announced an offer of settlement with the SEC and NYSE
for $250 million. This was also disclosed in the Company's Annual Report on Form 10-K
in Note 17, Commitments and Contingencies, in which we stated that the Company was
fully reserved for the settlement. The remaining amount reserved as of November 30,
2005 ($129 million) was not disclosed as it was not deemed material to the consolidated
statement of financial condition. For the year ended November 30, 2006 and 2005, the
net expense related to legal matters was $14 million and $146 million, respectively.

For the litigation matters that met the scope of reasonably possible under SFAS 5 as of
November 30, 2006 and 2005, the Company could not predict with certainty the range of
loss related to such matters, how such matters will be resolved, when they will ultimately
be resolved, or what the eventual settlement, fine, penalty or other relief might be. We do
not believe further disclosure is necessary for the financial statements to be presented
fairly.

---

[25] The Company requests that the highlighted information contained in Request Number 25 be
treated as confidential information and that the Commission provide timely notice to the contact
person identified on Page 1 before it permits any disclosure of the highlighted information.

20

DT_JK_000003611

CONFIDENTIAL TREATMENT REQUESTED BY
THE BEAR STEARNS COMPANIES INC.
BSC--0002

John Cash
United States Securities and Exchange Commission

If you have any questions or require further information, please do not hesitate to contact Jeffrey Farber, Senior Vice President – Finance and Controller, at (212) 272-6631 or me at (212) 272-4390.

Sincerely,

Samuel L. Molinaro, Jr.
Executive Vice President, Chief Financial Officer and Chief Operating Officer

21

DT_JK_000003612

# EXHIBIT 8



U.S. Securities and Exchange Commission

# Office of Inspector General

Office of Audits

# SEC's Oversight of Bear Stearns and Related Entities:

# The Consolidated Supervised Entity Program



September 25, 2008
Report No. 446-A

The SEC believes this report contains
non-public and confidential
Information



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

OFFICE OF
INSPECTOR GENERAL

September 25, 2008

**To:**     Chairman Christopher Cox
Erik Sirri, Director, Division of Trading and Markets
Lori Richards, Director, Office of Compliance Inspections and
Examinations
John White, Director, Division of Corporation Finance
Jonathan Sokobin, Director, Office of Risk Assessment

**From:**   H. David Kotz, Inspector General

**Subject:** Audit of *SEC's Oversight of Bear Stearns and Related Entities: The
Consolidated Supervised Entity Program*, Report No. 446-A

This memorandum transmits the Securities and Exchange Commission, Office of
Inspector General's (OIG) final report detailing the results of our audit on the
SEC's Oversight of Bear Stearns and Related Entities: The Consolidated
Supervised Entity Program. This audit was conducted pursuant to a
Congressional request from Ranking Member Charles E. Grassley of the United
States Senate Committee on Finance.

The final report consists of 26 recommendations that are addressed primarily to
the Division of Trading and Markets (TM). Recommendations 18 and 25 are also
addressed to the Office of Compliance Inspections and Examinations (OCIE) and
Recommendation 19 is also addressed to the Office of Risk Assessment (ORA).
Recommendations 20 and 21 are addressed to the Division of Corporation
Finance (CF), Recommendation 17 is addressed to CF and TM, and
Recommendation 22 is addressed to Chairman Cox.

In response to the draft report, responsible management officials agreed with 21
out of 26 recommendations. TM concurred with 20 of 23 recommendations
addressed to them and disagreed with Recommendations 13, 15, and 16. OCIE
concurred with both recommendations addressed to them. CF concurred with
Recommendation 17, but disagreed with Recommendations 20 and 21.

Your written responses to the draft report, dated August 18, 2008, are included in
their entirety in Appendices VI and VII. In addition, OIG's response to Chairman
Cox's and Management's comments are included in Appendix VIII.

Should you have any questions regarding this report, please do not hesitate to contact me.  During this audit we appreciate the courtesy and cooperation that you and your staff extended to our auditors.

Attachment

cc:  Peter Uhlmann, Chief of Staff, Chairman's Office
     Diego Ruiz, Executive Director, Office of the Executive Director
     Brian Cartwright, General Counsel, Office of General Counsel
     Andrew Donohue, Director, Division of Investment Management
     John Nester, Director Office of Public Affairs
     William Schulz, Office of Legislative and Intergovernmental Affairs
     Bob Colby, Deputy Director, TM
     Daniel Gallagher, Deputy Director, TM
     Shelley Parratt, Deputy Director, CF
     Michael Macchiaroli, Associate Director, TM
     Mary Ann Gadziala, Associate Director, OCIE
     Matthew Eichner, Assistant Director, TM
     John Walsh, Chief Counsel, OCIE
     Thomas K. McGowan, Assistant Director, TM
     Herb Brooks, Assistant Director, TM
     William Lenox, Ethics Counsel, Office of General Counsel
     Denise Landers, Legal Counsel, TM
     Juanita Bishop Hamlett, Branch Chief, OCIE
     Darlene L. Pryor, Management Analyst, Office of the Executive Director
     Other staff who participated in the audit

     Rick Hillman, Managing Director of Financial Markets and Community
           Investment, GAO

# The CSE Program (Including Reviews Performed on Bear Stearns)

## Executive Summary

**Background.**  During the week of March 10, 2008, rumors spread about liquidity problems at The Bear Stearns Companies, Inc. (Bear Stearns).[1]  As the rumors spread, Bear Stearns was unable to obtain secured financing from counterparties.  This caused severe liquidity problems. As a result, on Friday March 14, 2008, JP Morgan Chase & Co. (JP Morgan) provided Bear Stearns with emergency funding from the Federal Reserve Bank of New York (FRBNY).[2]  According to Congressional testimony,[3] after the markets closed on March 14, 2008, it became apparent that the FRBNY's funding could not stop Bear Stearns' downward spiral.  As a result, Bear Stearns concluded that it would need to file for bankruptcy protection on March 17, 2008, unless another firm purchased it.  On Sunday March 16, 2008, (before the Asian markets opened), Bear Stearns' sale to JP Morgan was announced with financing support from the FRBNY.  In May 2008, the sale was completed.

Because Bear Stearns had collapsed, at the time of our fieldwork, there were six holding companies in the Securities and Exchange Commission's (Commission) Consolidated Supervised Entity (CSE) program.  In addition to Bear Stearns, these six holding companies include or included Goldman Sachs Group, Inc. (Goldman Sachs), Morgan Stanley, Merrill Lynch & Co. (Merrill Lynch), Lehman Brothers Holdings Inc. (Lehman Brothers), Citigroup Inc. and JP Morgan.  On September 15, 2008, Lehman Brothers announced that it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch.[4]  Both firms had experienced serious financial difficulties.  Finally, on September 21, 2008, the Board of Governors of the Federal Reserve System (Federal Reserve) approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies with the Federal Reserve as their new principal regulator.  As a result, the future of the CSE program is uncertain.

---

[1]  See Acronyms used in Appendix I.

[2]  The funding was from the Federal Reserve Bank of New York (FRBNY) through JP Morgan Chase & Co. (JP Morgan) to The Bear Stearns Companies, Inc. (Bear Stearns) because JP Morgan, unlike Bear Stearns, could borrow money from the FRBNY.

[3]  Timothy Geithner (President and Chief Executive Officer, FRBNY) and Alan Schwartz (President and Chief Executive Officer of Bear Stearns) before U.S. Senate Committee on Banking, Housing and Urban Affairs on Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators dated April 3, 2008.

[4]  The audit fieldwork was completed prior to these events on September 15, 2008.

Of the seven original CSE firms, the Commission exercised direct oversight over only five firms (Bear Stearns, Goldman Sachs, Morgan Stanley, Merrill Lynch, and Lehman Brothers), which did not have a principal regulator. The Commission does not directly oversee Citigroup Inc. and JP Morgan because these firms have a principal regulator, the Federal Reserve.

The CSE program is a voluntary program that was created in 2004 by the Commission pursuant to rule amendments under the Securities Exchange Act of 1934.[5]  This program allows the Commission to supervise these broker-dealer holding companies on a consolidated basis.  In this capacity, Commission supervision extends beyond the registered broker-dealer to the unregulated affiliates of the broker-dealer to the holding company itself.  The CSE program was designed to allow the Commission to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place United States regulated broker-dealers and other regulated entities at risk.

A broker-dealer becomes a CSE by applying to the Commission for an exemption from computing capital using the Commission's standard net capital rule, and the broker-dealer's ultimate holding company consenting to group-wide Commission supervision (if it does not already have a principal regulator).  By obtaining an exemption from the standard net capital rule, the CSE firms' broker-dealers are permitted to compute net capital using an alternative method.  The Commission designed the CSE program to be broadly consistent with the Federal Reserve's oversight of bank holding companies.

Bear Stearns' main activities were investment banking, securities and derivatives sales and trading, clearance, brokerage and asset management.  Bear Stearns was highly leveraged with a large exposure (*i.e.,* concentration of assets) in mortgage-backed securities.  Bear Stearns had less capital and was less diversified than several of the other CSE firms.

The Commission stated that Bear Stearns' unprecedented collapse was due to a liquidity crisis caused by a lack of confidence.  Chairman Christopher Cox described Bear Stearns as a well-capitalized and apparently fully liquid major investment bank that experienced a crisis of confidence, denying it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.[6]

---

[5]  Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428).  Securities and Exchange Commission (Commission).  21 June 2004.
<http://www.sec.gov/rules/final/34-49830.htm>.
[6]  Source: Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators Before United states (U.S.) Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

**Congressional Request.** On April 2, 2008, the Office of Inspector General (OIG) received a letter from Ranking Member Charles E. Grassley of the United States Senate Committee on Finance, requesting that the OIG analyze the Commission's oversight of CSE firms and broker-dealers subject to the Commission's Risk Assessment Program.[7] This letter noted that the Commission's Division of Trading and Markets (TM) was responsible for regulating the largest broker-dealers, and their associated holding companies. The letter requested a review of TM's oversight of the five CSE firms it directly oversees, with a special emphasis on Bear Stearns. The letter requested that the OIG analyze how the CSE program is run, the adequacy of the Commission's monitoring of Bear Stearns, and make recommendations to improve the Commission's CSE program.

The United States Senate Committee on Finance letter also requested that the OIG provide an update of findings made in its previous audit report on the Commission's Broker-Dealer Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report no. 354, issued on August 13, 2002).[8]

**Audit Objectives.** In response to the April 2, 2008 Congressional Request, the OIG conducted two separate audits with regard to the Commission's oversight of Bear Stearns and related entities. This audit's objectives were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

The OIG performed a second audit on the Commission's Broker-Dealer Risk Assessment Program to follow up on the current status of recommendations made in the OIG's prior audit report of the Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report no. 354, issued on August 13, 2002) and to examine the Broker-Dealer Risk Assessment program to determine whether improvements are needed. The Commission's Risk-Assessment program tracks the filing status of 146 broker-dealers that are part of a holding company structure and have at least $20 million in capital. The Risk Assessment Program report found that TM is not fulfilling its obligations in accordance with the underlying purpose of the Broker-Dealer Risk Assessment program in several respects. TM has failed to update and finalize the rules governing the program, TM has not enforced the filing requirement incumbent on broker-dealers, resulting in the failure of nearly one-third of the required firms to file 17(h) documents, TM has not yet determined whether the two remaining Bear Stearns' broker-dealers are obligated to file Form 17-H, and TM only

---

[7] A copy of this request letter is attached to this report in full in Appendix II.

[8] The U.S. Senate Committee on Finance letter also requested that the Office of Inspector General (OIG) conduct an investigation into the facts and circumstances surrounding the Commission's decision not to pursue an Enforcement Action against Bear Stearns. This issue will be addressed in an OIG investigative report to be issued on September 30, 2008.

conducts an in-depth review of the filings for six of the 146 filing firms that TM determined are most significant, based on their free credit balances and customer accounts. Audit report number 446-B examining the Commission's Risk Assessment program contains 10 recommendations and was issued on September 25, 2008.

**Retention of an Expert.** Given the complexity of the subject matter, the OIG retained an expert, Albert S. (Pete) Kyle to provide assistance with this audit. Professor Kyle joined the University of Maryland faculty as the Charles E. Smith Chair Professor of Finance at the Robert H. Smith School of Business in August 2006. He earned a Bachelor of Science degree in Mathematics from Davidson College in 1974, studied Philosophy and Economics at Oxford University as a Rhodes Scholar and completed his Ph.D. in Economics at the University of Chicago in 1981. He was a professor at Princeton University's Woodrow Wilson School from 1981-1987, at the University of California's Haas Business School in Berkeley from 1987-1992, and at Duke University from 1992-2006.

Professor Kyle is a renowned expert on many aspects of capital markets, with a particular focus on market microstructure. He has conducted significant research on such topics as informed speculative trading, market manipulation, price volatility, and the information content of market prices, market liquidity, and contagion. His paper "Continuous Auctions and Insider Trading" (Econometrica, 2005) is one of the mostly highly cited papers in theoretical asset pricing.

Professor Kyle was elected a Fellow of the Econometric Society in 2002. He was also a board member of the American Finance Association from 2004-2006. He served as a staff member of the Presidential Task Force on Market Mechanisms (Brady Commission), after the stock market crash of 1987. During his career, he has worked as a consultant on finance topics for several government agencies, in addition to the Commission, including the Department of Justice, the Internal Revenue Service, the Federal Reserve and the Commodity Futures Trading Commission.

Professor Kyle's Curriculum Vitae appears in Appendix III of this report.

In this audit, Professor Kyle analyzed TM's oversight of the CSE firms, with a particular focus on Bear Stearns. Professor Kyle reviewed TM's internal memoranda on the CSE firms, which documented TM's assessment of the CSE firms' operations and reviewed data in the CSE firms' monthly and quarterly CSE program filings.

From this information, Professor Kyle analyzed the firms' financial data, holdings, risk management strategies, tolerance for risk and assessed the adequacy of the firms' filings. In particular, Professor Kyle analyzed Bear Stearns' capital, liquidity, and leverage ratios, access to secured and unsecured financing, and its

compliance with industry and worldwide standards such as the Basel Standards.[9] Professor Kyle analyzed how TM supervised or oversaw Bear Stearns' mortgage-backed securities portfolio, its use of models to measure risk, the adequacy of its models, its model review process, the relationship between its traders and risk management department, and its risk-management scenarios. Professor Kyle also examined how TM supervised Bear Stearns' internal operations, including its funding of two prominent hedge funds that collapsed in the summer of 2007.

**Audit Conclusions and Results.**  The CSE program's mission (goal) provides in pertinent part as follows:

> The regime is intended to allow the Commission to monitor for, and act quickly in response to, financial or operational weakness in a CSE holding company or its unregulated affiliates that might place regulated entities, including US and foreign-registered banks and broker-dealers, *or the broader financial system at risk.*[10] [Emphasis added]

Thus, it is undisputable that the CSE program failed to carry out its mission in its oversight of Bear Stearns because under the Commission and the CSE program's watch, Bear Stearns suffered significant financial weaknesses and the FRBNY needed to intervene during the week of March 10, 2008, to prevent significant harm to the broader financial system.[11]

This audit was not intended to be a complete assessment of the multitude of events that led to Bear Stearns' collapse, and accordingly, does not purport to demonstrate any specific or direct connection between the failure of the CSE Program's oversight of Bear Stearns and Bear Stearns' collapse.  However, we have identified serious deficiencies in the CSE program that warrant improvements.  Overall, we found that there are significant questions about the adequacy of a number of CSE program requirements, as Bear Stearns was

---

[9] "The Basel Committee on Banking Supervision (Basel Committee) seeks to improve the quality of banking supervision worldwide, in part by developing broad supervisory standards.  The Basel Committee consists of central bank and regulatory officials from 13 member countries: Belgium, Canada, France, Germany, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, United Kingdom, and United States.  The Basel Committee's supervisory standards are also often adopted by nonmember countries."  Source:  Government Accountability Office.  Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, February 15, 2007.

[10]  Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria.  Commission. 16 Mar 2007.
<http://www.sec.gov/divisions/marketreg/cseoverview.htm>.

[11] The Commission established criteria (the link is provided below) for measuring the success of the Consolidated Supervised Entity (CSE) program.  While the CSE program may have been successful in achieving its established criteria, none of the criteria standards directly related to the failure of a CSE firm and its effect on the broader financial system (as stated in the CSE program's goal statement).  Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria.  Commission. 16 Mar 2007.

compliant with several of these requirements, but nonetheless collapsed.  In addition, the audit found that TM became aware of numerous potential red flags prior to Bear Stearns' collapse, regarding its concentration of mortgage securities, high leverage, shortcomings of risk management in mortgage-backed securities and lack of compliance with the spirit of certain Basel II standards, but did not take actions to limit these risk factors.

In addition, the audit found that procedures and processes were not strictly adhered to, as for example, the Commission issued an order approving Bear Stearns to become a CSE prior to the completion of the inspection process. Further, the Division of Corporation Finance (CF) did not conduct Bear Stearns' most recent 10-K filing review in a timely manner.

The audit also identified numerous specific concerns with the Commission's oversight of the CSE program, some of which are summarized as follows:[12]

(a)     Bear Stearns was compliant with the CSE program's capital and liquidity requirements;[13] however, its collapse raises questions about the adequacy of these requirements;

(b)     Although TM was aware, prior to Bear Stearns becoming a CSE firm, that Bear Stearns' concentration of mortgage securities was increasing for several years and was beyond its internal limits, and that a portion of Bear Stearns' mortgage securities (e.g., adjustable rate mortgages) represented a significant concentration of market risk, TM did not make any efforts to limit Bear Stearns' mortgage securities concentration;

(c)     Prior to the adoption of the rule amendments which created the CSE program, the broker-dealers affiliated with the CSE firms were required to either maintain:

• A debt to-net capital ratio of less than 15 to 1(after their first year of operation); or

• Have net capital not less than the greater of $250,000 or two percent of aggregate debit items computed in accordance with the *Formula for Determination of Reserve Requirements for Broker-Dealers.*

However, the CSE program did not require a leverage ratio limit for the CSE firms.  Furthermore, despite TM being aware that Bear Stearns' leverage was high, TM made no efforts to require Bear

---

[12] We have no specific evidence indicating whether any of these issues directly contributed to Bear Stearns' collapse since our audit scope did not include a determination of the cause of Bear Stearns' collapse (see Appendix IV).

[13] As discussed in the Scope and Methodology section (see Appendix IV), we did not independently verify (*i.e.,* recalculate and determine the accuracy) Bear Stearns' capital or liquidity amounts.

Stearns to reduce its leverage, despite some authoritative sources describing a linkage between leverage and liquidity risk;

(d) · TM became aware that risk management of mortgages at Bear Stearns had numerous shortcomings, including lack of expertise by risk managers in mortgage-backed securities at various times; lack of timely formal review of mortgage models; persistent understaffing; a proximity of risk managers to traders suggesting a lack of independence; turnover of key personnel during times of crisis; and the inability or unwillingness to update models to reflect changing circumstances.  Notwithstanding this knowledge, TM missed opportunities to push Bear Stearns aggressively to address these identified concerns;

(e) There was no documentation of discussions between TM and Bear Stearns of scenarios involving a meltdown of mortgage market liquidity, accompanied by a fundamental deterioration of the mortgages themselves.  TM appeared to identify the types of risks associated with these mortgages that evolved into the subprime mortgage crisis yet did not require Bear Stearns to reduce its exposure to subprime loans;

(f) Bear Stearns was not compliant with the spirit of certain Basel II standards and we did not find sufficient evidence that TM required Bear Stearns to comply with these standards;

(g) TM took no actions to assess Bear Stearns' Board of Directors' and senior officials' (e.g., the Chief Executive Officer) tolerance for risk although we found that this is a prudent and necessary oversight procedure;

(h) TM authorized (without an appropriate delegation of authority) the CSE firms' internal audit staff to perform critical audit work involving the risk management systems instead of the firms' external auditors as required by the rule that created the CSE program;

(i) In June 2007, two of Bear Stearns' managed hedge funds collapsed.  Subsequent to this collapse, significant questions were raised about some of Bear Stearns' senior managements' lack of involvement in handling the crisis.  However, TM did not reassess the communication strategy component of Bear Stearns' Contingency Funding Plan (CFP) after the collapse of the hedge funds, and very significant questions were once again raised about some of Bear Stearns' managements' handling of the crisis during the week of March 10, 2008;

(j) The Commission issued four of the five Orders approving firms to use the alternative capital method, and thus become CSEs (including Bear Stearns) before the inspection process was completed; and

(k)     CF did not conduct Bear Stearns' most recent 10-K filing review in a timely manner. The effect of this untimely review was that CF deprived investors of material information that they could have used to make well-informed investment decisions (*i.e.,* whether to buy/sell Bear Stearns' securities). In addition, the information (*e.g.,* Bear Stearns' exposure to subprime mortgages) could have been potentially beneficial to dispel the rumors that led to Bear Stearns' collapse.

**Recommendations.** We identified 26 recommendations (see Appendix V) that should significantly improve the Commission's oversight of CSE firms. Chairman Cox's and Management's comments are attached in Appendix VI and VII, respectively. Our recommendations include:

(a)     A reassessment of guidelines and rules regarding the CSE firms' capital and liquidity levels;

(b)     Taking appropriate measures to ensure that TM adequately incorporates a firm's concentration of securities into the CSE program's assessment of a firm's risk management systems and more aggressively prompts CSE firms to take appropriate actions to mitigate such risks;

(c)     A reassessment of the CSE program's policy regarding leverage ratio limits;

(d)     Ensuring that: (1) the CSE firms have specific criteria for reviewing and approving models used for pricing and risk management, (2) the review and approval process conducted by the CSE firms is performed in an independent manner by the CSEs' risk management staff, (3) each CSE firm's model review and approval process takes place in a thorough and timely manner, and (4) limits are imposed on risk taking by firms in areas where TM determines that risk management is not adequate;

(e)     Being more skeptical of CSE firms' risk models and working with regulated firms to help them develop additional stress scenarios that have not already been contemplated as part of the prudential regulation process;

(f)     Greater involvement on the part of TM in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal;

(g)     Taking steps to ensure that mark disputes do not provide an occasion for CSE firms to inflate the combined capital of two firms by using inconsistent marks;

(h)     Encouraging the CSE firms to present Value at Risk and other risk management data in a useful manner, which is consistent with how

the CSE firms use the information internally and allows risk factors to be applied consistently to individual desks;

(i)   Ensuring (in accordance with Basel II) that the Consolidated Supervised Entities take appropriate capital deductions for illiquid assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral;

(j)   Greater discussion of risk tolerance with the CSE firms' Boards of Directors and senior management to better understand whether the actions of CSE firms' staff are consistent with the desires of the Boards of Directors and senior management;

(k)   Requiring compliance with the existing rule that requires external auditors to review the CSE firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act for this deviation from the current rule's requirement;

(l)   Ensuring that reviews of a firm's CFP includes an assessment of a CSE firm's internal and external communication strategies;

(m)   Developing a formal automated process to track material issues identified by the monitoring staff to ensure they are adequately resolved;

(n)   Ensuring that they complete all phases of a firm's inspection process before recommending that the Commission allow any additional CSE firms the authority to use the alternative capital method;

(o)   Improving collaboration efforts among TM, CF, the Office of Compliance Inspections and Examination (OCIE), and the Office of Risk Assessment (ORA);

(p)   The development by CF of internal guidelines for reviewing filings timely and tracking and monitoring compliance with its internal guidelines; and

(q)   The creation of a Task Force led by ORA with staff from TM, the Division of Investment Management, and OCIE to perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis.

The final report consists of 26 recommendations that are addressed primarily to the Division of Trading and Markets (TM). Recommendations 18 and 25 are also addressed to the Office of Compliance Inspections and Examinations (OCIE) and Recommendation 19 is also addressed to the Office of Risk Assessment (ORA). Recommendations 20 and 21 are addressed to the Division of

Corporation Finance (CF), Recommendation 17 is addressed to CF and TM, and Recommendation 22 is addressed to Chairman Cox.

In response to the draft report, responsible management officials agreed with 21 out of 26 recommendations. TM concurred with 20 of 23 recommendations addressed to them and disagreed with Recommendations 13, 15, and 16. OCIE concurred with both recommendations addressed to them. CF concurred with Recommendation 17, but disagreed with Recommendations 20 and 21.

# TABLE OF CONTENTS

Executive Summary.................................................................................iv

Table of Contents ................................................................................. xiv

Background and Objectives........................................................................ 1

Findings and Recommendations ............................................................... 10

Finding 1:  Bear Stearns Was Compliant With The CSE
Program's Capital Ratio And Liquidity Requirements, But The
Collapse Of Bear Stearns Raises Questions About The
Adequacy Of These Requirements ........................................................ 10
    Capital................................................................................. 10
        Adequacy of Capital Levels.............................................. 10
        Increased Access to Secured Financing.............................. 11
        Recommendation 1 ........................................................ 13

        Liquidity....................................................................... 14
        Recommendation 2 ........................................................ 17

Finding 2: TM Did Not Adequately Address Several Significant
Risks That Impact The Overall Effectiveness Of The CSE
Program.......................................................................................... 17
        Concentration of Assets ................................................. 17
        Recommendation 3 ........................................................ 18

        Leverage...................................................................... 19
        Recommendation 4 ........................................................ 20

        Bear Stearns Model Review Process and Risk
        Management Staffing Were Inadequate In The Area Of
        Mortgage Backed Securities............................................. 20
        Recommendation 5 ........................................................ 24

        Risk Scenarios .............................................................. 24
        Recommendation 6 ........................................................ 27
        Recommendation 7 ........................................................ 27

        Non-compliance With Basel II............................................ 27
        Mark Disputes............................................................... 27
        Recommendation 8 ........................................................ 29

        Inconsistent VaR Numbers............................................... 29
        Recommendation 9 ........................................................ 29

Bear Stearns' Capital Requirements for Illiquid
Assets and Stressed Repos Require Careful
Oversight ...................................................................................... 29
Recommendation 10 ................................................................. 33

Tolerance for Risk .......................................................................... 33
Recommendation 11 ..................................................................... 33

Finding 3:  TM, Without Explicit Authority, Allowed The CSE
Firms' Internal Auditors To Perform Critical Work ............................. 34
Recommendation 12 ................................................................. 35

Finding 4:  TM Did Not Review The Communication Strategy
Component Of Bear Stearns' Contingency Funding Plan After
The Collapse Of Two Of Its Managed Hedge Funds ......................... 35
Recommendation 13 ................................................................. 36

Finding 5:  TM's Monitoring Staff Do Not Adequately Track
Material Issues ................................................................................. 37
Develop a Formal Automated Tracking Process ..................... 37
Recommendation 14 ................................................................. 38

Follow-up on Prior OCIE Findings ............................................... 38
Recommendation 15 ................................................................. 40

Finding 6:  The Commission's Orders Allowing Firms (Including
Bear Stearns) To Use The Alternative Capital Method Were
Generally Approved Before The Inspection Process Was
Completed........................................................................................... 40
Recommendation 16 ................................................................. 41

Finding 7:  Collaboration Between TM and Other Commission
Divisions/Offices Should Be Significantly Improved ......................... 41
Collaboration with CF ................................................................. 41
Recommendation 17 ................................................................. 42

Collaboration with OCIE ............................................................. 42
Recommendation 18 ................................................................. 43

Collaboration with ORA ............................................................. 43
Recommendation 19 ................................................................. 43

Finding 8:  CF's Filing Review Of Bear Stearns' 2006 10-K
Was Not Timely ................................................................................. 44
Review of Bear Stearns' 10-K Filing ......................................... 44

Recommendation 20 ........................................................................... 45
Bear Stearns' Response to CF's Comment Letter ..................... 45
Recommendation 21 ........................................................................... 46

Finding 9:  Certain Firms May Pose A Systemic Risk
Because They Are Not Supervised On A Consolidated Basis ......... 46
Recommendation 22 ........................................................................... 47

Finding 10:  TM Should Address Organizational Issues
Involving The Future Of The CSE Program ........................................... 48
Changes to the CSE Program ...................................................... 48
Recommendation 23 ........................................................................... 49

Program Staffing ............................................................................ 49
Recommendation 24 ........................................................................... 50

Ethics Manual................................................................................. 50
Recommendation 25 ........................................................................... 50

Coordination with Other Regulators ........................................... 50
Recommendation 26 ........................................................................... 51

Appendices
Appendix I:  Acronyms......................................................................... 52
Appendix II:  Congressional Audit Request ....................................... 54
Appendix III:  Curriculum Vitae (OIG expert: Albert "Pete" Kyle) ..................... 56
Appendix IV:  Scope and Methodology............................................... 70
Appendix V:  List of Recommendations.............................................. 76
Appendix VI:  Chairman Cox's Comments ......................................... 81
Appendix VII:  Management Comments ............................................... 83
Appendix VIII:  OIG Response to Chairman Cox & Management
Comments........................................................................................ 115
Appendix IX:  Gross Leverage Ratios.................................................. 119
Appendix X:  Criteria............................................................................ 120

APPENDIX I

# Background and Objectives

## Background

**General Background Information.**  The Division of Trading and Markets (TM)[14] is responsible for regulating broker-dealers, which includes administering the Consolidated Supervised Entity (CSE) and Broker-Dealer Risk Assessment programs.  The Office of Compliance Inspections and Examinations (OCIE) has responsibility within the Securities and Exchange Commission (Commission) for conducting the inspections[15] of broker-dealers, including broker-dealers that are affiliated with CSE firms[16] (*i.e.*, investment banks).[17]  The following TM offices are directly involved in these programs:

- Office of Financial Responsibility:  This office is responsible for administering the financial responsibility regulations (*e.g.*, net capital rule[18]

---

[14] See Acronyms used in Appendix I.

[15] The Division of Trading and Markets (TM) uses the term "inspections", however, the Office of Compliance Inspections and Examinations (OCIE) uses the term "examinations".  For purposes of this audit report, we use the term "inspections" to refer to both.  In addition, for purposes of this audit report, OCIE also includes the Inspection staff in the Commission's regional offices.

[16] During our audit fieldwork, there were four Consolidated Supervised Entity (CSE) firms whose principal regulator (as discussed below) was the Commission: Goldman Sachs Group, Inc., Lehman Brothers Holdings Inc. (Lehman Brothers), Merrill Lynch & Co., Inc., and Morgan Stanley.  On September 15, 2008, Lehman Brothers announced that it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch & Co., Inc.  On September 21, 2008, the Federal Reserve approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies.  The Bear Stearns Companies, Inc. (Bear Stearns) was also a CSE firm (approved in November 2005) until its collapse.  In addition, JP Morgan Chase & Co. (JP Morgan) and Citigroup Inc. have been approved to use the alternative method for their broker-dealer capital requirements, but the Board of Governors of the Federal Reserve System (Federal Reserve) is their principal regulator (*i.e.*, is responsible for the consolidated entity) but the Commission is responsible for the oversight of their broker-dealers.  As a result, the Securities and Exchange Commission (Commission) defers oversight (of the consolidated entity) of JP Morgan and Citigroup to the Federal Reserve to avoid duplicative or inconsistent regulation.

[17] In 2007, in response to a Government Accountability Office (GAO) report <u>Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration</u>. Report 07-154, March 15, 2007 (as discussed in the Prior Audit Coverage section of the Scope and Methodology - see Appendix III); the Chairman (in consultation with the other Commissioners) transferred the responsibility for conducting inspections of the consolidated entity from OCIE to TM.  OCIE retained (within the Commission) responsibility for conducting inspections on the CSE's broker-dealers.  The Self Regulatory Organizations (SRO) have the primary inspection responsibility for the registered broker-dealers.  OCIE has oversight responsibility of these broker-dealers and conducts periodic inspections.  The Financial Industry Regulatory Authority (FINRA) is the primary regulator of approximately 5,000 broker-dealers registered in the United States (U.S.).

[18] "The net capital rule focuses on liquidity and is designed to protect securities customers, counterparties, and creditors by requiring that broker-dealers have sufficient liquid resources on hand at all times to satisfy claims promptly".  Source: GAO Report <u>Risk-Based Capital Regulatory and Industry Approaches to Capital and Risk</u>, Report No. GGD-98-153, July 20, 1998.

and customer protection[19]).  These regulations are intended to protect customers and financial institutions.  This office also oversees the Securities Investor Protection Corporation and has approximately nine staff.[20]

- Office of Prudential Supervision and Risk Analysis:  The staff (referred to as "monitors") in this office work in teams of three to review each CSE firm.  They perform their work mainly through periodic meetings and informal discussions with CSE staff.  The staff also review CSE required financial filings.  The staff have backgrounds in economics, accounting, and finance and expertise in credit, market, or liquidity risk.  Approximately 13 individuals comprise the staff.

- Office of CSE Inspections:  This office is responsible for conducting the inspections on the CSE firms.  They have seven staff who are located in both Washington D.C. and New York.

**CSE Program.**  In 2004, the Commission adopted rule amendments under the Securities and Exchange Act of 1934,[21] which created the voluntary CSE program.  This program allows the Commission to supervise certain broker-dealer holding companies on a consolidated basis.  In this capacity, Commission supervision extends beyond the registered broker-dealer to the unregulated affiliates of the broker-dealer and the holding company itself.  The CSE program was designed to allow the Commission to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place United States (U.S.) regulated broker-dealers and other regulated entities at risk.

A broker-dealer becomes a CSE by applying to the Commission for an exemption from the Commission's standard net capital rule,[22] and the broker-dealer's ultimate holding company consenting to group-wide Commission supervision, if it does not already have a principal regulator.  By obtaining an exemption from the standard net capital rule, the CSE firms' broker-dealers are permitted to compute net capital using an alternative method.[23]

---

[19] The customer protection rule "is designed to ensure that customer property (securities and funds) in the custody of broker-dealers is adequately safeguarded."
Source: GAO Report Risk-Based Capital Regulatory and Industry Approaches to Capital and Risk, Report No. GGD-98-153, July 20, 1998.

[20] The Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et. seq.*, as amended, was enacted to protect customers from losses resulting from a broker-dealers' failure, thereby promoting investor confidence in the securities markets. The Securities Investor Protection Corporation was created by the Act to pay investor claims. (See 15 U.S.C. § 78ccc).

[21] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428).  Commission.  21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.

[22] See 17 C.F.R. § 24015c3-1.

[23] The alternative capital method is based on mathematical models and scenario testing, while broker-dealers operating under the standard net capital rule must meet certain ratios and maintain minimum net capital levels based on the type of securities activities they conduct. (See 17 C.F.R. 240.15c3-1(a)(7)).

The Commission designed the CSE program to be broadly consistent with the Board of Governors of the Federal Reserve System's (Federal Reserve) oversight of bank holding companies.  However, the CSE program "reflects the reliance of securities firms on mark-to-market accounting as a critical risk and governance control.  Second, the design of the CSE regime reflects the critical importance of maintaining adequate liquidity in all market environments for holding companies that do not have access to an external liquidity provider." [24]

The CSE application process includes TM reviewing a firm's application[25] (for an exemption from the net capital rule) and makes a recommendation to the Commission.  Approval of the firm's application is contingent on the firm agreeing to group-wide Commission supervision of the consolidated entity (including unregulated affiliates), if the firm does not already have a principal regulator.  In addition, CSE firms must agree to:

- "Maintain and document an internal risk management control system for the affiliate group;"[26]

- "Calculate a group-wide capital adequacy measure consistent with the international standards adopted by the Basel Committee on Banking Supervision [[27]] ('Basel Standards')."[28]  The CSEs are required to maintain an overall Basel capital ratio[29] of not less than the Federal Reserve's 10 percent "well-capitalized" standard for bank holding companies.  The CSE must notify the Commission (e.g., file an Early Warning Notice) if the 10 percent capital ratio is or is likely to be violated,[30] or if tentative net capital of the broker-dealer falls below $5 billion;[31]

---

[24] Source: *Examining Regulation and Supervision of Industrial Loan Companies* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (October 4, 2007) (statement of Erik Sirri, Director of TM, Commission).

[25] The application process includes inspections whose purpose is to verify the information the firms provides during the application process and to "assess the adequacy of the implementation of the firm's internal risk management policies and procedures."
Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[26] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[27] "The Basel Committee on Banking Supervision (Basel Committee) seeks to improve the quality of banking supervision worldwide, in part by developing broad supervisory standards.  The Basel Committee consists of central bank and regulatory officials from 13 member countries: Belgium, Canada, France, Germany, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, United Kingdom, and United States.  The Basel Committee's supervisory standards are also often adopted by nonmember countries." Source: GAO. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, February 15, 2007.

[28] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>. [footnote added]

[29] The Basel capital ratio is capital divided by risk weighted assets.

[30] We are aware of one instance where this occurred.  In our opinion, TM acted reasonably.

[31] Sources for the information include:
- *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission); and

- Maintain "sufficient stand-alone liquidity and sufficient financial resources to meet its expected cash outflows in a stressed liquidity environment where access to unsecured funding is not available for a period of at least one year. Another premise of this liquidity planning is that any assets held in a regulated entity are unavailable for use outside of the entity to deal with weakness elsewhere in the holding company structure, based on the assumption that during the stress event, including a tightening of market liquidity, regulators in the U.S. and relevant foreign jurisdictions would not permit a withdrawal of capital;"[32]

- "Consent to Commission examination [inspection] of the books and records of the ultimate holding company [*i.e.*, the consolidated entity] and its affiliates, where those affiliates do not have principal regulators;"[33]

- "Regularly report on the financial and operational condition of the holding company, and make available to the Commission information about the ultimate holding company or any of its material affiliates that is necessary to evaluate financial and operations risks within the ultimate holding company and its material affiliates;"[34] and

- "Make available [examination] inspection reports of principal regulators for those affiliates that are not subject to Commission [examination] inspection."[35]

The firms agreed to consolidated supervision because of the preferential capital treatment under the alternative method and international requirements.  The European Union's (EU) Conglomerates Directive required that affiliates of U.S. registered broker-dealers demonstrate that they were subject to consolidated supervision by a U.S. regulator or face significant restrictions on their European operations.[36]

---

- Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34-428).  Commission.  21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.

[32] Source: *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission).

[33] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008.  <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[34] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008.  <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[35] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008.  <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[36] According to the CSE final rule, "EU [European Union] 'consolidated supervision' consists of a series of quantitative and qualitative rules, imposed at the level of the ultimate holding company, regarding firms' internal controls, capital adequacy, intra-group transactions, and risk concentration.  Without a demonstration of 'equivalent' supervision, U.S. securities firms have expressed concerns that an affiliate institution located in the EU either may be subject to additional capital charges or be required to form a sub-holding company in the EU.'  See 'Directive 2002/87/EC of the European Parliament and of the Council of 16 December 2002."  Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428). Commission. 21 June 2004.  <http://www.sec.gov/rules/final/34-49830.htmP42_10820>.

**Mortgage Loans.** Beginning around late 2004, lenders offered mortgages to individuals who did not meet the normal qualifications (*e.g.,* income or credit history). Many of these loans had teaser rates and/or were interest only. These more risky loans are referred to as "subprime mortgages." The theory behind approving these risky loans was that the homeowner would be able to refinance the loan in a few years because of the increased growth in home values and the individual's improved credit rating. Banks converted these loans into securities and sold the securities to other firms (known as the securitization process).

Once home values began to decrease, mortgage loan defaults started to increase, causing the market value of the mortgage securities to decrease. In the ensuing months, the financial services industry wrote-down billions of dollars in the value of all types of mortgage securities.[37]

**Bear Stearns' Collapse.**[38] The Bear Stearns Companies, Inc. (Bear Stearns) was a holding company that had two registered broker-dealers. Its main activities were investment banking, securities and derivatives sales and trading, clearance, brokerage and asset management.[39] Bear Stearns was highly leveraged[40] with a large exposure (*i.e.,* concentration of assets) in mortgage-backed securities.[41] Bear Stearns also had less capital and was less diversified than several of the CSE firms.

In June 2007, two of Bear Stearns' managed hedge funds collapsed because of subprime mortgage losses.[42] Nearly a year later, during the week of March 10, 2008, rumors spread about liquidity problems at Bear Stearns. Due to Bear Stearns' lenders not rolling over secured financing, Bear Stearns faced severe liquidity problems on March 14, 2008.[43] As a result, on March 14, 2008, JP Morgan Chase & Co. (JP Morgan) provided Bear Stearns with emergency

---

[37] In accordance with Generally Accepted Accounting Principles, the securities must be valued at fair market value (*i.e.,* mark to market accounting).

[38] Sources for this information include:
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Timothy Geithner, President and Chief Executive Officer, Federal Reserve Bank of New York (FRBNY);
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Jamie Dimon (Chairman and Chief Executive Officer, JP Morgan); and
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Alan Schwartz (President and Chief Executive Officer, Bear Stearns).

[39] Source: 2006 Bear Stearns' Annual Report (page 32).

[40] There are many definitions of leverage. A simple definition of leverage is assets divided by capital. Bear Stearns' gross leverage ratio was about 33-1. See Appendix IX.

[41] Depending on the definition used to classify a mortgage as "subprime", Bear Stearns' exposure to subprime mortgages varied. However, it clearly had a large exposure to mortgage securities overall.

[42] Bear Stearns' direct exposure to these hedge funds was minimal.

[43] A pledge of collateral supports secured financing.

funding.[44]  According to Congressional testimony,[45] after the markets closed on March 14, 2008, it became apparent that FRBNY's funding could not stop Bear Stearns' downward spiral.  As a result, Bear Stearns concluded that it would need to file for bankruptcy protection on March 17, 2008, unless another firm purchased it.[46]  On March 16, 2008, Bear Stearns' sale to JP Morgan was announced with financing support from the FRBNY.  In May 2008, the sale was completed.

In testimony given before the Senate Committee on Banking, Housing, and Urban Affairs on April 3, 2008, Chairman Christopher Cox stated that Bear Stearns' collapse was due to a liquidity crisis caused by a lack of confidence.[47]  Chairman Cox described Bear Stearns' collapse as a "run on the bank"[48] which occurred exceptionally fast and in an already distressed market environment (*i.e.,* the credit crisis).  Specifically, Chairman Cox testified as follows:

> What happened to Bear Stearns during the week of March 10th was likewise unprecedented.  For the first time, a major investment bank that was well-capitalized and apparently fully liquid experienced a crisis of confidence that denied it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.  Counterparties would not provide securities lending services and clearing services. Prime brokerage clients moved their cash balances elsewhere.  These decisions by counterparties, clients, and lenders to no longer transact with Bear Stearns in turn influenced other counterparties, clients, and lenders to also reduce their exposure to Bear Stearns.[49]

---

[44] The funding was from FRBNY through JP Morgan to Bear Stearns because JP Morgan could borrow money from FRBNY.

[45] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators Before U.S. Senate Committee on Banking, Housing and Urban Affairs,* 110th Congress (April 3, 2008) (statements of Timothy Geithner, President and Chief Executive Officer, FRBNY, and Alan Schwartz, President and Chief Executive Officer, Bear Stearns).

[46] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[47] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[48] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S.. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[49] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

According to a Commission press release,[50] TM monitored Bear Stearns' capital and liquidity daily since Bear Stearns' hedge funds collapsed. According to data (provided to TM by Bear Stearns), there was adequate capital at the holding company level and at Bear Stearns' two registered broker-dealers prior to and during the week of March 10, 2008. In addition, the Commission stated that Bear Stearns was compliant with the $5 billion liquidity requirement.[51] Furthermore, according to data we reviewed, Bear Stearns had significantly increased its liquidity levels since May 2007.[52]

The Commission stated that neither the CSE program nor any regulatory model (*i.e.,* the Basel Standards)[53] used by commercial or investment banks considered the possibility that secured financing, even when backed by high-quality collateral could become completely unavailable. Instead, the CSE program only considered that a deterioration of secured financing could occur (*e.g.,* that financing terms could become less favorable) and that unsecured funding could be unavailable for at least one year.

**The Commission's Response to Bear Stearns' Collapse.** In the aftermath of Bear Stearns' collapse, the Commission has:

- Supported the work of the Basel Committee on Banking Supervision regarding their planned updated guidance (*i.e.,* strengthening the standards applicable to liquidity risks) on liquidity management;[54]

- Supported legislation to make the CSE program mandatory.[55] At a recent Congressional hearing before the Committee on Financial Services, House of Representatives, July 24, 2008, Chairman Christopher Cox stated:

---

[50] Source: <u>Statement of SEC Division of Trading and Markets Regarding The Bear Stearns Companies.</u> Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-44.htm>. The Chairman also made similar statements in his letter to the Basel Committee regarding liquidity management; and testimony (*Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission)).

[51] As discussed in the Scope and Methodology section (see Appendix IV), we did not independently verify (*i.e.,* recalculate and determine the accuracy) Bear Stearns' capital or liquidity amounts.

[52] According to the Commission, Bear Stearns had a high of $21 billion (in liquidity) in early March 2008, (*i.e.,* before the week of March 10), compared to $7.6 billion in May 2007 according to TM data. Source: <u>Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity</u> Management. Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-48.htm>.

[53] The CSE firms operate under the Basel II standards.

[54] Source: <u>Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity</u> Management. Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-48.htm>.

[55] Sources of this information include:
- *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission); and
- *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

The mandatory consolidated supervision regime for investment banks should provide the SEC [Commission] with several specific authorities. Broadly, with respect to the holding company, these include authority to: set capital and liquidity standards; set recordkeeping and reporting standards; set risk management and internal control standards; apply progressively more significant restrictions on operations if capital or liquidity adequacy falls, including requiring divestiture of lines of business; conduct examinations and generally enforce the rules; and share information with other regulators. Any future legislation should also establish a process for handling extraordinary problems, whether institution-specific or connected with broader market events, to provide needed predictability and certainty.[56]

- Requested dedicated Congressional funding for the CSE program and increased CSE staffing from about 25 to 40 people;[57]

- Consulted with the CSE firms on their liquidity situation (*e.g.,* funding plans). Specifically, the Commission worked with the firms to:

  o increase their liquidity levels;[58]

  o lengthen the terms of their secured and unsecured financing;[59]

  o review their risk practices and models;[60]

  o discuss their long-term funding plans, including plans for raising new capital by accessing the equity and long-term debt markets;[61]

  o increase their public disclosures of their capital and liquidity;[62]

---

[56] Source: *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

[57] Source: *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Chairman, Commission).

[58] Source: *Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators,* Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[59] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[60] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[61] Source: *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

- Invited FRBNY examiners to review the CSE firms' funding and how the firms are managing their funding;[63] and

- In July 2008, the Commission and the Federal Reserve agreed on a Memorandum of Understanding (MOU) involving coordination and information sharing.[64]

# Objectives

As a result of the collapse of Bear Stearns in March 2008, we received a Congressional request to perform this audit of the Commission's CSE Program, in addition to an audit of the Commission's Broker-Dealer Risk Assessment Program (see Appendix II).

The objectives of this audit were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

The objectives of the audit on the Commission's Broker-Dealer Risk Assessment Program were to follow up on recommendations made in the Office of Inspector General's (OIG) prior audit report of the Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report No. 354, issued on August 13, 2002) and to examine the Broker-Dealer Risk Assessment process to determine whether improvements are needed. Audit report number 446-B discusses the Risk Assessment Program in detail and addresses these objectives.

---

[63] Source: Speech by SEC [Commission] Chairman: Address to the Security Traders 12th Annual Washington Conference. Commission. 7 May 2008. <http://www.sec.gov/news/speech/2008/spch050708cc.htm>.

[63] Source: *Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing, and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[64] SEC [Commission], FRB Sign Agreement to Enhance Collaboration, Coordination and Information Sharing. Commission. 7 July 2008. <http://www.sec.gov/news/press/2008/2008-134.htm>.