# Exhibit 29

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------x

IN RE THE BEAR STEARNS COMPANIES, INC.
SECURITIES, DERIVATIVE, AND ERISA
LITIGATION

Master File No.:
08 M.D.L. 1963(RWS)

This Document Relates to:

Securities Action, No. 08 Civ. 2793(RWS)

--------------------------------------x

BRUCE S. SHERMAN,

Plaintiff,

Index No.:

v. 09 Civ. 8161 (RWS)

BEAR STEARNS COMPANIES INC., JAMES CAYNE,
WARREN SPECTOR AND DELOITTE & TOUCHE LLP,

Defendants

--------------------------------------x

VIVINE H. WANG,

Plaintiff,

Index No.:

v. 11 Civ. 5643(RWS)

THE BEAR STEARNS COMPANIES LLC, J.P.
MORGAN SECURITIES LLC, J.P. MORGAN
CLEARING CORP., DELOITTE & TOUCHE LLP,
ALAN D. SCHWARTZ, ALAN C. GREENBERG, JOEY
ZHOU, and GARRETT BLAND,

Defendants.

--------------------------------------x

(CAPTION CONTINUED ON NEXT PAGE)

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 26..29

Page 26

JOHN D. FINNERTY - CONFIDENTIAL

any way associated with this case.

**Q. Would it surprise you to learn there's a plaintiff in one of the opt-out actions whose name is Vivine Wang?**

A. I can't say I'd be surprised. I know there are other opt-out actions and if she's a plaintiff it wouldn't surprise me.

**Q. And how about H. Roger Wang, is that a name you're familiar with?**

A. No.

**Q. Have you ever had your expert opinions excluded by any court?**

A. No.

**Q. Has a court ever declined to accept an expert opinion that you've offered?**

A. Yes.

**Q. And we spoke at your prior deposition about the AIG matter which had been presided over by Judge Swain. Other than that matter, can you think of any other instance where a court declined to accept your expert opinions?**

Page 27

JOHN D. FINNERTY - CONFIDENTIAL

A. In the AIG case I believe was Judge Batts.

**Q. Oh, pardon me, you're right.**

A. It was Judge Batts.

**Q. Yes.**

A. Because we had a little back and forth on statistical significance, and she didn't accept the testimony on statistical significance and she also wasn't comfortable with the market efficiency -- efficiency of the market for the convertible bonds, of the AIG's convertible bonds.

**Q. Right. And other than Judge Batts declining to accept your expert opinions in the AIG matter, is there any other instance where a court has declined to accept your expert opinions that you're aware of?**

A. Just to be clear, it was only on those dates where the significance level was between 5 and 10 percent. She was comfortable with the opinions regarding the other dates, the other four

Page 28

JOHN D. FINNERTY - CONFIDENTIAL

dates where there was statistical significance at the 5 percent level or better.

As to other opinions, back in 1997, there was an opinion in a matter styled as Northern Ireland Development Authority versus Arthur Andersen which involved a fraud concerning the De Lorean Motor Company, and the issue involved the application of the new investment doctrine and Judge Mukasey did not accept my testimony in that case that an exchange of securities constituted effectively new issue. I think I set the record straight in a subsequent Law Review article, but his opinion stands. He did not agree with me.

**Q. And other than those two instances that we've just discussed, is there any other instance where you are aware that a court declined to accept your expert opinions?**

A. I'm not aware of any others. I mean people have, they've disagreed

Page 29

JOHN D. FINNERTY - CONFIDENTIAL

with certain assumptions I've made, but not, not rejecting opinions.

**Q. Have you ever previously given expert opinions that involve a leakage analysis?**

A. I have written about leakage, included it in an expert report. I don't -- and I believe I was asked about it in a deposition. I've not testified about it -- it was a 10(b)(5) matter and that testimony was not rendered in court, but the issue was covered in a deposition.

**Q. So one prior occasion you wrote about leakage and testified at a deposition in the same matter about leakage?**

A. Yes, it was only -- there was only one other matter where I found it, I will only testify about leakage if I believe there's leakage. If I don't believe there's leakage I'm not going to testify about it. So there was one other matter where there was some evidence of leakage.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 30..33

Page 30
JOHN D. FINNERTY - CONFIDENTIAL

**Q. And what was the name of that matter?**

A. Silverman versus Motorola.

**Q. When were you first contacted by plaintiffs' counsel about providing an expert report in the Bear Stearns multidistrict litigation and the Sherman action?**

A. Sometime I believe it was early in 2013.

**Q. And who contacted you at that time?**

A. Mr. Henken.

**Q. And were you formally retained in 2013?**

A. Yes.

**Q. And in your report you state that AlixPartners is being compensated at a rate of $930 per hour for your work in this matter. Does that sound right to you?**

MR. HENKEN: Object to form.

A. Yes.

**Q. And about how many hours have**

Page 31
JOHN D. FINNERTY - CONFIDENTIAL

**you worked on this matter so far?**

A. Since my original retention I believe I've worked somewhere between about 300 and 400 hours.

**Q. And have you invoiced the hours that you've spent on these matters so far?**

A. AlixPartners -- well, first, I was part of my original firm I think when the engagement began, and Finnerty Economic Consulting billed for the time I spent while I was operating on my own. Since I've been at AlixPartners, AlixPartners has billed for my time. AlixPartners has billed for all the time I've spent on this matter through April 30th.

**Q. And how much has AlixPartners invoiced on this matter through April 30th?**

A. I don't know.

**Q. Just to be clear, the 300 to 400 hours, does that include your prior work on this matter when you were still**

Page 32
JOHN D. FINNERTY - CONFIDENTIAL

**at Finnerty consulting?**

A. Yes.

**Q. Okay. So you joined AlixPartners in 2013?**

A. May 28th, 2013.

**Q. But you were retained by Boies, Schiller prior to that date?**

A. Finnerty Economic Consulting was retained prior to that date. When I joined AlixPartners, the Finnerty Economic Consulting retention concluded and AlixPartners was retained to provide work and I was asked then to do that work of course.

**Q. So fair to say that since 2013, whether Finnerty Economic Consulting or AlixPartners was the entity submitting the invoices, you have spent approximately 300 to 400 hours on this matter?**

A. Yes.

**Q. Dr. Finnerty, can you describe how you went about preparing this report?**

MR. HENKEN: Object to form.

Page 33
JOHN D. FINNERTY - CONFIDENTIAL

A. I was asked by Boies, Schiller & Flexner and Korein Tillery to investigate three issues. One was the efficiency of the market for the common stock of The Bear Stearns Companies during what we refer to in, I guess we're calling this Finnerty 12 -- Finnerty what? Finnerty 12?

**Q. Correct.**

A. In Finnerty 12 we refer to as the relevant period in the class action matter, we refer to it as the class period. So I was asked to evaluate the efficiency of the market for the stock. Counsel realized that I had done the same work previously so I was really just reviewing that analysis to see if anything needed to be changed.

Secondly, I was asked to perform a loss causation analysis.

And thirdly, I was asked to calculate the damages that the plaintiff in this particular matter, Mr. Sherman, experienced under the assumption that the

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 34..37

Page 34

JOHN D. FINNERTY - CONFIDENTIAL

trier of fact found on behalf of the plaintiff on the issue of liability.

So I was asked to do those three things.

The first thing I did was to review the earlier report to see whether or not there was anything I needed to change on the issue of market efficiency.

The second thing I did was to determine with my staff what work I needed to do in order to perform the loss causation analysis and the damages analysis. Since the damages analysis really flows from the loss causation analysis, I initially focused my efforts on loss causation.

There's a voluminous record in this matter, as everybody in this room knows, so we decided that we had to, we, my staff and I through discussions with counsel, somehow tried to sharpen the focus to make sure that we were reviewing documents that were most relevant to the case and we met with a, I guess I'd call

Page 35

JOHN D. FINNERTY - CONFIDENTIAL

it an electronic discovery firm, and figured out a search routine with them and with Boies, Schiller and Korein Tillery to enable us to search for relevant documents on the, on the various alleged elements of the fraud, the alleged fraud.

That search addressed issues such as the liquidity problems that were evident with Bear Stearns as early as the spring of '07, valuation issues, risk management issues, VaR issues. We wanted to look at all of the documents we could that reflected the information exchange among people inside of Bear Stearns, or between Bear Stearns and other parties, all of the documents that we could find, whether there were reports by third parties or reports prepared by personnel within Bear Stearns that would reflect on each of those issues as those issues evolved throughout the relevant period.

The first cut at the analysis took the documents, searched them

Page 36

JOHN D. FINNERTY - CONFIDENTIAL

electronically, produced sets of documents on each of the, of the issues. I personally reviewed them to figure out whether we could sharpen up the list of keywords and to really focus on the -- on the most critical documents.

That resulted in the production of various binders of documents, reports, emails and so on that I reviewed and in the course of that we were able to, under my direction, come up with a categorization, a scheme where we would identify documents that looked like they were the most relevant. I think we called those hot documents. There were documents that were in a second category that perhaps weren't quite so on point, but would be useful. We called those significant documents. And then we had other classifications.

I personally reviewed, along with Ms. Lawrence, every single hot document, every single significant document.

Page 37

JOHN D. FINNERTY - CONFIDENTIAL

In the case of each of those I made notations and put whatever information on there.I needed to because I knew I would use that in writing the report, to identify the issue, how that issue was addressed within those documents.

At the same time, those documents would refer to other documents that would be useful, such as the SEC OIG report. There were references, for example, to the Oliver Wyman reports. We then set about getting all of those documents as well.

The one --

**Q. If I could just --**

A. I'm sorry, I know I could go on all morning if we're not careful, but you asked me and I want to, I want to give you a truthful answer.

**Q. Go ahead, finish up.**

A. The one thing that I didn't get that I asked for that counsel was not able to get from the defendant, I

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 38..41

Page 38
JOHN D. FINNERTY - CONFIDENTIAL

specifically asked for the JPMorgan valuations at the time JPMorgan completed the acquisition of Bear Stearns. Under generally accepted accounting principles, I believe that JPMorgan would be obligated to do a fair market valuation of all of the assets on a -- on a marked-to-market basis under purchase accounting, and I asked for the workpapers and I never -- I was never able to get those.

But everything else that I identified I was able to obtain copies of and reviewed with my staff.

So I think at a fairly high level that's what we did.

**Q. Thank you. So to back up to the search routine that you described, how were the search terms determined for your search routine?**

A. I worked with counsel to identify the terms, search terms, and then counsel had a staff of people who would actually go through physically,

Page 39
JOHN D. FINNERTY - CONFIDENTIAL

would take the documents I guess that came out of the electronic search and then do a hand search to make sure that what was being turned up was relevant. Those were then put into binders and I reviewed them.

Based on those reviews I went back at least once and we adjusted the search terms to make sure that we were getting the documents that were on point.

**Q. When you say we adjusted the search terms, was that you and counsel adjusting the search terms?**

A. Yes, yes.

**Q. And how lengthy was this list of search terms?**

A. I don't recall. I have to -- I'd say at least filled a page.

**Q. And was the only way that you identified documents through this search routine and then through documents referenced by documents recovered in the search routine as you previously described?**

Page 40
JOHN D. FINNERTY - CONFIDENTIAL

A. In addition, I think there were other documents that weren't in the electronic files, that probably were in boxes of documents that -- there was probably another hand search. I'm trying to remember. There was a combination of the hand search and the electronic search. There may have also been that additional search.

**Q. What repository of documents are you referring to that this hand search was conducted over?**

A. I believe there were documents that were turned over in discovery.

**Q. And they were documents that were printed out and --**

A. I believe -- I believe so.

**Q. And they were provided to you by counsel?**

A. Well counsel had the documents. I -- there must be a million plus documents. I did not look at a million documents. What I did was to look at documents that had been

Page 41
JOHN D. FINNERTY - CONFIDENTIAL

identified as documents that had information that I identified I was looking for, that subset, and then through time we tried to winnow that subset down to what I've testified are the hot documents and the significant documents.

And then in those documents there were other documents that were referenced that I asked for that counsel provided.

So that was the search process that we went through. It was really an interactive search.

**Q. And you said that there were documents that you were looking for. What were those documents that you were looking for?**

MR. HENKEN: Object to form.

A. I was looking for documents that would be informative on the issues of the liquidity problems confronting Bear Stearns during the relevant period, documents that were informative as to the

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 42..45

Page 42
JOHN D. FINNERTY - CONFIDENTIAL

risk management systems and any problems with those systems, documents that would be informative as to the valuation methodologies that Bear Stearns employed, how it applied its models, any deficiencies, efforts to update those models. I looked specifically, after I had the OIG report, for information concerning what Bear Stearns had done in response to the various issues that had been identified. For example, back in 2005 when they filed their initial CSE application, deficiencies were I'd identified by the FSA when they sought approvals in the UK.

There would be documents like, like the ones I've just mentioned that were cited in emails or other internal documents, and if those looked to be on point, then I requested copies of those as well.

**Q. And you mentioned that you saw the SEC's OIG report referenced. And can you remember what type of document you**

Page 43
JOHN D. FINNERTY - CONFIDENTIAL

**saw that referenced in?**

A. I saw the document itself. It was, actually it was attached to one of the complaints. I don't recall whether it was the complaint in this matter or the class action matter, maybe both. The original version I saw was heavily redacted. I eventually received a copy that was unredacted that, quite frankly, when the redactions were removed it was a much more informative document.

And there were -- I think there were emails that referred to it.

But in the case of the OIG report ultimately what I, what I relied upon was the unredacted version.

As I recall, I was looking for emails that, and other information on the redacted version to try to get some idea as to what information had been redacted so that I could understand it. But the first version was so heavily redacted it was -- it was really quite difficult to understand in detail the basis for the

Page 44
JOHN D. FINNERTY - CONFIDENTIAL

criticisms. Once I got the unredacted version it was a lot clearer. So that's what I was looking for. I was looking for the information that had been deleted or references to it.

**Q. And you've been referencing the relevant period and you indicated that it, in what we've been discussing relevant period in this matter and previously talked about it as the class period and just to be clear for the record and make sure we're talking about the same thing, relevant period is December of 2006 through March 14th of 2008?**

A. Yes.

**Q. Is that --**

A. Yes, December 14th, 2006 to March 14th, 2008.

**Q. And you mentioned that you would review the materials and then request additional materials. Were you aware when you reviewed the OIG report that response to the report had been**

Page 45
JOHN D. FINNERTY - CONFIDENTIAL

**submitted by the Division of Trading and Markets of the SEC?**

A. Yes, in fact, it was attached to one of the OIG report, one of the versions of the OIG report I reviewed, it was physically attached to it.

**Q. Did you --**

A. As though it were one report.

**Q. Did you review that appendix to the OIG report?**

A. Yes, I did.

**Q. You mentioned that liquidity issues were evident at Bear Stearns in the spring of 2007. Can you explain what you meant by that?**

A. After the problems, the financial problems that the two structured credit funds had, had become apparent to the market, both the funds actually failed in June of '07, but their problems really became apparent in March and April, the unlevered fund seemed to have fewer problems. But a better way to say it is the levered fund encountered

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 46..49

Page 46

JOHN D. FINNERTY - CONFIDENTIAL

its difficulties a little sooner because of the effects of the leverage.

But as the funds' problems became more and more apparent and the funds reported larger losses and first the leverage fund and then the unleveraged fund were earmarked for closure, it became increasingly apparent that there were some adverse implications for Bear Stearns.

There were negative reports in the press. We can see from the internal emails there were lots of concerns about the effect on reputation.

And what also becomes clear, particularly in email traffic involving the internal funding group at Bear Stearns run by Paul Friedman, that by June of '07 Bear Stearns is starting to have problems with its internal funding. There are concerns that the failure of the two hedge funds was a failure of risk management, was a failure of, failure to value the securities properly, and there

Page 47

JOHN D. FINNERTY - CONFIDENTIAL

were concerns that because those two funds were sponsored by Bear Stearns and headed by Ralph Cioffi who had been a senior fixed income person at Bear Stearns, that the problems of the two funds were symptomatic of problems at Bear Stearns.

And there's email traffic involving Paul Friedman and others where it's clear that they're experiencing some resistance in the market as they try to fund Bear Stearns' operations.

And as you move into August, the problems actually start to get quite severe, and there are emails where they're warning that they don't want to do anything that will spook the market or show signs of weakness.

And Bear is making really great efforts to try to put some distance between Bear Stearns and these two funds, although Bear had been, had been repo financing the funds and wound up actually having to -- they actually extended I

Page 48

JOHN D. FINNERTY - CONFIDENTIAL

think it was about a billion two repo facility to the unlevered fund, that as long as that umbilical cord remained there were concerns that there was a relationship between the two that implied that the problems the funds were having -- the fund was having might be problems that were similar to what would be afflicting Bear and that was affecting their funding. It was affecting their ability to raise short term funding in the marketplace.

**Q. And so you described, I asked you about the spring of '07, I don't think that you've described anything that, at Bear Stearns in the spring of '07. Is that accurate? Spring being the months of, you know, mid-March to mid-June.**

A. June 20, 21st. The two funds effectively failed by June. I think the levered fund, it was pretty clear the levered fund wasn't going to make it earlier than that.

Page 49

JOHN D. FINNERTY - CONFIDENTIAL

The problems start to become apparent in June. According to the email traffic, the funding problems at Bear Stearns really intensified and became a big concern by August. So I can't tell you whether it was late July, it was mid-August, but it was certainly by August one can see emails involving Paul Friedman where he and his group are expressing concerns about their ability to roll over financing, to attract new sources of funds, to continue providing enough financing to their prime brokerage clients. They're experiencing -- they're experiencing some liquidity stress.

**Q. And are you, Dr. Finnerty, offering an opinion about Bear Stearns' liquidity in your report?**

MR. HENKEN: Object to form.

A. I'm not sure what you're asking.

**Q. Are you offering an opinion that Bear Stearns' liquidity was inadequate during the relevant time**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 50..53

Page 50

JOHN D. FINNERTY - CONFIDENTIAL

**period?**

A. Well I clearly was. Bear Stearns failed. I mean anybody reading the record would clearly understand that it was a liquidity problem. So yes, the liquidity was inadequate because it was the lack of liquidity that sunk the ship.

**Q. Did you analyze, Dr. Finnerty, what Bear Stearns' liquidity was during the relevant time period?**

A. I reviewed documents that showed the liquidity position. I reviewed the email traffic between members of management and Paul Friedman and others in his group discussing the difficulties that Bear Stearns was having with its funding sources. I was -- I reviewed another whole set of internal documents that talked about the steps they had to take in order to try to preserve what liquidity they had.

So I've reviewed that record. I did study that record and studied how the liquidity situation got worse in the

Page 51

JOHN D. FINNERTY - CONFIDENTIAL

summer of '07, seemed to improve a little bit in the fall, starting December 20th, '07 when they reported the first quarterly loss as a public company, how the liquidity situation from that point on really started to get severe and grew more and more severe until finally we had the run on the bank the end of the week of March 10th and Bear Stearns went out of business.

**Q. And did you analyze at any particular time what Bear Stearns' liquidity was?**

MR. HENKEN: Object to form.

A. There are a whole series of reports that were included in the documents that I reviewed that provided various liquidity measures throughout the period from about the middle of '07 to March of '08. I may have actually seen some from even earlier. But certainly from I'd say probably the March of '07 to March of '08 time frame I reviewed the regular reports that are showing up in,

Page 52

JOHN D. FINNERTY - CONFIDENTIAL

in the management files that were turned over in discovery that quantify the liquidity, and all the internal reports we had that talk about the efforts of Bear Stearns to find new sources of liquidity, to roll over the repos, to change the liquidity policy, all of that information, and there was a tremendous amount of it, was reflected in the documents I reviewed. And I reviewed each of them carefully.

**Q. Are those documents, Dr. Finnerty, reflected in the documents considered attached as appendix B to your report?**

A. Yes, they are.

**Q. And are the documents that you identified in your search routine as hot documents, are those documents included in appendix B to your report?**

A. I don't know that all of the hot documents are in there. Certainly the ones that I relied upon in preparing the report. Since I've labeled this

Page 53

JOHN D. FINNERTY - CONFIDENTIAL

documents considered, all of the -- all of the hot documents, and to the extent there were significant documents that I considered in writing the report, are listed here.

There are other documents that undoubtedly in the search that was conducted and are contained in the binders of documents I reviewed, that are not here.

I am sure this list, as voluminous as it is, does not include every single document I touched. But it does include all of the documents that I considered as the basis for my opinions, including those I looked at and thought were relevant as well as those I actually relied upon and quoted.

**Q. And where can I find in your report the documents that you actually relied upon in rendering your opinions?**

MR. HENKEN: Object to form.

A. They're all -- they're all cited. I have quotations from document

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 58..61

Page 58
JOHN D. FINNERTY - CONFIDENTIAL

valuation models, and therefore, the workpapers would be informative as to whether or not there were systematic overvaluations or not.

Secondly, audit firms in the course of the audit, particularly if a firm has some stresses, will consider whether there's a need for a going concern opinion, and I would expect that certainly in connection with the 2007 audit there would be some workpapers in the Deloitte & Touche files that would show whatever work they did in considering whether or not they would need to insist upon a going concern or provide a going concern opinion in the financials.

**Q. So, Dr. Finnerty, you did not have Deloitte's workpapers available to you when you put together the report that you submitted on March 2nd; is that correct?**

A. That's correct, I did not.

**Q. And did you have any**

Page 59
JOHN D. FINNERTY - CONFIDENTIAL

**valuations of Bear Stearns' assets available to you when you prepared your report from March 2nd?**

A. I had the valuations that Bear Stearns did, and there were valuations that were summarized in their -- their quarterly and annual reports. There were many documents internally that talked about valuation issues, mark-to-market disputes. So there were a number of documents that were informative on that issue, but I didn't have the workpapers.

**Q. Dr. Finnerty, did you conduct an independent analysis of the valuations of any of Bear Stearns' assets during the relevant time period?**

MR. HENKEN: Object to form.

A. No. I relied on the documents I reviewed. I didn't do my own.

**Q. Did you do any evaluation of Bear Stearns' capital during the relevant time period?**

MR. HENKEN: Object to form.

A. I reviewed the record and what

Page 60
JOHN D. FINNERTY - CONFIDENTIAL

was, what was -- what was written about by others who had done that review. I didn't do -- I didn't feel it was necessary to do my own independent review, and didn't because I felt I could rely upon the work of others.

**Q. And what others are you referring to?**

A. The OIG report, for example, which found that Bear Stearns was undercapitalized.

**Q. And did you do any independent calculations of Bear Stearns' liquidity during the relevant time period?**

MR. HENKEN: Object to form.

A. I did the calculations that are embodied in attachment 28, where I compared Bear Stearns to the other four large publicly traded broker-dealers. So I did that particular comparison. In the report there are various exhibits that have -- whatever -- the calculations that I did that reflect on the liquidity. I think attachment 28 is the one that's

Page 61
JOHN D. FINNERTY - CONFIDENTIAL

most directly relevant.

**Q. And other than attachment 28, did you do any other analysis, independent analysis of Bear Stearns' liquidity?**

A. Yes. And I would include the market's assessment of the credit quality, because credit quality is fundamentally tied to liquidity.

And so I looked and analyzed the changes in Bear Stearns' credit spreads on its bonds, its swap spread, and I analyzed the changes in those spreads in attachment 29. I looked at the 5 year CDS spread, the 10 year yield spread over the course of the relevant period.

So I was looking at the market's, it's really the market's assessment of liquidity and credit and all those factors that affect its financial condition.

And so that's the analysis that, the calculations I did. You I did

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 62..65

Page 62
JOHN D. FINNERTY - CONFIDENTIAL

independent analysis in that I thoroughly reviewed whatever was, was written during the relevant period by people inside and outside of Bear on that particular issue.

**Q. Going back to your request for the Deloitte workpapers, what prompted you last week to ask for those workpapers?**

A. I had been hopeful that, because I'd requested the documents many times, that I would be able to get the mark to market on the Bear Stearns assets and liabilities at the time of the acquisition and I never was able to get those. So I thought that because I couldn't get the documents directly from JPMorgan, that perhaps instead I could get the Deloitte workpapers. And that that -- that source of information could -- could be helpful in getting to this issue of whether there were systematic overvaluations.

There's certainly plenty of documentary evidence that there were

Page 63
JOHN D. FINNERTY - CONFIDENTIAL

overvaluations, but I thought that the Deloitte workpapers would be helpful in determining whether or not those overvaluations were systematic.

**Q. And did you get the Deloitte workpapers from plaintiffs' counsel?**

A. I haven't gotten them yet. I don't know if we're going to get them. But I haven't received them yet.

**Q. And why did you think it was important to have the mark to market from JPMorgan's analysis of the -- of Bear Stearns' assets?**

A. The book value of equity before Bear Stearns failed, so at the end of the week of March the 10th, it was something in the maybe $80 range, I'm trying to remember the exact number, the book value of equity. And the company sold for $2. And, you know, even recognizing that there are reasons why the financial condition of Bear Stearns and its relatively weak negotiating position at that point would lead to a

Page 64
JOHN D. FINNERTY - CONFIDENTIAL

discount, the huge gap between the book value of the equity, which is supposed to be on a marked-to-market basis, and $2 a share suggests to me that the assets were carried on Bear Stearns' books at a -- at an overvaluation.

I know that there's -- this is not something I cite as a source, but there are -- there are books that have been written about Bear Stearns' failure that argue that there was at least a $6 billion overvaluation, and I can't remember whether they attribute that to JPMorgan's due diligence team or the due diligence team from the Flowers firm. But certainly the point has been made that one of the reasons why the price was so low, the $2 price was so low, and one of the reasons why the Flowers firm, I don't think they actually put a bid in, the reason for really the lack of bidding that last weekend was the fact that there were problems encountered in the course of the due diligence and the problems

Page 65
JOHN D. FINNERTY - CONFIDENTIAL

really reflected a substantial overvaluation of some of the assets, some of the mortgage assets. I think it was primarily the subordinated interests in the CDOs, the subprime, subprime mortgages, subprime CDO classes and there could be some other parts of the mortgage book.

But the implication was that there were some valuation problems in those, in those securities books and that that had scared, had scared prospective bidders away.

**Q. And what is --**

A. The $2 price.

**Q. And what is the basis for the statements that you're making about the overvaluation and the bidding that weekend?**

A. Well, I'm not --

MR. HENKEN: Object to form.

A. I'm not giving an opinion and I'm simply -- I'm simply noting that there have been in the popular sort of

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 66..69

Page 66
JOHN D. FINNERTY - CONFIDENTIAL
press there is a book on the failure of Bear Stearns that argued that I think it was a $6 billion overvaluation. I didn't put it in the report because I can't rely upon it. I have no basis for checking it.

I'm simply saying that based on that and other reports at the time, I suspect that there was an overvaluation.

I can see in the documentary evidence I reviewed many instances of overvaluation, for example, the $1.9 billion write-down on December 20th, '07 when they said the loss was going to be about a billion two, it's a billion nine, that they're -- and the mark-to-market disputes.

So with that as background, when I then read that last weekend that there were at least two entities that went through the Bear Stearns books, and as part of the due diligence would value the assets and liabilities, it raises that suspicion and what I wanted to do

Page 67
JOHN D. FINNERTY - CONFIDENTIAL
was to look at the JPMorgan valuations, the mark-to-market valuations just to see if there was an overvaluation evident as of the end of that week, and if so, how much of an overvaluation there was.

So it's simply I see the evidence -- I see something alerting me that there may be a problem. I realize it's something that has to be investigated. I couldn't investigate it and that's why I didn't put it in the report.

**Q. So you're not offering an opinion that Bear Stearns' assets were overvalued during the relevant time period?**

MR. HENKEN: Object to form.

A. I believe that there are numerous indications that certain assets were overvalued. Some of them substantially because that led to mark-to-market disputes. What I'm not giving is an opinion that this was systematic. I know there were

Page 68
JOHN D. FINNERTY - CONFIDENTIAL
overvaluations, I see it in the emails, I see it in other, for example, the OIG report. But I don't know whether they were systematic and I don't know the full extent of them because I don't have the evidence. And I was hoping that the combination of the JPMorgan mark to market and the Deloitte workpapers would shed some light on that.

**Q. Where in your report do you opine about specific overvaluations of Bear Stearns' assets?**

A. I don't opine about it, I cite the evidence that there was overvaluation. I cite the mark-to-market disputes, and it comes up in a number of places.

**Q. If you could point to those places in the report I'd appreciate it.**

MR. HENKEN: Professor Finnerty, please take your time.

A. At least one place starts on page 74.

**Q. And where on page 74 are you**

Page 69
JOHN D. FINNERTY - CONFIDENTIAL
**referring to?**

A. Section B, the overvaluation of the assets and the book value of equity, the first part of that section talks about Bear Stearns representing to the public the importance of particularly the equity value. And then on page 76 I cite various problems, valuation related problems as reflected, internal email communications. That starts on page 76. There are references to these various mark-to-market disputes starting on Roman ii on page 78.

So there are other references in the report, but I was specifically referring to pages 74 to 79.

**Q. And where on 74 to 79 do you identify any particular assets as having been overvalued?**

A. The internal email communications --

MR. HENKEN: Object to form.

A. -- starting on page 76, there the email identifies an audit report that

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 70..73

Page 70

JOHN D. FINNERTY - CONFIDENTIAL

in turn identifies several deficiencies.

**Q. Those deficiencies appear to be relating to back testing and stress testing?**

A. Yes. Well you'll --

**Q. So can you answer --**

A. You'll get the valuation issues there too.

**Q. What asset is being overvalued in your opinion?**

MR. HENKEN: Ms. Carey, please allow the witness to finish the answer.

A. I'm sorry, I think I interrupted counsel. I don't know, it doesn't seem to identify, in little (a) it doesn't seem to identify any particular assets. I'm reading on in (b) the valuation problem that is referenced there, this is testimony from Wendy, I'm probably going to mispronounce her name, Demonchaux, talking specifically about mortgages, the overvaluation of mortgages.

Page 71

JOHN D. FINNERTY - CONFIDENTIAL

**Q. What mortgages is Ms. Demonchaux -- she's not testifying, but she's just writing an email.**

A. Sorry, writing an email.

**Q. What mortgages is Ms. Demonchaux indicating are overvalued in this email, according to you?**

A. It looks like mortgage-backeds and asset-backed securities, she refers in that bold statement, the first part of that is referring to the real problem is in the mortgage and asset-backed area, whole loans are the funding issue, shouldn't they be the target. So she's talking about mortgage backeds, and asset backeds and whole loans.

**Q. Did you speak to Ms. Demonchaux when drafting your report?**

A. No.

**Q. Do you know what she meant in this email?**

MR. HENKEN: Object to form.

A. I can only interpret what she wrote.

Page 72

JOHN D. FINNERTY - CONFIDENTIAL

**Q. So based on Ms. Demonchaux's email you believe that Bear Stearns' mortgage assets were overvalued, is that your testimony?**

MR. HENKEN: Object to form.

A. She's referring to that. This isn't the only thing I'm referring to but it's part of it. There are other items here in this section that also refer to overvaluation.

**Q. Sure, let's go through them. Can you point to another place where -- another -- strike that.**

**Can you point to another area of your report where there is, where you believe there is evidence of overvaluation of Bear Stearns' assets?**

A. (c) is talking about the difference between the real market prices and the Totem data which I think are model prices.

**Q. And what assets are you claiming are overvalued in connection with that email?**

Page 73

**JOHN D. FINNERTY - CONFIDENTIAL**

A. Marano was on the mortgage desk so he would have been talking, he would have been referring to the mortgage securities, mortgage backeds.

**Q. Any particular mortgages that you can tell from this email?**

A. No, no.

**Q. So it is your testimony that based on this email you think this is evidence that Bear Stearns, particular Bear Stearns assets were being overvalued?**

A. I think it's -- it's indicating that, yes, I think it is.

**Q. And what part of this email is indicating that to you?**

A. Risk management refuses to recognize the difference between real market prices and Totem -- Totem data.

And the secondly, the risk management's treatment of the trading desk mark implies that the desk is being dishonest and systematically mismarking the book.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 74..77

Page 74
JOHN D FINNERTY - CONFIDENTIAL

If somebody is systematically mismarking the book they're not going to mismark it down, they're going to mismark it up because they want to avoid taking losses

**Q. If you could turn to --**

A I'm not finished Sorry

**Q. I'm sorry, but there's something I need to show you with that, so Exhibit 25 in your report, if you could turn to the email that you're just quoting from. So you just said, Dr. Finnerty, you quoted the aspect of the email that said the desk is being dishonest and systematically mismarking the book. Can you read the next sentence?**

A "This is just not the case and risk does not do a good job in my opinion at recognizing this and explaining it to management "

**Q. And so you didn't put in your -- you didn't include in your quotation of this the very next sentence that said**

Page 75
JOHN D. FINNERTY - CONFIDENTIAL

**this is just not the case, am I correct about that?**

A You're correct

**Q. Okay. Do you think that changes the way one might read this email?**

A Let me read the whole email I didn't include the whole email

**Q. Yes, I know.**

A What the email is saying is that Totem, based on the Totem data it appears that Bear Stearns is mismarking the book and Mr Bainlardi is then trying to deny that The fact is that the difference in marks exist

**Q. And so Dr. Finnerty, you say the fact is the difference in marks exist. What do you mean by that?**

A It's what's referred to in the first part of the email from Mr Bainlardi to Mr Nierenberg They're talking about conversations with Totem being fruitless Totem is collecting this data and reporting it The Totem --

Page 76
JOHN D FINNERTY - CONFIDENTIAL

the Totem marks and the Bear Stearns desk's marks are -- are different and sometimes, as this email notes, sometimes the differences are wide and sometimes they're not But those differences exist and Mr Bainlardi is then saying well this really isn't relevant, at least to him it isn't But the fact is there is this difference in the marks between Totem and the desk and that's the point I was trying to make

**Q. And you think this is evidence that Bear Stearns was overvaluing some particular asset?**

MR HENKEN Object to form

A Based on the Totem data, yes, I think that's right

**Q. And what asset is being overvalued?**

MR HENKEN Object to form

A These would be fixed income assets based on the fact that Mr Marano, head of fixed income, was being copied, this would be referring to something in

Page 77
JOHN D FINNERTY - CONFIDENTIAL

the fixed income book

**Q. But you don't know what fixed income assets they're speaking about; is that correct?**

A No, I don't know specifically

**Q. And do you know if they were reporting their asset values on the basis of Totem data?**

A I don't know whether they were using the Totem data or they were using their own marks

**Q. And so you don't know if they were valuing their assets appropriately or not, do you?**

A This suggests there were differences Unless I got the Deloitte & Touche workpapers I couldn't tell, I couldn't provide a full analysis I think the -- I think the Deloitte workpapers would reflect that Presumably they would have, they would contain the Totem marks, the marks from the desk and some resolution That's what I would expect

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 78..81

Page 78
JOHN D. FINNERTY - CONFIDENTIAL

**Q. And you had another email that you were referring to back on page 77 of your report as, quote, furnishing evidence about the overvaluation of securities at Bear Stearns.**

A. Yes.

**Q. Can you help me understand what particular assets you think are being overvalued based on this email?**

A. It's an asset backed collateralized debt obligation.

**Q. Do you know which one?**

A. It doesn't say, but it does -- it does indicate the portion of the portfolio that the security's in. And it indicates the importance of it by saying the risk is, let's see, "if the customer mark is demonstrated to be more accurate than our own and we remark the rest of our ABS-backed CDO inventory consistently with it, the desk would take substantial write-downs."

**Q. How does that support that Bear Stearns' assets were overvalued?**

Page 79
JOHN D. FINNERTY - CONFIDENTIAL

A. Because you wouldn't be taking a write-down if those assets were undervalued, you'd write it up.

**Q. Does this email actually say that the customer mark was more accurate than the Bear Stearns' mark?**

A. It doesn't contain that conclusion, but it certainly raises that possibility. It does note that when they have, when they compare the customer mark to theirs that there's a very significant difference, and it goes on to cite I guess a write-down, let's see, stemming from a Colonnade subordinated bond and super-senior CDs it says.

**Q. You're familiar with valuing structured mortgage products; is that correct?**

MR. HENKEN: Object to form.

A. Yes, I am.

**Q. And during the 2007, late 2007 -- strike that.**

**In December of 2007, what was the market like for CDOs backed by ABS,**

Page 80
JOHN D. FINNERTY - CONFIDENTIAL

**do you recall?**

A. CDOs backed by ABS or RMBS?

**Q. ABS.**

A. ABS? It depends upon what's in there. The market was somewhat unsettled, for example, for the poorer quality credit stuff.

**Q. Would you agree that the market for ABS CDOs in late 2007 was not liquid?**

MR. HENKEN: Object to form.

A. There were parts of the market that were not liquid.

**Q. Would it surprise you to see differences between marks on ABS CDOs amongst various dealers during this time period?**

A. The fact there are differences is not surprising. It's whether they're large and whether they're systematic is the issue. But the differences per se, no, it doesn't surprise me.

We've been going for about an hour and a half, can we just take a

Page 81
JOHN D. FINNERTY - CONFIDENTIAL

break?

MS. CAREY: Sure, that would be fine with me.

THE VIDEOGRAPHER: Stand by. Here marks the end of file number 2, we're going off the record, the time is 10:27 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: Here marks the beginning of file number 3, we are back on the record, the time is 10:43 a.m.

**Q. Dr. Finnerty, before the break we were discussing the evidence that you cited as supporting your statement that Bear Stearns overvalued mortgage-related assets on its books. Other than the emails we reviewed, are you aware of any other alleged evidence of overvaluation of Bear Stearns' mortgage-related assets in your report?**

A. I think it's important to be clear the footnotes don't just talk about mortgage backeds, they talk about whole

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

JOHN D. FINNERTY - CONFIDENTIAL

loans, they talk about asset backeds, which would be other than mortgage backeds, those are backed by assets other than mortgages. There are CDOs. So the problem is a little more pervasive.

But yes, there's other evidence in the report, the particular section we're looking at also has a subsection that references the SEC's office of Inspector General report.

**Q. And to be clear in my question I was talking about mortgage-related assets, not mortgage-backed assets?**

A. Oh, I'm sorry, mortgage related, okay. That would be -- that would include whole loans.

**Q. And what -- other than the OIG report and the emails that we discussed, are there any other documents or information that you relied upon in your report for the statement that valuations of mortgage-related assets on Bear Stearns' books were overvalued?**

A. Yes.

JOHN D. FINNERTY - CONFIDENTIAL

**Q. Can you direct me to what that is?**

A. There's the write-down that took place December 20th, it was announced December 20th, 2007. It was a billion nine write-down when the market was expecting a billion two.

There are a number of references in internal documents to, and I believe in the OIG Inspector General's report, that the mortgage models that Bear Stearns was using did not include consideration of the possibility of housing prices declining, and in fact housing prices had been declining since the middle of '06. The Case-Shiller index peaked at about June or July of '06. There were mark-to-market disputes. I have a -- the citations from the OIG report, but there are also many emails that talk about the valuation disputes that really grew out of I think it was the repo financing, the market, mark-to-market disputes that is.

JOHN D. FINNERTY - CONFIDENTIAL

There are other references in the documents I reviewed to problems with the models, that the models were outdated, the models, for example, didn't include default modeling correctly. There were some emails that discussed models that had been developed back in the early eighties to value agency mortgage-backed securities which don't really have default risk because they're guaranteed by the Fannie Mae or Freddie Mac.

Those models were being used in some cases to value mortgages that were subject, private label mortgages that were subject to default risk.

I'm not sure I've given you a complete list. And I know there are references to these particular points in other parts of the report.

So what we've done, what I've done in section, the section begins on 74 is just to highlight some of the emails and references the OIG report, but I

JOHN D. FINNERTY - CONFIDENTIAL

haven't -- I haven't -- I haven't tried to be comprehensive.

**Q. Just so I'm clear, you haven't tried to be comprehensive in indicating in your report the bases for your statements relating to Bear Stearns' overvaluation of mortgage-related assets, is that what you're saying?**

MR. HENKEN: Object to form.

A. I haven't -- I haven't provided every single document that substantiates the point. I didn't provide all of them. If one goes through all of the documents considered you will see that there are many other examples of reports and emails and internal documents that refer to the overvaluation issues.

**Q. And it's your position that all of those documents are listed in your documents considered, all the documents that you relied upon?**

A. All the ones I relied upon. I'm sure beyond that there are documents, as I testified this morning, there are

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 86..89

Page 86

JOHN D. FINNERTY - CONFIDENTIAL

documents that were characterized as significant. There are other documents that weren't either hot or significant that also make reference to these overvaluation issues.

I've simply, not simply, I've indicated the ones that I believe are the best examples, the most representative, but it certainly isn't, isn't the full list. There are lots of them.

**Q. And so these best examples which we just reviewed prior to the break, those are the ones that you believe were the best examples on pages 76 and 77 and 78?**

A. Yes.

MR. HENKEN: Object to form.

A. Yes.

**Q. Let me make that question clearer because it was a little bit garbled. It's your position that the emails that appear in your report on pages 76, 77 and 78 are the best examples that you were able to locate of evidence**

Page 87

**JOHN D. FINNERTY - CONFIDENTIAL**

**that Bear Stearns was overvaluing its mortgage-related assets; is that correct?**

MR. HENKEN: Object to form.

A. Yes.

**Q. Do you have any opinions, Dr. Finnerty, that you intend to offer in this case that are not set forth in your report?**

A. Not as I sit here today. It's certainly possible that counsel might ask me to do additional work which might lead to other opinions, but I don't have any other opinions that I intend to provide as I sit here today.

**Q. And you're not here today as a fact witness, am I right about that?**

A. I'm not.

MR. HENKEN: Object to form.

**Q. You don't have any firsthand knowledge about Bear Stearns' operations during the relevant time period?**

MR. HENKEN: Object to form.

**Q. Is that correct?**

A. That's correct.

Page 88

JOHN D. FINNERTY - CONFIDENTIAL

**Q. Are you providing an expert opinion that Bear Stearns' risk management disclosures were inaccurate?**

MR. HENKEN: Object to form.

A. I believe that there were material misstatements or omissions in the risk management disclosures. I don't know if that would rise to the level of a formal opinion, but certainly I cite the evidence and, and explain that in the report. So I certainly believe that to be the case.

**Q. But are you offering an opinion that, an expert opinion -- strike that.**

**Are you offering an expert opinion, Dr. Finnerty, that Bear Stearns' risk management disclosures were inaccurate?**

MR. HENKEN: Object to form.

A. I'm not providing a legal opinion. I'm providing a financial opinion that they were -- that they did not adequately describe the risk

Page 89

JOHN D. FINNERTY - CONFIDENTIAL

management issues, the deficiencies in the risk management systems.

Whether that's, you know -- it doesn't rise to a legal opinion because I'm not a lawyer.

**Q. I'm not asking for a legal opinion. I'm asking whether -- let me put it another way.**

**Do you believe that you are qualified as an expert in risk management?**

MR. HENKEN: Object to form.

A. Yes.

**Q. Have you ever in all of the testimony that you've ever given offered expert testimony on risk management?**

A. I don't know that I've provided testimony on risk management. I handled risk management for a bank that was a federal, a state and federally regulated bank, so I had to do that. I mean I was the person who had to handle the risk management, handle the hedging, so I've done it.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 90..93

Page 90

JOHN D. FINNERTY - CONFIDENTIAL

**Q. Have you ever been qualified as an expert in risk management in a litigation?**

MR. HENKEN: Object to form.

A. I don't know. I don't recall any.

**Q. And just to return to it, because I wasn't asking for a legal opinion, but just whether you are offering in your mind an expert opinion about whether Bear Stearns' risk management disclosures were inaccurate during the relevant time period?**

MR. HENKEN: Object to form.

A. Yes, I believe -- I believe they were -- I believe they were inadequate. Again, I'm not giving a legal opinion, but from a financial perspective I believe they were inadequate.

**Q. Did you analyze Bear Stearns' disclosures relating to its risk management?**

A. I did review those as well as

Page 91

JOHN D. FINNERTY - CONFIDENTIAL

what -- as well as what was said about the actual condition of the risk management systems and the deficiencies of those systems. So I reviewed both.

**Q. And other than acting as a risk manager for a financial institution, what are your qualifications in risk management, Dr. Finnerty?**

MR. HENKEN: Object to form.

A. I teach risk management as part of my fixed income classes. I teach hedging, how you design hedges, how you monitor the hedges. I teach asset liability management of financial institutions, particularly insurance companies in the course of my fixed income classes. So I teach that subject.

**Q. And what about value at risk, Dr. Finnerty, did you determine that Bear Stearns' value at risk disclosures in its financial statements were inaccurate?**

A. I read the opinions of others which seem to me to be well supported. I did not do my own independent assessment

Page 92

JOHN D. FINNERTY - CONFIDENTIAL

of VaR, I didn't think I needed to because others such as Professor Kyle, who assisted the SEC have opined on the issue. But I didn't do an independent assessment, but I've reached the opinion that Professor Kyle substantiates this opinion that the VaR disclosures were inadequate.

**Q. And are you aware that Professor Kyle didn't speak with anyone at Bear Stearns when he conducted his work?**

MR. HENKEN: Object to form.

A. That's my understanding.

**Q. And are you aware that Dr. Kyle didn't obtain any documents from Bear Stearns in conducting his work?**

MR. HENKEN: Object to form.

A. As I read the OIG report he received documents through the SEC. I don't know that he received them directly, but he -- based on what he's -- what his views are represented as and the investigations that are described, I

Page 93

JOHN D. FINNERTY - CONFIDENTIAL

believe he did receive documents through the SEC.

**Q. Is it your understanding that the office of Inspector General of the SEC indicated that Bear Stearns' VaR disclosures were inadequate?**

A. I believe that's one of Professor Kyle's opinions. If there were -- there were issues -- well, there were problems with the VaR models. I don't know that the report says that the disclosures were inadequate. I don't know if it uses those words. But it describes the VaR problems and if you compare the problems to what was disclosed or not disclosed about VaR, then you could easily -- you could come to that opinion.

For example, the fact that there wasn't a firm-wide VaR limit, that I don't believe has ever been disclosed by Bear Stearns and yet that problem, that deficiency has been cited repeatedly, for example, by Oliver Wyman.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 94..97

Page 94
JOHN D. FINNERTY - CONFIDENTIAL

It's cited internally through emails. It's cited in the OIG report. So that deficiency is cited repeatedly and yet did not make its ways into Bear Stearns' disclosures.

**Q. And what is your opinion about Bear Stearns' VaR disclosures?**

MR. HENKEN: Object to form.

A. As I just testified, they didn't disclose the lack of a firm-wide VaR limit. They didn't disclose they were using different VaR methodologies on different desks, so one couldn't compare them meaningfully, and that is different from, certainly based on the Oliver Wyman report and the OIG report and my -- my own experience, I think that's different from Street practice.

Firms use VaR -- firms that create and use VaR in risk management use it consistently, at least to the best they can.

**Q. And your basis for your opinion that Bear Stearns' -- let me**

Page 95
JOHN D. FINNERTY - CONFIDENTIAL

**strike that.**

**Other than the Oliver Wyman report and the OIG report, what is the basis for your statement that Bear Stearns' VaR was inaccurate?**

MR. HENKEN: Object to form.

A. That wasn't what I just said. What I testified was that they were using different VaR methodologies on different desks, so there were inconsistencies across the different marketing segments at Bear. And secondly, there was no overall VaR limit. That was my testimony.

**Q. Do you know if Bear Stearns' VaR was, as disclosed was inaccurate?**

A. I don't know.

**Q. Returning to risk management which we spoke about a little bit already, what is your opinion on Bear Stearns' risk management if you have one?**

A. Based on the, on the research that I did, based on the documents I reviewed, based on my knowledge,

Page 96
JOHN D. FINNERTY - CONFIDENTIAL

experience and training, I think the Bear Stearns' risk management system was seriously deficient in several important respects.

**Q. And please elaborate on what respects you think were deficient?**

A. I'm going to qualify my answer by everything that's in -- that's in the report. So I'll just highlight the things that I can recall sitting here.

They were understaffed, seriously understaffed. They did not regularly review the models. In fact, there were models that as of the time Bear failed that had been scheduled for review for years that hadn't been reviewed. This is a difficult, challenging process, but all of the -- the major firms have large groups of people that actually go in and check the code, check the models, try to validate the valuations provided by the models, and with the limited staff that Bear had, as reflected in various emails, they

Page 97
JOHN D. FINNERTY - CONFIDENTIAL

couldn't do it. They simply couldn't. In fact, there are emails from Tom Marano and others pointing out that they simply didn't have the ability to do that.

Second problem with risk management is that they, the very small. staff they had, at least in one case got down to about one or two people. They were actually sitting on the trading desk. So if you have your risk management people on the trading desk they can't be -- or it's very difficult to imagine them being independent, and there's emails, internal emails complaining that the risk management people are not functioning as an independent check on the trading desk. They're basically taking orders from the trading desk.

That -- that lack of independence of your risk management group is a -- is a really serious problem. The risk management group has to be independent.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 102..105

Page 102
JOHN D FINNERTY - CONFIDENTIAL

criticizes Bear for not going back and finding previous stressful scenarios to try to stress the balance sheet, stress the valuations to see how the business would, would function

And I think that's a -- that's a major failing because every time I've looked at any scenario analysis, the basic methodology involves going back historically and identifying periods of -- of great stress, such as periods where housing prices declined That would be the way one would do that rather than just trying to come up with something and something hypothetical off the top of your head You look at real scenarios How bad was it in the recession of '01 to '03 How bad was it -- what, the -- if you're looking at commodities, for example, how bad was it in the mid-seventies when we had the oil price run-up You would actually identify very stressful periods and use that as a basis of structuring your risk analysis

Page 103
JOHN D FINNERTY - CONFIDENTIAL

And based on the criticisms that I read, Bear wasn't doing that

**Q. Other than the criticisms that you read of Bear Stearns' risk management, what analysis did you conduct of Bear Stearns' models?**

A I didn't, I didn't test their models myself

**Q. Do you know if Bear Stearns improved its models at all during the time period 2006, December of 2006 through March of 2008?**

A There is email communications indicating that there was some improvement in some of the models, but also pointing out that there remained a lot of work to be done

So there was some improvement, but even, even on the eve of the -- of the failure of the firm in March of 2008 there were -- there was, based on the emails there was a lot of work -- and the OIG report there was a lot of modeling validation work and testing work that

Page 104
JOHN D FINNERTY - CONFIDENTIAL

remained to be done

**Q. Do you know which models remained to be validated?**

A There were a lot of them, but I haven't seen a list that enumerates them

**Q. How do you know there were a lot of them?**

A Because the emails, there were several

**Q. Because of which emails?**

A There were emails involving Sam Molinaro, Sam Molinaro in fact, is the one I'm thinking of and I can't give you the specific date, but there was one model -- one model -- there was one email, either he was a recipient or he was a sender, that is complaining about the fact they simply don't have enough people to do all of the modeling and to revise and update all the models

**Q. Was that -- you don't know what date that email was?**

A Not off the top --

Page 105
JOHN D FINNERTY - CONFIDENTIAL

**Q. Do you know if it's cited in your report?**

A I believe it is cited in the report but I don't recall the date as I sit here today

**Q. And you don't know which models allegedly were not updated?**

A I've not seen a list, a list of them

**Q. And in terms of the scenario analysis, have you done an analysis of which scenarios were being run by Bear Stearns over which portfolios?**

A No, I'm citing to others who did do that and found them deficient, but I've not -- I've not done that I didn't think it was necessary to redo their work

**Q. Do you know what work they actually did?**

A Yes, they reviewed the scenarios They reviewed the methodologies that were being used for selecting the scenarios because their

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 110..113

Page 110

JOHN D FINNERTY - CONFIDENTIAL

hypothetical stress scenarios

**Q. And you didn't conduct any independent analysis of the scenarios that were being used by Bear Stearns during the relevant time period, correct?**

MR HENKEN Object to form

A That's correct I believed it was reasonable to rely on Oliver Wyman and the other documents on which I relied, but I didn't do an independent check

**Q. What's your understanding of how the Oliver Wyman report came about?**

A Oliver Wyman was hired by Bear Stearns to try to improve the risk management systems

**Q. And who did the hiring, do you know?**

A Sam Molinaro I believe, or at least he was one of the people who hired him

**Q. And you also made a statement that Bear Stearns' risk management was understaffed. Do you know if it was, in**

Page 111

JOHN D. FINNERTY - CONFIDENTIAL

**your opinion was it understaffed throughout the relevant time period?**

A Throughout much of the period I don't know if it was understaffed every single day There was a period I believe in -- sometime in '07 where there were a very large number of departures and based on the communications among the various employees, and I think some deposition testimony as well, those, the miss -- the staff that had departed was not replaced, not fully replaced and as a result they were deficient in terms of numbers and skills

**Q. Did you look at doctorments -- doctorments -- strike that.**

**Dr. Finnerty, did you look at any documents that indicated who was employed in the risk management function at Bear Stearns during the relevant time period?**

MR HENKEN Object to form

A Yes, the people who staffed that group were identified

Page 112

JOHN D FINNERTY - CONFIDENTIAL

**Q. How about the employees of that group, did you in your work review documents reflecting the full staffing of those groups?**

A I don't know that I ever saw any document that identified every single staff member The documents did identify the leaders and some of the key people I don't know that the lists were exhaustive

**Q. Are the documents that you're referring to included on your list of documents considered in appendix B?**

A There are documents that certainly would identify people who were in key risk management roles As I testified, there were -- there were a number of other documents that I looked at that I found useful for background that I didn't list in those documents So, for example, there are documents in the -- listed in appendix B that will identify the key risk management people Any documents that I saw that would

Page 113

JOHN D FINNERTY - CONFIDENTIAL

simply list everybody in the group or other members of the group would probably not be there, but I wouldn't know that for sure until I actually looked at the list

I didn't -- I didn't try to count the number of people in the group What I did was to identify the key people and I reviewed email communications that commented on deficiencies in numbers and skill and so on Those are the documents that I would have included in appendix B

**Q. You're aware that Bear Stearns had a liquidity pool, am I right?**

A Yes

MR HENKEN Object to form

A Yes, at the holding company level

**Q. And they called it the parent company only liquidity pool, is that a term that you've seen in the documents, PCO?**

A Yes

**Q. Have you done any analysis of**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 114..117

Page 114
JOHN D. FINNERTY - CONFIDENTIAL

the parent company only liquidity at Bear Stearns during the relevant time period?

A Yes.

Q. And do you know if the liquidity ever dipped below the required liquidity for a CSE during the relevant time period?

A I don't know whether it -- whether it did or not I mean I looked at documents certainly that identified the level and how it changed over time

Q. Do you know what Bear Stearns' liquidity requirement was pursuant to its status as a CSE?

A I can't tell you that number as I sit here today It was less than 19 billion I think

Q. Pardon me?

A It was certainly less than 19 billion I think they -- they had more than would be required as a CSE I believe

Q. And Dr. Finnerty, are you aware that Bear Stearns disclosed its

Page 115
JOHN D. FINNERTY - CONFIDENTIAL

parent company only liquidity in its financial statements?

A Yes And also in analyst presentations It was -- that was a number that was -- that was disclosed and the policy of maintaining that pool was disclosed

Q. Are you contending at all that the number that was disclosed in Bear Stearns' financial statements for its liquidity was inaccurate?

A No, I'm not

Q. You say that -- strike that.

In your loss causation analysis in your report do you identify any stock price inflation that is attributable to any specific misstatement or omission that you detail in your report?

MR HENKEN Object to form

A I identify the omissions -- I'm sorry, the inflation as being due primarily to the liquidity issues which in turn were affected by the other

Page 116
JOHN D FINNERTY - CONFIDENTIAL

issues I didn't try to parse it out as among problems with the valuation models or problems with risk management It's all ultimately related to the liquidity issues Those other issues in turn affected, fed into the liquidity issues

Q. So I'm correct that in your report you do not specifically connect stock price inflation to any particular misstatement or omission, is that correct?

MR HENKEN Object to form

A Tied to liquidity, liquidity issues and I believe the liquidity issues really were tied to the, and fundamentally related to the others, meaning risk management, valuation, so on, so I tied it to, it's really liquidity It was the misstatements, omissions about the liquidity, but those other misstatements and omissions in turn affected the misstatements about the -- the liquidity

Q. So is it your position that

Page 117
JOHN D. FINNERTY - CONFIDENTIAL

throughout the relevant time period the stock price inflation was attributable to -- strike that.

Is it your contention that the stock price inflation that you're claiming occurred throughout the relevant time period is directly attributed to misstatements that Bear Stearns made about its liquidity?

MR HENKEN Object to form

A It's attributable to the liquidity problems which in turn are tied to the other problems, underlying problems about which there are also misstatements and omissions It's all one basic problem The inadequacy of the capital reserves, the inadequacy of the liquidity, the inadequacy of the valuation models, the inadequacy of the risk management system It was all part and parcel of the, the same problem

Q. But you cite in your report particular statements that you claim are misstatements, am I correct?

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 118..121

Page 118

JOHN D. FINNERTY - CONFIDENTIAL

A Yes

**Q. Do you tie any of those particular misstatements to any alleged stock price inflation at any particular time?**

A They're tied --

MR HENKEN Object to form

A They're tied to the liquidity issues and that's what leads to the inflation in the stock

**Q. Let me put it a different way. Let's look at an example. On December 20th, 2007 Bear Stearns had an earnings conference where the following statement is quoted in your report: "With respect to our balance sheet, capital and liquidity position, our profile is strong." And you claim that that is a misstatement. Does that sound right?**

A Yes

**Q. And the question I have is whether in your analysis you would attribute the stock price decline if there were one following such a statement**

Page 119

JOHN D. FINNERTY - CONFIDENTIAL

**to that particular statement in your analysis?**

A I'm not sure I follow your question

**Q. My question is -- yes, if there was -- if there was a decline in the stock price following that statement which you claim was a misstatement, would that be a -- could you specifically attribute inflation in the stock to that statement?**

MR HENKEN Object to form

A That was really the beginning of I think the leakage period So yes There was information that in that statement caused and reflected the leakage of information about the underlying problems in Bear, all of which fed into liquidity problems, the risk of confronting Bear, that got progressively worse as March 2008 approached So that was in fact part of the leakage That's part of the justification for the leakage approach

Page 120

JOHN D FINNERTY - CONFIDENTIAL

**Q. But your analysis doesn't tie stock price inflation to particular statements in exhibit or attachment 30 or 31, does it?**

MR HENKEN Object to form.

A. The declines in the price of the stock were the result of leakage between December 20th of 2007 and March 13, '08 and then the eventual liquidity issues that became evident March 14th and March 17th So it's not specific statements. The fraud wasn't -- this wasn't a fraud that was revealed by a final statement where the company confesses what it has done wrong This was a fraud where the information was reflected over a period of time as market participants became aware of the seriousness of the liquidity issues, and those liquidity issues then finally resulted in the run on the bank which brought Bear down March 14th and 17th 2008

So it was those events that

Page 121

JOHN D FINNERTY - CONFIDENTIAL

disclosed the problems It wasn't specific statements where Bear Stearns or Bear Stearns' management said, you know, we've been misstating all along our capital reserves and we haven't told you about our valuation problems and we haven't told you about our risk management problems, I'm not saying that at all I'm saying this was a -- this was an alleged fraud that was revealed through private information during the leakage period and the only public information was the information that became clear at the end of the week of March the 10th when Bear Stearns first had to go to JPMorgan and get a -- get a $30 billion, what everybody thought was a bailout, and then when it became parent that even that wouldn't save them and they finally, they failed

**Q. Do you separate the effect of misstatements regarding risk management versus valuation in your analysis of the decline in Bear Stearns' stock price?**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 130..133

Page 130

**JOHN D. FINNERTY - CONFIDENTIAL**

**assertion that Bear Stearns couldn't access the unsecured financing market in early 2008?**

A The internal email traffic There was email traffic involving Paul Friedman's group that was talking specifically about the difficulty they were having with the banks and it stands to reason if a bank isn't going to lend to you on a secured basis it's certainly not going to lend to you on an unsecured basis

**Q. And you said that Bear Stearns had difficulty obtaining unsecured financing in August of 2007 and should have disclosed that in your opinion. Do you think that Bear Stearns continued to have difficulty obtaining unsecured credit in October of 2007?**

MR HENKEN Object to form

A I think the liquidity distress was relieved to some degree in the fall of '07 It became more severe towards the end of '07, certainly by December of

Page 131

JOHN D FINNERTY - CONFIDENTIAL

'07 The initial problems that were apparent in the summer lessened in severity into September and October, and but then became more severe in the fall, particularly once Bear announced the first quarterly loss and the unexpectedly large write-down At that point the emails involving Paul Friedman's group indicate increasing difficulties rolling over financing

**Q. And other than those emails from Paul Friedman's group, what else are you relying on for your belief that Bear Stearns had increasing difficulties rolling over financing?**

A There may be other -- other things I cite in the report As I sit here those were really the primary documents I relied upon I mean Bear Stearns wasn't announcing that it was having these problems, so as a result we were limited as to the information that's available There may have been other sources that talked about issues with

Page 132

JOHN D FINNERTY - CONFIDENTIAL

Bear, but it was primarily the internal emails talking about sweeping the street and getting any -- any access to funding we can find, or having -- we don't want to spook customers We have to take our prime brokerage customers and cut them back because we simply don't have access to funding It's those sorts of emails, but that information was within Bear

Now at some point that information got out and that was the basis for the leakage, but it wasn't as though there was ever a formal announcement we're having difficulty rolling our financing They didn't do that

**Q. Do you -- strike that.**

**Did you conduct any analysis of how Bear Stearns replaced funding sources that were lost during the 2007 and 2008 time period?**

A I did analysis and it consisted of reviewing what was, first of all, what was in the emails that I

Page 133

JOHN D FINNERTY - CONFIDENTIAL

reviewed There were also internal reports that listed various funding sources so I was able to -- I was able to review that information as well

**Q. And are those internal reports reflecting funding sources contained in appendix B to your report?**

A I believe they are

**Q. You write in your report that "A perception that Bear Stearns had insufficient capital and excessive leverage could impair its access to repurchase financing by raising concerns that Bear Stearns was too risky a borrower."**

**Do you know that Bear Stearns' access to repurchase financing actually was impaired by that, the perception that it had insufficient capital and excessive leverage?**

MR HENKEN Object to form

A Its access to repurchase financing was clearly impaired Particularly as we get close to March of

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 134..137

Page 134
JOHN D. FINNERTY - CONFIDENTIAL

2008. The specific reasons why the various financial institutions were pulling their repurchase financing I'm less certain of. I don't -- I don't think that the documents that I reviewed provided reasons why institutions like Rabobank or ABN Amro refused to roll over their repurchase financing.

**Q. And we spoke about capital a little bit earlier. Bear Stearns disclosed its capital, correct, in its financial statements?**

A. Yes, it did.

**Q. And do you know if Bear Stearns -- strike that.**

**Do you know if Bear Stearns' disclosures of its capital were misstatements?**

MR. HENKEN: Object to form.

A. I have no basis for saying, and I don't believe that they were misstated. I don't think the calculations -- I don't have any basis to say the -- and I don't have an opinion

Page 135
JOHN D. FINNERTY - CONFIDENTIAL

that they were incorrect. As far as I know, on a book basis what they reported, what Bear reported for its capital I accept as correct.

**Q. And you wrote that Bear Stearns' leverage increased its vulnerability to a loss of investor confidence as well as its financial flexibility during times of stressful markets. Do you recall that?**

A. I do.

**Q. And would you agree that the markets became more volatile in the fall of 2007 and into the winter of 2008?**

A. There were certainly periods of time within the fall '07 period and the spring '08 period where market volatility increased.

You know, for example, when the, the auction rate securities fiasco occurred, that was a period of heightened volatility when the 144a ARS market blew up in August and September of '07, and then when the rest of the ARS market blew

Page 136
JOHN D. FINNERTY - CONFIDENTIAL

up in early February of '08, those were periods of significant stress in the marketplace.

**Q. Did Bear Stearns disclose its leverage in its financial statements?**

A. Yes, it disclosed certain leverage ratios and provided data so that if someone wanted to do other leverage ratio calculations they could do them.

**Q. And in paragraph 196 of your report you say, "it's entirely possible that Bear Stearns' high leverage contributed to a lack of confidence in the firm, including unsubstantiated rumors which had an impact on its collapse. Do you see that?**

A. I'm sorry, you're in paragraph 196?

**Q. Yes. At least I thought I was.**

A. You are, because I just didn't read far enough and see the sentence. I found it. Yes, I -- I did write that sentence and I -- actually I think I'm

Page 137
JOHN D. FINNERTY - CONFIDENTIAL

quoting from the OIG report in that sentence.

**Q. You agree with what the OIG report said that?**

A. I do and I'd be happy to explain why. Yes, I do. Leverage is a double edged sword.

**Q. Well you write also that Bear Stearns' high leverage and concentration in mortgages were potential red flags. We already talked about the leverage having been disclosed. Do you know if Bear Stearns' mortgage holdings were disclosed in its financial statements in 2006 and 2007?**

A. Bear Stearns did disclose its mortgage holdings and it disclosed them throughout its history, and Bear Stearns was historically known as primarily a mortgage broker-dealer, that was their expertise.

One of the places though where Bear Stearns clearly fell down in its mortgage disclosures was in its

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 138..141

Page 138

JOHN D. FINNERTY - CONFIDENTIAL

disclosures of its subprime exposure, and if one reads the SEC comment letter, and Samuel Molinaro, I think it was Sam Molinaro wrote the letter of reply, there were a number of items of information that were omitted about, for example, delinquency rates, true exposure, the amount of foreclosures that actually occurred, and those, the lack of those disclosures omitted information that the OIG report, for example, found would have been useful to, it omitted information that investors would have found useful.

So yes, there was mortgage disclosure, but there was not sufficient mortgage disclosure about the subprime risk exposure to enable investors to really fully understand the true exposure.

Also, as I testified earlier today, there were some serious questions about the overvaluation or possible overvaluation of the mortgage book. And that kind of reached a crescendo around

Page 139

JOHN D. FINNERTY - CONFIDENTIAL

the time of the write-down, December 20th of '07, when the analysts were surprised at the magnitude of the -- of the write-down.

**Q. Did you do any analysis of what Bear Stearns was -- what information about -- strike that.**

**Did you do any analysis of what information about its mortgage holdings Bear Stearns was required to report publicly during the relevant time period?**

MR. HENKEN: Object to form.

A. That really requires a legal analysis. No, I didn't do an independent analysis. I reviewed what was in the SEC comment letter and in Bear Stearns' response. And I didn't think as a result of having done that analysis I needed to do any, any further review.

The SEC noted deficiencies and Bear Stearns acknowledged them, it freely acknowledged that their disclosure was inadequate and said they would, in the

Page 140

JOHN D. FINNERTY - CONFIDENTIAL

future they would carefully review their disclosures or the information and decide what to disclose.

So they acknowledged the deficiencies in the '06 report.

**Q. Where in the letter does Bear Stearns say that its disclosures were inadequate? You want to show us?**

A. If you read the response letter I believe it was signed by Sam Molinaro, he notes in there that there was information. I don't think he says legally deficient, but he notes that there's information that he acknowledges would have been helpful to investors.

**Q. Can we look at where that is that he says that?**

A. Sure, sure.

**Q. Tab 7. And if I could direct your attention to the end of the response, which is where I think there's some summary comments.**

MR. HENKEN: Please, Professor Finnerty, feel free to take your

Page 141

JOHN D. FINNERTY - CONFIDENTIAL

time to look through the document.

A. I'm really in response to your question, I was referring to page 62 in my report, actually the section that begins on page 62, and the first sentence in paragraph 146 that references SEC staff comment 2(g), where I say that Bear Stearns acknowledged the company did not clearly disclose its exposure to subprime mortgage loans.

**Q. Well you actually said something different, Dr. Finnerty. You said that Mr. Molinaro indicated that the disclosure would have been -- let me just get your testimony here, that Mr. Molinaro acknowledged that the disclosure of additional subprime mortgage holding information would have been helpful to investors.**

**Is that not supported then by the document that you were citing in your report?**

MR. HENKEN: Object to form.

A. I think there's also comment

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

JOHN D FINNERTY - CONFIDENTIAL

to that effect in here too

**Q. Where are you looking?**

A I'm looking at the whole thing actually trying to find it

**Q. The whole thing being are you looking at the letter that was written to the --**

A Yes

**Q. -- SEC?**

A Yes, I am

**Q. And where in 2(g) does it say that Mr. Molinaro acknowledged that additional subprime mortgage holding information would have been helpful to investors?**

A I don't see that specific reference, but I do see on page 17 in 2(l) they talk about the possible effect of the subprime lending on their results of future operations and liquidity I really did think that I had, and I don't see it in this document, a more direct acknowledgment

But there's the acknowledgment



JOHN D FINNERTY - CONFIDENTIAL

of the possibility of liquidity issues and they -- and Molinaro notes in the future they'll consider the level of involvement in subprime lending and seek to enhance disclosures

But then they provide disclosures far in excess of the disclosures that they actually provided in their -- in their 2006 10-K I don't see those specific words

**Q. And the letter you've been looking at, Dr. Finnerty, a letter from Mr. Molinaro to the SEC was relating to Bear Stearns' financial statements for 2006; is that correct?**

A Yes, those financials in the 2006 10-K

**Q. And are you aware that Bear Stearns made disclosures about its subprime exposure in 2007?**

A It did, but it didn't have anywhere near the richness of detail as indicated in the letter, but yes, there were some, some disclosure about subprime



JOHN D FINNERTY - CONFIDENTIAL

in, I believe it was the third quarter of 2007

**Q. And the SEC completed its review of these disclosures after Bear Stearns had collapsed; is that correct?**

MR HENKEN Object to form

A Yes, I believe that's correct I think this letter was actually submitted after they submitted the 2007 10-K in January of '07, but for full --

**Q. That's not the question.**

A The full review wasn't completed until about April of, April of '08

**Q. So how could the disclosure of the information in Bear Stearns' response here have caused its stock price to decline prior to its collapse?**

MR HENKEN Object to form

A I'm not saying that, that the disclosure of this information caused it It's the lack of disclosure In other words, if there were richer detail about the subprime exposure and if the subprime



JOHN D FINNERTY - CONFIDENTIAL

exposure was really very limited, telling that to investors would reduce their perception of risk

**Q. It's your opinion that this information would have been significant to investors?**

A Yes, I believe it would As reflected in the SEC letter, yes, I think it would have been The SEC is asking about this information because of their view and I agree, I think the information would have been significant to investors

**Q. Do you know what other information -- strike that.**

**Do you know what other investment banks were disclosing about their subprime holdings during the same time period?**

A Generally

**Q. And were they disclosing, in your opinion, greater details about their subprime holdings than Bear Stearns was at the time?**

A Some were and some weren't

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 146..149

Page 146
JOHN D FINNERTY - CONFIDENTIAL

There was not a uniform practice I can't -- I can't as I sit here say that Bear Stearns was the worst, because that's not true

**Q. How do you think that additional disclosure about Bear Stearns' subprime mortgages would have dispelled rumors that led to Bear Stearns' ultimate collapse?**

MR HENKEN Object to form

A Judging by the articles that appeared in the media, there was a concern that Bear Stearns' mortgage-backed portfolio had a lot of subprime CDOs in it as the two funds had failed that had And that may not be the case But there was concern, and I think that concern was fueled in December 20thth, 2007, when Bear Stearns suddenly took a write-down that was bigger than investors had expected So there was concern that these mortgage problems were related to subprime exposure Therefore, if that's not true, then fuller

Page 147
JOHN D FINNERTY - CONFIDENTIAL

disclosure of the subprime exposure would have, would have I think dispelled some of those doubts

**Q. But you acknowledge that Bear Stearns had disclosed to the market in 2007 that it was net short subprime mortgages, true?**

A The direct position I don't think Bear Stearns disclosed, fully disclosed the indirect exposures through all of its CDO holdings, so I believe, as I look at the disclosure, what they're referring to are the subprime securities I don't think that's a -- and this is the same complaint that's been leveled against other broker-dealers They weren't disclosing the comprehensive subprime mortgage exposure That would -- and that was a fundamental problem for all of these firms

**Q. Do you know if Bear Stearns had significant exposure to CDOs during 2008?**

A They certainly had exposure

Page 148
JOHN D FINNERTY - CONFIDENTIAL

Without knowing the actual numbers I can't tell you whether it was significant But we can certainly see in the, in the internal emails there's concern about the residual interests and at one point one of the senior fixed income people writes an email to his colleague saying blow this stuff out of here right now because this stuff is going to be trouble or words to that effect

**Q. And in putting together your report here you didn't examine the Bear Stearns' CDO holdings?**

A I didn't try to drill down into those holdings I don't think I needed to because I have, for example, the OIG Inspector General's report and the other reports that I have relied upon So I didn't, I didn't drill down, I didn't -- I didn't, first of all if I wanted to drill down I didn't have the information to do that to get into the nuts and bolts of the portfolio But I

Page 149
JOHN D FINNERTY - CONFIDENTIAL

don't think I needed to do that because of the other work that had been done, for example, by Professor Kyle

**Q. Do you have any basis for thinking that there was significant subprime exposure at Bear Stearns that needed to be disclosed during this time period? Strike that. Let me ask a better question.**

**Do you have any basis for believing that Bear Stearns had significant subprime exposure that it wasn't disclosing to the market in the first quarter of 2008?**

A Yes

**Q. And what is that based on?**

A Bear Stearns was a major underwriter of mortgage-backed securities, and the subprime mortgage space was the source of a tremendous number of, of mortgages that were securitized, and that both the subprime and the Alt-A were, were markets where Bear Stearns was very active, in fact, it

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 154..157

Page 154
JOHN D FINNERTY - CONFIDENTIAL

getting more and more concerned and colleagues more and more concerned that Bear is going to have trouble rolling over its financing

**Q. Do you know if any of the rumors about Bear Stearns' were false?**

A I haven't been able, and no one would be able to really to identify all the rumors, so I can't answer the question

**Q. Are you aware of any false rumors that were circulating about Bear Stearns?**

A I can't say there weren't any I just don't know There were some rumors that were surprising about who might acquire them and where they might get financing from I have no idea if there's any truth to them For example at one point there was a rumor that Fortress was going to make a large investment I don't know whether there's any truth to that, for example, I just don't know

Page 155
JOHN D FINNERTY - CONFIDENTIAL

**Q. So it's possible that false rumors may have contributed to the run on Bear Stearns during the week of March 10th?**

A By the time you get to the middle of the week and Alan Schwartz goes on CNBC, I think it was CNBC, and he says there aren't any -- any -- the liquidity is fine and there's no truth to the rumors and then the funds keep withdrawing money later that day and it intensifies on that Thursday, so there's lots of rumors flying around, I wouldn't be at all surprised if at that point there were false rumors I mean people are trying to figure out what's going on and it's just the nature of the securities business that, that there -- at that point there'll be lots of speculations and rumors It's just the way the market operates

**Q. And you say that there were rumors about valuation issues. What are you referring to?**

Page 156
JOHN D. FINNERTY - CONFIDENTIAL

A I'm referring specifically to problems with the mark-to-market issues There are emails and references in the OIG report to two very substantial mark disputes of more than a hundred million dollars each sometime in I believe it was March There's a reference also to a huge mark dispute with State Street That may be one of the two for all I know Where State Street is so angry that they're going to -- they're threatening to pull their financing from Bear Stearns

There are also references to a large number of mark-to-market disputes around the 13th of March And I think Alan Schwartz in his deposition testifies that Bear had to send I think it was $3 billion of cash to counterparties to try to quell the rumors that were growing out of the -- of that And it was all over -- ultimately I'm sure it was over a combination of valuation and liquidity issues

Page 157
JOHN D FINNERTY - CONFIDENTIAL

So that's a pretty good example of how serious they were that Bear Stearns would have to, if it were true, if they would have to send $3 billion to various counterparties to try to resolve those mark-to-market disputes

**Q. And do you think that a bank run is more likely in a stressed market environment?**

MR HENKEN Object to form

A As a -- as a general matter, yes, I think it is

**Q. Is it your belief that absent the alleged fraud, the bank run on Bear Stearns would not have occurred?**

MR HENKEN Object to form

A I don't think that's really my issue, but I'll answer your question Unfortunately in the world of finance and economics we can't run, rerun experiments the way they do in the hard sciences So we can't really get a determinative answer to that question

I think it's much less likely

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 158..161

Page 158

JOHN D. FINNERTY - CONFIDENTIAL

the run would have occurred. Could it have been avoided entirely? I don't know. Bear Stearns' financial problems, particularly the liquidity issues, were, were really pretty severe. If they'd been disclosed earlier the stock price without a doubt would have -- would have declined because people would have understood the nature of the problems.

Would that have then given Bear Stearns enough time to implement policies, make changes in its operations and get out of the difficulty? Possible.

**Q. I said that Bear Stearns' liquidity issues were pretty severe. When were they pretty severe?**

A. They were severe in the summer of '07, particularly June, they seemed to become less, less severe in the early fall. Certainly I think by December 20th, 2007 when they reported the first quarterly losses of public company, judging, again judging by the internal emails and the difficulties Bear was

Page 159

JOHN D. FINNERTY - CONFIDENTIAL

having rolling over its financing, they became more severe by that -- became very severe at that point.

And from December 20th, 2007 onwards they grew in severity until ultimately they culminated in the run on the bank.

MS. CAREY: Now would be a good time to take another break if people are interested.

MR. HENKEN: Sounds good.

THE VIDEOGRAPHER: Stand by. Here marks the end of file number 3, we're going off the record, the time is 12:19 p.m.

(Luncheon recess: 12:19 p.m.)

Page 160

JOHN D. FINNERTY - CONFIDENTIAL

A F T E R N O O N S E S S I O N

1:20 p.m.

THE VIDEOGRAPHER: Here marks the beginning of file number 4, we are back on the record, the time is 1:20 p.m.

JOHN D. FINNERTY, resumed, having been previously duly sworn, was examined and testified further as follows:

CONTINUED EXAMINATION

BY MS. CAREY:

**Q. Dr. Finnerty, I want to understand how you calculated disclosure date damages per share for March 17th, 2008. My understanding is you multiplied the percentage of abnormal return attributable to the fraud on the day the corrective disclosure is reflected in the share price by the closing price prior -- on the date prior to the disclosure. Do I have that right?**

MR. HENKEN: Object to form.

A. Yes.

Page 161

JOHN D. FINNERTY - CONFIDENTIAL

**Q. And did you use that methodology for calculating disclosure date damages on March 17th?**

A. Yes, I did.

**Q. And is it fair to say that the estimated inflation on March 14th is the disclosure date damages on March 17th?**

A. There is the damage resulting from the disclosure on the 14th which becomes apparent, from what's disclosed on the 14th, which becomes apparent on the 17th, and there's the damage on the 14th which is the result of what was I guess disclosed before the market opened on the 14th.

**Q. Okay. So the inflation, the estimated inflation on March 14th is --**

A. $23.17.

**Q. And the disclosure date damages on March 17th are?**

A. Well the damages that day, it's actually the damages are associated with what was disclosed on the 14th. It becomes apparent on the 17th when the

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 162..165

Page 162
JOHN D. FINNERTY - CONFIDENTIAL

stock trades down 7 -- the abnormal return is minus 77.24 percent.

**Q. Okay.**

A. The damages result from a particular disclosure and they're reflected after the disclosure. In some cases, depending upon whether the disclosure is the end of the prior day or the beginning of the current day, the disclosure may precede by a day, calendar day the actual realization of the damages.

**Q. But the damages number would be $23.17 per share?**

MR. HENKEN: Object to form.

A. Yes. That's -- that's attributable to what happened on the 14th. After the market closed it became apparent on the 17th when the stock traded down from $30 to $4.81.

**Q. So disclosure date damages for March 17th would be $23.17?**

MR. HENKEN: Object to form.

A. Maybe we have a semantic

Page 163
JOHN D. FINNERTY - CONFIDENTIAL

problem. The disclosure occurred on the 14th, but the impact since it was after the market closed you can't see it in the market price of the stock until the following trading day.

**Q. Understood.**

A. So the damages really occurred on the 14th but they became apparent over the trading day on the 17th.

**Q. So you would say $23.17 of damages is attributable per -- strike that.**

**You would say after the close of trading on March 14th there was a disclosure that resulted in inflation of $23.17 per share on March 14th?**

MR. HENKEN: Object to form.

A. It became apparent in the market on the 17th, but it was due to the disclosure, on what happened after the market closed the 14th. Part of this was the disclosure of what happened over the weekend when Bear Stearns agreed to sell, the board approved the sale of the

Page 164
JOHN D. FINNERTY - CONFIDENTIAL

company for $2 a share.

**Q. Okay. That -- what is the disclosure that occurred after the close of trading on March 14th, 2008 that you claim impacted the stock price?**

A. It was really it was the sale of Bear Stearns, the ultimate failure of Bear Stearns.

**Q. Okay. And could that disclosure of -- strike that.**

**Could the disclosure of the sale of Bear Stearns have occurred prior to the close of trading on March 14th?**

MR. HENKEN: Object to form.

A. If it had become apparent that Bear Stearns couldn't continue in its current form, it could have occurred sooner. But it would have to be clear that Bear Stearns -- Bear Stearns had reached the point where it couldn't survive on its own because that's what ultimately led to its sale to JPMorgan.

**Q. But in your opinion, was the disclosure capable of being made on the**

Page 165
JOHN D. FINNERTY - CONFIDENTIAL

**14th, the disclosure being that Bear Stearns was going to be sold for $2 per share?**

MR. HENKEN: Object to form.

A. Not unless the board had met and approved the transaction.

**Q. And do you know when the board met and approved the transaction?**

A. Yes, it actually approved it on Sunday, the 16th.

**Q. So if the transaction was approved on Sunday, the 16th, it couldn't have been disclosed prior to the close of trading on March 14th, correct?**

A. That's correct.

**Q. So the announcement of the acquisition of Bear Stearns by JPMorgan was a timely announcement, correct?**

MR. HENKEN: Object to form.

A. I'm not sure what you mean by timely. Timely in what sense?

**Q. Meaning that it was disclosed to the market the next trading day after it occurred?**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 166..169

Page 166
JOHN D. FINNERTY - CONFIDENTIAL

A. In that sense, yes.

Q. You list a number of news items in paragraphs 87 to 91 of your report. They include the downgrades of Bear Stearns' long term credit ratings by credit rating agencies in addition to the announcement that Bear Stearns was going to be acquired by JPMorgan. Was it possible for Bear Stearns to disclose any of the events in these news items on March 14th, 2008 during trading?

A. It can only disclose the information if the event has occurred. So unless it knew that Moody's was going to downgrade them or that Standard & Poor's was going to downgrade them, there's nothing they could have disclosed until after those events had occurred.

Q. Do you know if Bear Stearns knew it was going to be downgraded by credit rating agencies prior to the close of trading on March 14th, 2008?

A. I don't know. Sometimes the agencies will give some forewarning, but

Page 167
JOHN D. FINNERTY - CONFIDENTIAL

oftentimes they don't, so I just don't know.

Q. You don't know if that occurred in this instance?

A. I do not know.

Q. In paragraphs 80 to 86 which discuss the events of March 14th, 2008, you say that Bear's "severe liquidity issues and the rating declines were negative news."

A. Where were you looking specifically? That all sounds very familiar, but.

Q. 84.

A. 84? Okay.

Q. Do you see that?

A. I do.

Q. Is it fair to say the market was aware of liquidity issues at Bear Stearns during trading on March 14th, 2008?

A. Certainly there are -- there were investors who were aware of it. There was still buying activity going on,

Page 168
JOHN D. FINNERTY - CONFIDENTIAL

so I'm not sure that all the investors were aware of that, but generally I think they were aware of liquidity issues and if they'd read the rating announcement then I think they certainly would have been even more aware of the liquidity issues.

Q. And these rating announcements are different than the announcements that we were describing in paragraph 87 which occurred after the close of trading, correct?

A. Yes.

Q. So there had been credit rating downgrades of Bear Stearns during trading on March 14th; is that right?

A. That's correct.

Q. Bear Stearns disclosed before the start of trading on March 14th, 2008 that it had experienced a significant deterioration in its liquidity. Do you recall that?

A. Yes.

Q. And it also disclosed that it

Page 169
JOHN D. FINNERTY - CONFIDENTIAL

was entering into an emergency credit facility with JPMorgan; is that correct?

A. That is correct.

Q. And you acknowledge in your report that on March 14th Bear Stearns believed that that facility would shore up its liquidity, do you agree with that?

MR. HENKEN: Object to form.

A. Yes, I believe they did, that they did in turn believe that, that that would happen.

Q. And do you know when Bear Stearns learned that the loan facility would no longer be available?

MR. HENKEN: Object to form.

A. I don't think they learned that it wouldn't be available. I think they learned that it wouldn't have the duration they originally thought. My recollection is they originally thought it would be for a period of a month, something in the general vicinity of a month, and then were told over the course of the weekend that that was not the

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 170..173

Page 170
JOHN D. FINNERTY - CONFIDENTIAL
deal, that the facility would have a limited duration of a matter of days, and I don't remember the exact cutoff. It would substantially shorten it. I believe that happened either after the close of trading on the 14th or sometime on the weekend they realized that the credit line was not what they had believed it to be.

Q. And you indicate that, in paragraph 256, which is quite a bit forward here, that market participants did not know that this strategy, the strategy to get a secured loan facility, had failed until it was announced on Sunday, March 16th, 2008, that JPMorgan would buy Bear Stearns for just $2 a share. How is the failure of the secured loan facility to shore up Bear Stearns' liquidity directly attributable to the market, you say, "finally having discovered the severity of Bear Stearns' liquidity crisis"?

MR. HENKEN: Object to form.

Page 171
JOHN D. FINNERTY - CONFIDENTIAL
Q. Let me do that again, that was hard to understand.

You also say in paragraph 256, in addition to that market participants did not know that the strategy had failed until it was announced on Sunday, March 16th, that the so-called run on the bank -- strike that again. Let me just read the whole thing?

"Market participants did not know that this strategy had failed until it was announced on Sunday, March 16th, 2008, that JPMorgan would buy Bear Stearns for just $2 per share. These developments and the so-called run on the bank are all directly attributable to the market finally having discovered the severity of Bear Stearns' liquidity crisis."

And so my question is how did the failure of a secured loan facility to shore up Bear Stearns' liquidity attribute -- contribute to the market's discovery of the, quote, severity of Bear

Page 172
JOHN D. FINNERTY - CONFIDENTIAL
Stearns' liquidity crisis?

MR. HENKEN: Object to form.

A. The market realized that the $30 billion facility alone would not be sufficient to resolve the liquidity issues, and Bear Stearns -- and Bear Stearns' management had concluded that at the end of the trading day on the 14th that the bleeding of cash that continued and that had continued to such an extent that the $30 billion credit line by it -- wouldn't be sufficient, it would have to be supplemented or something else would have to be done.

And that means that a problem that one might have thought during the day on the 14th could be solved with a $30 billion credit line after the close of market it was determined that even a $30 billion credit line wouldn't be able to solve it. Therefore it's a more serious problem. That's what I'm referring to there.

Q. And you said that, in the next

Page 173
JOHN D. FINNERTY - CONFIDENTIAL
paragraph, the $2 per share price that JPMorgan agreed to pay, quote, "at least partly reflects Bear Stearns' weak negotiating leverage owing to its financial distress and the paucity of potential bidders for Bear Stearns during the weekend of March 15th to 16th, 2008. This weak negotiating leverage effect is a direct consequence of the materialization of Bear Stearns' liquidity problems because a highly leveraged and liquidity strained financial institution is likely to find itself in a weak negotiating position if its liquidity problems are revealed and then attempts to find another institution to bail it out."

When you say the materialization of Bear Stearns' liquidity problems here, do you mean the run on the bank?

A. I mean the run on the bank and ultimately the, the failure of Bear Stearns. The run on the bank is a very

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 202..205

Page 202
JOHN D FINNERTY - CONFIDENTIAL

adjusted

So I'm not assuming they're identical every single day I'm assuming that they are severe, severe enough that there is substantial inflation in the stock every day, but it does vary somewhat And in fact you can see if you look in the inflation column that the inflation amount varies and therefore the severity of the liquidity problems vary somewhat But it's still, I believe it was great enough to sink the ship

**Q. Could you tell me on any given day during the relevant time period what the state of Bear Stearns' liquidity was?**

MR HENKEN Object to form

A No do I -- nor do think I have to I don't think --

**Q. I'm not asking if you have to, I'm asking --**

A I don't think that's my job

**Q. I'm asking if you can tell me on any particular day during the relevant time period what the state of Bear**

Page 203
JOHN D. FINNERTY - CONFIDENTIAL

**Stearns' liquidity was?**

MR HENKEN Same objection

A Generally they were having difficulty, great difficulty rolling over their repo financing They were having enormous difficulty, if they even were able to model on a unsecured basis They had severe problems with their VaR models, their valuation models, their risk management systems All of those problems that ultimately resulted in the run on the bank and the failure of Bear Stearns, all of those problems existed and were just as serious back at the beginning of the relevant period as they were at the end of the period

**Q. I understand that you believe that to be the case, but that's actually not what I'm asking. What I'm asking is have you done any analysis so that you could tell me on any day in the relevant time period what the status was of Bear Stearns' liquidity?**

MR HENKEN Object to form

Page 204
JOHN D FINNERTY - CONFIDENTIAL

A I just told you the -- the -- I don't know to the exact dollar, but the general, the condition, the liquidity of this company was in serious, serious, serious -- had serious, serious liquidity problems as a result of all of the alleged problems that are disclosed in the complaint related to the risk management models, the valuation models, the VaR calculations, all of those existed Those liquidity problems were severe

I can't tell you how much more severe on any given day than on some other given day But what I can tell you is it just reflected in the internal emails, this company had severe liquidity problems going right on back in the relevant period and these problems with the VaR models, the valuation models, the risk management systems, those problems were severe right back to the beginning of the relevant period

**Q. The relevant period begins in**

Page 205
JOHN D. FINNERTY - CONFIDENTIAL

**December of 2006. You're claiming that Bear Stearns' liquidity problems were essentially unchanged back to December of 2006?**

A No The problems that gave rise to the liquidity problems were just as severe in the early part of the period Those problems ultimately culminated in liquidity problems which became progressively more and more severe and culminated in a run on the bank and the failure of this institution

**Q. What analysis have you done of events in December of 2006 through December of 2007?**

A All of the information that I have that provides the basis for my opinions is in this report

**Q. And you said earlier that to the best that you can determine the liquidity problems were severe enough to sink the ship going right on back to the beginning of December 20th if they had been fully disclosed. Do you mean**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 206..209

Page 206
JOHN D. FINNERTY - CONFIDENTIAL

December 20th, 2007?

A. Yes.

Q. And do you believe that the liquidity problems at Bear Stearns were severe enough to sink the ship going back to December 14th of 2006?

A. I haven't said that. No, I'm not sure they are. But those -- the existing, underlying problems that gave rise to the serious liquidity problems did exist.

Q. Did you analyze during the period of December 14th, 2006 to December 20th, 2007 the severity of the liquidity problems at Bear Stearns?

A. No.

MR. HENKEN: Object to form.

A. No. I analyzed these other problems which are disclosed in the report.

Q. Dr. Finnerty, would you agree that financial markets became more stressed at the end of February 2008 than they had been in prior months?

Page 207
JOHN D. FINNERTY - CONFIDENTIAL

MR. HENKEN: Object to form.

A. I think they were probably more stressed at the beginning of the month than at the end of the month.

Q. The beginning of February 2008?

A. Yes. That's when the auction rate securities market blew up.

Q. Were you aware of bid/ask spreads widening during this time period?

MR. HENKEN: Object to form.

A. Yes, they widened certainly from the beginning of February 2008 when the auction rate securities market problems occurred, the spreads did widen. I don't know exactly which day and I don't know how long the widening continued, but the widening did occur.

Q. At the end of February 2008 are you aware that haircuts for mortgage-backed securities increased sharply?

MR. HENKEN: Object to form.

A. I have no reason to doubt

Page 208
JOHN D. FINNERTY - CONFIDENTIAL

that.

Q. And are you aware that the value of mortgage-backed securities backed by Alt-A securities was falling at the beginning of March 2008?

A. I would have thought it was -- they would have been falling sooner, but that doesn't surprise me also. I have no reason to doubt that.

Q. Have you analyzed the general conditions in the financial markets during the relevant time period?

MR. HENKEN: Object to form.

A. Yes.

Q. And I just cited a couple of indicators of the conditions of the financial markets. Are you aware of any others in the February or March 2008 time period?

A. I cited the auction rate securities market blowing up. There was a general widening of the credit spreads. There were increasing short positions in the stocks of the broker-dealers,

Page 209
JOHN D. FINNERTY - CONFIDENTIAL

particularly Bear. But also Lehman. Lehman had huge buildup in short positions in March.

There were substantial slow-downs in underwriting, for example, of CDOs, which put stress -- put some stress on the financial institution that were underwriting because that had been such a big part of their business.

So there were a number of indicators that the business environment had deteriorated.

Q. Can you think of any others?

A. Not off the top of my head, but I -- you know, I did look at that period. Without looking at the data I don't want to say something about changes in spreads and changes in credit ratings without actually, without actually looking at the data. But it was in this time period that, for example, the ratio of downgrades to upgrades increased significantly, lots more downgrades than upgrades.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 210..213

Page 210
JOHN D. FINNERTY - CONFIDENTIAL

Generally the credit market indicators were signaling increased distress during this period. So there are a variety of measures that people use. Those were generally signaling that situations were worsening.

Mortgage default rates were going up quite a bit. It was apparent, certainly by the spring of '08, it was apparent how bad the 2006 vintage, CDO vintages were. The -- somewhere in there the ABX Index started plummeting. So there were a number of indicators that there was credit stress in the market.

**Q. And could the market conditions we've just been discussing have increased concern by market participants in the survival of financial institutions like Bear Stearns?**

A. Like Bear Stearns, Lehman Brothers, Washington Mutual. It would have affected potentially a lot of financial institutions. It wouldn't have singled, necessarily singled out Bear

Page 211
JOHN D. FINNERTY - CONFIDENTIAL

Stearns.

**Q. Dr. Finnerty, do you think that if Bear Stearns had disclosed a significant deterioration in its liquidity in January of 2007 it would have been as likely to have experienced a run on the bank as it was in March of 2008?**

A. You mean January 2007? You mean January 2007?

MR. HENKEN: Object to form.

A. I doubt it. The situation was, was certainly more serious by the end of '08. Going back to January of '07, I doubt the consequences would have been as severe. And that's what my comment earlier about I think the ship could have sunk as early as December 20th of '07. In other words, the run on the bank could have started earlier. I think it's unlikely going back to January '07 that a run on the bank would have occurred under those circumstances. I think that's much less likely.

Page 212
JOHN D. FINNERTY - CONFIDENTIAL

**Q. And other than the disclosure of deterioration in Bear Stearns' liquidity and downgrades on March 14th, and of the acquisition of Bear Stearns by JPMorgan for $2 a share and downgrades following the close of the market on the 14th through the close of the market on March 17th, are there any other corrective disclosures that you were aware of during the week of March 10th?**

A. Can you read that question back, please.

(Record read as requested.)

A. No, I'm not aware of any others.

**Q. And would you, Dr. Finnerty, consider the announcements of ratings downgrades corrective disclosures?**

A. I think those were part of the corrective disclosures, part of the reaction to the liquidity crisis. So yes, I would include those as part of the, part of the corrective disclosures.

**Q. And you said before that Bear**

Page 213
JOHN D. FINNERTY - CONFIDENTIAL

**Stearns was not alone, that Lehman and I think you said Washington Mutual also could have been impacted by the market conditions that we were discussing. If Bear Stearns was known to be heavily invested in mortgages I think you testified earlier, could that have caused a more significant impact on Bear Stearns than on other investment banks that were not as heavily invested in mortgages?**

A. It could have, because of the high concentration in mortgages, it could have.

**Q. Is it your opinion that Bear Stearns' disclosures relating to its liquidity prior to March 14th were misstated?**

MR. HENKEN: Object to form.

A. Yes.

**Q. Are there any particular disclosures by Bear Stearns that you're thinking of when you think of the misstatements of its liquidity?**

A. Yes.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 218..221

Page 218
JOHN D. FINNERTY - CONFIDENTIAL

company factors unrelated to the fraud.

That basic methodology is the same every single day throughout the damage period. What's different is I have to take into account the fact that some days there's a public corrective disclosure and other days there's the leakage of information privately through the market and I need to take into account the fact that on some days it's public and some days it's private.

The same basic approach is the same, I have to adjust every day for market factors, industry factors and company factors unrelated to the fraud.

**Q. I'm not sure I understand this concept of private disclosure. Can you direct me to where that is in your report where you describe the private disclosure?**

A. Leakage.

**Q. When you say leakage you mean private disclosure?**

A. That's correct.

Page 219
JOHN D. FINNERTY - CONFIDENTIAL

**Q. And can you just explain in your own words what your leakage methodology was here?**

A. The leakage methodology involves calculating the difference between the but-for price and the actual price on each day during the period when the company was experiencing severe financial difficulties and its trading partners, its banks, those entities that are dealing with it see those indicia of those problems, the overvaluation of the assets, for example, the large mark-to-market disputes. That would suggest information about the financial condition and the liquidity of Bear.

There isn't a press release. There isn't a defined event that says we have serious financial problems and the market can react to it.

Instead, it's knowledgeable parties in contact with Bear know about this information because of their dealings with Bear. That information

Page 220
JOHN D. FINNERTY - CONFIDENTIAL

will get reflected in Bear's share price.

And so the essence of the leakage theory is that part of the drop in the stock price for Bear from March 20th on is a reflection of the fact that certain parties dealing with Bear became increasingly concerned about Bear's liquidity issues, its overvaluation issues and so on, and their trading would result in Bear's share price declining.

**Q. Can you describe how you controlled for market-wide and industry wide effects in your methodology?**

A. Yes, when I calculate the abnormal return I do that just the way I do it on the last two days. I use the market model, I use the a Fama French 3-Factor Model. I use a broad-based market index to adjust for market-wide factors. And I use the S&P investment banking and brokerage index to adjust for market factors.

In the backwardation I adjust for company-specific events on the -- on

Page 221
JOHN D. FINNERTY - CONFIDENTIAL

the non-fraud days by having the, assuming I should say that the expected return on the non-fraud day is identical to the actual return, the actual world.

**Q. And can I assume that the control for market wide and industrywide effects is shown by the difference between the BSC total return column and the abnormal return column, is that the right way of thinking about it?**

A. Yes, it is.

**Q. And the expected returns represent the return that you calculated would be expected in Bear Stearns' stock the day after you control for the market and industry factors?**

A. The expected return is calculated by applying the market model, the Fama French 3-Factor model.

**Q. Is the dollar price decline in Bear's stock price that you attribute to leakage of the alleged fraud on a given day equal to the decline in inflation from the prior trading day to that day?**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 222..225

Page 222
JOHN D. FINNERTY - CONFIDENTIAL

A. The dollar decline? No --

**Q. The dollar price decline?**

A. No.

**Q. Can you explain how that works?**

A. Well if you do that you get ridiculous results. For example, if you were to do that calculation which Dr. Ferrell did, you would conclude that on February the 5th, in the but-for world in his model, the stock price for Bear Stearns declined by 18 percent. You would conclude in his, according to his model, if you apply this constant dollar drop, that on March 5th, '08, that Bear Stearns' stock in the but-for world would have declined 35 percent. You get results that are not only counterintuitive, they just make no sense.

**Q. And so can you -- so can we take an example. Let's look at January 17th. And can you explain how you would say leakage caused the decline in the**

Page 223
JOHN D. FINNERTY - CONFIDENTIAL

**stock price on that day?**

A. Leakage is occurring in the marketplace through the activities of people who are trading on this -- on this private information, information that has leaked into the market. So there isn't a distinct disclosure. The effect of the leakage and the perceptions of Bear Stearns' liquidity problems are reflected in the inflation day to day.

On some days that perception leads to an increase in inflation and other days it leads to a decrease.

**Q. So how would you measure of the effect of the alleged fraud on Bear Stearns' stock price on January 17th, 2008?**

A. $63.78. That's a lot of inflation.

**Q. And there was no news that you record on that day; is that correct?**

A. On that day, whatever news was released was not related to the fraud. Wait a minute now, that's not right.

Page 224
JOHN D. FINNERTY - CONFIDENTIAL

Hang on. There was -- there was fraud-related news I think on that day. You said March 17th?

**Q. No, I'm saying January 17th.**

A. I'm sorry, January 17th. On January 17th, that's coded zero, so there was fraud-related news -- sorry, I don't see it in my exhibit, my attachment 30 I guess it is.

**Q. Right behind --**

A. What I try to do is to catalog the news and distinguish between the fraud-related and the non-fraud-related news. For some reason I don't see January 17th. I guess on that day I didn't -- I didn't see any news on that day, that's gotta be correct.

**Q. And so for dates where you didn't see any news, the entire amount of inflation that you calculated in the stock is attributed to the fraud?**

A. In that case I assumed that the expected return on the stock was equal to the market model determined

Page 225
JOHN D. FINNERTY - CONFIDENTIAL

return on the stock and whatever -- whatever news there was could have -- could be fraud-related, could not. I don't know what it is. But I just assumed that the expected return on the stock would be equal to the market model's expected return.

**Q. What I'm trying to understand is what the, what the practical impact of that is. You're calculating that there were damages relating to the inflation as part of attachment 31, correct, and are you taking into account for January 17th that there was inflation in the stock that was attributed to the fraud?**

A. That's correct, but it actually went down $4 from the prior day. It decreased. The inflation decreased on that day.

**Q. And so but on days where there is no news, anyplace on this report where there's no news where the non-fraud -- it's hard to read these columns but it looks like the expected return and the**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 226..229

Page 226

**JOHN D. FINNERTY - CONFIDENTIAL**

**adjusted expected return -- well, that doesn't help I guess. Strike that.**

A. The inflation actually went down. I'm assuming the stock price went down minus 5.83 and we'd expected it to go down minus 5.46, so what actually happened is the inflation went down. Actually the effect is that it's treated as though the news actually reduced the, reduced the inflation so it was inflation reducing news. Positive news to Bear Stearns in effect because the inflation diminished.

There's no bias -- I mean that -- that -- the news on those days where I can't identify anything, it's just as likely as not that it could be favorable or unfavorable, could be fraud, could be non-fraud-related, so I'm being perfectly benign in how I treat this. I'm simply saying on those days where I can't identify any news at all I'm just going to assume that one would normally expect that the stock would react on a

Page 227

JOHN D. FINNERTY - CONFIDENTIAL

percentage basis in the but-for world the way it -- we'd expect it in accordance with the market model. Any difference could either increase or decrease the fraud depending upon the effect of the leakage. The leakage can be favorable as well as unfavorable and so there's no bias in this calculation. It can -- it can cut both ways.

**Q. So you're claiming that there was leakage because of the fraud but the inflation is decreasing on January 17th?**

A. I'm -- I'm saying there is leakage throughout the period. Because of the nature of that information it is not noted in a press release. So I can't say on any given day exactly what information or how much information, but what I'm picking up is over the entire period the effect of the leakage of the information related to the fraud and how that would affect the stock price and I'm developing, actually I just took it from Cornell and Morgan's article in the UCLA

Page 228

JOHN D. FINNERTY - CONFIDENTIAL

Law Review and using the methodology that they developed and that I guess Dan Fischel applied in the Household matter, I'm applying that methodology with one adjustment. I'm specifically adjusting for company-specific news, which I believe you have to put in there, I made that one enhancement to the model and then I'm using that to plot how I would expect the price to behave in the absence of the fraud. I'm comparing that to the actual behavior and that difference in any given day is the amount of inflation.

What actually causes that day to day I don't know because there aren't press releases that identify what's being disclosed. But what I can see is that, I can see the decline in the price of the stock, the persistent price in the decline of the stock over the leakage period.

I can see in the internal emails, I can see the deterioration in the financial condition. I can see the

Page 229

JOHN D. FINNERTY - CONFIDENTIAL

deterioration in liquidity. I know that Bear's dealing with counterparties in the repo market, its banks, and the other financial institution it deals with.

So that information is there, it's just not out in the public arena. It's there, it's private in the sense that its counterparties know and these are sophisticated institutions which would presumably trade on it.

**Q. And just to clarify, when there is no news listed for a particular date in attachment 30, that means that you didn't see any news on those days relating to Bear Stearns; is that correct?**

A. I didn't see any -- anything other than perhaps routine news. There was no -- no what I would regard as news, value -- value affecting news, value that would affect the value of the stock, either relating to the fraud or not relating to the fraud.

**Q. Okay.**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 230..233

Page 230
JOHN D. FINNERTY - CONFIDENTIAL

A. In other words, there could be an announcement that they promoted Joe Smith to head of the mortgage department. I'm not regarding that as significant. So I'm not saying that there is no Bear Stearns news. I'm saying there's no news of the type that one would expect to move the stock price.

**Q. Okay. You also have in your attachment 30 a column where you note news items that you say are not economically significant news items. Can you distinguish how those news items that are marked no in the economically significant news column from the types of news that you were just describing?**

A. Is that information of the type that a reasonable investor, when this information is added to the mix of information that he or she has, would be likely to cause that investor to change his or her assessment of the stock, stock's value.

**Q. And how did you determine what**

Page 231
JOHN D. FINNERTY - CONFIDENTIAL

**was economically significant news here?**

A. Because I'm an economist, so I have reviewed hundreds of studies, event studies that show how the market reacts to different types of economic phenomenon, earnings surprises, forecast changes, dividend announcements, share buybacks, plant closings and the like.

So I'm using that frame of reference to apply the test I just described. Is this information of a type that a reasonable investor would expect when it's added to the mix of what was available beforehand might cause them to change the price of the stock. And we have a whole body of economic and financial and accounting research that identifies the kinds of information that will lead to those changes in price.

**Q. And I just want to be clear that I understand why that, that non-economically significant news that you list is different from the type of news that you don't list for a particular**

Page 232
JOHN D. FINNERTY - CONFIDENTIAL

**day.**

A. Can't list everything. I mean so I listed the news that I think would be, would be economically significant. I think I tried to follow that except in the -- let's see. I wanted, I guess I should say I really wanted to highlight those items because those are items that, as I say, those are items that would normally one would expect to move the price of the stock.

**Q. When you say those items, you mean what?**

A. Economically significant news items.

**Q. So those that are marked no in the column for economically significant news you have determined are not economically significant as you have just defined it, correct?**

A. Correct.

**Q. And you have included those items in your attachment 30 why?**

A. It's always possible, in spite

Page 233
JOHN D. FINNERTY - CONFIDENTIAL

of what I think is economically significant or not, that, that an item might nevertheless move the stock. So I want to be -- I want to be -- I want to have full disclosure. So I'm going to list those items, even those items that may not be economically significant, I'm going to list them in attachment 30. I'm going to identify them as items that I don't think are economically significant to distinguish them from items that are, but I'm going to list them, I'm going to list them in order for the reader to see them.

**Q. And you're listing those items but not listing items on other news days why? How did you make that determination?**

A. Those other days really had nothing that I thought was -- was -- was noteworthy.

**Q. So you're distinguishing between noteworthy and non-noteworthy amongst those things that are not**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 242..245

Page 242
JOHN D. FINNERTY - CONFIDENTIAL

is statistically significant. So we need to add some words to that and I will take care of that.

Q. And Dr. Finnerty, on dates that have a mix of fraud and non-fraud news, how did you determine what should be input in the column entitled non-fraud-related?

A. The test we applied is there has to be non-fraud-related news and a statistically significant return on the stock. So that should have been applied consistently.

Q. Regardless of whether -- strike that.

So you would apply footnote 2 to your analysis in attachment 31 regardless whether the news on a particular day was a mix of fraud and non-fraud news?

A. Yes, I believe that's correct.

Q. If you could look, Dr. Finnerty, at attachment 30, the news on January 8th, 2008, do you see here that

Page 243
JOHN D. FINNERTY - CONFIDENTIAL

you have a mix of fraud-related and non-fraud-related news that you've listed?

A. Yes.

Q. And I just want to ask you before we go further about some of the news items there. You have under the non-fraud-related news "Moody's downgraded Bear Stearns' Alt-A deals based on higher than anticipated rates of delinquency, foreclosure and REO in the underlying collateral."

You also have "Matthew Albrecht, an analyst at Standard & Poor's said Bear Stearns needs to diversify."

How did you come to designate that news as non-fraud-related news?

A. It didn't seem to me that it was related directly to the fraud.

Q. You had said before that you determined non-fraud versus fraud-related news based on the allegations in the complaint, correct?

A. Correct.

Page 244
JOHN D. FINNERTY - CONFIDENTIAL

Q. And you're talking about the Sherman complaint when you're talking about the allegations in the complaint, correct?

A. Correct.

Q. And do you know that there are allegations in the Sherman complaint about Bear Stearns' mortgage holdings?

A. Yes.

Q. And its -- the comment here about Bear Stearns needing to diversify, would you take that as a comment on its exposure to fixed income?

A. It doesn't say specifically what it's tied to. I don't think there's an allegation that Bear Stearns failed to disclose something about diversification. I mean that's the logic we went through. That's why that particular item was categorized as non-fraud-related.

There's no -- I don't think there's a fraud allegation directly related to diversification.

Q. But there is a fraud

Page 245
JOHN D. FINNERTY - CONFIDENTIAL

allegation related to Bear Stearns' mortgage holdings, correct?

A. Yes, there is. But this is specific to particular deals and anticipated, it says higher than anticipated rates of delinquency and foreclosure. This is talking about the specifics of the collateral.

Q. And the fraud-related news that you cite includes that Bear Stearns' CEO would be stepping down and a successor would be named. Why is that in your estimation fraud-related news?

A. I think his stepping -- we viewed his stepping down as being related to the problems inside of Bear Stearns that were somehow related to the liquidity and the other issues.

Q. When you say we, I thought that you had made the determination about what was fraud versus non-fraud. Was there someone else who was working with you on that determination?

A. I made the determination

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 250..253

Page 250
JOHN D. FINNERTY - CONFIDENTIAL

A. I think that should have been coded a one also.

**Q. So the information in attachment 31 for February 15th, 2008 is incorrect?**

A. Yes, I think that's right.

**Q. March 5th, 2008, is the information in attachment 31 for March 5th, 2008 correct?**

A. That doesn't make sense either. Can we take another break. Let me check again, sorry.

THE VIDEOGRAPHER: Stand by. Here marks the end of file number 5, we're going off the record, the time is 3:33 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: Here marks the beginning of file number 6, we are back on the record, the time is 3:50 p.m.

**Q. Dr. Finnerty, before the last break you had asked to step out to call your office again because we were**

Page 251
JOHN D. FINNERTY - CONFIDENTIAL

**discussing the attachment 31 non-fraud-related column and the zeroes and the ones.**

A. Yes.

**Q. Do you wish to change any of your prior testimony about this?**

A. Yes.

**Q. Go ahead.**

A. I did not read my own footnote correctly. The footnote as modified, corrected I should say, says the value's equal to one if the only observed public news on that day is non-fraud-related, in that case we treat the adjusted expected return in the but-for world as equal to the BSC total return in the actual world.

So on those days where there's both fraud-related and non-fraud-related news they would be coded as a zero.

So the only days that are coded one are days where there's only, the only public news is not fraud-related and the return is statistically significant, and that would mean that the

Page 252
JOHN D. FINNERTY - CONFIDENTIAL

coding is incorrect for January 8th, 2008, that should be a zero. It is incorrect for January 9th, that should be coded zero. And it's incorrect for January 15th, that should be coded zero.

I believe the other days are correct.

**Q. January --**

A. January 8th.

**Q. January 8, 9th?**

A. January 8th, January 9th and January 15th are coded incorrectly. They're miscoded as ones and they should be zeroes. So I apologize for wasting everybody's time. Sorry.

**Q. How about January 30th?**

A. January 30th.

**Q. Let me ask you an actual question. Is the information listed in attachment 31 for January 30th accurate?**

A. I believe so, but let me check attachment 30. You're right. January 30th has both fraud-related, non-fraud-related news, so it has both

Page 253
JOHN D. FINNERTY - CONFIDENTIAL

and therefore it should be coded zero.

**Q. And again, what does coding it zero mean in your analysis?**

A. Everything other than one. The easiest way to explain it I think is it's coded one if the only public news is fraud -- is non-fraud-related and if the abnormal return is statistically significant. Everything else is coded zero. So if there's both fraud-related, non-fraud-related news, coded zero. If there's no news it's coded zero. If there's non-fraud-related news but the return is not statistically significant, coded zero.

**Q. And what is the impact to your inflation calculation of coding something zero?**

A. If I code it zero, depending upon the nature of the return, it could either increase or decrease the amount of inflation. It's going to depend not only on how it's coded, but it's going to depend upon what the return is, because

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 254..257

Page 254
JOHN D. FINNERTY - CONFIDENTIAL

the inflation during this period can go up as well as down.

So the net effect of the four miscodings we've talked about, I can't say unless I actually redo the calculations what the effect would be, other than it would -- the numbers will be different, but I don't know that it's systematically biased in one direction or the other.

**Q. How did you control for company-specific non-fraud news on days that you designated as a zero?**

A. I did not.

**Q. And we were talking about inflation being, increasing and decreasing in your analysis, and I just want to make sure I understand the point you were making before about January 17th. Inflation is higher on January 17th than it is on January 18th, correct?**

A. Inflation is lower on January 17th.

**Q. Can you explain what you mean**

Page 255
JOHN D. FINNERTY - CONFIDENTIAL

**by that? The number -- you're meaning that less inflation has come out of the stock?**

A. The inflation -- the amount of inflation on January 17th is $63.78.

**Q. Okay.**

A. The amount of inflation the day before is $67.77. So the amount of inflation is $4 higher on the 16th of January than it is on the 17th of January.

**Q. I was talking about the 17th and the 18th.**

A. Oh, I'm sorry on January 17th, we talked about that. January 18th the inflation is $62.02, so the inflation has actually gone down and on -- between those two days there is, there's non-fraud-related news which is why that day is coded as a -- and significant -- and the return is statistically significant, that's why that day is coded one. The model -- the model suggests that the degree of inflation is actually

Page 256
JOHN D. FINNERTY - CONFIDENTIAL

going down.

**Q. And when the model -- when the -- strike that.**

**When the degree of inflation is going down, what does that mean in your damages analysis?**

A. That would mean --

MR. HENKEN: Object to form.

A. That would mean there's smaller damages associated with that day.

**Q. So if the inflation is going down, does that mean that there is leakage of the fraud between January 17th and January 18th of 2008?**

A. It means that whatever leakage had occurred is to some degree reversed because the degree of inflation is, is declining. The amount of inflation is changing throughout this period. It's not constant. We talked about that before. It's not constant.

**Q. But the question is whether if the amount of inflation is decreasing from one day to the next that means that**

Page 257
JOHN D. FINNERTY - CONFIDENTIAL

**there, under your analysis, there is a leakage of fraud from that, from that one day to the next day?**

A. There's no leakage of fraud on the 18th of January. That day has, it has non-fraud-related news.

**Q. We're talking about from the 17th of January to the 18th of January?**

A. Right, but what the -- what the one is referring to is what happens on the 18th, and on the 18th, between the close of the 17th and the close on the 18th, there is no fraud-related news, at least none -- the only news that we can pick up through the public and the public sources is not related to the fraud and in fact the return is statistically significant.

So something is happening in the market that suggests that the, that the fraud, at least the effect on the inflation has -- has diminished as reflected in the smaller, the smaller inflation number.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

JOHN D FINNERTY - CONFIDENTIAL

**Q. And do you attribute that change in the inflation number to a leakage of fraud?**

A. No If there were leakage, if truly leakage of the fraud, the amount of inflation would, the amount of inflation would actually -- let's see. Yes, yes, I would attribute that to the leakage of the fraud because that winds up, the leakage of the fraud winds up decreasing the inflation, so the effect of the leakage is to reduce the amount of inflation in the stock.

**Q. Even on days when there is statistically significant non-fraud news you would still attribute the decrease in inflation to leakage of the fraud; is that correct?**

A. The only thing that can cause the, the decrease in inflation is the leakage relative to the fraud That's independent of whatever, whatever news the company is disclosing unrelated to the fraud. The leakage of the fraud is,

JOHN D FINNERTY - CONFIDENTIAL

is related specifically to the items that are, that are disclosed in the, in the complaint, and what the coding of the one and zero, what the coding of the one items is reflecting publicly available news, but as I've testified earlier, the nature of the leakage is that it's information that is being disbursed privately. In other words, it's not being disclosed through press releases or company SEC filings. It's information that's being disclosed outside of the public arena

**Q. So your testimony is that the leakage is due -- strike that.**

**Your testimony is that the inflation is due to the leakage of the fraud, but the abnormal return, which is statistically significant, is attributed to non-fraud news?**

MR. HENKEN: Object to form

**Q. Is that correct?**

A I don't know, can you give me that back.

JOHN D. FINNERTY - CONFIDENTIAL

(Record read as requested )

A. The first part of the question I don't understand The abnormal return I'm attributing to the, to the economically statistically -- I'll say the statistically significant release of news unrelated to the fraud

The release of information in the market, the leakage is not related to the public news that's disclosed That -- that leakage occurs independent of that effect

**Q. Okay. I want to talk a little bit more again about how you determined what was fraud news versus non-fraud news in attachment 30. And you had said previously that fraud-related news was determined if it was related to allegations in the complaint; is that correct?**

A. Yes

**Q. And what did you mean by related to allegations in the complaint? Can you be more specific?**

**JOHN D. FINNERTY - CONFIDENTIAL**

A. Just what the words say.

**Q. When you -- was there any need in your application -- strike that.**

**In determining whether news was related to the fraud alleged in the complaint, did the news item need to demonstrate that the market was aware of the fraud that was alleged?**

A The nature of leakage is that the, the market as a whole is not aware of it or not necessarily aware of it The information is leaking into the market because of the trading activity of people who may be involved with Bear Stearns and see these problems or perceive these problems and trade on the basis of that information.

**Q. Okay. So we're going to back up a little bit. Just to be clear, I want to just make sure I understand your attachment 31. On days where you determined that all the news was non-fraud-related and the abnormal return was statistically significant, you would**

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 262..265

Page 262
JOHN D. FINNERTY - CONFIDENTIAL

**indicate that with a one in the non-fraud-related column, correct?**

A. Yes.

**Q. And on those days the adjusted expected return would be equal to the actual total return; is that correct?**

A. That's correct.

**Q. Okay. So any decline in stock price on a date that was designated with a one would not be attributed to the fraud; is that correct?**

A. On those days you would have the actual return in the but-for world would match the actual return observed for the stock in the -- in the market. You could still have -- you could still have leakage occurring on those days. The inflation level could change. I'm simply assuming on those days where there's no fraud-related news observed and the, the stock price in those -- on those days, because of the statistically significant return, I'm attributing the percentage return entirely to events

Page 263
JOHN D. FINNERTY - CONFIDENTIAL

unrelated to the fraud, but in calculating the amount of inflation, I'm subtracting the actual, the but-for price from the actual price. So the amount of inflation could actually change and that comports with the real world. You could have inflation coming into the stock or leaving the stock, that could happen on any day during, during the period starting December 20th, 2007.

**Q. But the question was whether that inflation would be due -- well, strike that.**

**The question was would any decline in the stock price on a day that is designated one in your non-fraud-related column, did you calculate that it was part of the alleged fraud in your calculations?**

A. No, I didn't calculate. What I calculated was the amount of inflation and I calculated the amount of inflation as the difference between the actual price and the but-for price, and what I

Page 264
JOHN D. FINNERTY - CONFIDENTIAL

did on those days that were coded one because the only public news was unrelated to the fraud and the return was statistically significant, I attributed the actual return or matched the actual return on the stock to the return on the stock I would expect the stock to have in the but-for world.

Because I'm applying those percentage returns to different dollar amounts in the but-for world and the actual world, it turns out that the dollar amounts of change in the but-for world and the actual world could be different. I'm equating the percentage returns, not the dollar returns. And as a result, the inflation level could change, but that's consistent with what one would expect in practice.

You could have inflation changing because you could have information leaking even though you have a statistically significant announcement of something unrelated to the fraud.

Page 265
JOHN D. FINNERTY - CONFIDENTIAL

**Q. Isn't the but-for price based on the abnormal return?**

A. It is.

**Q. And what is your basis for saying that inflation is leaking out of the stock on the days when the abnormal return is attributable only to non-fraud news?**

MR. HENKEN: Object to form.

A. Inflation could leak out of a stock on any day throughout this entire period, any day.

**Q. Well what is your support for that?**

A. That's what leakage is. Leakage is --

**Q. And so --**

A. Leakage is the disbursement of information through the marketplace among sophisticated traders, people who interact with Bear. There's no announcement of, of news the way there is of -- of news related to leakage.

What this is designed to pick

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 266..269

Page 266

JOHN D FINNERTY - CONFIDENTIAL

up is information about Bear Stearns and its deteriorating condition that was picked up by sophisticated parties who are dealing with Bear Stearns It's not the market in general reacting to news What I'm trying to do in this analysis is the adjust specifically for adjustments to identifiable public news

Once I do that I've then corrected for that news, but I'm also allowing for, on any of these given days, I'm also allowing for the possibility that information leaks into the market

I mean to be clear, information isn't only leaking in on days that are coded zero Information is potentially leaking -- information about the fraud is potentially leaking on any day

**Q. You say that you're trying to adjust specifically for adjustments to identifiable public news. I'm not sure I understand what you mean by that.**

A If you were to look at the

Page 267

JOHN D FINNERTY - CONFIDENTIAL

Cornell and Morgan paper, they do not make an adjustment for significant company announcements unrelated to the fraud I think that their model is in need of an adjustment and the adjustment is to take into account on some days a company, this case Bear Stearns, makes announcements of news that are unrelated to the fraud, the return is statistically significant, and on those days I adjust the but-for price line to reflect the effect of, as best I can determine, what the effect would be in the, in the but-for world

I do that by assuming that the percentage return in the but-for world would be the same as the percentage return I observe in the real world

The dollar returns are going to be different The dollar changes have to be different because I'm applying the similar percentage to different base amounts

And as I testified earlier, if

Page 268

JOHN D FINNERTY - CONFIDENTIAL

you do the -- if you try to equate the dollar amounts you get silly results, you get the price changing by 35 percent and 18 percent on days in the but-for world and that makes no sense

**Q. Why did you make an adjustment to the Cornell and Morgan paper?**

A Because I think you have to as a matter of economics adjust for the fact that if a company makes an announcement of non-fraud-related news and that news is significant, then that will move the stock price and it has nothing to do with the fraud Therefore, in order to do the calculation of the damages correctly, one has to adjust for three things Market-wide factors, industry-wide factors and company information unrelated to the fraud

And so the adjustment, the coding of one and zero addresses that third issue I'm adjusting for certain items of information about the company that are publicly, publicly released that

Page 269

JOHN D FINNERTY - CONFIDENTIAL

have a statistically significant impact on the stock price

**Q. Okay.**

A And they, Morgan and Cornell didn't do that and I think their model is fine up to that point I think with that adjustment their model works fine

**Q. Have you seen anybody else employ the analysis that you are describing here, your leakage analysis?**

A Dan Fischel used it in Household

**Q. Anyone other than Dan Fischel in Household?**

A Not that I'm aware of There could be others, but I know Dan did

**Q. Do you believe the entire abnormal return was caused by non-fraud news on days when you have a one in the non-fraud-related column?**

A No, there are days where it appears as though some of the change would be caused by leakage or could be changes in the perception of the

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 270..273

Page 270
JOHN D FINNERTY - CONFIDENTIAL

company's financial information which would change the amount of inflation It could be -- it could be both

**Q. It could be, but do you know which one it is in a particular day?**

A No one could know that unless you actually knew what information was being exchanged among all the parties privately You couldn't -- you couldn't determine that That's the nature of the private information, that's the essence of leakage The information is coming into the market through the, just the interactions of people with Bear Stearns It's not coming into the market through public announcements

**Q. Your attachment 31 has a one in the non-fraud-related column for December 24th and January 4th, 7th, 8th, 15th, 18th, etc., but you found inflation dissipated on these days; is that correct?**

MR HENKEN One of those dates at least was a date that he's

Page 271
JOHN D FINNERTY - CONFIDENTIAL

testified about previously that the one -- that's the 8th?

MS CAREY You're asking me a question, Matthew?

MR HENKEN No, I'm offering you to clean up your record slightly The 8th is a date where there's a one in the chart and he's already testified should be a zero

MS CAREY I've lost track of what should be a zero and a one at this point

MR HENKEN That's fine

**Q. Does that one -- does that one remain a zero or does it get changed to a one?**

A January 8th, January 9th, January 15th and also January 30th should be zeroes

**Q. January 8th, 9th and 15th?**

A 15th and I believe you asked me earlier --

**Q. 30th?**

A -- about the 30th and I think

Page 272
JOHN D FINNERTY - CONFIDENTIAL

I testified the 30th should also be coded zero, but let me check

**Q. Let me withdraw my question and ask you, December 24th, January 4th, 7th, and 18th, for example, are all days where you found inflation dissipated, is that correct?**

A January 24th inflation dissipated that would be evidence of leakage What were the other days you asked about?

**Q. 4th, 7th, 18th?**

A January 4th, January 7th, and January 18th on all three of those days leakage reduced the amount of inflation

**Q. And all of those days were coded one, meaning that they were non-fraud-related days; is that correct?**

A They were coded --

MR HENKEN Object to form

A They were coded one because the only public information that was disclosed was not related to the fraud and the impact on the stock of that

Page 273
JOHN D FINNERTY - CONFIDENTIAL

information was statistically significant That does not have any implication for the -- for the leakage Leakage can occur, as I testified, independent of any public announcement the company makes

**Q. So you're assuming there was leakage even though there was no news on that day to indicate there was leakage?**

A No, I'm not assuming I'm measuring the effect that I attribute to leakage Leakage, I don't have a set of announcements, that's not what leakage is I don't know about all of the trading that people were engaging in and why

What I'm trying to do is over this time period from January -- from December 20th, 2013 to March 13th, 2008, pick up the effect in the marketplace of what I can observe through emails and other documents, is a clear worsening of the problems affecting Bear Stearns There's a very noticeable drop in Bear

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 274..277

Page 274
JOHN D. FINNERTY - CONFIDENTIAL

Stearns stock and I am attributing and trying to measure the effect of the information that was available privately, not in the public arena, at least not to all of the investors in the market, and trying to reflect the effect of that on Bear Stearns' stock and the damages in this case.

**Q. On days where there was only non-fraud-related news but the abnormal return was not statistically significant, you attributed the abnormal return to the fraud; is that correct?**

A. No, that's not what I'm doing. I am -- I am plotting the but-for price line On those days where there is not significant public news, I'm assuming on those days that the return in the but-for world would be as -- as predicted by the, by the model, by the market model Inflation could go up, inflation could go down on those days

**Q. But you're assuming that the change was fraud-related?**

Page 275
JOHN D. FINNERTY - CONFIDENTIAL

MR HENKEN. Object to form

A I'm assuming that, that there's a change in the amount of inflation and that could be, could be related to either an increase or a dissipation in the -- in the -- in the fraud effect in the market It is fraud -- it is fraud effect related that is causing the change in inflation.

**Q. Couldn't non-fraud news cause a nonstatistically significant return?**

A. Yes.

**Q. Okay, so I want to make sure I have it straight. On days where the entry in the non-fraud-related column is zero in attachment 31, you treated the adjusted expected return as equal to the expected return; is that correct?**

A. The expected return according to the Fama French 3-Factor Model

**Q. Is that a yes?**

A. That's a yes with a clarification, yes

**Q. And the expected return is the**

Page 276
JOHN D. FINNERTY - CONFIDENTIAL

**total return minus the abnormal return, do I have that correct?**

A. I'm sorry, can you read that back

(Record read as requested.)

A. The expected return is what comes out of the market model. It turns out arithmetically your calculation is correct.

**Q. Do you believe the abnormal return was not affected by non-fraud news on days when you have a zero in the non-fraud-related column of attachment 31?**

A. I'm sorry, can you read that one back.

(Record read as requested )

A. I haven't made that assumption. I'm calculating the abnormal return as the difference between the actual return and the -- and the expected return I calculated the expected return by applying the market model.

**Q. And you say in paragraph 190**

Page 277
JOHN D. FINNERTY - CONFIDENTIAL

**of your report that it's very important to exclude company-specific information that's not related to the alleged fraud in your damage calculation, correct?**

A. Correct, that's what I did But I limited it to only information that's statistically significant. If it's not, it's not significant, then I didn't see the need to eliminate it. What I did do is I eliminated information that I can observe that does have a significant effect on the, on the stock, and clearly, in those cases where the only public news I can observe is not related to the fraud and the stock price moves to a significant degree, I need to adjust for that and that's exactly what I did

**Q. But you used the entire abnormal return on days that have a zero to calculate the but-for price; is that correct?**

A On days that are coded with a zero I used the expected return to

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 282..285

Page 282
JOHN D FINNERTY - CONFIDENTIAL

I observe, the only news I observe is news unrelated to the fraud and it's significant news, I'm going to significantly adjust the but-for price for that news In other words, those abnormal returns as well as the expected returns because on those days I have information that leads me to believe that what's driving the stock price and the total return is at least in part that effect primarily Well, in part that significant news, but also the market factors and the industry factors

**Q. How did you determine the dates for your leakage period?**

A I analyzed the information that was in various documents that I reviewed, the email traffic, for example, and took all of that information collectively, and then I looked at -- so I got a -- I got a strong sense of the liquidity issues, particularly the repo, refinancing issues And I looked at analyst reports throughout the period and

Page 283
JOHN D FINNERTY - CONFIDENTIAL

I noticed that around December 20th, 2007 there was increased interest and increased concern expressed about the financial condition and the liquidity situation at Bear The large write-down, I think it was a billion nine There was I believe, there was a rating reduction right after that report There certainly was a lot of discussion in the -- in the emails internally about the effects of that first loss as a public company

Certainly Bear Stearns had highlighted for years that it had never lost money in any quarter as a public company And that just seemed like a watershed event based on all of that information that I reviewed

So I picked that, I think that's a conservative date because as I testified this morning, there is evidence that in the summer, the spring and the summer, April, May, June, that there were, particularly following the failure of the two hedge funds, big hedge funds,

Page 284
JOHN D FINNERTY - CONFIDENTIAL

that Bear had some very serious liquidity issues Those seemed to moderate after the summer, but they never went away And then they came back in December

So I decided to be conservative and pick the date as December 20th, 2007, although I believe I could have -- I could have justified an earlier date because of the stresses that were evident in the summer of 2007

**Q. Did you conduct an analysis of the earlier time period to see how that would have impacted your opinions regarding loss causation?**

A I analyzed the information throughout the time period and I picked the dates and then I did the loss causation analysis and the damages analysis In other words, I didn't -- I didn't use those to pick the date I picked the date based on my economic analysis of Bear's situation and the events as I saw them unfolding and as I read about the reactions to them in the

Page 285
JOHN D FINNERTY - CONFIDENTIAL

analyst reports and the internal documents

I settled on the date and then I did the loss causation analysis and the formal loss causation analysis that's in the report

**Q. Did you conduct the same calculation of but-for price and inflation per share for any other time period other than December 20th to March 14th, 2008?**

A No, I did not March 13th, 2008, but no, I did not

**Q. You point to in your report certain credit indicators as indicating that there was leakage of the alleged fraud; is that correct?**

A Yes

**Q. And those included widening of Bear Stearns' CDS spread. You claim that those changes are consistent with market participants reacting to leakage of information about Bear Stearns' liquidity problems; is that correct?**

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 286..289

Page 286

JOHN D. FINNERTY - CONFIDENTIAL

A Yes

**Q. Do you have an opinion about whether those changes such as the CDS spreads were caused by the leakage of information concerning the alleged fraud?**

A No I chose my words very carefully I said they're consistent with it I'm not saying they caused it

**Q. It's true though that these credit indicators could have changed in the absence of any leakage of fraud regarding Bear Stearns, correct?**

MR HENKEN Object to form

A They change every day, yes, they could But it's a question of the degree to which they change and the speed with which they change I don't think they would have changed to the same degree, but they would have changed I mean the market, the market deteriorated When the market deteriorates, the credit spreads widen

**Q. In paragraph 210 of your report you say that Bear Stearns' 5 year**

Page 287

JOHN D. FINNERTY - CONFIDENTIAL

**CDS spread widened in November of 2007. Did you analyze whether the widening of Bear Stearns' 5 year CDS spread could have been caused by factors that were non-fraud-related?**

A Yes, I looked at -- I've looked at credit spreads during that period because this was a period that I analyzed in a number of different auction rate securities cases This sort of, of spread widening, 200 basis points to 619 basis points in a period of roughly four months is pretty unusual This is an enormous widening

But I'm not saying this was all due just to Bear Stearns' problems There were certainly difficulties in the credit markets and in the industry

But this kind of widening was, I believe the record would show it was wider than, for example, if you compare them to Morgan Stanley, Goldman Sachs and Lehman Brothers and Merrill, these spreads were widening more quickly They

Page 288

JOHN D FINNERTY - CONFIDENTIAL

were all widening, but these were widening more quickly

**Q. These meaning? What are you referring to when you say these?**

A The 5 year CDS spread, for example, for Bear Stearns that increased from 200 to 619

**Q. You also point to a downgrade by S&P on November 15th, 2007, but your leakage period doesn't begin until over a month later. How could that downgrade have affected Bear Stearns' stock price during the leakage period?**

A Usually a downgrade will decrease a company's stock price There's evidence that that happens The primary effect is on their, the bond prices, but it does affect the stock prices As I've said, as I testified, I think December 20th is being conservative in that it starts later than I could have

This could be very well one of the events that could have been related

Page 289

JOHN D FINNERTY - CONFIDENTIAL

to rating agency concerns about deteriorating liquidity, could be evidence of the frauds I didn't -- I didn't include it in my model, I didn't include it in the damage calculation

**Q. So you actually don't know whether this downgrade had any impact on Bear Stearns' stock price during the leakage period; is that correct?**

A I didn't, I would suspect it had a negative effect on the day the rating change was announced That's normally what I would expect Although, if the rating agency -- if the market was expecting a downgrade you don't, sometimes you don't see any change at all, but no, I didn't do that calculation But the evidence is that usually rating agency -- rating -- rating reductions are anticipated to some degree by the market

**Q. But didn't you conclude that this downgrade was evidence of leakage?**

A I thought I said there was --

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 302..305

Page 302
JOHN D. FINNERTY - CONFIDENTIAL

public release of SEC filings or announcements. It results from the interaction of people in the marketplace.

Q. And do you describe what you're testifying to today in your report in any place?

A. It --

Q. As -- let me just finish because, sorry, that was an incomplete question.

Do you describe leakage in the way that you've described it today anywhere in your report in this matter?

A. I describe it in my report and I reference the Cornell and Morgan paper from the 1990 UCLA Law Review which has a more fulsome discussion of leakage. So I do, I do describe it. I don't describe it quite as fully as Cornell and Morgan do, but I reference their paper.

Q. Were you able to find -- strike that.

Could you have used the same methodology as you did for March 13th and

Page 303
JOHN D. FINNERTY - CONFIDENTIAL

March 14th for the leakage period?

A. One could --

MR. HENKEN: Object to form.

A. One could not go through exactly the same arithmetic steps because I've testified to there's not a separate disclosure of fraud-related news on each of those days in the public market. So one cannot do the same calculation because one does not have the same information disclosure method.

The method -- the damage method one uses has to fit the facts.

Q. Did you identify any specifically -- specifically identifiable public news during the leakage period that you would consider a corrective disclosure?

A. No. I didn't in my report.

Q. And you indicated that you reviewed Mr. Sherman's complaint at one point; is that correct?

A. Yes.

Q. And are you aware that Mr.

Page 304
JOHN D. FINNERTY - CONFIDENTIAL

Sherman alleges various partial corrective disclosures in his complaint?

A. He may.

Q. Did you analyze any of the partial corrective disclosures that Mr. Sherman identified in his complaint?

A. No. I -- I -- I analyzed the two disclosures at the end of the period.

Q. Did you agree with Mr. Sherman's allegations regarding partial corrective disclosures in his complaint?

MR. HENKEN: Object to form.

A. I believe that the damages analysis I have done fits the facts of the case and I'm not rendering an opinion on any of those particular dates. That's not my -- it's not my job.

Q. Is the approach you use for calculating inflation for March 13th and March 14th sometimes called the constant dollar approach?

A. No. Constant dollar approach refers to the earlier part of the relevant -- the relevant period.

Page 305
JOHN D. FINNERTY - CONFIDENTIAL

Q. The period from December 14th, 2006 to December 19th, 2007 would refer to how you calculated the inflation --

A. Yes.

Q. Sorry, that's not really a question. You used the constant dollar approach to calculate inflation from December 14th, 2006 to December 19th, 2007; is that correct?

A. From December 20th, 2007 back to the beginning of the relevant period.

Q. Okay. So you have three different ways of calculating inflation during the relevant time period, correct?

MR. HENKEN: Object to the form.

A. No, I have one methodology and as I've testified, the facts have to -- the damage calculation, the steps have to fit the facts.

There are two days at the end of the period where there are discrete public announcements and one can identify the impact of each of those discretely.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 306..309

Page 306

JOHN D. FINNERTY - CONFIDENTIAL

In the case of the leakage, the leakage is coming in on a continuous basis. There are not discrete public announcements. So in order to calculate the damages one must calculate them over an interval. But in each case I'm adjusting for market-wide factors, industry factors and significant company-specific news.

So I'm using the same model, same basic methodology but I'm, in one case I'm calculating damage on discrete days -- dates and in the other case calculating over intervals.

As far as constant dollar method, every consulting firm that does these kinds of analyses that I've ever come into contact with, once they allow for the, or calculate the effect of the disclosures on the discrete dates, use the constant dollar method to -- some -- I'll take -- some use constant percentage, but most use the constant dollar method and that's a way of

Page 307

JOHN D. FINNERTY - CONFIDENTIAL

projecting back to earlier dates when there may or may not be other -- other disclosures.

But that, that methodology is perfectly consistent with Dura. There are no ins and outs damages as a result of Dura, so the constant dollar method is consistent with the Supreme Court's decision in Dura and that's the method I applied.

**Q. Have you ever calculated inflation using backwardation but employing a constant dollar approach in any prior matter?**

A. I've used the constant dollar approach in every, every damage calculation I've done for 10 years or more. Backwardation I've -- this is the first time I've actually done a report where I've done a damage calculation. I have opined on leakage in the Silverman versus Motorola matter, although I didn't incorporate it into the damage calculation. In order to do that, one

Page 308

JOHN D. FINNERTY - CONFIDENTIAL

needs to use the backwardation approach.

The only other time I've used the backwardation approach is in my published, my published damage model in the Stanford Journal of Law, Business and Finance.

**Q. Dr. Finnerty, so you calculated inflation three different ways using one methodology, is that your testimony?**

MR. HENKEN: Object to form.

A. I did, I did one damage calculation which respects the fact that during one part of the period there are two discrete disclosure dates, during another part of the period there is a leakage on a continuous basis, and during the third part of the period there is, there may be leakage but I've conservatively assumed there isn't. It's all one damage calculation.

**Q. One damage calculation, one methodology, how would you describe the differences in the way that you**

Page 309

JOHN D. FINNERTY - CONFIDENTIAL

**approached calculating inflation in those three different periods that you've described?**

A. One needs to tailor the damages calculation to fit the facts and circumstances.

**Q. Can you describe how your, the methodology you used in the expert opinion you provided in the Silverman v. Motorola case differs from the one that you conducted here?**

A. I'm sorry, can you read that one back.

(Record read as requested.)

A. Yes, counsel in that matter asked me to do a leakage analysis, which I did, and I calculated the return, the abnormal return on the stock during the leakage period.

But when I -- when I prepared my loss causation and damages report, counsel asked me, actually told me it just wasn't necessary to include the leakage damages in the calculation.

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 310..313

Page 310

JOHN D FINNERTY - CONFIDENTIAL

So I did it in the, and referred to it in the market efficiency report I think I referred to it in the loss causation report if I recall correctly, but I was not actually asked to perform the calculation of damages for the leakage period Simply note it exists, note I could do it, explain how I could do it, but not include it specifically in the damage calculation

**Q. Is there any other difference between your leakage opinion here and your leakage opinion in that case?**

A No, I don't believe so

**Q. Did you cap inflation when you conducted your leakage analysis in the Silverman v. Motorola case?**

A I capped inflation in all cases to the actual loss that the shareholder suffers I mean that's required under the law So yes, I did cap it

**Q. Did you cap the inflation during the leakage period in this case?**

Page 311

JOHN D. FINNERTY - CONFIDENTIAL

A When one does the damage calculation you cap it for the shareholder, for the transactions in which the shareholder engages You don't cap it each day The rule is that you can't, a shareholder can't essentially make money through your damages calculation So your damages cannot -- your damages calculated due to the alleged fraud cannot exceed the actual out-of-pocket losses So the cap is to the actual out-of-pocket losses the shareholder suffered

And I did do that calculation for Mr Sherman purchase by purchase which as I understand it is the way the calculation should be done So it's based on the shareholder and it's based on the purchases the shareholder, the shareholder makes

**Q. And where is that capping of inflation reflected in your report?**

A Exhibit 37 In Exhibit 37 in panel B, attachment 37, panel B I have

Page 312

JOHN D FINNERTY - CONFIDENTIAL

the out-of-pocket loss per share in the one, two, three, four, fifth column from the left

**Q. And that reflects the cap that you imposed on inflation in your analysis?**

A Yes, turns out the cap -- the cap wasn't binding because the actual damages were less than the out-of-pocket loss

**Q. Would you say that leakage is a generally accepted way of measuring inflation in 10(b)(5) cases?**

A The fact that it was published in an article in a major Law Review and is used in a major case like Household, I would say yes, it's accepted In those cases where there's evidence that leakage occurred It doesn't mean there's leakage in every case and if there isn't leakage in the case then you don't include it in the damage calculation

The damages calculation has to fit the facts and circumstances and where

Page 313

JOHN D FINNERTY - CONFIDENTIAL

there's evidence of leakage then it's an accepted methodology, but if there's no evidence of leakage then you wouldn't do the calculation

**Q. So in the Silverman v. Motorola case if you had been asked to conduct a leakage analysis but you didn't think that the circumstances were appropriate for one, you wouldn't have conducted that analysis, correct?**

A That's correct If I didn't think it fit the facts and circumstances then I would so advise counsel and wouldn't do the calculation

**Q. Was it your idea to conduct a leakage analysis in this matter?**

A Yes, it was I believed it fit the facts and circumstances after I analyzed the record I've been working on this case for over two years and before we, before I talked to counsel about damages I'd worked on this case probably for a year and a half

So I was thoroughly familiar

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 318..321

Page 318

JOHN D. FINNERTY - CONFIDENTIAL

case, actually first I came to Silverman versus Motorola, but then also this case, I applied the methodology that I had developed and published in the Stanford Journal.

**Q. You applied that extension that you were describing in the Silverman v. Motorola case?**

A. Yes, I believe we did.

**Q. And prior to that you had never used it before in a, in an expert report; is that correct?**

A. Well that's correct because there weren't any other cases, and I've worked on a lot of 10(b)(5) cases. I haven't -- and up to that time I hadn't worked on any other cases where there was evidence of leakage.

I want to emphasize, I only do this, would only do this in those cases where there's reason to believe there's leakage. This isn't something that one would do in every single case. Far from it. The facts -- the facts have to

Page 319

JOHN D. FINNERTY - CONFIDENTIAL

suggest that there was a leakage of the information about the alleged fraud into the market and only then would one apply this methodology.

**Q. Do you show -- strike that.**

**In your report do you demonstrate that the alleged fraud caused Bear Stearns' stock price to decline from December 14th, 2006 through December 19th, 2007?**

A. No, I don't. I don't. I'm not claiming that it did. I'm not -- I believe the leakage started December 20th, certainly by December 20th, so I'm not -- I'm not attributing any leakage to the -- or not using leakage as an explanation for that drop prior to that time.

**Q. In your report do you analyze loss causation prior to December 20th, 2007?**

MR. HENKEN: Object to form.

A. No, I'm not arguing that loss causation occurred prior to that date.

Page 320

JOHN D. FINNERTY - CONFIDENTIAL

**Q. Is it your view that there was no corrective disclosures of information related to the alleged fraud prior to December 20th, 2007?**

A. No. I think I'm being conservative in starting the analysis at December 20th, 2007. I think there -- I think there probably was some leakage but I've decided in the interest of conservatism to start the calculation at December 20th, 2007.

As I testified, the basis for that is the liquidity problems that Bear Stearns experienced in the summer of 2007, immediately following the failure of the two -- the two credit -- the credit enhanced and the leveraged credit enhanced strategies funds.

**Q. Am I correct in assuming that the entire dollar amount of inflation on December 20th, 2007 -- strike that.**

**In your analysis do you assume the entire dollar amount of inflation on December 20th, 2007 was present every day**

Page 321

**JOHN D. FINNERTY - CONFIDENTIAL**

**from December 14th, 2006 to December 19th, 2007?**

A. Yes, I do.

**Q. And the estimate for inflation on December 20th, 2007 is arrived at by carrying back the inflation from the entire leakage period as well as the entirety of the abnormal returns on March 14th and March 17th; is that correct?**

MR. HENKEN: Object to form.

A. I'm not carrying, I'm not really carrying back the inflation. I'm applying the backwardation method to figure out what the but-for price is in each day during the leakage period and calculating inflation each day as the difference between the but-for price and the, and the actual price.

The effect is to carry back the last two, that is the inflation amounts from March 13th and -- it's actually March 14th and March 17th. That is from the disclosures before the market opened on the 14th and after it closed on

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 322..325

Page 322

JOHN D. FINNERTY - CONFIDENTIAL

the 14th. But for the, the leakage period, because the damage calculation is done over the interval, you can't really talk about carrying it back in the same way you can the, the effect of the discrete disclosures at the end of the period.

But the cumulative effect of all of those, the cumulative effect is $79.09 and that is determined as of December 20th, 2007.

**Q. Dr. Finnerty, did you do any analysis of whether the disclosure of any alleged fraud would have caused the same reaction in Bear Stearns' stock on any day between December 14th, 2006 and December 19th, 2007?**

A. I don't -- I don't understand what you're asking me. I've never seen anybody do that calculation. What are you really asking me?

**Q. What I'm asking you, Dr. Finnerty, is did you analyze if circumstances in the market were as bad**

Page 323

JOHN D. FINNERTY - CONFIDENTIAL

**during the period December 14th, 2006 to December 19th, 2007 as they were during the rest of the relevant time period? For starters I'll ask that.**

MR. HENKEN: Object to form.

A. I've not done a hypothetical calculation of what might have happened if they'd made disclosures before December 20th, 2007. I've never seen anybody do that sort of calculation in one of these analyses. But the straightforward answer to your question is no, I haven't done it. Let me add if I had done it, you would be telling me that it was highly subjective, I bet. I mean seriously, I just don't think that we have the tools to really let us do that kind of calculation with any reasonable degree of certainty.

**Q. In paragraph 64 you say that you modified the Fama French 3-Factor Model.**

A. I'm sorry, you said paragraph 64?

Page 324

JOHN D. FINNERTY - CONFIDENTIAL

**Q. Correct.**

A. Okay.

**Q. To include the returns on an industry index of common stocks that are comparable to Bear Stearns, correct?**

A. Correct.

**Q. And in 65 of your report you identify that those common stocks were for a handful of different companies, including E*Trade Financial Corp., do you see that?**

A. I do.

**Q. And you also include Charles Schwab Corporation as one of the common stocks that would be included in your industry index; is that correct?**

A. These are companies that are included in Standard & Poor's index. I picked an index and Standard & Poor's picked them. I didn't pick them. I picked the index. Standard & Poor's picked the stocks.

**Q. Understood. And so in the Standard & Poor's index, in addition to**

Page 325

JOHN D. FINNERTY - CONFIDENTIAL

**investment banks, E*Trade Financial Corp. and Charles Schwab Corp. were also included; is that correct?**

A. That's correct.

**Q.. Do you believe that E*Trade is comparable to Bear Stearns?**

MR. HENKEN: Object to form.

A. Apparently Standard & Poor's does because they include it in the index. I'm using their index. And when you do this kind of calculation what's important is not each individual company, it's the portfolio. There's an extremely high correlation between the returns on Bear Stearns stock and the returns on this index. But Standard & Poor's, who follows this industry, they selected it and they must believe these are comparable and so I went with their choice. I followed --

**Q. I'm asking you, Dr. Finnerty, do you believe that E*Trade is comparable to Bear Stearns?**

A. I don't think --

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 338..341

Page 338
JOHN D. FINNERTY - CONFIDENTIAL

your leakage period came from. Is this information part of your analysis of how to select the start of your leakage period?

A. As this section is labeled, I'm really starting in paragraph 210 discussing the market's reaction to the leak of information.

Q. I see.

A. Then I provide some of the background in the period leading up to that. But this has got a different focus. The focus in paragraph 210 is the market's reaction to the leakage of the information. That earlier paragraph is where I picked the date where I really start the analysis.

Q. Okay. Understood. And at the very beginning of the day you indicated that you had been retained to provide opinions on loss causation damages and the efficiency of the market for Bear Stearns' common stock; is that correct?

A. Yes.

Page 339
JOHN D. FINNERTY - CONFIDENTIAL

Q. On pages 4 and 5 you summarize your opinions, is that also correct?

A. Yes.

Q. And on page 128 you provide conclusions on your loss causation analysis; is that correct?

A. Yes. 128 and 129.

Q. Thank you. And on pages 134 to 136 you summarize your conclusions; is that correct?

A. Yes, with regard to all three issues.

Q. And we discussed earlier today other opinions that you are offering expert testimony on today. Can you, other than -- strike that.

Other than the market for Bear Stearns' common stock -- strike that.

Again other than the efficiency of the market for Bear Stearns' common stock, the loss causation opinions that you've described today, and the damages opinion that's reflected in your report, could you please list the

Page 340
JOHN D. FINNERTY - CONFIDENTIAL

other opinions that you're offering in this report?

A. These are the only opinions I'm offering in the report, the ones that are stated here.

MR. LOCKWOOD: I'm sorry, are you pointing to a particular part of the report when you were saying that?

THE WITNESS: Yes, I'm sorry. I was pointing to 134 and 135.

MS. CAREY: Thank you for that clarification. I'd like just a couple of minutes to review some notes. We can go off the record.

THE VIDEOGRAPHER: Stand by. Here marks the end of file number 7, we are going off the record, the time is 5:52 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: Here marks the beginning of file number 8, we are back on the record, the time is 5:57 p.m.

Page 341
JOHN D. FINNERTY - CONFIDENTIAL

MS. CAREY: Thank you, Dr. Finnerty, I don't have any other questions. I just want to quickly do a couple of housekeeping things. One, I want to mark the transcript confidential pursuant to the protective order that's in place. And then also, Mr. Kemp, I just wanted to make sure that we got you on the record as having attended. Do you want to note your appearance?

MR. KEMP: Sean Kemp of the Law Offices of Sean M. Kemp, local counsel to the Ghods Law Firm, attorneys for Vivine Wang.

EXAMINATION BY MS. SUKIENNIK:

Q. Good evening, Dr. Finnerty.

A. Good evening.

Q. I am Brittany Sukiennik, I'm here representing Deloitte. I just have a few questions for you. It will just take a moment.

You testified earlier today

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

Confidential
JOHN D. FINNERTY - 05/14/2015 Pages 346..349

Page 346
JOHN D. FINNERTY - CONFIDENTIAL

liquidity situation.

Q. Are there any specific emails or documents that you're aware of that support a conclusion that Mr. Schwartz was aware of liquidity problems other than the five documents cited in paragraph 176?

A. Yes. There's a lot of email traffic that does reflect that and I didn't try to list every single document, but there are many.

Q. Well the list you put in paragraph 176, was this intended to be an illustrative list of your best examples showing his knowledge?

A. Yes. They were intended to be representative, the best representative examples.

Q. If you just look on the page, I'm just going to draw your attention to paragraph (c) in 176, (c), it says in emails dated March 12th, 2008, between Mr. Molinaro and Nierenberg, do you see that paragraph?

Page 347
JOHN D. FINNERTY - CONFIDENTIAL

A. I do.

Q. And if I use your footnotes correctly, it looks to me that the email reflecting that statement would be attached as Exhibit 66; is that right?

A. Exhibit 66 would be the email that's referred to in paragraph 270.

Q. Oh, okay.

A. I'm sorry, paragraph (d), subparagraph (d).

Q. So it's 65?

A. Oh, 65, sorry. That -- yes, that's the Molinaro/Nierenberg email.

Q. Let me see if I get this right. Okay, could you take a look at that exhibit. So paragraph 65 has two emails reflected on the page, correct, in Exhibit 65?

A. Yes, there's a string that's got two emails.

Q. And the top one says "How is the tone this morning? Alan will be on CNBC at 9 NYT."

Do you see that?

Page 348
JOHN D. FINNERTY - CONFIDENTIAL

A. Yes.

Q. Did you understand that to mean 9 o'clock New York time?

A. Yes, I did.

Q. And do you understand that Mr. Schwartz spoke on CNBC on a Squawkbox show at 9 o'clock on the morning of the 12th?

A. Yes, he did.

Q. Are you aware of any statements he made after that that were attributed to him about the liquidity situation at Bear Stearns?

A. Without going back and looking at the record, I can't give you any off the top of my head.

Q. So let's just go back to page 94 of your report. And we could, we could refer to the exhibits if you'd like, but if you look in (d) and (e) of 176, there's references there to emails dated March 13th, 2008, correct?

A. Yes.

Q. So we can agree that Mr.

Page 349
JOHN D. FINNERTY - CONFIDENTIAL

Schwartz would not have had the information reflected in those March 13th, 2008 emails on March 12th, 2008; is that agreeable to you?

MR. HENKEN: Object to form.

A. It depends upon what that information is. If the emails reflect information that was available prior to that date, he wouldn't have the emails, but he could have the information.

Q. Well let's take a look at it. The (d) is reflecting the fact that on March 13th, the morning of March 13th they're aware that through March 12th, 2008 Bear customers wired out a total of $7.8 billion. Do you see that?

A. I do.

Q. So that's information about an event that happened on March 12th, 2008, right?

MR. HENKEN: Object to form.

A. That's correct.

Q. So that wouldn't have been available to Mr. Schwartz at the start of

Merrill Corporation - New York
1-800-325-3376 www.merrillcorp.com/law/

**Errata Sheet: Deposition of John D. Finnerty, Ph.D. on May 14, 2015**

*Sherman v. Bear Stearns Companies, Inc*, No. 09-8161 (08 MDL No. 1963)

| Page | Line | Change From | Change To | Reason |
|---|---|---|---|---|
| 23 | 3 | pay | paid | Transcription Error |
| 42 | 14 | I'd | | Misspoke |
| 158 | 23 | of | as a | Transcription Error |
| 188 | 8 | 913th | 13th | Transcription Error |
| 203 | 8 | model | borrow | Transcription Error |
| 228 | 20-21 | price in the decline | decline in the price | Transcription Error |
| 229 | 20 | no | not | Transcription Error |
| 265 | 19 | disbursement | dispersion | Transcription Error |
| 268 | 4 | percent and | percent in the actual world and | Clarification |
| 273 | 20 | 2013 | 2007 | Misstatement |
| 278 | 16 | index and you | index | Clarification |
| 278 | 17 | multiply | multiplied | Clarification |
| 278 | 18 | market | industry | Misspoke |
| 279 | 23 | none | no | Transcription Error |
| 285 | 13 | 13th | 14th | Misspoke |
| 298 | 24 | 1713th | 13th | Transcription Error |
| 300 | 19 | 13th | 17th | Transcription Error |
| 301 | 10 | market | information | Transcription Error |

Date: June 30, 2015

John D. Finnerty

Subscribed and sworn to before me this _____ day of _____________, 2015.

see attached

_______________________

Notary Public

My Commission Expires:_______________________

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Francisco

Subscribed and sworn to (or affirmed) before me on this 30th day of June, 2015, by John D. Finnerty

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

JANET G. BEVERLY
Commission # 2040279
Notary Public - California
San Francisco County
My Comm. Expires Oct 1, 2017

(Seal)

Signature [signature]