# Exhibit 41

**Expert Report**


**Joseph C. Schubert**

In Re The Bear Stearns Companies, Inc. Securities, Derivative and ERISA Litigation

In Re: Bruce S. Sherman
v. Bear Stearns Companies Inc., *et al*.

In Re: Vivine H. Wang
v. The Bear Stearns Companies LLC, *et al*.


April 16, 2015


CONFIDENTIAL

**Table of Contents**

I.     Engagement Scope ...................................................................................................... 3

II.    Qualifications ............................................................................................................. 3

III.   Compensation ............................................................................................................. 3

IV.    Information Considered ............................................................................................. 3

V.     Summary of Opinions ................................................................................................ 4

VI.    Overview ..................................................................................................................... 5

VII.   Risk Management and Value at Risk ("VaR") ......................................................... 6

VIII.  Overview of a Financial Statement Audit ................................................................ 7

    *A.    PCAOB Standards* ................................................................................................. 7

    *B.    Responsibility of Management* .............................................................................. 7

    *C.    Objective of an Audit* ............................................................................................ 7

    *D.    Objective of an Interim Review* ............................................................................. 8

    *E.    Auditing Fair Value Measurements and Disclosures* ........................................... 9

IX.    Deloitte & Touche's Compliance with GAAS ......................................................... 10

    *A.    General Standards* ................................................................................................ 10

    *B.    Standards of Fieldwork* ........................................................................................ 12

    *C.    Standards of Reporting* ........................................................................................ 15

X.     Audit Procedures: Mortgages, Mortgage- and Asset-Backed Securities ............... 17

    *A.    General* .................................................................................................................. 17

    *B.    Mortgage- and Asset-Backed Securities ("MBS")* .............................................. 20

    *C.    Mortgage Loans* .................................................................................................... 22

        1.    Performing Mortgage Loans .......................................................................... 22

        2.    Non-Performing Mortgage Loans and Real Estate Owned ("REO") ........... 23

    *D.    Hedge Fund Considerations* ................................................................................. 25

    *E.    Evaluation Audit Results* ...................................................................................... 25

XI.    Deloitte &Touche's Consideration of the Going Concern Assumption ................. 25

XII.   Summary Conclusion ................................................................................................. 26

CONFIDENTIAL

## I.  Engagement Scope

I have been retained by Cravath, Swaine & Moore LLP as an expert in the auditing standards of the Public Company Accounting Oversight Board (United States) ("PCAOB Standards") and United States generally accepted accounting principles ("GAAP") to evaluate the work performed by Deloitte & Touche LLP ("Deloitte & Touche"), in order to express certain expert opinions about its audits of The Bear Stearns Companies, Inc. and subsidiaries ("Bear Stearns" or the "Company") for the years ended November 30, 2006 and November 30, 2007.

## II.  Qualifications

Prior to my retirement from Ernst & Young LLP ("E&Y") on June 30, 2009, I was a Senior Partner in E&Y's Assurance & Advisory Business Services practice.  I have over 30 years of experience performing financial statement audits, consulting on accounting, auditing and internal control matters and conducting forensic accounting/fraud investigations.  I have extensive experience in bank processes and controls, mortgage banking, derivatives, securitizations and structured finance, real estate, mergers and acquisitions, broker/dealers, capital markets, securities registration and financial reporting.  Over the years, my responsibilities also included developing E&Y's audit methodologies and guidance relating to internal controls and integrated audits for the Financial Services industry.  I also served as an audit quality review team leader in E&Y's audit quality inspections program.  I am a certified public accountant ("CPA").

I have not testified or authored publications within the last four years and 10 years, respectively.  My resume is attached as Appendix A to this report.

## III. Compensation

My fee for this matter is $650 per hour.  My fees are not dependent on, or in any way contingent upon, my findings or opinions.

## IV. Information Considered

Throughout the course of my work, I have had access to Deloitte & Touche workpapers related to its audits.  I have focused my attention on areas of the audits that I felt were most relevant given the scope and assertions made by the plaintiffs and Dr. John D. Finnerty with respect to Deloitte & Touche's independent auditor opinions on the Bear Stearns consolidated financial statements for the years ended November 30, 2006 and November 30, 2007 (the "2006 Financial Statements" and the "2007 Financial Statements").  These focused areas included: audit planning and approach, risk assessments, tests of controls, tests of higher risk areas, valuation of mortgages and mortgage-backed securities, and auditing and accounting conclusions.  I also focused on various summary and detailed audit memos documenting procedures performed by Deloitte & Touche and the results of those procedures.

This report describes my work performed to date and summarizes the opinions I have formed to date.  The opinions expressed in this report are mine based upon work I have performed.  Below is a summary of information I have considered to provide my expert opinions.

A.  *Bruce S. Sherman v. Bear Stearns Companies Inc., et al.*, No. 09-CV-8181 (RWS), ECF Dkt. No. 1 (Complaint, filed September 24, 2009).

3

B. *Vivine H. Wang v. The Bear Stearns Companies LLC, et al.*, No. 11-CV-5643 (RWS), ECF Dkt. No. 1 (Complaint, filed March 29, 2011).

C. *In re Bear Stearns Companies, Inc.:  Securities, Derivative, and ERISA Litigation*, No. 08-MD-1963 (RWS), ECF Dkt. No. 61 (Consolidated Class Action Complaint, filed February 27, 2009).

D. Deloitte & Touche's audit workpapers related to its audits of the 2006 and 2007 Financial Statements and quarterly review workpapers for the intervening quarters.

E. 2006 and 2007 Financial Statements and quarterly consolidated financial statements for intervening quarters.

F. Deposition testimony of George Simeone and exhibits, December 19, 2014.

G. Deposition testimony of Samuel L. Molinaro and exhibits, December 4, 2014.

H. GAAP, PCAOB Standards, and technical reference materials relevant at the time.

I. Expert report of John D. Finnerty, Ph.D. ("Finnerty Report") dated March 2, 2015.


If new information is provided or discovered, I reserve the right to supplement or otherwise revise my opinions and conclusions at that time.


### V.  Summary of Opinions

A. It is my opinion that Deloitte & Touche properly planned and performed its audits of The Bear Stearns Companies, Inc. and subsidiaries consolidated financial statements for the years ended November 30, 2006 and November 30, 2007 (the "2006 Audit", the "2007 Audit" or collectively, the "Audits") in accordance with generally accepted auditing standards ("GAAS").

B. It is my opinion that the procedures performed by Deloitte & Touche provided it reasonable basis to conclude that the 2006 and 2007 Financial Statements were presented fairly, in all material respects, in conformity with GAAP.

C. It is my opinion that Deloitte & Touche planned and performed audit procedures during its 2006 and 2007 Audits related to mortgages and mortgage-backed securities in accordance with GAAS.

D. It is my opinion that the procedures performed by Deloitte & Touche provided it reasonable basis to conclude that mortgages and mortgage-backed securities were reported in accordance with GAAP at November 30, 2006 and November 30, 2007, in all material respects, in relation to the 2006 and 2007 Financial Statements, taken as a whole.

In addition to my opinions identified above, throughout this report, I will refute various allegations made by the plaintiffs and Finnerty about Deloitte & Touche's 2006 and 2007 Audits.  For example, Finnerty states, "[a]s alleged in the Complaint, defendants made several related categories of misrepresentations

CONFIDENTIAL

and material omissions."[1]  He stated that the "defendants allegedly misrepresented and omitted material information regarding (1) Bear Stearns' risk management practices (including its measurements of Value-at-risk ("VaR")), (2) the value and risks of Bear Stearns' mortgages, mortgage-backed and asset-backed securities, and (3) the adequacy of Bear Stearns' liquidity and capital reserves."[2]  I have considered these allegations in the context of my evaluation of Deloitte & Touche's 2006 and 2007 Audits and disagree with the plaintiffs' allegations that Deloitte & Touche did not perform its 2006 and 2007 Audits in accordance with GAAS.


### VI. Overview

Based on my review of Deloitte & Touche's audit workpapers and related materials, I have reached the conclusion that Deloitte & Touche performed its 2006 and 2007 Audits in accordance with GAAS as more fully described in Sections VIII, IX, X and XI of this report.  In accordance with GAAS, Deloitte & Touche obtained an understanding and tested the Company's processes and methodologies to measure the fair value of financial instruments reported in its 2006 and 2007 Financial Statements in accordance with GAAP.  Those procedures included testing relevant internal controls and assessing relevant model inputs and assumptions utilized by the Company to estimate those fair value measurements.  Deloitte & Touche's audit procedures provided it with a reasonable basis to conclude that mortgages and mortgage-backed securities were reported in accordance with GAAP in the 2006 and 2007 Financial Statements.

I have read the plaintiffs' complaints and the report of their expert, Finnerty, and I disagree with their conclusions with respect to Deloitte & Touche's 2006 and 2007 Audits.  The general assertions by plaintiffs and Finnerty about valuation of financial instruments appear to be based on a misunderstanding of VaR models.  As I will explain below, VaR is a quantitative risk management technique that estimates the probability of the value of a financial instrument rising above or falling below a specified amount.  It was not utilized by the Company in its financial reporting processes to measure fair values of financial instruments in accordance with GAAP and reported in its 2006 and 2007 Financial Statements. Therefore, purported deficiencies in the Company's VaR models would not affect the 2006 or 2007 Financial Statements, as a whole, or, more specifically, the fair value of financial instruments reported in those financial statements.

Finally, the plaintiffs and Finnerty concluded that the Company's distressed sale to JP Morgan in March 2008 indicated the 2007 Financial Statements were misstated and that as a result, Deloitte & Touche's audit opinion was false.  I disagree.  I have reviewed Deloitte & Touche's working papers and other documents that evaluated the Company's ability to continue as a going concern.  The analysis and discussions with management provided reasonable basis for Deloitte & Touche's conclusions with respect to the Company's ability to continue as a going concern.  The distressed sale of the Company to JP Morgan on March 18, 2008 and subsequent to the date of Deloitte & Touche's audit report dated January 28, 2008 does not indicate inadequate performance under GAAS by Deloitte & Touche or support a conclusion that the financial statements were misstated.  Rather, the distressed sale is indicative of a run on the bank as a consequence of panic by counterparties.

In the following paragraphs, I will further explain my opinions.  I will start by discussing allegations made by the plaintiffs and Finnerty related to risk management practices and VaR and clarify that these practices and measurements do not constitute financial reporting in accordance with GAAP.  Then, I will provide explanations from GAAS about responsibilities of management, the objective of an audit and the

---

[1] Expert Report of John D. Finnerty, Ph.D., ¶ 134.

[2] *Id.*

CONFIDENTIAL

audit process, particularly related to testing fair value measurements reported in the financial statements. Finally, I will discuss my opinion that Deloitte & Touche performed its 2006 and 2007 Audits, including its audit procedures with respect to mortgages and mortgage-backed securities, and assessing the Company's going concern evaluation, in accordance with GAAS.

## VII.     Risk Management and Value at Risk ("VaR")

The plaintiffs and Finnerty allege the Company's risk management practices, including measurements of VaR, were deficient and caused the Company to materially overvalue mortgages, mortgage-backed and asset-backed securities reported in the Company 2006 and 2007 Financial Statements and, as a result, Deloitte & Touche's opinions on those financial statements were false.  I disagree.  VaR is a quantitative risk management technique disclosed in the Company's Management Discussion & Analysis ("MD&A") that "estimates the probability of the value of a financial instrument rising above or falling below a specified amount."[3]  VaR is one method used by risk managers to measure and manage the level of risk that the Company undertakes.  Risk management practices, including VaR, as discussed by plaintiffs and Finnerty, do not constitute financial reporting in accordance with GAAP.

The observations described above and presented by the plaintiffs and Finnerty were founded in various reports issued by regulators, consultants and the Company's internal audit department.[4]  Plaintiffs' and Finnerty appear to misunderstand the observations in the reports as they do not relate to the financial reporting process to measure and report the fair value of financial instruments in accordance with GAAP. Rather, the methods utilized by the Company to measure and report the fair value of financial instruments in accordance with GAAP considered available market data and information to estimate the price that would be received for the financial instrument at the measurement date (*e.g.*, an exit price).[5]  For example, at Bear Stearns, fair value measurement processes considered "as if" securitizations for whole loan mortgages and for mortgage-backed securities, quoted market prices, Business Unit Controllers ("BUCs") comparisons to vendor prices, and additional levels of review and approvals by mark to market committees. This is consistent with SFAS 157, *Fair Value Measurements*, ("SFAS 157") and demonstrates both quantitative and qualitative factors that may be considered in measuring fair values in accordance with GAAP.  In summary, the purposes of risk management practices, including VaR measures are very different from the financial reporting process to measure and report fair values of financial instruments in accordance with GAAP.

---

[3] The Bear Stearns Companies Inc., Annual report to stockholders (Exhibit 13 to The Bear Stearns Companies Inc., Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended November 30, 2007, filed January 29, 2008), page 71.

[4] United States Securities and Exchange Commission letter sent to Jeffrey M. Farber, dated December 2, 2005 ("2005 SEC Letter") (Finnerty Ex. 4); Financial Services Authority ("FSA") Letter sent to Kanwardeep Ahluwalia, dated September 19, 2007 ("2007 FSA Letter") (Finnerty Ex. 6); U.S. Securities and Exchange Commission, Office of Inspector General, Office of Audit, "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program," September 25, 2008, Report No. 446-A, at 45-46 ("2008 OIG Report") (Finnerty Ex. 8); reports issued by Oliver Wyman between July 2007 and March 2008 ("Wyman Reports") (Finnerty Exs. 9-12); Bear Stearns internal audit report re: Review of the Global Credit Department – (New York, London, and Dublin), dated November 29, 2006 (Finnerty Ex. 23).

[5] 2007 TBSCI 1416 Document the Entity's Accounting Policies (09-07) (DT_WP_000148657-61); 2007 TBSCI 1416.1 Acctg Policy Financial Instruments That Trade In Temp Dislocated Markets PBE (DT_WP_000148663-68).

6

CONFIDENTIAL

## VIII.      Overview of a Financial Statement Audit

### A.  PCAOB Standards

As a result of the passage of the Sarbanes-Oxley Act of 2002 (the "Act"), auditing and related professional practice standards to be used in the performance of and reporting on audits of financial statements of public companies are established by the Public Company Accounting Oversight Board ("PCAOB").  The Act authorized the PCAOB to establish auditing standards to be used by registered public accounting firms in the preparation and issuance of audit reports for entities subject to the Act or the rules of the Securities and Exchange Commission ("SEC").  Accordingly, public accounting firms registered with the PCAOB are required to adhere to PCAOB standards in the audits of issuers.  The PCAOB adopted as interim standards, on an initial, transitional basis, the generally accepted auditing standards described in the American Institute of Certified Public Accountants' ("AICPA") Auditing Standards Board's Statement on Auditing Standards No. 95 ("SAS 95"), Generally Accepted Auditing Standards, in existence on April 16, 2003.  I will refer to these auditing standards as GAAS throughout this report.

### B.  Responsibility of Management

GAAS provides that "[t]he financial statements are management's responsibility.  The auditor's responsibility is to express an opinion on [management's] financial statements.  Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal control is limited to that acquired through the audit.  Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.  [Conversely], the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them."[6]

Deloitte & Touche entered into engagement letters with the Company to perform the 2006 and 2007 Audits (the "2006 Engagement Letter" and the "2007 Engagement Letter").[7]  These letters outlined the responsibilities of Deloitte & Touche and the Company's management related to the 2006 and 2007 Audits.  Those letters state, "The overall accuracy of the financial statements, including interim financial information, and their conformity with generally accepted accounting principles is the responsibility of the Company's management."[8]

### C.  Objective of an Audit

"The objective of an audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of

---

[6] AU Section 110, *Responsibilities and Functions of the Independent Auditor*, ¶ .03.

[7] Letter from Deloitte & Touche to Vincent Tese and Samuel Molinaro, dated October 5, 2007 (DT_WP_000332940-61); Letter from Deloitte & Touche to Vincent Tese and Samuel Molinaro, dated June 20, 2006 (DT_WP_000276383-402).

[8] Letter from Deloitte & Touche to Vincent Tese and Samuel Molinaro, dated October 5, 2007 (DT_WP_000332940-61).

CONFIDENTIAL

operations, and its cash flows in conformity with GAAP."[9]  "Justification for the expression of the auditor's opinion rests on the conformity of his audit with generally accepted auditing standards and on the findings."[10]  The objective of this report is "to prevent misinterpretation of the degree of responsibility the auditor is assuming."[11]  This expression of an opinion is given through a report that is signed and dated by the auditor.

An auditor typically works within economic limits; the auditor's opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost.  The auditor must decide, again exercising professional judgment, whether the evidential matter available to him or her is within the limits of time and cost and is sufficient to justify expression of an opinion.  This is one reason why an auditor's opinion can only provide reasonable assurance about the fair presentation of the financial statements.[12]

The auditor's responsibility does not extend beyond the financial statements and other financial information identified in his report and the auditor has no obligation to perform any procedures to corroborate other information contained in the document,[13] including an Annual Report filed on Form 10-K.  However, he or she should read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information appearing in the financial statements.[14]  For example, Deloitte & Touche's Report of Independent Registered Public Accounting Firm for the 2006 and 2007 Audits of the 2006 and 2007 Financial Statements did not refer to or provide any opinion on the MD&A or Risk Factors prepared by Bear Stearns management and presented in the Company's Form 10-K filings.  That information was the responsibility of the Company's management.

### D.   Objective of an Interim Review

The objective of a review of interim financial information differs significantly from the objective of an audit of financial statements in accordance with GAAS (such as quarterly reviews of financial statements included in a Form 10-Q).[15]  The objective of an audit is to provide a reasonable basis for expressing an opinion regarding the financial statements taken as a whole.

A review of interim financial information does not provide a basis for the expression of such an opinion, because the review "does not contemplate (*a*) tests of accounting records through inspection, observation, or confirmation; (*b*) tests of controls to evaluate their effectiveness; (*c*) obtaining corroborating evidential matter in response to inquiries; or (*d*) the application of certain other procedures ordinarily performed during an audit.  A review may bring to the accountant's attention significant matters affecting the interim financial information, but it does not provide assurance that the accountant will become aware of all significant matters that would be disclosed in an audit."[16]

"Accordingly, the accountant does not express an opinion on the interim financial information."[17]  The procedures involving interim reviews are less in scope than those for audits.[18]  GAAS state the

---

[9] AU Section 110, *Responsibilities and Functions of the Independent Auditor*, ¶ .01.

[10] AU Section 508, *Reports on Audited Financial Statements*, ¶ .03.

[11] *Id.* at ¶ .05.

[12] AU Section 326, *Evidential Matter,* ¶ .23.

[13] AU Section 550, *Other Information in Documents Containing Audited Financial Statements*, ¶ .04.

[14] *Id.*

[15] AU Section 722, *Interim Financial Information*, ¶ .07.

[16] *Id*.

[17] *Id.* at ¶ .09.

CONFIDENTIAL

"[p]rocedures for conducting a review of interim financial information generally are limited to inquiries and analytical procedures, rather than search and verification procedures, concerning significant accounting matters relating to the financial information to be reported." [19]   For example, the 2006 and 2007 Engagement Letters  state an interim "review will not result in the expression of an opinion concerning the fairness of the presentation of the interim financial information in accordance with generally accepted accounting principles and cannot be relied on to reveal all significant matters that would be disclosed in an audit."[20]

### E.   Auditing Fair Value Measurements and Disclosures

"Management is responsible for making the fair value measurements and disclosures included in the financial statements." [21]   "The measurement of fair value may be relatively simple for certain assets or liabilities, for example, investments that are bought and sold in active markets that provide readily available and reliable information on the prices at which actual exchanges occur.  For those items, the existence of published price quotations in an active market is the best evidence of value.  The measure of fair value of other assets or liabilities may be more complex.  A specific asset may not have an observable market price or may possess such characteristics that it becomes necessary for management to estimate its fair value based on the best information available in the circumstances."[22]   "Fair value measurements for which observable market prices are not available are inherently imprecise.  That is because, among other things, those fair value measurements may be based on assumptions about future conditions, transactions, or events whose outcome is uncertain and will therefore be subject to change over time."[23]   "The estimation of fair value may be achieved through the use of a valuation method (for example, a model premised on discounting of estimated future cash flows)."[24]

"Audit procedures dealing with management's assumptions are performed in the context of the audit of the entity's financial statements."[25]   "The auditor's consideration of such assumptions is based on information available to the auditor at the time of the audit.  The auditor is not responsible for predicting future conditions, transactions, or events that, had they been known at the time of the audit, may have had a significant effect on management's actions or management's assumptions underlying the fair value measurements and disclosures."[26]   "The objective of the audit procedures is therefore not intended to obtain sufficient appropriate audit evidence to provide an opinion on the assumptions themselves.  Rather, the auditor performs procedures to evaluate whether the assumptions provide a reasonable basis for measuring fair values in the context of an audit of the financial statements taken as a whole."[27]   "For items valued by the entity using a valuation model, the auditor does not function as an appraiser and is not expected to substitute his or her judgment for that of the entity's management.  Rather, the auditor

---

[18] *Id.*

[19] *Id.*

[20] Letter from Deloitte & Touche to Vincent Tese and Samuel Molinaro, dated October 5, 2007 (DT_WP_000332940-61); Letter from Deloitte & Touche to Vincent Tese and Samuel Molinaro, dated June 20, 2006 (DT_WP_000276383-402).

[21] AU Section 328, *Auditing Fair Value Measurements and Disclosures*, paragraph .04.

[22] *Id.* at ¶ .08.

[23] *Id.* at ¶ .05.

[24] *Id.* at ¶ .08.

[25] *Id.* at ¶ .32.

[26] *Id.* at ¶ .05.

[27] *Id.* at ¶ .32.

CONFIDENTIAL

reviews the model and evaluates whether the assumptions used are reasonable and the model is appropriate considering the entity's circumstances."[28]

"Evaluating audit evidence for assertions about derivatives and securities may require the auditor to use considerable judgment.  That may be because the assertions, especially those about valuation, are based on highly subjective assumptions or are particularly sensitive to changes in the underlying circumstances. Valuation assertions may be based on assumptions about the occurrence of future events for which expectations are difficult to develop or on assumptions about conditions expected to exist over a long period; for example default rates or prepayment rates."[29]

Deloitte & Touche documented its understanding of the Company's methodologies to estimate fair values of financial instruments the Company presented in its 2006 and 2007 Financial Statements.  Deloitte & Touche performed tests of those methodologies utilizing team members with specialized skills to assess the reasonableness of the methodologies, including assumptions and inputs the Company utilized to estimate the fair values presented.

### IX. Deloitte & Touche's Compliance with GAAS

Bear Stearns was an issuer, as defined by the Securities Exchange Act of 1934.[30]  The auditor of a company defined as an issuer is required to be registered with the PCAOB.  The audit process under PCAOB standards is framed by 10 Generally Accepted Auditing Standards ("GAAS").  The 10 standards are enumerated below along with examples demonstrating Deloitte & Touche's compliance with such standards during its 2006 and 2007 Audits.

### A.  General Standards

1. The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

Deloitte & Touche's audit teams for the 2006 and 2007 Audits of Bear Stearns included many Partners, Directors, Senior Managers, Managers, Seniors, and Staff (the "Audit Team(s)").  The Audit Teams had a substantial amount of training, experience, and specialized skills in the industry based on Deloitte & Touche's leading position in the market place around securities firms and broker dealer entities.  Many of these professionals were licensed Certified Public Accountants ("CPAs") who were industry specialists and well experienced in securities firms and broker dealer audits.[31]

Deloitte & Touche also had policies and procedures in place to ensure its audit team members received appropriate training and were informed of current market events which could affect their audits.  For example, the 2007 Audit workpapers included Practice Alerts and guidance issued by Deloitte & Touche that were considered by the Audit Team.

---

[28] *Id.* at ¶ .38.
[29] AU Section 332, *Auditing Derivative Instruments*, ¶ .41.
[30] *See* 15 U.S.C. § 78c(a)(8) (defining "issuer").
[31] 2007 TBSCI 1810A Audit Planning Memorandum - Supplement (09-07) (DT_WP_000150853-63); 2007 TBSCI 1230 Strategic Audit Planning (09-07) (DT_WP_000148521-25); Deposition Testimony of George Simeone, December 19, 2014 32:25-39:11.

CONFIDENTIAL

George Simeone was responsible for the overall conduct of the 2006 and 2007 Audits.  Based on his status as a CPA, years of experience in the industry, and prior experience on the Bear Stearns Audit, I believe he was qualified to lead the Audits.  During the 2006 and 2007 Audits, Mr. Simeone defined and delegated responsibilities to other Audit Team members having appropriate training and experience in the industry and on prior audits of the Company.  For example, Tom Graham was responsible for Corporate, Chris Donovan was responsible for Capital Markets and Jon Raphael was responsible for the Company's mortgage entities.  The 2006 and 2007 Audit Teams also utilized Deloitte & Touche specialists to assist with the evaluation and understanding of complex valuation areas in the audits.[32]  For example, Steve Votaw, Senior Manager, and Jeff Green, Principal, were in Deloitte & Touche's Quantitative Services group, which performed audit procedures and interacted with audit team members with respect to more complex valuation areas related to mortgages and mortgage backed securities.  The team also utilized specialists from Deloitte & Touche's Enterprise Risk Service ("ERS") Technology group to assist with understanding and testing relevant accounting and information systems.

In my opinion, the Deloitte & Touche Audit Teams for the 2006 and 2007 Audits possessed adequate technical training and proficiency as auditors to perform the 2006 and 2007 Audits.

2.  In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.

Deloitte & Touche's 2006 and 2007 Audit workpapers indicate steps were taken to verify that Deloitte & Touche, as well as its partners and employees, were without bias and free from any obligation to or interest in the Company, and its directors and officers.  The workpapers indicate that:

- Members of the 2006 and 2007 Audit Teams were independent of the Company at all times during the conduct of the 2006 and 2007 Audits.[33]

- Deloitte & Touche assessed that it, as a firm, was independent of the Company at all times during the conduct of the 2006 and 2007 Audits and communicated this to the Company's audit committee.[34]

Deloitte & Touche's independence in mental attitude is exhibited by the thousands of pages of audit and interim review workpapers generated during the 2006 and 2007 Audits, which documented its principal procedures and testing results.  These workpapers include schedules that summarize potential misstatements to account balances identified during the course of its audits and were evaluated to determine if they were material to the 2006 and 2007 Financial Statements.

Further, as noted above, Deloitte & Touche workpapers also utilized specialized team members to assist in several areas of the 2006 and 2007 Audits, including testing and understanding the Company's information systems and fair value measurements.

Nothing has come to my attention that leads me to conclude that Deloitte & Touche failed to maintain an independent mental attitude during its 2006 and 2007 Audits.

---

[32] 2006 EMC 2390 Use of Specialists (DT_WP_000108618-23).
[33] 2007 TBSCI 3321 Required Audit Committee Communications (DT_WP_000334819-42); 2006 TBSCI 3320 Required Audit Committee Communications (DT_WP_000276718-789).
[34] 2007 TBSCI 3321 Required Audit Committee Communications (DT_WP_000334819-42); 2006 TBSCI 3320 Required Audit Committee Communications (DT_WP_000276718-789).

CONFIDENTIAL

3.  Due professional care is to be exercised in the performance of the audit and the preparation of the report.

The 2006 and 2007 Audits were staffed with individuals having technical competence and experience to perform the audits.  Deloitte & Touche carefully planned its 2006 and 2007 Audits and communicated roles and responsibilities to Audit Team members.  Further, Deloitte & Touche's staffing and supervision of audit areas by specialized industry experts in areas of higher risk, demonstrates that the Audit Team members were assigned tasks and supervised their teams commensurate with their level of knowledge, skill, and ability so that they could evaluate the audit evidence they were examining.[35]  It is also evident that audit team members understood their roles and responsibilities, were aware of relevant professional accounting and auditing standards, and were knowledgeable about the Company and the current business environment at the time of its audits.[36]

In order to exercise due professional care the auditor is required to exercise professional skepticism which includes a questioning mindset and critical assessment of the audit evidence.  Deloitte & Touche's workpapers demonstrate an appropriate level of professional skepticism through the performance of the risk assessments that were considered in designing the nature, timing and extent of its audit procedures; obtaining audit evidence from third parties; inquiries of management regarding the risk of fraud, and staffing the audit with specialized industry experts who possessed the ability to critically assess the audit evidence.  Furthermore and as another example, the 2007 Audit Team demonstrated its due professional care during the 2007 year-end audit procedures when it reconsidered and lowered its initial determination of planning materiality based on the Company's 2007 financial results.

Based upon the evidence described throughout this report and workpapers reviewed, it is my opinion that Deloitte & Touche exercised due professional care in the performance of the 2006 and 2007 Audits.

B.  *Standards of Fieldwork*

4.  The work is to be adequately planned and assistants, if any, are to be properly supervised.

In planning the 2006 and 2007 Audits, Deloitte & Touche performed the following:

*   Established its understanding with Bear Stearns regarding the services to be performed for the engagement which were communicated in the 2006 and 2007 Engagement Letters.[37]
*   Obtained an understanding of Bear Stearns and its environment, including its internal controls.[38]
*   Reviewed the prior year audit files and financial statements.
*   Performed a preliminary analytical review.[39]
*   Obtained an understanding of the methods used to process accounting information.[40]

---

[35] 2007 TBSCI 1810A Audit Planning Memorandum - Supplement (09-07) (DT_WP_000150853-63).

[36] 2007 TBSCI 1410 Understand the Entity and Its Environment (DT_WP_000148529-50); 2007 TBSCI 1411 Understand the Entity and Its Environment - Documentation of Risks (DT_WP_000148641-49).

[37] Letter from Deloitte & Touche to Vincent Tese and Samuel Molinaro, dated October 5, 2007 (DT_WP_000332940-61); Letter from Deloitte & Touche to Vincent Tese and Samuel Molinaro, dated June 20, 2006 (DT_WP_000276383-402).

[38] 2007 TBSCI 1410 Understand the Entity and Its Environment (DT_WP_000148529-50).

[39] 2007 TBSCI 1611 Preliminary Review Analysis (09-07) (DT_WP_000150548); 2006 TBSCI 1611 Preliminary Analytical Review Analysis (09-06) (DT_WP_000002346).

CONFIDENTIAL

- Obtained an understanding of the components of internal control.[41]
- Performed risk assessments for key business processes and accounts which were considered in designing the nature, timing and extent of procedures.[42]
- Performed an assessment of the risk of material misstatement due to fraud.[43]
- Assessed planning materiality.[44]
- Conducted inquiries of management.
- Developed an audit program that set forth in reasonable detail the audit procedures Deloitte & Touche believed were necessary to accomplish its audit objectives.
- Summarized its audit strategy and audit planning decisions in summary memos.
- Communicated audit instructions to various teams.
- Timely communicated, in writing, a summary of its 2006 and 2007 audit plans to the audit committee of the Board of Directors of the Company.

Deloitte & Touche supervised the 2006 and 2007 Audit Teams.  For example, Audit Team members were informed of their responsibilities and the objectives of the audit procedures that they were responsible to perform.  The engagement partners appropriately delegated areas of the 2006 and 2007 Audits to qualified team members to perform their assigned audit procedures.  The workpapers prepared by the Audit Team members document review by appropriate levels of more senior Deloitte & Touche personnel, including managers and partners.

Based on the above and my review of the workpapers, it is my opinion that the 2006 and 2007 Audits were properly planned, staffed, and supervised in compliance with GAAS.

5.  A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

In order to obtain a sufficient understanding of internal controls over financial reporting to plan the audit and to determine the nature, timing, and extent of tests to be performed, GAAS state that, "[i]n all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation."[45]    Deloitte & Touche obtained this understanding throughout its 2006 and 2007 Audits by performing the following procedures:[46]

---

[40] 2007 TBSCI 1510 Overview of the Accounting Process (DT_WP_000149234-71); 2006 TBSCI 1510 Overview of the Accounting Process (DT_WP_000001112-70); 2007 TBSCI 1530 Understand the Financial Accounting Cycle (DT_WP_000149281-85); 2006 TBSCI 1530 The Financial Accounting Cycle (DT_WP_000001177- 88).

[41] 2007 TBSCI 4002B Financial Accounting Cycle - Control Reliance - Master MAP (DT_WP_000155008-44); 2007 TBSCI 4001A Entity Level – Master MAP (DT_WP_000154964-5006).

[42] 2007 TBSCI 1810 Audit Planning Memorandum (DT_WP_000150745-59); 2007 TBSCI 1810A Audit Planning Memorandum - Supplement (09-07) (DT_WP_000150853-63); 2007 TBSCI 2610 Year-End Reporting and Auditing Considerations (DT_WP_000154442-44).

[43] 2007 TBSCI 1210.1 Assessment of Fraud, Control Environment and Engagement Risk (DT_WP_000148408-42); 2007 TBSCI 1210.4 Inquiries of Management Regarding the Risk of Fraud (09-07) (DT_WP_000148444-56); 2007 TBSCI 1210.5A Fraud Risk Assessment Brainstorming Session (DT_WP_000148466-517).

[44] 2007 TBSCI 1710 Determine Planning Materiality SSE (DT_WP_000150710-13); 2007 TBSCI 1711.1 Planning Materiality Calculation (DT_WP_000150715); 2007 TBSCI 1711.2 Updated Materiality Considerations (DT_WP_000150724-28); 2006 TBSCI 1710 Determine Planning Materiality SSE (DT_WP_000002556-60).

[45] AU Section 319, Consideration of Internal Control in a Financial Statement Audit, ¶ .02.

[46] 2007 TBSCI 4001A Entity-Level - Master MAP (DT_WP_000154964-5006).

CONFIDENTIAL

- Obtained an understanding of internal controls at the entity level including the control environment, risk assessment process, information systems and communication, and monitoring.
- Understood management's process for assessing internal controls.
- Planned the audit of internal controls over financial reporting.
- Evaluated and documented the nature of the control activities subjected to the work of others.
- Tested the design operating effectiveness of the entity-level control activities, including antifraud programs and controls, determined to be effectively designed and implemented.
- Tested the design and operating effectiveness of control activities over significant accounts and disclosures determined to be effectively designed and implemented.[47]
- Evaluated the significance of each control deficiency that was identified by Deloitte & Touche, as well as those identified by Company management and others.

Deloitte & Touche determined that the complexity of the business processing environment at Bear Stearns required personnel evaluating controls to have relevant business process, accounting, and information systems expertise.  For technology areas related to general computer controls and application controls, which formed the foundation for reliable processing of transactions, Deloitte & Touche's ERS specialists were involved in the procedures.  Deloitte & Touche also involved internal controls design and testing subject matter specialists to provide consulting support to the 2006 and 2007 Audit Teams.[48]  It is important to note that an auditor obtains an understanding and tests the effectiveness of internal controls over the financial reporting.[49]  The auditor is not responsible for testing and reporting on an entity's risk management processes or framework.

Based upon the information noted above and my review of the 2006 and 2007 Audit workpapers, it is my opinion that Deloitte & Touche obtained a sufficient understanding of internal controls over financial reporting to plan the audit and to determine the nature, timing, and extent of tests to be performed in compliance with GAAS.

6. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

Deloitte & Touche's 2006 and 2007 Audit workpapers demonstrate that it obtained sufficient competent evidential matter to afford a reasonable basis for its opinions on the 2006 and 2007 Financial Statements. The Audit Teams included over 100 professionals who collectively spent thousands of hours performing audit procedures throughout the course of 2006 and 2007 Audits.  Deloitte & Touche generated thousands of files and workpaper documents performing those audits that support its conclusions.

According to GAAS, "[c]orroborating evidential matter includes both written and electronic information such as checks; records of electronic fund transfers; invoices; contracts; minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him or her to reach conclusions through valid reasoning."[50] The workpapers demonstrate that this is the type of audit evidence the Audit Team considered in performing the 2006 and 2007 Audits.

---

[47] AS 2 effective in 2006, ¶¶ 27, 88 and 92; AS 5 effective in 2007, ¶¶ 28, 42 and 44.
[48] 2007 TBSCI 1810.4 Supplemental Planning Memorandum on the audit of ICFR (DT_WP_000150775-90).
[49] AS 2 effective in 2006, ¶ 4; AS 5 effective in 2007, ¶ 3.
[50] AU Section 326, *Evidential Matter*, ¶ .17.

CONFIDENTIAL

GAAS also state that "The amount and kinds of evidential matter required to support an informed opinion are matters for the auditor to determine in the exercise of his or her professional judgment after a careful study of the circumstances in the particular case."[51]   During its 2007 audit planning and risk assessment, Deloitte & Touche used professional judgment to carefully study the risks that should be addressed as part of its audit procedures.  For example, Deloitte & Touche considered risks associated with the valuation of financial instruments and designed the nature, timing and extent of its audit procedures to address those risks as discussed later in my report.

Deloitte & Touche obtained, tested and analyzed a variety of audit evidence to support its opinions during the 2006 and 2007 Audits.  This included confirmation of account balances with third parties, corroborating information obtained from independent sources, evaluating assumptions and models utilized by the Company to estimate fair values, and obtaining written representations from management regarding the Company's 2006 and 2007 Financial Statements.  The Audit Teams reviewed this audit evidence to determine whether it supported the information and assertions in the 2006 and 2007 Financial Statements.  Throughout the workpapers, the Audit Teams demonstrated the use of reasonable auditor judgment in evaluating the reliability and validity of audit evidence they obtained.

### C.   Standards of Reporting

7.   The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

Deloitte & Touche's Report of Independent Registered Public Accounting Firm included the following opinions with respect to its 2007 and 2006 Audits.

"In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of The Bear Stearns Companies Inc. and subsidiaries as of November 30, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended November 30, 2007, in conformity with accounting principles generally accepted in the United States of America." (January 28, 2008)

"In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of The Bear Stearns Companies Inc. and subsidiaries as of November 30, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended November 30, 2006, in conformity with accounting principles generally accepted in the United States of America." (February 12, 2007)

Deloitte & Touche's reports on the 2006 and 2007 Financial Statements state each is presented in accordance with GAAP.

8.   The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

Deloitte & Touche's Report of Independent Registered Public Accounting Firm dated January 28, 2008 on the 2007 Financial Statements states, "As discussed in Note 1 and Note 3 to the consolidated financial

---

[51] *Id.* at ¶ .22.

statements, effective December 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 155, 'Accounting for Certain Hybrid Instruments, an amendment of FASB Statements No. 133 and 140" and Statement of Financial Accounting Standards No. 157, "Fair Value Measurements."

These accounting standards were appropriately adopted in 2007 and that change was reported in Deloitte & Touche's Report of Independent Registered Public Accounting Firm related to the 2007 Financial Statements.

9.  Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

Deloitte & Touche evaluated the financial statement disclosures reported in the 2006 and 2007 Financial Statements. For example, Deloitte & Touche performed procedures such as:

- Read the 2006 and 2007 Financial Statements.
- Reviewed Practice Alerts issued by the Deloitte & Touche National Office.
- Obtained supporting documentation, on a test basis, for amounts and disclosures in the Financial Statements.
- Read and evaluated comment letters received from the SEC Division of Corporate Finance ("SEC Comment Letter(s))".
- Completed compliance questionnaires that assisted the Audit Teams with evaluating the disclosures in accordance with GAAP.
- Held interactive discussions and made inquiries of, various appropriate levels of the Company's management with respect to disclosures.

The Company received two SEC Comment Letters from the SEC Division of Corporate Finance during the relevant time period.  The first, dated September 27, 2007, was related to a review of the Company's Form 10-K for the fiscal year ended November 30, 2006 and included information requests about the Company's exposure to subprime loans.  The second, dated December 11, 2007, was sent to highlight disclosure issues that the Company might want to consider related to certain non-consolidated conduits, structured investment vehicles and collateralized debt obligations as it prepared its MD&A for the 2007 Form 10-K annual report.  Neither Comment Letter concluded that prior filings with SEC were misstated or should be revised.

The workpapers document that the Company considered the Comment Letters in connection with its 2007 Form 10-K and that the Company provided additional disclosure of the matters discussed in the Comment Letters.  The additional disclosure was primarily made in the Company's MD&A.  Deloitte & Touche read the Comment Letters and considered them as it evaluated footnote disclosures in the 2007 Financial Statements in accordance with GAAP.  The footnote disclosures in the 2007 Financial Statements continued to disclose fair values of financial instruments and concentration risk in accordance with GAAP, in all material respects, as in prior years.  In addition, with the adoption of SFAS 157, Fair Value Measurements ("SFAS 157") at the beginning of fiscal year 2007, new comparative disclosures were presented in the 2007 Financial Statements that were not previously presented in 2006.  The disclosures provided the reader of the financial statements more information about the hierarchy of the quality and reliability of the information used to determine fair values (*e.g.*, Levels 1, 2 and 3).  These disclosures were not the correction of omissions of disclosures in prior year financial statements; rather, these new disclosures were required due to an adoption of the new fair value accounting standard.

In my opinion, Deloitte & Touche's approach to address the Comment Letters was reasonable.  Further, Item 1B - "Unresolved Staff Comments" within Form 10-K requires a company to explain certain

CONFIDENTIAL

comments it has received from the SEC staff on previously filed reports that have not been resolved after an extended period of time. "Extended period of time" is defined as not less than 180 days before the end of its fiscal year to which the annual report relates.[52] The Comment Letters received by Bear Stearns were not received within this time period and, therefore, disclosure in Item 1B was not required.

I have read the Notes to the 2006 and 2007 Financial Statements and in my opinion, Deloitte & Touche had a reasonable basis to conclude the disclosures about financial instruments and concentration risk were consistent with what was required by GAAP at the time, in all material respects, in relation to the 2006 and 2007 Financial Statements taken as a whole. Further, the plaintiffs and Finnerty made assertions about the level of disclosure related to subprime lending made in the MD&A and Risk Factors section of the Form 10-K. As noted previously, Deloitte & Touche's responsibility is limited to the 2006 and 2007 Financial Statements on which it reported and it is not responsible for auditing other information contained in the Company's Form 10-K filings, including MD&A and Risk Factors.

10. The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

Deloitte & Touche issued an unqualified opinion on its audit of the consolidated statements of financial condition of the Company as of November 30, 2007 and 2006, and the related consolidated statements of income, comprehensive income, cash flows and changes in stockholders' equity for each of the three years in the period ended November 30, 2007.

Deloitte & Touche issued an unqualified opinion on its audit of the consolidated statements of financial condition of the Company as of November 30, 2006 and 2005, and the related consolidated statements of income, comprehensive income, cash flows and changes in stockholders' equity for each of the three years in the period ended November 30, 2006.

Deloitte & Touche's performance of the 2006 and 2007 Audits in accordance with GAAS provided it with a reasonable basis for its opinions.

### X.  Audit Procedures: Mortgages, Mortgage- and Asset-Backed Securities

*A.  General*

Mortgages, mortgage- and asset-backed securities were reported in the line item "Financial instruments owned, at fair value" as of November 30, 2006 and 2007. The 2007 Financial Statements and Footnote 3, "Financial Instruments", disclosed the following as of November 30, 2007.

---

[52] Rule 12b-2 of the Exchange Act.

CONFIDENTIAL

|  | November 30, 2007 (in millions) |
|---|---|
|  |  |
| Mortgages, mortgage- and asset-backed | $46,141 |
| Fair values reported as: [53] |  |
|    Level 1 | - |
|    Level 2 | $28,891 |
|    Level 3 | $17,250 |
|  |  |
| Total Financial instruments owned, at fair value | $138,242 |
| Total Assets | $395,362 |

The plaintiffs and Finnerty make assertions that the fair value of certain financial instruments and related disclosures reported in the 2006 and 2007 Financial Statements were not presented in accordance with GAAP and, therefore, Deloitte & Touche's opinions on those financial statements were false and misleading.  However, I have not seen any specificity to substantiate those claims, any evidence Finnerty reviewed Deloitte & Touche workpapers, or any adjustments to the 2006 and 2007 Financial Statements proposed by the plaintiffs or Finnerty.

Further, as noted previously, and contrary to the plaintiffs' and Finnerty's claims, fair values reported in the 2006 and 2007 Financial Statements were not based on the VaR measurements.  Rather, as required by GAAP, estimates of fair value were based on quoted market prices in active markets; observable market based inputs or unobservable inputs that are corroborated by market data (*e.g.*, vendor pricing, etc.); or, estimation models for securities with unobservable inputs and not corroborated by market data. Contrary to the plaintiffs' assertions, internal controls over financial reporting of fair value of financial instruments were tested by Deloitte during its 2006 and 2007 Audits.  In the following paragraphs, I summarize why I believe the Deloitte & Touche audit procedures with respect to mortgages and mortgage-backed securities performed during the 2006 and 2007 Audits were performed in accordance with GAAS and that such procedures provided a reasonable basis for its opinions on the 2006 and 2007 Financial Statements, taken as a whole.

During the course of its 2007 Audit, Deloitte & Touche issued Practice Alerts to audit teams that provided current guidance on emerging topics with respect to the market conditions in 2007.  Those Practice Alerts included:

---

[53] The Company did not adopt FAS 157 until 2007 and therefore, these disclosures about securities classified as Level 1, 2 and 3 were not required, presented, or available for 2006.

CONFIDENTIAL

- Practice Alert 07-2, Audit Response to Developments in the Mortgage Lending Market Affecting Many Organizations and Industries. This Practice Alert was issued on March 30, 2007 and addressed background information on recent events in the markets for subprime mortgages, provided an overview of risks facing various types of entities that were affected by those market events and suggested procedures audit professionals should consider in conducting interim reviews of affected entities' financial statements.

- Practice Alert 07-3, Adverse Market Conditions Persist for Subprime Mortgages.  This Practice Alert was issued on June 27, 2007 and provided an update on the state of the subprime markets as of the close of the second quarter calendar year 2007.  It suggested that practitioners continue to monitor developments and refer to prior practice alerts in connection with its procedures.

- Practice Alert 07-4, Turbulent Debt Conditions Continue.  This Practice Alert was issued on August 3, 2007 and updated on September 18, 2007.  It provided an update on the state of the market and procedures audit engagement teams should consider in performing interim and year-end procedures on entities affected by the deterioration in markets for certain debt instruments, including subprime and near-prime mortgage-backed securities and high yield corporate debt securities.

The Audit Team's consideration of the above-referenced Practice Alerts is documented throughout the 2007 workpapers.[54]  I believe these Practice Alerts and the Audit Team's consideration of the relevant issues demonstrate Deloitte & Touche's due care in considering current market conditions for subprime products in its approach to audit procedures performed during the 2007 Audit.

I have reviewed workpapers to understand Deloitte & Touche's risk assessment with respect to the valuation of mortgages and mortgage-backed securities and the design of the nature, timing and extent of audit procedures performed to test the valuation assertion based on its risk assessment.  I have also reviewed the workpapers documenting the results of its control and substantive audit procedures.

During the 2007 Audit planning and risk assessment process, Deloitte & Touche documented specific identified risks with respect to the valuation assertion for certain mortgage and mortgage-backed securities products.  This was a change from prior years and responsive to the deterioration in the financial markets during the second and third quarters of 2007.  I also noted that the 2007 Audit Team utilized the Deloitte & Touche Quantitative Services Group, with specialized valuation experience and skills, to assist in testing the valuation assertion and review of methodologies utilized by Bear Stearns to estimate fair values.  The population of significant identified risks associated with such mortgage-backed securities totaled $6.844B as of August 31, 2007 and $4.305B as of November 30, 2007.[55]

The Audit Team's audit approach based on its risk assessment included testing and relying on internal controls and planning and performing substantive audit procedures at interim dates and at year end to test the valuation of financial instrument inventory positions.  In the following paragraphs, I will summarize those procedures and discuss my opinion that those procedures were performed in accordance with relevant auditing standards and provided Deloitte & Touche reasonable basis to conclude that mortgages,

---

[54] 2007 TBSCI 1810B Planning Memo Supplement – Response to Turbulent Debt Conditions (DT_WP_000150865-70).

[55] 2007 BSCM 5216.1 MBS Valuation Selections Testing (Interim & Final) (DT_WP_000219006); 2007 BSCM 5215.1 Leadsheet – Prism Pop Summary & Y/E Sample Calc (DT_WP_000218729).

CONFIDENTIAL

mortgage- and asset-backed securities were presented in accordance with GAAP in relation to the consolidated financial statements taken as a whole.

### B.  Mortgage- and Asset-Backed Securities ("MBS")

Deloitte & Touche obtained an understanding of the Company's methodologies to value different securities product types and to confirm its understanding of the processes and controls in place around price verification of MBS and related products.[56]  For example, the Company's internal controls included procedures performed by the risk management group to verify prices on security positions and other valuations for financial reporting purposes (the "Risk Management Group").  Deloitte & Touche met personnel in the Company's Risk Management Group to understand the general methodologies utilized in pricing mortgage-related products in accordance with GAAP.[57]  In those meetings, Deloitte & Touche obtained an understanding of the populations reviewed by the Company, underlying data and assumptions used in determining its valuations (e.g., prepayment speeds, default rates, cumulative loss rates, etc.), as well as relevant internal controls.  The assumptions and underlying data obtained from these meetings were made available to Audit Team members in Deloitte & Touche's Quantitative Services Group for review and to assess their consistency with market conditions and industry practice.

With this understanding, Deloitte & Touche performed procedures to test and, in due course, rely on internal controls over the valuation process with respect to these securities.  The Company's procedures to measure securities at fair value are summarized as follows:

- Traders mark each security to fair value.
- Business Unit Controllers ("BUCs") independently review each valuation mark by Bear Stearns traders against vendor pricing services such as Bloomberg, Reuters, and Interactive Data Corp. (IDC) (collectively "Vendor Marks").
- Fair value differences between Bear Stearns traders and Vendor Marks are investigated by the BUC with the vendor, and a determination was made by the Risk Management Group to adjust the vendor mark, adjust the trader mark, or retain the original mark.
- The determinations are reviewed and finalized by the Mark to Market Committee, comprised of experienced senior management.
- BUCs and Risk Management Group review reserves recorded for security inventories.[58]

These positions largely consisted of government issued agency MBS, or investment grade seasoned and liquid non-agency MBS. Based on the market conditions in 2007, the BUCs were identifying an increasing number of differences between external vendor marks and the Company's trader marks.  As a result, the BUCs' procedures and the number of challenges to the marks appropriately increased in the latter half of 2007.  Deloitte & Touche documented its understanding of this process in the workpapers.[59]

---

[56] 2007 BSCM 5215.8 Memo on MBS Risk Management Valuation Verification Methodology (DT_WP_000218995-9004).

[57] 2007 BSCM 5215.8 Memo on MBS Risk Management Valuation Verification Methodology (DT_WP_000218995-9004); 2007 TBSCI 4210 Controls That Address Risks (DT_WP_000155180-93); 2007 BSCM 4302 Process Level Workbook Template – Mortgages (DT_WP_000213744); 2007 BSCM 4301 MBS & PAUG – Narrative (DT_WP_000213739-42).

[58] 2007 BSCM 5302 Audit Procedures – Reserves (DT_WP_000222173-74).

[59] 2007 BSCM 5215.3 Memo on Results of Client Vendor Priced Positions Review (DT_WP_000218822-24).

CONFIDENTIAL

The Company processes described above demonstrated to me that the Company was considering available market information, evaluating potential differences in value, and had an appropriate process to objectively adjust fair values of securities for financial reporting purposes.  For example, the Company recorded adjustments to reduce the fair value of securities totaling approximately $1.2 billion during the fourth quarter 2007.[60]

As previously stated, Deloitte & Touche considered the deterioration in the market for certain mortgage-backed securities and identified them as having specific identified risk relating to potential valuation errors.[61]  To address the valuation risk, at interim dates and year end, Deloitte & Touche utilized sampling approaches, which considered key items, to test the valuation of a sample of these and other securities.[62]  Deloitte & Touche also considered the effect of Standard & Poor's and Moody's ratings and changes, if any, between interim and year end.  To evaluate the Bear Stearns valuation of the securities selected for testing, Deloitte & Touche performed the following:

1. Deloitte & Touche professionals met with Company personnel to understand its methodology to estimate the fair value of securities and performed walkthroughs of the process to confirm their understanding.
2. For securities within the sample that subsequently sold, the sales price was compared to the Company's recorded valuation.
3. When a counterparty to the security existed, the Company's recorded valuation was compared to the counterparty's pricing.
4. Compared the Company's recorded price to one or more external vendor prices.
5. Gained an updated understanding of relevant assumptions and inputs to evaluate the reasonableness of the Company's methodology and valuation.
6. Re-priced certain selections and compared the valuation to the Company's price.
7. Tested reserving methodology and balances.

As part of its year-end audit procedures, the Audit Team re-evaluated its calculation of Monetary Precision as a result of the Company's lower than anticipated pre-tax earnings and a fourth quarter loss. As a result, Deloitte & Touche reduced materiality from $90.5 million to $70.0 million and re-calculated its sample size using the revised materiality amount.[63]  This demonstrated to me Deloitte & Touche's due care in performing its Audit.

In addition to the above, at year end, Deloitte & Touche compared prices subsequent to year end to the year-end price to further evaluate the reasonableness of the Company's price.  This test of subsequent events and transactions after the balance sheet date assisted Deloitte & Touche in evaluating the Company's fair value measurements of MBS as of the balance sheet dates and is consistent with updated

---

[60] 2007 BSCM 5201.1 Inventory Valuation - Rollforward procedures memo (DT_WP_000218212-17); 2007 BSCM 8211 Principal Transactions Rollforward YTD 2007 (DT_WP_000224395).

[61] 2007 TBSCI 1810.14 Planning Memo Supplement – Trading Team Inventory Valuation Approach (DT_WP_000150822-29).

[62] 2007 BSCM 5216.1 MBS Valuation Selections Testing (Interim & Final) (DT_WP_000219006); 2007 BSCM 5215.1 Leadsheet – Prism Pop Summary & Y/E Sample Calc (DT_WP_000218729); 2007 BSCM 5215.2 Memo on Results of D&T MBS Valuation (DT_WP_000218804-20); 2007 BSCM 5201.1 Inventory Valuation - Rollforward procedures memo (DT_WP_000218212-17); 2007 BSCM 5216.2 MBS Selection FAS 157 levels (DT_WP_000219073); 2007 BSCM 5207 Sample Size Determination (DT_WP_000218269).

[63] 2007 BSCM 5201.1 Inventory Valuation - Rollforward procedures memo (DT_WP_000218212-17).

CONFIDENTIAL

auditing standards effective December 15, 2006.[64]  It further demonstrated that Deloitte & Touche was paying attention to changes to auditing standards throughout the course of its audits.

The types of procedures described above are the types of procedures I would expect to be performed in evaluating the fair value measurements of these types of securities and are consistent with relevant auditing standards.

### C. Mortgage Loans

Deloitte & Touche obtained an understanding of the Company's methodologies to value different mortgage types in accordance with GAAP.  Loan products were classified by the Company as performing loans and non-performing loans.  With this understanding, Deloitte & Touche performed procedures to test and rely on internal controls over the valuation process with respect to loans.  Similar to mortgage-backed securities, Deloitte & Touche performed a risk assessment and identified certain types of loans as having specific identified risks with respect to the valuation assertion.

### 1.  Performing Mortgage Loans

At both August 31, 2007 and November 30, 2007, the Company estimated the valuation of performing whole loans utilizing securitization models to estimate the value of the whole loans "as if" such loans were securitized.  Once the whole loans were pooled into an "as if" securitization and assigned a value, then the "as-if" securitizations were independently reviewed and challenged by Bear Stearns' BUC function and then reviewed again by the Risk Management Group to verify and conclude upon the reasonableness of the assumptions and valuation assigned by the mortgage desk.  "As  if" securitizations were compared to existing issued securities with similar attributes to determine the reasonableness of the "as if" value based on analysis of the tranche valuations, related assumptions, collateral characteristics, and capital structures.

Deloitte & Touche's approach to test the valuation of performing mortgage loans at interim and year end was to evaluate and test the process utilized by the Company to estimate its valuations.  As described above, these procedures included the following:

- Deloitte & Touche met with BUCs and the Risk Management Group to discuss the values and assumptions of each "as if" securitization and obtained supporting documentation for each.[65] Deloitte & Touche inquired about significant variances it identified by meeting with Traders, the Risk Management Group, and BUCs to obtain corroborating explanations and supporting evidence, where applicable.

- Deloitte & Touche reviewed the securitization models to determine the reasonableness of the model structure.  These procedures were performed by Deloitte & Touche team members with specialized skills from the Deloitte & Touche Quantitative Services group,[66] as follows:

    o  Assessed the reasonableness of the securitization model calibration to the published ABX Index, where applicable.[67]

---

[64] AU Section 328, *Auditing Fair Value Measurements and Disclosures*, ¶ 41.
[65] 2007 EMC 5451 Memo on Performing Whole Loan Valuation – Interim (DT_WP_000242918-24).
[66] 2007 EMC 5456A Memo on Bear Stearns Securitization Model – 2007 (DT_WP_000244947-49).

CONFIDENTIAL

- o Obtained and assessed the reasonableness of default and loss severity curve assumptions for different product types.

- Deloitte & Touche compared recently issued, outstanding and observable securitizations to the "as if" securitization marks.

- Deloitte & Touche obtained existing issued and outstanding securitization deal sheets for securitization deals that included similar collateral to the "as if" population and compared the securitization price of the collateral in the deal sheets to the price of the "as if" securitized loans.

- Where relevant, Deloitte & Touche compared whole loan sales to third parties within the 4th quarter to evaluate the interim and year end marks. [68]

Based on its testing and re-performance, Deloitte & Touche concluded that the valuation approach utilizing securitization models was theoretically sound and related inputs to those models were similar to recent actual deals with reasonable adjustments given difficult market conditions.[69]  Further, this approach was consistent with SFAS 157, which states that the objective of a fair value measurement is to determine the price that would be received to sell the security at the measurement date (an exit price).[70]

The types of procedures described above are the types of procedures I would expect to be performed in evaluating the valuation of these types of mortgages and were consistent with relevant auditing standards.

2.  Non-Performing Mortgage Loans and Real Estate Owned ("REO")

The Company's estimated valuation for non-performing loans and real estate owned was based on the adjusted value of the underlying real property collateral.   The adjusted value of the underlying real property collateral was estimated by the Company utilizing non-performing loan ("NPL") valuation models that considered Broker Price Opinions ("BPO") and other assumptions including estimated selling costs, geography, stage of loan, insurance coverage, etc.  The BPO is obtained from independent third parties, and is the major determinant for the valuation of non-performing loans because it provides an estimate of collateral value which is then adjusted for various assumptions based on specific circumstances.  The Company had policies and procedures in place around BPOs including a decision tree which Deloitte & Touche obtained as part of its audit procedures.[71]  Use of BPOs for valuation of non-performing loans was industry practice.

Deloitte & Touche's approach to test the valuation of non-performing loans at interim and year end was to evaluate and test the process utilized by the Company to estimate its valuations.  These procedures included the following:

---

[67] 2007 EMC 5456 Memo on Performing Whole Loan Valuation – Year End (DT_WP_000244939-45).
[68] 2007 EMC 5451 Memo on Performing Whole Loan Valuation – Interim (DT_WP_000242918-24).
[69] 2007 EMC 5456A Memo on Bear Stearns Securitization Model – 2007 (DT_WP_000244947-49).
[70] FASB Statement of Financial Accounting Standards No. 157, *Fair Value Measurements*.
[71] 2007 EMC 5453.4-1 BPO Ordering Process – Decision Tree – As of Sept. 2007 (DT_WP_000243712-15); 2007 EMC 5453.4-2 Decision Tree Review. for the BPO Ordering Process – Interim (DT_WP_000243717-21).

CONFIDENTIAL

- Deloitte & Touche professionals met with Company personnel to understand its methodology to value non-performing loans.[72]  This understanding included obtaining a BPO decision tree prepared by the Company that graphically reflected the Company's decisions and processes.

- Deloitte & Touche reviewed and tested NPL models utilized by the Company and documented its understanding of those models in the workpapers.[73]  Modeling audit procedures were performed by Deloitte & Touche team members with specialized skills from the Deloitte & Touche Quantitative Services group.

- Deloitte & Touche selected a representative sample of inputs, including BPO values, from which to test the models.[74]

- Deloitte & Touche performed model recalculations for different loan product types.[75]

- Deloitte & Touche selected a sample of non-performing loans to test the valuation.  For each selection, Deloitte & Touche obtained an understanding of the valuation methodology and reviewed the assumptions that had a significant impact on the valuation methodology. Deloitte & Touche utilized assumption information to independently recalculate the fair values developed by the Company.[76]

I noted that the Company revisited its BPO procurement process during the 4th quarter of 2007 due to the changing credit market conditions.  Deloitte & Touche reviewed and tested these changes as part of its year end testing procedures.  This is an example of how the Company was aware of the conditions in the market place and was adjusting its approach to valuation.

Based on its testing and re-performance, Deloitte & Touche concluded that the valuation models and related inputs and assumptions utilized by the Company to estimate non-performing and REO loan valuations were reasonable.

The audit procedures described above are the procedures I would expect to be performed in evaluating the fair value measurement of non-performing mortgages and Real Estate Owned where the values are collateral dependent.  Such procedures were consistent with relevant auditing standards.

---

[72] 2007 EMC 5453 Memo on Non-Performing Core Desk Whole Loan and REO Valuation – Interim (DT_WP_000243130-34).

[73]  2007 EMC 5453.3 PV Table Assumptions (DT_WP_000243692); 2007 EMC 5461.1 Bear EMCLoan Mod (DT_WP_000245423-29).

[74] 2007 EMC 5453.4 BPO Testing for Valuations (REO & Whole Loans) – Interim (DT_WP_000243699); 2007 EMC 5453.4A Memo on Testing of BPOs for Valuations of Non-Performing Loans & REO – 11/30/07 (DT_WP_000243723-25); 2007 EMC 5453.4B BPO Analysis Management Report – PBC (DT_WP_000243727-30).

[75] 2007 EMC 5453 Memo on Non-Performing Core Desk Whole Loan and REO Valuation – Interim (DT_WP_000243130-34); 2007 EMC 5453.5 Non-Performing Core Desk Valuation Testing (NP & REO) – 8-31-07 (DT_WP_000244093).

[76] 2007 EMC 5453.5 Non-Performing Core Desk Valuation Testing (NP & REO) – 8-31-07) (DT_WP_000244093).

CONFIDENTIAL

### D.  Hedge Fund Considerations

In its second quarter 2007 review, Deloitte & Touche considered the disclosure implications related to the distress of the High Grade Fund and Enhanced Leveraged Fund (the "Hedge Funds") managed by the Company.[77]  The Company provided additional disclosure in its 2nd Quarter Form 10-Q.  On July 23, 2007, the Company seized the financial instrument collateral that secured financing provided by the Company to the High-Grade Fund.[78]  The collateral seized by the Company was recorded on the Company's books and records and was thereafter subject to the same processes and controls to measure and report fair value of financial instruments in accordance with GAAP described earlier in this report.  Both Hedge Funds failed during the third quarter of 2007 and the Company appropriately wrote off the Company's investments and fees receivables from the funds, losses from the closure of the secured financing agreement to the High Grade Fund and other directly related expenses.[79]

### E.  Evaluation Audit Results

The workpapers document the bases for Deloitte & Touche's conclusions with respect to valuation of mortgages, mortgage- and asset-backed securities.  I noted that Deloitte & Touche accumulated and aggregated audit differences based on its testing to evaluate materiality in connection with other misstatements identified during its audits.  Further, Deloitte & Touche had a process to test and evaluate disclosures made in the consolidated financial statements.  It documented its completion of compliance checklists that assisted the Audit Team in evaluating the adequacy of financial statement disclosures in the consolidated financial statements.  Based on my review, I believe Deloitte & Touche's evaluation of unrecorded audit adjustments and footnote disclosures was performed in accordance with relevant auditing standards at the time.  Finally, Deloitte & Touche obtained appropriate written management representations regarding the Company's fair value measurements and disclosures in the financial statements.

Based on the above, it is my opinion that Deloitte & Touche's procedures and evaluation of audit results provided it with a reasonable basis for its opinion that mortgages, mortgage- and asset-backed securities were presented in accordance with GAAP, in all material respects, in relation to the consolidated financial statements taken a whole as of November 30, 2006 and 2007.

## XI. Deloitte &Touche's Consideration of the Going Concern Assumption

The plaintiffs and Finnerty make allegations that the Company had inadequate liquidity and capital reserves.  These terms are not defined or presented in accordance with GAAP in the 2006 and 2007 Financial Statements.  Accordingly, Deloitte & Touche did not express an opinion on such matters.  However, during the 2007 Audit, Deloitte & Touche assessed whether the Company's going concern assumption underlying the preparation of the 2007 Financial Statements continued to remain appropriate.  Deloitte & Touche evaluated the Company's assessment of going concern by considering many factors, including management's Funding & Liquidity Package for December 2007, its understanding of the Company and market conditions at the time, current events and conditions, and discussions with management.  Based on its procedures, Deloitte & Touche reasonably concluded that the Company's use

---

[77] 2Q TBSCI 2330A Summary Memo – High Grade Strategies Fund (DT_WP_000199814-22).

[78] 3Q 2007 TBSCI 2330.2 Summary Memo Supplement - High Grade Credit Strategies Funds (DT_WP_000207025-33).

[79] 3Q 2007 TBSCI 2330 PR 1 BSAM PL Impact (DT_WP_000349893).

CONFIDENTIAL

of the going concern assumption in preparation of the 2007 Financial Statements continued to be appropriate.[80]

Bear Stearns experienced a significant liquidity crisis during the end of the week of March 10, 2008, which concluded in its merger with JP Morgan Chase.  In connection with Deloitte & Touche's review of events subsequent to the Company's November 30, 2007 year end and in connection with the filing of a registration statement in connection with the merger, Deloitte & Touche evaluated whether a low implied stock value of the Company at $2 per share as compared to its book value per share of $85 at November 30, 2007, was indicative of errors in the 2007 Financial Statements.  The Audit Team considered many factors, including liquidity and regulatory capital.  Deloitte & Touche documented that Bear Stearns had over $18 billion of high quality liquid assets as of the morning of March 11, 2008.  Deloitte & Touche also documented that throughout the week of March 10, 2008 until the closing of the JP Morgan Chase merger transaction at March 18, 2008, Bear Stearns had capital ratios well in excess of the 10% level used by the Federal Reserve Board in its "well-capitalized" standard.  Deloitte & Touche also noted that the JP Morgan Chase CFO, Mike Cavanagh, stated in a press conference in connection with the merger, "…we're very comfortable with the position at which Bear Stearns had marked the positions..."[81] Deloitte & Touche reasonably concluded that the transaction was a distressed sale and that the low implied stock value was not an indication of errors in previous financial statements, either those of the annual period ended November 30, 2007 or those of the quarter ended February 29, 2008.

Further, GAAS states "[t]he auditor is not responsible for predicting future conditions or events.  The fact that the entity may cease to exist as a going concern subsequent to receiving a report from the auditor that does not refer to substantial doubt, even within one year following the date of the financial statements, does not, in itself, indicate inadequate performance by the auditor.  Accordingly, the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern."[82]

### XII.        Summary Conclusion

The Deloitte & Touche Audit Teams demonstrated the requisite technical training and proficiency, maintained their independence throughout the course of the audits and performed their procedures with due professional care as defined by GAAS.  Throughout the course of its Audits, Deloitte & Touche properly planned audit procedures by obtaining a sufficient understanding of internal control and executed these procedures to gather sufficient competent evidential matter to support its opinions on Bear Stearns consolidated financial statements.  Based on all of the information I have considered, it is my opinion that Deloitte & Touche performed its 2006 and 2007 Audits in accordance with GAAS which provided it with a reasonable basis to conclude that the Bear Stearns consolidated financial statements for the years ended November 30, 2006 and November 30, 2007 were presented in accordance with GAAP, in all material respects.

---

[80] Funding & Liquidity Package, the Bear Stearns Companies Inc. December 2007 (DT_WP_000333540-91); 2007 TBSCI 2331 Assessment of Going Concern (DT_WP_000153920-27).

[81] 1Q 2008 TBSCI - 2370.1 Additional Procedures re Subsequent Events (DT_WP_000266879-85).

[82] AU Section 341, *The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern,* ¶ .04.

CONFIDENTIAL

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed: April 16, 2015

Joseph C. Schubert

CONFIDENTIAL

Appendix A

## Joseph C. Schubert
### Salt Lake City, Utah 84117
joe.schubert@gmail.com

Joe Schubert has over 30 years of experience in performing financial statement audits, consulting on accounting, auditing, and internal control matters, and conducting forensic accounting/fraud investigations. Prior to his retirement from Ernst & Young LLP ("E&Y") on June 30, 2009, Schubert was a Senior Partner in E&Y's Assurance and Advisory Business Services practice in the Financial Services Office. Schubert has extensive experience in bank processes and controls, mortgage banking, derivatives, securitizations and structured finance, real estate, mergers and acquisitions, broker/dealers, capital markets, securities registration and financial reporting.

During Schubert's tenure at E&Y, he also served in E&Y's National Offices in both New York and Cleveland and as the Global Coordinating Partner for a $1.6 trillion global bank. Schubert's leadership roles at E&Y included serving as E&Y's Controls & Methodology Leader (*i.e.*, technical director of auditing) for the Financial Services Office and as the U.S. Financial Services Industry Leader for the Assurance & Advisory Business Services practice. His responsibilities included developing E&Y's audit methodologies and guidance relating to internal controls and integrated audits for the Financial Services industry, which included commercial banks, savings institutions, broker-dealers, and insurance. Schubert was credited with the conception, design and implementation of the Firm's automated online securities pricing application and with the conception and design of the Firm's derivative instrument valuation center. Schubert has also served as an audit quality review team leader in E&Y's audit quality inspections program for over ten years where he authored assurance quality control opinions and reports based upon reviews and analysis of relevant workpapers and the application of relevant professional auditing and accounting standards. Schubert was a guest lecturer at the University of Notre Dame graduate school of Business on the subject of accounting for securitizations of financial instruments and the various assumptions that are inherent in the recognition of gain on sale and subsequent balance sheet valuation.

**Litigation and Forensic Consulting Practice**
• 2009 to present - including engagement by a large audit and accounting firm in its defense of the Countrywide Securities litigation

**E&Y Career Experiences**
• 2005-2009 New York Financial Services Office - Senior Banking & Capital Markets client service partner and the office technical director of auditing
• 2000-2004 Salt Lake City - Financial services, manufacturing and mining client service partner
• 1997-2002 Cleveland National Audit Office - US Financial Services Industry Leader for Assurance and Advisory practices
• 1994-1997 New York National Office - Accounting & Auditing consultation and financial services industry partner
• 1978-1994 Fresno - Staff accountant through audit practice leader serving financial services companies excepting portions of 1982-1983 separation to serve as a community bank CEO and Board Member.

**Education and Certification**
• Bachelors Degree - California State University, Fresno
• Certified Public Accountant – Utah

28

CONFIDENTIAL