# Exhibit 78

**The Bear Stearns Companies Inc.**
**Minutes of Special Meeting of**
**Board of Directors – March 16, 2008**

A special meeting of the Board of Directors (the "Board") of The Bear Stearns Companies Inc. ("TBSCI"), a Delaware corporation, was held at 383 Madison Avenue, New York, New York on March 16, 2008 beginning at 1:45 p.m. and continuing through the afternoon with brief adjournments from time to time.

1. **Attendance and Organization at the Meeting**

The following directors were present:

| | |
|---|---|
| James E. Cayne | Frank T. Nickell |
| Henry S. Bienen | Paul A. Novelly |
| Carl D. Glickman | Frederic V. Salerno |
| Michael Goldstein | Alan D. Schwartz |
| Alan C. Greenberg | Vincent Tese |
| Donald J. Harrington | Wesley S. Williams, Jr. |

Being all 12 of the directors and constituting a quorum thereof. Mr. Bienen and Mr. Glickman participated in the meeting via telephone conference in accordance with the By-laws. Also present were the following officers of TBSCI: Samuel L. Molinaro, Jr., Executive Vice President; Michael S. Solender, Esq., General Counsel and Jeffrey M. Lipman, Esq., Assistant Secretary. Also present were Rodgin Cohen, Jay Clayton and Mitchell Eitel from the law firm of Sullivan & Cromwell LLP; Dennis Block and William Mills from the law firm of Cadwalader, Wickersham & Taft LLP and Gary Parr from Lazard Frères & Co. LLC. Peter Atkins from the law firm of Skadden, Arps, Slate, Meagher & Flom LLP joined at 3:45 p.m. after an adjournment. Mr. Cayne served as Chairman of the meeting and Mr. Lipman served as Secretary.

2. **Notice of the Meeting**

In accordance with the By-laws, notice of the meeting was waived by the attendance of the entire board.

3. **Negotiations, Proposed Agreements and Other Matters**

Mr. Schwartz provided an update on the status of negotiations. He said JP Morgan Chase ("Chase") earlier today was not as positive as last night and was not sure they could proceed. He stated that Chase was evaluating what the mortgage portfolio would be worth if liquidated and that they would have to ask the Federal Reserve Bank for support of losses on the portfolio. Mr. Cohen reported that the

DT_WP_000389091

Federal Reserve Bank (the "Fed") had told him that nothing was off the table. Mr. Schwartz said Chase has not responded to recent messages.

Mr. Schwartz next discussed the status of negotiations with J. C. Flowers & Co. LLC ("Flowers"). He said Flowers did not have enough backers and that Flowers had asked Goldman Sachs to bid on certain assets. Flowers would also need a one year window of eligibility for TBSCI's collateral at the Fed.

Mr. Parr told the Board that Chase reported that it had made a fair amount of progress with the Fed. He said the one remaining issue to be worked through was whether the Fed would guarantee a large pool of TBSCI's mortgage portfolio. He said the most difficult aspect of a potential Flowers' transaction would be correctly assessing TBSCI's liquidity needs. Flowers could get hung on capital if those owing money to Bear do not pay.

Mr. Schwartz next stressed the need for TBSCI to file for bankruptcy protection immediately if an agreement is not reached by early evening. While TBSCI's broker-dealer regulated subsidiaries could only file for Chapter 7 liquidation or else be subject to a receivership by the SIPC, the other subsidiaries could seek protection under the bankruptcy laws. The Board then discussed the protection a bankruptcy filing would afford TBSCI's non-regulated businesses and the fact that management and the Board would not be able to reorganize and oversee the regulated broker-dealer business upon a bankruptcy filing. The Board also discussed the effect of a bankruptcy on TBSCI's approximately $60 billion in repurchase agreements. He reported that the bankruptcy lawyers were preparing for a filing Monday morning. He discussed the need to move the clearing business to another broker/dealer. He said that Goldman Sachs was looking at BSSC. Mr. Schwartz spoke about someone taking over as counter party to the derivatives book. He said he believed Goldman Sachs had the ability to do so and that management had reached out to Morgan Stanley, who was coming over to do diligence.

Mr. Schwartz told the Board that if an agreement was not reached there would be disclosure and other issues to address in Asia starting around six p.m., and that TBSCI could not permit trading, if there is going to be a bankruptcy filing. He also said the same issues would need to be considered by the opening in London.

Mr. Schwartz next mentioned that he, Mr. Molinaro, Mr. Greenberg and Mr. Cayne could need separate counsel and that because the firms they have selected represent Bear Stearns the firms would need a waiver of possible conflicts of interest.

Mr. Block discussed which firms would be representing who and commented that such separate representation would be appropriate under the circumstances. Mr. Cohen said that it would be appropriate for the Board to grant waivers of possible conflicts of interest. On motion duly made, seconded and carried, the following

2

DT_WP_000389092

resolution was adopted, with each director affected abstaining with respect to the affect of the resolution regarding such director:

> RESOLVED, the engagement of Skadden, Arps, Slate, Meagher & Flom LLP by Mr. Schwartz; Simpson Thacher & Bartlett LLP by Mr. Molinaro; Schulte Roth & Zabel LLP by Mr. Greenberg; Kramer Levin Naftalis & Frankel LLP by Mr. Cayne; and either Arnold & Porter LLP or Weil, Gotshal & Manges LLP by Mr. Solender be and hereby are authorized and approved, and management is hereby authorized to waive any potential conflicts of interest to the extent necessary to allow such firms to act as counsel to the aforementioned individuals.

Mr. Block next spoke about possible amendments to the By-laws of TBSCI to provide that in connection with any indemnification, expenses, including attorneys' fees, incurred by the person entitled to indemnification in defending any such action, suit or proceeding shall be paid or reimbursed by TBSCI promptly upon demand by such person. Mr. Block commented that such action was appropriate under the circumstances. Mr. Cohen said this was common and permitted by statue. On motion duly made, seconded and carried, the following resolution was adopted:

> WHEREAS, the Board of Directors of The Bear Stearns Companies Inc. (the "Board of Directors"), a Delaware corporation (the "Corporation"), has determined that it is in the best interests of the Corporation to amend the Corporation's By-Laws as set forth below.

> NOW THEREFORE BE IT:

> RESOLVED, that the By-Laws of the Corporation be amended by adding Article 14 as set forth below:

> ARTICLE 14
> INDEMNIFICATION

> In connection with any indemnification as set forth in Article VIII of the Corporation's Certification of Incorporation, expenses, including attorneys' fees, incurred by the person entitled to indemnification in defending any such action, suit or proceeding shall be paid or reimbursed by the Corporation promptly upon demand by such person and, if any such demand is made in advance of the final disposition of any such action, suit or proceeding, promptly upon receipt by the Corporation of an undertaking of such person to repay such expenses if it shall

3

CONFIDENTIAL

DT_WP_000389093

ultimately be determined that such person is not entitled to be indemnified by the Corporation.

Mr. Block then said that if it was decided that bankruptcy filings should be made, it will be necessary for the boards of the various subsidiaries to authorize and approve the bankruptcy filings. Given the short timeframe to implement all actions necessary to file the subsidiaries for bankruptcy protection, it would be prudent to change the boards of the affected subsidiaries so that a limited number of signatories would be required to authorize, approve and effect the filings. On motion duly made, seconded and carried, the following resolution was adopted:

WHEREAS, The Bear Stearns Companies Inc., a Delaware corporation (the "Company"), is the direct or indirect parent company of the subsidiaries listed on Schedule A attached hereto and various other subsidiaries;

WHEREAS, the Board of Directors of the Company has determined it is advisable to alter the Boards of Directors of the subsidiaries set forth on Schedule A and such other subsidiaries, whether held directly or indirectly by the Company, as management may determine will be necessary to file for protection under applicable bankruptcy laws (each such subsidiary, an "Affected Subsidiary");

NOW THEREFORE BE IT:

RESOLVED, that each of the directors of each of the Affected Subsidiaries are hereby removed as directors, effective as of such time as management may determine; and it is

FURTHER RESOLVED, that, effective as of such time as management may determine, the following individuals are hereby nominated and appointed as directors to each of the Affected Subsidiaries, such individuals to serve on such boards of directors at the request of the Company:

Jeffrey Mayer
Samuel L. Molinaro Jr.
Alan D. Schwartz

FURTHER RESOLVED, that all actions previously taken by any officer, director, representative or agent of the Company in the name or on behalf of the Company in connection with the matters contemplated by the foregoing resolutions, to the extent they are consistent with the authority conferred by such resolutions, be, and

4

CONFIDENTIAL

each of them hereby is, adopted, ratified, confirmed and approved
in all respects as the act and deed of the Company.

Mr. Parr told the Board that Chase was now considering proposing four dollars a
share in Chase stock. Shortly thereafter, Mr. Parr received a call from Chase and
there was a brief adjournment.

Mr. Schwartz and Mr. Parr reported on a conversation they had during an
adjournment with Chase. Chase was now considering offering two dollars a share
because the government would not permit a higher number. Mr. Schwartz and Mr.
Parr expressed extreme disappointment to Chase and made demand for contingent
securities with the underlying value tied to assets if the assets were worth more,
but Chase reiterated that the Fed and the Treasury Department would not support
a transaction where TBSCI equity holders received any significant consideration
because of the "moral hazard" of the federal government using taxpayer money to
"bail out" the investment bank's stockholders.  Mr. Parr commented that if the
potential transaction with Chase was signed and submitted to TBSCI's
shareholders for a vote, and the vote was negative, Chase would have the right to
purchase certain assets – TBSCI's headquarters and its prime brokerage business.

A discussion of the alternatives continued and various board members asked
various questions of management and the legal advisors.  TBSCI's legal and
financial advisors and management expressed preliminary views regarding
Chase's two dollar a share proposal relative to the alternative of bankruptcy.

Mr. Cohen told the Board that if a corporation is insolvent the Board's obligations
include creditors. He further said that he understood there was approximately
seventy billion dollars in debt at the parent level that could potentially be affected
if there was a bankruptcy filing.

Mr. Block reported that Chase sent a merger agreement and stock option
agreement earlier today at approximately 1:30 a.m.  Lawyers for both parties had
discussed certain issues and TBSCI's counsel sent a marked merger agreement
back to Chase's counsel around noon. Mr. Block explained that the agreement
was structured as a stock-for-stock transaction with an exchange ratio of 0.05473
shares of Chase stock for each share of TBSCI stock, representing $2 per share
for TBSCI stockholders; that Chase was providing a guaranty of certain of
TBSCI's obligations; that the Fed was providing supplemental funding of up to
$30 billion; and that Chase would receive an option to purchase up to 19.9% of
TBSCI's outstanding shares. TBSCI's counsel had explained to Chase's counsel
that there should be very limited conditions to Chase's obligations to close and
that Chase should not be able to terminate the transaction except in very limited
circumstances. Counsel also explained that there were limited regulatory
approvals necessary for the transaction. Mr. Block explained that many of the
extensive representations in the original draft were deleted, and, except those
relating to authority and capitalization, accuracy of the representations and

5

CONFIDENTIAL

DT_WP_000389095

warranties would be eliminated as a condition to closing. Mr. Block told the Board that TBSCI will be obligated to hold a shareholder vote. If the vote fails and Chase wants to renegotiate, TBSCI would have to negotiate a restructuring of the transaction in good faith. Mr. Block discussed Chase's option to purchase 19.9 percent of TBSCI's outstanding shares; their option to purchase 383 Madison Avenue (the "Building") and their option to buy the prime brokerage business. Mr. Block advised that the legal advisors had met with Tom Flexner, the head of TBSCI's real estate group, and discussed at length what would be the fair value for selling the Building and Mr. Flexner indicated that $1.1 billion would be a fair price. The Board was informed that Chase's counsel was considering dropping insistence on the right to buy the prime brokerage business after having been advised by legal representatives of TBSCI of, among other things, the operational difficulty it would pose. Mr. Block mentioned that Chase had to get back to TBSCI on the mechanism by which TBSCI will be funded to operate; that the transaction may be taxable; and that Chase wants to be reimbursed for payments under its guarantee if the transaction does not close or another bidder comes in. Mr. Block reported that Chase will need waivers from the government for Chase to have "input" on TBSCI's business before the transaction closes.

Mr. Atkins pointed out that while elements of the proposed transaction (such as the 1 year term, the obligation to restructure, the option on the Building and the uncapped stock option) in an ordinary situation might be viewed as obstacles to third party bidders, it was important to recognize the situation confronting TBSCI's Board, including that a decision had to be made by TBSCI's Board immediately in the face of a real deadline for a bankruptcy filing, and, as TBSCI's Board had been informed, the only two choices were the Chase transaction in which creditors would be kept whole and stockholders would receive $2 per share and a bankruptcy filing in which stockholders were likely to receive nothing and certain creditors were likely to suffer losses. Mr. Nickell commented that the price might not be approved by stockholders.

Mr. Cohen next discussed the Board's options. He mentioned that although a search was conducted, there had not been a lot of bidders in this environment. Mr. Cohen did not think Flowers would get timely approval from the federal authorities; and, he noted that management had advised that without a transaction TBSCI will not be able to operate on Monday. He mentioned the risk of insolvency and the potential harm to bondholders. Mr. Cohen said that directors would have a fiduciary duty to bondholders under Delaware law if the corporation is insolvent and that if the corporation is in the so-called "zone of insolvency," it would be prudent for the directors to keep this principle in mind. Mr. Block pointed out that if there was a bankruptcy filing, the regulators would take over TBSCI's regulated businesses which are the significant assets that generate revenue.

Mr. Atkins stated that directors continue to have a duty to stockholders, including (if not detracting from the recovery by creditors) seeking to maximize the value

6

DT_WP_000389096

stockholders would receive. He noted his understanding that Lazard had tried to develop other third party interest but there were no other bidders, and that Chase was the only clear opportunity for stockholders to obtain value. In response to a question from a director, Mr. Atkins said no stockholders were being asked to enter into voting agreements. Mr. Atkins also noted that if stockholders did not approve the transaction, Chase had the right to require a renegotiation of the terms in good faith and resubmit them to stockholders, but Chase would not be obligated to increase the price.

Mr. Salerno asked if others could bid or if the hurdles were too high. Mr. Schwartz replied that the agreement will not allow TBSCI to solicit but that another party could make a bid. Mr. Schwartz told the Board that it was unlikely the Fed would back another bidder and that there was no real alternative to Chase. In response to a question from directors, Mr. Block and Mr. Cohen said they thought the stockholders vote could occur within the next eight weeks.

Various board members asked about evaluating the alternative of bankruptcy and the matter was discussed among those present. Based on information provided by management, its legal advisors and Lazard regarding TBSCI's financial position, the expected treatment of its businesses, assets and financing arrangements in a bankruptcy proceeding and the expected actions of its customers, counterparties, creditors, employees and regulators in the context of a bankruptcy, the board of directors was advised by Lazard, TBSCI's legal advisors and management that it was their collective view that, in the event of a bankruptcy of TBSCI, the holders of TBSCI common stock likely would receive no value and there likely would be losses incurred by certain creditors of TBSCI.

Mr. Parr informed the Board of his firm's efforts to find possible buyers. He said he had spoken with the CEOs of banks and other entities among which were Bank of NY Mellon, Barclays, Nomura, Deutsche Bank, Flowers, Fortress and Carl Icahn with respect to a takeover or some form of credit support. Goldman Sachs and Morgan Stanley had come in to look at the prime brokerage book. Mr. Parr reported that Flowers never got close to what it would need from the government and the lenders and that no other party had provided a viable proposal. His feedback from conversations with CEOs was that Chase was the best buyer. Mr. Parr told the Board that he had spoken with his team about the consequences of a bankruptcy. He said that a Chapter 11 reorganization could not be used for broker-dealers and that certain types of contracts, such as repurchase agreements, are entitled to certain safe harbor provisions under the bankruptcy code. Because of the elements of a financial institution's balance sheet one cannot find a way to stabilize as one might in other industries. Mr. Parr reiterated the collective view previously stated that a transaction was clearly preferable to bankruptcy. He told the Board that because much of the proposed deal was not standard Lazard's fairness opinion will speak about alternatives, including bankruptcy. Lazard will be able to say the deal is fair. Mr. Parr told the Board the conclusion was clear cut. Directors asked and counsel advised that under the exigent circumstances

7

involved the acceptance of Chase's offer would be consistent with the directors' exercise of their fiduciary duties.

Mr. Molinaro and Mr. Schwartz discussed what first quarter earnings would probably be as well as how the "run" on TBSCI developed. Mr. Molinaro mentioned that prime broker accounts were moving to other firms and repo lenders were refusing to roll over starting Wednesday night. Thursday morning TBSCI had twelve billion dollars in cash, including 15c3 cash that would be available to TBSCI. Mr. Schwartz said there were rumors that TBSCI was failing to meet margin calls. He said this resulted in two billion dollars in margin calls. Even though management disagreed with the amount of the calls, TBSCI paid all the calls but said it did not agree on one billion two hundred million dollars of the calls, which after payment needed further discussions with counterparties. Mr. Schwartz said TBSCI also was seeing a significant increase in assignments of settlement of transactions to other broker/dealers. While repo activity was going on and bank loans were okay Thursday morning, late in the day repo counterparties were saying they would not renew the next day and customer cash was continuing to go out. At that point TBSCI had five billion dollars in cash minus a three billion dollar overdraft at Citibank. Mr. Molinaro said that on Friday he thought TBSCI had utilized the Chase facility for approximately thirteen billion dollars and that Chase had applied a twenty per cent haircut. He also felt that CDS spreads were so wide that people were shorting as an alternative to buying a CDS. He mentioned a strategy of shorting stock and buying bonds. Mr. Molinaro mentioned that TBSCI was being told now that ABN Amro, its clearing agent in Asia was saying that they were not going to complete deliveries.

Mr. Cohen suggested that some time pass before any trades in either TBSCI or Chase be effected by the directors and executive officers of TBSCI and that they should not be commenting on the deal. Mr. Clayton pointed out that timing was tight as the deadline for approving a bankruptcy was upon them because of various legal and practical considerations, including that the Securities Investors Protection Corporation might act to protect customer accounts. Mr. Clayton further stated that no financial firm has reorganized successfully. Mr. Block said he had spoken with his bankruptcy lawyers and they had the same view.

At 5:30 p.m., several lawyers from Skadden, Sullivan & Cromwell, and Alexander Sheers, a lawyer with Bear, Stearns & Co. Inc., joined the meeting. Mr. White from Skadden spoke to the Board about the revised agreement that Chase had sent at approximately 4:20 p.m. Among other things, Mr. White spoke about the option on the Building. Mr. White also spoke about the conditions to Chase's obligation to close which he characterized as customary but limited. He discussed the no material change since November 30, 2007 clause and a number of other provisions, including, but not limited to, the proposed covenant providing Chase with a right to influence the way business is run, limitations on borrowing from third parties, and TBSCI's obligation to use efforts to maintain TBSCI's business.

CONFIDENTIAL

DT_WP_000389098

Mr. White pointed out that TBSCI's inability to terminate the agreement for a year may be a deterrent to other bidders who would have to wait up to a year before executing an agreement to acquire TBSCI. Mr. Block pointed out that there is a fixed ratio of Chase shares for TBSCI shares and that the value to TBSCI shareholders will move with the market price for Chase shares.

Additional discussion ensued with the directors asking several questions all of which were answered.

Mr. Mills then explained the resolutions approving the form of agreement and giving authority for their execution. On motion duly made, seconded and carried, the following resolutions were adopted:

> WHEREAS, the Board of Directors of The Bear Stearns Companies Inc. (the "Board of Directors"), a Delaware corporation (the "Company"), has been advised of the material terms and conditions of a draft Agreement and Plan of Merger (the "Merger Agreement"), by and between the Company and JPMorgan Chase & Co. ("Parent"), a Delaware corporation;

> WHEREAS, the Board of Directors of the Company has been advised of the material terms of a draft Stock Option Agreement (the "Option Agreement"), between the Company and Parent;

> WHEREAS, pursuant to the Merger Agreement, following satisfaction of the conditions set forth in the Merger Agreement, the Company will be merged with and into a new wholly owned subsidiary of Parent ("Sub"), with the Company continuing as the surviving corporation (the "Merger");

> WHEREAS, pursuant to the terms of the Option Agreement, Company will grant to Parent an option to purchase, subject to the terms thereof, shares of the Company's common stock;

> WHEREAS, the Company has received the written opinion of Lazard Freres & Co. LLC that, subject to the limitations and assumptions therein, the consideration to be received in the Merger by the holders of the Company's common stock is fair from a financial point of view; and

> WHEREAS, after due consideration, the Board of Directors has determined that it is in the best interests of the Company and its stockholders to consummate the business combination transaction provided for in the Merger Agreement and to grant the option pursuant to the Option Agreement.

9

CONFIDENTIAL

## THE MERGER

NOW THEREFORE BE IT:

RESOLVED, that after consideration of the terms and conditions of the Merger Agreement, the Board of Directors hereby (a) determines that the terms of the Merger, the Merger Agreement and the transactions contemplated thereby, are advisable and fair to, and in the best interests of, the Company and its stockholders; (b) approves and adopts the Merger Agreement and the transactions contemplated thereby; and (c) recommends that the Company's stockholders approve and adopt the Merger Agreement and the transactions contemplated thereby; and it is further

RESOLVED, that the Merger and the form, terms and provisions of the Merger Agreement, including the schedules and exhibits thereto, be, and each hereby is, authorized and approved, and that each of the proper officers of the Company be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to finalize, execute and deliver the Merger Agreement, with such changes, amendments or other modifications thereto as such officers may approve, the authority for such changes to be conclusively evidenced by such execution; and it is further

RESOLVED, that the proper officers of the Company be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to take such additional lawful actions as they may deem necessary or advisable to consummate the transactions contemplated by the Merger Agreement, including the Merger; and it is further

RESOLVED, that the Board of Directors hereby directs that the Merger Agreement and the transactions contemplated thereby, including the Merger, be submitted to the stockholders of the Company entitled to vote thereon for their consideration and approval pursuant to the applicable provisions of the Delaware General Corporation Law (the "DGCL") and the Securities Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder (the "Exchange Act"), as applicable, and that the President be, and hereby is, authorized, empowered and directed in the name and on behalf of the Company, to set a date for a meeting of the Company's stockholders at such time as he deems appropriate, but in any case, as promptly as practicable following execution and delivery of the Merger Agreement.

CONFIDENTIAL

DT_WP_000389100

## THE OPTION

RESOLVED, that the Option Agreement and the form, terms and provisions of the Option Agreement be, and each hereby is, authorized and approved, and that each of the proper officers of the Company be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to finalize, execute and deliver the Option Agreement, with such changes, amendments or other modifications thereto as such officers may approve, the authority for such changes to be conclusively evidenced by such execution; and it is further

RESOLVED, that the proper officers of the Company be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to take such additional lawful actions as they may deem necessary or advisable to consummate the transactions contemplated by the Option Agreement.

## DELAWARE GENERAL CORPORATION LAW

RESOLVED, that to the extent that Section 203 of the DGCL would otherwise be applicable to the transactions contemplated by the Merger Agreement, the Board of Directors does hereby approve, pursuant to Section 203(a)(1) of the DGCL, the transactions contemplated by the Merger Agreement, including any transaction contemplated by such agreement which when consummated would result in Parent, Sub or any of their respective affiliates, becoming an Interested Stockholder as such term is defined in Section 203 of the DGCL.

## CERTIFICATE OF INCORPORATION

RESOLVED, that to the extent that Article IX of the Company's Certificate of Incorporation would otherwise be applicable to the transactions contemplated by the Merger Agreement, the Board of Directors does hereby approve the transactions contemplated by the Merger Agreement, including any transaction contemplated by such agreement which when consummated would otherwise constitute a Significant Transaction as such term is defined in Article IX of the Company's Certification of Incorporation; and it is further

RESOLVED, that to the extent that Article IX of the Company's Certificate of Incorporation would otherwise be applicable to the transactions contemplated by the Merger Agreement, the Board of Directors does hereby determine that none of Parent, Sub or any of

11

DT_WP_000389101

their respective affiliates shall be deemed an Interested Stockholder, as such term is defined in Article IX of the Company's Certificate of Incorporation, for purposes of Article IX of the Company's Certificate of Incorporation.

## REGULATORY AND STOCK EXCHANGE FILINGS

RESOLVED, that the proper officers of the Company be, and each of them without the others hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to prepare all documentation, to effect all submissions, filings and notices, and to obtain all permits, waivers, consents, approvals and authorizations of all third parties, federal, provincial, territorial, state, foreign country or multi-national regulatory or supervisory authorities and other governmental entities (including, without limitation, any submission, filing or notice required or advisable to be made with The New York Stock Exchange, Inc., the Secretary of State of the State of Delaware, the Board of Governors of the Federal Reserve System, the Financial Industry Regulatory Authority, the Financial Services Authority, the Financial Services Agency of Japan, or pursuant to Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), to execute personally or by attorney-in-fact any such required filings and any amendments or supplements to any of the foregoing, to cause any such required filings and any amendments and supplements thereto to become effective or otherwise approved, and to execute and deliver all certificates, instruments or other documentation required in connection with any of the above and to take actions necessary or advisable in order to comply with applicable law or any agreements to which the Company or any of its subsidiaries is a party or subject, as any proper officer may deem necessary or advisable to consummate the transactions contemplated by the Merger Agreement.

RESOLVED, that the proper officers of the Company be, and each of them without the others hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to prepare, execute and file with the Securities and Exchange Commission (the "SEC"), and to cooperate with Parent in the preparation, execution and filing of, any and all statements, reports, schedules, documents and information concerning the Merger, the Merger Agreement and any of the transactions contemplated thereby or related thereto, as shall be necessary or advisable under the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder, and the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC

CONFIDENTIAL

DT_WP_000389102

promulgated thereunder (the "Exchange Act"), including, without limitation, any proxy statement/prospectus.

RESOLVED, that the proper officers of the Company be, and each of them without the others hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to take any actions such proper officers may deem necessary or advisable to cause the shares of common stock of the Company to be delisted from The York Stock Exchange and to deregister the shares of common stock of the Company under the Exchange Act and any state securities or "blue sky" commissions in connection with the consummation of the Merger.

RESOLVED, that the proper officers of the Company be, and each of them without the others hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to negotiate, execute and deliver agreements with such banks, brokers, depositories, information agents, proxy solicitors, public relations agencies and such other business entities and service providers as any proper officers may deem necessary or advisable in order to effectuate any of the transactions contemplated by the Merger Agreement, including the Merger.

## REGULATORY APPROVAL

RESOLVED, that the proper officers of the Company be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to make all necessary regulatory filings and documents related thereto, and to perform all such other actions that such officers deem necessary or advisable to comply with the applicable laws of any jurisdiction and with any consent, notice, approval or other authorization or requirement in connection with the consummation of the Merger and the transactions contemplated thereby.

## SECTION 16(b) APPROVAL

RESOLVED, that the disposition by Henry S. Bienen, James E. Cayne, Jeffrey M. Farber, Carl D. Glickman, Michael Goldstein, Alan C. Greenberg, Donald J. Harrington, Jeffrey Mayer, Samuel L. Molinaro Jr., Frank T. Nickell, Paul A. Novelly, Frederic V. Salerno, Alan D. Schwartz, Michael S. Solender, Vincent Tese and Wesley S. Williams Jr. (the "Section 16 Officers and Directors") of shares of common stock of the Company, options to purchase shares of common stock of the Company, restricted stock units and CAP units set forth opposite their name on Schedule B attached

13

DT_WP_000389103

hereto in connection with the Merger is hereby approved in all respects.

RESOLVED, that the foregoing resolution is intended to serve as approval ("Section 16(b) Approval") for purposes of exempting the disposition by the Section 16 Officers and Directors of such shares of common stock of the Company, options to purchase shares of common stock of the Company, restricted stock units and CAP units in connection with the Merger and the Merger Agreement from the provisions of Section 16(b) of the Exchange Act, pursuant to the exemption provided in Rule 16b-3 of the Rules and Regulations under the Exchange Act.

GENERAL

RESOLVED, that the authority granted to the appropriate officers of the Company pursuant to the foregoing resolutions shall be deemed to include, in the case of each such resolution, the authority to perform such further acts and deeds as may be necessary, convenient or appropriate, in the judgment of such officers, to carry out the transactions contemplated thereby and the purposes and intents of the foregoing resolutions, and all acts and deeds previously performed by the officers or counsel for the Company prior to the date of these resolutions that are within the authority conferred hereby are confirmed, approved and ratified in all respects as the authorized acts and deeds of the Company; and it is further

RESOLVED, that all actions previously taken by any officer, director, representative or agent of the Company in the name or on behalf of the Company in connection with the matters contemplated by the foregoing resolutions, to the extent they are consistent with the authority conferred by such resolutions, be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects as the act and deed of the Company.

The members of the Board all concluded that the Board's approval was only because there were no alternatives to the agreement with Chase other than bankruptcy.

The meeting ended at approximately 6:15 p.m.

14

CONFIDENTIAL

DT_WP_000389104

<u>Schedule A</u>

Arctos Partners
Bear Energy LP
[Bear Stearns Asset Management Inc.]
Bear Stearns Capital Markets Inc.
Bear Stearns Commercial Mortgage Inc.
Bear Stearns Corporate Lending Inc.
Bear Stearns Credit Products Inc.
Bear Stearns Energy LP
Bear Stearns Forex Inc.
Bear Stearns Investment Products Inc.
Bear Stearns Mortgage Capital Corp.
Bear Stearns Residential Mortgage Corporation
BE Alabama LLC
BE Alleghany LLC
BE CA LLC
BE Ironwood LLC
BE KJ LLC
BE Louisiana LLC
BE Red Oak LLC
EMC Mortgage Corporation
[ES Merchant Banking]
Max Recovery Inc.
Plymouth Park Tax Services LLC

15

CONFIDENTIAL

DT_WP_000389105

## Schedule B

| Name | Common Stock | CAP Units | Restricted Stock Units | Stock Options |
|---|---|---|---|---|
| Henry S. Bienen | 2,043 | -- | 2,372 | 2,622 |
| James E. Cayne | 5,658,591 | 465,342 | -- | 796,953 |
| Jeffrey M. Farber | 3,911 | 27,332 | -- | 22,469 |
| Carl D. Glickman | 291,542 | -- | 2,875 | 16,119 |
| Michael Goldstein | -- | -- | 506 | 1,200 |
| Alan C. Greenberg | 15,000 | 258,305 | -- | 148,991 |
| Donald J. Harrington | 56 | -- | 2,565 | 9,119 |
| Jeffrey Mayer | 10,008 | 302,494 | -- | 255,446 |
| Samuel L. Molinaro Jr. | 82,683 | 256,261 | -- | 344,755 |
| Frank T. Nickell | 34,217 | -- | 2,875 | 20,986 |
| Paul A. Novelly | 125,000 | -- | 3,568 | 10,194 |
| Frederic V. Salerno | 1,157 | -- | 2,875 | 20,986 |
| Alan D. Schwartz | 1,026,680 | 439,380 | -- | 727,376 |
| Michael S. Solender | -- | 35,490 | -- | 17,520 |
| Vincent Tese | 1,102 | -- | 2,875 | 16,119 |
| Wesley S. Williams Jr. | 3,500 | -- | 1,689 | 4,665 |

16

CONFIDENTIAL