UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE BEAR STEARNS COMPANIES, INC. SECURITIES, DERIVATIVE, AND ERISA LITIGATION<br><br>This Document Relates To:<br>Securities Action, No. 08 Civ. 2793 (RWS) | Master File No.:<br>08 MDL 1963 (RWS)<br><br>ECF Case |
| BRUCE S. SHERMAN,<br><br>            Plaintiff,<br><br>     v.<br><br>BEAR STEARNS COMPANIES INC., JAMES CAYNE, WARREN SPECTOR AND DELOITTE & TOUCHE LLP,<br><br>            Defendants. | Index No.:<br>09 Civ. 8161 (RWS)<br><br>**FILED UNDER<br>SEAL** |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Brad S. Karp
John F. Baughman
Jessica S. Carey
Jonathan H. Hurwitz
1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns
Companies Inc.*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
David S. Frankel
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100
*Attorneys for Defendant James E. Cayne*

WACHTELL, LIPTON, ROSEN & KATZ
David B. Anders
51 West 52nd Street
New York, New York  10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.     The Undisputed Facts Show that Defendants Made No Material Misstatements or
       Actionable Omissions .............................................................................................. 2

       A.     Plaintiff Cannot Show Any Material Misstatement or Actionable Omission
              About Bear Stearns's Mortgage Exposure or Repo Financing ............................. 2

       B.     Plaintiff Cannot Show any Material Misstatement or Omission Regarding
              Bear Stearns's Mortgage Valuations or Leverage .................................................. 4

       C.     Plaintiff Has Not Shown any Material Misstatement or Omission About
              Bear Stearns's Risk Management ............................................................................ 6

       D.     Plaintiff Has Not Shown and Cannot Show any Material Misstatement or
              Actionable Omission Regarding Bear Stearns's Liquidity or Capital .................... 9

II.    Plaintiff Cannot Prove the Alleged Fraud Caused His Losses ........................................ 10

III.   Plaintiff's Other Arguments Also Fail .......................................................................... 12

CONCLUSION ................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Bear Stearns Cos., Inc. Sec. Deriv. & ERISA Litig.*,
    995 F. Supp. 2d 291 (S.D.N.Y. 2014) ................................................................. 12

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014) ................................................................................. 3

*In re Dreier LLP*,
    527 B.R. 126 (S.D.N.Y. 2014) ........................................................................... 14

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .............................................................. 2-3

*Nelson v. County of Allegheny*,
    60 F.3d 1010 (3d Cir. 1995) .............................................................................. 13

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ................................................................................... 3

**STATUTES**

15 U.S.C. § 78j ........................................................................................... 12, 13

15 U.S.C. § 78r ............................................................................................... 12

15 U.S.C. § 78t ............................................................................................... 12

**OTHER AUTHORITIES**

U.S. Const., Article III......................................................................................... 13

Doc#: US1:10366596v1

### PRELIMINARY STATEMENT

Plaintiff's opposition to our summary judgment motion makes clear that his case rests almost entirely on the inadmissible evidence in the OIG Audit Report and the inadmissible testimony of his purported expert, Dr. Finnerty.[1]  Again and again in his opposition, plaintiff relies on the OIG Audit Report and Dr. Finnerty's testimony in responding to virtually every point addressed in our motion—among others, plaintiff's claims that Bear Stearns overvalued its assets, that it failed to disclose alleged risk management deficiencies, and that plaintiff's losses were proximately caused by these alleged misrepresentations or nondisclosures.  As shown in the accompanying motions to exclude, however, neither the OIG Audit Report nor Dr. Finnerty's testimony is admissible evidence on these points.  If the Court agrees, as we respectfully submit it should, there is little or nothing left of plaintiff's case, and this motion can readily be resolved in defendants' favor.

Even if the OIG Audit Report and Dr. Finnerty's testimony were admissible, defendants would still be entitled to summary judgment because, despite years of litigation, plaintiff is unable to produce admissible evidence sufficient for any reasonable jury to find that defendants committed fraud.  We anticipated and addressed many of plaintiff's arguments in our opening papers.  Plaintiff does not dispute many of the points established in our moving papers. And, as we showed there and below, plaintiff is unable to establish either that defendants made any material misstatements or actionable omissions, or that his losses were caused by any misconduct of defendants.  And plaintiff's remaining arguments are without merit.

---

[1]   We use capitalized terms in this brief in accordance with the definitions in our moving brief ("Mem."; 09 Civ. 8161, Dkt. No. 98).  "Opp." refers to the plaintiff's opposing brief (Dkt. No. 114), "Def. 56.1" refers to our Rule 56.1 statement (Dkt. No. 100), and "Pl. 56.1" refers to the plaintiff's Rule 56.1 statement (Dkt. No. 118). Exhibits ("Ex.") 1-83 are attached to the Declaration of Jessica S. Carey accompanying our moving papers, dated August 17, 2015 (Dkt. No. 103), and Exs. 84-92 are attached to the accompanying Declaration of Jessica S. Carey, dated November 20, 2015.

ARGUMENT

I.     **The Undisputed Facts Show that Defendants Made No Material Misstatements or Actionable Omissions**

As we showed in our moving papers, there is no evidence sufficient to support plaintiff's claims that defendants made material misstatements or omissions about Bear Stearns's financing or mortgage exposure; the value of its mortgage assets; its leverage; its risk management; or its liquidity or capital.  Plaintiff's opposition does not remedy these deficiencies.

A.     **Plaintiff Cannot Show Any Material Misstatement or Actionable Omission About Bear Stearns's Mortgage Exposure or Repo Financing**

Plaintiff's efforts in his opposition to establish a claim based on alleged misstatements about Bear Stearns's mortgage exposure or reliance on repo financing lack merit.

*Mortgage exposure.*  Plaintiff does not dispute our showing (Mem. at 12) that Bear Stearns disclosed the significance of mortgage origination and securitization to its business, and that it accurately reported the size of its holdings, the risks associated with the concentration in mortgages, and the difficulty in valuing mortgages.  Plaintiff also does not dispute that the Company's statements that it had "unique expertise" in the mortgage market, was conservatively managing its exposure to the subprime market, and was in "no danger" from that market are *statements of opinion that as a matter of law are not actionable.  (Id.* at 14.)

Plaintiff argues that Bear Stearns should have disclosed more detail concerning its subprime holdings.  But plaintiff does not and cannot dispute that the Company's disclosures concerning subprime—which showed that its net subprime position was short—were accurate, and he does not and cannot dispute the showing in our opening brief (at 14-15) that the Company had no duty to disclose more than it did.  Absent such a duty, nondisclosure is not fraudulent. *See In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (even "the nondisclosure of material information... is insufficient to state an actionable

2

misrepresentation absent a duty to disclose") (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *see also Dalberth* v. *Xerox Corp*, 766 F.3d 172, 183 (2d Cir. 2014) (disclosure is not required "merely because a reasonable investor would very much like to know that fact").

   *Repo financing*.  Plaintiff's arguments concerning Bear Stearns's reliance on repo financing are equally deficient.  Plaintiff does not dispute that Bear Stearns accurately disclosed, for each and every quarter during the relevant period, the amount of its outstanding repo financing (Pl. 56.1 ¶ 89; Ex. 84, 2Q07 10-Q at 5; Ex. 85, 3Q07 10-Q at 5; Ex. 11, 2007 10-K at 82; Ex. 86, 1Q08 10-Q at 5), and he cites no authority suggesting that Bear Stearns was obligated to disclose such information more than quarterly.  Nor does plaintiff dispute that Bear Stearns repeatedly cautioned investors that an "inability … to engage in repurchase agreements or securities lending, could have a substantial negative effect on [its] liquidity."  (Pl. 56.1 ¶ 91; Ex 1, 2006 10-K at 21; Ex. 11, 2007 10-K at 18.)   Plaintiff argues (Opp. at 6-7) that these disclosures were misleading because, he contends, internal Company emails show that the Company struggled to maintain repo financing during parts of the summer and fall in 2007.  But, as plaintiff's own expert admits, these were periods of market-wide volatility, and Bear Stearns disclosed that these market conditions posed challenges to its business.  (Ex. 2, Finnerty Rpt ¶¶ 22-29; Ex. 29, Finnerty Tr. at 135:13-136:4; Def. 56.1 ¶ 95-97; Ex. 44, Stulz Rpt ¶ 91.)  And plaintiff cannot contest that, as shown in Bear Stearns's quarterly SEC reports, the intra-quarter liquidity challenges were overcome, and the Company maintained approximately $100 billion in repo financing at each quarter end during the relevant period.  (Ex. 84, 2Q07 10-Q at 5; Ex. 85, 3Q07 10-Q at 5; Ex. 11, 2007 10-K at 82; Ex. 86, 1Q08 10-Q at 5; Mem. at 25.)

3

**B.    Plaintiff Cannot Show any Material Misstatement or Omission Regarding
      *Bear Stearns's Mortgage Valuations or Leverage***

As shown in our moving brief (at 15-20), plaintiff cannot establish that Bear
Stearns's mortgage assets were overvalued or that its reported leverage was inaccurate.   In
response, plaintiff does not dispute that he cannot show that any specific assets or class of assets
were overvalued by any amount, much less a material amount.   And, while he principally relies
on the OIG Audit Report, that report likewise does not conclude that Bear Stearns overvalued its
mortgage assets.   (Mem. at 17-19.)

Plaintiff's efforts to substitute for the lack of supporting evidence are insufficient.

***Valuation models***.   Plaintiff principally contends that the models Bear Stearns
allegedly used to value its mortgage assets were outdated or had not been sufficiently reviewed.
(Opp. at 11-13.)   But, as set forth more fully in our moving brief (at 17-19), these bare assertions
are not enough.   Neither plaintiff nor his expert claims even to have reviewed any of the relevant
models.   And plaintiff has not identified *which* models were purportedly outdated or not
reviewed, what those models were actually used for, or whether the alleged failure to update or
review the models led to any inaccuracies in reported valuations.   Plaintiff's assertion that the
size of Bear Stearns's total mortgage holdings shows that any overvaluation was material (Opp.
at 14) is irrelevant, because he has not established any overvaluation, and in any event is a non
sequitur, because determining materiality in this context requires comparing the total assets to
the amount of the alleged overvaluation.

The evidence also does not support plaintiff's contention that Bear Stearns's
valuation models were unreliable during the relevant period.   He relies heavily on statements in
the OIG Audit Report that some unspecified models were "outdated" at the end of 2005 and that
some models had not been reviewed in 2008, but (even if the OIG Audit Report were admissible)

4

plaintiff's expert conceded that the Company's models were improved over the relevant period, and that he could not identify which models remained to be reviewed at the end of that period. (Ex. 29, Finnerty Tr. at 103:10-104:7.) The only alleged deficiency in the models that plaintiff identifies, in reliance on the OIG Audit Report, is that the models purportedly failed to incorporate expected default rates. (Opp. at 12.) But the OIG Audit Report does not support plaintiff's assertion. The OOA did not review the models, and its report states only that the SEC's internal memoranda "rarely mentioned how the models dealt with default risk" and concluded that "[i]n 2006, [the SEC] missed an opportunity to push Bear Stearns aggressively ...to add incorporate [sic] default rates into mortgage modeling." (Ex. 30, OIG Audit Rpt at 22-23.) And the undisputed evidence shows that Bear Stearns's models *did* take account of default rates. (Ex. 45, Verschleiser Tr. at 166:11-167:4; Ex. 87, Simeone Tr. at 65:21-66:22.)

   ***Mark disputes***.  Plaintiff's reliance on disputes in July 2007 and March 2008 between Bear Stearns and certain counterparties concerning how it marked collateral (Opp. at 13) is unavailing. Plaintiff does not contest our showing (Mem. 18-19) that mark disputes are routine, nor does he offer evidence that it was Bear Stearns's marks, rather than those of its counterparties, that were allegedly erroneous. Plaintiff also does not establish that these disputes affected Bear Stearns's financial reporting. Nor, finally, does plaintiff show how disputes involving a fraction of 1% of Bear Stearns's assets could demonstrate that any allegedly erroneous valuation was material. (*Id.* at 19.)

   ***Merger price***.  Finally, plaintiff contends that the $2 per share price originally agreed to in the JPMorgan merger (later increased to $10) supports his assertion that Bear Stearns's assets were overvalued. (Opp. at 13-14.) As shown in our opening brief, however (at 19-20), the testimony and contemporaneous documents show that the price reflected Bear

Stearns's lack of negotiating leverage and pressure from the government on JPMorgan to lower the price—not that its assets were overvalued. The only evidence plaintiff cites to the contrary is the conclusory assertion by his expert that the merger price "suggests" overvaluation. (Opp. at 13-14.) And the expert conceded that he did not have access to information about JPMorgan's valuation of Bear Stearns's assets (Ex. 29, Finnerty Tr. at 37:23-38:12, 63:11-67:13 (stating that he was "not giving an opinion" on the merger price reflecting valuation because he had "no basis for checking it")), and that the merger price "at least partly reflects Bear Stearns' weak negotiating leverage" (Ex. 2, Finnerty Rpt ¶ 257).

*Leverage.* Because plaintiff's argument that the Company's reported leverage was understated admittedly relies on a finding that its assets were overvalued (Opp. at 13)—which, as discussed above, plaintiff cannot establish—plaintiff also cannot prove the Company made any misstatements concerning its leverage. In any event, plaintiff's position rests on a non-sequitur. Plaintiff contends that "Bear's reported leverage ratios were calculated using inflated asset values and therefore were lower than reality." (Id.) But this is backwards. If, as plaintiff contends, the Company's reported asset values were inflated, the result would be that its reported leverage (in simplified form, the ratio of assets to equity) would be overstated, not understated, making the Company appear to be a riskier investment than it actually was.

## C.   Plaintiff Has Not Shown any Material Misstatement or Omission About Bear Stearns's Risk Management

Plaintiff does not dispute our showing (Mem. at 20-21) that alleged deficiencies in a company's risk management do not establish a claim for fraud absent a misrepresentation or actionable omission, or create the affirmative disclosure obligation necessary to establish an actionable omission. Nor does plaintiff dispute our showing (Mem. at 23-24) that expressions of opinion, such as that Bear Stearns's risk management was "very good" or "excellent" are not

actionable as a matter of law. Plaintiff instead purports to identify specific statements by defendants about risk management that he contends were false and misleading. (Opp. at 15-20.) But the evidence plaintiff proffers is not sufficient for a reasonable jury to conclude that any of the specific alleged misstatements was false or misleading when made.

*VaR models and testing.* Once again relying primarily on the OIG Audit Report, plaintiff challenges the accuracy of statements by Bear Stearns about its risk management—including that it "regularly evaluate[d] and enhance[d] [its] VaR models," "performed an entity-wide VaR analysis," employed "stress testing" to "better ensure that trading strategies are followed within acceptable risk parameters," and expected to "continue to develop and refine its formal stress testing methodologies." (Opp. at 15-17.) But the relevant portion of the OIG Audit Report relies entirely on an SEC letter from 2005, and plaintiff has not shown that the observations in the letter were still accurate in 2007 and 2008 when the challenged statements were made. Indeed, the evidence is to the contrary: for example, in its response to the OIG Audit Report, T&M confirmed that Bear Stearns "made significant progress in improving its VaR infrastructure subsequent to approval [as a CSE in 2005]"; that "[i]nputs to VaR models were regularly updated following application approval"; that VaR "was implemented firm-wide"; and that Bear Stearns "did incorporate into its risk scenarios those risks discussed [with T&M], such as a housing-led recession scenario." (Ex. 30, OIG Audit Rpt at 94-96; *see also* Def. 56.1 ¶¶ 64-67, 70-71.) While the OOA contested T&M's views about the recommendations in the OOA's report, it did not dispute the factual accuracy of the quoted statements.

*Counterparty credit risk.* Plaintiff also contends that Bear Stearns misrepresented that it used various methods to assess the credit risk of its counterparties. (Opp. at 17-18.) Based on a 2005 letter from the SEC, he asserts that counterparties representing more than $2.5

7

billion in exposure "were overdue for review." (*Id.* (quoting Ex. 2, Finnerty Rpt Ex. 4 at 20).) But plaintiff offers no evidence of the state of Bear Stearns's counterparty review process during 2007 and 2008. The $2.5 billion in 2005 exposure—less than 1% of its total assets—is immaterial as a matter of law, and plaintiff does not contend that Bear Stearns's collapse was due to counterparty defaults. (*See supra* at 5.)

        *Independence of risk management.* Plaintiff also challenges Bear Stearns's statements that risk management was "independent of all trading areas and reports to the chief risk officer" and that the "cornerstone" of risk management was "constant communication between the trading department management and senior management concerning inventory positions and market risk profile." (Opp. at 18-19.) Plaintiff once again relies almost entirely on the SEC's letter from 2005 and the OIG Audit Report, but the comments in these documents do not support plaintiff's claim that Bear Stearns's disclosures about its risk management were false. For example, plaintiff cites the OOA's speculation that allowing risk managers to sit on the same desk with traders "could" potentially infringe on the independence of particular risk managers, but the Report acknowledges that even this one procedure carries advantages (such as improved communication) as well as disadvantages, and it does not materially call into question the independence of the Company's risk management function, much less that risk managers reported to a Chief Risk Officer. (Ex. 30, OIG Audit Rpt at 22.)

        *Independence of BSAM hedge funds.* Plaintiff also challenges as false a statement by Bear Stearns's CFO in June 2007 that the hedge funds operated by its asset management subsidiary were operated independently from its broker-dealer business, and an alleged statement to Sherman by a Bear Stearns director that Bear Stearns did not have "substantial exposure" to the assets of the hedge funds. (Opp. at 19-20.) But plaintiff cites no

8

evidence that Bear Stearns's trading desks had any exposure to the hedge fund assets during the relevant period. Plaintiff cites a form that a Bear Stearns employee submitted to an industry group in March 2006 stating that the repo desk marked the funds' investments to market and that Bear Stearns's risk management department monitored their investments. (Ex. 2, Finnerty Rpt Ex. 3 at BEAR 01568654.) But the relevant witnesses testified consistently that the Company imposed a moratorium on trading between the two entities beginning in late 2006, and that a Chinese Wall was in place requiring the assets of the hedge funds and the broker dealer's trading desks to operate independently. (Ex. 88, Tannin Tr. at 89:10-90:02; Ex. 48, Cioffi Tr. at 44:21-45:15; Ex. 89, Cioffi Tr. at 93:21-94:2; Ex. 90, Friedman Tr. at 177:5-17.)

*Culture of Risk Management.* Finally, plaintiff challenges statements that "comprehensive risk management procedures [had] been established to identify, monitor and control each of the Company's major risks" and that Bear Stearns had a "[c]ulture of risk management." (Opp. at 20.) But such statements, like the statements that the Company's risk management was "strong" or "very good," are statements of opinion that are not actionable as a matter of law. (Mem. at 23-24.)

### D. Plaintiff Has Not Shown and Cannot Show any Material Misstatement or Actionable Omission Regarding Bear Stearns's Liquidity or Capital

Plaintiff does not and cannot dispute our showing that Bear Stearns accurately disclosed the amounts of its liquidity and capital, or that statements of opinion that its liquidity and capital were "strong" or "adequate" are not actionable. (Mem. at 24-25.) Plaintiff tries to recast these statements as statements of fact, but the cases cited in our opening brief make clear that these are precisely the types of statements of opinion that are too indefinite to be actionable under the securities laws. (*Id.*) In any event, plaintiff has proffered no analysis showing that the Company's capital and liquidity were inadequate at the relevant times. (*See id.* at 26.) The

9

undisputed evidence also shows that the Company's liquidity, which plaintiff does not dispute was accurately disclosed, remained steady throughout the relevant time period until at least March 12, 2008, and that both its capital and liquidity were well in excess of regulatory standards. (*Id.* at 25.) The documents on which plaintiff relies show only that the Company was attempting to shore up its capital and liquidity to prepare for potential problems in a difficult and unpredictable market. That, in hindsight, Bear Stearns lacked sufficient liquidity to withstand a run on the bank, which even regulators have described as unforeseen (Def. 56.1 ¶ 114), does not establish that its liquidity and capital were inadequate when the challenged statements were made. (Mem. at 26.)

## II.    Plaintiff Cannot Prove the Alleged Fraud Caused His Losses

Plaintiff does not dispute that he has the burden to proffer admissible expert evidence on loss causation and damages, or that, if the testimony of his purported expert is held to be inadmissible—as it should be—defendants are entitled to summary judgment. (Mem. at 27-29.)  But even if it is not, plaintiff cannot establish loss causation by showing either a corrective disclosure or the materialization of an undisclosed risk.

*No corrective disclosures.*  As shown in our moving brief (at 29-31), plaintiff cannot establish that the Company's statements on March 14 and 16, 2008 or the responses to these statements by analysts and rating agencies the following day were corrective disclosures. None of these statements revealed any "then-undisclosed fact with regard to the specific misrepresentations alleged." (*Id.* at 30.)  While plaintiff argues that a statement need not admit wrongdoing to qualify as a corrective disclosure, he does not dispute that a corrective disclosure must address the specific facts allegedly concealed by the misrepresentation.  (*Id.* at 29-31.) Here, neither disclosure mentioned risk management, asset valuation, or capital, and thus they

cannot constitute a corrective disclosure on those issues. (*Id.* at 31) The undisputed evidence also shows that the disclosure concerning the Company's liquidity position was not corrective of any earlier misrepresentation, but rather reflected changed circumstances. (*Id.*) As described above the Company's liquidity, which was accurately disclosed, remained steady until at least March 12, 2008 when the Company experienced a sudden and unanticipated bank run. (*See supra* at 9-10; Mem. at 25.)

> *No materialization of concealed risk.* Nor has plaintiff shown that the bank run was a foreseeable materialization of a previously concealed risk. As shown above, plaintiff has not shown that the Company's risk management was deficient, its assets were overvalued, or that it had inadequate capital or liquidity. In any event, plaintiff has not proffered sufficient evidence for a reasonable juror to conclude that these issues caused the run on the bank that led to the liquidity crisis and near collapse. Instead, as the very analyst statements quoted by plaintiff confirm, the bank run was the materialization of *disclosed* risks, combined with a sharp deterioration in market conditions and unfounded rumors. (*See* Mem. at 32.) Plaintiff cites an Oppenheimer analyst report that he describes as "tying [Bear Stearns's] dire situation to the fact that it was leveraged 30-to-1" (Opp. at 30), but there is no dispute that Bear Stearns disclosed that degree of leverage. (Pl. 56.1 ¶ 94.) Bear Stearns also disclosed the facts about its liquidity, repo borrowing, and prime brokerage business that Buckingham Research, in a report plaintiff cites, described as contributing to its "uniquely challenging situation" when faced with the loss of confidence from the market. (Ex. 52, Ferrell Rpt ¶ 32 n.54, n.55.)

> *Leakage.* Finally, plaintiff cannot establish that any alleged misstatements or actionable omissions caused his losses between December 20, 2007 and March 13, 2008, the purported "Leakage Period." For the reasons set forth in our motion to exclude Dr. Finnerty's

11

Report and testimony, including his failure adequately to control for non-fraud related intervening factors, plaintiff cannot show that leakage of fraud caused his losses. Plaintiff's recitation of negative news events, several of which Dr. Finnerty explicitly acknowledged were unrelated to the alleged fraud (*see* Ex. 2, Finnerty Report Att. 30; Ex. 91, Finnerty Tr. at 291:20-294:7), as purported evidence of leakage is both at odds with the "private disclosure" rationale proffered by Finnerty at his deposition (Ex. 29, Finnerty Tr. at 120:2-121:21; 218:23-220:11), and does not establish that leakage of the alleged fraud caused plaintiff's losses.

### III.   Plaintiff's Other Arguments Also Fail

Plaintiff's remaining arguments also do not defeat summary judgment.

*Section 18*.  Plaintiff concedes that his claim under Section 18 of the Exchange Act is time-barred.  Accordingly, this claim should be dismissed.  (Opp. at 6 n.4.)

*Section 20(a)*.  Plaintiff concedes that, to establish a claim under Section 20(a) of the Exchange Act, he must establish a primary violation of Section 10(b).  (Opp. at 36.)  As shown above and in our moving brief, plaintiff has not established a primary violation.

*Holder claims*.  As this Court held in *In re Bear Stearns Cos., Inc. Sec. Deriv. & ERISA Litig.*, 995 F. Supp. 2d 291, 314-15 (S.D.N.Y. 2014) ("*SRM*"), New York law does not recognize holder claims.  Plaintiff urges the Court to defer ruling until the Second Circuit resolves the appeal in that case.  (Opp. at 36.)  But there is no reason to defer ruling here.  The Court should follow its ruling in *SRM* and grant summary judgment on plaintiff's holder claims.

*Purchases by charitable foundation*.  Plaintiff lacks standing to sue for losses incurred by the Foundation.  (*See* Mem. at 36-38.)  The Foundation cannot now recover because it did not seek to opt out of the class action settlement.  Plaintiff's argument that the Foundation's shares were included in *his* opt-out notice is foreclosed by this Court's Order, which is clear that the "person," not the shares, must have sought exclusion.  (*See* 08 Civ. 2793,

Dkt. No. 249 ¶¶ 1, 10, incorporating by reference 08 M.D.L. 1963, Dkt. No. 279, Ex. 1, ¶ 1(dd) (excluding from the class "any *Person* who timely and validly seeks exclusion from the Settlement Class") (emphases added).) Moreover, plaintiff has no standing under Article III to bring claims on behalf of a separately incorporated entity. Plaintiff appeals to a "prudential exception" to Article III standing based on the "close relationship" and "barrier to the injured party's ability to assert its own interests" (Opp. at 38), but cites no case suggesting that a director of a separately incorporated entity has the kind of "close relationship" to sue on behalf of that entity. Such a rule would undo fundamental principles of corporate law and derivative actions. Nor does he cite a single case showing that an entity is "barred" from pursuing its interests merely because it is a charity, particularly one, such as the Foundation, with more than $20 million in assets. (*See* Ex. 92, 2014 Foundation Tax Return at 2.) Indeed, to this day, the Foundation continues to operate and file tax returns, confirming that it can act on its own behalf. (*Id.* at 1, 13.) Finally, the Court should deny plaintiff's request, more than six years after the complaint was filed and after the statute of repose has run, to substitute a new plaintiff. The very case that plaintiff cites, *Nelson* v. *County of Allegheny*, 60 F.3d 1010, 1015 (3d Cir. 1995), rejected leave to substitute a new party after a limitations period had run where that party "had ample time" to sue, and failed to demonstrate that its "failure was due to mistake."

   ***Legg Mason escrow.*** Finally, defendants are also entitled to summary judgment on claims related to the shares purchased in the Legg Mason escrow account, because plaintiff cannot carry his burden to establish that any losses on those shares caused injury to *him*. (Mem. at 38-40.) Plaintiff misconstrues the analysis. It is not "the type of account" (Opp. at 39) that prevents plaintiff from proving a Section 10(b) claim. Rather, plaintiff's claims are barred because he cannot show that he, rather than Legg Mason, suffered any losses on those shares. As

13

a matter of black letter law, plaintiff did not hold legal title to shares in the escrow account at the relevant times. *See In re Dreier LLP*, 527 B.R. 126, 133 (S.D.N.Y. 2014) ("legal title to property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement"). Thus, at the time of the purchases, Legg Mason held legal title to the shares. Because Legg Mason (which has not sued or opted out) clawed back $68.4 million from that account prior to any distribution from the account to plaintiff (Mem. at 39), plaintiff cannot prove that any losses on the shares caused injury to him.

## CONCLUSION

For the foregoing reasons and those in defendants' moving brief, the Court should grant defendants' motion for summary judgment against all of plaintiff's claims.

14

Dated: November 20, 2015
      New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Brad S. Karp (bkarp@paulweiss.com)
John F. Baughman (jbaughman@paulweiss.com)
Jessica S. Carey (jcarey@paulweiss.com)
Jonathan H. Hurwitz (jhurwitz@paulweiss.com)

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns Companies Inc.*

David S. Frankel (dfrankel@kramerlevin.com)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
(212 715-9100)
*Attorneys for Defendant James E. Cayne*

David B. Anders (DBAnders@wlrk.com)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*