UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE BEAR STEARNS COMPANIES, INC. SECURITIES, DERIVATIVE, AND ERISA LITIGATION<br><br>This Document Relates To:<br>Securities Action, No. 08 Civ. 2793 (RWS) | Master File No.:<br>08 MDL 1963 (RWS)<br><br>ECF Case |
| BRUCE S. SHERMAN,<br><br>                                    Plaintiff,<br><br>          v.<br><br>BEAR STEARNS COMPANIES INC., JAMES CAYNE, WARREN SPECTOR AND DELOITTE & TOUCHE LLP,<br><br>                                    Defendants. | Index No.:<br>09 Civ. 8161 (RWS)<br><br>**FILED UNDER SEAL** |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF JOHN D. FINNERTY

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Brad S. Karp
John F. Baughman
Jessica S. Carey
Jonathan H. Hurwitz
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
*Attorneys for Defendant The Bear Stearns Companies Inc.*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
David S. Frankel
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
*Attorneys for Defendant James E. Cayne*

WACHTELL, LIPTON, ROSEN & KATZ
David B. Anders
51 West 52nd Street
New York, New York 10019
(212) 403-1000
*Attorneys for Defendant Warren J. Spector*

Doc#: US1:10366452v1

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| PRELIMINARY STATEMENT | 1 |
| ARGUMENT | 2 |
| I. Finnerty's Leakage Model Is Not Accepted or Peer Reviewed | 2 |
| II. Finnerty Has Not Adequately Controlled for Non-Fraud Information | 3 |
|     A. Finnerty's Methodology Is Hopelessly Flawed | 3 |
|     B. Finnerty's Leakage Model Produces Absurd Results | 5 |
| III. Finnerty Has Not Established that Leakage Caused Plaintiff's Losses | 6 |
| IV. Finnerty's Use of the Constant Dollar Method Is Not Reliable in this Case | 8 |
| V. Finnerty's Other Opinions Should Be Excluded | 9 |
| CONCLUSION | 10 |

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Home Assur. Co. v. Merck & Co.*,
 462 F. Supp. 2d 435 (S.D.N.Y. 2006) ...................................................................................9

*Arista Records LLC v. Usenet.com, Inc.*,
 608 F. Supp. 2d 409 (S.D.N.Y. 2009) ...................................................................................9

*Dura Pharmaceuticals, Inc. v. Broudo*,
 544 U.S. 336 (2005) ......................................................................................................1, 5, 9

*Glickenhaus & Co. v. Household Int'l, Inc.*,
 787 F.3d 408 (7th Cir. 2015) ..............................................................................................4, 7

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................................................9

*In re Williams Sec. Litig.*,
 496 F. Supp. 2d 1195 (N.D. Okla. 2007) ..............................................................................6

*In re Williams Sec. Litig.*,
 558 F.3d 1130 (10th Cir. 2009) .............................................................................................5

Doc#. US1:10366452v1

## PRELIMINARY STATEMENT

Despite plaintiff's attempts to salvage Finnerty's overreaching and ultimately unreliable analysis of loss causation and damages, the fundamental defects identified in defendants' opening brief remain: *First*, Finnerty can point to no case or academic article endorsing his novel leakage methodology, because none exists. Finnerty's leakage methodology has not attained general acceptance, nor has it been peer-reviewed; indeed, the author of the article Finnerty cites for his leakage model has criticized the approach Finnerty espouses here for calculating Bear Stearns's stock price inflation during the Leakage Period.

*Second*, in order to satisfy the requirements of *Dura*, Finnerty's model for measuring the inflation in Bear Stearns's stock price must account for confounding information, such as firm-specific information unrelated to the alleged fraud. Despite numerous attempts to do so, including a new supplemental report submitted in opposition to defendants' motion, Finnerty has failed to demonstrate that fraud, as opposed to other factors, caused Bear Stearns's stock price to decline between December 20, 2007 and March 13, 2008, his so-called "Leakage Period."[1] Instead, Finnerty's leakage model generates absurd results that render it completely unreliable. It is simply not plausible that Finnerty attributes 96% of the total decline in Bear Stearns's stock price during this time—when its peers also suffered severe stock price declines—to leakage of the alleged fraud. Nor has Finnerty otherwise made the requisite connection between plaintiff's losses and any actual leakage of the alleged fraud.

*Third*, plaintiff admits that Finnerty must show that Bear Stearns's stock price would have reacted in the same way earlier in the relevant period as it did following the run on

---

[1] We use capitalized terms in this brief in accordance with the definitions in our moving brief ("Mem."; 09 Civ. 8161, Dkt. No. 102). "Opp." refers to plaintiff's opposing brief (Dkt. No. 115), "Def. OIG Br." refers to our moving brief for our motion to exclude the OIG Audit Report (Dkt. No. 105), "Finnerty Decl." refers to the Declaration of John D. Finnerty (Dkt. No. 117), and "Ferrell Decl." refers to the accompanying Declaration of Allen Ferrell. Exhibits ("Ex.") 1-83 are attached to the Declaration of Jessica S. Carey accompanying our moving papers (Dkt. No. 103) and Exs. 84-92 are attached to the accompanying Declaration of Jessica S. Carey.

the bank and the announcement of the $2 per share merger price in March 2008, and plaintiff cannot dispute that Finnerty has made no such showing.

***Finally***, Finnerty should not be permitted to opine on Bear Stearns's risk management, valuation, liquidity, and capital, because he conducted no independent analysis of these topics, and his mere summarization of the record will not assist the trier of fact.

## ARGUMENT

### I. Finnerty's Leakage Model Is Not Accepted or Peer Reviewed

Plaintiff argues that "leakage analysis" has been endorsed by the courts and accepted by the relevant scientific community, citing a handful of cases and academic articles that generally recognize the possibility of losses where the truth begins to "leak out" to the market. (Opp. at 7-8.) Plaintiff misses the point. Defendants do not argue that leakage, as a potential theory of loss causation, has never been written about or acknowledged by courts, but instead that Finnerty's ***methodology*** for estimating loss causation and damages based on leakage has never been accepted by any court or subjected to any peer review. None of the cases or academic literature cited by plaintiff is to the contrary.[2] (Ferrell Decl. ¶ 17.) Indeed, the only two courts to have evaluated leakage methodologies as proof of loss causation and damages have rejected them, in part because the analyses did not adequately control for confounding factors; namely, the impact of firm-specific information that was unrelated to the alleged fraud. (Mem. at 9, 13.) While Finnerty claims to have controlled for confounding factors, his methodology for doing so is entirely novel. Finnerty's leakage methodology should thus be excluded because it has not been subject to peer review and is not "generally accepted." (Mem. at 9-11.)

---

[2] Finnerty claims to have taken his methodology from a 1990 article co-authored by Professor Bradford Cornell. (Finnerty Decl. ¶¶ 12-13.) But Cornell recently opined, in evaluating a similar leakage model, that he was "aware of no academic support," including his own article, for a model which, like Finnerty's, attributes stock price changes to fraud on days when no fraud-related news was disclosed. Instead, he opined that such a model rests on "pure assertion and speculation." (Ex. 93, Cornell Rpt at 7-9; *see* Ex. 2, Finnerty Rpt ¶¶ 188-91.)

2

## II. Finnerty Has Not Adequately Controlled for Non-Fraud Information

### A. Finnerty's Methodology Is Hopelessly Flawed

Finnerty acknowledges that in order to prove plaintiff's losses were caused by the alleged fraud, his leakage methodology must control not only for market and industry factors that may have affected Bear Stearns's stock price, but also for Company-specific, non-fraud news. (Opp. at 6-7; Ex. 2, Finnerty Rpt ¶ 190.) Defendants have demonstrated that Finnerty's leakage model fails to do this on days where he finds a mix of Bear Stearns news (fraud and non-fraud related) or where the abnormal return in the stock price was not statistically significant. (Mem. at 12-13.) This is particularly significant because Finnerty's "Fraud Days"[3] are exclusively comprised of days without statistically significant abnormal returns and mixed days with statistically significant abnormal returns. (Ex. 2, Finnerty Rpt Att. 30; Finnerty Decl. Att. B.)

In response, Finnerty belatedly attempts to justify his treatment of firm-specific, non-fraud news in a supplemental report (Finnerty Decl. ¶¶ 17-30). But Finnerty's new analysis only underscores the unreliability of his leakage methodology. Finnerty concludes that his classification of days with mixed news, or without statistically significant abnormal returns, as fraud related, rather than non-fraud related, does not materially affect his inflation estimate. (Finnerty Decl. ¶¶ 33-36.) Put another way, even if Finnerty attributed *none* of the abnormal return in Bear Stearns's stock price to fraud on any day, even if the actual return on Bear Stearns's stock price was completely explained by market and industry factors or non-fraud Company-specific news, he *still* would find that inflation dissipated by $27.53 due to leakage. (Ferrell Decl ¶ 11.) That is only $4.61 less than the $32.14 in inflation dissipation Finnerty finds in his "base case" (the methodology reflected in his Report and the most favorable to plaintiff),

---

[3] As shown in defendants' opening brief, Finnerty accounts for the impact of leakage by designating days as fraud or non-fraud. On "Non-Fraud Days," he uses the actual return on Bear Stearns's stock price to calculate inflation, and on "Fraud Days" he subtracts the abnormal return, to account for the alleged fraud. (Mem. at 4.)

where he incorporates the abnormal return on Fraud Days. (Ferrell Decl. ¶ 11 n.13.) The *total* stock price decline over the Leakage Period was $33.60. Thus, even if Bear Stearns's stock behaved during the Leakage Period exactly as expected in the absence of fraud, Finnerty's model would nevertheless attribute 82% of the stock price decline to leakage. Rather than bolstering Finnerty's analysis, this absurd result shows precisely why his leakage model is defective.[4]

Instead of being driven by abnormal returns during the Leakage Period, the significant inflation dissipation that Finnerty finds during that period is a function of the sizable declines in Bear Stearns's stock price *after* that period, on March 14 and March 17, 2008. (Mem. at 16-18.) According to Finnerty, inflation changes every day during the Leakage Period regardless whether there is any fraud related news. (Opp. at 9-10.)[5] Because Bear Stearns's stock price declined significantly on March 14 and March 17, 2008, Finnerty begins his inflation calculations with a but-for price of $10.41 per share—a number so small that the returns, expected or abnormal, have almost no impact on the but-for price during the Leakage Period. (Finnerty Decl. Att. B.) Thus, when Finnerty subtracts the but-for price from the actual price to estimate inflation due to leakage, Finnerty automatically attributes almost the entire change in stock price to inflation by the simple mechanical function of applying the return percentage to a smaller number. (Ferrell Decl. ¶ 12.) Finnerty has no valid basis for assuming that leakage

---

[4] Plaintiff attempts to shift the burden of identifying non-fraud, Company-specific news to defendants, citing *Glickenhaus & Co.* v. *Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015). (Opp. at 7.) However, unlike the expert in *Household*, Finnerty did not testify that no firm-specific, non-fraud information contributed the decline in stock price. Instead, he identified numerous examples of non-fraud related information that could have affected the Company's stock price during the Leakage Period. (*See* Ex. 2, Finnerty Rpt Att. 30.) Having done so, under *Household*, "the burden shifts back to plaintiffs to account for that specific information or provide a loss-causation model that doesn't suffer from the same problem, like the specific-disclosure model." *Household*, 787 F.3d at 422. Plaintiff has failed to meet that burden.

[5] Finnerty's conclusory and speculative assertion that "leakage continues on those days with non-fraud-related news" (Opp. at 13), is not supported by any evidence: Finnerty does not even attempt to link any of the handful of documents he cites as supposed "private" leakage of information among Bear Stearns trading counterparties to any actual stock price movements. It also runs afoul of the loss causation principles that Finnerty claims to be addressing. (Finnerty Decl. ¶ 14.) Namely, if plaintiff were permitted simply to assume any inflation dissipation during a leakage period was attributable to fraud, plaintiff would fail to address confounding factors, such as firm-specific, non-fraud information. (Mem. at 11-14.)

4

would have caused the stock price to change by this amount, particularly as the changes bear no relationship to any abnormal return in the stock price, but rather are governed by the purported dissipation of inflation *after* the end of the Leakage Period. (*See* Opp. at 14 n.7 (admitting that changes in inflation are due to the percentage change applied to different amounts).)

The Tenth Circuit affirmed exclusion of a leakage theory in *In re Williams Sec. Litig.*, 558 F.3d 1130 (10th Cir. 2009) on similar grounds. The plaintiff had argued that the company's "true value" was what it traded at after it declared bankruptcy, attributing the declines in value prior to bankruptcy to leakage of the alleged fraud. *Id.* at 1138-39. The court rejected this leakage theory as unreliable because it failed to link the purported revelation of the truth to a corresponding loss. *Id.* at 1139. The court explained that "[t]his failure to show a causal connection between the fraud and the loss would turn securities laws into just the sort of 'broad insurance against market losses' that *Dura* rejected." *Id.* Like *Williams*, Finnerty's inflation estimates are driven almost entirely by his determination of the "true value" of Bear Stearns *after* the Leakage Period, rather than any abnormal return *during* the Leakage Period. Thus, plaintiff has not established that his losses were due to the market's reaction to any revelation of fraud rather than to the "tangle of factors" affecting Bear Stearns's stock price. *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 343 (2005).

### B. Finnerty's Leakage Model Produces Absurd Results

As defendants' have shown, Finnerty's leakage model fails adequately to control for the tangle of factors that impacted Bear Stearns's stock price during the Leakage Period. Despite the indisputable, severe market turmoil affecting the entire industry during this period (Ex. 2, Finnerty Rpt ¶¶ 22-29)—Finnerty nevertheless attributes 96% of Bear Stearns's stock price decline, $32.14 of a total decline of $33.60, to leakage. (Finnerty Decl. Att. B.) Yet Bear Stearns's stock price movements for all but the last four days of this nearly three-month period

5

were in line with its peer firms, with no statistically significant abnormal return. (*See infra* at 7.)

For example, Professor Ferrell describes seven days on which Finnerty attributes stock price declines to leakage, where Finnerty's own event study would attribute the declines to market and industry factors. (*See* Ferrell Decl. ¶¶ 6-8.) Those days account for $22.16 of the inflation that Finnerty asserts is due to leakage, which is 69% of the total inflation Finnerty finds during the Leakage Period. (*Id.*) For instance, on January 17, 2008, Bear Stearns had a return of -5.83%. Finnerty's event study attributes 94% of this decline to market and industry factors, predicting a return of -5.46%, yet Finnerty attributes 87% of the dollar decline to leakage. (*Id.*)

In sum, Finnerty's implausible results underscore the unreliability of his leakage methodology. *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1254-55 (N.D. Okla. 2007) (rejecting leakage theory where stock price trajectory was "remarkably similar" to peer firms, but plaintiff attributed only a fraction of the decline to non-fraud factors). Unable to correct the myriad deficiencies in Finnerty's leakage analysis, plaintiff attempts to deflect scrutiny of them, arguing that any criticisms of the methodology should be resolved by the trier of fact. (Opp. at 9.) But a review of Finnerty's own calculations and methods reveals that he has failed to address confounding factors, such as Company-specific, non-fraud news, as well as market and industry factors, and therefore he does not reliably estimate any amount of inflation due to leakage.

### III. Finnerty Has Not Established that Leakage Caused Plaintiff's Losses

Finnerty claims that the "truth" about Bear Stearns leaked out to the market between December 20, 2007 and March 13, 2008. Plaintiff alleges this leakage occurred not through any public disclosures by Bear Stearns, but instead through unspecified private information shared among a "restricted audience" of "market participants," as well as through the allegedly fraud-related news Finnerty lists in his report (which he does not claim revealed any fraud to the market (Ex. 91, Finnerty Tr. at 235:19-236:4, 260:14-261:18; Mem. at 13-14)).

6

(Opp. at 10.) But none of the evidence Finnerty cites comes close to showing that market participants were aware of any fraud, much less that they were trading on it. (Mem. at 11.)

The facts here stand in stark contrast to *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015), where the Seventh Circuit recently ordered a new trial given plaintiffs' expert's failure to control for firm-specific, non-fraud news in his leakage model. In *Household*, the leakage period began with the filing of a lawsuit concerning the defendant's predatory lending practices—the center of the alleged fraud—and included contemporaneous news reports, analyst reports, and internal emails attributing the stock price decline to revelation of the alleged fraud. *Id.* at 413, 420. Thus, while the information was revealed over an extended period of time, plaintiff was able to demonstrate that the market was reacting to the revelation of the purported fraud during the leakage period. Plaintiff here fails to make any similar showing.

Further, as discussed above, for the vast majority of the Leakage Period, between December 20, 2007 and March 7, 2008, the movement in Bear Stearns's stock price, after controlling for non-fraud related, Company-specific information (as determined by Finnerty), was in line with that of its peer firms. (Mem. at 15.) Absent a statistically significant abnormal return due to the alleged fraud (or, put differently, that cannot be explained by factors unrelated to the alleged fraud), there is no evidence that leakage caused any of plaintiff's losses prior to March 10, 2008, as opposed to random chance or other factors. (Ferrell Decl. ¶¶ 13.)

Plaintiff agrees that Bear Stearns's aggregate return during this period (which was not statistically significant) was similar to that of its peer firms, but attributes that effect to positive returns between January 22 and January 25, 2008, claiming that if those days are excluded, there is a statistically significant abnormal return. (Opp. at 15-16; Finnerty Decl. ¶ 41.) He is incorrect. Finnerty is only able to achieve these results by failing to control for non-

7

fraud related news on other days during the period. (Finnerty Decl. ¶ 41 n.43.) This is inconsistent with the requirement to control for non-fraud related Company-specific news, as well as with Finnerty's own calculation of the cumulative abnormal return elsewhere in his Report, where he *excluded* January 22 to January 25, 2008 *and* all other days that he determined were non-fraud related from his calculation. (Ferrell Decl. ¶ 16.) Finnerty offers no explanation for his failure to apply his methodology consistently, but, had he done so, he would have found that the cumulative abnormal return prior to March 10, 2008, even under his "base case" scenario, was *not* statistically significant. (Ferrell Decl. ¶¶ 15-16.)[6]

While plaintiff argues that the days in the Leakage Period prior to March 10, 2008 were reasonably included in Finnerty's analysis, a comparison of the fluctuations in Bear Stearns's stock price versus the stock prices of its peer firms prior to March 10 clearly shows that they followed similar trajectories until Bear Stearns experienced a run on the bank the week of March 10. (Ex. 52, Ferrell Rpt ¶ 59, Ex. 7.) There simply is no evidence that any of the stock price declines between December 20, 2007 and March 7, 2008 were due to leakage rather than other factors, and plaintiff should not be allowed to use the results during the week of March 10, 2008 to create the impression of an abnormal return where there was none.

IV. Finnerty's Use of the Constant Dollar Method Is Not Reliable in this Case

Finnerty's inflation calculation is unreliable for the additional reason that he improperly carries back the entire dollar amount of the purported inflation that dissipated from Bear Stearns's stock on March 14 and 17, 2008, without showing that the stock price would have reacted in the same way had the alleged fraud been revealed earlier. (Mem. at 16-18.) While

---

[6] Further, because Finnerty failed to control for Company-specific, non-fraud news in his calculation of the cumulative abnormal return, his claim that Bear Stearns underperformed its peer companies during this period cannot constitute evidence of leakage since any underperformance could have been due to non-fraud related factors. Indeed, both of the periods for which Finnerty claims the stock price movement at Bear Stearns was not in line with its peers include days where Finnerty attributed the abnormal negative return to non-fraud related news. (*See* Finnerty Decl. ¶ 39; Ex. 2, Finnerty Rpt Att. 30.)

plaintiff spends much space extolling the constant dollar method as the *only* method for damages valuation consistent with *Dura* (*e.g.* Opp. at 16-18), he admits that the constant dollar method requires "that the disclosure of the fraud would remove the same dollar amount…from Bear's stock price as was removed from the stock after the revelation of fraud in March 2008" (*Id.* at 18). Here, there is considerable reason to doubt that the dollar amount of the stock price reaction to Bear Stearns's announcements in March 2008, which addressed a run on the bank and the $2 per share merger price, was a reliable indicator of how the market would have reacted to news of the alleged fraud had the announcement been made months earlier. (*See* Mem. at 16-17.)

## V.     Finnerty's Other Opinions Should Be Excluded

Plaintiff does not dispute that Finnerty conducted no independent analysis of Bear Stearns's risk management, valuation, capital, and liquidity to reach his purported opinions that the Company's assets were overvalued, and that its risk management, capital, and liquidity were inadequate. Instead, plaintiff argues that Finnerty properly relied on analyses conducted by others, including Oliver Wyman and the OOA, citing a number of cases for the proposition that an expert can rely on "data collected by others." (Opp. at 23-24.) But unlike those cases, Finnerty did not rely on the *data* collected by others; he relied on their *conclusions*. It is improper for Finnerty to hold himself out as an expert on these topics, when he is simply summarizing the opinions of others. (Mem. at 23-24.) Like the experts in *Arista Records LLC* v. *Usenet.com, Inc.*, 608 F. Supp. 2d 409, 428 (S.D.N.Y. 2009) and *Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007), Finnerty conducted no independent analysis. And while plaintiff attempts to compare Finnerty's report to the report submitted by the expert in *Am. Home Assur. Co.* v. *Merck & Co.*, 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006) (Opp. at 23), unlike that expert, Finnerty did not review the underlying materials that informed the earlier report and reach similar conclusions. Indeed, Finnerty could

9

not possibly have based his opinions on the data underlying the OIG Audit Report, as much of its source materials were non-public and not obtained through discovery. (*See* Def. OIG Br. at 7.)

While plaintiff points to the 2,750 documents listed in Finnerty's Appendix as evidence that he conducted a review of the contemporaneous record, the vast majority of the documents listed are news reports and academic articles pertaining to Finnerty's loss causation analysis. (Ex. 2, Finnerty Rpt, App. B.) While a review of those documents was no doubt time consuming, it has little relevance to Finnerty's purported "investigation" of internal events at Bear Stearns. Finnerty's report lists a scant 71 internal Bear Stearns documents, and Finnerty confirmed at his deposition that this list "include[s] all of the documents that I considered as the basis for my opinions" (Ex. 29, Finnerty Tr. at 53:14-19). The list does not include, for example, reports concerning Bear Stearns's liquidity, capital, or asset valuation. Indeed, Finnerty testified that he requested, but was not given access to the documents necessary to opine on any systemic overvaluation of the Company's assets. (*Id.* at 37:23-38:12; Ex. 91, Finnerty Tr. at 56:7-59:13.) And the handful of internal documents he does cite is far from adequate to support his conclusions that Bear Stearns's risk management was deficient, its capital and liquidity inadequate, or its assets overvalued. (*See* Mem. at 18-23.) Nor does Finnerty make any attempt to explain how these documents support his opinions beyond his own *ipse dixit*. Finnerty's mere summary of the record without any independent analysis is not the proper province of an expert, would not assist the trier of fact, and should be excluded. (*See* Mem. at 23-25.)

## CONCLUSION

For these reasons and those in their moving brief, defendants respectfully request that the Court grant their motion to exclude the report and testimony of John D. Finnerty.[7]

---

[7] To the extent the Court is inclined to deny this motion, defendants respectfully request leave to depose Finnerty concerning his supplemental report.

Dated: November 20, 2015
New York, New York

> Respectfully Submitted,
>
> PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
>
> By: _____
> Brad S. Karp (bkarp@paulweiss.com)
> John F. Baughman (jbaughman@paulweiss.com)
> Jessica S. Carey (jcarey@paulweiss.com)
> Jonathan H. Hurwitz (jhurwitz@paulweiss.com)
>
> 1285 Avenue of the Americas
> New York, New York 10019-6064
> (212) 373-3000
> *Attorneys for Defendant The Bear Stearns Companies Inc.*
>
>
> David S. Frankel (dfrankel@kramerlevin.com)
> KRAMER LEVIN NAFTALIS & FRANKEL LLP
> 1177 Avenue of the Americas
> New York, New York 10036
> (212 715-9100)
> *Attorneys for Defendant James E. Cayne*
>
>
> David B. Anders (DBAnders@wlrk.com)
> WACHTELL, LIPTON, ROSEN & KATZ
> 51 West 52nd Street
> New York, New York 10019
> (212) 403-1000
> *Attorneys for Defendant Warren J. Spector*

11

Doc# US1 10366452v1