# Exhibit 89

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF NEW YORK
 2

 3    IN RE BEAR STEARNS COMPANIES,
      INC. SECURITIES, DERIVATIVE,      Master File No.:
 4    AND ERISA LITIGATION,             08 MDL NO. 1963(RWS)
      This Document Relates to:
 5    Securities Action,
      08 Civ 2793 (RWS)
 6    _____

 7    BRUCE S. SHERMAN,
 8          Plaintiff,
 9    v.                                Index No.:
                                        09 CV 8161(RWS)
10    BEAR STEARNS COMPANIES INC.,
      JAMES CAYNE, WARREN SPECTOR
11    and DELOITTE & TOUCHE LLP,
12      Defendant.
      _____

13                           CONFIDENTIAL
                             DEPOSITION OF
14                         MR. RALPH CIOFFI
15
16       Taken on Behalf of the Plaintiff
17
            DATE TAKEN:    October 15, 2014
18          TIME:          10:00 a.m.
            PLACE:         Robins Kaplan
19                         Miller & Ciresi
                           711 Fifty Avenue South
20                         Naples, Florida
21
22       Examination of the witness taken before:
23            Elizabeth M. Brooks, RPR, FPR
24
25    Job # 85461
```

Page 90

RALPH CIOFFI

Q Have you ever had any discussions with Warren Spector since you left the Bear premises in June?
A I saw Warren at a wedding three years ago, and, prior to that, the only other time I spoke with him was after my acquittal.
Q Did he call you to congratulate you?
A Yes.
Q Okay. And the wedding that you spoke with Warren at, who was getting married?
A My good friend's daughter, who was also a friend, mutual friend of Warren's.
Q No discussions about any business?
A No. Nope.
Q Have you communicated in any other way with Warren Spector, either by e-mail, text or anything else, after being asked to leave the Bear premises on June 20 or 21st?
A I had an individual that wanted to be introduced to Warren, and I introduced him vis-a-- via e-mail.
Q Okay. And how long ago was that?
A That was in, oh, probably 2000 -- after the trial; '09, 2010, probably.

Page 91

RALPH CIOFFI

Q Matthew Tannin was a member of the team you assembled to run the High Grade Enhanced Leverage funds, correct?
A Correct.
Q What was his title?
A He was -- I believe the official title in New York was Chief Operating Officer.
Q Had you worked with him before you set up your funds?
A I had, yes.
Q In what capacity?
A I ran the, uh, one of the CDO businesses within the broker dealer, and he worked both in that group as well as, at one point, subsequent to that, he worked in the CDO research group.
Q You selected him for your team?
A I did.
Q And I think we've covered this, but I just wanted to make sure.
In terms of his compensation, whatever his base salary was, that was paid for by BSAM, correct?
A Well, it came off of the top of -- if we had a dollar of gross revenue --

Page 92

RALPH CIOFFI

Q It was expensed?
A It was expensed.
Q Okay. It did not come out of your 50 percent of whatever the net profit was?
A Right. The fixed expenses did not. That was borne equally by BCM and my business.
Q And to the extent that Tannin received any incentive pay bonus, that did come from your 50 percent of the share?
A Correct.
Q And that was determined by you?
A We had a process. I would submit to BSAM my bonus requests, if you will. They would sign off on them and then they would be paid.
Q So they had to approve what you were paying out of your money?
A Yes. And they did. The reason they wanted that is -- well, I mean, they have the authority to approve it or not approve it.
Q Did you ever have any issues with getting your people paid the way you wanted them paid?
A Uh, minor issues. Nothing significant.
Q And who -- who was it at BSAM that would

Page 93

RALPH CIOFFI

review and approve your proposed incentive compensation for your team?
A Uh, I don't -- it went to the HR group within BSAM, and I don't know what process they went through, if they sat down -- they may have had a compensation committee within BSAM.
Q Your point of contact would be HR?
A Yeah. And I don't recall the person I spoke with.
Q Whether they got Rich Marin involved or not, you have no idea?
A Right. I don't know if -- that's correct. I don't know what happened after I sent those requests off.
Q Okay. What kind of trading volume did your trading of the fund assets, both High Grade and Enhanced Leverage, generate in 2006 and 2007? Would you describe it as high volume?
A Yes.
Q Okay. And that would include trading with Bear Stearns, right?
MR. HURWITZ: Objection to the form.
THE WITNESS: Well, we had a moratorium with

Page 94

```
 1                  RALPH CIOFFI
 2      Bear for part of '06 and part of '07, so --
 3   BY MR. ZELCS:
 4      Q   This would be prior to the moratorium that I'm
 5   asking.
 6      A   Prior to, I guess, September of '06   Bear --
 7   Bear was one of our top dealers, yes.
 8      Q   What is a principal trade letter, as that term
 9   was used while you were with Bear Stearns?
10      A   If we did a transaction with an affiliate that
11   involved a purchase or sale of a security, we had to get
12   that.  We had to get the price at which that trade
13   occurred, signed off on by our fund administrator.
14      Q   When you say a purchase or sale of a security,
15   would one of your repo transactions be considered a
16   security that needed a principal trade letter?
17      A   Initially.  Well, initially, no, but
18   subsequent to the PTL issue, we will call it, we were
19   told that.
20          MR. HURWITZ:  I don't want to have privileged
21      information disclosed here, so I would ask you not
22      to disclose anything you were told by counsel.
23          THE WITNESS:  Initially we did not believe a
24      repo required a PTL.
```

Page 95

```
 1                  RALPH CIOFFI
 2   BY MR. ZELCS:
 3      Q   Again, without getting into what you were told
 4   by lawyers later on, you did consider a repo something
 5   you needed to cover with a PTL as well?
 6      A   Yes.
 7      Q   Who were the outside counsel for your funds?
 8      A   I believe -- I believe Stroock -- I believe it
 9   was Stroock.  I believe they did our documents, our
10   PPMs.
11      Q   That's S-T-R-O-O-C-K?
12      A   O-C-K, Stroock Levine.
13      Q   Who was the outside counsel for BSAM?
14      A   I don't know.
15      Q   Were they one and the same?
16      A   I don't know.  I do not know that.
17      Q   You didn't have any inside counsel working for
18   your funds; right?
19      A   Well, BSAM had a compliance department, but
20   they didn't work for the fund.
21      Q   How did you first become aware of the fact
22   that your funds were not able to generate timely
23   principal trade letters documenting the necessary notice
24   and consent for trades between your funds and Bear
```

Page 96

```
 1                  RALPH CIOFFI
 2   Stearns?
 3      A   We were called by the compliance department,
 4   that there was a backlog of PTL letters.
 5      Q   When you say "a backlog", what do you mean?
 6      A   Well, there were a number of principal
 7   transactions done, or affiliated transactions done with
 8   the broker dealer where letters hadn't been sent or
 9   letters had been sent and hadn't been returned by the
10   fund administrator prior to settlement.
11      Q   Okay.  So in some instances a letter hadn't
12   been prepared?
13      A   Correct
14      Q   And in some instances there was no evidence
15   that the independent contractor ever consented to the
16   affiliated trades you were doing?
17      A   In some instances a letter had been prepared
18   and not sent.
19      Q   Who communicated -- sorry.
20          Who at the compliance department of BSAM
21   contacted you with this issue?
22      A   They didn't contact me directly.  They would
23   have probably contacted Matt as chief operating officer.
24   I don't know who specifically within compliance.
```

Page 97

```
 1                  RALPH CIOFFI
 2      Q   Okay.  But your sense is you learned about
 3   this from Matt and Matt learned about it from BSAM
 4   compliance?
 5      A   Correct.
 6      Q   Did you ever discuss this issue with anyone
 7   other than Matt Tannin?
 8      A   Rich Marin.
 9      Q   How about Geissinger?
10      A   I'm sure we discussed it with Geissinger.
11      Q   How about Spector?
12      A   Personally, I didn't, but I -- I expect he
13   knew.
14          MR. WEINSTEIN:  Let's not -- I don't want you
15      to guess.
16          THE WITNESS:  I didn't speak to Warren about
17      it.
18   BY MR. ZELCS:
19      Q   Your expectation was that it bubbled up to him
20   one way or the other, even though you didn't speak to
21   him?
22      A   That would be my expectation.
23      Q   Based upon your experience working there and
24   with Warren?
```