# Exhibit 91

```
 1              C O N F I D E N T I A L

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------x
     IN RE THE BEAR STEARNS COMPANIES, INC.
 4   SECURITIES, DERIVATIVE, AND ERISA
     LITIGATION
 5
                            Master File No.:
 6                          08 M.D.L. 1963(RWS)

 7   This Document Relates to:

 8   Securities Action, No. 08 Civ. 2793(RWS)
     ------------------------------------x
 9   BRUCE S. SHERMAN,

10              Plaintiff,
                            Index No.:
11        v.                09 Civ. 8161 (RWS)

12   BEAR STEARNS COMPANIES INC., JAMES CAYNE,
     WARREN SPECTOR AND DELOITTE & TOUCHE LLP,
13
                Defendants
14   ------------------------------------x
     VIVINE H. WANG,
15
                Plaintiff,
16                          Index No.:
          v.                11 Civ. 5643(RWS)
17
     THE BEAR STEARNS COMPANIES LLC, J.P.
18   MORGAN SECURITIES LLC, J.P. MORGAN
     CLEARING CORP., DELOITTE & TOUCHE LLP,
19   ALAN D. SCHWARTZ, ALAN C. GREENBERG, JOEY
     ZHOU, and GARRETT BLAND,
20
                Defendants.
21   ------------------------------------x

22
     (CAPTION CONTINUED ON NEXT PAGE)
23

24

25
```

Page 54

1      JOHN D. FINNERTY - CONFIDENTIAL
2   after document.  So anybody reading the
3   report will know exactly what I have
4   relied upon.  It's everything that's
5   heavily footnoted.
6      Q.     So anything that is cited in
7   the report, including quotations in the
8   report, are documents that you relied
9   upon and you're distinguishing -- let me
10  just ask that question.  Those are
11  documents relied upon?
12     A.     Those are documents that I
13  relied upon, heavily relied upon because
14  I've cited them and footnoted them.
15         There are other documents that
16  I relied upon that are in this list that
17  I didn't necessarily footnote, but
18  they're listed here in the, in appendix
19  B, and appendix B also has other
20  documents that I considered that I
21  considered to such an extent that I, I
22  would have either used them as background
23  information or as information that was
24  useful and helpful in forming my
25  opinions

Page 55

1      JOHN D. FINNERTY - CONFIDENTIAL
2         I've tried to err on the side
3   of being more inclusive rather than less,
4   but as I've testified, I didn't include
5   every document I touched
6      Q.     Did you review every document
7   that's listed in documents considered?
8      A.     Yes, I did.
9      Q.     And the documents that you
10  said were identified as significant
11  documents through your search routine,
12  are those all included in appendix B to
13  your report?
14     A.     The ones that inform my
15  opinions or served as background, those
16  would be included.  There are other
17  significant documents that I reviewed,
18  but I decided that either they were
19  duplicative, in fact, a lot of them were
20  duplicative, as with any email string,
21  what will happen is you have 10 emails in
22  the string and sometimes we'd have all 10
23  of them in separate emails.  I'm only
24  going to list the one that has all 10
25         But the ones that, the

Page 56

1      JOHN D. FINNERTY - CONFIDENTIAL
2   documents, particularly the emails, the
3   reports that informed my opinions, those
4   are listed here.  The others I touched
5   that didn't, I didn't find helpful, I
6   cast them aside.
7      Q.     Okay.  And other than the
8   request for JPMorgan's valuations, you
9   said you've made no other requests of
10  plaintiffs for documents; is that
11  correct?
12     A.     I made one other request last
13  week, or requested that counsel make the
14  request.  I don't know if that request
15  has been conveyed to the defendants.  So
16  there was one other request.
17     Q.     What was that request?
18     A.     That was really discussed with
19  counsel.  I think before I answer that
20  question I'd like to talk to counsel
21  whether I should tell you.  I guess
22  that's --
23         MR. HENKEN:  You can go ahead
24     and answer that one.
25         THE WITNESS:  Excuse me?

Page 57

1      JOHN D. FINNERTY - CONFIDENTIAL
2         MR. HENKEN:  You can answer
3     that.
4      A.     Okay.  I asked counsel if we
5   could obtain copies of the Deloitte &
6   Touche workpapers that would contain the,
7   any of the valuations or all the
8   valuations that Deloitte & Touche did in
9   connection with its audits in '06 and
10  '07, and I asked for workpapers relating
11  to the, any going concern analysis that
12  Deloitte & Touche did in connection with
13  either of those audits.
14     Q.     And why did you ask for that
15  information?
16     A.     One of the issues that's
17  important is the, in this matter is the
18  valuations that Bear Stearns did and
19  whether the assets were carried on the
20  books at accurate valuations or whether
21  they were overvalued.  An audit firm, I
22  was a partner of an audit firm at one
23  point, an audit firm of the caliber of
24  Deloitte & Touche will do, in my
25  experience, very thorough checking of the

Page 58

1    JOHN D. FINNERTY - CONFIDENTIAL
2    valuation models, and therefore, the
3    workpapers would be informative as to
4    whether or not there were systematic
5    overvaluations or not.
6            Secondly, audit firms in the
7    course of the audit, particularly if a
8    firm has some stresses, will consider
9    whether there's a need for a going
10   concern opinion, and I would expect that
11   certainly in connection with the 2007
12   audit there would be some workpapers in
13   the Deloitte & Touche files that would
14   show whatever work they did in
15   considering whether or not they would
16   need to insist upon a going concern or
17   provide a going concern opinion in the
18   financials.
19       Q.     So, Dr. Finnerty, you did not
20   have Deloitte's workpapers available to
21   you when you put together the report that
22   you submitted on March 2nd; is that
23   correct?
24       A.     That's correct, I did not.
25       Q.     And did you have any

Page 59

1    JOHN D. FINNERTY - CONFIDENTIAL
2    valuations of Bear Stearns' assets
3    available to you when you prepared your
4    report from March 2nd?
5        A.     I had the valuations that Bear
6    Stearns did, and there were valuations
7    that were summarized in their -- their
8    quarterly and annual reports.  There were
9    many documents internally that talked
10   about valuation issues, mark-to-market
11   disputes.  So there were a number of
12   documents that were informative on that
13   issue, but I didn't have the workpapers.
14       Q.     Dr. Finnerty, did you conduct
15   an independent analysis of the valuations
16   of any of Bear Stearns' assets during the
17   relevant time period?
18           MR. HENKEN:  Object to form.
19       A.     No.  I relied on the documents
20   I reviewed  I didn't do my own.
21       Q.     Did you do any evaluation of
22   Bear Stearns' capital during the relevant
23   time period?
24           MR  HENKEN:  Object to form.
25       A.     I reviewed the record and what

Page 60

1    JOHN D. FINNERTY - CONFIDENTIAL
2    was, what was -- what was written about
3    by others who had done that review.  I
4    didn't do -- I didn't feel it was
5    necessary to do my own independent
6    review, and didn't because I felt I could
7    rely upon the work of others.
8        Q.     And what others are you
9    referring to?
10       A.     The OIG report, for example,
11   which found that Bear Stearns was
12   undercapitalized.
13       Q.     And did you do any independent
14   calculations of Bear Stearns' liquidity
15   during the relevant time period?
16           MR. HENKEN.  Object to form.
17       A.     I did the calculations that
18   are embodied in attachment 28, where I
19   compared Bear Stearns to the other four
20   large publicly traded broker-dealers  So
21   I did that particular comparison.  In the
22   report there are various exhibits that
23   have -- whatever -- the calculations that
24   I did that reflect on the liquidity.  I
25   think attachment 28 is the one that's

Page 61

1    JOHN D. FINNERTY - CONFIDENTIAL
2    most directly relevant.
3        Q.     And other than attachment 28,
4    did you do any other analysis,
5    independent analysis of Bear Stearns'
6    liquidity?
7        A.     Yes.  And I would include the
8    market's assessment of the credit
9    quality, because credit quality is
10   fundamentally tied to liquidity
11           And so I looked and analyzed
12   the changes in Bear Stearns' credit
13   spreads on its bonds, its swap spread,
14   and I analyzed the changes in those
15   spreads in attachment 29.  I looked at
16   the 5 year CDS spread, the 10 year yield
17   spread over the course of the relevant
18   period.
19           So I was looking at the
20   market's, it's really the market's
21   assessment of liquidity and credit and
22   all those factors that affect its
23   financial condition.
24           And so that's the analysis
25   that, the calculations I did.  You I did

Confidential
JOHN D. FINNERTY   - 05/14/2015       Pages 234..237

Page 234

1    JOHN D. FINNERTY - CONFIDENTIAL
2  economically significant?
3      A.    Something that is, is clearly
4  routine like promotion of a vice
5  president, I mean that's not worth even
6  paying attention to.  It's not going to
7  move the price of the stock.
8      Q.    So you've made some
9  determination that even the
10 non-economically significant items are
11 noteworthy in their -- in their ability
12 to potentially move the stock?
13     A.    Yes, sometimes they are.
14     Q.    How did you control for
15 company-specific non-fraud news on days
16 that you designated as fraud days in your
17 -- in your attachment 31?
18         MR. HENKEN:  Object to form.
19     Q.    Let me rephrase that.  How did
20 you control for company-specific
21 non-fraud news on days that you
22 designated as fraud days in attachment
23 30?
24     A.    30 --
25     Q.    Sorry, 31.

Page 235

1    JOHN D. FINNERTY - CONFIDENTIAL
2      A.    30, 31 should be consistent.
3         MR. HENKEN:  Object to form.
4      A.    I'm sorry, could you read that
5  question back.
6      Q.    Let me rephrase it again.
7  When you -- let me find your errata, Dr.
8  Finnerty, hold on one second.
9         What does zero indicate in the
10 non-fraud-related column in attachment
11 31?
12         MR. LOCKWOOD:  31?
13         MS. CAREY.  31.
14     A.    Zero would indicate that we
15 found some fraud-related news.  Whether
16 it's -- let's see.  If we found some
17 fraud-related news we would code it as a
18 zero.
19     Q.    Okay.  And I want to
20 understand how you determined what was
21 fraud news versus non-fraud news on a
22 particular day.  Can you explain that,
23 please?
24     A     If it was related to the
25 allegations in the complaint we treated

Page 236

1    JOHN D. FINNERTY - CONFIDENTIAL
2  it as fraud-related and if it was not
3  related to the allegations in the
4  complaint then it was not coded that way.
5      Q.    Okay.  So did you choose the
6  -- strike that.
7         Did you make the determination
8  yourself as to what was fraud-related and
9  what was non-fraud-related in attachment
10 30?
11     A.    Yes.
12     Q.    And if you look at attachment
13 30, January 10th, 2008.  Do you see that
14 date?
15     A.    I do.
16     Q.    And you have non-fraud-related
17 news listed there, correct?
18     A.    Correct.
19     Q.    And in your attachment 30
20 there is a zero in the non-fraud-related
21 column for January 10th.  Can you explain
22 that, please?
23     A.    I can't explain that one.
24 That may be a mistake.
25     Q.    Would you look at January

Page 237

1    JOHN D. FINNERTY - CONFIDENTIAL
2  16th, 2008 in attachment 30.  And you
3  have non-fraud-related news listed there.
4  And in attachment 31 you have it marked
5  zero.  Do you see that?
6      A.    Yes, I do.
7      Q.    Can you explain that, please?
8      A.    I can't explain that one
9  either.  Let me call back to the office,
10 let me get the people who helped me with
11 this and resolve that because I can't
12 explain these inconsistencies.  Now might
13 be a good time for a break.  Let me call
14 back and ask.  I'll give you an answer.
15     Q.    I have several more
16 inconsistencies to show you so you might
17 want to hold off until we do all of them.
18     A.    Sure, let's do the whole list.
19         MS. CAREY:  We can take a
20     break now.
21         MR. HENKEN:  It actually
22     sounds like --
23         MS. CAREY.  You want to keep
24     going?  It will be awhile.
25         MR. HENKEN:  You want to take

Confidential
JOHN D. FINNERTY   - 05/14/2015     Pages 258..261

Page 258

1  JOHN D. FINNERTY - CONFIDENTIAL
2     Q.     And do you attribute that
3  change in the inflation number to a
4  leakage of fraud?
5     A.     No.  If there were leakage, if
6  truly leakage of the fraud, the amount of
7  inflation would, the amount of inflation
8  would actually -- let's see.  Yes, yes, I
9  would attribute that to the leakage of
10  the fraud because that winds up, the
11  leakage of the fraud winds up decreasing
12  the inflation, so the effect of the
13  leakage is to reduce the amount of
14  inflation in the stock.
15     Q.     Even on days when there is
16  statistically significant non-fraud news
17  you would still attribute the decrease in
18  inflation to leakage of the fraud; is
19  that correct?
20     A.     The only thing that can cause
21  the, the decrease in inflation is the
22  leakage relative to the fraud.  That's
23  independent of whatever, whatever news
24  the company is disclosing unrelated to
25  the fraud.  The leakage of the fraud is,

Page 259

1  JOHN D. FINNERTY - CONFIDENTIAL
2  is related specifically to the items that
3  are, that are disclosed in the, in the
4  complaint, and what the coding of the one
5  and zero, what the coding of the one
6  items is reflecting publicly available
7  news, but as I've testified earlier, the
8  nature of the leakage is that it's
9  information that is being disbursed
10  privately.  In other words, it's not
11  being disclosed through press releases or
12  company SEC filings.  It's information
13  that's being disclosed outside of the
14  public arena.
15     Q.     So your testimony is that the
16  leakage is due -- strike that.
17            Your testimony is that the
18  inflation is due to the leakage of the
19  fraud, but the abnormal return, which is
20  statistically significant, is attributed
21  to non-fraud news?
22            MR. HENKEN:  Object to form.
23     Q.     Is that correct?
24     A.     I don't know, can you give me
25  that back.

Page 260

1  JOHN D. FINNERTY - CONFIDENTIAL
2            (Record read as requested.)
3     A.     The first part of the question
4  I don't understand.  The abnormal return
5  I'm attributing to the, to the
6  economically statistically -- I'll say
7  the statistically significant release of
8  news unrelated to the fraud.
9            The release of information in
10  the market, the leakage is not related to
11  the public news that's disclosed.  That
12  -- that leakage occurs independent of
13  that effect.
14     Q.     Okay.  I want to talk a little
15  bit more again about how you determined
16  what was fraud news versus non-fraud news
17  in attachment 30.  And you had said
18  previously that fraud-related news was
19  determined if it was related to
20  allegations in the complaint; is that
21  correct?
22     A.     Yes.
23     Q.     And what did you mean by
24  related to allegations in the complaint?
25  Can you be more specific?

Page 261

1  JOHN D. FINNERTY - CONFIDENTIAL
2     A.     Just what the words say.
3     Q.     When you -- was there any need
4  in your application -- strike that.
5            In determining whether news
6  was related to the fraud alleged in the
7  complaint, did the news item need to
8  demonstrate that the market was aware of
9  the fraud that was alleged?
10     A.     The nature of leakage is that
11  the, the market as a whole is not aware
12  of it or not necessarily aware of it.
13  The information is leaking into the
14  market because of the trading activity of
15  people who may be involved with Bear
16  Stearns and see these problems or
17  perceive these problems and trade on the
18  basis of that information.
19     Q.     Okay.  So we're going to back
20  up a little bit.  Just to be clear, I
21  want to just make sure I understand your
22  attachment 31.  On days where you
23  determined that all the news was
24  non-fraud-related and the abnormal return
25  was statistically significant, you would

Confidential
JOHN D. FINNERTY    - 05/14/2015      Pages 290..293

Page 290

1      JOHN D. FINNERTY - CONFIDENTIAL
2   I believe there was a downgrade after
3   December 20th.  Maybe I'm misremembering.
4   Thought there was a rating change after
5   December 20th.
6       Q.     I'm referring to paragraph 210
7   in your report.
8       A.     This is clearly before.  That
9   wasn't what I was referring to.  I
10  believe there was another rating action
11  of some sort following the earnings
12  release and the announcement of the loss
13  on December 20th.  And it specifically --
14  my recollection is there were reports and
15  I think one of them was a rating agency
16  report that expressed concern about the,
17  the effect the loss would have on the
18  calculated leverage ratio.
19      Q.     So I'm talking about the
20  downgrade in November 15th, 2007.  That's
21  not evidence of leakage, is that your
22  testimony?
23      A.     I don't know.  As I testified,
24  I'm being conservative I think in
25  starting the leakage period at December

Page 291

1      JOHN D. FINNERTY - CONFIDENTIAL
2   20th.  So I'm not -- I'm not attributing
3   anything to do with that particular
4   rating action, I'm not attributing it to
5   leakage.
6       Q.     And are you attributing any
7   ratings downgrades to -- strike that.
8              Is it possible that ratings
9   downgrades could have been driven by
10  market events?
11             MR. HENKEN:  Object to form.
12      A.     Rating actions are driven by
13  changes in the creditworthiness of a
14  company.  If all of the companies in a
15  particular industry are similarly
16  affected by deterioration in credit
17  conditions then in that sense you could
18  have a market impact or industry impact.
19      Q.     And so it's -- strike that.
20             And there was a, a downgrade
21  by Moody's on December 20th, 2007, do you
22  recall that?
23      A.     That's the one I was referring
24  to earlier.
25      Q.     Okay.  And in that announcement

Page 292

1      JOHN D. FINNERTY - CONFIDENTIAL
2   Moody's said that Bear Stearns' ratings
3   benefits from its ample capital position
4   and strong liquidity profile, are you
5   aware of that?
6       A.     If you tell me that I take
7   your representation.
8       Q.     And I'm representing that it
9   does say that.  Is that consistent with
10  your claim that Moody's demonstrates
11  leakage of information -- sorry, strike
12  that.
13             Is Moody's statement that Bear
14  Stearns had ample capital and a strong
15  liquidity profile consistent with your
16  view that the Moody's report demonstrates
17  leakage of fraud?
18      A.     No.  What it would suggest is
19  that they weren't fully aware of the --
20  of the seriousness of the situation at
21  Bear Stearns even though they downgraded
22  them.  They wouldn't have made the
23  comment about ample liquidity if they
24  believed that.
25      Q.     Can you explain why you have

Page 293

1      JOHN D. FINNERTY - CONFIDENTIAL
2   the Moody's report listed as non-fraud
3   news in attachment 30?
4       A.     You asked me about that
5   before.  The rating decision that was
6   described in the report, we read the
7   report, tied the rating downgrade to
8   anticipated rates of delinquency,
9   foreclosure and real estate owned in the
10  underlying collateral.  And so based on
11  the justification that they provided, it
12  doesn't appear to be directly related to
13  the fraud.  I mean the rationale they
14  give is tied specifically to
15  characteristics of the underlying
16  collateral.
17      Q.     So if that's the case and the
18  news doesn't appear to be directly
19  related to the fraud, how is it that that
20  report is nevertheless in your opinion
21  evidence of leakage?
22      A.     When I gave you that earlier
23  answer I wasn't looking at this
24  disclosure, what's actually in the
25  report.  I mean generally the

Confidential
JOHN D. FINNERTY    - 05/14/2015    Pages 294..297

Page 294

1    JOHN D. FINNERTY - CONFIDENTIAL
2    deterioration in the credit quality would
3    be certainly consistent with evidence of
4    leakage.  Apparently this particular
5    rating action which was based on
6    something unrelated to the fraud would
7    not be evidence of leakage.
8             Is it time for another break?
9             MS. CAREY:  Sure, if you'd
10    like one that's fine.
11            THE WITNESS:  Can we talk
12    about logistics.  I know I messed
13    everybody up by --
14            MR. HENKEN:  Hold on.
15            THE VIDEOGRAPHER:  We're going
16    off the record, the time is 4:44
17    p.m., this is the end of file
18    number 6.
19            (A recess was taken.)
20            THE VIDEOGRAPHER:  Here marks
21    the beginning of file number 7, we
22    are back on the record, the time is
23    5 o'clock p.m.
24    Q.    Dr. Finnerty, generally
25    speaking, if the abnormal stock price

Page 295

1    JOHN D. FINNERTY - CONFIDENTIAL
2    changes over a period of time are not
3    statistically significant, could that
4    period of time nevertheless be considered
5    a leakage period?
6    A.    Abnormal, abnormal returns?
7    I'm not sure what -- I can't follow your
8    question.
9    Q.    If the abnormal returns over a
10    period are not statistically significant,
11    could that period of time nevertheless be
12    considered a leakage period?
13    A.    Whether it's a leakage period
14    depends upon whether any information is
15    disclosed.  Yes, it could be a leakage
16    period.  There's a separate issue as to
17    whether or not the impact on the stock
18    price was significant.  But it certainly
19    can be a leakage period.
20    Q.    Wouldn't the lack of any
21    statistical significance signal that the
22    stock price movement could be due to
23    random chance?
24    A.    One has to look at the overall
25    cumulative effect and judge that

Page 296

1    JOHN D. FINNERTY - CONFIDENTIAL
2    cumulative effect over the time period in
3    order to make a determination as to
4    whether there's a statistically
5    significant impact.  But there certainly
6    can be leakage.  Leakage may not be -- it
7    may turn out the leakage isn't
8    significant, but the leakage nevertheless
9    occurs.
10            I mean there are two
11    different, two different issues.  One is
12    the economic issue of whether there's
13    leakage.  The second is the statistical
14    issue of whether it rises to the level of
15    statistical significance.
16    Q.    So if the -- if you looked at
17    the overall cumulative effect on Bear
18    Stearns' stock during the leakage period
19    and it was not statistically significant
20    at the 5 percent or 1 percent level, or
21    10 percent level let's say, could that
22    nevertheless be considered a leakage
23    period?
24    A.    Yes.  Leakage occurs as a
25    result of the disclosure of information.

Page 297

1    JOHN D. FINNERTY - CONFIDENTIAL
2    Whether -- whether that effect is
3    statistically significant is an entirely
4    separate statistical issue, and how to
5    treat it within the damage calculations
6    is an issue for the trier of fact.
7    Q.    And you determined that there
8    was a negative 25.71 percent decline in
9    Bear Stearns' share price over the entire
10    leakage period; is that correct?
11    A.    That's correct.
12    Q.    Can you describe the
13    calculations you did to reach that
14    estimate?
15    A.    Take attachment 31 and on all
16    those days where there is a one in the
17    column labeled non-fraud-related, meaning
18    non-fraud-related information, we took
19    those returns, we calculated the
20    geometric average of those returns.  We
21    then calculated the standard deviation of
22    the returns to test for statistical
23    significance and concluded that the 25.71
24    percent cumulative return was
25    statistically significant at the 1