UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

IN RE THE BEAR STEARNS COMPANIES, INC.
SECURITIES, DERIVATIVE, AND ERISA
LITIGATION

This Document Relates To:
    Securities Action, No. 08 Civ. 2793 (RWS)

: Master File No.:
: 08 M.D.L. No. 1963 (RWS)

: ECF Case

---------------------------------------------------------------- x

: **FILED UNDER**
  **SEAL**

BRUCE S. SHERMAN,

          Plaintiff,

   v.

BEAR STEARNS COMPANIES INC., JAMES
CAYNE, WARREN SPECTOR and DELOITTE &
TOUCHE LLP,

      Defendants.

: Index No.:
: 09 Civ. 8161 (RWS)

---------------------------------------------------------------- x


## DECLARATION OF PROFESSOR ALLEN FERRELL

## NOVEMBER 20, 2015

## I.      QUALIFICATIONS AND SUMMARY OF CONCLUSIONS

1.      I submitted a rebuttal report in this matter on April 16, 2015 (the "Ferrell Report").[1] The Ferrell Report responded to the expert report of John Finnerty, Ph.D (the "Finnerty Report") and explained, among other things, that Professor Finnerty's analysis of loss causation and inflation during the "Purported Leakage Period" (i.e. the period during which he purports to find that alleged inflation "leaked" out of Bear's stock price) is fundamentally flawed.

2.      On October 13, 2015, Professor Finnerty submitted a declaration (the "Finnerty Declaration") in which he purports to "have adjusted the calculation [in the Finnerty Report] slightly" and to have implemented a "handful of corrections" he made to his report during his deposition.[2] The Finnerty Declaration also contains new arguments and analyses and cites academic studies he claims support his analysis of the Purported Leakage Period.

3.      I was asked by counsel for the Defendants to assess the Finnerty Declaration. I find that despite his changes, Professor Finnerty's analysis of loss causation and inflation during the Purported Leakage Period continues to be unreliable because he fails to exclude the effects of non-fraud related factors.

## II.     PROFESSOR FINNERTY'S ANALYSIS OF LOSS CAUSATION AND INFLATION FAILS TO EXCLUDE THE EFFECTS OF NON-FRAUD FACTORS

4.      Professor Finnerty acknowledges that a firm's stock price could be affected by "general stock market price movements and industry-related factors" as well as "company-specific information that is not related to the alleged fraud."[3] However, as I explain below, the

---

1.      The Ferrell Report provides information on my qualifications. I include my current CV as Appendix A. Capitalized terms have the same meaning as in the Ferrell Report unless otherwise stated.

2.      Finnerty Declaration ¶ 35 & Note 38.

3.      Finnerty Report ¶¶ 58 & 190.

results Professor Finnerty presents in his Declaration further demonstrate that his methodology fails to exclude these non-fraud factors. As a result, his methodology fails to reliably measure the effect of the alleged fraud.

**A.**   **Professor Finnerty Fails to Exclude the Effects of Market and Industry Factors as Measured by His Own Event Study**

5.    Professor Finnerty estimates the effect of "general stock market price movements and industry-related factors that are unrelated to the [alleged fraud]" ("market and industry factors") on Bear's stock price each day during the Purported Leakage Period using an event study.[4] This is important to his methodology because the effects of market and industry factors are, by construction, not related to the alleged fraud. Only the portion of the stock return unexplained by market and industry factors – referred to as the "residual return" or "abnormal return" (or "cumulative" residual/abnormal return for a series of days) – can potentially be attributed to Bear-specific information.

6.    Exhibit A shows four days where Professor Finnerty's event study finds that almost all of the decline in Bear's stock price was due to market and industry factors, i.e. the abnormal return is minimal, yet his model attributes the majority of the decline in Bear's stock price to "leakage" of the fraud. For example, on January 17, 2008 Professor Finnerty's event study finds 94% of the decline in Bear's stock price was due to market and industry factors but he nevertheless attributes 87% of the decline in Bear's stock price on this date to "leakage" of the fraud. In other words, the price impact he attributes to "leakage" of fraud is inconsistent with his own event study's findings as to the impact of market and industry factors.[5]

---

4.    Finnerty Report ¶ 58.

5.    I note that on January 17, 2008 Professor Finnerty did not find any positive company specific non-fraud related news. Finnerty Report ¶ 234 and Attachment 30 & Finnerty Declaration Attachment A. In Attachment 30 to

7.     Exhibit B shows three additional days during the Purported Leakage Period which further illustrate the failure of Professor Finnerty's model to exclude the effect of market and industry factors.  On all three days, Professor Finnerty's event study finds that Bear's stock price would have been expected to decline _more_ based on market and industry movements than it actually declined.  In other words, the abnormal return on these days is actually positive.  Nevertheless, he attributes more than 80% of the stock price decline on each of these days to "leakage" of the fraud.[6]

8.     The seven days in Exhibits A and B have a significant effect on Professor Finnerty's estimate of damages during the Purported Leakage Period.  Together, they account for $22.16 (69%) of the alleged inflation that Professor Finnerty purports to find "leaked" out of Bear's stock price.[7, 8]

---

the Finnerty Report and Attachment A to the Finnerty Declaration, Professor Finnerty likewise reports no positive company specific non-fraud related news on February 28, 2008 and February 29, 2008.  On January 15, 2008 Professor Finnerty reports that Bear's share price forecast was cut by Lehman and classifies this as non-fraud news.  Finnerty Report Attachment 30.

6.   I note that neither Attachment 30 to the Finnerty Report nor Attachment A to the Finnerty Declaration report any company specific non-fraud related news on any of the days in Exhibit B.

7.   Finnerty Declaration Attachment B (showing inflation of $78.73 on the day before the Purported Leakage Period and $46.59 on the last day of the Purported Leakage Period).  $78.73 - $46.59 = $32.14.  $22.16/ $32.14 = 69%.

8.   The fact that Professor Finnerty's model attributes price declines to "leakage" that are caused by market and industry factors is evident in his original report, as I explained in the Ferrell Report.  Ferrell Report ¶¶ 55-57.  There, among other things, I showed that Professor Finnerty's analysis of the Purported Leakage Period found that the amount of alleged inflation that "leaked" out of Bear's stock price was over 50% larger than the sum of the actual price changes Professor Finnerty attributed to "leakage."  Ferrell Report ¶ 55 and Exhibit 6.  I identified the actual price changes Professor Finnerty attributed to the "leakage" as the residual price changes (i.e. the price change associated with the abnormal return) as measured by Professor Finnerty's own event study on days that were not designated as non-fraud news days (I excluded days Professor Finnerty designated as non-fraud related news days because Professor Finnerty stated that the abnormal return on these days was "caused by non-fraud related news."  Finnerty Report Attachment 31 Note 2.).  Professor Finnerty's estimate of the amount of inflation that "leaked" out of Bear's stock price should not logically exceed the sum of the residual price changes because the remainder of the decline in Bear's stock price, according to his own event study, was due to market and industry factors.  Ferrell Report ¶ 55 and Exhibit 6.

Professor Finnerty's new estimate of inflation also exceeds the sum of the residual price changes found by his event study.  According to his Declaration, the amount of inflation that "leaked" out of Bear's stock price ($32.14) is more than 86% higher than the sum of the residual price changes during the Purported Leakage

3

**B.** **Professor Finnerty Does Not Control for the Effects of Bear-Specific Non-Fraud Related Information During the Purported Leakage Period**

9.      Professor Finnerty states that "it is very important to exclude company-specific information that is not related to the alleged fraud from the damage calculation."[9] I agree. The portion of the stock return explained by Bear-specific non-fraud related information cannot, by definition, be caused by the alleged fraud.

10.      Professor Finnerty claims to have excluded the effects of Bear-specific non-fraud information by an adjustment to his estimate of Bear's stock's true value (the value Bear's stock would have had but for the alleged fraud) on days he designates as "non-fraud related news days."[10] In his Declaration, Professor Finnerty claims that "even if [he] were to reclassify certain days during the Leakage Period as non-fraud-related news days to address Defendants' criticisms, the damages amounts would not be substantially different from my original damage calculation."[11]

11.      It is true that "reclassify[ing] certain days during the Leakage Period as non-fraud-related news days" has a small effect on Professor Finnerty's damages. However, the reason for this is that the adjustment Professor Finnerty makes on "non-fraud-related news days" has a minimal effect on his overall results. For instance, I replicated Professor Finnerty's model and

---

Period. Finnerty Declaration Attachment B (showing inflation of $78.73 on the day before the Purported Leakage Period and $46.59 on the last day of the Purported Leakage Period. $78.73 - $46.59 = $32.14). In my analysis here I do not remove days Professor Finnerty designated as non-fraud-related news days because Professor Finnerty testified that "you could still have "leakage" occurring on [days he designates as non-fraud-related news days]." Finnerty Deposition 262:9-263:11. The sum of the residual price declines on all days during the Purported Leakage Period is $17.25. *See* Exhibit C. $32.14/$17.25 = 186.3%. If I remove the days Professor Finnerty now designates as non-fraud related news days, I find the sum of residual price declines is $22.88. *Id.* $32.14 is 40% larger than $22.88. I note that neither $17.25 nor $22.88 is a reliable estimate of the inflation that "leaked" out of Bear's stock price for the reasons I provided in the Ferrell Report and that I provide below, including that Professor Finnerty fails to exclude the effects of non-fraud related company specific news.

9.      Finnerty Report ¶ 190.

10.      Finnerty Report ¶¶ 190-191 & Note 310

11.      Finnerty Declaration ¶ 36.

found that if I do not classify any day during the Purported Leakage Period as a non-fraud related news day, the model's estimate of the inflation that "leaked" out of Bear's stock price changes by a mere 2%.[12]  Conversely, if I classify every day in the Purported Leakage Period as a non-fraud related news day, the model's estimate of the inflation that "leaked" out of Bear's stock price changes by just 14%, i.e. $27.53 still somehow "leaks" out of Bear's stock price as a result of the fraud according to the model.[13]  In other words, even if Bear's actual return were completely explained by non-fraud factors on every day of the Purported Leakage Period, Professor Finnerty's model would mechanically find that "leakage" caused Bear's stock price to fall by $27.53.[14]

### C.   Professor Finnerty's Model Produces the Results Described Because It Is Fundamentally Flawed

12.    The failure of Professor Finnerty's model to take account of the impact of market and industry effects (described in Section A above) and the impact of non-fraud related information (described in Section B above) is the result of a fundamental flaw in the "backwardation method" he uses to estimate the impact of "leakage" of the fraud.[15]  His "backwardation method" estimates Bear's "true value" on each day of the Purported Leakage Period by taking his estimate of the true value of Bear's stock at the close of the last day of the Purported Leakage Period and then back-casting this price to previous days based on either Bear's actual return (for non-fraud related news days) or the return due to market and industry factors (on

---

12.    If no days are treated as non-fraud related news days, Professor Finnerty's damages model calculates inflation as $78.02 on December 19, 2007. *See* Exhibit D.  $78.02 – $46.59 = $31.43 and  $31.43/$32.14 = 98%.

13.    If all days are treated as non-fraud related news days, Professor Finnerty's damages model calculates inflation was $74.12 on December 19, 2007. *See* Exhibit D.  $74.12 – $46.59  = $27.53 and  $27.53/$32.14 = 86%.

14.    On non-fraud related news days, Professor Finnerty's model assumes the percentage change in Bear's true value would be the same as the actual return on Bear's stock. *See infra* ¶ 12 & Note 16.  Because Bear's true value cannot, by definition, be affected by the alleged fraud, this is equivalent to assuming Bear's stock would have had the same return, but for the alleged fraud, as it actually did and, therefore, that Bear's return was entirely caused by non-fraud related factors on non-fraud related news days.

15.    Finnerty Report ¶¶ 190-191.

all other days).[16]  Because Professor Finnerty purports to find that the true value of Bear's stock

was such a small fraction of Bear's stock price at the end of the Purported Leakage Period ($10.41

when the stock price was $57),[17] the change in the model's estimated "true value" is minimal on

each day of the Purported Leakage Period (a return on a low stock value will generate a small

change in the dollar value relative to that same return on a high stock value).  In turn, this has the

mechanical result in his model of attributing almost all of the actual declines in Bear's stock price

to the alleged fraud, despite the actual effects on Bear's stock price of market and industry factors

and company specific non-fraud related news.[18]  As a result of this fundamental flaw, Professor

Finnerty's backwardation method would find that the alleged fraud caused Bear's stock price to

decline during the Purported Leakage Period regardless of whether there was any "leakage."[19]

### D.    Bear's Cumulative Abnormal Return Over the Purported Leakage Period, Prior to March 10, is Not Statistically Significant

13.    In the Ferrell Report, I noted that Bear's cumulative abnormal return over

the Purported Leakage Period (prior to March 10, 2008) was not statistically significant as

measured by Professor Finnerty's event study.[20]  Because Professor Finnerty's event study did not

find that the cumulative abnormal return was statistically significant, it did not rule out the

---

16.  Finnerty Report ¶¶ 190-191 & Attachment 31. Specifically, Professor Finnerty's "backwardation method" divides his estimate of the true value of Bear's stock by one plus the "adjusted expected return" to estimate the true value of Bear's stock on the prior trading day. Finnerty Declaration Attachment B. On "non-fraud related news days" his estimate of the "adjusted expected return" is Bear's actual return; on all other days it is the return that his event study attributes to market and industry factors. Finnerty Report ¶¶ 58, 190-191 & Attachment 31 & Finnerty Declaration Attachment B.

17.  Finnerty Declaration Attachment B. This is true for all of Professor Finnerty's "scenarios."

18.  Exhibit C shows Professor Finnerty's model attributes 78% or more of the price decline to "leakage" on all but one of the 33 days that Bear's stock price fell during the Purported Leakage Period.

19.  This is most starkly illustrated by the three days shown in Exhibit B where Professor Finnerty attributes substantial price declines to "leakage" even though his own event study found the portion of Bear's return not caused by market and industry factors (i.e. the abnormal return) was positive.

20.  Ferrell Report ¶ 60 and Exhibit 8. In calculating Bear's cumulative abnormal return in my report, I excluded days Professor Finnerty designated as non-fraud related news days because Professor Finnerty wrote that the abnormal return on these days was "caused by non-fraud related news." Finnerty Report Attachment 31 Note 2.

possibility that the cumulative abnormal return was caused by chance and, consequently, it did not establish that the alleged fraud caused Bear's Stock Price to decline over the Purported Leakage Period (prior to the week of March 10, 2008).  In his Declaration, Professor Finnerty responds that "[i]f the substantially positive abnormal return for [January 22, 2008 through January 25, 2008] was excluded from the Leakage Period, Bear Stearns's cumulative abnormal return during the Leakage Period excluding the week of March 10, 2008 would be -14.56% and statistically significant at the 5% level."[21]  This claim is misleading.

14.      My calculation of the cumulative abnormal return already excluded January 22, 2008 through January 25, 2008, along with all of the days designated by Professor Finnerty as non-fraud related news days.  I excluded these dates to be consistent with Professor Finnerty's methodology for estimating the cumulative abnormal return in his initial report.  Specifically, in his initial report Professor Finnerty defined the cumulative abnormal return for the Purported Leakage Period as "the portion of the decline in Bear Stearns' share price over the entire Leakage Period that is attributable to the leakage of information concerning the alleged fraud after controlling for market-wide and industry-wide factors and Company-specific information that is unrelated to the alleged fraud ..."[22]  (emphasis added).  Professor Finnerty estimated "the cumulative abnormal return (CAR) for the entire Leakage Period" in Attachment 34 to his report.[23] To replicate this estimate I needed to exclude days Professor Finnerty designated as non-fraud related news days, including January 22, 2008 through January 25, 2008, from the calculation. Professor Finnerty recalculates the cumulative abnormal return during the Purported Leakage

---

21.    Finnerty Declaration ¶ 41.

22.    Finnerty Report ¶ 236.

23.    Finnerty Report ¶ 236 & Attachment 34.

Period in Attachment C to his Declaration. I replicated his result and found that he again excluded all days he designated as non-fraud related news days. Excluding non-fraud news days is consistent with Professor Finnerty's admonition, with which I agree, that "it is very important to exclude company-specific information that is not related to the alleged fraud from the damage calculation."[24]

15.     However, when I replicated Professor Finnerty's calculation that "Bear Stearns's cumulative abnormal return during the Leakage Period excluding the week of March 10, 2008 would be -14.56% and statistically significant at the 5% level"[25] I found that I needed to include every "non-fraud related news day" (except January 22, 2008 through January 25, 2008) and make no adjustment for non-fraud related news. My finding is consistent with Professor Finnerty's admission in Note 43 of his Declaration that he did not "control[] for Bear Stearns-specific non-fraud related information" in this analysis.[26]

16.     Thus, Professor Finnerty was only able to find that "the cumulative abnormal return during the Leakage Period excluding the week of March 10, 2008 [and January 22, 2008 through January 25, 2008]" was statistically significant by applying a methodology that is inconsistent with his Report and the rest of his Declaration and which he admits does not control for non-fraud related information.[27] Because he fails to establish that the cumulative abnormal return in Bear's stock price from December 20, 2007 through March 7, 2008, even excluding January 22, 2008 through January 25, 2008, was not caused by non-fraud factors, he likewise fails to establish that it was caused by "leakage" of the alleged fraud.

---

24.   Finnerty Report ¶ 190.

25.   Finnerty Declaration ¶ 41.

26.   Finnerty Declaration Note 43.

27.   Finnerty Declaration ¶ 41.

### E.    The Academic Studies Cited in the Finnerty Declaration Do Not Support His Claim that He Has Controlled for Non-Fraud Related News

17.    Professor Finnerty cites academic studies that, he claims, find evidence of "leakage" in other contexts.[28]  However, none of these papers use the methodology he uses to control for company specific non-fraud related information.  In particular, Professor Finnerty repeatedly cites a paper by Bradford Cornell and R. Gregory Morgan.[29]  However, Professor Finnerty admits the approach described in this paper "does not adjust for company-specific announcements that are unrelated to the alleged fraud, which may cause that approach to overstate the amount of inflation due to the fraud."[30]

18.    In fact, one of the papers he cites states that an event study that looks for the effect of an event over a period longer than three trading days "can easily generate spurious results" because "it becomes difficult, if not impossible, to isolate the effect of the event [being analyzed, here the alleged fraud] from the effect of other events that affect a firm's stock price."[31,][32]  Professor Finnerty's analysis of loss causation and inflation during the Purported Leakage Period examines the effects of "leakage" over a period of 57 trading days.[33]

---

28.    Finnerty Declaration ¶¶ 8-9.

29.    Finnerty Report ¶ 188, 189 & 191 & Finnerty Declaration ¶ 11, 12 & 13.

30.    Finnerty Declaration Note 21.

31.    Finnerty Declaration ¶ 11, note 16.

32.    McWilliams, Abagail, Donald Siegel, and Siew Hong Teoh, "Issues in the Use of the Event Study Methodology: A Critical Analysis of Corporate Social Responsibility Studies," *Organizational Research Methods* 2, October 1999 ("McWilliams et al. 1999") at 354 ("The second difficulty with extending the window beyond a day or two is that it becomes difficult, if not impossible, to isolate the effect of the event from the effect of other events that affect a firm's stock price. For large firms, there are likely to be several confounding events almost every trading day. Therefore, the longer the window, the more likely it becomes that other events will affect the stock price and cloud the results of an event study. … When the event window is long, which in this context means more than 3 trading days, the method can easily generate spurious results.").
    This paper goes on to explain that it may be valid to look for the effect of an event over a long period of time if one examines a large number of firms because the effect of any information not related to the event in question will cancel out across the different firms being examined, but Professor Finnerty's study only analyzes one firm; therefore, the effect of information not related to the alleged fraud will not be canceled. *Id.* at 354 ("A

_____

Allen Ferrell

November 20, 2015

_____

study by Brown and Warner (1985) has been used to justify the use of longer windows. However, Brown and Warner demonstrate that their justification is appropriate only if confounding events are truly random, which is plausible if and only if the sample size is quite large.").

33.  Professor Finnerty's approach in this case is even inconsistent with the approach he outlines in his own article, which he cites for support in his Declaration. Finnerty Declaration Note 21. In that article, he explained that his "adjustment" to take into account non-fraud related news "is done by substituting in the backwardation calculation the actual stock return on the dates of important (non-fraud related) company news, rather than using the return implied by market and industry movement." Finnerty, John D. and George M. Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," *Stanford Journal of Law, Business & Finance,* Spring 2003, pp. 213-263 at 221 (emphasis added). This is not the approach Professor Finnerty employs here to estimate damages. Here he uses the actual stock return if the only observed public news on that day is non-fraud-related and the abnormal return is statistically significant. Finnerty Declaration Attachment B (showing "The Base Case Scenario" only classifies a day as a non-fraud related news day if the only news is non-fraud related and the abnormal return is statistically significant) & Attachment D (stating Professor Finnerty used "The Base Case Scenario" to estimate damages). Therefore, the approach outlined in Professor Finnerty's article would use the actual stock return on days when there was "important" non-fraud related information, even if there was other fraud related news and/or the abnormal return on that day was not statistically significant, but the approach he employs here would not.

10

# Appendix A

1

## Allen Ferrell
Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

### CURRENT POSITIONS

*Greenfield Professor of Securities Law*, Harvard Law School

*Member of Editorial Board,* Journal of Financial Perspectives

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

### EDUCATION

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

### PREVIOUS POSITIONS

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

## COURSES TAUGHT

*Securities Regulation*
*Securities Litigation*
*Regulation of Market Structure*
*Law and Finance*
*Law and Corporate Finance*
*Contracts*

## REFEREE FOR FOLLOWING JOURNALS

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

## CONSULTING AREAS

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

## Papers

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, *revise and resubmit Journal of Financial Economics* (winner of Moskowitz Prize for outstanding quantitative research in socially responsible investing)

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, in PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (Brookings Institution Press 2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," in GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (editor Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" in REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, in BROOKINGS – NOMURA PAPERS IN FINANCIAL SERVICES, Brookings Institution Press, 2007

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, in EXCHANGES: CHALLENGES AND IMPLICATIONS, Euromoney (2007)

"Shareholder Rights" in REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," in REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (Oxford University Press) (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

"Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

## TESTIMONY LAST FOUR YEARS

*David E. Kaplan, et al. v. S.A.C. Capital Advisors, L.P., et al.,* Case No. 12 Civ. 9350 and *Birmingham Retirement and Relief System, et al., v. S.A.C. Capital Advisors, L.P., et al.,* Case No. 13 Civ. 2459, Supplemental Declaration, November 18, 2015.

*David E. Kaplan, et al. v. S.A.C. Capital Advisors, L.P., et al.,* Case No. 12 Civ. 9350 and *Birmingham Retirement and Relief System, et al., v. S.A.C. Capital Advisors, L.P., et al.,* Case No. 13 Civ. 2459, Declaration, August 27, 2015.

*In re Puda Coal Securities Inc. et al. Litigation*, Case No. 1:11-CV-2598, Expert report and deposition on July 29, 2015

*City of Lakeland Employees Pension Plan v. Baxter International, Inc., et al.*, Case No. 1:10-cv-06016, Expert report and deposition on June 3, 2015

*Bruce Sherman v. Bear Stearns Companies Inc. et al,* Case No. 08 MDL No. 1963, Expert report and deposition on May 28, 2015

*Fosbre v. Las Vegas Sands Corp.*, Case No. 2:10-cv-00765-APG-GWF, Expert report and deposition on March 25, 2015

*City of Lakeland Employees Pension Plan v. Baxter International, Inc., et al.*, Case No. 1:10-cv-06016, Expert report and deposition on October 17, 2014

*Louisiana Municipal Police Employees Retirement System v. Simon Property Group, Inc.*, Case No. 7764-CS, Expert report and deposition on July 7, 2014

*In re Lehman Brothers Securities and ERISA Litigation*, Case No. 09 MD 2017, Expert report and deposition on April 24, 2014

*SEC v. Moshayedi*, Case No. 12-CV-01179-JVS-JPR, Expert report and deposition on July 30, 2013

*In re Bank of America Corporation Securities, Derivative and ERISA Litigation*, Case No. 09 MDL 2058, Expert report and deposition on July 26, 2013

*Schneider v. Primerica Inc.*, FINRA Case No. 11-04751, Arbitration hearing on March 24-25, 2013

*CMMF, LLC v. J.P. Morgan Investment Management, Inc & Ted Ufferfilge*, Case No. 09-601924, Trial Testimony in Supreme Court in the State of New York, January 28-29, 2013 and deposition on September 20, 2012

*In re Bank of America Corporation Securities, Derivative, & ERISA Litigation,* Case No. 09-MDL-2058, Expert reports and deposition on May 22, 2012

*Securities and Exchange Commission v. Tambone & Hussey*, Case No. 06-CV-10885-NMG, Expert reports and deposition on January 13, 2012

*Hayes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, FINRA Case No. 11-00432, Arbitration hearing on January 10, 2012

## Appendix B
## Materials Relied Upon

**Expert Reports, Declarations, and Testimony**

Expert Report of John D. Finnerty, Ph.D., March 2, 2015

Rebuttal Report of Professor Allen Ferrell to the Expert Report of John Finnerty, Ph.D., April 16, 2015

Deposition of John D. Finnerty, May 14, 2015

Declaration of John D. Finnerty, Ph.D. in Support of Opposition to Defendant's Motion to Exclude Dr. Finnerty's Report and Testimony, October 13, 2015

**Academic Literature**

Agapova Anna and Jeff Madura, 2011, "Information Leakage Prior to Company Issued Guidance," Financial Management, Fall, 623-646

Seth Anju, 1990, "Value Creation in Acquisitions: A Re-Examination of Performance Issues," Strategic Management Journal, 11, 99-115

Brav, A., W. Jiang, F. Partnoy, and R. Thomas, "Hedge Fund Activism, Corporate Governance, and Firm Performance," Journal of Finance 63, August 2008, pp. 1729-1775

Brigida Matthew and Jeff Madura, 2012, "Information Leakage Prior to 13D Filings," Journal of Financial and Economic Practice, 12(2), 23-38

Cornell, Bradford and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," UCLA Law Review 37, June 1990, pp. 883-924

Finnerty, John D. and George M. Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," Stanford Journal of Law, Business & Finance, Spring 2003, pp. 213-263

Keown Arthur J. and John M. Pinkerton, 1981, "Merger Announcements and Insider Trading Activity: An Empirical Investigation," The Journal of Finance, XXXVI(4), 855-869

McWilliams, Abagail, Donald Siegel, and Siew Hong Teoh, "Issues in the Use of the Event Study Methodology: A Critical Analysis of Corporate Social Responsibility Studies," *Organizational Research Methods* 2, October 1999

Mikkelson, Wayne H. and Ruback, Richard S., "An Empirical Analysis of the Interim Equity Investment Process," Journal of Financial Economics 14, December 1985, pp. 523-553

Pound John and Richard Zeckhauser, 1990, "Clearly Heard on the Street: The Effect of Takeover Rumors on Stock Prices," Journal of Business, 63(3), 291-308

Turk Thomas A., 1992, "Takeover Resistance, Information Leakage, and Target Firm Value," Journal of Management, 18(3), 503-522